DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE K. SNODGRASS, State Bar #148137
JEREMY M. GOLDMAN, State Bar #218888
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:      (415) 554-6762
Facsimile:      (415) 554-4699
E-Mail:         jeremy.goldman@sfcityatty.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOORDASH, INC. and GRUBHUB INC.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant. | Case No. 3:21-cv-05502 EMC<br><br>**DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S NOTICE AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:   November 4, 2021<br>Time:           1:30 p.m.<br>Place:          Courtroom 5 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

NOTICE AND MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

ISSUES TO BE DECIDED .................................................................................... 1

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

          A.     The Ordinance........................................................................... 2

          B.     Plaintiffs' Business Practices .................................................. 3

LEGAL STANDARD FOR MOTION TO DISMISS ............................................ 4

ARGUMENT .......................................................................................................... 4

I.     THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE CONTRACT CLAUSE OF THE FEDERAL AND STATE CONSTITUTIONS .. 4

          A.     There Is No Substantial Impairment of a Contractual Relationship ........... 5

          B.     The Ordinance Is an Appropriate and Reasonable Way to Advance a Significant and Legitimate Public Purpose .................................................. 7

II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR AN UNCONSTITUTIONAL TAKING UNDER THE FIFTH AMENDMENT OR FOR INVERSE CONDEMNATION UNDER THE CALIFORNIA CONSTITUTION ............................................................................................ 9

          A.     Plaintiffs' Contracts Do Not Give Rise to a Claim Under the Taking Clause ......................................................................................................... 9

          B.     Even If Plaintiffs' Contracts Are Property for the Purposes of the Taking Clause, the Complaint Fails to Establish a Regulatory Taking ................. 10

III.     THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF ARTICLE XI, SECTION 7 OF THE CALIFORNIA CONSTITUTION ............. 12

IV.     THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF DUE PROCESS ................................................................................................... 13

V.     THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF EQUAL PROTECTION ................................................................................... 15

VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FIRST
AMENDMENT RETALIATION ............................................................................. 18

A.   The Complaint Does Not Satisfy Any Element as to Grubhub ................ 18

B.   The Complaint Does Not Plausibly Allege Facts to Establish the Second
and Third Elements as to DoorDash .......................................................... 19

VII.  THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE
DORMANT COMMERCE CLAUSE ................................................................... 22

VIII. LEAVE TO AMEND SHOULD BE DENIED ..................................................... 24

CONCLUSION ............................................................................................................................ 25

1

## **TABLE OF AUTHORITIES**

**CASES**

*Allied Properties v. Dep't of Alcoholic Beverage Control*
    53 Cal.2d 141 (1959) ................................................................................................12

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978)......................................................................................................9

*Animal Legal Def. Fund v. Wasden*
    878 F.3d 1184 (9th Cir. 2018) ...................................................................................17

*Armour v. City of Indianapolis, Ind.*
    566 U.S. 673 (2012)....................................................................................................15

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)...............................................................................................4, 21

*Associated Home Builders etc., Inc. v. City of Livermore*
    18 Cal.3d 582 (1976) .................................................................................................13

*Bd. of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc.*
    749 F.2d 1396 (9th Cir. 1984) ...................................................................................10

*Birkenfeld v. City of Berkeley*
    17 Cal.3d 129 (1976) .................................................................................................13

*Blair v. Bethel Sch. Dist.*
    608 F.3d 540 (9th Cir. 2010) .....................................................................................20

*Boardman v. Inslee*
    978 F.3d 1092 (9th Cir. 2020) ...................................................................................18

*Brown v. Hovatter*
    561 F.3d 357 (4th Cir. 2009) .....................................................................................14

*California Bldg. Indus. Assn. v. City of San Jose*
    61 Cal.4th 435 (2015) ..................................................................................................7

*California Grocers Ass'n v. City of Long Beach*
    No. 221CV00524ODWASX, 2021 WL 3500960 (C.D. Cal. Aug. 9, 2021)...............5

*Campanelli v. Allstate Life Ins. Co.*
    322 F.3d 1086 (9th Cir. 2003) .....................................................................................5

*Capp v. Cty. of San Diego*
    940 F.3d 1046 (9th Cir. 2019) ...................................................................................18

*Chang v. United States*
    859 F.2d 893 (Fed. Cir. 1988) .......................................................................11, 12, 25

*Chinatown Neighborhood Ass'n v. Harris*
   794 F.3d 1136 (9th Cir. 2015) ............................................................24, 25

*City of Las Vegas v. Foley*
   747 F.2d 1294 (9th Cir. 1984) ....................................................................20

*Classic Cab, Inc. v. D.C.*
   288 F. Supp. 3d 218 (D.D.C. 2018) ............................................................11

*Comm. for Reasonable Regul. of Lake Tahoe v. Tahoe Reg'l Plan. Agency*
   311 F. Supp. 2d 972 (D. Nev. 2004) ............................................................25

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*
   508 U.S. 602 (1993) ..................................................................................11

*Connolly v. Pension Benefit Guaranty Corp.*
   475 U.S. 211 (1986) ..........................................................................9, 10, 11

*CTS Corp. v. Dynamics Corp. of America*
   481 U.S. 69 (1987) ....................................................................................23

*Cycle City, Ltd. v. Harley-Davidson Motor Co.*
   81 F. Supp. 3d 993 (D. Haw. 2014) ..............................................................8

*Desoto CAB Co., Inc. v. Picker*
   228 F. Supp. 3d 950 (N.D. Cal. 2017) ............................................16, 17, 24

*Duquesne Light Co. v. Barasch*
   488 U.S. 299 (1989) ..................................................................................14

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*
   459 U.S. 400 (1983) ................................................................................5, 8

*Exxon Corp. v. Eagerton*
   462 U.S. 176 (1983) ....................................................................................9

*Exxon Corp. v. Governor of Maryland*
   437 U.S. 117 (1978) ..............................................................................22, 23

*F.C.C. v. Beach Commc'ns, Inc.*
   508 U.S. 307 (1993) ..................................................................................15

*Fayer v. Vaughn*
   649 F.3d 1061 (9th Cir. 2011) ......................................................................4

*Fed. Power Comm'n v. Hope Natural Gas Co.*
   320 U.S. 591 (1944) ..............................................................................14, 15

*Fed. Power Comm'n v. Nat. Gas Pipeline Co. of Am.*
   315 U.S. 575 (1942) ..................................................................................14

*Fitzgerald v. Racing Ass'n of Cent. Iowa*
    539 U.S. 103 (2003) .................................................................................................16

*Fortune Players Grp., Inc. v. Quint*
    No. 16-CV-04557-TEH, 2016 WL 7102735 (N.D. Cal. Dec. 6, 2016) .....................19

*Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*
    864 F.2d 551 (7th Cir. 1988) ...................................................................................20

*Gallinger v. Becerra*
    898 F.3d 1012 (9th Cir. 2018) ......................................................................15, 18, 24

*General Motors Corp. v. Romein*
    503 U.S. 181 (1992) ...................................................................................................5

*Guggenheim v. City of Goleta*
    638 F.3d 1111 (9th Cir. 2010) ..................................................................................17

*Hell's Angels Motorcycle Corp. v. Cty. of Monterey*
    89 F. Supp. 2d 1144 (N.D. Cal. 2000) .......................................................................1

*Hernandez v. City of Hanford*
    41 Cal.4th 279 (2007) ..........................................................................................7, 16

*Hettinga v. United States*
    677 F.3d 471 (D.C. Cir. 2012) ..................................................................................14

*Hotel & Motel Ass'n of Oakland v. City of Oakland*
    344 F.3d 959 (9th Cir. 2003) ....................................................................................16

*Humanitarian L. Project v. U.S. Treasury Dep't*
    578 F.3d 1133 (9th Cir. 2009) ..................................................................................18

*Huskey v. City of San Jose*
    204 F.3d 893 (9th Cir. 2000) ....................................................................................19

*In re Seltzer*
    104 F.3d 234 (9th Cir. 1996) .................................................................................4, 5

*Inman v. Hatton*
    No. 17-CV-06612-SI, 2018 WL 1100959 (N.D. Cal. Mar. 1, 2018)..........................19

*Int'l Fur Trade Fed'n v. City & Cty. of San Francisco*
    472 F. Supp. 3d 696 (N.D. Cal. 2020) ......................................................................24

*Kavanau v. Santa Monica Rent Control Bd.*
    16 Cal.4th 761 (1997) ..............................................................................................14

*Kawaoka v. City of Arroyo Grande*
    17 F.3d 1227 (9th Cir. 1994) ....................................................................................20

*Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*
  762 F.2d 1124 (1st Cir. 1984) ..................................................................................10

*Keystone Bituminous Coal Ass'n v. DeBenedictis*
  480 U.S. 470 (1987) ........................................................................................7, 10

*Laurel Park Cmty., LLC v. City of Tumwater*
  698 F.3d 1180 (9th Cir. 2012) ..............................................................................11

*Lefrancois v. State of R.I.*
  669 F. Supp. 1204 (D.R.I. 1987) ..............................................................................6

*Litmon v. Harris*
  768 F.3d 1237 (9th Cir. 2014) ..............................................................................16

*Lynch v. United States*
  292 U.S. 571 (1934) ................................................................................................9

*MHC Fin. Ltd. P'ship v. City of San Rafael*
  714 F.3d 1118 (9th Cir. 2013) ..............................................................................11

*Mountain Water Co. v. Montana Dep't of Pub. Serv. Regul.*
  919 F.2d 593 (9th Cir. 1990) ................................................................................17

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*
  567 F.3d 521 (9th Cir. 2009) ................................................................................22

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
  682 F.3d 1144 (9th Cir. 2012) ..............................................................................24

*Nat'l Pork Producers Council v. Ross*
  456 F. Supp. 3d 1201 (S.D. Cal. 2020) ................................................................24

*Navarro v. Block*
  250 F.3d 729 (9th Cir. 2001) ..................................................................................4

*Nebbia v. People of New York*
  291 U.S. 502 (1934) ..............................................................................................13

*Nordlinger v. Hahn*
  505 U.S. 1 (1992) ..................................................................................................15

*Norman v. Baltimore & Ohio R. Co.*
  294 U.S. 240 (1935) ..............................................................................................10

*Nw. Grocery Ass'n v. City of Seattle*
  No. C21-0142-JCC, 2021 WL 1055994 (W.D. Wash. Mar. 18, 2021) ................7, 8

*Olson v. California*
  No. CV1910956DMGRAOX, 2020 WL 6439166 (C.D. Cal. Sept. 18, 2020) ........5, 8, 18

*Olson v. California*
  No. CV1910956DMGRAOX, 2020 WL 905572 (C.D. Cal. Feb. 10, 2020) ...........................17

*Park Pet Ship, Inc. v. City of Chicago*
  872 F.3d 495 (7th Cir. 2017) ........................................................................................22

*Peick v. Pension Ben. Guar. Corp.*
  724 F.2d 1247 (7th Cir. 1983) .....................................................................................10

*Penn Central Transportation Co. v. New York City*
  438 U.S. 104 (1978) .....................................................................................................10

*Pennell v. City of San Jose*
  485 U.S. 1 (1988) .........................................................................................................13

*Permian Basin Area Rate Cases*
  390 U.S. 747 (1968) .....................................................................................................13

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970) .....................................................................................................23

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty., Ind.*
  57 F.3d 505 (7th Cir. 1995) ....................................................................................10, 11

*Reddy v. Litton Indus., Inc.*
  912 F.2d 291 (9th Cir. 1990) .......................................................................................24

*Rocky Mountain Farmers Union v. Corey*
  730 F.3d 1070 (9th Cir. 2013) ................................................................................22, 23

*Rosenblatt v. City of Santa Monica*
  940 F.3d 439 (9th Cir. 2019) ..................................................................................22, 23

*Ruckelshaus v. Monsanto Co.*
  467 U.S. 986 (1984) .......................................................................................................9

*Safeway Inc. v. City & Cnty. of San Francisco*
  797 F. Supp. 2d 964 (N.D. Cal. 2011) ........................................................................15

*San Francisco Apartment Ass'n v. City & Cty. of San Francisco*
  142 F. Supp. 3d 910 (N.D. Cal. 2015) ........................................................................16

*San Francisco Taxi Coal. v. City & Cty. of San Francisco*
  979 F.3d 1220 (9th Cir. 2020) ..................................................................................7, 16

*San Remo Hotel L.P. v. City And Cty. of San Francisco*
  364 F.3d 1088 (9th Cir. 2004) .......................................................................................9

*Siegel v. Bradstreet*
  No. CV 08-2480 CAS (SSX), 2008 WL 4195949 (C.D. Cal. Sept. 8, 2008) .................8

*Sierra Med. Servs. All. v. Kent*
  883 F.3d 1216 (9th Cir. 2018) ...................................................................................12

*Smith v. Pelican Bay State Prison*
  No. 15-CV-04875-EMC, 2016 WL 285062 (N.D. Cal. Jan. 25, 2016) ......................24

*Snake River Valley Elec. Ass'n v. PacifiCorp*
  357 F.3d 1042 (9th Cir. 2004) .....................................................................................7

*Somers Realty Corp. v. Harding*
  886 F. Supp. 386 (S.D.N.Y. 1995) .............................................................................22

*Sprewell v. Golden State Warriors*
  266 F.3d 979 (9th Cir. 2001) .......................................................................................4

*Support Working Animals, Inc. v. DeSantis*
  457 F. Supp. 3d 1193 (N.D. Fla. 2020) .......................................................................8

*Sveen v. Melin*
  138 S. Ct. 1815 (2018) .................................................................................................4

*TCF Nat. Bank v. Bernanke*
  643 F.3d 1158 (8th Cir. 2011) ...................................................................................14

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*
  368 F.3d 1053 (9th Cir. 2004) ...................................................................................24

*Thornton v. City of St. Helens*
  425 F.3d 1158 (9th Cir. 2005) ...................................................................................16

*Tsosie v. Califano*
  630 F.2d 1328 (9th Cir. 1980) .....................................................................................8

*U.S. Tr. Co. of New York v. New Jersey*
  431 U.S. 1 (1977) .........................................................................................................7

*United States Trust Co. v. New Jersey*
  431 U.S. 1 (1977) .........................................................................................................5

*United States v. O'Brien*
  391 U.S. 367 (1968) ...................................................................................................20

*United States v. Padilla-Diaz*
  862 F.3d 856 (9th Cir. 2017) .....................................................................................15

*United States v. Wilde*
  74 F. Supp. 3d 1092 (N.D. Cal. 2014) .......................................................................17

*Valley Bank of Nevada v. Plus Sys., Inc.*
  914 F.2d 1186 (9th Cir. 1990) ...................................................................................22

*Vance v. Bradley*
    440 U.S. 93 (1979)................................................................................................8

*Wright v. Incline Vill. Gen. Improvement Dist.*
    665 F.3d 1128 (9th Cir. 2011) ...........................................................................17

*Young Am.'s Found. v. Napolitano*
    No. 17-CV-02255-MMC, 2018 WL 1947766 (N.D. Cal. Apr. 25, 2018)..........................21, 25


**CONSTITUTIONAL PROVISIONS**

California Constitution
    Article I, Section 9 ...............................................................................................5
    Article I, Section 19 .............................................................................................9
    Article XI, Section 7 ...........................................................................................12

U.S. Constitution
    Article I, Section 10 .............................................................................................4


**SAN FRANCISCO CODES AND REGULATIONS**

S.F. Police Code
    § 5300 ......................................................................................2, 3, 7, 8, 17

MOTION TO DISMISS; MPA
CASE NO. 3:21-cv-05502 EMC
         ix
n:\govlit\li2021\220034\01544712.docx

**NOTICE AND MOTION**

PLEASE TAKE NOTICE THAT on November 4, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, Courtroom 5, before the Honorable Edward Chen, Defendant City and County of San Francisco ("the City") will and hereby does move the Court for an order dismissing the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, the other documents filed in connection with this motion, the papers and records on file in this action, and such other written and oral argument as may be presented to the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**
**ISSUES TO BE DECIDED**

Whether the Complaint fails to state a claim for (1) violation of the Contracts Clause of the federal and state constitutions; (2) an unconstitutional taking under the federal and state constitutions; (3) exceeding the scope of the police power under the state constitution; (4) violation of due process under the federal and state constitutions; (5) violation of equal protection under the federal and state constitutions; (6) First Amendment retaliation; and (7) violation of the Dormant Commerce Clause.

**INTRODUCTION**

Taking "a smorgaşbord approach to pleading," *Hell's Angels Motorcycle Corp. v. Cty. of Monterey*, 89 F. Supp. 2d 1144, 1147 (N.D. Cal. 2000), Plaintiffs DoorDash and Grubhub assert seven causes of action under a host of federal and state constitutional provisions, all seeking to have this Court invalidate the City's decision to cap at fifteen percent the commissions that third-party delivery service platforms may charge local restaurants.  The City took the action in an effort to address the decline of the restaurant industry—businesses that are critical to the economic and social vitality of San Francisco's commercial corridors, and that have struggled with the high commissions that the largest third-party platforms have been able to impose through their market dominance.

Plaintiffs' numerous claims are variations on a handful of legally flawed ideas.  Plaintiffs posit as the basis for several claims that a law is arbitrary or impermissibly discriminatory if it benefits some business entities at the expense of others, but that supposition is simply incorrect.  They condemn the

City's law as "confiscatory" and a regulatory taking while overlooking their own allegations that they are able to "offset" or "recoup" their losses from the commission cap—and their own prior disclosures to investors that they may face future laws regulating their commissions, and that could result in changes to their business model.  And they seek invalidation of the law, regardless of whether it serves a legitimate purpose, by implausibly portraying themselves as victims of animus and retaliation because the Board of Supervisors previously opposed Proposition 22—a measure DoorDash supported—on the ground that it would strip gig workers of the panoply of workplace protections afforded employees.  The argument is a nonsequitur, and the very statements on which Plaintiffs rely show that officials were concerned about the plight of San Francisco's restaurants when enacting and extending the commission cap beyond the pandemic.  Finally, Grubhub baselessly contends that the commission cap discriminates against interstate commerce, a charge undermined by its co-Plaintiff's inability to join the claim because, like other platforms subject to the law, it is headquartered in San Francisco and the law regulates evenhandedly as to both of them.  Because all of these claims are irredeemably flawed, the Court should dismiss the Complaint without leave to amend.

**STATEMENT OF FACTS**

### A.     The Ordinance

Ordinance No. 234-20, which added Article 53 to the San Francisco Police Code, was enacted on November 20, 2020.  ECF#1 ¶ 50 & Ex. D.  While it contains several additional provisions that are not challenged in this litigation, at issue here is its imposition of a fifteen percent cap on the commissions that third-party delivery service companies may charge restaurants.  *Id.* ¶ 52.  The Ordinance followed by approximately seven months an emergency order by the Mayor likewise imposing fifteen percent cap.  *Id.* ¶ 34.  The findings of the Ordinance include the following:

- "Restaurants are vital to the character and community fabric of San Francisco ('City').  They reflect and nurture the cultural diversity of the City, while offering access to food, an essential foundation of human health and basis for social connection.  Restaurants are also important engines of the local economy, providing jobs and serving as commercial anchors in neighborhoods across the City."  ECF#1 Ex. D, S.F. Police Code § 5300(a).

- "Restaurants occupy a substantial percentage of ground floor retail space along the City's commercial corridors," but "in recent years the City's restaurant industry has been in decline," with the number of closures exceeding the number of openings for at least the past five years.  *Id.* § 5300(b), (c).

- That decline has "coincide[d] with the rapid rise of third-party delivery services," just four of which controlled "approximately 98% of the entire market" as of November 2019. *Id.* § 5300(d).

- "The increasing market dominance of a small number of third-party food delivery service companies has resulted in increasingly difficult economic conditions for City restaurants, which must contract with these companies if they wish to access the growing share of customers who rely on delivery platforms to obtain meals." *Id.* § 5300(e).

- These companies' "market dominance" has given them "disproportionate leverage in contract negotiations with restaurants," which they have used to extract high fees that "diminish restaurants' already-narrow profit margins." *Id.* § 5300(f).

- "Sample contracts … reflect that these companies commonly charge restaurants a 10% per-order fee for 'delivery services,'" and impose additional fees "as much as 20% of the order cost for what are described as 'marketing' or 'logistics' services," which are highly profitable. *Id.* § 5300(g).

- "While money spent by consumers at local restaurants circulates within communities and bolsters the vitality of commercial corridors, third-party food delivery services companies have amassed concentrated wealth without providing similar community benefits. And increasingly, these companies are using their market leverage to extract unfairly high payments from restaurants, hastening the closure of City restaurants and the resulting decline of City commercial districts." *Id.* § 5300(h).

- The pandemic has "worsened the economic picture for City restaurants," which have become "dependent on delivery and takeout orders, and increasingly vulnerable to unfair contract terms demanded by delivery services companies," which "have enjoyed unprecedented revenue." *Id.* § 5300(i).

The Ordinance describes the commission cap as an "important step[] to ensure that restaurants can thrive in San Francisco and continue to nurture vibrant, distinctive commercial districts." *Id.* § 5300(j). It applies to third-party platforms that serve twenty or more restaurants. ECF#1 ¶ 54.

The law originally had a sunset date of sixty days after the amendment or termination of the pandemic "Stay Safer At Home" order or any subsequent order allowing restaurants to resume at 100% capacity. ECF#1 ¶ 57. However, in June 2021, the Board of Supervisors voted unanimously to repeal the sunset date, so that the cap would continue in effect. ECF#1 ¶ 65 (Ordinance No. 97-21). The Mayor declined to sign the repeal measure, but it became effective without her signature. *Id.* ¶ 67.

## B.    Plaintiffs' Business Practices

Grubhub alleges that restaurants opting to use its marketplace "select a negotiable marketing package that typically ranges from 5-20% per order," and that for contracts that include delivery facilitation, the total commission rate is "generally greater" than fifteen percent. ECF#1 ¶ 25. DoorDash alleges that it offers a plan in which it "facilitates the delivery of online orders for a flat

commission rate of 15%," but that "most restaurants have opted for plans with commissions of 25% or 30%." *Id.* ¶ 59.b; *see also id.* ¶ 23.  Under both companies' contracts, restaurants "are free to leave Plaintiffs' platforms at any time for any reason." *Id.* ¶ 18.

Commissions are only "one way" in which Plaintiffs generate revenue, although commissions "represent a substantial part of their revenue streams." ECF#1 ¶ 19.  The Complaint alleges that, "[f]or several years, there has been a robust public debate about the amount of commissions restaurants pay to third-party platforms." *Id.* ¶ 26.  Plaintiffs allege that they will "offset the revenue lost due to lower commissions with restaurants" by increasing the fees they charge consumers and/or reducing the scope of the services they provide.  *Id.* ¶ 71; *see also id.* ¶¶ 73.d, 108.

**LEGAL STANDARD FOR MOTION TO DISMISS**

A court accepts as true the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  However, this tenet is inapplicable to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Likewise, a court does not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations.  Therefore, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation marks and citation omitted).  A court "need not … accept as true allegations that contradict matters properly subject to judicial notice…." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

**ARGUMENT**

## I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE CONTRACT CLAUSE OF THE FEDERAL AND STATE CONSTITUTIONS

To state a claim for violation of Article I, Section 10 of the U.S. Constitution, a plaintiff must allege facts establishing, first, that the challenged law operates as a "substantial impairment" of a contractual relationship.  If such impairment exists, the plaintiff must then show that the law is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018); *see also In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996) (challenger bears the burden).  Unless the public entity is itself the contracting party, "courts properly

defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977)).  California law follows the federal test in determining whether there is a violation of Article I, section 9 of the state constitution.  *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1097 (9th Cir. 2003).

### A.    There Is No Substantial Impairment of a Contractual Relationship

The substantial impairment inquiry "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  *In re Seltzer*, 104 F.3d at 236 (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).  The Complaint does not allege facts to establish the third.

First, there is no substantial impairment when the contract is in a regulated industry and the challenged law was "foreseeable as the type of law that would alter contract obligations."  *Energy Reserves*, 459 U.S. at 416; *see, e.g.*, *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 6439166, at *11 (C.D. Cal. Sept. 18, 2020) (no substantial impairment of independent contractor contracts where it was foreseeable that law could require classification as employees); *California Grocers Ass'n v. City of Long Beach.*, No. 221CV00524ODWASX, 2021 WL 3500960, at *5 (C.D. Cal. Aug. 9, 2021) (ordinance requiring premium for grocery workers was not a substantial impairment because "parties could have foreseen additional regulation" relating to minimum labor standards in the grocery industry).  Plaintiffs themselves allege that, "[f]or several years, there has been a robust public debate about the amount of commissions restaurants pay to third-party platforms," and cite several newspaper articles, including one explicitly discussing the possibility of legislation in San Francisco to address the impact of high commission rates on local restaurants. ECF#1 ¶ 26; Goldman Decl. Ex. H.  In its April 7, 2014 IPO prospectus, Grubhub noted that it was subject to "still evolving" laws governing the Internet and e-commerce, including those that "may cover … pricing" as well as other issues.  Goldman Decl. Ex. B at 22.  A July 10, 2019 article in the New York Post reported that the New York State Liquor Authority was developing rules to limit commissions to ten percent, and the Authority considered a draft Advisory at its meeting approximately a month later that would impose a commission cap by extending an existing rule

applicable to leases.  Goldman Decl. Exs. I, J.  A draft registration statement that DoorDash submitted to the SEC on February 13, 2020—before the Mayor's declaration of emergency, ECF#1 ¶ 30—stated that "[r]egulatory and administrative bodies may enact new laws or promulgate new regulations that are adverse to our business … including … by attempting to regulate the commissions businesses like ours agree to with merchants."  Goldman Decl. Ex. C at 36.  And its December 2020 IPO prospectus similarly noted that "[o]ur business is subject to a variety of U.S. laws and regulations, including those related to … pricing and commissions, many of which are unsettled and still developing," and acknowledged that commission caps could be "retained after the COVID-19 pandemic subsides."  *Id.* Ex. D at 59-60.  Thus, there is no substantial impairment because it was foreseeable that Plaintiffs could face laws regulating their commissions; indeed, Grubhub warned potential investors about it in its first public SEC filing in 2014.

Moreover, because restaurants "are free to leave Plaintiffs' platforms at any time for any reason,"  ECF#1 ¶ 18, none of Plaintiffs' contracts guarantee them a particular revenue stream.  In *Lefrancois v. State of R.I.*, 669 F. Supp. 1204 (D.R.I. 1987), the plaintiff alleged that a state law prohibiting a landfill from accepting waste from out-of-state impaired its contract with the Rhode Island Solid Waste Management Corporation (RISWMC), because the contract allowed it to deposit Massachusetts waste at the landfill so long as it did not exceed the amount of Rhode Island waste deposited in Massachusetts.  While the court ultimately "assumed" a substantial impairment "in the interest of the expedient resolution of this controversy," it noted that "there is much force to the defendants' contention" that there was no substantial impairment because the contract was terminable at will by RISWMC.  *Id.* at 1215.  The fact that restaurants are not required by their contracts to continue using Plaintiffs' services similarly militates against a finding of substantial impairment.

Finally, apart from the foreseeability of regulation limiting commissions and the indeterminate nature of Plaintiffs' contracts, the Complaint does not allege facts establishing that the fifteen percent cap is a significant limitation, especially in light of Plaintiffs' allegations that they are able to offset lost revenues in other ways.  ECF#1 ¶¶ 71, 108.

### B.     The Ordinance Is an Appropriate and Reasonable Way to Advance a Significant and Legitimate Public Purpose

Even if the Complaint had plausibly alleged a substantial impairment of Plaintiffs' contracts, the claim would still fail because the Ordinance is an appropriate and reasonable way to advance a significant and legitimate public purpose.  Because the City is not a party to the contracts, the Court's review is a deferential one akin to rational basis review.  *See, e.g.*, *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1051 n.9 (9th Cir. 2004) ("Because the state is not a party to the contract, we defer to the legislature's judgment that the ESSA is necessary legislation to meet the stated purposes."); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 506 (1987) ("We refuse to second-guess the Commonwealth's determinations that these are the most appropriate ways of dealing with the problem"); *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 22-23 (1977) ("As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.").

First, as set forth in the findings, the City has a significant and legitimate public purpose in enacting the Ordinance.  Restaurants are vital to communities' character and are important engines of the local economy, anchoring commercial districts, but the industry has declined alongside the rise of third-party delivery service companies.  The largest of them control almost the entire market and have gained disproportionate leverage in contract negotiations, hastening the closure of restaurants and the decline of commercial districts.  S.F. Police Code § 5300(a)-(h).  When a municipality "determines that a particular neighborhood or the community in general is in special need of a specific type of … business establishment," it may enact legislation "to serve such a need."  *California Bldg. Indus. Assn. v. City of San Jose*, 61 Cal.4th 435, 461-62 (2015); *see also Hernandez v. City of Hanford*, 41 Cal.4th 279, 296 (2007) (cities may regulate or control competition to preserve the economic viability of business districts and neighborhood shopping areas); *San Francisco Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020) ("That the City would try to mitigate the fallout for those most affected by a shift in the market is a permissible state purpose, even if some may question its policy wisdom.").  While restaurants are the direct beneficiaries of the Ordinance, they play an important role in the vitality of communities and commercial districts.  *See, e.g.*, *Nw. Grocery Ass'n v.*

*City of Seattle*, No. C21-0142-JCC, 2021 WL 1055994, at *8 (W.D. Wash. Mar. 18, 2021) (promoting retention of grocery workers protects health of the community); *Cycle City, Ltd. v. Harley-Davidson Motor Co.*, 81 F. Supp. 3d 993, 1011 (D. Haw. 2014) (regulating the termination and non-renewal of franchise agreements is a significant and legitimate public purpose because sale of motor vehicles is vital to the economy and State's isolated geographic location makes it necessary to ensure that vehicles, parts, and service are available); *see also, e.g.*, *Siegel v. Bradstreet*, No. CV 08-2480 CAS (SSX), 2008 WL 4195949, at *5 (C.D. Cal. Sept. 8, 2008) (protecting artists from exploitation by personal managers/agents); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1223 (N.D. Fla. 2020) (protecting greyhound racing dogs from harm).

Second, by limiting the commissions that third-party platforms may charge restaurants, the Ordinance bears an appropriate and reasonable relationship to the problem identified. It notes that large third-party delivery service companies have been able to impose high commission rates through their market dominance, contributing to the closure of restaurants and resulting decline of commercial districts. *See* S.F. Police Code § 5300(j). Plaintiffs contend that it is unreasonable to impose a permanent cap on commission rates, ECF#1 ¶ 79, but "the public purpose need not be addressed to an emergency or temporary situation." *Energy Reserves*, 459 U.S. at 412. While the Ordinance included a finding that the COVID-19 emergency "has worsened the economic picture for City restaurants," S.F. Police Code § 5300(i), it did not identify the pandemic as the cause of the problem. The decline of the restaurant industry and the rise of third-party delivery service companies—and the high commission rates they were able to impose—preceded it, S.F. Police Code § 5300(d)-(h), and Plaintiffs themselves allege that legislation to cap commissions was under consideration before the public health emergency, ECF#1 ¶¶ 26-27. Plaintiffs also contend that the Ordinance is unreasonable because the City could aid restaurants in other ways. ECF#1 ¶ 80. But the availability of policy alternatives does not render the Ordinance unreasonable, and is simply irrelevant under the deferential standard of review applicable here. *See, e.g.*, *Vance v. Bradley*, 440 U.S. 93, 102 n.20 (1979); *Tsosie v. Califano*, 630 F.2d 1328, 1338 (9th Cir. 1980); *Olson*, 2020 WL 6439166, at *11 ("the Court defers

to the State's assessment of the reasonableness and necessity of enacting AB 5 to remedy a perceived economic and social problem.").[1]

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR AN UNCONSTITUTIONAL TAKING UNDER THE FIFTH AMENDMENT OR FOR INVERSE CONDEMNATION UNDER THE CALIFORNIA CONSTITUTION

Plaintiffs contend that, to the extent their contracts with restaurants provide for a commission rate greater than fifteen percent, the Ordinance is an unconstitutional taking of their contractual right to those commissions. ECF#1 ¶ 91 (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934) for the proposition that contracts are "property" susceptible to a taking).[2]  This theory does not state a valid taking claim under either the federal or state constitution.  *See San Remo Hotel L.P. v. City And Cty. of San Francisco*, 364 F.3d 1088, 1093 (9th Cir. 2004) (while Article I sec. 19 "'protects a somewhat broader range of property values' than the corresponding federal provision," the Ninth Circuit otherwise "construe[s] the clauses congruently.").

### A.   Plaintiffs' Contracts Do Not Give Rise to a Claim Under the Taking Clause

In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986), the Supreme Court addressed a takings challenge to the Multiemployer Pension Plan Amendments Act (MPPAA), which required the employers, when they withdrew from the pension fund, to pay more into the fund than they had agreed among themselves to pay.  The Court began by noting that "Congress routinely creates burdens for some that directly benefit others," such as by setting minimum wages or controlling prices.  *Id.* at 223.  And it explained that the fact that existing contracts might have contrary terms erects no barrier to the government's authority to enact such legislation because

---

[1] In addition, the Ordinance is not "limited in effect to contractual obligations or remedies," but imposes "a generally applicable rule of conduct designed to advance 'a broad societal interest'…." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191 (1983) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249 (1978)).  *Exxon* involved a price-control statute that prohibited oil and gas producers from passing on an increased severance tax to their purchasers.  The Court found that the statute imposed a general rule of conduct because the pass-through prohibition "applied to all oil and gas producers, regardless of whether they happened to be parties to sale contracts that contained a provision permitting them to pass tax increases through to their purchasers." *Id.*  Here, too, the Ordinance imposes a cap on commissions regardless of whether there are contract provisions that currently call for a higher rate.  Plaintiffs acknowledge that some of their contracts with restaurants have commission rates that do not exceed fifteen percent.

[2] Plaintiffs also cite *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984), but it held only that a trade secret was a property right susceptible to a takings analysis.

"[p]arties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.'" *Id.* at 224 (quoting *Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307-08 (1935)).  The Court accordingly found no valid taking claim based on the fact that the MPPAA required the employers to pay amounts that exceeded the limits specified in their contracts:

> If the regulatory statute is otherwise within the powers of Congress … its application may not be defeated by private contractual provisions.  For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking…. This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without compensation.  But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

*Id.* at 224 (citations omitted).  In other cases involving the same statute, numerous appellate courts, including the Ninth Circuit, concluded that the Taking Clause did not protect the employers' contract rights.  *See Bd. of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1406 (9th Cir. 1984); *Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1275-76 (7th Cir. 1983); *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 762 F.2d 1124, 1135 (1st Cir. 1984); *see also Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty., Ind.*, 57 F.3d 505, 510 n.2 (7th Cir. 1995) (*Connolly* effectively overruled *Lynch* to the extent *Lynch* held that contracts are always property the government may not take without compensation).

## B.     Even If Plaintiffs' Contracts Are Property for the Purposes of the Taking Clause, the Complaint Fails to Establish a Regulatory Taking

Although *Connolly* did not hold that a contract right may *never* constitute property for the purpose of the Taking Clause, it also held that the plaintiffs had failed to establish a regulatory taking under the factors in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978): "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly*, 475 U.S. at 225 (quoting *Penn Central*, 438 U.S. at 124).  Plaintiffs bear a "heavy burden" to establish a regulatory taking, *Keystone Bituminous Coal*, 480 U.S. at 493, and the Complaint fails to do so.

Beginning with the third factor—the character of the governmental action—*Connolly* again noted that under the MPPAA the government did not appropriate anything for its own use, but merely "adjust[ed] the benefits and burdens of economic life to promote the common good [which,] under our cases, does not constitute a taking requiring Government compensation." 473 U.S. at 225. The same is true here: The City does not take anything for its own use by limiting the commissions third-party delivery service companies may charge restaurants. Other cases involving a taking claim based on contract rights have likewise found no taking where the government took nothing for its own use. *See, e.g.*, *Pro-Eco*, 57 F.3d at 511; *Chang v. United States*, 859 F.2d 893, 896 (Fed. Cir. 1988); *Classic Cab, Inc. v. D.C.*, 288 F. Supp. 3d 218, 228 (D.D.C. 2018). And Plaintiffs' allegation that they can offset losses through changes to their business model, ECF#1 ¶ 71, likewise precludes a taking claim. *See Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1190-91 (9th Cir. 2012) (ordinances restricting uses of manufactured home parks did not have character of a taking because they did not prevent plaintiffs from converting their properties to other uses).

As to the first factor, even assuming that most contracts have commission rates of 25 or 30 percent, ECF#1 ¶ 59.b, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645 (1993). Thus, the Ninth Circuit rejected a taking claim where the economic impact exceeded *eighty* percent of the property's value, pointing to Supreme Court and Ninth Circuit decisions finding no taking where the diminution in value was even greater. *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1126 (9th Cir. 2013). Moreover, in *Chang*, the court found no regulatory taking where sanctions imposed on Libya caused petroleum engineers the complete loss of their employment contracts with a Libyan oil company. The court noted that the employment contracts "were not for a fixed period, and each contract could be terminated at the option of the employee or upon the failure or inability to maintain the necessary Libyan work or residence visas." 859 F.2d at 898. Because restaurants "are free to leave Plaintiffs' platforms at any time for any reason," ECF#1 ¶ 18, the same considerations apply here. And again, Plaintiffs allege that they will be able to "recoup" or "offset" any losses from reduced commissions. ECF#1 ¶¶ 71, 73.d, 108.

Finally, as to the second factor, the Complaint does not allege any facts establishing that Plaintiffs had "distinct investment-backed expectations." *See Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1226 (9th Cir. 2018). "This is not the usual 'investment' situation where the plaintiffs have purchased or developed property and subsequently been denied the right to use it in an economically viable manner as contemplated at the time of purchase or development." *Chang*, 859 F.2d at 898. Plaintiffs knew that restaurants may leave their platforms "at any time for any reason," and also knew that the amount they charge restaurants in commissions has been the subject of "robust public debate." ECF#1 ¶¶ 18, 26. Plaintiffs warned potential investors that they have "a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful." Goldman Decl. Ex. B at 12; Ex. D at 24. They warned that they might fail to retain restaurants with which they have contracted. *Id.* Ex. B at 13; Ex. D at 26-27. And they warned of the potential for regulation that could control their pricing. *Id.* Ex. B at 22; Ex. C at 36, 49; Ex. D at 59-60; *see also* Ex. D at 32 ("Many factors, including … legal and regulatory requirements, constraints, or changes … could significantly affect our pricing strategies.").

Accordingly, the Complaint fails to allege a regulatory taking under the *Penn Central* factors.

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF ARTICLE XI, SECTION 7 OF THE CALIFORNIA CONSTITUTION

Article XI, section 7 of the California Constitution provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." In their third cause of action, citing a state appellate decision from 1937, Plaintiffs seek to have this Court invalidate the Ordinance on the ground that it exceeds the City's authority under this section because it does not promote the welfare of the general public. ECF#1 ¶ 105. But when a plaintiff claims "that a statute does not constitute a proper exercise of the police power, the inquiry of court is limited to determining whether the object of the statute is one for which that power may legitimately be invoked and, if so, whether the statute bears a reasonable and substantial relation to the object sought to be attained." *Allied Properties v. Dep't of Alcoholic Beverage Control*, 53 Cal.2d 141, 146 (1959). The standard is a deferential one: "It is not our province to weigh the desirability of the social or economic policy underlying the statute or to question its wisdom; they are

purely legislative matters." *Id.*; *see also Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal.3d 582, 601 (1976) (where plaintiff claims that land use ordinance exceeds municipality's authority under the police power, the ordinance must be upheld as long as "it is fairly debatable that the restriction in fact bears a reasonable relation to the general welfare"); *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 161 (1976) (court must uphold rent control ordinance under the police power unless there is "a complete absence of even a debatable rational basis for the legislative determination … that rent control is a reasonable means of counteracting harms and dangers to the public health and welfare emanating from a housing shortage").

As discussed above in Section I.B, the Ordinance has a legitimate objective and is reasonably and substantially related to that objective, easily satisfying the "debatable rational basis" standard. While Plaintiffs complain that the Ordinance does not regulate other vendors with which restaurants contract, like "supply and equipment providers," ECF#1 ¶ 112, the Complaint contains no allegations to negate the Ordinance's findings that the decline of the restaurant industry has coincided with the rise of third-party delivery services, in which just four companies control 98% of the market and are able to use their disproportionate leverage to exact high fees. There is no contention that the same market dynamics apply to other vendors. *See also infra* Section V. The Complaint therefore fails to state a claim for exceeding the scope of the police power under the state constitution.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF DUE PROCESS

In their fourth cause of action, Plaintiffs contend that the Ordinance violates due process, in particular as it applies to price controls. A price control satisfies due process as long as it is not "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt....'" *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 769-770 (1968)); *see also Nebbia v. People of New York*, 291 U.S. 502, 537 (1934) ("If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied.") "In the context of price control … courts generally find that a regulation bears 'a reasonable relation to a proper legislative purpose' so long as the law does not deprive investors a 'fair return' and thereby become 'confiscatory.'"

1    *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal.4th 761, 771 (1997) (quoting *Fed. Power Comm'n*

2    *v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575, 584, 585 (1942)).

3          Plaintiffs allege that the Ordinance "lacks a reasonable and nondiscriminatory legislative

4    purpose," ECF#1 ¶ 120; that allegation has already been addressed above. *Supra*, Section I.B.

5    Moreover, Plaintiffs' contention that the commission cap is confiscatory overlooks their own

6    allegations that they will offset or recoup losses from lower restaurant commissions by increasing the

7    fees they charge consumers and/or reducing the scope of the services they provide.  ECF#1 ¶¶ 71,

8    73.d, 108.  In a case challenging the Durbin Amendment, the Eighth Circuit wrote:

9          The Durbin Amendment only restricts how much certain financial institutions issuing a
           debit card may charge for processing a transaction; it does *not* restrict how much those
10         institutions may charge their customers for the privilege of using their debit-card
           services.  Since TCF is free under the Durbin Amendment to assess fees on its
11         customers to offset any losses under the Durbin Amendment, we are skeptical that the
           Durbin Amendment has even created a sufficient price control on TCF's debit-card
12         business so as to trigger a confiscatory-rate analysis or that the law could, in fact,
           produce a confiscatory rate.
13

14   *TCF Nat. Bank v. Bernanke*, 643 F.3d 1158, 1164 (8th Cir. 2011).  Similarly, while the Ordinance

15   limits the commission rate that Plaintiffs can charge *restaurants* for their services, it does not limit

16   compensation from other sources, and indeed, the Complaint affirmatively alleges that Plaintiffs will

17   recoup any losses from reduced restaurant commissions.  Given those allegations, the Ordinance

18   cannot be confiscatory, and the Due Process Clause does not protect a particular business model (*e.g.*,

19   charging commissions to restaurants rather than fees to consumers).  *See, e.g.*, *Hettinga v. United*

20   *States*, 677 F.3d 471, 480 (D.C. Cir. 2012); *Brown v. Hovatter*, 561 F.3d 357, 368 (4th Cir. 2009).

21         Plaintiffs' averred ability to offset their losses by imposing or increasing consumer fees (which

22   would bring the added benefits of consumer transparency) is fatal to their claim, but even putting that

23   issue aside, the Complaint's allegations do not establish that a fifteen percent cap on commissions is

24   confiscatory.  First, Plaintiffs acknowledge that commissions represent only "one way" in which they

25   generate revenue, even if an (undefined) "substantial part" of their revenue streams.  ECF#1 ¶ 19.  The

26   Complaint lacks any specific allegations establishing the total effect of the commission cap.  *Cf.*

27   *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310 (1989) ("[I]t is not theory but the impact of the rate

28   order which counts.  If the total effect of the rate order cannot be said to be unreasonable, judicial

inquiry ... is at an end.”) (quoting *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944)) (alterations supplied by the Court).  Second, the Complaint indicates that Plaintiffs do offer contracts with a commission rate of fifteen percent, ECF#1 ¶¶ 23, 25, undermining a contention that such a rate is necessarily “confiscatory.”  Third, neither DoorDash nor Grubhub allege that they have not been able to operate profitably during the pandemic because commissions have been capped at fifteen percent.  To the contrary, Grubhub alleges that it earned profits during the pandemic and reinvested them to help restaurants, *id.* ¶ 33.b, and DoorDash alleges that it was able to offer San Francisco restaurants 30-day commission-free trials and gave away $250,000 to help them, *id.* ¶ 33.a. Fourth, while Plaintiffs object that the Ordinance does not provide an “upward adjustment procedure,” *id.* ¶ 109, that objection overlooks that Plaintiffs charge a *percentage* commission on the orders placed, so Plaintiffs’ revenues will increase as restaurants raise their prices in the future.  Accordingly, Plaintiffs have no claim for violation of due process.

## V.     THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF EQUAL PROTECTION

Plaintiffs contend that the Ordinance violates equal protection under the federal and state constitutions.  Where a challenged law does not discriminate against a protected class or impinge fundamental rights, the plaintiff must show that it is not rationally related to any legitimate governmental objective.  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018).  A conclusory allegation that the claimed differential treatment is arbitrary or irrational is inadequate; rather, the plaintiff must negate “every conceivable basis” that could legitimately support it.  *United States v. Padilla-Diaz*, 862 F.3d 856, 862 (9th Cir. 2017).  A law is “constitutionally valid if ‘there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.’”  *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)).  The same standards apply to equal protection claims under the federal and state constitutions.  *Safeway Inc. v. City & Cnty. of San Francisco*, 797 F. Supp. 2d 964, 971 (N.D. Cal. 2011).

Plaintiffs contend that the Ordinance violates equal protection by giving preferential economic treatment to restaurants at the expense of third party delivery platforms. ECF#1 ¶ 135. But "legislators often favor one industry or segment of commerce over another," and such legislation is routinely upheld under rational basis review. *Desoto CAB Co., Inc. v. Picker*, 228 F. Supp. 3d 950, 959 (N.D. Cal. 2017); *see also, e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 109 (2003) (state could tax revenues from slot machines on riverboats differently from slot machines at racetracks); *San Francisco Taxi Coal.*, 979 F.3d at 1225. The findings of the Ordinance describe restaurants' particular importance to the City and its economy. Moreover, while the Complaint contains a conclusory allegation that third-party platforms are similarly situated to other businesses that contract with restaurants, ECF#1 ¶ 136, it does not allege facts to negate the bases to distinguish between them expressed in the Ordinance's findings, *e.g.*, that the decline of the restaurant industry has coincided with the rise of third-party delivery services, in which just four companies control 98% of the market and are able to use their disproportionate leverage to impose high fees. Legislators could rationally believe that the same market dynamics do not apply to other vendors with which restaurants contract. Plaintiffs also complain that the Ordinance does not apply to platforms that serve fewer than twenty restaurants, ECF#1 ¶ 137, but that distinction is rational given the control of the market exercised by the largest companies. *See, e.g.*, *Hernandez*, 41 Cal.4th at 302 (upholding differential treatment of large department stores and other retail stores); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 970 (9th Cir. 2003) (city's "enforcement scheme stems not from an irrational prejudice but rather from the unique traits of the target businesses"). Because Plaintiffs have not plausibly alleged that these large companies are similarly situated to other vendors or to smaller third-party platforms, they have failed to satisfy the threshold requirement of an equal protection claim. *See, e.g.*, *Litmon v. Harris*, 768 F.3d 1237, 1243 (9th Cir. 2014); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005); *San Francisco Apartment Ass'n v. City & Cty. of San Francisco*, 142 F. Supp. 3d 910, 932 (N.D. Cal. 2015).

Section I.B above establishes that the Ordinance is rationally related to a legitimate objective. Plaintiffs' contention that the Ordinance will not achieve its purposes, ECF#1 ¶ 139, is irrelevant because, in evaluating an equal protection claim under rational basis review, courts "do not require

that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011) (internal quotation marks and citation omitted); *cf. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) ("Whether the City of Goleta's economic theory for rent control is sound or not, and whether rent control will serve the purposes stated in the ordinance of protecting tenants from housing shortages and abusively high rents or will undermine those purposes, is not for us to decide.").

Finally, Plaintiffs allege that third-party delivery service companies are a "politically unpopular group of businesses," and contend that some City officials expressed animus towards those companies over their advocacy for Proposition 22. ECF#1 ¶ 138. But political opposition to the goals of Proposition 22 or disagreement with some of the tactics used to promote it, *see* ECF#1 ¶ 42, is not animus or irrational prejudice as those terms have been used in equal protection jurisprudence. *See, e.g.*, *Desoto CAB*, 228 F. Supp. 3d at 958 n.6; *United States v. Wilde*, 74 F. Supp. 3d 1092, 1097 (N.D. Cal. 2014); *see also infra* Section VI.B. Moreover, the Complaint alleges that those sentiments "were not shared by California voters," who "passed Proposition 22 by a margin of over 17 percentage points," and also alleges that the Mayor opposed the removal of the sunset provision. ECF#1 ¶¶ 43, 67. Given these allegations, the Complaint does not plausibly allege that these companies are politically unpopular. *See also Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 905572, at *9 n.13 (C.D. Cal. Feb. 10, 2020) ("Far from being politically unpopular, the burgeoning demand for gig companies' services stems from their widespread acceptance by consumers."); S.F. Police Code § 5300(d) (describing increasing usage of third-party food delivery services, especially in urban markets like San Francisco); *Desoto CAB*, 228 F. Supp. 3d at 958 (rejecting "ipse dixit" argument that "taxi companies have been historically disfavored and subject to adverse treatment"). But in any event, "[w]hen the politically unpopular group is not a traditionally suspect class," the plaintiff must show not only that "impermissible animus toward an unpopular group prompted the statute's enactment" but *also* that "the statute serves no legitimate governmental purpose." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018) (citing *Mountain Water Co. v. Montana Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 598 (9th Cir. 1990)). Since the Ordinance is rationally related to

legitimate governmental interests, Plaintiffs cannot state an equal protection claim by tacking on an allegation of animus. *See Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020) (rejecting equal protection claim based on animus because court already found that statute served legitimate interests under rational-basis review); *Gallinger*, 898 F.3d 1012, 1021 (9th Cir. 2018) (same); *Olson*, 2020 WL 6439166, at *8 ("Plaintiffs have not sufficiently alleged that legislators' concerns are motivated solely by animus or that, even if Plaintiffs are a politically unpopular group, AB 5's failure to exempt them serves no legitimate governmental purpose.") (internal quotation marks omitted).

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR FIRST AMENDMENT RETALIATION

The Complaint alleges that the Ordinance was enacted in retaliation for DoorDash's public support, advocacy, and financing of Proposition 22.  ECF#1 ¶¶ 150-52.  "To state a First Amendment retaliation claim, a plaintiff must plausibly allege that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (internal quotation marks and citation omitted).

### A.   The Complaint Does Not Satisfy Any Element as to Grubhub

The Complaint does not allege that Grubhub engaged in constitutionally protected activity, and therefore fails to satisfy the first and third elements of a retaliation claim.  Moreover, it contains only a conclusory allegation that the Ordinance "chills Grubhub from making statements in support of Proposition 22, or similar legislation, in the future."  ECF#1 ¶ 153.  But a limit on the commissions Grubhub may charge restaurants in no way chills its speech; the Ordinance does not regulate or restrict speech at all.  *See Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1143 (9th Cir. 2009) (rejecting First Amendment claim for lack of standing because "neither self-censorship nor subjective chill is the functional equivalent of a well-founded fear of enforcement when the statute on its face does not regulate expressive activity").

### B. The Complaint Does Not Plausibly Allege Facts to Establish the Second and Third Elements as to DoorDash

While the Complaint alleges that DoorDash engaged in constitutionally protected activity through its support of Proposition 22, it does not satisfy the remaining elements. As to the second element, the Complaint indicates that DoorDash worked to pass Proposition 22 even while it knew that legislation that could cap its commissions was under consideration. ECF#1 ¶¶ 26, 41. That history indicates that a corporation of ordinary firmness would not be deterred from advocating for legislation to advance its perceived interests simply because success in enacting it might lead a legislative body in the future to enact different legislation that it disfavors. *See Fortune Players Grp., Inc. v. Quint*, No. 16-CV-04557-TEH, 2016 WL 7102735, at *5 (N.D. Cal. Dec. 6, 2016) (plaintiff failed to allege "that Defendants' actions were such that an ordinary corporate entity would be deterred from pursuing its right to petition for redress of grievances"). And even putting that aside, the Complaint does not plausibly allege that DoorDash's political activity was a substantial or motivating factor in the enactment of the Ordinance.

First, Plaintiffs allege that the removal of the sunset provision in June 2021 was retaliatory, not the initial enactment of the Ordinance (limited to the duration of the COVID-19 emergency). ECF#1 ¶ 154. But it was the initial enactment of the ordinance, not the removal of the sunset provision, that was close in time to the enactment of Proposition 22. *Id.* Moreover, a First Amendment retaliation claim cannot be based on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this.'" *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000); *see also Inman v. Hatton*, No. 17-CV-06612-SI, 2018 WL 1100959, at *5 (N.D. Cal. Mar. 1, 2018) (no plausible claim where "allegations only show that the allegedly retaliatory conduct followed several months after" alleged protected activity). And in any event, the Complaint's allegations indicate that concern about high commission fees predated the passage of Proposition 22—including discussions of potential legislation in San Francisco—and Plaintiffs warned their own investors about the possibility of regulation impacting their pricing. *See supra* Section I.A.

Second, the Complaint alleges that the Board of Supervisors passed a resolution that formally opposed Proposition 22. ECF#1 ¶ 42.a. That resolution described the ways in which Proposition 22 would undo the benefits of AB 5, including the protections conferred by many workplace laws. *See*

Goldman Decl. Ex. A.  Plaintiffs are "not the only part[ies] in this case whose interests implicate First Amendment concerns.  To the contrary, we assume *all* of the Board members have a protected interest in speaking out and voting their conscience on the important issues they confront...." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 545 (9th Cir. 2010).  While some of the companies that supported Proposition 22 are subject to the Ordinance, others are not because they do not provide delivery services for restaurants, and others—like Grubhub—are subject to the Ordinance even though they did not publicly support Proposition 22.[3]  *See Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 556 (7th Cir. 1988) (rejecting retaliation claim and noting that ordinance enacted allegedly to retaliate against police officers who worked for the electoral defeat of the mayor and several members of the city council impacted all police officers, regardless of whom they supported).  Plaintiffs' contention that, because the Board previously expressed its opposition to Proposition 22, this Court must invalidate as retaliatory subsequent laws impacting some of the companies that supported it is unprecedented and unwarranted.

Third, while the Complaint points to statements by a few members of the Board of Supervisors in connection with the repeal of the sunset provision, statements by individual legislators do not establish the motivation of the legislative body as a whole.  *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994).  And the statements do not support a retaliation claim in any event.  Plaintiffs allege that Supervisor Stefani observed that DoorDash's "revenue tripled in the first quarter showing sustained demand for food delivery services, even as coronavirus vaccinations picked up and the nation moved toward reopening," and that "our restaurants have suffered so much and we're trying to get them back on their feet, save them." ECF#1 ¶ 59b.  Those statements contain no evidence of retaliation for support of Proposition 22.  Plaintiffs allege that Supervisor Safai stated that many restaurants "felt as though they were in a position of negotiating with a gun to their head for lack of a better term," that he tried but could not persuade delivery

---

[3] Campaign finance records maintained by the California Secretary of State do not show any contributions in support of Proposition 22 by three other third-party platforms identified in paragraph 16 of the Complaint:  goPuff, Delivery.com, and Slice.  *See* Request for Judicial Notice & Goldman Decl. Exs. K-M.

companies "to do the right thing" without legislation, and that some of the companies "have a vested interest in putting restaurants out of business" because they want to set up "ghost kitchens and want to set up their own infrastructure where they can deliver food directly to consumers by bypassing this entire industry." *Id.* ¶ 64a-c. Again, there is nothing in these statements that suggests retaliation for support of Proposition 22. Finally, the Complaint quotes multiple statements by Supervisor Peskin:

- during the pandemic, restaurant profits plummeted while sales by delivery platforms doubled, ECF#1 ¶¶ 61.a., 61.b;

- he had been working on legislation to limit commissions prior to the pandemic because "emergency or not, we really have an imperative to protect independent restaurants from the exploitive and predatory practices of third-party food delivery apps that seek to extract wealth from our local economy, harming our commercial corridors, and harming workers throughout the Bay Area," *id.* ¶ 61.c;

- delivery companies should be able to sell more profitable advertising and marketing services "through separate contracts without coercion of these restaurants" or through separate companies, *id.* ¶ 61.d;

- "DoorDash, Uber Eats, Postmates all contributed to the most expensive ballot measure in history, Prop 22, to gut employee protections"; third-party platforms saw exponential growth during the pandemic while SF restaurants incurred $400M in rent debt; and "70,000 Bay Area hospitality workers lost their jobs while Big Tech spent $220M to pass Prop 22, the most anti-worker initiative in California history. We will continue to push back against companies who demonstrate blatant disregard for small businesses, workers and neighborhoods. Correcting this imbalance is a long-term project." *Id.* ¶ 63.

The first three statements do not even refer to Proposition 22; like other quoted statements indicating that elected officials were concerned about the plight of restaurants and the effect of their decline on the City's neighborhoods, these allegations (to the extent they are relevant) affirmatively undercut Plaintiffs' retaliation claim. *See, e.g.*, *Young Am.'s Found. v. Napolitano*, No. 17-CV-02255-MMC, 2018 WL 1947766, at *10 (N.D. Cal. Apr. 25, 2018) ("as the factual allegations provide a 'more likely explanation[ ]' than that asserted by the plaintiff, the complaint fails to state a 'plausible' claim.") (citing *Iqbal*, 556 U.S. at 681-82). Moreover, while the last set of statements mention funding for Proposition 22, they describe the harms of the law—gutting employee protections—as necessitating a "long-term project" to "correct[] the imbalance" wrought by it. These statements do not evince retaliation; they describe Supervisor Peskin's desire to enact legislation to counter or mitigate the harmful effects of a law that several third-party platforms persuaded the electorate to pass. That is ordinary and appropriate political activity; indeed, in advocating for Proposition 22, third-party

platforms themselves were seeking to counter a law they did not like:  AB 5.  The fact that they

publicly supported Proposition 22 does not immunize them from future regulation impacting them.

*See Somers Realty Corp. v. Harding*, 886 F. Supp. 386, 390-91 (S.D.N.Y. 1995) ("plaintiff has

simply not presented a serious question creating a fair ground for litigation").

## VII.    THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE DORMANT COMMERCE CLAUSE

In the final cause of action, Grubhub—but not DoorDash—alleges that the Ordinance violates

the Dormant Commerce Clause of the U.S. Constitution.  Such a claim may take one of two forms:

> If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.  Absent discrimination, we will uphold the law "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087-88 (9th Cir. 2013) (internal quotation

marks and citation omitted).  The Complaint does not state a claim in either form.

First, while the Complaint includes conclusory allegations that the Ordinance discriminates

against interstate commerce, ECF#1 ¶¶ 165-166, there are no factual allegations to back it up.

Grubhub's theory is that because the Ordinance does not apply to third-party delivery companies that

serve twenty or fewer restaurants, the Ordinance "creates a discriminatory market, enabling local

services to gain a larger share of the total sales in the market than that of out-of-state service

providers."  *Id.* ¶ 167.  But since the Ordinance does not distinguish between local and out-of-state

third-party platforms, it does not discriminate on its face.  *See Nat'l Ass'n of Optometrists & Opticians

LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009); *Valley Bank of Nevada v. Plus Sys.,

Inc.*, 914 F.2d 1186, 1193 (9th Cir. 1990); *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 450 (9th

Cir. 2019).  Moreover, the premise of Grubhub's argument is that companies serving twenty or fewer

restaurants are located in San Francisco, whereas companies that serve more are not.  But this

assumption is contradicted by Grubhub's co-Plaintiff, DoorDash, which is headquartered in San

Francisco, ECF#1 ¶ 9, and in any event, there are no factual allegations to support it.  *See Rosenblatt*,

940 F.3d at 452 ("conclusory allegations of disparate impact are not sufficient" to survive motion to

dismiss) (quoting *Park Pet Ship, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017)); *Exxon

*Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978) (the commerce clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations").[4]

Furthermore, even if small third-party platforms were more likely to be based in San Francisco and large platforms were more likely to be based outside of it, there would still be no Commerce Clause violation. In *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987), the Supreme Court considered a challenge to an Indiana takeover act that applied only to corporations chartered in Indiana with a threshold number of Indiana shares or shareholders. Although the law did not discriminate based on the residency of the offerors, Dynamics Corporation contended that the law would apply most often to out-of-state entities because most hostile tender offers "are launched by offerors outside Indiana." 481 U.S. at 88. The Court rejected the contention that a disproportionate impact on out-of-state entities rendered the law discriminatory. *Id.* ("Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors, we reject the contention that the Act discriminates against interstate commerce."); *see also Exxon Corp.*, 437 U.S. at 126; *Rocky Mountain*, 730 F.3d at 1089. Moreover, as discussed in Section V above, small third-party delivery service companies are not similarly situated to large ones given the market control exercised by the largest firms. *See Rosenblatt*, 940 F.3d at 451 (explaining that discrimination "assumes a comparison of substantially similar entities" and finding that non-resident property owners were not similarly situated to city residents); *Rocky Mountain*, 730 F.3d at 1089 (no discrimination where there is a reason, apart from origin, to treat entities differently).

The Complaint also contains a conclusory allegation that the Ordinance places a burden on instate commerce that outweighs the local benefits it conveys, ECF#1 ¶ 168, but again there are no supporting factual allegations. A law "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Moreover, where a complaint fails plausibly to allege a substantial burden on interstate commerce, it is irrelevant whether the law will achieve its objectives. *Rosenblatt*, 940 F.3d at 452.

---

[4] The absence of such allegations is no accident. Like DoorDash, Uber Technologies Inc. and its subsidiary Portier LLC (which operates Uber Eats and Postmates) and Instacart are headquartered in San Francisco. *See* Request for Judicial Notice & Goldman Decl. Exs. E-G.

Here, the Complaint fails to allege a significant burden on interstate commerce because where "a regulation does not regulate activities that inherently require a uniform system of regulation and does not otherwise impair the free flow of materials and products across state borders, there is not a significant burden on interstate commerce." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154-55 (9th Cir. 2012); *Rosenblatt*, 940 F.3d at 452 (cases invalidating laws under the *Pike* test involve "state 'regulation of activities that are inherently national or require a uniform system of regulation'—most typically, interstate transportation.") (quoting *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015)).  The market for restaurant delivery services in San Francisco does not involve such activities, and accordingly the claim must be dismissed.  *See, e.g.*, *Int'l Fur Trade Fed'n v. City & Cty. of San Francisco*, 472 F. Supp. 3d 696, 704 (N.D. Cal. 2020); *Nat'l Pork Producers Council v. Ross*, 456 F. Supp. 3d 1201, 1209 (S.D. Cal. 2020).

## VIII.   LEAVE TO AMEND SHOULD BE DENIED

A court may deny leave to amend where it would be futile.  *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).  Here, because Plaintiffs' claims fail for fundamental legal reasons and based on allegations in the Complaint or records subject to judicial notice, they cannot be saved by additional factual allegations.  *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 297 (9th Cir. 1990) (an amended complaint may only allege other facts consistent with the challenged pleading); *Smith v. Pelican Bay State Prison*, No. 15-CV-04875-EMC, 2016 WL 285062, at *1 (N.D. Cal. Jan. 25, 2016) (denying leave to amend where flaw related to legal theory rather than "an absence of adequate detail").  The reasonable relationship between the Ordinance and a legitimate governmental purpose defeats Plaintiffs' first, third, fourth, and fifth causes of action as a matter of law.  *See Gallinger*, 898 F.3d at 1022 n.10; *Desoto CAB*, 228 F. Supp. 3d at 962.[5]  The second cause of action cannot successfully be amended because, under *Connolly*, Plaintiffs' contractual right to commissions creates no claim under the Taking Cause, and because facts alleged in the Complaint and

---

[5] The first cause of action also fails because there is no substantial impairment of a contractual relationship, as established by the Complaint's allegations and statements in Plaintiffs' SEC filings—therefore rendering amendment futile under this prong as well.  And the fourth cause of action cannot establish that the Ordinance is confiscatory given the Complaint's own allegations, including Plaintiffs' averred ability to offset their losses.

Plaintiffs' own statements to potential investors in their SEC filings defeat a regulatory taking claim under the *Penn Central* factors in any event.  *See Chang*, 859 F.2d at 898; *Comm. for Reasonable Regul. of Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 311 F. Supp. 2d 972, 994-98 (D. Nev. 2004). Leave to amend would also be futile on the sixth cause of action because the statements that Plaintiffs put forth as the basis for the claim not merely fail to support an inference that the enactment of the Ordinance was retaliatory, but affirmatively undermine it.  *See Young Am.'s Found.*, 2018 WL 1947766, at *10.  Finally, because the Ordinance regulates evenhandedly whether a third-party platform is local or out of state (and indeed, DoorDash is headquartered in San Francisco), and because restaurant delivery is not inherently national and does not require a uniform system of regulation, no amendment would enable Plaintiffs to state a claim for violation of the Dormant Commerce Clause.  *See Chinatown Neighborhood Ass'n*, 794 F.3d at 1146-47.

## CONCLUSION

For the foregoing reasons, San Francisco respectfully requests that the Court grant its motion to dismiss without leave to amend.

Dated:  September 10, 2021

> DENNIS J. HERRERA
> City Attorney
> WAYNE K. SNODGRASS
> JEREMY M. GOLDMAN
> Deputy City Attorneys
>
>
> By: /s/*Jeremy M. Goldman*
> JEREMY M. GOLDMAN
>
> Attorneys for Defendant
> CITY AND COUNTY OF SAN FRANCISCO