1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE K. SNODGRASS, State Bar #148137
   JEREMY M. GOLDMAN, State Bar #218888
3  Deputy City Attorneys
   City Hall, Room 234
4  1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
5  Telephone:    (415) 554-6762
   Facsimile:    (415) 554-4699
6  E-Mail:       jeremy.goldman@sfcityatty.org

7
   Attorneys for Defendant
8  CITY AND COUNTY OF SAN FRANCISCO

9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13  DOORDASH, INC. and GRUBHUB INC.,          Case No. 3:21-cv-05502 EMC

14         Plaintiffs,                        **DECLARATION OF JEREMY M.
                                              GOLDMAN IN SUPPORT OF CITY AND
15         vs.                                COUNTY OF SAN FRANCISCO'S
                                              REQUEST FOR JUDICIAL NOTICE AND
16  CITY AND COUNTY OF SAN FRANCISCO,         MOTION TO DISMISS**

17         Defendant.                         Hearing Date:   November 4, 2021
                                              Time:           1:30 p.m.
18                                            Place:          Courtroom 5

19                                            Attachments:    Exhibits A-M

20

21

22

23

24

25

26

27

28

GOLDMAN DECLARATION                                    n:\govlit\li2021\220034\01550503.docx
CASE NO. 3:21-cv-05502 EMC

I, Jeremy M. Goldman, declare as follows:

1.      I am a Deputy City Attorney in the San Francisco City Attorney's Office and an attorney of record for Defendant City and County of San Francisco.  The matters within this declaration are true of my personal knowledge.

2.      Attached hereto as **Exhibit A** is a true and correct copy of Resolution No. 499-20, adopted by the San Francisco Board of Supervisors on October 20, 2020.  I obtained it from the following URL: https://sfgov.legistar.com/LegislationDetail.aspx?ID=4662801&GUID=45633ACF-D5AB-4230-97DF-D60DF203B534.

3.      Attached hereto as **Exhibit B** is a true and correct copy of an excerpt from Grubhub's Prospectus for its initial public offering, filed with the SEC on April 7, 2014.  The excerpt is from the full document that I obtained at the following URL:

https://www.sec.gov/Archives/edgar/data/1594109/000119312514133730/d647121d424b4.htm.

4.      Attached hereto as **Exhibit C** is a true and correct copy of an excerpt from a draft registration statement that DoorDash submitted to the SEC on February 13, 2020.  The excerpt is from the full document that I obtained at the following URL:

https://www.sec.gov/Archives/edgar/data/0001792789/000095012320001953/filename1.htm.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an excerpt from DoorDash's Prospectus for its initial public offering, filed with the SEC on December 9, 2020.  The excerpt is from the full document that I obtained at the following URL:

https://www.sec.gov/Archives/edgar/data/0001792789/000095012320001953/filename1.htm.

6.      Attached hereto as **Exhibit E** is a true and correct copy of a Form 8-K that Uber Technologies, Inc. filed with the SEC on December 1, 2020.  It identifies the location of its principal executive offices as 1455 Market Street, 4th Floor, San Francisco, California 94103, and attaches and incorporates by reference a press release announcing that Uber Technologies has completed its acquisition of Postmates, Inc., and stating that it will operate the Postmates app alongside its Uber Eats app.  I obtained the Form 8-K from the following URL:

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001543151/000155278120000580/e20585_uber-8k.htm.  The Form 8-K includes a link to the press release attached as an exhibit, which I followed and

downloaded from the following URL:

https://www.sec.gov/Archives/edgar/data/0001543151/000155278120000580/e20585_ex99-1.htm.

7.      Attached hereto as **Exhibit F** is a true and correct copy of the December 1, 2020 Statement of Information filed with the California Secretary of State by Portier, LLC.  It describes its business as "Operates uberEATs (food delivery)" and identifies the location of its principal office as 1455 Market Street, 4th Floor, San Francisco, California 94103.  I obtained the filing through the search function on the website maintained by the California Secretary of State at the following URL: https://businesssearch.sos.ca.gov.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the December 17, 2020 Statement of Information filed with the California Secretary of State by "Maplebear Inc. which will do business in California as Instacart."  It identifies the location of its principal executive office as 50 Beale Street, Suite 600, San Francisco, CA 94105.  I obtained the filing through the search function on the website maintained by the California Secretary of State at the following URL: https://businesssearch.sos.ca.gov.

9.      Attached hereto as **Exhibit H** is a true and correct copy of Eve Batey, *San Francisco Mulls Legislation for Ghost Kitchens and Food Delivery Services*, EATER SAN FRANCISCO (Feb. 27, 2020), cited in paragraph 26 of the Complaint.  I obtained it at the URL provided in the Complaint: https://bit.ly/3aVvG2F.

10.      Attached hereto as **Exhibit I** is a true and correct copy of Lisa Fickensher and Kevin Dugan, *State liquor authority threatens delivery services over hefty fees*, NEW YORK POST (July 10, 2019).  I obtained it from the following URL: https://nypost.com/2019/07/10/state-liquor-authority-threatens-delivery-services-over-hefty-fees/.

11.      Attached hereto as **Exhibit J** is a proposed Advisory as set forth in the Agenda for the New York State Liquor Authority meeting of August 20, 2019.  I obtained it from the website maintained by the State Liquor Authority at the following URL: https://sla.ny.gov/system/files/documents/2019/08/8-20-2019_-_Detailed_Miscellaneous_Agenda----.pdf.

12.    Attached hereto as **Exhibit K** is a printout from the California Secretary of State's website showing expenditures for and against Proposition 22.  I obtained it from the following URL: https://www.sos.ca.gov/campaign-lobbying/cal-access-resources/measure-contributions/2020-ballot-measure-contribution-totals/proposition-22-changes-employment-classification-rules-app-based-transportation-and-delivery-drivers-initiative-statute.

13.    Attached hereto as **Exhibit L** is a printout from the California Secretary of State's website showing contributions to the Yes On 22 Campaign Committee.  I obtained it from the following URL:  https://cal-access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1422181&session=2019&psort=NAME&view=received.

14.    Attached hereto as **Exhibit M** is a printout from the California Secretary of State's website showing late contributions to the Yes On 22 Campaign Committee.  I obtained it from the following URL: https://cal-access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1422181&session=2019&psort=NAME&view=late1.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.  Executed September 10, 2021.


                    /s/*Jeremy M. Goldman*
                  JEREMY M. GOLDMAN

# EXHIBIT A
# to

**Declaration of Jeremy M. Goldman
In Support Of San Francisco's Request For
Judicial Notice And Motion To Dismiss**

FILE NO.  201155                    RESOLUTION NO. 499-20

1    [Opposing California State Proposition 22 - App-Based Drivers as Contractors and Labor
     Policies Initiative - November 3, 2020, Ballot]

2

3    **Resolution opposing California State Proposition 22, App-Based Drivers as**

4    **Contractors and Labor Policies Initiative, on the November 3, 2020, ballot.**

5

6            WHEREAS, Many California cities including San Francisco, Los Angeles, San Diego,

7    and Oakland have been at the forefront of worker protection laws including minimum wage,

8    consumer safety, healthcare coverage, and generous paid sick leave laws that ensure

9    workers can keep their communities safe while avoid choosing between their health and their

10   income; and

11           WHEREAS, For many Californians, work is a source of dignity, identity and purpose to

12   provide for a family and support a community and work should be safe, free from

13   discrimination, and provide a fair wage; and

14           WHEREAS, App-based companies such as Uber, Lyft, Instacart, Doordash, and

15   Postmates claim to be "the future of work" yet continue to exploit their workers for profit; and

16           WHEREAS, On April 30, 2018, the California Supreme Court issued a unanimous

17   decision in the matter of Dynamex Operations West, Inc. v. Superior Court of Los Angeles

18   (2018), which embraced a standard for worker classification that presumes that are workers

19   are employees instead of independent contractors; and

20           WHEREAS, The ruling was one of the most significant legal victories in decades for

21   misclassified workers, who lack a basic safety net when they are sick, laid off, or get injured

22   on the job; and

23           WHEREAS, Assembly Bill No. 5 was signed into law in September 2018 to codified

24   existing case law as established by the California Supreme Court in the Dynamex case to give

25   the State of California stronger enforcement tools and make it harder for companies to label

1   workers and independent contractors instead of employees, a common practice that has

2   allowed businesses to skirt local, state, and federal labor law; and

3       WHEREAS, The San Francisco Board of Supervisor passed Resolution No. 338-19 in

4   July 2019 in support of Assembly Bill No. 5; and

5       WHEREAS, Instead of adhering to Assembly Bill No. 5, Uber, an app-based ride share

6   company, put together a deceptive ballot measure creating a loophole in existing law for app-

7   based companies to continue to exploit their workers for profit; and

8       WHEREAS, Proposition 22 allows app-based companies to boost their profits by

9   refusing to provide their workers with benefits required under current law such as paid sick

10  leave, unemployment insurance, or healthcare; and

11      WHEREAS, Proposition 22 only requires app-based companies to pay workers for

12  "engaged time" when they are logged in to an app, and actively working rather than including

13  idle time when workers are waiting for an order or ride request; and

14      WHEREAS, Under Proposition 22, workers may only be guaranteed $5.64 an hour

15  including "non-engaged" hours when workers do not have a passenger or order, which is far

16  less than minimum wage and workers are only compensated for less than two-thirds of their

17  work; and

18      WHEREAS, Under Proposition 22, workers must work for more than 39 hours a week

19  to qualify for the minimum healthcare benefit based on their "engaged time"; and

20      WHEREAS, Proposition 22 prevent workers from accessing a single day of paid sick or

21  family leave, and unemployment benefits that many need during this pandemic; and

22      WHEREAS, Proposition 22 would force workers absorb the cost of medical care for on-

23  the-job injuries instead of filing for workers compensation and give the companies  more

24  power to deny workers long-term medical or income protections if they are disabled on the

25  job; and

1    WHEREAS, Proposition 22 waters down existing protections for workers against

2    harassment and discrimination by allowing for discrimination against immigration status, and

3    failing to include any enforcement tools; and

4    WHEREAS, Proposition 22 eliminates required sexual harassment training as well as

5    the obligations on Uber and Lyft to investigate both customers' and drivers' harassment

6    claims; and

7    WHEREAS, Article 7 of Proposition 22 would cancel nearly every current and

8    conceivable workplace law including any local laws such as minimum wage standards, living

9    wage, safeguard tips, sick leave, emergency COVID-19 leave, tips, healthcare benefits, or

10   unfair termination that would seek to extend workplace protection to app-based workers; and

11   WHEREAS, Proposition 22 would eliminate the ability of the California State

12   Legislature to ever change the law by requiring a seven-eighths vote to amend the initiative

13   and will leave workers permanently unprotected; and

14   WHEREAS, App-based companies like Uber, Lyft, DoorDash, Instacart and Postmates

15   have spent a combined $184 million to date, the largest expenditure on a ballot position in

16   California history; now, therefore, be it

17   RESOLVED, That the City and County of San Francisco hereby formally opposes

18   Proposition 22, the App-Based Drivers as Contractors and Labor Policies Initiative, on the

19   November 3, 2020, ballot; and, be it

20   FURTHER RESOLVED, That the City and County of San Francisco go on record in

21   opposition of Proposition 22, the App-Based Drivers as Contractors and Labor Policies

22   Initiative, on the November 3, 2020, ballot; and, be it

23   FURTHER RESOLVED, That the City and County of San Francisco urges other

24   municipalities to oppose Proposition 22, the App-Based Drivers as Contractors and Labor

25   Policies Initiative, on the November 3, 2020, ballot.

Supervisors Walton; Safai, Peskin, Ronen, Haney, Fewer, Mandelman, Mar, Preston, Yee
**BOARD OF SUPERVISORS**                                                                                    Page 3



# City and County of San Francisco

## Tails

### Resolution

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

---

**File Number:**   201155                    **Date Passed:**   October 20, 2020

Resolution opposing California State Proposition 22, App-Based Drivers as Contractors and Labor Policies Initiative, on the November 3, 2020, ballot.

October 20, 2020 Board of Supervisors - ADOPTED

Ayes: 11 - Fewer, Haney, Mandelman, Mar, Peskin, Preston, Ronen, Safai, Stefani, Walton and Yee

File No. 201155

**I hereby certify that the foregoing Resolution was ADOPTED on 10/20/2020 by the Board of Supervisors of the City and County of San Francisco.**

_____
**Angela Calvillo**
**Clerk of the Board**

_____                    _____
Unsigned                                            10/30/2020
**London N. Breed**                                 **Date Approved**
**Mayor**

I hereby certify that the foregoing resolution, not being signed by the Mayor within the time limit as set forth in Section 3.103 of the Charter, or time waived pursuant to Board Rule 2.14.2, became effective without her approval in accordance with the provision of said Section 3.103 of the Charter or Board Rule 2.14.2.

_____                    10/30/2020
Angela Calvillo                                     _____
Clerk of the Board                                  Date

# EXHIBIT B
# to
## Declaration of Jeremy M. Goldman
## In Support Of San Francisco's Request For
## Judicial Notice And Motion To Dismiss

424B4 1 d647121d424b4.htm 424B4

Table of Contents

<div align="right">

Filed Pursuant to Rule 424(b)(4)
Registration No. 333-194219

</div>

**PROSPECTUS**

<div align="center">

# 7,405,614 Shares



## Common Stock
## $26.00 per share

</div>

This is the initial public offering of shares of common stock of GrubHub Inc. We are offering 4,000,000 shares to be sold in this offering. The selling stockholders identified in this prospectus are offering an additional 3,405,614 shares. We will not receive any of the proceeds from the sale of shares being sold by the selling stockholders.

The selling stockholders have granted the underwriters an option to purchase up to 1,110,842 additional shares of our common stock.

Prior to this offering, there has been no public market for the common stock. The initial public offering price per share is $26.00. Our shares of common stock have been approved for listing on the New York Stock Exchange ("NYSE") under the symbol "GRUB."

*We are an "emerging growth company" as defined under the federal securities laws and, as such, may elect to comply with certain reduced public company reporting requirements for future filings.*

**Investing in our common stock involves risks. See the section titled "Risk Factors" beginning on page 12.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

|  | Per Share | Total |
|---|---|---|
| Public Offering Price | $26.00 | $ 192,545,964.00 |
| Underwriting Discount | $ 1.82 | $ 13,478,217.48 |
| Proceeds to GrubHub Inc. (before expenses) | $24.18 | $ 96,720,000.00 |
| Proceeds to Selling Stockholders (before expenses) | $24.18 | $ 82,347,746.52 |

The underwriters expect to deliver the shares to purchasers on or about April 9, 2014 through the book-entry facilities of The Depository Trust Company.

# Citigroup                        Morgan Stanley

<div align="center">

### Allen & Company LLC

</div>

**BMO Capital Markets**      **Canaccord Genuity**      **Raymond James**      **William Blair**

April 3, 2014

**Table of Contents**



# Connecting hungry diners with local restaurants across the country



## How it works

### Search...
Search your favorite local restaurants

### Order...
Order directly through our websites or apps

### Eat!
Restaurant prepares and delivers your food



## Making the takeout experience awesome for both diners and restaurants

**For Diners:**

- Discover new restaurants.
- Easily order online or with our apps.
- No more waiting on hold or frustrating phone calls, and no extra fees.
- Great 24/7 customer service.

**For Restaurants:**

- More orders. New customers.
- No upfront fees.
- An online and mobile presence.
- OrderHub, Boost and DeliveryHub: The latest technology to help manage their orders.

Table of Contents

We are responsible for the information contained in this prospectus and in any free-writing prospectus we prepare or authorize. We, the selling stockholders and the underwriters have not authorized anyone to provide you with different information, and we, the selling stockholders and the underwriters take no responsibility for any other information others may give you. We are not, and the underwriters are not, making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than its date.

---

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY | 1 |
| RISK FACTORS | 12 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 32 |
| BASIS OF PRESENTATION | 33 |
| INDUSTRY AND MARKET DATA | 35 |
| USE OF PROCEEDS | 36 |
| DIVIDEND POLICY | 37 |
| CAPITALIZATION | 38 |
| DILUTION | 39 |
| UNAUDITED PRO FORMA FINANCIAL INFORMATION | 41 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OTHER DATA | 44 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 48 |
| BUSINESS | 70 |
| MANAGEMENT | 80 |
| EXECUTIVE COMPENSATION | 89 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 98 |
| PRINCIPAL AND SELLING STOCKHOLDERS | 100 |
| DESCRIPTION OF CAPITAL STOCK | 104 |
| SHARES ELIGIBLE FOR FUTURE SALE | 108 |
| U.S. FEDERAL TAX CONSIDERATIONS FOR NON-U.S. HOLDERS | 111 |
| UNDERWRITING | 115 |
| LEGAL MATTERS | 121 |
| EXPERTS | 121 |
| WHERE YOU CAN FIND MORE INFORMATION | 121 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

i

**Table of Contents**

## SUMMARY

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. This summary does not contain all of the information you should consider before investing in our common stock. You should read this entire prospectus carefully, including the sections titled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Unless otherwise stated or the context requires otherwise, (i) when we refer to the "Seamless Platform," we refer to the operations for Seamless North America, LLC as of and for the year ended December 31, 2011 and from January 1, 2012 through October 28, 2012, the date when Aramark Corporation ("Aramark") completed the spin-off of its interest in the Seamless business, and to the operations for Seamless Holdings Corporation, an entity formed for the purpose of completing the spin-off and whose assets primarily consist of Aramark's former interest in the Seamless business and its subsidiaries ("Seamless Holdings"), beginning on October 29, 2012, (ii) when we refer to the "GrubHub Platform," we refer to the operations of GrubHub Holdings Inc., formerly known as GrubHub, Inc. ("GrubHub Holdings"), and its subsidiaries and (iii) all share and per share data in this prospectus reflects a 1-for-2 reverse stock split of our capital stock issued and outstanding (including adjustments for fractional shares), which was effected on April 2, 2014. On August 8, 2013 (the "Merger Date"), we completed a merger of the GrubHub Platform and the Seamless Platform (the "Merger"). Through the Merger, we formed GrubHub Inc., formerly known as GrubHub Seamless Inc., which includes both the GrubHub Platform and the Seamless Platform. In this prospectus, unless the context otherwise requires, the terms "GrubHub," "the Company," "our platform," "we," "us," and "our" refer, (i) prior to the Merger Date, to the Seamless Platform and (ii) after the Merger Date, to GrubHub Inc. and its subsidiaries.*

*References to operating metrics as "combined" reflect the combined results for the GrubHub Platform and the Seamless Platform beginning on the first day of the period for which the operating metric is presented. See "Basis of Presentation."*

### Our Mission

*Our mission is to make takeout better.*

**Our Company**

GrubHub is the leading online and mobile platform for restaurant pick-up and delivery orders, which we refer to as takeout. We processed more than 135,000 combined Daily Average Grubs (as defined herein) in 2013 and had approximately $1.3 billion of combined Gross Food Sales (as defined herein) on our platforms in 2013. We connect local restaurants with hungry diners in more than 600 cities across the United States and are focused on transforming the takeout experience. For restaurants, GrubHub generates higher margin takeout orders at full menu prices. Our platform empowers diners with a "direct line" into the kitchen, avoiding the inefficiencies, inaccuracies and frustrations associated with paper menus and phone orders. We have a powerful two-sided network that creates additional value for both restaurants and diners as it grows.

Our target market is primarily independent restaurants. These independent restaurants, which account for 61% of all U.S. restaurants (according to a 2013 industry report prepared by Euromonitor International ("Euromonitor")), remain local, highly fragmented and are mostly owner-operated family businesses. According to Euromonitor, Americans spent $204 billion at these approximately 350,000 independent restaurants in 2012. We believe that Americans spent approximately $67 billion on takeout at these independent restaurants.

For restaurants, takeout enables them to grow their business without adding seating capacity or wait staff. Advertising for takeout, typically done through the distribution of menus to local households or advertisements in local publications, is often inefficient and requires upfront payment with no certainty of success. In contrast, we

1

**Table of Contents**

provide the approximately 28,800 restaurants on our platform (as of December 31, 2013) with an efficient way to generate more takeout orders. We enable restaurants to access local diners at the moment when those diners are hungry and ready to purchase takeout. In addition, we do not charge the restaurants in our network any upfront or subscription fees, we do not require any discounts from their full price menus and we only get paid for the orders we generate for them, providing restaurants with a low-risk, high-return solution. We charge restaurants a per-order commission that is primarily percentage-based.

As our two-sided network of restaurants and diners has grown, many of our restaurants have chosen to pay higher rates to receive better exposure to more diners on our platform, and this has resulted in higher overall commission rates for us.

For diners, the traditional takeout ordering process is often a frustrating experience—from using paper menus to communicating an order by phone to a busy restaurant employee. In contrast, ordering on GrubHub is enjoyable and a dramatic improvement over the "menu drawer." We provide diners on our platform with an easy-to-use, intuitive and personalized platform that helps them search for and discover local restaurants and then accurately and efficiently place an order from any Internet-connected device. We also provide diners with information and transparency about their orders and status and solve problems that may arise. In addition, we make re-ordering convenient by storing previous orders, preferences and payment information, helping us promote diner frequency and drive strong repeat business.

The proliferation of mobile devices over the past few years has significantly increased the value of our platform. With powerful, easy-to-use mobile applications for iPhone, iPad and Android, we enable diners to access GrubHub whenever and wherever they want takeout. The discovery and ordering capabilities that are available on our consumer websites are also available through our mobile applications. We monetize the orders placed through our mobile applications using the same rate as orders placed through our websites. Our mobile applications make ordering from GrubHub more accessible and personal, driving increased use of our platform by restaurants and diners. Orders placed on mobile devices increased from approximately 20% of our consumer orders during the quarter ended December 31, 2011 to approximately 43% of our consumer orders during the quarter ended December 31, 2013.

The GrubHub Platform was founded in 2004 and the Seamless Platform was founded in 1999. We completed the Merger of the two companies in August 2013. The Merger has enabled us to expand our two-sided network, connecting customers in the geographies we serve with more restaurants. Through the combination of the GrubHub Platform and the Seamless Platform, we are able to eliminate duplicative marketing expenses and restaurant sales and take advantage of a complementary geographic footprint.

Our business has grown rapidly. In 2013, we generated revenue of $137.1 million, representing a 67% increase from 2012. Our revenue growth has been driven primarily by increasing adoption of our platform by restaurants and diners, with 3.4 million Active Diners (as defined herein) as of December 31, 2013, and the inclusion of results from the GrubHub Platform. $26.3 million of the increase in revenue and 1.9 million of the increase in Active Diners were due to the inclusion of results from the GrubHub Platform following the Merger Date. In 2013, our net income was $6.7 million and our Adjusted EBITDA was $38.1 million. See "—Summary Historical Consolidated Financial Information" for a discussion and reconciliation of Adjusted EBITDA to net income.

**The Takeout Market Opportunity**

Food is an essential, social and enjoyable aspect of everyday life. However, there is often little time to cook at home or dine out. In addition, diners are increasingly looking for a broader and more diversified choice of cuisines and menu items. Takeout offers a convenient alternative, providing diners with a wide variety of options, wherever they want and whenever they want.

2

Table of Contents

### Large and Fragmented Market

Our primary target market is comprised of approximately 350,000 independent restaurants that account for 61% of all U.S. restaurants, according to Euromonitor. According to Euromonitor, Americans spent $204 billion at these independent restaurants in 2012. We believe that Americans spent approximately $67 billion on takeout at these independent restaurants.

### Challenges for Independent Restaurants

Independent restaurant owners recognize that increasing takeout orders enables them to grow their business because they can service the additional orders by leveraging existing resources, including excess capacity and perishable inventory, without adding seating capacity or wait staff. Advertising for takeout is often done through the distribution of menus to local households or through local publications such as the yellow pages. These traditional methods of advertising are typically inefficient, require upfront payment with no certainty of success and are rapidly becoming obsolete as diners shift to online and mobile solutions for local search and discovery. Providing a quality experience for takeout diners is also a key challenge for restaurants. Because independent restaurants focus on serving on-premise diners, they typically have a limited ability to attend to the needs of takeout diners. The traditional takeout ordering process is highly manual and prone to errors and delays. Effectively and efficiently managing order delivery is also a challenge for independent restaurants given the nature of the process as well as their limited resources to handle follow-up calls.

Independent restaurants seek a simple and effective solution to expand their takeout business without significant investments or expertise in marketing and technology.

### Challenges for Diners

For diners, ordering takeout is usually a chore and is often a frustrating experience. Typically, ordering takeout starts with the challenge of choosing where to order from and what to order—usually relying on a tired, outdated and limited choice of menus found in the "menu drawer." Once a diner chooses and calls a restaurant, the ordering process can lead to angst, as the diner is faced with long hold times, distracted order-takers in an already error-prone process, difficulty communicating special requests, incomplete pricing information and the inevitable wait for delivery with limited transparency. Upon delivery, diners only have a few seconds to confirm that what they received is indeed what they ordered, with limited recourse in the event it is not.

Diners seek a simple, convenient and transparent takeout ordering solution with a wide variety of restaurant choices that provides them with a "direct line" into the kitchen.

## The GrubHub Solution

At GrubHub, we focus on providing value to both restaurants and diners through our two-sided network. We provide restaurants with more orders, help them serve diners better and enable them to improve the efficiency of their takeout business. For diners, we make takeout accessible, simple and enjoyable, enabling them to discover new restaurants and accurately and easily place their orders anytime and from anywhere.

### Why Restaurants Love GrubHub

With approximately 28,800 restaurants in our network as of December 31, 2013, we believe that we provide restaurants with the following key benefits:

- *More Orders*.   Through GrubHub, restaurants in our network receive more orders at full menu prices.

- *Targeted Reach*.   Restaurants in our network gain an online and mobile presence with the ability to reach their most valuable target audience—hungry diners in their area.

3

Table of Contents

- *Low Risk, High Return*.    GrubHub generates higher margin takeout orders for the restaurants in our network by enabling them to leverage their existing fixed costs.
- *Service and Efficiency*.    Restaurants in our network can receive and handle a larger volume of takeout orders more accurately, increasing their operational efficiency while providing their takeout diners with a high-quality experience.
- *Insights*.    We provide restaurants with actionable insights based on the significant amount of order data we gather, helping them to optimize their delivery footprints, menus, pricing and online profiles.

**Why Diners Love GrubHub**

With 3.4 million Active Diners as of December 31, 2013 and more than 135,000 combined Daily Average Grubs in 2013, we believe that we provide diners with the following key benefits:

- *Discovery*.    GrubHub aggregates menus and enables ordering from restaurants across more than 600 cities in the United States, in most cases providing diners with more choices than the "menu drawer" and allowing them to discover hidden gems from local restaurants in our network.
- *Convenience*.    Using GrubHub, diners do not need to place their orders over the phone. We provide diners with an easy-to-use, intuitive and personalized platform that makes ordering simple from any connected device.
- *Control and Transparency*.    Our platform empowers diners with a "direct line" into the kitchen, without having to talk to a distracted order-taker in an already error-prone process.
- *Service*.    For diners, GrubHub's role is similar to that of the waiter in a restaurant, providing a critical layer of customer service that is typically missing in takeout.

## Our Competitive Advantages

Our focus on making takeout better for both restaurants and diners has helped us to develop the following competitive advantages:

- *Market Leader with Significant Scale*.    We are the largest takeout platform, with approximately $1.3 billion in combined Gross Food Sales on our platform; approximately 28,800 restaurants across 600 cities in the United States; and 3.4 million Active Diners, yielding more than 135,000 combined Daily Average Grubs across our platform.
- *Powerful Two-Sided Network Effect*.    As we continue to increase the number of restaurants in our network, we become a more compelling platform for diners. As we continue to increase the number of diners on our platform, we generate more orders for and become more compelling to restaurants.
- *Growing and Recurring Diner Base*.    We believe that our easy-to-use ordering system, restaurant choices and enjoyable user experience all inspire new diners to try GrubHub and encourage existing diners to make GrubHub a way of life, driving repeat and growing use of our platform.
- *Product Innovation*.    We have a history of introducing new products that make our platform better, such as the introduction of our mobile applications and our restaurant-facing products, OrderHub and Boost.
- *Mobile Engagement and Monetization*.    We benefit from the growing adoption and increased use of our mobile applications, as they significantly increase the number of orders diners place through GrubHub. Orders placed on mobile devices increased from approximately 20% of our consumer orders during the quarter ended December 31, 2011 to approximately 43% of our consumer orders during the quarter ended December 31, 2013. We monetize the orders placed through our mobile applications using the same rate as orders placed through our websites.

4

Table of Contents

- *Attractive Business Model*.   Our scalable platform enables us to process additional orders at low incremental cost. As our two-sided network of restaurants and diners has grown, many of our restaurants have chosen to pay higher rates to receive better exposure to more diners on our platform, and this has resulted in higher overall commission rates for us.

**Our Growth Strategy**

We strive to make GrubHub an integral part of everyday life for our restaurants and diners through the following growth strategies:

- *Grow our Two-Sided Network*.   We intend to grow the number of restaurants in our existing geographic markets by providing them with opportunities to generate more takeout orders. We intend to grow the number of diners and orders placed on our network primarily through word-of-mouth referrals, marketing that encourages adoption of our mobile applications and increased order frequency.

- *Enhance our Platform*.   We plan to continue to invest in our websites and mobile products, develop new products and better leverage the significant amount of order data that we collect.

- *Deliver Excellent Customer Service*.   By meeting and exceeding the expectations of both restaurants and diners through our customer service, we seek to gain their loyalty and support for our platform.

- *Pursue Strategic Acquisitions*.   We intend to continue to pursue expansion opportunities in existing and new markets, as well as in core and adjacent categories through strategic acquisitions.

<div align="center">

**Risk Factors**

</div>

Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, before making a decision to invest in our common stock. Some of these risks are:

- We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful;

- If we fail to manage the integration of the Merger effectively, our results of operations and business could be harmed;

- If we fail to retain our existing restaurants and diners or to acquire new restaurants and diners in a cost-effective manner, our revenue may decrease and our business may be harmed;

- Growth of our business will depend on a strong brand and any failure to maintain, protect and enhance our brand would hurt our ability to retain or expand our base of restaurants and diners and our ability to increase their level of engagement;

- We rely on restaurants in our network for many aspects of our business, and any failure by them to maintain their service levels could harm our business; and

- We experience significant seasonal fluctuations in our financial results, which could cause our stock price to fluctuate.

<div align="center">

**Our Corporate Information**

</div>

The GrubHub Platform was founded in 2004 and the Seamless Platform was founded in 1999. We completed the Merger of the two platforms on the Merger Date.

<div align="center">

5

</div>

Table of Contents

Our principal executive offices are located at 111 W. Washington Street, Suite 2100, Chicago, Illinois 60602, and our telephone number is (877) 585-7878. Our website addresses are www.grubhub.com and www.seamless.com. Information contained on or that can be accessed through our website does not constitute part of this prospectus and inclusions of our website address in this prospectus are inactive textual references only.

As of December 31, 2013, we had more than 40 trademarks registered in the United States, including "GrubHub," "happy eating," "Seamless," "OrderHub" and "Your food is here." This prospectus may also contain trademarks, service marks, trade names and copyrights of other companies, which are the property of their respective owners. Solely for convenience, the trademarks, service marks, trade names and copyrights referred to in this prospectus are listed without the TM, SM, © and ® symbols, but we will assert, to the fullest extent under applicable law, our rights or the rights of the applicable owners, if any, to these trademarks, service marks, trade names and copyrights.

### Emerging Growth Company Status

We qualify as an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to:

- an exemption from complying with the auditor attestation requirements of Section 404 of the Sarbanes Oxley Act of 2002, as amended ("Section 404");
- a requirement to have only two years of audited financial statements and only two years of related selected financial data and management's discussion and analysis of financial condition and results of operations disclosure;
- reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements; and
- an exemption from the requirement to seek non-binding advisory votes on executive compensation and shareholder approval of any golden parachute payments not previously approved.

We have not made a decision regarding whether to take advantage of these exemptions. If we do take advantage of any of these exemptions, we do not know if some investors will find our common stock less attractive as a result. The result may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably opted out of the extended transition period for complying with new or revised accounting standards pursuant to Section 107(b) of the JOBS Act.

We could remain an "emerging growth company" for up to five years, or until the earliest of (a) the last day of the first fiscal year in which our annual gross revenues exceed $1 billion, (b) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter, or (c) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three-year period.

6

Table of Contents

## The Offering

| | |
|---|---|
| Common stock offered by us | 4,000,000 shares. |
| Common stock offered by the selling stockholders | 3,405,614 shares (or 4,516,456 shares if the underwriters exercise their option to purchase additional shares in full). |
| Common stock to be outstanding after this offering | 78,385,786 shares. |
| Use of proceeds | We expect to receive net proceeds from this offering of approximately $94.7 million, based upon the initial public offering price of $26.00 per share, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. We will not receive any proceeds from the sale of shares by the selling stockholders. |
| | We currently intend to use the net proceeds from this offering for working capital and other general corporate purposes. We may also use a portion of the net proceeds to acquire or invest in complementary businesses, products, services, technologies or other assets. See the section titled "Use of Proceeds" for additional information. |
| Concentration of ownership | Upon completion of this offering, our executive officers and directors, and their affiliates, will beneficially own, in the aggregate, 33.5% of our outstanding shares of common stock (or 32.7% if the underwriters exercise their option to purchase additional shares in full). |
| Proposed trading symbol | "GRUB." |

On April 2, 2014, we effected a 1-for-2 reverse stock split of our issued and outstanding common stock and Preferred Stock (as defined below) (the "Reverse Stock Split"). No fractional shares of the Company's common stock and Preferred Stock were issued as a result of the Reverse Stock Split. Any fractional shares resulting from the Reverse Stock Split have been rounded up to the nearest whole share.

The number of shares of common stock that will be outstanding after this offering is based on 74,385,786 shares outstanding as of December 31, 2013, and excludes:

- 7,530,948 shares of common stock issuable upon the exercise of options to purchase common stock that were outstanding as of December 31, 2013, with a weighted average exercise price of $4.08 per share; and

- 2,527,028 shares of common stock reserved for future issuance under our 2013 Omnibus Incentive Plan as of December 31, 2013, and any future increase in shares reserved for issuance under such plan.

Except as otherwise indicated, all information in this prospectus assumes:

- the automatic conversion of all outstanding shares of our convertible Series A Preferred Stock (the "Preferred Stock") into an aggregate of 19,284,113 shares of common stock, the conversion of which will occur immediately prior to the closing of this offering;

7

Table of Contents

- the filing and effectiveness of our amended and restated certificate of incorporation in Delaware and the adoption of our amended and restated bylaws, each of which will occur immediately prior to the closing of this offering;

- no exercise by the underwriters of their option to purchase up to an additional 1,110,842 shares of common stock from the selling stockholders in this offering; and

- the completion of the Reverse Stock Split, which was effected on April 2, 2014.

8

**Table of Contents**

### Summary Historical Consolidated Financial and Other Data

The following tables summarize our historical financial and other data, which has been derived from our consolidated financial statements included elsewhere in this prospectus. Our consolidated financial statements included elsewhere in this prospectus reflect the results of operations and financial condition of (i) the Seamless Platform as of and for the years ended December 31, 2011 and 2012, (ii) the Seamless Platform from January 1, 2013 through the Merger Date and for both the GrubHub Platform and the Seamless Platform after the Merger Date through December 31, 2013 and (iii) GrubHub Inc. as of December 31, 2013. Our historical results are not necessarily indicative of the results that may be expected in the future. The following summary financial and other data should be read in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2011 | 2012 | 2013[1] |
| **Statement of Operations Data:** | | | |
| Revenues | $60,611 | $82,299 | $137,143 |
| Costs and expenses: | | | |
| Sales and marketing | 17,198 | 26,892 | 37,347 |
| Operations and support | 13,961 | 18,165 | 34,173 |
| Technology (exclusive of amortization) | 5,651 | 10,172 | 15,357 |
| General and administrative | 9,777 | 12,249 | 21,907 |
| Depreciation and amortization | 4,033 | 6,089 | 13,470 |
| Total costs and expenses | 50,620 | 73,567 | 122,254 |
| Income before provision for income taxes | 9,991 | 8,732 | 14,889 |
| Provision (benefit) for income taxes | (5,220) | 813 | 8,142 |
| Net income | $15,211 | $ 7,919 | $ 6,747 |
| **Other Financial Information:** | | | |
| Adjusted EBITDA[2] | $14,827 | $17,185 | $ 38,134 |

(1) Includes results for Seamless Holdings through August 8, 2013, when we completed the Merger, and of GrubHub Inc., the combined company, for the remainder of the period presented.

(2) See the section titled "Non-GAAP Financial Measures" below for more information and for a reconciliation of Adjusted EBITDA to net income, the most directly comparable financial measure calculated and presented in accordance with U.S. generally accepted accounting principles.

| | As of December 31, 2013 | | |
|---|---|---|---|
| (in thousands) | Actual[1] | Pro Forma[2] (unaudited) | Pro Forma As Adjusted[3] |
| **Balance Sheet Data:** | | | |
| Cash and cash equivalents | $ 86,542 | $ 86,542 | $ 181,244 |
| Working capital | 29,568 | 29,568 | 124,270 |
| Total assets | 762,812 | 762,812 | 857,514 |
| Convertible Preferred Stock | 2 | — | — |
| Total stockholders' equity | 557,375 | 575,790 | 670,492 |

(1) Reflects the actual balances at GrubHub Inc. as of December 31, 2013.

9

**Table of Contents**

(2)    The pro forma column above reflects the automatic conversion of all outstanding shares of our convertible Preferred Stock as of December 31, 2013 into an aggregate of 19,284,113 shares of common stock, which conversion will occur immediately prior to the closing of this offering, as if such conversion had occurred on December 31, 2013.

(3)    The pro forma as adjusted column above gives effect to the pro forma adjustments set forth above and the sale and issuance by us of 4,000,000 shares of common stock in this offering at the initial public offering price of $26.00 per share, after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

**Key Business Metrics**

To analyze our business performance, determine financial forecasts and help develop long-term strategic plans, we review the following key business metrics:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2011 | 2012 | 2013 |
|  | | (unaudited) | |
| Active Diners[1] | 689,000 | 986,000 | 3,421,000 |
| Daily Average Grubs[2] | 45,700 | 62,000 | 107,900 |
| Gross Food Sales (in millions)[3] | $    412.2 | $    568.8 | $    1,014.9 |

(1)    We count Active Diners as the number of unique diner accounts from which an order has been placed in the past twelve months through our platform. We began including Active Diners from the GrubHub Platform as of the Merger Date.

(2)    We count Daily Average Grubs as the number of revenue generating orders placed on our platform divided by the number of days for a given period.

(3)    We calculate Gross Food Sales as the total value of food, beverages, taxes, prepaid gratuities, and any delivery fees processed through our platform. We include all revenue generating orders placed on our platform. Because we act as an agent of the merchant in the transaction, we recognize as revenue only our commissions from the transaction, which are a percentage of the total Gross Food Sales for such transaction.

**Non-GAAP Financial Measures**

Adjusted EBITDA is a financial measure that is not calculated in accordance with generally accepted accounting principles in the United States ("GAAP"). We define Adjusted EBITDA as net income adjusted to exclude acquisition costs and related severance, incomes taxes, depreciation and amortization and stock-based compensation expense. Below, we have provided a reconciliation of Adjusted EBITDA to our net income, the most directly comparable financial measure calculated and presented in accordance with GAAP. Adjusted EBITDA should not be considered as an alternative to net income or any other measure of financial performance calculated and presented in accordance with GAAP. Our Adjusted EBITDA may not be comparable to similarly titled measures of other organizations because other organizations may not calculate Adjusted EBITDA in the same manner as we calculate the measure.

We include Adjusted EBITDA in this prospectus because it is an important measure upon which our management assesses our operating performance. We use Adjusted EBITDA as a key performance measure because we believe it facilitates operating performance comparisons from period to period by excluding potential differences primarily caused by variations in capital structures, tax positions, the impact of acquisitions and restructuring, the impact of depreciation and amortization expense on our fixed assets and the impact of stock-based compensation expense. Because Adjusted EBITDA facilitates internal comparisons of our historical operating performance on a more consistent basis, we also use Adjusted EBITDA for business planning purposes

10

Table of Contents

and in evaluating acquisition opportunities. In addition, we believe Adjusted EBITDA and similar measures are widely used by investors, securities analysts, ratings agencies and other parties in evaluating companies in our industry as a measure of financial performance and debt-service capabilities.

Our use of Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations are:

- Adjusted EBITDA does not reflect our cash expenditures for capital equipment or other contractual commitments;

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Adjusted EBITDA does not reflect capital expenditure requirements for such replacements;

- Adjusted EBITDA does not reflect changes in, or cash requirements for, our working capital needs; and

- other companies, including companies in our industry, may calculate Adjusted EBITDA measures differently, which reduces their usefulness as comparative measures.

In evaluating Adjusted EBITDA, you should be aware that in the future we will incur expenses similar to some of the adjustments in this presentation. Our presentation of Adjusted EBITDA should not be construed as an inference that our future results will be unaffected by these expenses or any unusual or non-recurring items. When evaluating our performance, you should consider Adjusted EBITDA alongside other financial performance measures, including our net income and other GAAP results.

The following table presents a reconciliation of Adjusted EBITDA to our net income, the most comparable GAAP measure, for each of the periods indicated:

| | Year Ended December 31, | | |
| | 2011 | 2012 | 2013[1] |
|---|---|---|---|
| (in thousands) | | (unaudited) | |
| **Reconciliation of Adjusted EBITDA:** | | | |
| Net income | $15,211 | $ 7,919 | $ 6,747 |
| Income taxes[2] | (5,220) | 813 | 8,142 |
| Depreciation and amortization | 4,033 | 6,089 | 13,470 |
| EBITDA | 14,024 | 14,821 | 28,359 |
| Merger and restructuring costs[3] | — | — | 4,842 |
| Stock—based compensation | 803 | 2,364 | 4,933 |
| Adjusted EBITDA | $14,827 | $17,185 | $38,134 |

(1)    Includes results for Seamless Holdings through August 8, 2013, when we completed the Merger, and of GrubHub Inc., the combined company, for the remainder of the period presented.

(2)    The increase in income tax expense was primarily attributable to a reversal of deferred tax liability of $8.1 million in 2011 associated with the June 2011 sale of preferred stock to SLW Investors, LLC offset by 2011 income tax paid of $2.2 million, which represents the income tax expense from January 1, 2011 through May 31, 2011. For the period January 1, 2012 through October 27, 2012, the Company was a pass-through entity for income tax purposes. Immediately following the Merger Date, 100% of our taxable income is subject to income tax.

(3)    Merger and restructuring costs include transaction and integration related costs, such as legal and accounting costs, associated with the Merger, and restructuring costs.

Table of Contents

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, before making a decision to invest in our common stock. If any of the risks actually occur, our business, financial condition, results of operations and prospects could be harmed. In that event, the trading price of our common stock could decline, and you could lose part or all of your investment in us.*

### Risks Related to Our Business

***We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful.***

We have a limited operating history in an evolving industry that may not develop as expected. Assessing our business and future prospects is challenging in light of the risks and difficulties we may encounter. These risks and difficulties include our ability to:

- accurately forecast our revenues and plan our operating expenses;

- increase the number of and retain existing restaurants and diners using our platform;

- successfully compete with the traditional telephone, pen-and-paper takeout ordering process, along with other companies that are currently in, or may in the future enter, the business of allowing diners to order takeout food online;

- successfully expand our business in existing markets and enter new markets;

- adapt to rapidly evolving trends in the ways consumers and businesses interact with technology;

- avoid interruptions or disruptions in our service;

- develop a scalable, high-performance technology infrastructure that can efficiently and reliably handle increased usage, as well as the deployment of new features and products;

- hire, integrate and retain talented sales, customer service, technology and other personnel; and

- effectively manage rapid growth in our personnel and operations.

If the demand for ordering food online and through mobile applications does not develop as we expect, or if we fail to address the needs of restaurants or diners, our business will be harmed. We may not be able to successfully address these risks and difficulties, which could harm our business and results of operations.

***If we fail to manage the integration of the Merger effectively, our results of operations and business could be harmed.***

Since the Merger, we have implemented and continue to implement a process of integration to merge the two businesses. The possible risks associated with such integration include the following:

- we may make changes to unify our pricing models that could affect our relationship with existing restaurants in our network;

- we may experience difficulty with and may not succeed in rebranding a combined company;

- we are in the process of closing our Sandy, Utah office in order to consolidate our customer care, operations and technology teams in Chicago, and we may not be able to retain employees in that office for the necessary transition period before we are able to staff the Chicago office fully and/or until we are able to transition our technology platform completely;

- we may not assimilate the personnel, culture and operations of the two businesses in the combined company, including back-office functions and systems, such as accounting, human resources and others;

12

Table of Contents

- we may not be able to integrate smoothly the combined technologies or products with the current technologies and products, and customers may experience interruptions in their use of our platform as a result;

- unified policies, procedures and controls may not be applied to the combined company in a timely manner following the Merger;

- cost savings and/or marketing efficiencies may not meet our expectations; and

- our chosen strategy leading to the Merger may not be the appropriate strategy.

This integration may be difficult and unpredictable. It may be that resources invested in the Merger and integration efforts would have been or could be better utilized developing technology and products for our proprietary technology platform or on other strategic development initiatives. Additionally, our ongoing business could be disrupted, including management being distracted from other objectives, opportunities and risks. Successful integration also requires coordination of different functional teams. There can be no assurance that we will be successful in our business integration efforts or that we will realize the expected benefits.

### *If we fail to retain our existing restaurants and diners or to acquire new restaurants and diners in a cost-effective manner, our revenue may decrease and our business may be harmed.*

We believe that growth of our business and revenue is dependent upon our ability to continue to grow our two-sided network in existing geographic markets by retaining our existing restaurants and diners and adding new restaurants and diners. The increase in restaurants attracts more diners to our platform and the increase in diners attracts more restaurants. This two-sided network takes time to build and may grow more slowly than we expect or than it has grown in the past. In addition, as we have become larger through organic growth, the growth rates for Active Diners, Daily Average Grubs and Gross Food Sales have at times slowed, and may similarly slow in the future, even if we continue to add restaurants and diners on an absolute basis. Although we expect that our growth rates will continue to slow during certain periods as our business increases in size, if we fail to retain either our existing restaurants (especially our most popular restaurants) or diners, the value of our two-sided network will be diminished. In addition, although we believe that many of our new restaurants and diners originate from word-of-mouth and other non-paid referrals from existing restaurants and diners, we also expect to continue to spend to acquire additional restaurants and diners. We cannot assure you that the revenue from the restaurants and diners we acquire will ultimately exceed the cost of acquisition.

While a key part of our business strategy is to add restaurants and diners in our existing geographic markets, to a lesser degree, we may also expand our operations into new geographic markets. In doing so, we may incur losses or otherwise fail to enter new markets successfully. Our expansion into new markets may place us in unfamiliar competitive environments and involve various risks, including the need to invest significant resources and the possibility that returns on such investments will not be achieved for several years or at all.

### *Growth of our business will depend on a strong brand and any failure to maintain, protect and enhance our brand would hurt our ability to retain or expand our base of restaurants and diners and our ability to increase their level of engagement.*

We believe that a strong brand is necessary to continue to attract and retain diners and, in turn, the restaurants in our network. We need to maintain, protect and enhance our brand in order to expand our base of diners and increase their engagement with our websites and mobile applications. This will depend largely on our ability to continue to provide differentiated products, and we may not be able to do so effectively. While we may choose to engage in a broader marketing campaign to further promote our brand, this effort may not be successful or cost effective. If we are unable to maintain or enhance restaurant and diner awareness in a cost-effective manner, our brand, business, results of operations and financial condition could be harmed. Furthermore, negative publicity about our Company, including delivery problems, issues with our technology and complaints about our personnel or customer service, could diminish confidence in, and the use of, our products, which could harm our results of operations and business.

13

Table of Contents

***We rely on restaurants in our network for many aspects of our business, and any failure by them to maintain their service levels could harm our business.***

We rely upon restaurants in our network, principally small and local independent businesses, to provide quality food to our diners on a timely basis. If these restaurants experience difficulty servicing diner demand, producing quality food, providing timely delivery and good service or meeting our other requirements or standards, our reputation and brand could be damaged. In addition, if restaurants in our network were to cease operations, temporarily or permanently, face financial distress or other business disruption, or if our relationships with restaurants in our network deteriorate, we may not be able to provide diners with restaurant choices. This risk is more pronounced in markets where we have fewer restaurants. In addition, if we are unsuccessful in choosing or finding popular restaurants, if we fail to negotiate satisfactory pricing terms with them or if we ineffectively manage these relationships, it could harm our business and results of operations.

***We experience significant seasonal fluctuations in our financial results, which could cause our stock price to fluctuate.***

Our business is highly dependent on diner behavior patterns that we have observed over time. In our metropolitan markets, we generally experience a relative increase in diner activity from September to April and a relative decrease in diner activity from May to August. In addition, we benefit from increased order volume in our campus markets when school is in session and experience a decrease in order volume when school is not in session, during summer breaks and other vacation periods. Diner activity can also be impacted by colder or more inclement weather, which typically increases order volume, and warmer or sunny weather, which typically decreases order volume. Seasonality will likely cause fluctuations in our financial results on a quarterly basis. In addition, other seasonality trends may develop and the existing seasonality and diner behavior that we experience may change or become more extreme.

***We may not continue to grow at historical rates or maintain profitability in the future.***

While our revenue has grown in recent periods, this growth rate may not be sustainable and we may not realize sufficient revenue to maintain profitability. We may incur significant losses in the future for a number of reasons, including insufficient growth in the number of restaurants and diners on our platform, increasing competition, as well as other risks described in this prospectus, and we may encounter unforeseen expenses, difficulties, complications and delays and other unknown factors. We expect to continue to make investments in the development and expansion of our business, which may not result in increased revenue or growth. In addition, as a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. As a result of these increased expenditures, we will have to generate and sustain increased revenue to maintain profitability. Accordingly, we may not be able to maintain profitability and we may incur significant losses in the future, and this could cause the price of our common stock to decline.

***If we fail to manage our growth effectively, our brand, results of operations and business could be harmed.***

We have experienced rapid growth in our headcount and operations, both through organic growth as well as by our recent Merger. This growth places substantial demands on management and our operational infrastructure. Many of our employees have been with us for fewer than 18 months. We intend to make substantial investments in our technology, customer service, sales and marketing infrastructure. As we continue to grow, we must effectively integrate, develop and motivate a large number of new employees, while maintaining the beneficial aspects of our Company culture. We may not be able to manage growth effectively. If we do not manage the growth of our business and operations effectively, the quality of our platform and efficiency of our operations could suffer, which could harm our brand, business and results of operations.

14

Table of Contents

*The impact of economic conditions, including the resulting effect on consumer spending, may harm our business and results of operations.*

Our performance is subject to economic conditions and their impact on levels of consumer spending. Some of the factors having an impact on discretionary consumer spending include general economic conditions, unemployment, consumer debt, reductions in net worth, residential real estate and mortgage markets, taxation, energy prices, interest rates, consumer confidence and other macroeconomic factors. Consumer purchases of discretionary items generally decline during recessionary periods and other periods in which disposable income is adversely affected. Small businesses that do not have substantial resources, like virtually all of the restaurants in our network, tend to be more adversely affected by poor economic conditions than large businesses. Also, because spending for food purchases from restaurants is generally considered to be discretionary, any decline in consumer spending may have a disproportionate effect on our business relative to those businesses that sell products or services considered to be necessities. If spending at many of the restaurants in our network declines, or if a significant number of these restaurants go out of business, diners may be less likely to use our service, which could harm our business and results of operations. In addition, significant adverse economic conditions could harm the businesses of our corporate customers, resulting in decreased use of our platform. Moreover, the majority of restaurants in our network are located in major metropolitan areas like New York City, Chicago and the San Francisco Bay Area. To the extent any one of these geographic areas experience any of the above described conditions to a greater extent than other geographic areas, the harm to our business and results of operations could be exacerbated.

*We make the restaurant and diner experience our highest priority. Our dedication to making decisions based primarily on the best interests of restaurants and diners may cause us to forego short-term opportunities, which could impact our profitability.*

We base many of our decisions upon the best interests of the restaurants and diners who use our platform. We believe that this approach has been essential to our success in increasing our growth rate and the frequency with which restaurants and diners use our platform and has served our long-term interests and those of our stockholders. We believe that it is our responsibility to make our diners happy. In the past, we have foregone, and we may in the future forego, certain expansion or revenue opportunities that we do not believe are in the best interests of our restaurants and diners, even if such decisions negatively impact our business or results of operations in the short term. Our focus on making decisions based primarily on the interests of the restaurants and diners who use our platform may not result in the long-term benefits that we expect, and our business and results of operations may be harmed.

*If use of the Internet via websites, mobile devices and other platforms, particularly with respect to online food ordering, does not continue to increase as rapidly as we anticipate, our business and growth prospects will be harmed.*

Our business and growth prospects are substantially dependent upon the continued and increasing use of the Internet as an effective medium of transactions by diners. Internet use may not continue to develop at historical rates, and diners may not continue to use the Internet and other online services to order their food at current or increased growth rates or at all. In addition, the Internet and mobile applications may not continue to be accepted as a viable platform or resource for a number of reasons, including:

- actual or perceived lack of security of information or privacy protection;

- possible disruptions, computer viruses or other damage to Internet servers, users' computers or mobile applications;

- excessive governmental regulation; and

- unacceptable delays due to actual or perceived limitations of wireless networks.

15

Table of Contents

***We face potential liability, expense for legal claims and harm to our business based on the nature of our business and the content on our platform.***

We face potential liability, expense for legal claims and harm to our business relating to the nature of the takeout food business, including potential claims related to food offerings, delivery and quality. For example, third parties could assert legal claims against us in connection with personal injuries related to food poisoning or tampering or accidents caused by the delivery drivers of restaurants in our network. Alternatively, we could be subject to legal claims relating to the sale of alcoholic beverages by our restaurants to underage diners.

Reports, whether true or not, of food-borne illnesses (such as E. Coli, avian flu, bovine spongiform encephalopathy, hepatitis A, trichinosis or salmonella) and injuries caused by food tampering have severely injured the reputations of participants in the food business and could do so in the future as well. The potential for acts of terrorism on our nation's food supply also exists and, if such an event occurs, it could harm our business and results of operations. In addition, reports of food-borne illnesses or food tampering, even those occurring solely at restaurants that are not in our network, could, as a result of negative publicity about the restaurant industry, harm our business and results of operations.

In addition, we face potential liability and expense for claims relating to the information that we publish on our websites and mobile applications, including claims for trademark and copyright infringement, defamation, libel and negligence, among others. For example, we could be subject to claims related to the content published on allmenus.com and MenuPages.com ("MenuPages"), which contain approximately 275,000 menus, based on the fact that we do not obtain prior permission from restaurants to include their menus.

We have incurred and expect to continue to incur legal claims. Potentially, the frequency of such claims could increase in proportion to the number of restaurants and diners that use our platform. These claims could divert management time and attention away from our business and result in significant costs to investigate and defend, regardless of the merits of the claims. In some instances, we may elect or be compelled to remove content or may be forced to pay substantial damages if we are unsuccessful in our efforts to defend against these claims. If we elect or are compelled to remove valuable content from our websites or mobile applications, our platform may become less useful to restaurants and diners and our traffic may decline, which could harm our business and results of operations.

***We may not timely and effectively scale and adapt our existing technology and network infrastructure to ensure that our platform is accessible, which would harm our reputation, business and results of operations.***

It is critical to our success that restaurants and diners within our geographic markets be able to access our platform at all times. We have previously experienced service disruptions and in the future, we may experience service disruptions, outages or other performance problems due to a variety of factors, including infrastructure changes, human or software errors, capacity constraints due to an overwhelming number of diners accessing our platform simultaneously, and denial of service or fraud or security attacks. In some instances, we may not be able to identify the cause or causes of these performance problems within an acceptable period of time. It may become increasingly difficult to maintain and improve the availability of our platform, especially during peak usage times and as our products become more complex and our diner traffic increases. If our platform is unavailable when diners attempt to access it or it does not load as quickly as they expect, diners may seek other services, and may not return to our platform as often in the future, or at all. This would harm our ability to attract restaurants and diners and decrease the frequency with which they use our platform. We expect to continue to make significant investments to maintain and improve the availability of our platform and to enable rapid releases of new features and products. To the extent that we do not effectively address capacity constraints, respond adequately to service disruptions, upgrade our systems as needed or continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business and results of operations would be harmed.

16

Table of Contents

***Our failure to protect personal information provided by our diners against inappropriate disclosure, including security breaches, could violate applicable law and contracts with our service providers and could result in liability to us, damage to our reputation and brand and harm to our business.***

We rely on third-party payment processors and encryption and authentication technology licensed from third parties that is designed to effect secure transmission of personal information provided by our diners. We may need to expend significant resources to protect against impermissible disclosure, including security breaches, or to address problems caused by such disclosure. If we, or our third-party providers, are unable to maintain the security of our diners' personal information, our reputation and brand could be harmed and we may be exposed to litigation and possible liability.

Because we process and transmit payment card information, we are subject to the Payment Card Industry ("PCI") and Data Security Standard (the "Standard"). The Standard is a comprehensive set of requirements for enhancing payment account data security that was developed by the PCI Security Standards Council to help facilitate the broad adoption of consistent data security measures. We are required by payment card network rules to comply with the Standard, and our failure to do so may result in fines or restrictions on our ability to accept payment cards. Under certain circumstances specified in the payment card network rules, we may be required to submit to periodic audits, self-assessments or other assessments of our compliance with the Standard. Such activities may reveal that we have failed to comply with the Standard. If an audit, self-assessment or other test determines that we need to take steps to remediate any deficiencies, such remediation efforts may distract our management team and require us to undertake costly and time consuming remediation efforts. In addition, even if we comply with the Standard, there is no assurance that we will be protected from a security breach.

***We are subject to payment-related risks and if payment processors are unwilling or unable to provide us with payment processing service or impose onerous requirements on us in order to access their services, or if they increase the fees they charge us for these services, our business and results of operations could be harmed.***

We accept payments using a variety of methods, including credit and debit cards. For certain payment methods, including credit and debit cards, we pay bank interchange and other fees. These fees may increase over time and raise our operating costs and lower our profitability. We rely on third parties to provide payment processing services, including the processing of credit and debit cards. Our business may be disrupted for an extended period of time if any of these companies becomes unwilling or unable to provide these services to us. We are also subject to payment card association operating rules, certification requirements and rules governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. If we fail to comply with these rules or requirements, we may be subject to fines and higher transaction fees and/or lose our ability to accept credit and debit card payments from diners or facilitate other types of online payments, and our business and results of operations could be harmed.

***We rely on third parties, including our payment processor and data center hosts, and if these or other third parties do not perform adequately or terminate their relationships with us, our costs may increase and result our business and results of operations could be harmed.***

Our success will depend upon our relationships with third parties, including our payment processor and data center hosts. We rely on a third-party payment processor and encryption and authentication technology licensed from third parties that is designed to effect secure transmission of personal information provided by our diners. We rely on third-party data center hosts to provide a reliable network backbone with the speed, data capacity, security and hardware necessary for reliable Internet access and services. If our payment processor, or a data center host, or another third party, does not perform adequately, terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we may have difficulty finding an alternate provider on similar terms and in an acceptable timeframe, our costs may increase and our business and results of operations could be harmed.

In addition, we rely on off-the-shelf hardware and software platforms developed by third parties to build and customize our OrderHub and Boost tablet and mobile applications. If third parties fail to continue to produce or

17

Table of Contents

maintain these hardware and software platforms, our OrderHub and Boost tablet and mobile applications may become less accessible to restaurants and diners, and our business and results of operations could be harmed.

***If our security measures are compromised, or if our platform is subject to attacks that degrade or deny the ability of restaurants and diners to access our content, restaurants and diners may curtail or stop use of our platform.***

Like all online services, our platform is vulnerable to computer viruses, break-ins, phishing attacks, attempts to overload our servers with denial-of-service, misappropriation of data through website scraping or other attacks and similar disruptions from unauthorized use of our computer systems, any of which could lead to interruptions, delays or website shutdowns, causing loss of critical data or the unauthorized disclosure or use of personally identifiable or other confidential information. Like most Internet companies, we have experienced interruptions in our service in the past due to software and hardware issues as well as denial-of-service and other cyber attacks and, in the future, may experience compromises to our security that result in performance or availability problems, the complete shutdown of our websites or the loss or unauthorized disclosure of confidential information. In the event of a prolonged service interruption or significant breach of our security measures, our restaurants and diners may lose trust and confidence in us and decrease their use of our platform or stop using our platform entirely. We may be unable to implement adequate preventative measures against or proactively address techniques used to obtain unauthorized access, disable or degrade service or sabotage systems because such techniques change frequently, often remain undetected until launched against a target and may originate from remote areas around the world that are less regulated. Any or all of these issues could harm our ability to attract new restaurants and diners or deter current restaurants and diners from returning, reduce the frequency with which restaurants and diners use our platform or subject us to third-party lawsuits, regulatory fines or other action or liability, thereby harming our business and results of operations.

***We compete primarily with the traditional offline ordering process and adherence to this traditional ordering method and pressure from existing and new companies that offer online ordering could harm our business and results of operations.***

We primarily compete with the traditional offline ordering process used by the vast majority of restaurants and diners involving the telephone and paper menus that restaurants distribute to diners, as well as advertising that restaurants place in local publications to attract diners. Changing traditional ordering habits is difficult and if restaurants and diners do not embrace the transition to online food ordering as we expect, our business and results of operations could be harmed.

In addition to the traditional takeout ordering process, we also compete with other online food ordering businesses, chain restaurants that have their own online ordering platforms, point of sale companies and restaurant delivery services. Our current and future competitors may enjoy competitive advantages, such as greater name recognition, longer operating histories, greater market share in certain markets and larger existing user bases in certain markets and substantially greater financial, technical and other resources than we have. Greater financial resources and product development capabilities may allow these competitors to respond more quickly to new or emerging technologies and changes in restaurant and diner requirements that may render our products less attractive or obsolete. These competitors could introduce new products with competitive price and performance characteristics or undertake more aggressive marketing campaigns than ours. Large Internet companies with substantial resources, users and brand power could also decide to enter our market and compete with us. Furthermore, independent restaurants could determine that it is more cost effective to develop their own platform to permit online takeout orders rather than use our service.

As part of the Merger, we completed an agreement with the New York Attorney General's Office that required us to waive the exclusivity provisions in existing agreements with restaurants located in Manhattan and to refrain from entering into any new exclusive agreements in Manhattan until February 2015. Complying with the terms of this agreement could increase the ability of our competitors to compete in Manhattan and therefore could have an impact on our market position in Manhattan. If this agreement gives our competitors an advantage, our revenue may decrease and our business and results of operations may be harmed.

18

Table of Contents

If we lose existing restaurants or diners in our network, fail to attract new restaurants or diners or are forced to reduce our commission percentage or make pricing concessions as a result of increased competition, our business and results of operations could be harmed.

***If we do not continue to innovate and provide useful products or if our introduced products do not perform or are not adopted by restaurants in accordance with our expectations, we may not remain competitive and our business and results of operations could suffer.***

Our success depends in part on our ability to continue to innovate. To remain competitive, we must continuously enhance and improve the functionality and features of our platform, including our websites and mobile applications. The Internet and the online commerce industry are rapidly changing and becoming more competitive. If competitors introduce new products embodying new technologies, or if new industry standards and practices emerge, our existing websites, technology and mobile applications may become obsolete. Our future success could depend on our ability to:

- enhance our existing products and develop new products;

- persuade restaurants to adopt our new technologies and products in a timely manner; and

- respond to technological advances and emerging industry standards and practices on a cost-effective and timely basis.

Developing our platform, which includes our mobile applications, websites and other technologies entails significant technical and business risks. We may use new technologies ineffectively, or we may fail to adapt to emerging industry standards. If we face material delays in introducing new or enhanced products or if our recently introduced products do not perform in accordance with our expectations, the restaurants and diners in our network may forego the use of our products in favor of those of our competitors.

***Internet search engines drive traffic to our platform and our new diner growth could decline and our business and results of operations would be harmed if we fail to appear prominently in search results.***

Our success depends in part on our ability to attract diners through unpaid Internet search results on search engines like Google, Yahoo! and Bing. The number of diners we attract to our platform from search engines is due in large part to how and where our websites ranks in unpaid search results. These rankings can be affected by a number of factors, many of which are not under our direct control and may change frequently. For example, a search engine may change its ranking algorithms, methodologies or design layouts. As a result, links to our websites may not be prominent enough to drive traffic to our websites, and we may not know how or otherwise be in a position to influence the results. In some instances, search engine companies may change these rankings in a way that promotes their own competing products or services or the products or services of one or more of our competitors. Search engines may also adopt a more aggressive auction-pricing system for keywords that would cause us to incur higher advertising costs or reduce our market visibility to prospective diners. Our websites have experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of diners directed to our platform could harm our business and results of operations.

***We expect a number of factors to cause our results of operations to fluctuate on a quarterly and annual basis, which may make it difficult to predict our future performance.***

Our results of operations could vary significantly from quarter to quarter and year to year because of a variety of factors, many of which are outside of our control. As a result, comparing our results of operations on a period-to-period basis may not be meaningful. In addition to other risk factors discussed in this section, factors that may contribute to the variability of our quarterly and annual results include:

- our ability to attract new restaurants and diners and retain existing restaurants and diners in our network;

- our ability to accurately forecast revenue and appropriately plan our expenses;

<div align="center">19</div>

Table of Contents

- the effects of changes in search engine placement and prominence;

- the effects of increased competition on our business;

- our ability to successfully expand in existing markets and successfully enter new markets;

- the impact of worldwide economic conditions, including the resulting effect on diner spending on takeout;

- the seasonality of our business, including the effect of academic calendars on college campuses and seasonal patterns in restaurant dining;

- the impact of weather on our business;

- our ability to protect our intellectual property;

- our ability to maintain an adequate rate of growth and effectively manage that growth;

- our ability to maintain and increase traffic to our platform;

- our ability to keep pace with technology changes in the takeout industry;

- the success of our sales and marketing efforts;

- costs associated with defending claims, including intellectual property infringement claims and related judgments or settlements;

- changes in governmental or other regulation affecting our business;

- interruptions in service and any related impact on our reputation or brand;

- the attraction and retention of qualified employees and key personnel;

- our ability to choose and effectively manage third-party service providers;

- changes in diner behavior with respect to takeout, especially in New York City, Chicago and the San Francisco Bay Area;

- the effects of natural or man-made catastrophic events;

- the effectiveness of our internal controls;

- changes in the online payment transfer rate; and

- changes in our tax rates or exposure to additional tax liabilities.

***The loss of key senior management personnel could harm our business and future prospects.***

We depend on our senior management and other key personnel. We may not be able to retain the services of any of our senior management or other key personnel. Although we have employment agreements with our key senior management personnel, their employment is at-will and they could leave at any time. The loss of any of our executive officers or other key employees, could harm our business and future prospects.

***We depend on talented personnel to grow and operate our business, and if we are unable to hire, retain, manage and motivate our personnel, or if our new personnel do not perform as we anticipate, we may not be able to grow effectively.***

Our future success will depend upon our ability to continue to identify, hire, develop, motivate and retain talented personnel. We may not be able to retain the services of any of our employees or other members of senior management in the future. In addition, from time to time, there may be changes in our senior management team that may be disruptive to our business. If our senior management team fails to work together effectively and to execute our plans and strategies, our business and results of operations could be harmed.

Our growth strategy also depends on our ability to expand our organization by attracting and hiring high-quality personnel. Identifying, attracting, recruiting, training, integrating, managing and motivating talented

20

Table of Contents

individuals will require significant time, expense and attention. Competition for talent is intense, particularly in technology driven industries such as ours. If we are not able to effectively recruit and retain our talent, our business and our ability to achieve our strategic objectives would be harmed.

***Unfavorable media coverage could harm our business and results of operations.***

We are the subject of media coverage from time to time. Unfavorable publicity regarding our business model, content, personnel, customer service, technology, product changes, product quality or privacy practices could harm our reputation. Such negative publicity could also harm the size of our network and engagement and loyalty of our restaurants and diners, which could adversely impact our business and results of operations.

***Our business, and that of our third-party providers and third-party data center, is subject to the risks of severe weather, earthquakes, fires, floods, hurricanes and other natural catastrophic events and to interruption by man-made problems such as computer viruses or terrorism.***

Our business, particularly in areas of significant concentration like New York, Chicago and San Francisco, is subject to damage or interruption from severe weather, earthquakes, fires, floods, tornadoes, hurricanes, power losses, telecommunications failures, terrorist attacks, acts of war and similar events. For example, severe weather in Chicago, the location of our corporate headquarters and most of our customer service staff, could inhibit the ability of our customer service staff to get to work, which could result in service problems and complaints from restaurants or diners. As we rely heavily on our servers, computer and communications systems, as well as those of our third-party providers and third-party data centers, and the Internet to conduct our business and provide high quality customer service, disruptions could harm our ability to run our business, which could harm our results of operations and financial condition. For example, in October 2012, Superstorm Sandy caused blackouts throughout significant portions of New York City, which resulted in restaurants and diners being unable to access our platform for several days. These events could also negatively impact diner activity or the ability of restaurants to continue to operate.

***Increases in food, labor, energy and other costs could adversely affect results of operations.***

An increase in restaurant operating costs could cause restaurants in our network to raise prices or cease operations. Factors such as inflation, increased food costs, increased labor and employee benefit costs, increased rent costs and increased energy costs may increase restaurant operating costs. Many of the factors affecting restaurant costs are beyond the control of the restaurants in our network. In many cases, these restaurants may not be able to pass along these increased costs to diners and, as a result, may cease operations, which could harm our profitability and results of operations. Additionally, if these restaurants raise prices, order volume may decline, which could harm our profitability and results of operations.

***Future acquisitions could disrupt our business and harm our business and results of operations.***

As part of our business strategy, we will continue to selectively explore acquisition opportunities of companies and technologies to strengthen our platform. The identification of suitable acquisition candidates can be difficult, time consuming and costly, and we may not be able to successfully complete identified acquisitions. The risks we face in connection with acquisitions include:

- regulatory hurdles;

- the anticipated benefits may not materialize;

- diversion of management time and focus from operating our business to addressing acquisition integration challenges;

- transition of the acquired company's users to our websites and mobile applications;

- retention of employees from the acquired company;

- cultural challenges associated with integrating employees from the acquired company into our organization;

21

Table of Contents

- integration of the acquired company's accounting, management information, human resources and other administrative systems;
- the need to implement or improve controls, procedures and policies at a business that prior to the acquisition may have lacked effective controls, procedures and policies;
- coordination of product development and sales and marketing functions;
- liability for activities of the acquired company before the acquisition, including patent and trademark infringement claims, violations of laws, commercial disputes, tax liabilities and other known and unknown liabilities; and
- litigation or other claims in connection with the acquired company, including claims from terminated employees, users, former stockholders or other third parties.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and investments could cause us to fail to realize the anticipated benefits of these acquisitions or investments, cause us to incur unanticipated liabilities, and harm our business generally. Future acquisitions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities, amortization expenses or the impairment of goodwill, any of which could harm our business and results of operations.

*Government regulation of the Internet and e-commerce is evolving, and unfavorable changes could substantially harm our business and results of operations.*

We are subject to general business regulations and laws as well as federal and state regulations and laws specifically governing the Internet and e-commerce. Existing and future laws and regulations may impede the growth of the Internet, e-commerce or other online services, and increase the cost of providing online services. These regulations and laws may cover sweepstakes, taxation, tariffs, user privacy, data protection, pricing, content, copyrights, distribution, electronic contracts and other communications, consumer protection, broadband residential Internet access and the characteristics and quality of services. It is not clear how existing laws governing issues such as property ownership, sales, use and other taxes, libel and personal privacy apply to the Internet and e-commerce. Unfavorable resolution of these issues may harm our business and results of operations.

*Our business is subject to a variety of U.S. laws, many of which are unsettled and still developing and which could subject us to claims or otherwise harm our business or results of operations.*

We are subject to a variety of laws in the United States, including laws regarding data retention, online credit card payments, privacy, data security, distribution of user-generated content, consumer protection and tax, which are frequently evolving and developing. The scope and interpretation of the laws that are or may be applicable to us are often uncertain and may be conflicting. For example, laws relating to the liability of providers of online services for activities of their users and other third parties are currently being tested by a number of claims, including actions based on invasion of privacy and other torts, unfair competition, copyright and trademark infringement, and other theories based on the nature and content of the materials searched, the ads posted or the content provided by users. In addition, regulatory authorities in the United States and the European Union are considering a number of legislative and regulatory proposals concerning data protection and other matters that may be applicable to our business. It is also likely that if our business grows and evolves and our products are used in a greater number of geographies, we will become subject to laws and regulations in additional jurisdictions. It is difficult to predict how existing laws will be applied to our business and the new laws to which we may become subject.

If we are not able to comply with these laws or regulations or if we become liable under these laws or regulations, we could be harmed, and we may be forced to implement new measures to reduce our exposure to this liability. This may require us to expend substantial resources or to discontinue certain products or features, which would negatively affect our business. In addition, the increased attention focused upon liability issues as a result of lawsuits and legislative proposals could harm our reputation or otherwise impact the growth of our business. Any costs incurred to prevent or mitigate this potential liability could also harm our business and results of operations.

22

Table of Contents

*Failure to adequately protect our intellectual property could harm our business and results of operations.*

Our business depends on our intellectual property, the protection of which is crucial to the success of our business. We rely on a combination of patent, trademark, trade secret and copyright law and contractual restrictions to protect our intellectual property. In addition, we attempt to protect our intellectual property, technology and confidential information by requiring our employees and consultants who develop intellectual property on our behalf to enter into confidentiality and assignment of inventions agreements and non-competition agreements, and third parties to enter into nondisclosure agreements. These agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property or technology and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information, intellectual property or technology. Despite our efforts to protect our proprietary rights, unauthorized parties may copy aspects of our website features, software and functionality or obtain and use information that we consider proprietary.

We have registered, among numerous other trademarks, "GrubHub," "happy eating," "Seamless," "OrderHub" and "Your food is here." as trademarks in the United States. Competitors have and may continue to adopt service names similar to ours, thereby harming our ability to build brand identity and possibly leading to user confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other trademarks that are similar to our trademarks. Litigation or proceedings before the U.S. Patent and Trademark Office or other governmental authorities and administrative bodies in the United States and abroad may be necessary in the future to enforce our intellectual property rights and to determine the validity and scope of the proprietary rights of others. Our efforts to enforce or protect our proprietary rights may be ineffective and could result in substantial costs and diversion of resources, which could harm our business and results of operations.

*We may be unable to continue to use the domain names that we use in our business, or prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand or our trademarks or service marks.*

We have registered domain names for our websites that we use in our business, most importantly seamless.com, grubhub.com, MenuPages.com and allmenus.com. If we lose the ability to use a domain names, whether due to trademark claims, failure to renew the applicable registration, or any other cause, we may be forced to market our products under a new domain name, which could cause us substantial harm, or to incur significant expense in order to purchase rights to the domain name in question. In addition, our competitors and others could attempt to capitalize on our brand recognition by using domain names similar to ours. Domain names similar to ours have been registered in the United States and elsewhere. We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand or our trademarks or service marks. Protecting and enforcing our rights in our domain names may require litigation, which could result in substantial costs and diversion of resources, which could in turn harm our business and results of operations.

*Intellectual property infringement assertions by third parties could result in significant costs and harm our business, results of operations and reputation.*

We operate in an industry with extensive intellectual property litigation. Other parties have asserted, and in the future may assert, that we have infringed their intellectual property rights. Such litigation may involve patent holding companies or other adverse patent owners who have no relevant product revenue, and therefore our own issued and pending patents may provide little or no deterrence. We could be required to pay substantial damages or cease using intellectual property or technology that is deemed infringing.

For example, we are currently a defendant to a patent infringement suit filed by Ameranth, Inc. in which we are alleged to infringe on patents relating to online ordering software. See the section titled "Business—Legal Proceedings" for a further discussion of this litigation. This litigation could cause us to incur significant expenses

23

Table of Contents

and costs. In addition, the outcome of any litigation is inherently unpredictable and, as a result of this litigation, we may be required to pay damages, an injunction may be entered against us, or a license or other right to continue to deliver an unmodified version of the service may not be made available to us at all or may require us to pay ongoing royalties and comply with unfavorable terms. Any of these outcomes could harm our business. Even if we were to prevail, this litigation could be costly and time-consuming, could divert the attention of our management and key personnel from our business operations, and may discourage restaurants and diners from using our products.

Furthermore, we cannot predict whether other assertions of third-party intellectual property rights or claims arising from such assertions will substantially harm our business and results of operations. The defense of these claims and any future infringement claims, whether they are with or without merit or are determined in our favor, may result in costly litigation and diversion of technical and management personnel. Furthermore, an adverse outcome of a dispute may require us to pay damages, potentially including treble damages and attorneys' fees if we are found to have willfully infringed a party's patent or copyright rights; cease making, licensing or using products that are alleged to incorporate the intellectual property of others; expend additional development resources to redesign our products; and enter into potentially unfavorable royalty or license agreements in order to obtain the right to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all. In any event, we may need to license intellectual property which would require us to pay royalties or make one-time payments. Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, the time and resources necessary to resolve them could harm our business, results of operations and reputation.

### *Some of our products contain open source software, which may pose particular risks to our proprietary software and products.*

We use open source software in our products and will use open source software in the future. From time to time, we may face claims from third parties claiming ownership of, or demanding release of, the open source software and/or derivative works that we developed using such software (which could include our proprietary source code), or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to purchase a costly license or cease offering the implicated products unless and until we can re-engineer them to avoid infringement. This re-engineering process could require significant additional research and development resources. In addition to risks related to license requirements, use of certain open source software can lead to greater risks than use of third-party commercial software, as open source licensors generally do not provide warranties or controls on the origin of software. Any of these risks could be difficult to eliminate or manage, and, if not addressed, could harm our business and results of operations.

### *We may require additional capital to support business growth, and this capital might not be available on acceptable terms, if at all.*

We intend to continue to make investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new features and products or enhance our existing products, improve our operating infrastructure or acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through future issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our common stock. Any debt financing we secure in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. We may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be impaired, and our business may be harmed.

24

Table of Contents

***Our business and results of operations may be harmed if we are deemed responsible for the collection and remittance of state sales taxes for our restaurants.***

If we are deemed an agent for the restaurants in our network under state law, we may be deemed responsible for collecting and remitting sales taxes directly to certain states. It is possible that one or more states could seek to impose sales, use or other tax collection obligations on us with regard to such food sales. These taxes may be applicable to past sales. A successful assertion that we should be collecting additional sales, use or other taxes or remitting such taxes directly to states could result in substantial tax liabilities for past sales and additional administrative expenses, which would harm our business and results of operations.

***Our net operating loss carryforwards may expire unutilized or underutilized, which could prevent us from offsetting future taxable income.***

We may be limited in the portion of net operating loss carryforwards that we can use in the future to offset taxable income for U.S. federal income tax purposes. As of December 31, 2011, 2012 and 2013, we had aggregate federal net operating loss carryforwards of $4.2 million, $3.4 million and $34.3 million, respectively, which expire at various dates through 2034. Our gross state and local net operating loss carryforwards are equal to or less than the federal net operating loss carryforward and expire over various periods based on individual state tax law.

We periodically assess the likelihood that we will be able to recover our net deferred tax assets. We consider all available evidence, both positive and negative, including historical levels of income, expectations and risks associated with estimates of future taxable income and ongoing prudent and feasible profits. As a result of this analysis of all available evidence, both positive and negative, we concluded that a valuation allowance against our net deferred tax assets should be applied as of December 31, 2012. To the extent we determine that all or a portion of our valuation allowance is no longer necessary, we will recognize an income tax benefit in the period in which such determination is made for the reversal of the valuation allowance. Once the valuation allowance is eliminated or reduced, its reversal will no longer be available to offset our current tax provision. These events could harm our results of operations.

## Risks Related to Ownership of Our Common Stock and this Offering

***Concentration of ownership among our existing executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions and could delay or prevent a change in corporate control.***

Upon completion of this offering, our executive officers, directors and holders of 5% or more of our outstanding common stock will beneficially own, in the aggregate, approximately 55% of our outstanding shares of common stock. Some of these persons or entities may have interests that are different from yours. For example, these stockholders may support proposals and actions with which you may disagree or which are not in your interests or which adversely impact the value of your investment. These stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of our certificate of incorporation and approval of significant corporate transactions. This control could have the effect of delaying or preventing a change of control in us or changes in management and could also make the approval of certain transactions difficult or impossible without the support of these stockholders, which in turn could reduce the price of our common stock.

***An active, liquid and orderly trading market for our common stock may not develop or be sustained, the price of our stock may be volatile, and you could lose all or part of your investment.***

Prior to this offering, there was no public market for shares of our common stock. The initial public offering price of our common stock will be determined through negotiation with the underwriters. This price will not necessarily reflect the price at which investors in the market will be willing to buy and sell our shares of common stock following this offering. In addition, the trading price of our common stock following this offering is likely to be highly volatile and could be subject to wide fluctuations in response to various factors, some of which are beyond our control.

25

Table of Contents

***The price of our common stock may be volatile, and you could lose all or part of your investment.***

The trading price of our common stock following this offering may fluctuate substantially and may be higher or lower than the initial public offering price. The trading price of our common stock following this offering will depend on a number of factors, including those described in this "—Risk Factors" section and "Special Note Regarding Forward-Looking Statements," many of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose all or part of your investment in our common stock since you might be unable to sell your shares at or above the price you paid in this offering. Factors that could cause fluctuations in the trading price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the market prices and trading volumes of technology stocks, particularly Internet stocks;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our common stock by us or our stockholders;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by any securities analysts who follow our Company or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new products;

- the public's reaction to our press releases, other public announcements and filings with the Securities and Exchange Commission (the "SEC");

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth of our markets.

Price and volume fluctuations may be even more pronounced in the trading market for our stock for a period of time following this offering. Securities class action litigation has often been instituted against companies following periods of volatility in the overall market and in the market price of a company's securities. Such litigation, if instituted against us, could result in substantial costs, divert our management's attention and resources and harm our business and results of operations.

26

Table of Contents

*A total of 70,980,172, or 91%, of our total outstanding shares after the offering are restricted from immediate resale, but may be sold on a stock exchange in the near future. The large number of shares eligible for public sale or subject to rights requiring us to register them for public sale could depress the market price of our common stock.*

The market price of our common stock could decline as a result of sales of a large number of shares of our common stock in the market after this offering, and the perception that these sales could occur may also depress the market price of our common stock. Based on 74,385,786 shares outstanding as of December 31, 2013, we will have 78,385,786 shares of common stock outstanding after this offering. Of these shares, the common stock sold in this offering will be freely tradable in the United States, except for any shares purchased by our "affiliates" as defined in Rule 144 under the Securities Act. The holders of shares of outstanding common stock have agreed with the underwriters, subject to certain exceptions, not to dispose of or hedge any of their common stock during the 180-day period beginning on the date of this prospectus, except with the prior written consent of Citigroup Global Capital Markets Inc. and Morgan Stanley & Co. LLC. After the expiration of the 180-day restricted period, these shares may be sold in the public market in the United States, subject to prior registration in the United States, if required, or reliance upon an exemption from United States registration, including, in the case of shares held by affiliates or control persons, compliance with the volume restrictions of Rule 144.

Upon completion of this offering, stockholders owning an aggregate of shares will be entitled, under contracts providing for registration rights, to require us to register shares of our common stock owned by them for public sale in the United States. In addition, we intend to file a registration statement to register the approximately 1,038,475 shares reserved for future issuance under our 2013 Omnibus Incentive Plan. Upon effectiveness of that registration statement, subject to the satisfaction of applicable exercise periods and, in certain cases, lock-up agreements with the representatives of the underwriters referred to above, the shares of common stock issued upon exercise of outstanding options will be available for immediate resale in the United States in the open market.

Sales of our common stock as restrictions end or pursuant to registration rights may make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. These sales also could cause our stock price to fall and make it more difficult for you to sell shares of our common stock. For more information on the registration rights, see "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

*Complying with the laws and regulations affecting public companies will increase our costs and the demands on management and could harm our business and results of operations.*

As a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act and rules subsequently implemented by the SEC, and the NYSE impose various requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased and will continue to increase our legal, accounting and financial compliance costs and have made and will continue to make some activities more time consuming and costly, particularly after we cease to be an "emerging growth company" as defined in the Jumpstart Our Business Startups Act enacted in April 2012. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or to incur substantial costs to maintain the same or similar coverage. These rules and regulations could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors or our board committees or as executive officers.

Our management team, including our CEO, has limited or no experience in managing publicly traded companies. Our management team and other personnel will need to devote a substantial amount of time to new compliance initiatives and we may not successfully or efficiently manage our transition to a public company. To

27

Table of Contents

comply with the requirements of being a public company, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring accounting or internal audit staff, which would require us to incur additional expenses and harm our results of operations.

***We are an "emerging growth company" and we cannot be certain if the reduced disclosure requirements applicable to "emerging growth companies" will make our common stock less attractive to investors.***

We are an "emerging growth company" and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies." We could remain an "emerging growth company" for up to five years following the completion of this offering or until (i) we achieve total annual gross revenues in excess of $1 billion during a fiscal year, (ii) become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, as a result of achieving a public float of at least $700 million as of the end of a second fiscal quarter or (iii) we issue more than $1 billion in nonconvertible debt during the preceding three year period. The exemptions include not being required to comply with the auditor attestation requirements of Section 404, reduced disclosure obligations regarding executive compensation in our registration statement, periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

While we will be required to disclose changes made in our internal control and procedures on a quarterly basis, if we choose not to comply with the auditor attestation requirements of Section 404, our auditors will not be required to attest to the effectiveness of our internal control over financial reporting until the later of the year following our first annual report required to be filed with the SEC or the date we are no longer an "emerging growth company." We could be an "emerging growth company" for up to five years. As a result, investors may become less comfortable with the effectiveness of our internal control and the risk that material weaknesses or other deficiencies in our internal controls go undetected may increase.

If we choose to provide reduced disclosures in our periodic reports and proxy statements while we are an emerging growth company, investors would have access to less information and analysis about our executive compensation, which may make it difficult for investors to evaluate our executive compensation practices. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions and provide reduced disclosure. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

***After we are no longer an "emerging growth company," we will be obligated to develop and maintain proper and effective internal control over financial reporting. We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective, which may harm investor confidence in our company and, as a result, the value of our common stock.***

After we are no longer an "emerging growth company," we will be required, pursuant to Section 404, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting for the first fiscal year beginning after the effective date of this offering. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting.

We are in the early stages of the costly and challenging process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404. We may not be able to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing process, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. If we are unable to assert that our internal control over financial reporting is effective, investors could lose confidence in the accuracy and completeness of our financial reports, which would cause the price of our common stock to decline.

28

**Table of Contents**

*Our independent registered public accounting firm has advised us that it identified a material weakness in the internal control over financial reporting of Seamless Holdings, now known as GrubHub Inc., for the years ended December 31, 2011 and 2012. If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.*

Our independent registered public accounting firm has not conducted an audit of Seamless Holdings' (which is now known as GrubHub Inc.) internal control over financial reporting. However, in connection with its audit of Seamless Holdings' consolidated financial statements as of and for the years ended December 31, 2011 and 2012 included elsewhere in this prospectus, our independent registered public accounting firm discovered a material weakness relating to the documentation of journal entry review of Seamless Holdings. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Specifically, Seamless Holdings had not regularly documented its review of journal entries.

Since discovery of this material weakness, we have taken steps to fully understand the material weakness and to remediate it. We have implemented a formal review of all manual journal entries, including documentation, as part of our monthly close process. Additionally, in connection with the Merger, we retained the chief financial officer and controller that served in those roles for the GrubHub Platform. By utilizing their existing accounting and finance expertise, we have built a more experienced accounting and finance organization. While we have remediated this material weakness for the period ended December 31, 2013, we may identify additional related or unrelated material weaknesses or significant deficiencies in the future. If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.

In addition, implementing any appropriate changes to our internal controls may distract our officers and employees, entail substantial costs to implement new processes and modify our existing processes and take significant time to complete. Moreover, any such changes do not guarantee that we will be effective in maintaining the adequacy of our internal controls, and any failure to maintain that adequacy, or consequent inability to produce accurate financial statements on a timely basis, could increase our operating costs and harm our business. Furthermore, investors' perceptions that our internal controls are inadequate or that we are unable to produce accurate financial statements on a timely basis may harm our stock price.

*Anti-takeover provisions contained in our certificate of incorporation and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.*

Our certificate of incorporation and bylaws will contain and Delaware law contains provisions which could have the effect of rendering more difficult, delaying or preventing an acquisition deemed undesirable by our board of directors. Our corporate governance documents will include provisions:

- creating a classified board of directors whose members serve staggered three-year terms;

- authorizing "blank check" preferred stock, which could be issued by our board of directors without stockholder approval and may contain voting, liquidation, dividend and other rights superior to our common stock;

- limiting the liability of, and providing indemnification to, our directors and officers;

- limiting the ability of our stockholders to call and bring business before special meetings;

- requiring advance notice of stockholder proposals for business to be conducted at meetings of our stockholders and for nominations of candidates for election to our board of directors;

29

Table of Contents

- controlling the procedures for the conduct and scheduling of board of directors and stockholder meetings; and

- providing our board of directors with the express power to postpone previously scheduled annual meetings and to cancel previously scheduled special meetings.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the Delaware General Corporation law, which prevents some stockholders holding more than 15% of our outstanding common stock from engaging in certain business combinations without approval of the holders of substantially all of our outstanding common stock.

Any provision of our certificate of incorporation, bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

***We may invest or spend the proceeds of this offering in ways with which you may not agree or in ways which may not yield a return or enhance the price of our common stock.***

The net proceeds from the sale of our shares of common stock by us in this offering may be used for general corporate purposes, including working capital. We may also use a portion of the net proceeds to acquire complementary businesses, products, services or technologies. However, we do not have any agreements or commitments for any acquisitions at this time. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. The net proceeds may be invested with a view towards long-term benefits for our stockholders and this may not increase our results of operations or market value. Until the net proceeds are used, they may be placed in investments that do not produce significant income or that may lose value.

***Purchasers in this offering will experience immediate and substantial dilution in the book value of their investment.***

The initial public offering price of $26.00 per share is substantially higher than the net tangible book value per share of our outstanding common stock immediately after this offering. Therefore, if you purchase our common stock in this offering, you will incur immediate dilution of $24.03 in the net tangible book value per share from the price you paid. In addition, following this offering, purchasers who bought shares from us in the offering will have contributed 67% of the total consideration paid to us by our stockholders to purchase shares of common stock, in exchange for acquiring approximately 5% of our total outstanding shares as of December 31, 2013 after giving effect to this offering. The exercise of outstanding stock options and warrants will result in further dilution.

***If securities or industry analysts issue an adverse or misleading opinion regarding our common stock or do not publish or cease publishing research or reports about us, our business or our market, or if they change their recommendations regarding our stock adversely, our stock price and trading volume could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts may publish about us, our business, our market or our competitors. We do not control these analysts or the content and opinions included in their reports. If any of the analysts who cover us change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, our stock price would likely decline. If any analyst who covers us were to cease coverage of our Company or fail to publish reports on us regularly or if analysts elect not to provide research coverage of our common stock, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

30

Table of Contents

***We do not expect to declare any dividends in the foreseeable future.***

We do not anticipate declaring any cash dividends to holders of our common stock in the foreseeable future. Consequently, investors may need to rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment. Investors seeking cash dividends should not purchase our common stock.

31

**Table of Contents**

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements within the meaning of the federal securities laws, which statements involve substantial risks and uncertainties that may cause actual results to differ materially from those that we expect. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "anticipates," "believes," "contemplates," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "target" or "will" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans or intentions. Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- our future financial performance, including our revenue, costs and expenses, our ability to generate positive cash flow and our ability to achieve and maintain profitability;

- the sufficiency of our cash and cash equivalents to meet our liquidity needs;

- our ability to effectively manage our integration after the Merger;

- our ability to attract and retain restaurants to use our platform;

- our ability to increase the number of and retain existing diners using our websites and mobile applications;

- our ability to strengthen our two-sided network;

- the growth in the usage of our mobile applications and our ability to continue to successfully monetize this usage;

- our ability to innovate and provide a superior experience to restaurants and diners;

- our ability to successfully expand in our existing markets and into new markets;

- our ability to effectively manage our growth and future expenses;

- our ability to maintain, protect and enhance our intellectual property;

- our ability to comply with modified or new laws and regulations applying to our business; and

- the attraction and retention of qualified employees and key personnel.

While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual results. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus. All forward-looking statements are expressly qualified in their entirety by these cautionary statements. You should evaluate all forward-looking statements made in this prospectus in the context of these risks and uncertainties.

We caution you that the factors referenced above may not contain all of the factors that are important to you. In addition, we cannot assure you that we will realize the results or developments we expect or anticipate or, even if substantially realized, that they will result in the consequences we anticipate or affect us or our operations in the way we expect. The forward-looking statements included in this prospectus are made only as of the date hereof. We undertake no obligation to publicly update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law. If we do update one or more forward-looking statements, no inference should be made that we will make additional updates with respect to those or other forward-looking statements.

32

# EXHIBIT C
# to
**Declaration of Jeremy M. Goldman
In Support Of San Francisco's Request For
Judicial Notice And Motion To Dismiss**

DRS 1 filename1.htm

Table of Contents

As confidentially submitted to the Securities and Exchange Commission on February 13, 2020.
This draft registration statement has not been publicly filed with the
Securities and Exchange Commission and all information herein remains strictly confidential.

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM S-1
## REGISTRATION STATEMENT

*UNDER*
*THE SECURITIES ACT OF 1933*

# DoorDash, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 7389 | 46-2852392 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

DoorDash, Inc.
303 2nd Street, South Tower, 8th Floor
San Francisco, California 94107
(650) 487-3970
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Tony Xu
Co-Founder and Chief Executive Officer
303 2nd Street, South Tower, 8th Floor
San Francisco, California 94107
(650) 487-3970
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| Tony Jeffries | Keith D. Yandell | Richard A. Kline |
|---|---|---|
| Rezwan D. Pavri | Tia A. Sherringham | Heidi E. Mayon |
| Shannon R. Delahaye | Brian E. Brown | Sarah B. Axtell |
| Lang Liu | Rob Moreno | Goodwin Procter LLP |
| Wilson Sonsini Goodrich & Rosati, P.C. | DoorDash, Inc. | 601 Marshall Street |
| 650 Page Mill Road | 303 2nd Street, South Tower, 8th Floor | Redwood City, California 94063 |
| Palo Alto, California 94304 | San Francisco, California 94107 | (650) 752-3100 |
| (650) 493-9300 | (650) 487-3970 | |

**Approximate date of commencement of proposed sale to the public: As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee |
|---|---|---|

8/9/2021                                                                                          DRS

| Common stock, par value $0.00001 per share | $ | $ |
| --- | --- | --- |

(1)    Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(o) of the Securities Act of 1933, as amended.

(2)    Includes the aggregate offering price of additional shares that the underwriters have the option to purchase, if any.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant will file a further amendment which specifically states that this registration statement will thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement will become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

<span style="color:red">**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**</span>

<span style="color:red">Subject to Completion. Dated          , 2020.</span>

### Shares



# DoorDash, Inc.

## Common Stock

———————————————

This is an initial public offering of shares of common stock of DoorDash, Inc.

Prior to this offering, there has been no public market for our common stock. It is currently estimated that the initial public offering price per share will be between $        and $        . We intend to apply to list the common stock on                under the symbol "DASH".

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and, as such, we have elected to comply with certain reduced public company reporting requirements for this prospectus and may elect to do so in future filings.

**See "Risk Factors" beginning on page 17 to read about factors you should consider before buying shares of our common stock.**

———————————————

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

———————————————

|  | Per share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount(1) | $ | $ |
| Proceeds, before expenses, to DoorDash, Inc. | $ | $ |

(1)    See the section titled "Underwriting" for a description of the compensation payable to the underwriters.

To the extent that the underwriters sell more than              shares of common stock, the underwriters have the option to purchase up to an additional              shares from DoorDash, Inc. at the initial public offering price less the underwriting discount.

The underwriters expect to deliver the shares against payment in New York, New York, on or about              , 2020.

## Goldman Sachs & Co. LLC                                            J.P. Morgan

**Prospectus dated              , 2020**

Table of Contents

## TABLE OF CONTENTS

| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 17 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 65 |
| INDUSTRY, MARKET, AND OTHER DATA | 67 |
| USE OF PROCEEDS | 68 |
| DIVIDEND POLICY | 70 |
| CAPITALIZATION | 71 |
| DILUTION | 73 |
| SELECTED CONSOLIDATED FINANCIAL AND OTHER DATA | 76 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 78 |
| BUSINESS | 106 |
| MANAGEMENT | 136 |
| EXECUTIVE COMPENSATION | 144 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 155 |
| PRINCIPAL STOCKHOLDERS | 161 |
| DESCRIPTION OF CAPITAL STOCK | 164 |
| SHARES ELIGIBLE FOR FUTURE SALE | 170 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK | 173 |
| UNDERWRITING | 178 |
| LEGAL MATTERS | 184 |
| EXPERTS | 184 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 184 |
| NON-GAAP FINANCIAL MEASURES | 185 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

**Through and including                  , 2020 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.**

You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or the SEC. Neither we nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. Neither we nor any of the underwriters take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date, regardless of the time of delivery of this prospectus or of any sale of our common stock. Our business, financial condition, results of operations, and prospects may have changed since such date.

For investors outside the United States: Neither we nor any of the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of our common stock, and the distribution of this prospectus outside the United States.

i

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. This summary does not contain all of the information you should consider before investing in our common stock. You should read this entire prospectus carefully, including the sections titled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Non-GAAP Financial Measures" and our consolidated financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Unless the context otherwise requires, the terms "DoorDash," "the company," "we," "us," and "our" in this prospectus refer to DoorDash, Inc. and its consolidated subsidiaries.*

**OUR MISSION**

Our journey began on January 12, 2013, when our founders launched a website displaying menus from local restaurants in Palo Alto, California. Within a few hours, the first DoorDash consumer ordered prawn pad thai and spring rolls from a nearby Thai eatery, and shortly afterwards, dinner was delivered directly to his door. From that day forward, with the hundreds of millions of orders that have followed, merchants have made additional sales, consumers have connected with the best of their neighborhoods, and Dashers have found economic opportunity on our platform.

Since our founding, our mission has been to grow and empower local economies. We do this by connecting approximately 300,000 merchants,[1] 8.8 million consumers,[2] and 495,000 Dashers[3] in the United States, Canada, and Australia through our local logistics platform. Our platform enables local brick-and-mortar businesses to address consumers' expectations of ease and immediacy and thrive in today's convenience economy.

**OVERVIEW**

Technology has changed consumer behavior and driven a wave of demand for convenience. Consumers value frictionless online shopping experiences and on-demand delivery and are willing to pay for these conveniences. As consumers demand products and services quickly, inexpensively, and at the touch of a button, business is now happening where consumers are: at work, at home, and on-the-go. Local businesses have historically provided rich personalized experiences for consumers who shop in-store, but consumers are no longer going to physical storefronts for every purchase, and local businesses have struggled to compete. Many local businesses lack the capabilities to reach today's consumers or deliver to consumers off-premise. As a result, they miss out on this increasingly important source of growth.

---

[1]  Based on the number of individual stores that have completed an order through DoorDash in the past month, measured as of September 30, 2019.

[2]  Based on the number of individual consumer accounts that have completed an order on our Marketplace in the past month, measured as of September 30, 2019. An individual consumer account is identified by a unique email address. If a consumer had accounts under two different email addresses, and such consumer completed orders using both accounts during the measurement period, such consumer's activity would be counted as two separate consumers.

[3]  Based on the number of accounts held by independent contractors that have delivered an order through DoorDash, or Dashers, in the past month, measured as of September 30, 2019. An individual Dasher account is identified by a unique email address. If a Dasher had accounts under two different email addresses, and such Dasher delivered orders using both accounts during the measurement period, such Dasher's activity would be counted as two separate Dashers.

1

Table of Contents

When local businesses fail, local economies and communities suffer.

We founded DoorDash to be a merchant-first business. We enable local brick-and-mortar businesses to thrive in an increasingly convenience-driven economy with rapidly evolving consumer expectations. We do this by providing a technology platform that offers a comprehensive suite of services that solves mission-critical challenges such as customer acquisition, delivery, insights and analytics, merchandising, payment processing, and customer support. DoorDash helps merchants drive significant incremental sales and leverage the fixed cost investments that they have already made.

There are over 30 million small businesses in the United States[4] and they form the building blocks of local economies and communities. Small businesses, including family-owned businesses, local entrepreneurs, and operators or franchisees of large national or international chains, created approximately two-thirds of net new jobs in the United States from 2000 to 2017.[5]

When local businesses thrive, so do local economies and communities.

We are inspired by our merchants—by their entrepreneurship, their passion for their craft, their ingenuity, and their many contributions to their communities—and are committed to helping them grow and thrive as consumer expectations evolve.

---

[4]  U.S. Small Business Administration, Office of Advocacy, or SBA, Frequently Asked Questions, August 2018. See the section titled "Industry, Market, and Other Data."

[5]  SBA; see the section titled "Industry, Market, and Other Data."

2

Table of Contents

We believe that the value we deliver to merchants, consumers, and Dashers is a key reason why we have become the largest and fastest growing business in the U.S. local food delivery logistics category, with 33% U.S. category share and 44% category share in suburban markets.6



While we are the category leader, U.S. consumers on our platform represented less than three percent of the U.S. population as of September 2019, and we believe we are in the early phases of broad market adoption. In 2018, we generated gross order value on the DoorDash Marketplace, or Marketplace GOV, of $2.8 billion, which represented less than one percent of the $287.6 billion off-premise spend at restaurants and other consumer foodservices in the United States during the same period.7 This highlights the significant runway that we have in food alone. We are also beginning to expand into other verticals beyond food and our ambition is to empower all types of local businesses.

In 2018, we generated revenue of $290.6 million. In the same year, we had a net loss of $204.5 million and $(          ) million in Adjusted EBITDA as we made investments to address the massive market opportunity ahead of us.8 In the near term, we intend to continue to make substantial investments to increase consumer adoption and extend our leadership. We believe that our business will be successful and sustainable in the long term as our business model becomes more efficient, through increasing scale and continual operational improvements, and as our sales and marketing investments in acquiring and activating consumers normalize.

---

6   Edison Trends. Based on the dollar value of orders placed on the following platforms: Caviar, DoorDash, Grubhub, Postmates, Uber Eats, and other platforms that
    collectively represent less than five percent of total category share, as of September 30, 2019. Excludes Drive orders. See the section titled "Industry, Market, and
    Other Data."
7   Euromonitor International Limited. Consumer foodservices include cafes and bars, full-service restaurants, limited-service restaurants, self-service cafeterias, and
    street stalls and kiosks. See the section titled "Industry, Market, and Other Data."
8   See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Non-GAAP Metrics" and
    "Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and its reconciliation to net loss, the most directly comparable financial
    measure calculated in accordance with accounting principles generally accepted in the United States, or GAAP.

3

Table of Contents

## THE DOORDASH PLATFORM

Our local logistics platform connects merchants, consumers, and Dashers. We built our local logistics platform to serve the needs of these three key constituencies and to become more intelligent and efficient with each order. As we have grown, the scale of our local logistics platform has become one of our major competitive advantages and delivers substantial benefits to everyone we serve. We connect:

- **Merchants:** Approximately 300,000 merchants run and grow their businesses using our technology platform that offers a comprehensive suite of services.[9] In 2019, merchants on our local logistics platform experienced an average of      % year-over-year same store sales growth on our platform. Since our founding, merchants have generated over $6.5 billion in sales on our Marketplace.

- **Consumers:** Approximately 8.8 million people discover, engage with, and purchase goods from merchants on our local logistics platform.[10] Since our founding, more than 300 million orders have been completed through DoorDash, saving consumers countless hours.

- **Dashers:** Approximately 495,000 independent contractors use our local logistics platform to find opportunities to earn.[11] Since our founding, Dashers have earned over $2.5 billion through DoorDash.[12]

Our local logistics platform is powered by our proprietary technology that carefully optimizes the many interactions between merchants, consumers, and Dashers to make the end-to-end experience seamless and delightful. Each order on our local logistics platform provides a broad range of information that is analyzed by our machine learning algorithms to improve the quality and performance of our platform. From presenting personalized, curated content to consumers that takes into account cuisine and dietary preferences to providing information that enables Dashers to maximize their earnings opportunities, our machine learning algorithms continuously improve the experiences of our three constituencies and make our local logistics platform more intelligent and efficient with every order.

Our local logistics platform benefits from three powerful virtuous cycles:

- **Local Network Effects:** Our ability to attract more merchants, including local favorites and national brands, creates more selection in our DoorDash Marketplace, driving more consumer engagement, and in turn, more sales for merchants on our platform. Our strong national merchant footprint enables us to launch new markets and quickly establish a critical mass of merchants and Dashers, driving strong consumer adoption.

- **Economies of Scale:** As more consumers join our local logistics platform and their engagement increases, our entire platform benefits from higher order volume, which means more revenue for local businesses, more opportunities for Dashers to work and increase their earnings, and improved Dasher efficiency. This in turn attracts new Dashers to our local logistics platform, which improves the density of our Dasher network, resulting in faster deliveries for consumers.

---

[9]  Based on the number of individual stores that have completed an order through DoorDash in the past month, measured as of September 30, 2019.
[10] Based on the number of individual consumer accounts that have completed an order on our Marketplace in the past month, measured as of September 30, 2019.
[11] Based on the number of Dasher accounts that have delivered an order through DoorDash in the past month, measured as of September 30, 2019.
[12] Earnings include tips.

4

Table of Contents

- **Increasing Brand Affinity:** Both our local network effects and economies of scale lead to more merchants, consumers, and Dashers that utilize our local logistics platform. As we scale, we continue to invest in improving our offerings for merchants, selection, experience, and value for consumers, and earnings opportunities for Dashers. By improving the benefits of our local logistics platform for each of our three constituencies, our network continues to grow and we benefit from increased brand awareness and positive brand affinity. With increased brand affinity, we expect that we will enjoy lower acquisition costs for all three constituencies in the long term.



We have been successful in becoming the category leader in local food delivery logistics because of the value we create for merchants, consumers, and Dashers.[13] DoorDash only works if it works for merchants, consumers, and Dashers, and we continually strive to improve how we serve all constituents.

### WHY MERCHANTS WIN WITH DOORDASH

DoorDash is a merchant-first business. Our local logistics platform provides merchants with the opportunity to reach new consumers and benefit from incremental sales that leverage the fixed cost investments they have already made.

- **Demand Creation.** We provide merchants with access to highly engaged consumers in their communities, and we create demand for merchants through personalization and merchandising strategies that curate selection.

- **Comprehensive Merchant Services.** We have built a technology platform that offers a comprehensive suite of services that solves mission-critical needs for merchants. The majority of our merchants use our Marketplace to connect with consumers and Dashers to fulfill demand. In addition to our Marketplace, we have also developed a white-label logistics service, DoorDash Drive, which allows merchants that generate demand through

---

[13] Edison Trends; see the section titled "Industry, Market, and Other Data."

5

DRS

Table of Contents

their own websites, apps, and other channels to fulfill orders using our platform. Our DoorDash Pickup service enables consumers to place orders on our platform and pick up the orders directly from merchants. DoorDash for Business provides our merchants with large group orders and catering orders for businesses and events.

- **Operational Excellence.** Our platform is built to integrate seamlessly with merchants' existing processes and workflows. The unique challenges faced by merchants often serve as our guide as we build products and features. As we continue to scale our business, we find that many merchants face similar challenges, and so we develop solutions that may be broadly applied to merchants on our platform.

### WHY CONSUMERS WIN WITH DOORDASH

We believe DoorDash provides consumers with convenient access to an unmatched combination of selection, experience, and value.

- **Convenience.** DoorDash gives consumers living in urban and suburban communities alike the ability to have the best of their communities delivered to their doorsteps in minutes. We allow people to save their most precious resource: time.

- **Wide Selection.** We have partnerships with 128 of the 200 largest national restaurant brands[14] and provide consumers access to a wide selection of merchants. Broad selection, coupled with personalization and curation that is driven by our proprietary data science and analytics, enables us to provide extensive yet customized choices to consumers.

- **Best Experience.** We are focused on delivering the best end-to-end experience for consumers, which includes ease of use, speed of delivery, and quality.

- **Value.** We provide both lifestyle and economic value to consumers. The breadth of selection, convenience, and reliability of our local logistics platform means DoorDash solves problems for many occasions. Our subscription offering, DashPass, allows consumers to enjoy the convenience of delivery without paying per-order delivery fees.

### WHY DASHERS WIN WITH DOORDASH

The scale of our business provides Dashers with significant and flexible opportunities to earn.

- **Flexible Opportunities to Earn.** Dashers value the flexibility and autonomy of choosing where, when, and how often to work and the ability to earn income that fits around their other interests, which means they can log in and log out of our platform when they choose, and accept the deliveries that they prefer, all on their own terms. Dashers can use our platform after passing a background check, and eligible Dashers can receive their earnings on-demand through our Fast Pay service. We do not require Dashers to deliver by car as they also have the option to deliver by bike or scooter. In practice, this means that a broad range of people are able to deliver on our platform. In addition, our broad national coverage in the United States gives Dashers more opportunities to earn in more places.

---

[14]  Nation's Restaurant News, 2019 Top 200 Restaurant Chain Research, June 17, 2019. See the section titled "Industry, Market, and Other Data."

6

DRS

Table of Contents

- **Earning Transparency.** We provide Dashers with critical information regarding deliveries upfront, including guaranteed earnings, estimated time and distance, merchant name, and consumer drop-off information, so Dashers can make informed decisions about the deliveries they choose to accept. We also provide Dashers with key information and insights to track their earnings and meet their financial goals.

- **Dasher Community.** We aim to empower people from all walks of life to supplement their income and achieve their financial goals on their own terms. We actively listen to Dashers' perspectives and invest in constantly improving their experiences on our local logistics platform, including through the Dasher Community Council, which provides feedback directly to our executives.

### OUR OPPORTUNITY

We are the category leader in local food delivery logistics today and have an enormous market opportunity ahead of us in food alone. In 2018, Americans spent $1.5 trillion on food and beverages, of which $585.1 billion was spent on restaurants and other consumer foodservices.[15] Over time, restaurants have benefited from a shift away from cooking at home towards dine-in or delivery meals from restaurants, which has resulted in an increase in sales by restaurants.[16] This shift has been particularly pronounced with younger generations, as younger consumers spend significantly more compared to older consumers on both on-premise and off-premise restaurant dining.[17] We believe this shift towards dine-in and delivery meals will continue.

In addition to the shift towards dine-in and delivery meals, consumer spending on restaurants and other consumer foodservices has moved in recent years towards off-premise consumption, with the proportion of food consumed off-premise increasing from 45.6% of food and beverage spend in 2013 to 49.2%, or $287.6 billion, in 2018.[18] We believe that this off-premise opportunity will continue to grow. Thirty-eight percent of all adults and 50% of millennials say that they are more likely to have restaurant food delivered than they were two years ago.[19] The improving value proposition of local logistics platforms, including DoorDash, with wider selection than ever before, increasing convenience, and lower consumer fees has contributed to increasing off-premise consumption, and we expect this trend to accelerate. Through our Marketplace (which includes Pickup and DoorDash for Business) and Drive offerings, we expect to address and capture an increasing share of consumers' off-premise spend. In 2018, we generated Marketplace GOV of $2.8 billion, which represented less than one percent of the $287.6 billion off-premise opportunity.

---

[15] Euromonitor International Limited. Consumer foodservices include cafes and bars, full-service restaurants, limited-service restaurants, self-service cafeterias, and street stalls and kiosks. See the section titled "Industry, Market, and Other Data."

[16] U.S. Department of Agriculture, America's Eating Habits: Food Away From Home, September 2018. See the section titled "Industry, Market, and Other Data."

[17] U.S. Department of Agriculture; see the section titled "Industry, Market, and Other Data."

[18] Euromonitor International Limited; see the section titled "Industry, Market, and Other Data."

[19] National Restaurant Association; see the section titled "Industry, Market, and Other Data."

7

8/9/2021                                                                          DRS

Table of Contents

We started our business with a strategic focus on suburban markets and smaller metropolitan areas. According to Edison Trends, our industry is larger in smaller metropolitan areas than in the top tier of metropolitan areas and is growing faster.[20]



We believe that suburban markets and smaller metropolitan areas have experienced significantly higher growth compared to larger metropolitan markets because these smaller markets have been historically underserved by merchants and platforms that enable on-demand delivery. Accordingly, residents in these markets are more acutely impacted by the lack of alternatives and the inconvenience posed by distance and the need to drive to merchants, and therefore consumers in these markets derive greater benefit from on-demand delivery. As a result of our early focus on and experience with suburban markets and smaller metropolitan areas, we are particularly well positioned for continued growth in these markets.

While the majority of our business today is in the United States, we have a strong and growing business in Canada and have also recently launched in Australia. We are seeing signs of success internationally. For example, total consumers on our platform in Canada grew 195% year-over-year in September 2019.[21] We expect further international expansion to build on the massive market opportunity that is already available to us.

To date, the substantial majority of our merchants have been restaurants. We started with food because of the size and footprint of the merchant base and because we were attracted to the unique complexities of delivering food. Food is a large market with peaks and troughs of demand over the course of the day, which leads to periods of high demand during short windows of time. Focusing on restaurants enabled us to build a high-density network and improve the cost-effectiveness of our local logistics platform. We believe our expertise in food will help us scale to other industries as more and

---

[20] Edison Trends; see the section titled "Industry, Market, and Other Data." Edison Trends has categorized metropolitan areas into tiers based on population size, and the growth of gross monthly food sales on on-demand delivery platforms is significantly higher in tiers with smaller metropolitan areas than in the top tier. Gross monthly food sales are calculated year-to-date as of September 30, 2018 and September 30, 2019 based on food sales on DoorDash, Caviar, Grubhub, Postmates, Uber Eats, and certain other platforms. The tiers are defined as follows:
• Tier 1 – New York, Los Angeles, Chicago, Philadelphia, Washington D.C., San Francisco, Boston.
• Tier 2 – The next 43 metropolitan areas by population.
• Tier 3 – The next 50 metropolitan areas by population.
• Tier 4 – All other metropolitan areas with a population greater than 100,000.
• Other – All other geographic areas.
[21] Based on the number of individual consumer accounts that have completed an order on our Marketplace in the past month, measured as of September 30, 2018 and 2019.

8

DRS

Table of Contents

more local businesses beyond restaurants seek to participate in the convenience economy in search of more consumers and continued growth.

With increasing consumer adoption of technology-enabled solutions in every facet of modern life, we believe that there will be increasing demand for local logistics services by merchants in industry verticals beyond food. We have already started to serve merchants in other verticals, such as grocery and flowers, but we are still in the very early stages of expanding beyond food. We have just begun our journey and have ample opportunity for continued success in local logistics across verticals and geographies. Our ambition is to empower all types of local businesses, from single proprietors to franchisees, convenience stores to grocers, and florists to pharmacies.

## OUR GROWTH STRATEGY

We intend to broaden our network of merchants by providing innovative services that help merchants grow.

- **More merchants.** We have experienced tremendous success serving merchants, primarily in the food vertical, and there are many more that we have yet to reach. We will continue to invest in our go-to-market strategy and sales efforts to continue adding new merchants. Over time, we plan to add more merchants from verticals outside of food.

- **More merchant services.** We provide a range of services to help our merchants operate and grow their businesses. We will continue to innovate and introduce new services to add value for our merchants and unlock additional revenue opportunities for DoorDash.

We seek to increase consumer adoption and have DoorDash become a daily activity.

- **More consumers.** We plan to continue to increase our consumer reach, both in the United States and internationally.

- **More consumer engagement.** In the food vertical, we strive to increase the frequency with which consumers use DoorDash by increasing the breadth of restaurant selection, expanding the availability of meals at all times of the day, addressing the needs of business consumers, and enhancing affordability by increasing DashPass adoption. Further, as we continue to add new categories beyond food, we expect to gain additional consumer wallet share.

We seek to build a reliable, high quality, and operationally efficient logistics network.

- **Better consumer experience.** We continue to make investments aimed at improving the consumer experience. We are particularly focused on improving the quality of items delivered and the speed and timeliness of delivery, without sacrificing selection.

- **Better Dasher experience.** We also invest in improving Dasher experience and satisfaction. This includes improving onboarding and enabling Dashers to sign up and start making deliveries and earning faster.

- **Improve operational efficiency.**

  - As our order volumes increase, Dashers are busier and have more opportunities to earn. In addition, we continue to make significant investments to enhance the sophistication of our local logistics platform, which further increases the number of orders Dashers are able to complete in a given period of time.

  - As we continue improving the merchant, consumer, and Dasher experience, we expect to reduce our per-order cost of customer support, refunds, and credits.

9

Table of Contents

**Risk Factors Summary**

Our business is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors" immediately following this prospectus summary. These risks include the following:

- We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful;

- We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to achieve or maintain profitability in the future;

- We may not continue to grow on pace with historical rates;

- We face intense competition and if we are unable to compete effectively, our business, financial condition, and results of operations would be adversely affected;

- If we fail to retain our existing merchants and consumers or acquire new merchants and consumers in a cost-effective manner, our revenue may decrease and our business, financial condition, and results of operations could be adversely affected;

- If we fail to cost-effectively attract and retain Dashers or to increase the use of our platform by existing Dashers, our business, financial condition, and results of operations could be adversely affected;

- We rely on merchants on our platform for many aspects of our business, and any failure by them to maintain their service levels or any changes to their operating costs could adversely affect our business;

- If Dashers are reclassified as employees under federal or state laws, our business would be adversely affected;

- We expect a number of factors to cause our results of operations to fluctuate on a quarterly and annual basis, which may make it difficult to predict our future performance;

- Systems failures and resulting interruptions in the availability of our website, mobile application, or platform could adversely affect our business, financial condition, and results of operations; and

- The trading price of our common stock may be volatile, and you could lose all or part of your investment.

**Channels for Disclosure of Information**

Investors, the media, and others should note that, following the completion of this offering, we intend to announce material information to the public through filings with the SEC, the investor relations page on our website, press releases, public conference calls, webcasts, and our corporate blog at          .

The information disclosed by the foregoing channels could be deemed to be material information. As such, we encourage investors, the media, and others to follow the channels listed above and to review the information disclosed through such channels.

Any updates to the list of disclosure channels through which we will announce information will be posted on the investor relations page on our website.

**Corporate Information**

We were incorporated in 2013 as Palo Alto Delivery Inc., a Delaware corporation. In 2015, we changed our name to DoorDash, Inc. Our principal executive offices are located at 303 2nd Street, South Tower,

Table of Contents

8th Floor, San Francisco, California 94107, and our telephone number is (650) 487-3970. Our website address is www.doordash.com. Information contained on, or that can be accessed through, our website does not constitute part of this prospectus and inclusions of our website address in this prospectus are inactive textual references only. You should not consider information contained on our website to be part of this prospectus or in deciding whether to purchase shares of our common stock.

"DoorDash," our logo, and our other registered or common law trademarks, service marks, or trade names appearing in this prospectus are the property of DoorDash, Inc. Other trademarks and trade names referred to in this prospectus are the property of their respective owners.

## JOBS Act

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of specified reduced reporting requirements that are otherwise applicable generally to public companies. These reduced reporting requirements include:

- the requirement to present only two years of audited financial statements and only two years of related management's discussion and analysis in this prospectus;

- an exemption from compliance with the auditor attestation requirement on the effectiveness of our internal control over financial reporting;

- reduced disclosure about our executive compensation arrangements; and

- an exemption from the requirements to obtain a non-binding advisory vote on executive compensation or stockholder approval of any golden parachute arrangements.

We may take advantage of these provisions until we are no longer an emerging growth company. We would cease to be an emerging growth company upon the earliest to occur of: (i) the last day of the fiscal year in which we have more than $1.07 billion in annual revenue; (ii) the date we qualify as a large accelerated filer, with at least $700 million of equity securities held by non-affiliates; (iii) the date on which we have, in any three-year period, issued more than $1.0 billion in non-convertible debt securities; and (iv) the last day of the fiscal year ending after the fifth anniversary of this offering. We may choose to take advantage of some but not all of these reduced reporting burdens. We have taken advantage of certain reduced reporting burdens in this prospectus. Accordingly, the information contained herein may be different than the information you receive from other public companies in which you hold stock.

The JOBS Act permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to use this extended transition period until we are no longer an emerging growth company or until we affirmatively and irrevocably opt out of the extended transition period. As a result, our consolidated financial statements may not be comparable to the financial statements of companies that comply with new or revised accounting pronouncements as of public company effective dates.

See the section titled "Risk Factors—Risks Related to Our Business—We are an emerging growth company and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors."

11

DRS

Table of Contents

**THE OFFERING**

| | |
|---|---|
| Common stock offered by us | shares |
| Common stock to be outstanding after this offering | shares |
| Option to purchase additional shares of common stock from us | shares |
| Use of proceeds | We estimate that the net proceeds to us from the sale of shares of our common stock in this offering will be approximately $        (or approximately $        if the underwriters' option to purchase additional shares of our common stock from us is exercised in full), based upon the assumed initial public offering price of $        per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. |
| | The principal purposes of this offering are to increase our capitalization and financial flexibility, create a public market for our common stock, and enable access to the public equity markets for us and our stockholders. We intend to use the net proceeds we receive from this offering for general corporate purposes, including working capital, operating expenses, and capital expenditures. Additionally, we may use a portion of the net proceeds to acquire or invest in businesses, products, services, or technologies. However, we do not have agreements or commitments for any material acquisitions or investments at this time. We may also use a portion of the net proceeds to satisfy a portion of our anticipated tax withholding and remittance obligations related to the vesting and settlement of restricted stock units, or RSUs, that we have granted. See the section titled "Use of Proceeds" for additional information. |
| Concentration of ownership | Upon completion of this offering, our executive officers, directors, and holders of 5% or more of our common stock will beneficially own, in the aggregate, approximately    % of the outstanding shares of our common stock. |
| Proposed trading symbol | "DASH" |

The number of shares of our common stock that will be outstanding after this offering is based on           shares of our common stock outstanding as of          , and reflects           shares of redeemable convertible preferred stock that will automatically convert into shares of common stock immediately prior to the completion of this offering pursuant to the terms of our amended and restated certificate of incorporation, or the Capital Stock Conversion.

12

**Table of Contents**

The shares of our common stock outstanding as of            exclude the following:

- •         shares of our common stock issuable upon the exercise of options to purchase shares of our common stock outstanding as of        , with a weighted-average exercise price of $        per share;

- •         shares of our common stock subject to RSUs outstanding as of        ;

- •         shares of our common stock issuable upon the exercise of options to purchase shares of our common stock granted after        , with a weighted-average exercise price of $        per share;

- •         shares of our common stock subject to RSUs granted after        ;

- •         shares of our common stock issuable upon the exercise of a warrant to purchase common stock outstanding as of        , with an exercise price of $        per share;

- •         shares of our common stock reserved for future issuance under our equity compensation plans, consisting of:

  - •         shares of our common stock to be reserved for future issuance under our 2020 Equity Incentive Plan, or our 2020 Plan, which will become effective prior to the completion of this offering; and

  - •         shares of our common stock reserved for future issuance under our 2014 Stock Plan, or our 2014 Plan, as of        , which number of shares will be added to the shares of our common stock to be reserved for future issuance under our 2020 Plan upon its effectiveness, at which time we will cease granting awards under our 2014 Plan.

Our 2020 Plan provides for annual automatic increases in the number of shares of our common stock reserved thereunder and increases to the number of shares that may be granted thereunder based on shares under our 2014 Plan that expire, are tendered to or withheld by us for payment of an exercise price or for satisfying our tax withholding and remittance obligations, or are forfeited or otherwise repurchased by us, as more fully described in the section titled "Executive Compensation—Employee Benefit and Stock Plans."

Except as otherwise indicated, all information in this prospectus assumes:

- •   the Capital Stock Conversion will occur immediately prior to the completion of this offering;

- •   the filing and effectiveness of our amended and restated certificate of incorporation in Delaware and the effectiveness of our amended and restated bylaws, will each occur immediately prior to the completion of this offering;

- •   no exercise of outstanding stock options or warrants or settlement of outstanding RSUs subsequent to        ; and

- •   no exercise by the underwriters of their option to purchase up to an additional        shares of our common stock from us.

13

Table of Contents

### SUMMARY CONSOLIDATED FINANCIAL AND OTHER DATA

The following tables summarize our consolidated financial and other data. We have derived the summary consolidated statements of operations data for the years ended December 31, 2018 and 2019 and consolidated balance sheet data as of December 31, 2019 from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results that may be expected in the future. The following summary consolidated financial and other data should be read in conjunction with the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Non-GAAP Financial Measures" and our consolidated financial statements and related notes included elsewhere in this prospectus.

**Consolidated Statements of Operations Data**

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2018 | 2019 |
|  | (in thousands, except for per share data) | |
| Revenue | $ 290,631 | $ |
| Costs and expenses[1]: | | |
| Cost of revenue, exclusive of depreciation and amortization | 83,351 | |
| Operations and support | 144,518 | |
| Research and development | 51,001 | |
| Sales and marketing | 135,156 | |
| General and administrative | 77,808 | |
| Depreciation and amortization | 9,132 | |
| Total costs and expenses | 500,966 | |
| Loss from operations | (210,335) | |
| Interest income | 6,763 | |
| Interest expense | (485) | |
| Loss before income taxes | (204,057) | |
| Provision for income taxes | 404 | |
| Net loss | (204,461) | |
| Premium paid on repurchase of redeemable convertible preferred stock | (2,700) | |
| Net loss attributable to common stockholders | $(207,161) | $ |
| Net loss per share attributable to common stockholders, basic and diluted[2] | $   (23.38) | $ |
| Weighted-average number of shares outstanding used to compute net loss per share attributable to common stockholders, basic and diluted[2] | 8,861 | |
| Pro forma net loss per share, basic and diluted[2] | | $ |
| Weighted-average number of shares outstanding used to compute pro forma net loss per share, basic and diluted[2] | | |

14

Table of Contents

(1)    Costs and expenses include stock-based compensation expense as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | *(in thousands)* | |
| Operations and support | $ 3,073 | $ |
| Research and development | 10,546 | |
| Sales and marketing | 2,904 | |
| General and administrative | 7,044 | |
| Total stock-based compensation expense | $23,567 | $ |

(2)    See Note 12 to our consolidated financial statements included elsewhere in this prospectus for an explanation of the calculations of our basic and diluted net loss per share attributable to common stockholders, pro forma net loss per share attributable to common stockholders, and the weighted-average number of shares used in the computation of the per share amounts.

**Consolidated Balance Sheet Data**

| | Actual | Pro Forma[2] | Pro Forma as Adjusted[3][4] |
| --- | --- | --- | --- |
| | | *(in thousands)* | |
| Cash, cash equivalents, and marketable securities | $ | $ | $ |
| Working capital[1] | | | |
| Total assets | | | |
| Total liabilities | | | |
| Redeemable convertible preferred stock | | | |
| Additional paid-in capital | | | |
| Accumulated deficit | | | |
| Total stockholders' (deficit) equity | | | |

(1)    Working capital is defined as current assets less current liabilities.
(2)    The pro forma consolidated balance sheet data gives effect to (i) the Capital Stock Conversion, as if such conversion had occurred on                , (ii) the filing and effectiveness of our amended and restated certificate of incorporation, and (iii) an increase to additional paid-in capital and accumulated deficit related to stock-based compensation expense of $            associated with RSUs for which the service-based vesting condition was satisfied as of                and for which the liquidity event-related performance vesting condition will be satisfied in connection with this offering.
(3)    The pro forma as adjusted column in the balance sheet data table above gives effect to (i) the pro forma adjustments set forth above and (ii) the sale and issuance by us of shares of our common stock in this offering, based upon the assumed initial public offering price of $            per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.
(4)    Each $1.00 increase or decrease in the assumed initial public offering price of $            per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, would increase or decrease the amount of our pro forma as adjusted cash, cash equivalents, and marketable securities, working capital, total assets, and total stockholders' equity by $            million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, after deducting estimated underwriting discounts and commissions payable by us. An increase or decrease of 1.0 million shares in the number of shares offered by us would increase or decrease, as applicable, the amount of our pro forma as adjusted cash, cash equivalents and marketable securities, working capital, total assets, and total stockholders' equity by $            million, assuming the assumed initial public offering price remains the same, and after deducting estimated underwriting discounts and commissions payable by us.

15

Table of Contents

**Key Business and Non-GAAP Metrics**

In addition to the measures presented in our consolidated financial statements, we use the following key business and non-GAAP metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | **2018** | **2019** |
|  | *(in millions, except percentages)* | |
| Total Orders | 83.3 | |
| Marketplace GOV | $ 2,812.0 | |
| Contribution Profit (Loss)[1] | $ (59.4) | |
| Contribution Margin[1] | *(20.4)%* | |
| Adjusted EBITDA[1] | $ (    ) | |
| Adjusted EBITDA Margin[1] | *(    )%* | |

(1)   Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin are non-GAAP financial measures. For more information regarding our use of these measures and reconciliations to the most directly comparable financial measures calculated in accordance with GAAP, see the section titled "Non-GAAP Financial Measures."

See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Non-GAAP Metrics" for a description of Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin.

16

Table of Contents

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, including the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Non-GAAP Financial Measures" and our consolidated financial statements and related notes, before making a decision to invest in our common stock. Our business, financial condition, results of operations, or prospects could also be harmed by risks and uncertainties not currently known to us or that we currently do not believe are material. If any of the risks actually occur, our business, financial condition, results of operations, and prospects could be adversely affected. In that event, the market price of our common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business

***We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful.***

We launched operations in 2013 and we have since frequently expanded our platform features and services and changed our pricing methodologies. This limited operating history and our evolving business make it difficult to evaluate our future prospects and the risks and challenges we may encounter. These risks and challenges include our ability to:

- accurately forecast our revenue and plan our operating expenses;

- increase the number of and retain existing merchants, consumers, and Dashers using our platform;

- successfully compete with current and future competitors;

- successfully expand our business in existing markets and enter new markets and geographies;

- anticipate and respond to macroeconomic changes and changes in the markets in which we operate;

- maintain and enhance the value of our reputation and brand;

- adapt to rapidly evolving trends in the ways merchants and consumers interact with technology;

- avoid interruptions or disruptions in our service;

- develop a scalable, high-performance technology infrastructure that can efficiently and reliably handle increased usage, as well as the deployment of new features and services;

- hire, integrate, and retain talented technology, sales, customer service, and other personnel;

- effectively manage rapid growth in our personnel and operations; and

- effectively manage our costs related to Dashers.

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this "Risk Factors" section, our business, financial condition, and results of operations could be adversely affected. Further, because we have limited historical financial data and operate in a rapidly evolving market, any predictions about our future revenue and expenses may not be as accurate as they would be if we had a longer operating history or operated in a more predictable market. We have encountered in the past, and will encounter in the future, risks and uncertainties frequently experienced by growing companies with limited operating

17

Table of Contents

histories in rapidly changing industries. If our assumptions regarding these risks and uncertainties, which we use to plan and operate our business, are incorrect or change, or if we do not address these risks successfully, our results of operations could differ materially from our expectations and our business, financial condition, and results of operations could be adversely affected.

### *We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to achieve or maintain profitability in the future.*

We have incurred net losses in each year since our founding, we anticipate increasing expenses in the future, and we may not be able to achieve or maintain profitability in the future. We incurred a net loss of $204.5 million in 2018 and, as of December 31, 2018, we had an accumulated deficit of $485.5 million. We expect our costs will increase over time and our losses to continue as we expect to invest significant additional funds towards growing our business and operating as a public company. We have expended and expect to continue to expend substantial financial and other resources on developing our platform, including expanding our platform offerings, developing or acquiring new platform features and services, expanding into new markets and geographies, and increasing our sales and marketing efforts. These efforts may be more costly than we expect and may not result in increased revenue or growth in our business. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from achieving or maintaining profitability or positive cash flow on a consistent basis. If we are unable to successfully address these risks and challenges as we encounter them, our business, financial condition, and results of operations could be adversely affected.

Following the completion of this offering, the stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods, in particular in the quarter in which the offering is completed. Additionally, we may expend substantial funds in connection with the tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs. For more information, see "—The stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods and we may also expend substantial funds to satisfy a portion of our tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs, which may have an adverse effect on our financial condition and results of operations."

If we are unable to generate adequate revenue growth and manage our expenses, we may continue to incur significant losses in the future and may not be able to achieve or maintain profitability.

### *We may not continue to grow on pace with historical rates.*

We have grown rapidly over the last several years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance. In 2018 and 2019, our revenue was $290.6 million and $       , respectively, representing a       % growth rate. You should not rely on our revenue for any previous quarterly or annual period as any indication of our revenue or revenue growth in future periods. Our revenue growth rate has fluctuated in prior periods. Our revenue growth rate may decline in future periods as the size of our business grows and as we achieve higher market adoption rates. We may also experience declines in our revenue growth rate as a result of a number of factors, including slowing demand for our platform, insufficient growth in the number of merchants, consumers, and Dashers that utilize our platform, increasing competition, a decrease in the growth of our overall market, our failure to continue to capitalize on growth opportunities, increasing regulatory costs, and the maturation of our business, among others. We also expect to continue to make investments in the development and expansion of our business, which may not result in increased revenue or growth. In addition, we have strategically focused on suburban markets and smaller metropolitan areas since our founding because of the opportunity that these markets have presented for our local logistics platform. If the demand for local logistics platforms does not continue to grow in

18

DRS

Table of Contents

these markets, or if we are unable to maintain our category share in these markets, our revenue growth rate could be adversely affected. If our revenue growth rate declines, investors' perceptions of our business and the trading price of our common stock could be adversely affected.

***We face intense competition and if we are unable to compete effectively, our business, financial condition, and results of operations would be adversely affected.***

The markets in which we operate are intensely competitive and characterized by shifting user preferences, fragmentation, and frequent introductions of new services and offerings. In particular, local food delivery logistics, the largest category of our business today, is fragmented and intensely competitive. In the United States, we compete with other local food delivery logistics companies, such as Uber Eats, Grubhub, and Postmates, chain merchants that have their own online ordering platforms, pizza companies, such as Domino's, other merchants that own and operate their own delivery fleets, grocers and grocery delivery services, and companies that provide point of sale solutions and merchant delivery services. As we continue to expand our presence internationally, we will also face competition from local incumbents in these markets. In addition, we compete with traditional offline ordering channels, such as take-out offerings, telephone, and paper menus that merchants distribute to consumers as well as advertising that merchants place in local publications to attract consumers. Changing traditional ordering habits is difficult, and if merchants and consumers do not embrace the transition to local food delivery logistics as we expect, our business, financial condition, and results of operations could be adversely affected.

Our current and future competitors may enjoy competitive advantages, such as greater name recognition, longer operating histories, greater category share in certain markets, market-specific knowledge, established relationships with local merchants and larger existing user bases in certain markets, more successful marketing capabilities, and substantially greater financial, technical, and other resources than we have. Greater financial resources and product development capabilities may allow these competitors to respond more quickly to new or emerging technologies and changes in merchant, consumer, and Dasher preferences that may render our platform less attractive or obsolete. If certain merchants choose to partner with our competitors in a specific geographic market, or if merchants choose to engage exclusively with our competitors, we may lack a sufficient variety and supply of merchant options or lack access to the most popular merchants, such that our offering would become less appealing to consumers. Our competitors may also make acquisitions or establish cooperative or other strategic relationships among themselves or with others, including merchants. For example, certain of our competitors have recently acquired kitchens to enable them to produce and deliver food directly to consumers. Our competitors could also introduce new offerings with competitive price and performance characteristics or undertake more aggressive marketing campaigns than ours. Additionally, many of our competitors are well capitalized and offer discounted services, lower merchant commission rates and consumer fees, incentives for independent contractors who provide delivery services and consumer discounts and promotions, innovative platforms and offerings, and alternative pay models, which may be more attractive than those that we offer. Such competitive pressures may lead us to maintain or lower our commission rates and fees or maintain or increase our incentives, discounts, and promotions in order to remain competitive, particularly in markets where we do not have a leading position. Such efforts have negatively affected, and will continue to negatively affect, our financial performance, and there is no guarantee that such efforts will be successful. Further, the markets in which we compete have attracted significant investments from a wide range of funding sources, and we anticipate that many of our competitors will continue to be highly capitalized. These investments, along with the other competitive advantages discussed above, may allow our competitors to continue to lower their prices and fees, or increase the incentives, discounts, and promotions they offer, and compete more effectively against us. Delivery logistics services for food and the other verticals in which we compete are nascent, and we cannot guarantee that they will stabilize at a competitive equilibrium that will allow us to achieve profitability. As we expand to verticals beyond food, we may compete with large

19

Table of Contents

Internet companies with substantial resources, users, and brand power, such as Amazon and Google. Further, merchants could determine that it is more cost-effective to develop their own platforms to offer online pickup and delivery rather than use our platform.

In addition, within our industry, the cost to switch between offerings is low. Consumers have a propensity to shift to the lowest-cost provider and frequently use more than one local logistics platform, independent contractors who provide delivery services have a propensity to use multiple platforms concurrently as they attempt to maximize earnings, and merchants have a propensity to shift to the local logistics platform that offers the lowest commission rates and often adopt more than one platform to maximize their volume of orders. As we and our competitors introduce new offerings and as existing offerings evolve, we expect to become subject to additional competition. In addition, our competitors may adopt certain of our platform features or may adopt innovations that merchants, consumers, or Dashers value more highly than ours, which would render our platform less attractive and reduce our ability to differentiate our platform. Increased competition could result in, among other things, a reduction of the revenue we generate from the use of our platform, the number of platform users, the frequency of use of our platform, and our margins.

For all of these reasons, we may not be able to compete successfully. If we lose existing merchants, consumers, or Dashers that utilize our platform, fail to attract new merchants, consumers, or Dashers, or are forced to reduce our commission rate or make pricing concessions as a result of increased competition, our business, financial condition, and results of operations would be adversely affected.

***If we fail to retain our existing merchants and consumers or acquire new merchants and consumers in a cost-effective manner, our revenue may decrease and our business, financial condition, and results of operations could be adversely affected.***

We believe that growth of our business and revenue is dependent on our ability to continue to cost-effectively grow our platform by retaining our existing merchants and consumers and adding new merchants and consumers, including in new markets. The increase in merchants attracts more consumers to our platform and the increase in consumers attracts more merchants. This network takes time to build and may grow slower than we expect or than it has grown in the past. In particular, our national brand partnerships are a key component of our strategy to provide a wide selection for consumers. If we fail to retain either our existing merchants, especially our most popular merchants and our national brand partners, or consumers, the value of our network would be diminished. In addition, we expect to continue to incur substantial expenses to acquire additional merchants and consumers. In expanding our operations into new markets to acquire additional merchants and consumers, we may be placed into unfamiliar competitive environments and we may invest significant resources with the possibility that the return on such investments will not be achieved for several years or at all. We cannot assure you that the revenue from the merchants and consumers we acquire will ultimately exceed the cost of acquisition.

In addition, if merchants on our platform were to cease operations, temporarily or permanently, or face financial distress or other business disruption, or if our relationships with merchants on our platform deteriorate, we may not be able to provide consumers with sufficient merchant selection. This risk is particularly pronounced with restaurants, as each year a significant percentage of restaurants go out of business, and in markets where we have fewer merchants. In addition, if we are unsuccessful in attracting and retaining popular merchants, if merchants enter into exclusive arrangements with our competitors, if we fail to negotiate satisfactory terms with merchants, or if we ineffectively manage our relationships with merchants, our business, financial condition, and results of operations could be adversely affected. Changes to our business and to our relationships with some of our constituents may also impact our ability to attract and retain other constituents. For example, the increased growth of our subscription offering, DashPass, and how compelling this offering is to consumers, depends on our

20

Table of Contents

ability to sign up eligible merchants to DashPass. Additionally, many of our consumers initially access our platform to take advantage of certain promotions, such as discounts and other reduced fees. We strive to demonstrate the value of our platform and offerings to such consumers, thereby encouraging them to access our platform regularly or subscribe as a paid user of DashPass, through prompts and notifications and time-limited trials of DashPass and other offerings. However, these consumers may never convert to a paid subscription to DashPass or access our platform after they take advantage of our promotions. If we are not able to continue to expand our consumer base or fail to convert our consumers to regular paying consumers, demand for our full-price or paid services, such as DashPass, and our revenue may grow slower than expected or decline.

Further, certain consumers are indirect users of our platform, as they place orders through third-party websites and applications, such as Google, and merchant websites. Consumers may perceive these third-party websites and applications to be more efficient or user-friendly or have a stronger brand affinity to these third parties. If consumers increasingly use such third-party websites and applications to make orders on our platform, rather than through our website and consumer mobile application directly, our ability to establish relationships and build brand loyalty with consumers, collect information about consumer trends and preferences, and provide a customized experience based on such preferences would be adversely affected. This in turn could impact our ability to attract and retain consumers and adversely affect our business, financial condition, and results of operations.

***If we fail to cost-effectively attract and retain Dashers or to increase the use of our platform by existing Dashers, our business, financial condition, and results of operations could be adversely affected.***

Our continued growth depends in part on our ability to cost-effectively attract and retain Dashers who satisfy our screening criteria and procedures and to increase use of our platform by existing Dashers. To attract and retain Dashers, we have, among other things, offered monetary incentives and perquisites, such as credits to be used for orders on our platform, free DoorDash-branded apparel, and access to Dasher Experience Centers where Dashers can receive assistance with pressing issues, meet other Dashers, and participate in special events. If we do not continue to provide Dashers with flexibility on our platform, compelling opportunities to earn income, and other incentive programs that are comparable or superior to those of our competitors, we may fail to attract new Dashers or retain existing Dashers or increase their use of our platform. For example, if merchants and consumers choose to use competing offerings, we may lack sufficient opportunities for Dashers to earn, which may reduce the perceived utility of our platform and impact our ability to attract and retain Dashers. We also frequently test Dasher incentives with subsets of existing Dashers and potential Dashers, and these incentives could fail to attract and retain Dashers or fail to increase use of our platform by existing Dashers, or could have other unintended adverse consequences. In addition, changes in certain laws and regulations, including immigration and labor and employment laws, may result in a decrease in the pool of Dashers, which may result in increased competition for Dashers or higher costs of recruitment and engagement. Other factors outside of our control, such as increases in the price of gasoline, vehicles, or insurance, may also reduce the number of Dashers that utilize our platform or the use of our platform by Dashers. If we fail to attract Dashers or retain existing Dashers on favorable terms, or if we fail to increase the use of our platform by existing Dashers, we may not be able to meet the demand of merchants and consumers and our business, financial condition, and results of operations could be adversely affected.

***We rely on merchants on our platform for many aspects of our business, and any failure by them to maintain their service levels or any changes to their operating costs could adversely affect our business.***

We rely upon merchants on our platform, including small and local independent businesses, to provide quality goods to our consumers. If these merchants experience difficulty servicing consumer demand,

21

Table of Contents

producing quality goods, or meeting our other requirements or standards, or experience problems with their point-of-sale or other technologies, our reputation and brand could be damaged. Further, an increase in merchant operating costs could cause merchants on our platform to raise prices, renegotiate commission rates, or cease operations, which could in turn adversely affect our operational costs and efficiency, and if merchants on our platform were to cease operations, temporarily or permanently, we may not be able to provide consumers with sufficient merchant selection, which we expect would reduce the number of consumers on our platform. Many of the factors affecting merchant operating costs, including off-premise costs and prices, are beyond the control of merchants and include inflation, costs associated with the goods provided, labor and employee benefit costs, rent costs, and energy costs. Additionally, if merchants try to pass along increased operating costs and raise prices to consumers, order volume may decline, which we expect would adversely affect our financial condition and results of operations.

***If Dashers are reclassified as employees under federal or state law, our business would be adversely affected.***

We are subject to claims, lawsuits, arbitration proceedings, administrative actions, government investigations, and other legal and regulatory proceedings at the federal, state, and municipal levels challenging the classification of Dashers that utilize our platform as independent contractors. The tests governing whether a Dasher is an independent contractor or an employee vary by governing law and are typically highly fact sensitive. Laws and regulations that govern the status and classification of independent contractors are subject to changes and divergent interpretations by various authorities, which can create uncertainty and unpredictability for us. As referenced above, we maintain that Dashers that utilize our platform are independent contractors. However, Dashers may be reclassified as employees, especially in light of the evolving rules and restrictions on service provider classification and their potential impact on the local logistics industry. A reclassification of Dashers or other delivery service providers as employees would adversely affect our business, financial condition, and results of operations, including as a result of:

- monetary exposure arising from, or relating to failure to, withhold and remit taxes, unpaid wages and wage and hour laws and requirements (such as those pertaining to failure to pay minimum wage and overtime, or to provide required breaks and wage statements), expense reimbursement, statutory and punitive damages, penalties, including related to the California Labor Code Private Attorneys General Act, or PAGA, and government fines;

- injunctions prohibiting continuance of existing business practices;

- claims for employee benefits, social security, workers' compensation, and unemployment;

- claims of discrimination, harassment, and retaliation under civil rights laws;

- claims under laws pertaining to unionizing, collective bargaining, and other concerted activity;

- other claims, charges, or other proceedings under laws and regulations applicable to employers and employees, including risks relating to allegations of joint employer liability or agency liability; and

- harm to our reputation and brand.

In addition to the harms listed above, a reclassification of Dashers or other delivery service providers as employees would require us to significantly alter our existing business model and operations and impact our ability to add and retain Dashers to our platform and grow our business, which we would expect to have an adverse effect on our business, financial condition, and results of operations.

22

Table of Contents

We have been involved in and continue to be involved in numerous legal proceedings related to Dasher classification, and such proceedings have increased in volume since the California Supreme Court's 2018 ruling in *Dynamex Operations West, Inc. v. Superior Court*, or Dynamex. We are currently involved in a number of putative class actions and representative actions brought, for example, pursuant to PAGA, and numerous individual claims, including those brought in arbitration or compelled pursuant to the terms of our independent contractor agreements to arbitration, challenging the classification of Dashers that utilize our platform as independent contractors. In addition, in 2017, we settled one classification matter in California on a class basis including claims raised under PAGA and are in the process of settling a similar classification matter in California. See the section titled "Business—Legal Proceedings" for additional information about these types of legal proceedings.

An increasing number of jurisdictions are considering implementing standards similar to the test set forth in Dynamex to determine worker classification. Further, the California Legislature passed legislation, California Assembly Bill 5, or AB 5, and it was signed into law by Governor Gavin Newsom on September 18, 2019 and became effective on January 1, 2020. AB 5 codified the Dynamex standard regarding contractor classification, expanded its application, and created numerous carve-outs, which may have an adverse effect on our business, financial condition, and results of operations, may lead to increased legal proceedings and related expenses, and may require us to significantly alter our existing business model and operations. We, along with certain other companies, are supporting a campaign for a 2020 ballot initiative in California to preserve flexibility for Dashers. In addition, we could face further challenges to the classification of Dashers that utilize our platform as independent contractors as other states or jurisdictions where we operate consider implementing similar legislation or regulations, which we would expect to have an adverse effect on our business, financial condition, and results of operations.

***We expect a number of factors to cause our results of operations to fluctuate on a quarterly and annual basis, which may make it difficult to predict our future performance.***

Our results of operations have historically varied from period to period, and we expect that our results of operations will continue to vary significantly from quarter to quarter and year to year because of a variety of factors, many of which are outside of our control. As a result, comparing our results of operations on a period-to-period basis may not be meaningful. In addition to other risk factors described elsewhere in this "Risk Factors" section, factors that may contribute to the variability of our quarterly and annual results include:

- our ability to attract and retain merchants, consumers, and Dashers that utilize our platform in a cost-effective manner;

- our ability to accurately forecast revenue and appropriately plan expenses;

- the effects of increased competition on our business;

- our ability to successfully expand in existing markets and successfully enter new markets;

- changes in consumer behavior with respect to on-demand delivery;

- increases in marketing, sales, and other operating expenses that we may incur to grow and acquire new merchants, consumers, and Dashers;

- our business mix between Marketplace and Drive;

- the proportion of consumers that subscribe to DashPass;

- the impact of worldwide economic conditions, including the resulting effect on consumer spending on on-demand delivery;

- the seasonality of our business, particularly with respect to local food delivery logistics, including the effect of academic calendars on college campuses and seasonal patterns in restaurant dining;

23

Table of Contents

- the impact of weather on our business;

- our ability to maintain an adequate rate of growth and effectively manage that growth;

- our ability to maintain and increase traffic to our platform;

- the effects of changes in search engine placement and prominence;

- our ability to keep pace with technology changes in our industry;

- the success of our sales and marketing efforts;

- the effects of negative publicity on our business, reputation, or brand;

- our ability to protect, maintain, and enforce our intellectual property;

- costs associated with defending claims, including intellectual property infringement claims, and related judgments or settlements;

- changes in governmental or other regulations affecting our business, including regulations regarding the classification of Dashers that utilize our platform;

- interruptions in service and any related impact on our business, reputation, or brand;

- the attraction and engagement of qualified employees and key personnel;

- our ability to choose and effectively manage third-party service providers;

- the effects of natural or man-made catastrophic events;

- the effectiveness of our internal controls;

- the impact of payment processor costs and procedures;

- changes in the online payment transfer rate; and

- changes in our tax rates or exposure to additional tax liabilities.

The variability and unpredictability of our results of operations could result in our failure to meet our expectations or those of analysts that cover us or investors with respect to revenue or other results of operations for a particular period. If we fail to meet or exceed such expectations, the market price of our common stock could fall substantially, and we could face costly lawsuits, including securities class action suits.

***Systems failures and resulting interruptions in the availability of our website, mobile application, or platform could adversely affect our business, financial condition, and results of operations.***

It is critical to our success that merchants, consumers, and Dashers be able to access our platform at all times. Our systems, or those of third parties upon which we rely, may experience service interruptions or degradation or other performance problems because of hardware and software defects or malfunctions, distributed denial-of-service and other cyberattacks, infrastructure changes, human error, earthquakes, hurricanes, floods, fires, natural disasters, power losses, disruptions in telecommunications services, fraud, military or political conflicts, terrorist attacks, computer viruses, ransomware, malware, or other events. Our systems also may be subject to break-ins, sabotage, theft, and intentional acts of vandalism, including by our own employees. Some of our systems are not fully redundant and our disaster recovery planning may not be sufficient for all eventualities. Our business interruption insurance may not be sufficient to cover all of our losses that may result from interruptions in our service as a result of systems failures and similar events.

We have experienced and will likely continue to experience system failures and other events or conditions from time to time that interrupt the availability or reduce or affect the speed or functionality of

24

Table of Contents

our platform. These events have resulted in, and similar future events could result in, losses of revenue. In some instances, we may not be able to identify the cause or causes of these performance problems within an acceptable period of time. A prolonged interruption in the availability or reduction in the availability, speed, or other functionality of our platform could adversely affect our business and reputation and could result in the loss of users. Moreover, to the extent that any system failure or similar event results in harm or losses to the users of our platform, we have in the past voluntarily provided and may in the future voluntarily provide credits to merchants, consumers, and Dashers to compensate for such harm or the affected user could seek monetary recourse or contractual remedies from us for their losses and such claims, even if unsuccessful, would likely be time-consuming and costly for us to address.

***Our pricing methodologies are impacted by a number of factors and ultimately may not be successful in attracting and retaining merchants, consumers, and Dashers.***

Demand for our platform is highly sensitive to a range of factors, including the price of the goods delivered, the amount of compensation and gratuities required to attract and retain Dashers, incentives paid to Dashers, and the fees and commissions we charge merchants and consumers. Many factors, including operating costs, legal and regulatory requirements, constraints or changes, and our current and future competitors' pricing and marketing strategies, could significantly affect our pricing strategies. Certain of our competitors offer, or may in the future offer, lower-priced or a broader range of offerings. Similarly, certain competitors may use marketing strategies that enable them to attract or retain new merchants, consumers, and Dashers at a lower cost than us. There can be no assurance that we will not be forced, through competition, regulation, or otherwise, to reduce the price of delivery for consumers, increase the incentives we pay to Dashers that utilize our platform, or reduce the fees and commissions we charge merchants, or to increase our marketing and other expenses to attract and retain merchants, consumers, and Dashers in response to competitive pressures. We have launched, and may in the future launch, new pricing strategies and initiatives, such as subscription offerings like DashPass, and Dasher or consumer loyalty programs, or modify existing pricing methodologies, any of which may not ultimately be successful in attracting and retaining merchants, consumers, or Dashers. Further, our consumers' price sensitivity may vary by geographic location, and as we expand, our pricing methodologies may not enable us to compete effectively in these locations. In particular, our continued international expansion may require us to change our pricing strategies and to adjust to different cultural norms, including with respect to consumer pricing and gratuities. While we do and will attempt to set prices based on our prior operating experience and merchant, consumer, and Dasher feedback and engagement levels, our assessments may not be accurate or there may be errors in the technology used in our pricing and we could be underpricing or overpricing our services. In addition, if the services on our platform change, then we may need to revise our pricing methodologies.

***We face certain risks associated with our pay model for Dashers.***

Our pay model for Dashers, particularly with respect to gratuities for Dashers, has previously led, and may continue to lead, to negative publicity, lawsuits, and government inquiries. In the past, government authorities have brought claims against us related to our former Dasher pay model, and may bring similar claims in the future. For example, on November 19, 2019, the District of Columbia filed an action in the Superior Court of the District of Columbia alleging violations of the District of Columbia's Consumer Protection Procedures Act with respect to our Dasher pay model. Our Dasher pay model has also led, and may continue to lead, to some consumers providing lower gratuities, or no gratuities at all, to Dashers, which could impact the amount that Dashers are able to earn on our platform and our ability to attract and retain Dashers. We have also launched, and may in the future launch, certain changes to the rates and fee structure for Dashers that utilize our platform, which may not ultimately be successful in attracting and retaining Dashers. For example, in September 2019, we implemented a change to our pay model which led to an increase in Dasher compensation and incentives and which may result in an

25

Table of Contents

increase to the fees we charge to consumers, which in turn could affect our ability to attract and retain consumers. Further, this revised pay model may lead to negative publicity and as a result we may not be successful in attracting and retaining merchants, consumers, and Dashers. In the future, based on a variety of factors, including legal and regulatory changes, we may change our pay model again. Our revised pay model, and any future changes to our pay model or our ability to efficiently price our services, could adversely affect our business, financial condition, and results of operations.

Further, while we maintain that Dashers that utilize our platform are independent contractors, there is a risk that Dashers may be reclassified as employees under federal or state law. As discussed above, we have been involved in and continue to be involved in numerous legal proceedings related to Dasher classification, and such proceedings have increased in volume since the California Supreme Court's 2018 ruling in Dynamex. In addition, an increasing number of jurisdictions are considering implementing standards similar to the test set forth in Dynamex to determine worker classification. For example, the California Legislature passed AB 5 and it was signed into law by Governor Gavin Newsom on September 18, 2019 and became effective on January 1, 2020. AB 5 codified the Dynamex standard regarding contractor classification, expanded its application, and created numerous carve-outs, which may have an adverse effect on our business, financial condition, and results of operations, may lead to increased legal proceedings and related expenses, and may require us to significantly alter our existing business model and operations. We could face further challenges to the classification of Dashers that utilize our platform as independent contractors as other states and jurisdictions where we operate are considering similar legislation or regulations. A reclassification of Dashers or delivery service providers using a local logistics platform as employees could require us to revise our pricing methodologies and pay model to account for such a change to Dasher classification, and to make other substantive internal adjustments to account for any transition of a Dasher to an employment position.

***We are committed to expanding our platform and enhancing the DoorDash experience, which may not maximize short-term financial results and may yield results that conflict with the market's expectations, which could result in our stock price being adversely affected.***

We are passionate about expanding our platform and continually enhancing the DoorDash experience, with a focus on driving long-term engagement through innovation, the expansion of our platform and services, and providing high-quality support, which may not necessarily maximize short-term financial results. We frequently make business decisions that may reduce our short-term financial results if we believe that the decisions are consistent with our goals to improve the DoorDash experience, which we believe will improve our financial results over the long term. These decisions may not be consistent with the short-term expectations of our stockholders and may not produce the long-term benefits that we expect, in which case our growth, business, financial condition, and results of operations could be adversely affected.

***If we fail to manage our growth effectively, our brand, business, financial condition, and results of operations could be adversely affected.***

Since 2013, we have experienced rapid growth in our headcount, the number of users on our platform, our geographic reach, and our operations, and we expect to continue to experience growth in the future. For example, the number of our full-time employees has increased from                      as of                      to                      as of                      . Employee growth has occurred both at our San Francisco headquarters and in a number of our offices across the United States and internationally. This growth has placed, and may continue to place, substantial demands on management and our operational and financial infrastructure. As with many companies in our growth stage, a majority of our employees have been with us for fewer than 24 months. We have made, and intend to continue to make, substantial investments in our technology, customer service, and sales and marketing infrastructure. Our ability to

26

Table of Contents

manage our growth effectively and to integrate new employees, technologies, and acquisitions into our existing business will require us to continue to expand our operational and financial infrastructure and to continue to effectively integrate, develop, and motivate a large number of new employees, while maintaining the beneficial aspects of our culture. Continued growth could challenge our ability to develop and improve our operational, financial, and management controls, enhance our reporting systems and procedures, recruit, train, and retain highly skilled personnel, and maintain user satisfaction. Additionally, if we do not manage the growth of our business and operations effectively, the quality of our platform and the efficiency of our operations could suffer, which could adversely affect our reputation and brand, business, financial condition, and results of operations.

***Growth of our business will depend on a strong reputation and brand and any failure to maintain, protect, and enhance our brand would hurt our ability to retain or expand our base of merchants, consumers, and Dashers and our ability to increase their level of engagement.***

We believe that building a strong reputation and brand and continuing to increase the strength of the local network effects among the merchants, consumers, and Dashers that use our platform are critical to our ability to attract and retain all three constituencies and increase their engagement with our platform, and will only become more important as competition in our industry further intensifies. Successfully maintaining, protecting, and enhancing our reputation and brand and increasing the local network effects of our platform will depend on the success of our marketing efforts, our ability to provide consistent, high-quality services and support, and our ability to successfully secure, maintain, and defend our rights to use the "DoorDash" mark, our logo, and other trademarks important to our brand, as well as a number of other factors, many of which are outside our control. We believe that our paid marketing initiatives have been critical in promoting awareness of our platform, which in turn drives new consumer growth and engagement, but future marketing efforts may not be successful or cost-effective. Our consumers have a wide variety of options for delivery of goods, including other local logistics platforms and services, and consumer preferences may also change from time to time. To expand our consumer base, we must appeal to new consumers who may have historically used other methods of delivering goods or other local logistics platforms.

Our reputation, brand, and ability to build trust with existing and new merchants, consumers, and Dashers may be adversely affected by complaints and negative publicity about us, our platform, merchants, and Dashers that utilize our platform or our competitors' platforms, even if factually incorrect or based on isolated incidents. Negative perception of our platform or company may harm our reputation, brand, and local network effects, including as a result of:

- complaints or negative publicity about us, our platform, Dashers, merchants, consumers, or our policies and guidelines, including Dasher pay;

- missing or incorrect items, inaccurate orders, or cancelled orders;

- fraud;

- illegal, negligent, reckless, or otherwise inappropriate behavior by users or third parties;

- food tampering or inappropriate or unsanitary food preparation, handling, or delivery;

- a failure to provide Dashers with a sufficient level of orders or to pay Dashers competitively;

- a failure to offer consumers competitive pricing and delivery times;

- a failure to provide a range of delivery options sought by consumers;

- a failure to provide environmentally friendly delivery and packaging options;

- actual or perceived disruptions or defects in our platform, such as privacy or data security breaches or other security incidents, site outages, payment disruptions, or other incidents that impact the reliability of our services;

27

Table of Contents

- litigation over, or investigations by regulators into, our platform;

- users' lack of awareness of, or compliance with, our policies;

- changes to our policies that users or others perceive as overly restrictive, unclear, inconsistent with our values or mission, or not clearly articulated;

- a failure to comply with legal, tax, and regulatory requirements;

- a failure to enforce our policies in a manner that users perceive as effective, fair, and transparent;

- a failure to operate our business in a way that is consistent with our values and mission;

- inadequate or unsatisfactory user support experiences;

- illegal or otherwise inappropriate behavior by our management team or other employees or contractors;

- negative responses by merchants, consumers, or Dashers to new services on our platform;

- a failure to register and prevent misappropriation of our trademarks;

- perception of our treatment of employees, merchants, consumers, and Dashers and our response to employee, merchant, consumer, and Dasher sentiment related to political or social causes or actions of management; or

- any of the foregoing with respect to our competitors, to the extent such resulting negative perception affects the public's perception of us or our industry as a whole.

If we do not successfully develop, protect, and enhance our reputation and brand and increase the local network effects of our platform, our business may not grow and we may not be able to compete effectively. If existing and new merchants and consumers do not perceive the delivery services provided by Dashers that utilize our platform to be reliable, safe, and affordable, or if we fail to offer new and relevant services and features on our platform, we may not be able to attract or retain merchants, consumers, or Dashers or to increase their use of our platform, any of which we expect would adversely affect our business, financial condition, and results of operations. In addition, changes we may make to enhance and improve our platform and balance the needs and interests of merchants, consumers, and Dashers that utilize our platform may be viewed positively from one group's perspective but negatively from another group's perspective, or may not be viewed positively by any group. If we fail to balance the interests of merchants, consumers, and Dashers or make changes that they view negatively, merchants, consumers, and Dashers may stop or reduce usage of our platform or use alternative platforms, any of which could adversely affect our reputation, brand, business, financial condition, and results of operations.

*Unfavorable media coverage could harm our business, financial condition, and results of operations.*

We are the subject of media coverage from time to time. Unfavorable publicity regarding our business model, pay model, user support, technology, platform changes, platform quality, delivery issues, privacy or security practices, or management team could adversely affect our reputation. Such negative publicity could also harm the size of our network and the engagement and loyalty of merchants, consumers, and Dashers that utilize our platform, which could adversely affect our business, financial condition, and results of operations. For example, we have previously received negative media coverage related to the manner in which Dashers were compensated, in particular with respect to gratuities, and concerns related to food tampering and general food safety and quality, which has adversely affected our reputation and brand. As our platform continues to scale and public awareness of our brand increases, any future issues that draw media coverage could have an amplified negative

28

Table of Contents

effect on our reputation and brand. In addition, negative publicity related to key brands or influencers that we have partnered with may damage our reputation, even if the publicity is not directly related to us. Any negative publicity that we may receive could diminish confidence in, and the use of, our platform, which could adversely affect our business.

***We have been subject to cybersecurity incidents in the past and anticipate being the target of future attacks. Any actual or perceived security or privacy breach could interrupt our operations, harm our brand and adversely affect our reputation, brand, business, financial condition, and results of operations.***

Our business involves the collection, storage, processing, and transmission of personal data and other sensitive and proprietary data of our merchants, consumers, and Dashers. Additionally, we maintain sensitive and proprietary information relating to our business, such as our own proprietary information and personal data relating to our employees. An increasing number of organizations, including large online and off-line merchants and businesses, other large Internet companies, financial institutions, and government institutions, have disclosed breaches of their information security systems and other information security incidents, some of which have involved sophisticated and highly targeted attacks. In addition, these incidents can originate on our vendors' websites, which can then be leveraged to access our website, further preventing our ability to successfully identify and mitigate the attack. We have previously experienced these types of breaches and other incidents. For example, in September 2019, we reported an incident affecting one of our vendors that resulted in the unauthorized acquisition of certain Dashers' driver licenses as well as data related to certain of our consumers. This incident has resulted in regulatory inquiries and is the subject of litigation. While we maintain cyber insurance that may help provide coverage for these types of incidents, we cannot assure you that our insurance will be adequate to cover costs and liabilities related to this incident.

Because techniques used to obtain unauthorized access to or to sabotage information systems change frequently and may not be known until launched against us, we may be unable to anticipate or prevent these attacks, react in a timely manner, or implement adequate preventive measures, and we may face delays in our detection or remediation of, or other responses to, security breaches and other privacy- and security-related incidents. Unauthorized parties have in the past gained access, and may in the future gain access, to systems or facilities used in our business through various means, including gaining unauthorized access into our systems or facilities or those of merchants, consumers, and Dashers that utilize our platform, attempting to fraudulently induce our employees, merchants, consumers, Dashers, or others into disclosing user names, passwords, payment card information, or other sensitive information, which may in turn be used to access our information technology, or IT, systems, or attempting to fraudulently induce our employees, merchants, or others into manipulating payment information, resulting in the fraudulent transfer of funds to bad actors.

In addition, users on our platform could have vulnerabilities on their own devices that are entirely unrelated to our systems and platform, but could mistakenly attribute their own vulnerabilities to us. Further, breaches experienced by other companies may also be leveraged against us. For example, credential stuffing attacks are becoming increasingly common and sophisticated actors can mask their attacks, making them increasingly difficult to identify and prevent. We have previously experienced incidents of fraud on our platform that we believe involve credential stuffing attacks, which we have been unable to detect or prevent. Certain efforts may be state-sponsored or supported by significant financial and technological resources, making them even more difficult to detect, remediate, and otherwise respond to.

Although we have developed systems and processes that are designed to protect the data of merchants, consumers, and Dashers that utilize our platform, protect our systems, prevent data loss, and

29

Table of Contents

prevent other security breaches and security incidents, these security measures have not fully protected our systems in the past and cannot guarantee security in the future. The IT and infrastructure used in our business may be vulnerable to cyberattacks or security breaches, and third parties may be able to access data, including personal data and other sensitive and proprietary data of merchants, consumers, and Dashers, our employees' personal data, or our other sensitive and proprietary data, accessible through those systems. Employee error, malfeasance, or other errors in the storage, use, or transmission of any of these types of data could result in an actual or perceived privacy or security breach or other security incident. Although we have policies restricting the access to the personal information we store, there is a risk that these policies may not be effective in all cases.

Any actual or perceived breach of privacy, or any actual or perceived security breach or other incidents, could interrupt our operations, result in our platform being unavailable, result in loss or improper access to, or acquisition or disclosure of, data, result in fraudulent transfer of funds, harm our reputation, brand, and competitive position, damage our relationships with third-party partners, or result in claims, regulatory investigations, and proceedings and significant legal, regulatory, and financial exposure, and any such incidents or any perception that our security measures are inadequate could lead to loss of merchant, consumer, or Dasher confidence in, or decreased use of, our platform, any of which could adversely affect our business, financial condition, and results of operations. Any actual or perceived breach of privacy or security, or other security incident, impacting any entities with which we share or disclose data (including, for example, our third-party technology providers) could have similar effects. Further, any cyberattacks or actual or perceived security and privacy breaches and other incidents directed at, or suffered by, our competitors could reduce confidence in our industry as a whole and, as a result, reduce confidence in us. We also expect to incur significant costs in an effort to detect and prevent privacy and security breaches and other privacy- and security-related incidents, and we may face increased costs and requirements to expend substantial resources in the event of an actual or perceived privacy or security breach or other incident.

Additionally, defending against claims or litigation based on any security breach or incident, regardless of their merit, could be costly and divert management's attention. We cannot be certain that our insurance coverage will be adequate for data handling or data security costs or liabilities actually incurred, that insurance will continue to be available to us on commercially reasonable terms or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have an adverse effect on our reputation, brand, business, financial condition, and results of operations.

***The markets for local food delivery logistics and our other delivery logistics services are still in relatively early stages of growth and if these markets do not continue to grow, grow slower than we expect, or fail to grow as large as we expect, our business, financial condition, and results of operations could be adversely affected.***

The local food delivery logistics market has grown rapidly since we launched our local logistics platform in 2013, but it is still relatively new, and it is uncertain to what extent market acceptance will continue to grow, if at all. In addition, the market for the other delivery logistics services we facilitate, such as grocery delivery services, is also relatively nascent, and it is uncertain whether demand for grocery delivery services or other delivery logistics services we may facilitate in the future will continue to grow and achieve wide market acceptance, if at all. Our success will depend to a substantial extent on the willingness of people to widely adopt local food delivery logistics and the other delivery logistics services we facilitate. If the public does not perceive these services as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability, or for other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, or instead adopts

30

Table of Contents

alternative solutions that may arise, then the market for our platform may not further develop, may develop slower than we expect, or may not achieve the growth potential we expect, any of which could adversely affect our business, financial condition, and results of operations.

***We rely primarily on third-party insurance policies to insure our operations-related risks. If our insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business, which could adversely affect our business, financial condition, and results of operations.***

We procure third-party insurance policies to cover various operations-related risks including auto liability, employment practices liability, workers' compensation, business interruptions, cybersecurity and data breaches, crime, directors' and officers' liability, occupational accident liability for Dashers, and general business liabilities. For certain types of operations-related risks or future risks related to our new and evolving services, we may not be able to, or may choose not to, acquire insurance. In addition, we may not obtain enough insurance to adequately mitigate such operations-related risks or risks related to our new and evolving services, and we may have to pay high premiums, self-insured retentions, or deductibles for the coverage we do obtain. Additionally, if any of our insurance providers becomes insolvent, it would be unable to pay any operations-related claims that we make. Further, some of our agreements with merchants require that we procure certain types of insurance, and if we are unable to obtain and maintain such insurance, we would be in violation of the terms of these merchant agreements.

If the amount of one or more operations-related claims were to exceed our applicable aggregate coverage limits, we would bear the excess, in addition to amounts already incurred in connection with deductibles, self-insured retentions, or otherwise paid by our insurance subsidiary. Insurance providers have raised premiums and deductibles for many businesses and may do so in the future. As a result, our insurance and claims expense could increase, or we may decide to raise our deductibles or self-insured retentions when our policies are renewed or replaced. Our business, financial condition, and results of operations could be adversely affected if (i) the cost per claim, premiums, or the number of claims significantly exceeds our historical experience and coverage limits, (ii) we experience a claim in excess of our coverage limits, (iii) our insurance providers fail to pay on our insurance claims, (iv) we experience a claim for which coverage is not provided, or (v) the number of claims under our deductibles or self-insured retentions differs from historical averages.

***Taxing authorities may successfully assert that we have not properly collected, or in the future should collect, sales and use, gross receipts, value added, or similar taxes and may successfully impose additional obligations on us, and any such assessments, obligations, or inaccuracies could adversely affect our business, financial condition, and results of operations.***

The application of non-income, or indirect, taxes, such as sales and use tax, amusement tax, value-added tax, goods and services tax, business tax, and gross receipt tax, to businesses like ours is a complex and evolving issue. Many of the fundamental statutes and regulations that impose these taxes were established before the adoption and growth of the Internet and e-commerce. Significant judgment is required on an ongoing basis to evaluate applicable tax obligations and, as a result, amounts recorded are estimates and are subject to adjustments. In many cases, the ultimate tax determination is uncertain because it is not clear how new and existing statutes might apply to our business or to local logistics businesses generally.

In addition, governments are increasingly looking for ways to increase revenue, which has resulted in discussions about tax reform and other legislative action to increase tax revenue, including through indirect taxes. Such taxes could adversely affect our financial condition and results of operations.

We are subject to indirect taxes, such as payroll, sales, use, value-added, and goods and services taxes in the United States, Canada, and Australia, and we may face various indirect tax audits in various

31

Table of Contents

U.S. and foreign jurisdictions. In certain jurisdictions, we collect and remit indirect taxes. However, tax authorities may raise questions about, or challenge or disagree with, our calculation, reporting, or collection of taxes and may require us to collect taxes in jurisdictions in which we do not currently do so or to remit additional taxes and interest, and could impose associated penalties and fees. A successful assertion by one or more tax authorities requiring us to collect taxes in jurisdictions in which we do not currently do so or to collect additional taxes in a jurisdiction in which we currently collect taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest, could discourage merchants, consumers, and Dashers from utilizing our offerings, or could otherwise harm our business, financial condition, and results of operations. Further, even where we are collecting taxes and remitting them to the appropriate authorities, we may fail to accurately calculate, collect, report, and remit such taxes. Additionally, if merchants try to pass along increased additional taxes and raise prices to consumers, order volume may decline. Although we have reserved for potential payments of possible past tax liabilities in our financial statements, if these liabilities exceed such reserves, our financial condition would be harmed.

Under state tax law, we may be deemed responsible for collecting and remitting sales taxes directly to certain states. Our responsibility for these taxes may be applicable to past sales and could be applicable to the cost of goods or fees charged on our platform. A successful assertion that we should be collecting additional sales, use, or other taxes or remitting such taxes directly to states could result in substantial tax liabilities for past sales and additional administrative expenses. These taxes could also increase the cost for consumers using our platform. Any of the foregoing would adversely affect our business, financial condition, and results of operations.

Additionally, one or more states, localities, or other taxing jurisdictions may seek to impose additional reporting, record-keeping, or indirect tax collection obligations on businesses like ours. For example, taxing authorities in the United States and other countries have identified e-commerce platforms as a means to calculate, collect, and remit indirect taxes for transactions taking place over the Internet, and are considering related legislation. After the U.S. Supreme Court decision in *South Dakota v. Wayfair Inc.*, certain states have enacted laws that would require tax reporting, collection, or tax remittance on items sold online. Requiring tax reporting or collection could decrease merchant, consumer, or Dasher activity, which would harm our business. This new legislation could require us or Dashers to incur substantial costs in order to comply, including costs associated with tax calculation, collection, and remittance and audit requirements, which could make our offerings less attractive and could adversely affect our business, financial condition, and results of operations.

As a result of these and other factors, the ultimate amount of tax obligations owed may differ from the amounts recorded in our financial statements and any such difference may adversely affect our results of operations in future periods in which we change our estimates of our tax obligations or in which the ultimate tax outcome is determined.

***We may have exposure to greater than anticipated tax liabilities.***

We are subject to income taxes in the United States and certain foreign jurisdictions. Our effective tax rate could be adversely affected by changes in the mix of earnings and losses in countries with differing statutory tax rates, certain non-deductible expenses, and the valuation of deferred tax assets. Increases in our effective tax rate would reduce profitability or increase losses.

As we expand the scale of our international business activities, any changes in the United States or foreign taxation of such activities may increase our worldwide effective tax rate and harm our business, financial condition, and results of operations.

We have been subject to examination, and may be subject to examination in the future, by federal, state, local, and foreign tax authorities on income, employment, sales, and other tax matters. While we

Table of Contents

regularly assess the likelihood of adverse outcomes from such examinations and the adequacy of our provision for taxes, there can be no assurance that such provision is sufficient and that a determination by a tax authority would not have an adverse effect on our business, financial condition, and results of operations. Certain risks relating to employment taxes and sales taxes are described in more detail under " —If Dashers are reclassified as employees under federal or state law, our business would be adversely affected." and "—Taxing authorities may successfully assert that we have not properly collected, or in the future should collect, sales and use, gross receipts, value added, or similar taxes and may successfully impose additional obligations on us, and any such assessments, obligations, or inaccuracies could adversely affect our business, financial condition, and results of operations."

On December 22, 2017, the legislation commonly referred to as the Tax Cuts and Jobs Act, or the Tax Act, was enacted, which contains significant changes to U.S. tax law, including a reduction in the corporate tax rate and a transition to a new territorial system of taxation. The primary impact of the new legislation on our provision for income taxes was a reduction of the future tax benefits of our deferred tax assets as a result of the reduction in the corporate tax rate. However, since we have recorded a full valuation allowance against our deferred tax assets, these changes did not have a material impact on our consolidated financial statements. The impact of the Tax Act will likely be subject to ongoing technical guidance and accounting interpretation, which we will continue to monitor and assess.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2018, we had accumulated $322.2 million and $257.4 million of federal and state net operating loss carryforwards, or NOLs, respectively, available to reduce future taxable income, which will begin to expire in 2033 for federal and 2026 for state tax purposes. It is possible that we will not generate taxable income in time to use NOLs before their expiration, or at all. Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change NOLs to offset its post-change income may be limited. In general, an "ownership change" will occur if there is a cumulative change in our ownership by "5 percent stockholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. Our ability to use NOLs to reduce future taxable income and liabilities may be subject to annual limitations as a result of prior ownership changes and ownership changes that may occur in the future, including as a result of this offering.

The Tax Act, among other things, includes changes to U.S. federal tax rates and the rules governing NOLs. For NOLs arising in tax years beginning after December 31, 2017, the Tax Act limits a taxpayer's ability to utilize NOLs to 80% of taxable income (as calculated before taking the NOLs into account). In addition, NOLs arising in tax years ending after December 31, 2017 can be carried forward indefinitely, but carryback is generally prohibited. NOLs generated in tax years beginning before January 1, 2018 will not be subject to the taxable income limitation, and NOLs generated in tax years ending before January 1, 2018 will continue to have a two-year carryback and twenty-year carryforward period. As we maintain a full valuation allowance against our U.S. NOLs, these changes will not impact our balance sheet as of December 31, 2018. However, in future years, if and when a net deferred tax asset is recognized related to our NOLs, the changes in the carryforward and carryback periods as well as the new limitation on use of NOLs may significantly impact our valuation allowance assessments for NOLs generated after December 31, 2018.

33

Table of Contents

***Illegal, improper, or otherwise inappropriate activity of merchants, consumers, or Dashers, whether or not occurring while using our platform, could expose us to liability and adversely affect our business, brand, financial condition, and results of operations.***

Illegal, improper, or otherwise inappropriate activities by merchants, consumers, or Dashers, including the activities of individuals who may have previously engaged with, but are not then receiving or providing services offered through, our platform or individuals who are intentionally impersonating consumers or Dashers or the activities of Dashers while making deliveries to our consumers, have occurred, and in the future may occur, which could adversely affect our brand, business, financial condition, and results of operations. These activities include food tampering, inappropriate or unsanitary food preparation, handling, or delivery, assault, battery, theft, unauthorized use of credit and debit cards or bank accounts, sharing of consumer accounts, and other misconduct. Such activities may result in injuries, property damage, or loss of life for consumers and third parties, or business interruptions, reputational and brand damage, or other significant liabilities for us.

We have in the past incurred, and may in the future incur, losses from various types of fraud, including use of stolen or fraudulent credit card data, referral fraud by both consumers and Dashers, fraud with respect to background checks, attempted payments by consumers with insufficient funds, fraud committed by consumers in concert with Dashers, and account takeovers of Dasher accounts by bad actors. Bad actors use increasingly sophisticated methods to engage in illegal activities involving personal information, such as unauthorized use of another person's identity, account information, or payment information and unauthorized acquisition or use of credit or debit card details, bank account information, and mobile phone numbers. Under current credit card practices, we may be liable for orders facilitated on our platform with fraudulent credit card data, even if the associated financial institution approved the credit card transaction. Despite measures we have taken to detect and reduce the occurrence of fraudulent or other malicious activity on our platform, we cannot guarantee that any of our measures will be effective or will scale efficiently with our business. Our failure to adequately detect or prevent fraudulent transactions could harm our reputation or brand, result in litigation or regulatory action and lead to expenses that could adversely affect our business, financial condition, and results of operations.

While we have implemented various measures intended to anticipate, identify, and address the risk of these types of activities, these measures may not adequately address or prevent all illegal, improper, or otherwise inappropriate activity by these parties from occurring and such conduct could expose us to liability, including through litigation, or adversely affect our brand or reputation. For example, Dashers whose accounts we have deactivated from our platform may nevertheless find a way to create a new account on our platform and perform deliveries. At the same time, if the measures we have taken to guard against these illegal, improper, or otherwise inappropriate activities, such as our requirement that all Dashers undergo a background check, are too restrictive and inadvertently prevent Dashers and consumers otherwise in good standing from using our platform, or if we are unable to implement and communicate these measures fairly and transparently or are perceived to have failed to do so, the growth and engagement of the number of Dashers and consumers on our platform and their use of our platform could be adversely affected. Further, any negative publicity related to the foregoing, whether such incident occurred on our platform or on our competitors' platforms, could adversely affect our reputation and brand or public perception of our industry as a whole, which could negatively affect demand for platforms like ours, and potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***Our platform facilitates deliveries to consumers from non-partner merchants, and we face certain risks associated with these deliveries.***

We aim to have a broad selection of merchants on our platform, which includes facilitating deliveries to consumers from non-partner merchants. Facilitating deliveries from non-partner merchants is generally less operationally efficient than doing so with partner merchants, as our platform is not integrated with

34

Table of Contents

non-partner merchants' systems. For example, for orders with most partner merchants, Dashers have an expedited checkout process that does not require a separate payment in store, but for orders with non-partner merchants, Dashers may have to place and pay for the order separately in store. As a result, we generally experience higher operational expenses for each order, more time and manual processes needed to place each order, a higher likelihood of errors, and a higher cancellation rate of orders. The occurrence of any errors, delays with orders, or other problems associated with facilitating deliveries with non-partner merchants could create a negative perception of our platform and cause damage to our reputation and brand. While our goal is to convert non-partner merchants into partner merchants, our inability to do so at a sufficiently high rate, or at all, could adversely affect our business, financial condition, and results of operations.

Further, some non-partner merchants may not want to be included on our platform and may request to be removed. While we honor these requests, removing non-partner merchants impacts our ability to provide a broad selection of merchants. In addition, there is a risk that non-partner merchants bring legal claims against us relating to their inclusion on our platform. For example, in 2015, In-N-Out Burger filed a complaint against us claiming unfair competition, among other claims, and sought a permanent injunction to stop us from delivering their food. There is also a risk that state or local law is enacted to prevent platforms like ours from including non-partners on the platform. If we are required to remove non-partner merchants for any reason, this could adversely affect our ability to attract and retain consumers, and could directly and adversely affect our business, financial condition, and results of operations.

***Our business is subject to a variety of U.S. laws and regulations, many of which are unsettled and still developing, and failure to comply with such laws and regulations could subject us to claims or otherwise adversely affect our business, financial condition, or results of operations.***

The local delivery logistics industry and our business model are relatively nascent and rapidly evolving. We are subject to a variety of laws in the United States and other jurisdictions. Laws, regulations, and standards governing issues such as worker classification, labor and employment, anti-discrimination, food safety, alcoholic beverages, online credit card payments, gratuities, pricing and commissions, text messaging, subscription services, intellectual property, data retention, privacy, data security, consumer protection, background checks, website and mobile application accessibility, and tax are often complex and subject to varying interpretations, in many cases due to their lack of specificity. The scope and interpretation of these laws, and whether they are applicable to us, are often uncertain and may be conflicting, including varying standards and interpretations between state and federal law, between individual states, and even at the city and municipality level. As a result, their application in practice may change or develop over time through judicial decisions or as new guidance or interpretations are provided by regulatory and governing bodies, such as federal, state, and local administrative agencies. We have been proactively working with state and local governments and regulatory bodies to ensure that our platform is available broadly in the United States and Canada.

Additionally, laws relating to the potential liability of providers of online services for activities of their users and other third parties are currently being tested by a number of claims, including actions based on invasion of privacy and other torts, unfair competition, copyright and trademark infringement, and other theories based on the nature and content of the materials searched, the ads posted, or the content provided by users. In addition, regulatory authorities in the United States at the federal and state level are considering a number of legislative and regulatory proposals concerning privacy and other matters that may be applicable to our business. It is also likely that if our business grows and evolves and our services are used in a greater number of geographies, we would become subject to laws and regulations in additional jurisdictions. It is difficult to predict how existing laws would be applied to our business and the new laws to which it may become subject.

Recent financial, political, and other events may increase the level of regulatory scrutiny on larger companies, technology companies in general, and companies engaged in dealings with independent

35

Table of Contents

contractors. Regulatory and administrative bodies may enact new laws or promulgate new regulations that are adverse to our business, or they may view matters or interpret laws and regulations differently than they have in the past or in a manner adverse to our business, including by changing employment-related laws or by attempting to regulate the commissions businesses like ours agree to with merchants. Such regulatory scrutiny or action may create different or conflicting obligations on us from one jurisdiction to another.

Our success, or perceived success, and increased visibility may also drive some businesses that perceive our business model negatively to raise their concerns to local policymakers and regulators. These businesses and their trade association groups or other organizations may take actions and employ significant resources to shape the legal and regulatory regimes in jurisdictions where we may have, or seek to have, a market presence in an effort to change such legal and regulatory regimes in ways intended to adversely affect or impede our business and the ability of merchants, consumers, and Dashers to use our platform.

If we are not able to comply with these laws or regulations or if we become liable under these laws or regulations, including any future laws or obligations that we may not be able to anticipate at this time, we could be adversely affected, and we may be forced to implement new measures to reduce our exposure to this liability. This may require us to expend substantial resources or to discontinue certain services or platform features, which would adversely affect our business. Any failure to comply with applicable laws and regulations could also subject us to claims and other legal and regulatory proceedings, fines, or other penalties, criminal and civil proceedings, forfeiture of significant assets, and other enforcement actions. In addition, the increased attention focused upon liability issues as a result of lawsuits and legislative proposals could adversely affect our reputation or otherwise impact the growth of our business. Any costs incurred to prevent or mitigate this potential liability are also expected to adversely affect our business, financial condition, and results of operations.

***We face potential liability, expenses for legal claims, and harm to our business based on the nature of our business.***

We face potential liability, expenses for legal claims, and harm to our business relating to the nature of our business generally, and with the food delivery services we facilitate in particular, including potential claims related to food offerings, delivery, and quality.

We are subject to claims, lawsuits, arbitration proceedings, government investigations, and other legal, regulatory, and other administrative proceedings, including those involving personal injury, property damage, worker classification, labor and employment, anti-discrimination, commercial disputes, competition, consumer complaints, intellectual property disputes, compliance with regulatory requirements, and other matters, and we may become subject to additional types of claims, lawsuits, government investigations, and legal or regulatory proceedings as our business grows and as we deploy new services.

We are also subject to claims, lawsuits, and other legal proceedings seeking to hold us vicariously liable for the actions of merchants, consumers, and Dashers. For example, third parties could assert legal claims against us in connection with personal injuries related to food poisoning, tampering, or other food safety issues or accidents caused by Dashers that utilize our platform. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation, and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny. In addition, we could be subject to legal claims relating to the sale of alcoholic beverages or alcohol consumption. Regardless of the outcome of any legal proceeding, any injuries to, or deaths of, any consumers, Dashers, or third parties could result in negative publicity and harm to our brand, reputation, business, financial condition, and results of operations.

36

Table of Contents

Reports, whether true or not, of food-borne illnesses (such as E. Coli, avian flu, bovine spongiform encephalopathy, hepatitis A, trichinosis, or salmonella) and injuries caused by food tampering or inappropriate or unsanitary food preparation, handling, or delivery, or other food safety incidents have led to potential legal claims against, and severely injured the reputations of, participants in the food business and could do so in the future as well. Further, if any such report were to affect one or more of the merchants on our platform that generate a significant percentage of our overall Marketplace GOV, it could seriously harm our business. The potential for acts of terrorism on the U.S. or international food supply also exists and, if such an event occurs, it could harm our business and results of operations. Further, food that is ordered through our platform could be subject to a recall, but we may have limited ability, if any, to ensure compliance with a food recall. In addition, reports of food-borne illnesses, food recalls, food tampering, or inappropriate or unsanitary food preparation, handling, or delivery, even those occurring solely at merchants that are not on our platform, could, as a result of negative publicity about the restaurant or grocery industry, adversely affect our business, financial condition, and results of operations.

We also face potential liability and expense for claims, including class, collective, and other representative actions, by or relating to Dashers regarding, among other things, the classification of Dashers that utilize our platform as well as our Dasher pay model, including claims regarding disclosures we make with respect to sales tax, service fees, delivery fees, and gratuities, the process of signing up to become a Dasher, including the background check process, and the nature and frequency of our communications to Dashers via email, text, or telephone. In addition, we also face potential liability and expense for claims, including class actions, by consumers relating to, among other things, our Dasher pay model, including claims regarding disclosures we make with respect to sales tax, service fees, delivery fees, and gratuities, the local food delivery logistics services we facilitate, discrepancies between the menus on our website and consumer mobile application and the menus at the restaurant from which the food is delivered, including discrepancies in menu items and the prices of such items and taxes on such items, and the nature and frequency of our marketing communications to consumers via email, text, or telephone. See the section titled "Business—Legal Proceedings" for additional information about these types of legal proceedings.

In addition, we also face potential liability and expense for claims relating to the information that we publish on our website and mobile applications, including claims for trademark and copyright infringement, defamation, libel, and negligence, among others.

The results of any such claims, lawsuits, arbitration proceedings, government investigations, or other legal or regulatory proceedings cannot be predicted with any degree of certainty. Any claims against us, whether meritorious or not, could be time-consuming, result in costly litigation, be harmful to our reputation, require significant management attention, and divert significant resources. Determining reserves for our pending litigation is a complex and fact-intensive process that requires significant subjective judgment and speculation. It is possible that a resolution of one or more such proceedings could result in substantial damages, settlement costs, fines, and penalties that could adversely affect our business, financial condition, and results of operations. These proceedings could also result in harm to our reputation and brand, sanctions, consent decrees, injunctions, or other orders requiring a change in our business practices. Any of these consequences could adversely affect our business, financial condition, and results of operations. Further, under certain circumstances, we have contractual and other legal obligations to indemnify and to incur legal expenses on behalf of our business and commercial partners and current and former directors and officers.

In addition, we include arbitration and class action waiver provisions in our terms of service with the merchants, consumers, and Dashers that utilize our platform. These provisions are intended to streamline the litigation process for all parties involved, as they can in some cases be faster and less costly than litigating disputes in state or federal court. However, arbitration can be costly and

37

Table of Contents

burdensome, and the use of arbitration and class action waiver provisions subjects us to certain risks to our reputation and brand, as these provisions have been the subject of increasing public scrutiny. In order to minimize these risks to our reputation and brand, we may limit our use of arbitration and class action waiver provisions or be required to do so in a legal or regulatory proceeding, either of which could cause an increase in our litigation costs and exposure. Additionally, we permit certain users of our platform to opt out of such provisions, which could also cause an increase in our litigation costs and exposure.

Further, with the potential for conflicting rules regarding the scope and enforceability of arbitration and class action waivers on a state-by-state basis, as well as between state and federal law, there is a risk that some or all of our arbitration and class action waiver provisions could be subject to challenge or may need to be revised to exempt certain categories of protection. If these provisions were found to be unenforceable, in whole or in part, or specific claims are required to be exempted, we could experience an increase in our costs to litigate disputes and the time involved in resolving such disputes, and we could face increased exposure to potentially costly lawsuits, each of which could adversely affect our business, financial condition, and results of operations.

***If we do not continue to innovate and further develop our platform, our platform developments do not perform, or we are not able to keep pace with technological developments, we may not remain competitive and our business and results of operations could suffer.***

Our success depends in part on our ability to continue to innovate and further develop our platform. To remain competitive, we must continuously enhance and improve the functionality and features of our platform, including our website and mobile applications and the suite of merchant services that we offer through our platform. If we fail to expand the suite of merchant services that we offer through our platform, or if we fail to continuously enhance and improve our existing merchant services, our ability to retain and acquire merchants could be adversely affected. If competitors introduce new offerings embodying new technologies, or if new industry standards and practices emerge, our existing technology, services, website, and mobile applications may become obsolete. Our future success could depend on our ability to respond to technological advances and emerging industry standards and practices in a cost-effective and timely manner.

We have scaled our business rapidly and significant new platform features and services have in the past resulted in, and in the future may continue to result in, operational challenges affecting our business. Developing and launching enhancements to our platform and new services on our platform may involve significant technical risks and upfront capital investments that may not generate return on investment. We may use new technologies ineffectively, or we may fail to adapt to emerging industry standards. If we face material delays in introducing new or enhanced platform features and services or if our recently introduced offerings do not perform in accordance with our expectations, the merchants, consumers, and Dashers that utilize our platform may forego the use of our services in favor of those of our competitors.

***Our marketing efforts to help grow our business may not be effective.***

Promoting awareness of our platform is important to our ability to grow our business and to attract new merchants, consumers, and Dashers and can be costly. We believe that much of the growth in the number of merchants, consumers, and Dashers that utilize our platform is attributable to our paid marketing initiatives. Our marketing efforts currently include referrals, affiliate programs, free or discount trials, partnerships, display advertising, television, billboards, radio, video, direct mail, social media, email, podcasts, hiring and classified advertisement websites, mobile "push" communications, search engine optimization, and keyword search campaigns. Our marketing initiatives may become increasingly expensive and generating a meaningful return on these initiatives may be difficult. Even if we

38

Table of Contents

successfully increase revenue as a result of our paid marketing efforts, it may not offset the additional marketing expenses we incur. If our marketing efforts to help grow our business are not effective, we expect that our business, financial condition, and results of operations would be adversely affected.

***Any failure to offer high-quality support may harm our relationships with merchants, consumers, and Dashers and could adversely affect our business, financial condition, and results of operations.***

Our ability to attract and retain merchants, consumers, and Dashers is dependent in part on our ability to provide high-quality support. Merchants, consumers, and Dashers depend on our support organization to resolve any issues relating to our platform. We rely on third-parties to provide some support services and our ability to provide effective support is partially dependent on our ability to attract and retain third-party service providers who are not only qualified to support users of our platform but are also well versed in our platform. As we continue to grow our business and improve our offerings, we will face challenges related to providing high-quality support services at scale. Additionally, as we continue to grow our international business and the number of international users on our platform, our support organization will face additional challenges, including those associated with delivering support in languages other than English. Any failure to maintain high-quality support, or a market perception that we do not maintain high-quality support, could harm our reputation and adversely affect our ability to scale our platform and business, our financial condition, and results of operations.

***If we fail to maintain or improve the cost effectiveness of our local logistics platform, our business, financial condition, and results of operations could be adversely affected.***

Our ability to provide a cost-effective local logistics platform depends on a number of factors, including Dasher efficiency and Dasher pay. Dasher efficiency relies on the technology that powers our local logistics platform and while we continue to make significant investments to improve the efficiency and sophistication of our technology, including enhancements to demand prediction, forecasting food preparation times at merchants, and optimizing our routing and batching algorithms, there is no guarantee that such efforts will be successful and produce the resulting gains in efficiency to our platform that we expect, or at all. Dasher pay is a major component of the cost of our business and subject to a number of risks, including changes to our Dasher pay model. The cost effectiveness of our local logistics platform would also be adversely affected if our operational and technological improvements do not reduce the number of defective orders and accordingly our cost of operations and support and refunds and credits. If we are unable to maintain or improve the cost effectiveness of our local logistics platform, including with respect to Dasher efficiency and Dasher pay, our business, financial condition, and results of operations could be adversely affected.

***We experience significant seasonal fluctuations in our financial results, which could cause our common stock price to fluctuate.***

Our business is highly dependent on consumer spending and Dasher behavior patterns that have an impact on our growth and expenses. We generally experience changes in consumer activity over the course of the calendar year, although our rapid growth has made, and may continue to make, seasonal fluctuations difficult to detect. For example, consumer activity can be impacted by colder or more inclement weather, which typically increases consumer demand, and warmer or sunny weather, which typically decreases consumer demand. In addition, the number of available Dashers generally decreases during periods of inclement weather, but consumer demand during these times requires us to have more Dashers available to fulfill orders. During these times, we rely on incentive pay to attract sufficient Dashers to maintain the quality of our platform, which increases our costs. Further, severe weather in certain areas can cause businesses, including restaurants, to close, and make it impossible

39

Table of Contents

for Dashers to make deliveries if roads are closed or difficult to drive on. In addition, we benefit from increased order volume in our campus markets when school is in session, and we experience a decrease in order volume when school is not in session and during summer breaks and other vacation periods, causing a similar decrease in Dasher pay. Seasonality will likely cause fluctuations in our financial results on a quarterly basis. In addition, other seasonal trends may develop and the existing seasonal trends that we experience may become more pronounced and contribute to fluctuations in our results of operations as we continue to scale and our growth slows.

### *The impact of economic conditions, including the resulting effect on consumer spending, may adversely affect our business, financial condition, and results of operations.*

Our performance is subject to economic conditions and their impact on levels of consumer spending. Some of the factors having an impact on discretionary consumer spending include general economic conditions, unemployment, consumer debt, reductions in net worth, residential real estate and mortgage markets, taxation, energy prices, interest rates, consumer confidence, and other macroeconomic factors. Consumer purchases of discretionary items generally decline during recessionary periods and other periods in which disposable income is adversely affected. Further, small businesses that do not have substantial resources, like some of the merchants on our platform, tend to be more adversely affected by poor economic conditions than large businesses. If merchants on our platform were to cease operations, temporarily or permanently, or face financial distress or other business disruption, we may not be able to provide consumers with sufficient merchant selection and they may be less likely to use our platform. This risk is particularly pronounced with restaurants, as each year a significant percentage of restaurants go out of business, and in markets where we have fewer merchants. In addition, because spending for purchases from many of the merchants on our platform is generally considered to be discretionary, we expect that any decline in consumer spending would have a disproportionate effect on our business relative to those businesses that sell products or services considered to be necessities. If spending at the merchants on our platform declines, consumers may be less likely to use our platform, which could adversely affect our business, financial condition, and results of operations.

### *We may face difficulties as we expand our operations into new local markets in which we have limited or no prior operating experience.*

Our capacity for continued growth depends in part on our ability to expand our operations into, and compete effectively in, new local markets. It may be difficult for us to understand and accurately predict consumer preferences and purchasing habits in these new local markets. In addition, each market has unique regulatory dynamics. These include laws and regulations that can directly or indirectly affect our ability to operate, the pool of Dashers that are available, and our costs associated with insurance, support, fraud, and onboarding new Dashers. In addition, each market is subject to distinct competitive and operational dynamics. These include our ability to offer more attractive services than alternative options and our ability to efficiently attract and retain merchants, consumers, and Dashers, all of which affect our sales, results of operations, and key business metrics. As a result, we may experience fluctuations in our results of operations due to the changing dynamics in the local markets where we operate. If we invest substantial time and resources to expand our operations and are unable to manage these risks effectively, our business, financial condition, and results of operations could be adversely affected.

### *Our presence outside the United States and any future international expansion strategy will subject us to additional costs and risks and our plans may not be successful.*

We have started expanding our presence internationally. We launched our platform in Canada in 2015 and in Australia in 2019, and we may continue to expand our international operations. Operating outside of the United States may require significant management attention to oversee operations over a broad

40

DRS

**Table of Contents**

geographic area with varying cultural norms and customs, in addition to placing strain on our finance, analytics, compliance, legal, engineering, and operations teams. We may incur significant operating expenses and may not be successful in our international expansion for a variety of reasons, including:

- recruiting and retaining talented and capable employees in foreign countries and maintaining our company culture across all of our offices;

- an inability to attract merchants, consumers, and Dashers;

- competition from local incumbents that better understand the local market, may market and operate more effectively, and may enjoy greater local affinity or awareness;

- differing demand dynamics, which may make our platform less successful;

- complying with varying laws and regulatory standards, including with respect to labor and employment, data privacy, tax, and local regulatory restrictions;

- obtaining any required government approvals, licenses, or other authorizations;

- varying levels of Internet and mobile technology adoption and infrastructure;

- currency exchange restrictions or costs and exchange rate fluctuations;

- operating in jurisdictions that do not protect intellectual property rights in the same manner or to the same extent as the United States; and

- limitations on the repatriation and investment of funds as well as foreign currency exchange restrictions.

Our limited experience in operating our business internationally increases the risk that any potential future expansion efforts that we may undertake may not be successful. If we invest substantial time and resources to expand our operations internationally and are unable to manage these risks effectively, our business, financial condition, and results of operations could be adversely affected.

In addition, international expansion may increase our risks in complying with various laws and standards, including with respect to anti-corruption, anti-bribery, export controls, and trade and economic sanctions.

***If we or our partners fail to develop and successfully commercialize autonomous or drone delivery technologies or fail to develop such technologies before our competitors, or if such technologies fail to perform as expected, change our cost structure materially, are inferior to those of our competitors, or are perceived as less safe than those of our competitors or non-autonomous or non-drone delivery methods, our business, financial condition, and results of operations could be adversely affected.***

We believe that autonomous and drone delivery technologies may have the ability to meaningfully impact our industry. We have invested and we expect to continue to invest, in research and development related to autonomous and drone delivery technologies, either directly or in partnership with companies that develop such technologies. While we believe that autonomous and drone delivery could present substantial opportunities, the development of such technologies is expensive and time-consuming and may not be successful. Autonomous and drone delivery technologies involve significant risks and liabilities. Failures of our or our partners' autonomous or drone delivery technologies could generate substantial liability, create negative publicity, or result in regulatory scrutiny, all of which could have an adverse effect on our reputation, brand, business, results of operations, and prospects. Even if our or our partners' efforts to develop autonomous and drone delivery technologies are successful, such efforts may not be cost-effective and there is no guarantee that such technologies can reduce our current costs of facilitating on-demand delivery services. Further, several other companies, including

41

DRS

Table of Contents

Uber and Amazon, are also developing autonomous and drone delivery technologies, either themselves or through collaborations, and we expect that they will use such technology to further compete with us in the local logistics industry. Certain competitors may commercialize autonomous and drone delivery technologies at scale before we or our partners do. In the event that our competitors bring autonomous or drone delivery to market before we do, or their technology is or is perceived to be superior to our or our partners' technology, they may be able to leverage such technology to compete more effectively with us, which would adversely affect our business, financial condition, and results of operations. For example, if competitors develop autonomous and drone delivery technologies that successfully reduce the cost of facilitating delivery logistics services, these competitors could offer their services at lower prices as compared to the price available to consumers on our platform. If a significant number of consumers choose to use our competitors' offerings over ours, our business, financial condition, and results of operations could be adversely affected.

Further, we expect that governments will develop regulations that are specifically designed to apply to autonomous and drone technologies. These regulations could include requirements that significantly delay or narrowly limit the commercialization of autonomous and drone technologies, limit the amount of autonomous and drone delivery on our platform, or impose significant liabilities on manufacturers or operators of these solutions or developers of these technologies. Moreover, these regulations may affect our or our partners' ability to design and manufacture new autonomous or drone technologies. For example, commercial drone regulations adopted by the Federal Aviation Administration limit the altitude, available airspace, and weight of a drone and also the certification of remote pilots that can operate a drone for commercial purposes in the United States. If regulations of this nature continue to be implemented, we or our partners may not be able to commercialize autonomous and drone delivery technologies in the manner we expect, or at all. Further, if we or our partners are unable to comply with existing or new regulations or laws applicable to autonomous and drone solutions, we could become subject to substantial fines or penalties.

***We are subject to various U.S. and international anti-corruption laws and other anti-bribery and anti-kickback laws and regulations.***

We are subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, or the FCPA, and other anticorruption, anti-bribery, and anti-money laundering laws in the jurisdictions in which we do business, both domestic and abroad. These laws generally prohibit us and our employees from improperly influencing government officials or commercial parties in order to obtain or retain business, direct business to any person, or gain any improper advantage. The FCPA and other applicable anti-bribery and anti-corruption laws also may hold us liable for acts of corruption and bribery committed by our third-party business partners, representatives, and agents who are acting on our behalf. We and our third-party business partners, representatives, and agents may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities and we may be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries and our employees, representatives, contractors, and agents, even if we do not explicitly authorize such actions. These laws also require that we keep accurate books and records and maintain internal controls and compliance procedures designed to prevent any such actions. While we have policies and procedures to address compliance with such laws, we cannot assure you that our employees and agents will not take actions in violation of our policies or applicable law, for which we may be ultimately held responsible, and our exposure for violating these laws increases as our international presence expands and as we increase sales and operations in foreign jurisdictions. Any violation of the FCPA or other applicable anti-bribery, anti-corruption, and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, imposition of significant legal fees, loss of export privileges, severe criminal or civil sanctions, or suspension or debarment from U.S. government contracts, substantial diversion of management's attention, a drop in our stock price, or overall adverse consequences to our business, all of which may have an adverse effect on our reputation, business, financial condition, and results of operations.

DRS

Table of Contents

***If we are unable to make acquisitions and investments, or successfully integrate them into our business, our business, results of operations, and financial condition could be adversely affected.***

As part of our business strategy, we will continue to consider a wide array of potential strategic transactions, including acquisitions of businesses, new technologies, services, and other assets and strategic investments that complement our business. For example, in October 2019, we acquired certain assets and liabilities from Square, Inc. related to Caviar, a marketplace focused on facilitating deliveries from premium restaurants. We have previously acquired and continue to evaluate targets that operate in relatively nascent markets, and as a result, there is no assurance that such acquired businesses will be successfully integrated into our business or generate substantial revenue.

Acquisitions involve numerous risks, any of which could harm our business and negatively affect our financial condition and results of operations, including:

- intense competition for suitable acquisition targets, which could increase prices and adversely affect our ability to consummate deals on favorable or acceptable terms;

- failure or material delay in closing a transaction;

- transaction-related lawsuits or claims;

- difficulties in integrating the technologies, operations, existing contracts, and personnel of an acquired company;

- difficulties in retaining key employees or business partners of an acquired company;

- difficulties in retaining merchants, consumers, and delivery service providers, as applicable, of an acquired company;

- challenges with integrating the brand identity of an acquired company with our own;

- diversion of financial and management resources from existing operations or alternative acquisition opportunities;

- failure to realize the anticipated benefits or synergies of a transaction;

- failure to identify the problems, liabilities, or other shortcomings or challenges of an acquired company or technology, including issues related to intellectual property, regulatory compliance practices, litigation, revenue recognition or other accounting practices, or employee or user issues;

- risks that regulatory bodies may enact new laws or promulgate new regulations that are adverse to an acquired company or business;

- theft of our trade secrets or confidential information that we share with potential acquisition candidates;

- risk that an acquired company or investment in new services cannibalizes a portion of our existing business; and

- adverse market reaction to an acquisition.

If we fail to address the foregoing risks or other problems encountered in connection with past or future acquisitions of businesses, new technologies, services, and other assets and strategic investments, or if we fail to successfully integrate such acquisitions or investments, our business, financial condition, and results of operations could be adversely affected.

43

Table of Contents

***We depend on our highly skilled employees to grow and operate our business, and if we are unable to hire, retain, manage, and motivate our employees, or if our new employees do not perform as we anticipate, we may not be able to grow effectively and our business, financial condition, and results of operations could be adversely affected.***

Our future success will depend in part on the continued service of our founders, senior management team, key technical employees, and other highly skilled employees, including Tony Xu, our co-founder and Chief Executive Officer, and on our ability to continue to identify, hire, develop, motivate, and retain talented employees. We may not be able to retain the services of any of our employees or other members of senior management in the future. Also, all of our U.S.-based employees, including our senior management team and Mr. Xu, work for us on an at-will basis, and there is no assurance that any such employee will remain with us. Our competitors may be successful in recruiting and hiring members of our management team or other key employees, and it may be difficult for us to find suitable replacements on a timely basis, on competitive terms, or at all. If we are unable to attract and retain the necessary employees, particularly in critical areas of our business, we may not achieve our strategic goals. In addition, from time to time, there may be changes in our senior management team that may be disruptive to our business. If our senior management team fails to work together effectively and to execute its plans and strategies, our business, financial condition, and results of operations could be adversely affected.

We face intense competition for highly skilled employees, especially in the San Francisco Bay Area where we have a substantial presence and need for highly skilled employees. To attract and retain top talent, we have had to offer, and we believe we will need to continue to offer, competitive compensation and benefits packages. Job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. The trading price of our common stock following this offering is likely to be volatile and could be subject to fluctuations in response to various factors, and may not appreciate. If the perceived value of our equity awards declines for this or other reasons, it may adversely affect our ability to attract and retain highly qualified employees. Certain of our employees have received significant proceeds from sales of our equity in private transactions and many of our employees may receive significant proceeds from sales of our equity in the public markets following this offering, which may reduce their motivation to continue to work for us. We may need to invest significant amounts of cash and equity to attract and retain new employees and expend significant time and resources to identify, recruit, train, and integrate such employees, and we may never realize returns on these investments. If we are unable to effectively manage our hiring needs or successfully integrate new hires, our efficiency, ability to meet forecasts, and employee morale, productivity, and engagement could suffer, which could adversely affect our business, financial condition, and results of operations.

***Our company culture has contributed to our success and if we cannot maintain and evolve our culture as we grow, our business could be adversely affected.***

We believe that our company culture, which promotes authenticity, empathy, support for others, and bias for action, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

- failure to identify, attract, reward, and retain people in leadership positions in our organization who share and further our culture, values, and mission;

- the increasing size and geographic diversity of our workforce;

- competitive pressures to move in directions that may divert us from our mission, vision, and values;

- the continued challenges of a rapidly evolving industry;

44

Table of Contents

- the increasing need to develop expertise in new areas of business that affect us;

- negative perception of our treatment of employees, merchants, consumers, and Dashers or our response to employee sentiment related to political or social causes or actions of management; and

- the integration of new personnel and businesses from acquisitions.

If we are not able to maintain and evolve our culture, our business, financial condition, and results of operations could be adversely affected.

***We rely on a third-party payment processor to process payments made by consumers and payments made to merchants and Dashers, and if we cannot manage our relationship with such third party and other payment-related risks, our business, financial condition, and results of operations could be adversely affected.***

We rely on a third-party payment processor, Stripe, to process payments made by consumers and payments made to merchants and Dashers. Under our commercial agreement with Stripe, Stripe may terminate the relationship with advanced notice. If Stripe terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we would be required to find an alternate payment processor and may not be able to secure similar terms or replace such payment processor in an acceptable timeframe. Further, the software and services provided by Stripe may not meet our expectations, may contain errors or vulnerabilities, and could be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments or other payment transactions or make timely payments to merchants and Dashers, any of which could disrupt our business for an extended period of time, make our platform less convenient and attractive to users, and adversely affect our ability to attract and retain qualified merchants, consumers, and Dashers.

Nearly all payments by our consumers are made by credit card or debit card or through third-party payment services, which subjects us to certain regulations and to the risk of fraud. We may in the future offer new payment options to consumers that may be subject to additional regulations and risks. We are also subject to a number of other laws and regulations relating to the payments we accept from our consumers, including with respect to money laundering, money transfers, privacy, and information security. If we fail to comply with applicable regulations, we may be subject to civil or criminal penalties, fines, or higher transaction fees and may lose the ability to accept online payments or other payment card transactions, which could make our platform less convenient and attractive to consumers. We also rely on data provided by Stripe for financial statement reporting, and there could be inaccuracies and other errors in such data. If any of these events were to occur, our business, financial condition, and results of operations could be adversely affected.

Further, if we are deemed to be a money transmitter as defined by applicable law, we could become subject to certain laws, rules, and regulations enforced by multiple authorities and governing bodies in the United States and numerous state and local agencies that may define money transmitter differently. For example, certain states may have a more expansive view of who qualifies as a money transmitter. Additionally, outside of the United States, we could be subject to additional laws, rules, and regulations related to the provision of payments and financial services, and if we expand into new jurisdictions, the foreign regulations governing our business that we are subject to will expand as well. If we are found to be a money transmitter under any applicable regulation and we are not in compliance with such regulations, we may be subject to fines or other penalties in one or more jurisdictions levied by federal or state or local regulators. In addition to fines, penalties for failing to comply with applicable rules and regulations could include criminal and civil proceedings, forfeiture of significant assets, or other enforcement actions. We could also be required to make changes to our business practices or compliance programs as a result of regulatory scrutiny.

45

DRS

Table of Contents

Additionally, our third-party payment processor requires us to comply with payment card network operating rules, which are set and interpreted by the payment card networks. The payment card networks could adopt new operating rules or interpret or re-interpret existing rules in ways that might prohibit us from providing certain services to some users, be costly to implement, or difficult to follow. If we fail to comply with these rules or regulations, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from consumers or facilitate other types of online payments, and our business, financial condition, and results of operations could be adversely affected. We have also agreed to reimburse our third-party payment processor for any reversals, chargebacks, and fines they are assessed by payment card networks if we violate these rules. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***We primarily rely on Amazon Web Services to deliver our services to users on our platform, and any disruption of or interference with our use of Amazon Web Services could adversely affect our business, financial condition, and results of operations.***

We currently host our platform and support our operations on a single datacenter provided by Amazon Web Services, or AWS, a third-party provider of cloud infrastructure services. We do not have control over the operations of the facilities of AWS that we use. AWS' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity attacks, terrorist attacks, power outages, and similar events or acts of misconduct. Our platform's continuing and uninterrupted performance is critical to our success. We have experienced, and expect that in the future we will experience, interruptions, delays, and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions, and capacity constraints. In addition, any changes in AWS' service levels may adversely affect our ability to meet the requirements of users on our platform. Since our platform's continuing and uninterrupted performance is critical to our success, sustained or repeated system failures would reduce the attractiveness of our platform. It may become increasingly difficult to maintain and improve our performance, especially during peak usage times, as we expand and the usage of our platform increases. Any negative publicity arising from these disruptions could harm our reputation and brand and may adversely affect the usage of our platform.

Our commercial agreement with AWS will remain in effect until terminated by AWS or us. AWS may terminate the agreement for convenience by providing us at least 30 days advanced notice. AWS may also terminate the agreement for cause upon a material breach of the agreement, subject to AWS providing prior written notice and a 30-day cure period, and may in some cases terminate the agreement immediately for cause upon written notice. In the event that our agreement with AWS is terminated or we add additional cloud infrastructure service providers, we may experience significant costs or downtime in connection with the transfer to, or the addition of, new cloud infrastructure service providers. Any of the above circumstances or events may harm our reputation and brand, reduce the availability or usage of our platform, lead to a significant short-term loss of revenue, increase our costs, and impair our ability to attract new users, any of which could adversely affect our business, financial condition, and results of operations.

***We rely on third-party background check providers to screen potential Dashers and if such providers fail to provide accurate information or we do not maintain business relationships with them, our business, financial condition, and results of operations could be adversely affected.***

We rely on third-party background check providers to provide the criminal and/or driving records of potential Dashers to help identify those that are not qualified to use our platform pursuant to applicable law or our internal standards, and our business may be adversely affected to the extent such providers do not meet their contractual obligations, our expectations, or the requirements of applicable law or regulations. If any of our third-party background check providers terminates its relationship with us or

46

Table of Contents

refuses to renew its agreement with us on commercially reasonable terms, we may need to find an alternate provider, and may not be able to secure similar terms or replace such partners in an acceptable timeframe. In certain jurisdictions, including the United States, we rely on a single third-party background check provider for these jurisdictions. If we cannot find alternate third-party background check providers on terms acceptable to us, we may not be able to timely onboard potential Dashers, and as a result, our platform may be less attractive to potential Dashers and we may have difficulty finding enough Dashers to meet consumer demand. Further, if the background checks conducted by our third-party background check providers are inaccurate or do not otherwise meet our expectations, unqualified Dashers may be permitted to make deliveries on our platform and as a result we may be unable to adequately protect or provide a safe environment for our merchants and consumers and qualified Dashers may be inadvertently excluded from our platform. For example, we had a Dasher who had a criminal conviction that should have excluded him from using our platform who was nonetheless cleared by one of our background check providers and, as a result, we allowed him to make deliveries on our platform and he was subsequently alleged to cause personal injury to a merchant on our platform. As a result of inaccurate background checks, our reputation and brand could be adversely affected and we could be subject to increased regulatory or litigation exposure. In addition, if a Dasher engages in criminal activity after the third-party background check has been conducted, we may not be informed of such criminal activity and this Dasher may be permitted to continue making deliveries on our platform. In addition, if the background checks conducted by our third-party background check providers do not meet the requirements under applicable laws and regulations, we could face legal liability or negative publicity.

We are also subject to a number of laws and regulations applicable to background checks for potential and existing Dashers that utilize our platform. If we or our third-party background check providers fail to comply with applicable laws, rules, and legislation, our reputation, business, financial condition, and results of operations could be adversely affected, and we could face legal action, including class, collective, or other representative actions. For example, we have faced non-material issues in the past, including lawsuits and demand letters, related to notice requirements around background checks. In addition, background check qualification processes may be limited in certain jurisdictions based on national and local laws, and our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility.

In jurisdictions where our industry does not have regulations establishing standards for background checks, we decide on the scope of our background checks and the cadence with which we conduct such background checks. By choosing background checks that are less thorough in scope than we are permitted to conduct under applicable law or regulation, or by failing to run additional background checks after Dashers are on-boarded, we may face negative publicity or become subject to litigation in the future.

Any negative publicity related to any of our third-party background check providers, including publicity related to safety incidents or actual or perceived privacy or data security breaches or other security incidents, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***We rely on third parties to provide some of the software for our platform. If such third parties interfere with the distribution of our platform or with our use of such software, our business would be adversely affected.***

We rely upon certain third parties to provide software for our platform. For example, we use Google Maps for the mapping function that is critical to the functionality of our platform, and accordingly, we do not control all mapping functions employed by our platform or Dashers using our platform, and it is

47

Table of Contents

possible that such mapping functions may not be reliable. If the third parties we rely upon cease to provide access to the third-party software that we and Dashers use, do not provide access to such software on terms that we believe to be attractive or reasonable, or do not provide us with the most current version of such software, we may be required to seek comparable software from other sources, which may be more expensive or inferior, or may not be available at all, any of which would adversely affect our business.

***We depend on the interoperability of our platform across third-party applications and services that we do not control.***

We have integrations with Stripe, Salesforce, Twilio, Wavefront, Snowflake, third-party offerings such as Google Maps and AWS, and a variety of other vendors. Third-party applications, products, and services are constantly evolving, and we may not be able to maintain or modify our platform to ensure its compatibility with third-party offerings following development changes. In addition, some of our competitors or merchants on our platform may take actions that disrupt the interoperability of our platform with their own products or services, or exert strong business influence on our ability to, and the terms on which we, operate and distribute our platform. As our platform evolves, we expect the types and levels of competition we face to increase. Should any of our competitors or merchants on our platform modify their technologies, standards, or terms of use in a manner that degrades the functionality or performance of our platform or is otherwise unsatisfactory to us or gives preferential treatment to our competitors' products or services, our platform, business, financial condition, and results of operations could be adversely affected.

***We rely on mobile operating systems and application marketplaces to make our applications available to merchants, consumers, and Dashers, and if we do not effectively operate with or receive favorable placements within such application marketplaces and maintain high user reviews, our usage or brand recognition could decline and our business, financial results, and results of operations could be adversely affected.***

We depend in part on mobile operating systems, such as Android and iOS, and their respective application marketplaces to make our applications available to merchants, consumers, and Dashers that utilize our platform. Any changes in such systems and application marketplaces that degrade the functionality of our applications or give preferential treatment to our competitors' applications could adversely affect our platform's usage on mobile devices. If such mobile operating systems or application marketplaces limit or prohibit us from making our applications available to merchants, consumers, and Dashers, make changes that degrade the functionality of our applications, increase the cost of using our applications, impose terms of use unsatisfactory to us, or modify their search or ratings algorithms in ways that are detrimental to us, or if our competitors' placement in such mobile operating systems' application marketplace is more prominent than the placement of our applications, our user growth could slow. Our applications have experienced fluctuations in the past, and we anticipate similar fluctuations in the future. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

As new mobile devices and mobile platforms are released, there is no guarantee that certain mobile devices will continue to support our platform or effectively roll out updates to our applications. Additionally, in order to deliver high-quality applications, we need to ensure that our platform is designed to work effectively with a range of mobile technologies, systems, networks, and standards. We may not be successful in developing or maintaining relationships with key participants in the mobile industry that enhance users' experience. If merchants, consumers, or Dashers that utilize our platform encounter any difficulty accessing or using our applications on their mobile devices or if we are unable to adapt to changes in popular mobile operating systems, we expect that our user growth and user engagement would be adversely affected.

48

Table of Contents

***Internet search engines drive traffic to our platform and our new consumer growth could decline and our business, financial condition, and results of operations would be adversely affected if we fail to appear prominently in search results.***

Our success depends in part on our ability to attract consumers through unpaid Internet search results on search engines like Google, Yahoo!, and Bing. The number of consumers we attract to our platform from search engines is due in large part to how and where our website ranks in unpaid search results. These rankings can be affected by a number of factors, many of which are not under our direct control and may change frequently. For example, a search engine may change its ranking algorithms, methodologies, or design layouts. As a result, links to our website may not be prominent enough to drive traffic to our website, and we may not know how or otherwise be in a position to influence the results. In some instances, search engine companies may change these rankings in a way that promotes their own competing products or services or the products or services of one or more of our competitors. Search engines may also adopt a more aggressive auction-pricing system for keywords that would cause us to incur higher advertising costs or reduce our market visibility to prospective consumers. Our website has experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of consumers directed to our platform could adversely affect our business, financial condition, and results of operations.

***Government regulation of the Internet, mobile devices, and e-commerce is evolving, and unfavorable changes could substantially adversely affect our business, financial condition, and results of operations.***

We are subject to general business regulations and laws as well as federal and state regulations and laws specifically governing the Internet, mobile devices, and e-commerce that are constantly evolving. Existing and future laws and regulations, or changes thereto, may impede the growth of the Internet, mobile devices, e-commerce, or other online services, and increase the cost of providing online services, require us to change our business practices, or raise compliance costs or other costs of doing business. These regulations and laws, which continue to evolve, may cover taxation, tariffs, user privacy, data protection, pricing and commissions, content, copyrights, distribution, social media marketing, advertising practices, sweepstakes, mobile, electronic contracts and other communications, consumer protection, broadband residential Internet access, and the characteristics and quality of services. It is not clear how existing laws governing issues such as property ownership, sales, use, and other taxes, libel, and personal privacy apply to the Internet and e-commerce. In addition, as we continue to expand internationally, it is possible that foreign government entities may seek to censor content available on our mobile applications or website or may even attempt to block access to our mobile applications and website. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation and brand, a loss in business, and proceedings or actions against us by governmental entities or others, which could adversely affect our business, financial condition, and results of operations.

***Our business could be adversely impacted by changes in the Internet and mobile device accessibility of users.***

Our business depends on users' access to our platform via a mobile device or personal computer and the Internet. We may operate in jurisdictions that provide limited Internet connectivity, particularly as we expand internationally. Internet access and access to a mobile device or personal computer are frequently provided by companies with significant market power that could take actions that degrade, disrupt, or increase the cost of consumers' ability to access our platform. In addition, the Internet infrastructure that we and users of our platform rely on in any particular geographic area may be unable to support the demands placed upon it and could interfere with the speed and availability of our platform. Any such failure in Internet or mobile device or computer accessibility, even for a short period of time, could adversely affect our results of operations.

49

DRS

Table of Contents

***Changes in laws or regulations relating to privacy or the protection or transfer of data relating to individuals, or any actual or perceived failure by us to comply with such laws and regulations or any other obligations relating to privacy or the protection or transfer of data relating to individuals, could adversely affect our business.***

We receive, transmit, and store a large volume of personally identifiable information and other data relating to the users on our platform, as well as other personally identifiable information and other data relating to individuals such as our employees. Numerous local, municipal, state, federal, and international laws and regulations address privacy and the collection, storing, sharing, use, disclosure, and protection of certain types of data, including the California Online Privacy Protection Act, the Personal Information Protection and Electronic Documents Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act, Canada's Anti-Spam Law, Australia's Privacy Act, the Telephone Consumer Protection Act of 1991, or the TCPA, Section 5 of the Federal Trade Commission Act, and effective as of January 1, 2020, the California Consumer Privacy Act, or the CCPA. These laws, rules, and regulations evolve frequently and their scope may continually change, through new legislation, amendments to existing legislation, and changes in enforcement, and may be inconsistent from one jurisdiction to another. For example, the CCPA, which went into effect on January 1, 2020, among other things, requires new disclosures to California consumers and affords such consumers new abilities to opt out of certain sales of personal information. The CCPA provides for fines of up to $7,500 per violation. The CCPA was amended in September 2018, and it presently is unclear whether this legislation will be further modified or how it will be interpreted. The effects of this legislation potentially are far-reaching, however, and may require us to modify our data processing practices and policies and incur substantial compliance-related costs and expenses. Additionally, many laws and regulations relating to privacy and the collection, storing, sharing, use, disclosure, and protection of certain types of data are subject to varying degrees of enforcement and new and changing interpretations by courts. The CCPA and other changes in laws or regulations relating to privacy, data protection, and information security, particularly any new or modified laws or regulations, or changes to the interpretation or enforcement of such laws or regulations, that require enhanced protection of certain types of data or new obligations with regard to data retention, transfer, or disclosure, could greatly increase the cost of providing our platform, require significant changes to our operations or even prevent us from providing our platform in jurisdictions in which we currently operate and in which we may operate in the future.

Additionally, we have incurred, and may continue to incur, significant expenses in an effort to comply with privacy, data protection, and information security standards and protocols imposed by law, regulation, industry standards, or contractual obligations. In particular, with laws and regulations such as the CCPA imposing new and relatively burdensome obligations, and with substantial uncertainty over the interpretation and application of these and other laws and regulations, we may face challenges in addressing their requirements and making necessary changes to our policies and practices, and may incur significant costs and expenses in an effort to do so.

Despite our efforts to comply with applicable laws, regulations, and other obligations relating to privacy, data protection, and information security, it is possible that our interpretations of the law, practices, or platform could be inconsistent with, or fail or be alleged to fail to meet all requirements of, such laws, regulations, or obligations. Our failure, or the failure by our third-party providers or merchants on our platform, to comply with applicable laws or regulations or any other obligations relating to privacy, data protection, or information security, or any compromise of security that results in unauthorized access to, or use or release of personally identifiable information or other data relating to Dashers, consumers, or other individuals, or the perception that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing Dashers and consumers from using our platform, or result in fines, investigations, or proceedings by governmental agencies and private claims and litigation, any of which could adversely affect our business, financial condition, and results of operations. Even if not subject to legal challenge, the perception of privacy concerns, whether

50

Table of Contents

or not valid, may harm our reputation and brand and adversely affect our business, financial condition, and results of operations.

***We face the risk of litigation resulting from unauthorized text messages sent in violation of the Telephone Consumer Protection Act.***

The actual or perceived improper sending of text messages may subject us to potential risks, including liabilities or claims relating to consumer protection laws. For example, the TCPA restricts telemarketing and the use of automated SMS text messages without proper consent. This has resulted, and may in the future result, in civil claims against us. The scope and interpretation of the laws that are or may be applicable to the delivery of text messages are continuously evolving and developing. If we do not comply with these laws or regulations or if we become liable under these laws or regulations, we could face direct liability and our business, financial condition, and results of operations could be adversely affected.

***We may not timely and effectively scale and adapt our existing technology and network infrastructure to ensure that our platform is accessible, which would adversely affect our business, reputation, financial condition, and results of operations.***

We expect to continue to make significant investments to maintain and improve the availability of our platform and to enable rapid releases of new features and services. However, it may become increasingly difficult to maintain and improve the availability of our platform, especially during peak usage times and as our platform becomes more complex and our user traffic increases. If our platform is unavailable when merchants, consumers, and Dashers attempt to access it or it does not load as quickly as they expect our it experiences capacity constraints due to an overwhelming number of users accessing our platform simultaneously, users may seek other offerings, and may not return to our platform as often in the future, or at all. This would adversely affect our ability to attract merchants, consumers, and Dashers and decrease the frequency with which they use our platform. To the extent that we do not effectively address capacity constraints, upgrade our systems as needed, or continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business, reputation, financial condition, and results of operations would be adversely affected.

***Defects, errors or vulnerabilities in our applications, backend systems, or other technology systems and those of third-party technology providers could harm our reputation and brand and adversely impact our business, financial condition, and results of operations.***

The software underlying our platform is highly complex and may contain undetected errors or vulnerabilities, some of which may only be discovered after the code has been released. Our practice is to effect frequent releases of software updates, sometimes multiple times per day. The third-party software that we incorporate into our platform may also be subject to errors or vulnerabilities. Any errors or vulnerabilities discovered in our code or from third-party software after release could result in negative publicity, a loss of users or loss of revenue, and access or other performance issues. Such vulnerabilities could also be exploited by malicious actors and result in exposure of data of users on our platform, or otherwise result in a security breach or other security incident. We may need to expend significant financial and development resources to analyze, correct, eliminate, or work around errors or defects or to address and eliminate vulnerabilities. Any failure to timely and effectively resolve any such errors, defects, or vulnerabilities could adversely affect our business, reputation, brand, financial condition, and results of operations.

51

Table of Contents

***Failure to adequately protect our intellectual property could adversely affect our business, financial condition, and results of operations.***

Our business depends on our intellectual property, the protection of which is crucial to the success of our business. We rely on a combination of patent, trademark, trade secret, and copyright law and contractual restrictions to protect our intellectual property. In addition, we attempt to protect our intellectual property, technology, and confidential information by requiring our employees and consultants who develop intellectual property on our behalf to enter into confidentiality and invention assignment agreements, and third parties we share information with to enter into nondisclosure agreements. These agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property, or technology and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information or technology, or infringement of our intellectual property. Despite our efforts to protect our proprietary rights, unauthorized parties may copy aspects of our platform or other software, technology, and functionality or obtain and use information that we consider proprietary. In addition, unauthorized parties may also attempt, or successfully endeavor, to obtain our intellectual property, confidential information, and trade secrets through various methods, including through cybersecurity attacks, and legal or other methods of protecting this data may be inadequate.

We have registered, among other trademarks, the term "DoorDash" in the United States, Canada, and other jurisdictions. Competitors have and may continue to adopt service names similar to ours, thereby harming our ability to build brand identity and possibly leading to user confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other trademarks that are similar to our trademarks. Litigation or proceedings before the U.S. Patent and Trademark Office or other governmental authorities and administrative bodies in the United States and abroad may be necessary in the future to enforce our intellectual property rights and to determine the validity and scope of the proprietary rights of others. Further, we may not timely or successfully apply for a patent or register our trademarks or otherwise secure our intellectual property. Our efforts to protect, maintain, or enforce our proprietary rights may be ineffective and could result in substantial costs and diversion of resources, which could adversely affect our business, financial condition, and results of operations.

***Intellectual property infringement assertions by third parties could result in significant costs and adversely affect our business, financial condition, results of operations, and reputation.***

We operate in an industry with frequent intellectual property litigation. Other parties have asserted, and in the future may assert, that we have infringed their intellectual property rights. We could be required to pay substantial damages or cease using intellectual property or technology that is deemed infringing.

Further, we cannot predict whether other assertions of third-party intellectual property rights or claims arising from such assertions would substantially adversely affect our business, financial condition, and results of operations. The defense of these claims and any future infringement claims, whether they are with or without merit or are determined in our favor, may result in costly litigation and diversion of technical and management personnel. Further, an adverse outcome of a dispute may require us to pay damages, potentially including treble damages and attorneys' fees if we are found to have willfully infringed a party's patent or copyright rights, cease making, licensing, or using products that are alleged to incorporate the intellectual property of others, expend additional development resources to redesign our offerings, and enter into potentially unfavorable royalty or license agreements in order to obtain the right to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all. In any event, we may need to license intellectual property which would require us to pay royalties or make one-time payments. Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, the time and resources necessary to resolve them could adversely affect our business, reputation, financial condition, and results of operations.

52

DRS

Table of Contents

***We may be unable to continue to use the domain names that we use in our business or prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand, trademarks, or service marks.***

We have registered domain names that we use in, or are related to, our business, most importantly www.doordash.com. If we lose the ability to use a domain name, whether due to trademark claims, failure to renew the applicable registration, or any other cause, we may be forced to market our offerings under a new domain name, which could cause us substantial harm, or to incur significant expense in order to purchase rights to the domain name in question. We may not be able to obtain preferred domain names outside the United States due to a variety of reasons. In addition, our competitors and others could attempt to capitalize on our brand recognition by using domain names similar to ours. We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand or our trademarks or service marks. Protecting, maintaining, and enforcing our rights in our domain names may require litigation, which could result in substantial costs and diversion of resources, which could in turn adversely affect our business, financial condition, and results of operations.

***Our platform contains third-party open source software components, and failure to comply with the terms of the underlying open source software licenses could restrict our ability to provide our platform.***

Our platform contains software modules licensed to us by third-party authors under "open source" licenses. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification, or other contractual protections regarding infringement claims or the quality of the code. In addition, the public availability of such software may make it easier for others to compromise our platform.

Some open source licenses contain requirements that may, depending on how the licensed software is used or modified, require that we make available source code for modifications or derivative works we create based upon the licensed open source software, authorize further modification and redistribution of that source code, make that source code available at little or no cost, or grant other licenses to our intellectual property. If we combine our proprietary software with open source software in a certain manner, we could, under certain open source licenses, be required to release the source code of our proprietary software under the terms of an open source software license. This could enable our competitors to create similar offerings with lower development effort and time and ultimately could result in a loss of our competitive advantages. Alternatively, to avoid the release of the affected portions of our source code, we could be required to purchase additional licenses, expend substantial time, and resources to re-engineer some or all of our software or cease use or distribution of some or all of our software until we can adequately address the concerns.

Although we have certain policies and procedures in place to monitor our use of open source software that are designed to avoid subjecting our platform to conditions we do not intend, those policies and procedures may not be effective to detect or address all such conditions. In addition, the terms of many open source licenses have not been interpreted by U.S. or foreign courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our platform. From time to time, there have been claims challenging the ownership of open source software against companies that incorporate open source software into their solutions. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software. If we are held to have breached or failed to fully comply with all the terms and conditions of an open source software license, we could face infringement or other liability, or be required to seek costly licenses from third parties to continue providing our platform on terms that are

Table of Contents

not economically feasible, to re-engineer our platform, to discontinue or delay the provision of our platform if re-engineering could not be accomplished on a timely basis, or to make generally available, in source code form, our proprietary code, any of which could adversely affect our business, financial condition, and results of operations.

***The stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods and we may also expend substantial funds to satisfy a portion of our tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs, which may have an adverse effect on our financial condition and results of operations.***

We have granted RSUs to our employees and directors, which generally vest upon the satisfaction of both service-based and liquidity event-related performance vesting conditions occurring before the award's expiration date. The service-based vesting period is generally satisfied by the award holder providing services to us over a four-year period. The liquidity-event related performance vesting condition is satisfied on the earlier of: (i) a sale event for us or (ii) this offering. As of                  , no stock-based compensation expense had been recognized for such RSUs because a qualifying event as described above was not probable. In connection with this offering, we will record cumulative stock-based compensation expense for those RSUs for which the service-based vesting condition was satisfied prior to this offering. If this offering had been completed on                  , we would have recorded $          of cumulative stock-based compensation expense related to the RSUs on that date, and an additional $          of unrecognized stock-based compensation expense related to the RSUs that would be recognized over a weighted-average period of          years. In addition to stock-based compensation expense associated with the RSUs, as of                  , we had unrecognized stock-based compensation expense of $          related to other outstanding equity awards which we expect to recognize over a weighted-average period of          years. Following the completion of this offering, the stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods, in particular in the quarter in which the offering is completed.

Additionally, we may expend substantial funds in connection with the tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs. Our RSUs include RSUs for which the service-based vesting condition is expected to be satisfied prior to this offering and for which the liquidity-event related performance vesting condition will be satisfied in connection with this offering, which we refer to as the IPO Vested RSUs. The IPO Vested RSUs are expected to settle approximately          days following this offering, which date we refer to as the Settlement Date. Our RSUs also include RSUs for which the service-based vesting condition is expected to be satisfied after this offering but prior to the Settlement Date and for which the liquidity-event related performance vesting condition will be satisfied in connection with this offering, which we refer to as the Post-IPO Vested RSUs. The Post-IPO Vested RSUs will settle on a date promptly following the satisfaction of the service-based vesting condition.

To fund the tax withholding and remittance obligations arising in connection with the vesting and settlement of the IPO Vested RSUs and the Post-IPO Vested RSUs, we will either elect to (i) withhold shares of our common stock that would otherwise be issued with respect to such RSUs and pay the relevant tax authorities in cash to satisfy such tax obligations or (ii) have the holders of such RSUs use a broker or brokers to sell a portion of such shares into the market on the applicable settlement date, with the proceeds of such sales to be delivered to us for us to remit to the relevant taxing authorities, in order to satisfy such tax withholding and remittance obligations. Assuming we elect (i) for the IPO Vested RSUs, and at an assumed tax rate of          %, we expect to withhold an aggregate of                  shares of our common stock subject to the settlement of the IPO Vested RSUs and to pay $          to the relevant tax authorities in cash to satisfy our tax withholding and remittance obligations related to the settlement

54

**Table of Contents**

of the IPO Vested RSUs. Assuming we elect (i) for the Post-IPO Vested RSUs, and assuming that all Post-IPO Vested RSUs remain outstanding as of the applicable vesting date, at an assumed tax rate of     %, we expect to withhold up to an aggregate of          shares of our common stock that would otherwise be issued with respect to the Post-IPO Vested RSUs and to pay $         to the relevant tax authorities in cash to satisfy our tax withholding and remittance obligations related to the settlement of the Post-IPO Vested RSUs.

The amounts in the paragraph immediately above are based upon the assumed initial public offering price of $      per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus. The actual amount of this obligation could be higher or lower, depending on the market price of shares of our common stock on or about the applicable settlement date. At the assumed tax rate of     %, each $1.00 increase or decrease in the assumed initial public offering price of $      per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, would increase or decrease, as applicable, the amount of cash required to satisfy our tax withholding and remittance obligations related to the settlement of the IPO Vested RSUs by $      and the Post-IPO Vested RSUs by $      .

***We track certain operational metrics with internal systems and tools and do not independently verify such metrics. Certain of our operational metrics are subject to inherent challenges in measurement, and any real or perceived inaccuracies in such metrics may adversely affect our business and reputation.***

We track certain operational metrics, including our merchant, consumer, and Dasher counts and key business and non-GAAP metrics such as Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin, with internal systems and tools that are not independently verified by any third party and which may differ from estimates or similar metrics published by third parties due to differences in sources, methodologies, or the assumptions on which we rely. Our internal systems and tools have a number of limitations, and our methodologies for tracking these metrics may change over time, which could result in unexpected changes to our metrics, including the metrics we publicly disclose. If the internal systems and tools we use to track these metrics undercount or overcount performance or contain algorithmic or other technical errors, the data we report may not be accurate. While these numbers are based on what we believe to be reasonable estimates of our metrics for the applicable period of measurement, there are inherent challenges in measuring how our platform is used across large populations. For example, the accuracy of our operating metrics could be impacted by fraudulent users of our platform, and further, we believe that there are consumers who have multiple accounts, even though this is prohibited in our Terms of Service and we implement measures to detect and prevent this behavior. In addition, limitations or errors with respect to how we measure data or with respect to the data that we measure may affect our understanding of certain details of our business, which could affect our long-term strategies. If our operating metrics are not accurate representations of our business, if investors do not perceive our operating metrics to be accurate, or if we discover material inaccuracies with respect to these figures, we expect that our business, reputation, financial condition, and results of operations would be adversely affected.

***Certain estimates and information contained in this prospectus are based on information from third-party sources and we do not independently verify the accuracy or completeness of the data contained in such sources or the methodologies for collecting such data, and any real or perceived inaccuracies in such estimates and information may harm our reputation and adversely affect our business.***

Certain estimates and information contained in this prospectus, including general expectations concerning our industry and the market in which we operate, category share, market opportunity, and

55

Table of Contents

market size, are based to some extent on information provided by third-party providers. This information involves a number of assumptions and limitations, and although we believe the information from such third-party sources is reliable, we have not independently verified the accuracy or completeness of the data contained in such third-party sources or the methodologies for collecting such data. If there are any limitations or errors with respect to such data or methodologies, or if investors do not perceive such data or methodologies to be accurate, or if we discover material inaccuracies with respect to such data or methodologies, our reputation, financial condition, and results of operations could be adversely affected.

***We may require additional capital to support business growth, and this capital might not be available on acceptable terms, if at all.***

Historically, we have financed our operations primarily through equity issuances and cash generated from our operations. To support our growing business and to effectively compete, we must have sufficient capital to continue to make significant investments in our platform. We intend to continue to make investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new platform features and services or enhance our existing platform, improve our operating infrastructure, or acquire complementary businesses and technologies. Although we currently anticipate that our existing cash, cash equivalents, and marketable securities and cash flow from operations will be sufficient to meet our working capital and capital expenditure needs for at least the next 12 months, we may require additional financing. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through future issuances of equity, equity-linked securities, or convertible debt securities, our existing stockholders could suffer significant dilution, and any new securities we issue could have rights, preferences, and privileges superior to those of holders of our common stock.

We evaluate financing opportunities from time to time, and our ability to obtain financing will depend, among other things, on our development efforts, business plans, and operating performance and the condition of the capital markets at the time we seek financing. We may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be impaired, and our business, financial condition, and results of operations may be adversely affected.

***Our revolving credit facility contains financial covenants and other restrictions on our actions that may limit our operational flexibility or otherwise adversely affect our results of operations.***

We are party to a revolving credit agreement, which contains a number of covenants that limit our ability and our subsidiaries' ability to, among other things, incur additional indebtedness, grant liens, merge or consolidate with other companies or sell substantially all of our assets, pay dividends, make redemptions and repurchases of stock, make investments, loans and acquisitions, or engage in transactions with affiliates. We are also required to maintain a minimum liquidity balance. The terms of our credit facility may restrict our current and future operations and could adversely affect our ability to finance our future operations or capital needs. In addition, complying with these covenants may make it more difficult for us to successfully execute our business strategy, including potential acquisitions, and compete against companies which are not subject to such restrictions.

A failure by us to comply with the covenants or payment requirements specified in our credit agreement could result in an event of default under the agreement, which would give the lenders the right to terminate their commitments to provide additional loans under our credit facility and to declare all borrowings outstanding, together with accrued and unpaid interest and fees, to be immediately due and payable. If the debt under our credit facility were to be accelerated, we may not have sufficient cash or

56

DRS

Table of Contents

be able to borrow sufficient funds to refinance the debt or sell sufficient assets to repay the debt, which could immediately adversely affect our business, cash flows, results of operations, and financial condition. Even if we were able to obtain new financing, it may not be on commercially reasonable terms or on terms that are acceptable to us. As of                  , there was                  amount outstanding under the revolving credit facility.

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

As a public company, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, and the rules and regulations of the applicable listing standards of       . We expect that the requirements of these rules and regulations will continue to increase our legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on our personnel, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting, which includes hiring additional accounting and financial personnel to implement such processes and controls. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight. If any of these new or improved controls and systems does not perform as expected, we may experience material weaknesses in our controls.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. Further, weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our results of operations or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on           . We are not currently required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore not required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose. As a public company, we will be required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until after we are no longer an emerging growth

57

**Table of Contents**

company as defined in the JOBS Act. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed, or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business and results of operations and could cause a decline in the price of our common stock.

*Our reported results of operations may be adversely affected by changes in GAAP.*

GAAP is subject to interpretation by the Financial Accounting Standards Board, or FASB, the SEC, and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported results of operations and could affect the reporting of transactions completed before the announcement of a change. For example, in May 2014, the FASB issued Accounting Standards Update, or ASU, No. 2014-09, Revenue from Contracts with Consumers (Topic 606), which superseded nearly all existing revenue recognition guidance, and in February 2016, the FASB issued ASU No. 2016-02 "Leases (Topic 842)," which increases lease transparency and comparability among organizations. It is difficult to predict the impact of future changes to accounting principles or our accounting policies, any of which could negatively affect our reported results of operations.

*Operating as a public company requires us to incur substantial costs and requires substantial management attention. In addition, key members of our management team have limited experience managing a public company.*

As a public company, we will incur substantial legal, accounting, and other expenses that we did not incur as a private company. For example, we are subject to the reporting requirements of the Exchange Act, the applicable requirements of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the rules and regulations of the SEC, and the listing standards of                 . For example, the Exchange Act requires, among other things, we file annual, quarterly, and current reports with respect to our business, financial condition, and results of operations. Compliance with these rules and regulations will increase our legal and financial compliance costs, and increase demand on our systems, particularly after we are no longer an emerging growth company. In addition, as a public company, we may be subject to stockholder activism, which can lead to additional substantial costs, distract management, and impact the manner in which we operate our business in ways we cannot currently anticipate. As a result of disclosure of information in this prospectus and in filings required of a public company, our business and financial condition will become more visible, which may result in threatened or actual litigation, including by competitors.

Many members of our management team have limited experience managing a publicly traded company, interacting with public company investors and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, and results of operations.

## Risks Related to Ownership of Our Common Stock

*The trading price of our common stock may be volatile, and you could lose all or part of your investment.*

Prior to this offering, there has been no public market for shares of our common stock. The initial public offering price of our common stock will be determined through negotiation among us and the

Table of Contents

underwriters. This price does not necessarily reflect the price at which investors in the market will be willing to buy and sell shares of our common stock following this offering. In addition, the trading price of our common stock following this offering is likely to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. These fluctuations could cause you to lose all or part of your investment in our common stock since you might be unable to sell your shares at or above the price you paid in this offering. Factors that could cause fluctuations in the trading price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the trading prices and trading volumes of technology stocks;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our common stock by us or our stockholders;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new services or platform features;

- the public's reaction to our press releases, other public announcements, and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

- actual or anticipated developments in our business, our competitors' businesses, or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- actual or perceived privacy or security breaches or other incidents;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses, services, or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations, or principles;

- any significant change in our management;

- general economic conditions and slow or negative growth of our markets; and

- our anticipated uses of net proceeds from this offering.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

<div align="center">59</div>

Table of Contents

***A substantial portion of the outstanding shares of our common stock after this offering will be restricted from immediate resale, but may be sold on a stock exchange in the near future. The large number of shares eligible for public sale or subject to rights requiring us to register them for public sale could depress the market price of our common stock.***

The market price of our common stock could decline as a result of sales of a large number of shares of our common stock in the market after this offering, and the perception that these sales could occur may also depress the market price of our common stock. Based on            shares of our common stock outstanding (after giving effect to the Capital Stock Conversion) as of            , we will have            shares of our common stock outstanding after this offering. Our executive officers, directors, and the holders of substantially all of our capital stock and securities convertible into or exchangeable for our capital stock have entered into market standoff agreements with us or have entered or will enter into lock-up agreements with the underwriters under which they have agreed or will agree, subject to specific exceptions, not to sell any of our stock for            days following the date of this prospectus. We refer to such period as the lock-up period. We and the underwriters may release certain stockholders from the market standoff agreements or lock-up agreements prior to the end of the lock-up period.

As a result of these agreements and the provisions of our Amended and Restated Investors' Rights Agreement dated May 21, 2019, or our IRA, described further in the section titled "Description of Capital Stock—Registration Rights," and subject to the provisions of Rule 144 or Rule 701, shares of our common stock will be available for sale in the public market as follows:

- beginning on the date of this prospectus, all shares of our common stock sold in this offering will be immediately available for sale in the public market; and

- beginning            days after the date of this prospectus (subject to the terms of the lock-up agreements and market standoff agreements described above), the remainder of the shares of our common stock will be eligible for sale in the public market from time to time thereafter, subject in some cases to the volume and other restrictions of Rule 144.

Upon completion of this offering, stockholders owning an aggregate of up to            shares of our common stock will be entitled, under our IRA, to require us to register shares owned by them for public sale in the United States. In addition, we intend to file a registration statement to register shares reserved for future issuance under our equity compensation plans. Upon effectiveness of that registration statement, subject to the satisfaction of applicable exercise periods and the expiration or waiver of the market standoff agreements and lock-up agreements referred to above, the shares issued upon exercise of outstanding stock options or upon settlement of outstanding RSU awards will be available for immediate resale in the United States in the open market.

Sales of our common stock as restrictions end or pursuant to registration rights may make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. These sales could also cause the trading price of our common stock to fall and make it more difficult for you to sell shares of our common stock.

***Upon completion of this offering, our executive officers, directors, and holders of 5% or more of our common stock will collectively beneficially own approximately       % of the outstanding shares of our common stock and continue to have substantial control over us, which will limit your ability to influence the outcome of important transactions, including a change in control.***

Upon completion of this offering, our directors, executive officers, and other principal stockholders who own 5% or more of our outstanding common stock, and their affiliates will beneficially own, in the aggregate, approximately       % of the outstanding shares of our common stock. As a result, these stockholders, if acting together, will be able to exercise significant influence over all matters requiring

60

Table of Contents

stockholder approval, including the election of directors and approval of significant corporate transactions, such as a merger or other sale of our company or its assets. They may also have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. This concentration of ownership could limit your ability to influence corporate matters and may have the effect of delaying, preventing, or deterring a third party from acquiring control over our company, could deprive our stockholders of an opportunity to receive a premium for their common stock as part of a sale of our company and might ultimately affect the market price of our common stock.

*We are an emerging growth company and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common stock less attractive to investors.*

We are an emerging growth company, as defined in the JOBS Act, and have the option to utilize certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We may take advantage of these reporting exemptions until we are no longer an emerging growth company. We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year (A) following the fifth anniversary of the completion of this offering, (B) in which we have total annual revenue of at least $1.07 billion, or (C) in which we are deemed to be a large accelerated filer, with at least $700 million of equity securities held by non-affiliates as of the prior June 30th, and (ii) the date on which we have issued more than $1 billion in non-convertible debt during the prior three-year period.

Under the JOBS Act, emerging growth companies can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We have elected to use this extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (i) are no longer an emerging growth company or (ii) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates. While we have not made such an irrevocable election, we have not delayed the adoption of any applicable accounting standards. Further, we may take advantage of some of the other reduced regulatory and reporting requirements that will be available to us so long as we qualify as an emerging growth company.

Among other things, this means that our independent registered public accounting firm will not be required to provide an attestation report on the effectiveness of our internal control over financial reporting so long as we qualify as an emerging growth company, which may increase the risk that weaknesses or deficiencies in our internal control over financial reporting go undetected. Likewise, so long as we qualify as an emerging growth company, we may elect not to provide you with certain information, including certain financial information and certain information regarding compensation of our executive officers, that we would otherwise have been required to provide in filings we make with the SEC, which may make it more difficult for investors and securities analysts to evaluate our company. As a result, investor confidence in our company and the market price of our common stock may be adversely affected. Further, we cannot predict if investors will find our common stock less attractive because we will rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

Table of Contents

***If you purchase our common stock in this offering, you will incur immediate and substantial dilution.***

The assumed initial public offering price of $      per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, is substantially higher than the pro forma as adjusted net tangible book value per share of our outstanding common stock (after giving effect to the Capital Stock Conversion) of $      per share as of            . Investors purchasing shares of our common stock in this offering will pay a price per share that substantially exceeds the book value of our tangible assets after subtracting our liabilities. Therefore, if you purchase our common stock in this offering, you will incur immediate dilution of $      per share in the pro forma as adjusted net tangible book value per share from the price you paid.

This dilution is due in large part to the fact that our earlier investors paid substantially less than the initial public offering price when they purchased shares prior to this offering. In addition, as of            , options to purchase      shares of our common stock, with a weighted-average exercise price of $      per share, and      shares of our common stock subject to RSUs were outstanding. The exercise of any of these options, settlement of any of these RSUs, or issuance of additional shares of our common stock would result in additional dilution. As a result of the dilution to investors purchasing shares in this offering, investors may receive less than the purchase price paid in this offering, if anything, in the event of our liquidation. For more information, see the section titled "Dilution."

***Prior to this offering, there has been limited trading of our common stock at prices that may be higher than what our common stock will trade at once it is listed.***

Prior to this offering, our shares have not been listed on any stock exchange or other public trading market, but there has been some trading of our securities in private trades. These trades were speculative, and the trading price of our securities in these trades was privately negotiated. We cannot assure you that the price of our common stock will equal or exceed the price at which our securities have traded prior to this offering.

***We have broad discretion over the use of net proceeds from this offering and we may not use them effectively.***

We cannot specify with any certainty the particular uses of the net proceeds that we will receive from this offering. Our management will have broad discretion in the application of the net proceeds from this offering, including for any of the purposes described in the section titled "Use of Proceeds," and you will not have the opportunity as part of your investment decision to assess whether the net proceeds are being used appropriately. Because of the number and variability of factors that will determine our use of the net proceeds from this offering, their ultimate use may vary substantially from their currently intended use. The failure by our management to apply these proceeds effectively could adversely affect our business, financial condition, and results of operations. Pending their use, we may invest our proceeds in a manner that does not produce income or that loses value. Our investments may not yield a favorable return to our investors and may negatively impact the price of our common stock.

***Delaware law and provisions in our amended and restated certificate of incorporation and amended and restated bylaws could make a merger, tender offer, or proxy contest difficult, thereby depressing the market price of our common stock.***

Our status as a Delaware corporation and the anti-takeover provisions of the Delaware General Corporation Law may discourage, delay, or prevent a change in control by prohibiting us from engaging in a business combination with an interested stockholder for a period of three years after the date of the transaction in which the person became an interested stockholder, even if a change of control would be beneficial to our existing stockholders. In addition, our amended and restated certificate of incorporation

62

Table of Contents

and amended and restated bylaws will contain provisions that may make the acquisition of our company more difficult, including the following:

- any amendments to our amended and restated certificate of incorporation or our amended and restated bylaws will require the approval of at least two-thirds of our then-outstanding voting power;

- our board of directors is classified into three classes of directors with staggered three-year terms and directors are only able to be removed from office for cause;

- our stockholders will only be able to take action at a meeting of stockholders and will not be able to take action by written consent for any matter;

- our amended and restated certificate of incorporation will not provide for cumulative voting;

- vacancies on our board of directors will be able to be filled only by our board of directors and not by stockholders;

- a special meeting of our stockholders may only be called by the chairperson of our board of directors, our Chief Executive Officer, our President, or a majority of our board of directors;

- certain litigation against us can only be brought in Delaware;

- our amended and restated certificate of incorporation will authorize undesignated preferred stock, the terms of which may be established and shares of which may be issued without further action by our stockholders; and

- advance notice procedures apply for stockholders to nominate candidates for election as directors or to bring matters before an annual meeting of stockholders.

These provisions, alone or together, could discourage, delay, or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and to cause us to take other corporate actions they desire, any of which, under certain circumstances, could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

***Our amended and restated bylaws will designate a state or federal court located within the State of Delaware as the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers, or employees.***

Our amended and restated bylaws, which will become effective immediately prior to the completion of this offering, will provide that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers, or other employees to us or our stockholders, (iii) any action arising pursuant to any provision of the Delaware General Corporation Law, our amended and restated certificate of incorporation, or our amended and restated bylaws, or (iv) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware), in all cases subject to the court having jurisdiction over indispensable parties named as defendants. Nothing in our amended and restated bylaws precludes stockholders that assert claims under the Securities Act of 1933, as amended, or the Securities Act, from bringing such claims in state or federal court, subject to applicable law.

Any person or entity purchasing or otherwise acquiring any interest in any of our securities shall be deemed to have notice of and consented to this provision. This exclusive forum provision may limit a

63

Table of Contents

stockholder's ability to bring a claim in a judicial forum of its choosing for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. If a court were to find the exclusive forum provision in our amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could adversely affect our results of operations.

***In making your investment decision, you should understand that we and the underwriters have not authorized any other party to provide you with information concerning us or this offering.***

You should carefully evaluate all of the information in this prospectus. We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is not directly attributable to statements made by our officers and employees, that incorrectly reports on statements made by our officers or employees or that is misleading as a result of omitting information provided by us, our officers, or employees. We and the underwriters have not authorized any other party to provide you with information concerning us or this offering.

***If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendation regarding our common stock adversely, the market price and trading volume of our common stock could decline.***

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us, our business, our market, or our competitors. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If any of the analysts who cover us change their recommendation regarding our common stock adversely, provide more favorable relative recommendations about our competitors, or publish inaccurate or unfavorable research about our business, the price of our securities would likely decline. If few securities analysts commence coverage of us, or if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets and demand for our securities could decrease, which could cause the price and trading volume of our common stock to decline.

***We do not expect to pay dividends in the foreseeable future.***

We have never declared nor paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not anticipate declaring or paying any dividends to holders of our capital stock in the foreseeable future. In addition, our credit facility contains restrictions on our ability to pay dividends. Consequently, stockholders must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment.

64

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements within the meaning of the federal securities laws, which statements involve substantial risks and uncertainties. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expect," "plan," "anticipate," "could," "would," "intend," "target," "project," "contemplate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans, or intentions. Forward-looking statements contained in this prospectus include statements about:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, operating expenses, Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin, our ability to determine reserves, and our ability to achieve and maintain future profitability;

- our ability to successfully execute our business and growth strategy;

- the sufficiency of our cash, cash equivalents, and marketable securities to meet our liquidity needs;

- the demand for our platform or for local logistics platforms in general;

- our ability to attract and retain merchants, consumers, and Dashers;

- our ability to effectively manage costs related to Dashers;

- our ability to develop new offerings, services, and features and bring them to market in a timely manner and make enhancements to our platform;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- our expectations regarding outstanding litigation and legal and regulatory matters;

- our expectations regarding the effects of existing and developing laws and regulations, including with respect to independent contractor classification, taxation, and privacy and data protection;

- our ability to manage and insure auto-related and operations-related risk associated with our business;

- our expectations regarding new and evolving markets;

- our ability to develop and protect our brand;

- our ability to maintain the security and availability of our platform;

- our expectations and management of future growth;

- our expectations concerning relationships with third parties;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to integrate Caviar and any other companies and assets that we acquire;

- the increased expenses associated with being a public company; and

- our anticipated uses of net proceeds from this offering.

We caution you that the foregoing list may not contain all of the forward-looking statements made in this prospectus.

65

Table of Contents

You should not rely upon forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this prospectus primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations, and prospects. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, and other factors, including those described in the section titled "Risk Factors" and elsewhere in this prospectus. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. We cannot assure you that the results, events, and circumstances reflected in the forward-looking statements will be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

Neither we nor any other person assumes responsibility for the accuracy and completeness of any of these forward-looking statements. Moreover, the forward-looking statements made in this prospectus relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this prospectus to reflect events or circumstances after the date of this prospectus or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, or investments we may make.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

66

# EXHIBIT D
# to
## Declaration of Jeremy M. Goldman
## In Support Of San Francisco's Request For
## Judicial Notice And Motion To Dismiss

424B4 1 d752207d424b4.htm 424B4

Table of Contents

<div align="right">
Filed pursuant to Rule 424(b)(4)
Registration No. 333-250056
</div>

<div align="center">

## 33,000,000 Shares



# DoorDash, Inc.

### Class A Common Stock

_____

</div>

This is an initial public offering of shares of Class A common stock of DoorDash, Inc.

We have three classes of authorized common stock, Class A common stock, Class B common stock, and Class C common stock. The rights of the holders of Class A common stock, Class B common stock, and Class C common stock are identical, except with respect to voting and conversion. Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 20 votes per share and is convertible at any time into one share of Class A common stock. Shares of Class C common stock have no voting rights, except as otherwise required by law, and will convert into Class A common stock, on a share-for-share basis, following the conversion or exchange of all outstanding shares of Class B common stock into shares of Class A common stock and upon the date or time specified by the holders of a majority of the outstanding shares of Class A common stock voting as a separate class. Upon the completion of this offering, no shares of Class C common stock will be issued and outstanding.

Upon the completion of this offering, all shares of Class B common stock will be held by Tony Xu, Andy Fang, and Stanley Tang, or our Co-Founders, who are all current executives and directors. Upon completion of this offering, Messrs. Xu, Fang, and Tang will collectively hold approximately 69% of the voting power of our outstanding capital stock, which voting power may increase over time as Messrs. Xu, Fang, and Tang exercise or vest in equity awards outstanding at the time of the completion of this offering. If all such equity awards held by Messrs. Xu, Fang, and Tang had been exercised or vested and exchanged for shares of Class B common stock as of the date of the completion of this offering, Messrs. Xu, Fang, and Tang would collectively hold 79% of the voting power of our outstanding capital stock. Messrs. Xu, Fang, and Tang have entered into a voting agreement whereby Mr. Xu will have the authority (and irrevocable proxy) to direct the vote and vote the shares of Class B common stock held by Messrs. Fang and Tang, and their respective permitted entities and permitted transferees, at his discretion on all matters to be voted upon by stockholders. As a result, Mr. Xu will be able to determine or significantly influence any action requiring the approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction.

Prior to this offering, there has been no public market for our Class A common stock. The initial public offering price per share is $102.00. We have been approved to list our Class A common stock on the New York Stock Exchange under the symbol "DASH".

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and, as such, we have elected to comply with certain reduced public company reporting requirements for this prospectus and may elect to do so in future filings.

**See "Risk Factors" beginning on page 23 to read about factors you should consider before buying shares of our Class A common stock.**

<div align="center">_____</div>

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

<div align="center">_____</div>

|  | Per share | Total |
|---|---|---|
| Initial public offering price | $ 102.00 | $ 3,366,000,000 |
| Underwriting discount(1) | $ 2.448 | $ 80,784,000 |
| Proceeds, before expenses, to DoorDash, Inc. | $ 99.552 | $ 3,285,216,000 |

(1)   See the section titled "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters do not have an option to purchase additional shares of Class A common stock from us at the initial offering price less the underwriting discount.

The underwriters expect to deliver the shares against payment in New York, New York, on or about December 11, 2020.

| | |
|---|---|
| **Goldman Sachs & Co. LLC** | **J.P. Morgan** |

| | | | | |
|---|---|---|---|---|
| **Barclays** | **Deutsche Bank Securities** | | **RBC Capital Markets** | **UBS Investment Bank** |
| **Mizuho Securities** | **JMP Securities** | **Needham & Company** | **Oppenheimer & Co.** | **Piper Sandler**    **William Blair** |

<div align="center">**Prospectus dated December 8, 2020**</div>

Table of Contents



Table of Contents



424B4

Table of Contents



Table of Contents

## TABLE OF CONTENTS

| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 23 |
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | 84 |
| INDUSTRY, MARKET, AND OTHER DATA | 86 |
| USE OF PROCEEDS | 87 |
| DIVIDEND POLICY | 90 |
| CAPITALIZATION | 91 |
| DILUTION | 93 |
| SELECTED CONSOLIDATED FINANCIAL AND OTHER DATA | 96 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 99 |
| NON-GAAP FINANCIAL MEASURES | 149 |
| BUSINESS | 158 |
| MANAGEMENT | 209 |
| EXECUTIVE COMPENSATION | 221 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 239 |
| PRINCIPAL STOCKHOLDERS | 246 |
| DESCRIPTION OF CAPITAL STOCK | 250 |
| SHARES ELIGIBLE FOR FUTURE SALE | 259 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR CLASS A COMMON STOCK | 263 |
| UNDERWRITING | 268 |
| LEGAL MATTERS | 274 |
| EXPERTS | 274 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 274 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

**Through and including January 2, 2021 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.**

You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or the SEC. Neither we nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. Neither we nor any of the underwriters take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date, regardless of the time of delivery of this prospectus or of any sale of our Class A common stock. Our business, financial condition, results of operations, and prospects may have changed since such date.

For investors outside the United States: Neither we nor any of the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of our Class A common stock, and the distribution of this prospectus outside the United States.

Table of Contents



Table of Contents



Table of Contents



424B4

Table of Contents



424B4

Table of Contents

### A LETTER FROM TONY XU, CO-FOUNDER AND CEO

We started DoorDash to help people like my Mom.

I was five years old when I immigrated from China with my parents. Like many immigrants, my family came to this country to pursue the American Dream. Dad came to pursue a Ph.D. in Aeronautical Engineering from the University of Illinois at Urbana-Champaign. Mom hoped she could retain her job as a doctor, her occupation in China, but the odds were against her. The United States didn't recognize her Chinese medical license and with only $250 to our family's name, putting her through school again was impossible. But that didn't stop her.

Mom put food on the table by working three jobs a day for 12 years. One of those jobs was as a server at a local Chinese restaurant, where I got a front row seat as a dishwasher. For Mom, working at a restaurant was a means to an end. After deferring her dreams for more than a decade, she saved enough money to return to school and open her medical clinic, which she still runs more than 20 years later.

DoorDash exists today to empower those like my Mom who came here with a dream to make it on their own. Fighting for the underdog is part of who I am and what we stand for as a company. Having spoken to countless merchants since DoorDash's founding in 2013—from a Mom and Pop store like Oren's Hummus to the General Managers of Chili's (aka "ChiliHeads")—I am humbled by their relentless drive to create and build, and their contribution to their communities. While small businesses are vital to our communities and created approximately two-thirds of net new jobs in the United States from 2000 to 2018,[1] they now risk being left behind in the convenience economy where consumers have become accustomed to obtaining everything in a few clicks, a trend that has only accelerated in a COVID world. Helping brick-and-mortar businesses compete, succeed, and flourish in these rapidly changing times is the core problem we are trying to solve.

### *The Future of "Local" — Our Unique Opportunity*

DoorDash has always been about helping local businesses succeed, more so than about food delivery. As students at Stanford, we canvassed the Bay Area asking dozens of local businesses what they needed to grow their business. When they shared the challenges related to delivery, we were surprised. Delivery was not a new idea, yet outside of New York City in the United States, very few businesses offered it. Seven years ago, we could not have imagined how big a transformation this would become, and we are still in the early innings of this evolution of local commerce.

While we started by enabling food delivery, our plan is to build products that transform the way local merchants do business and enrich the communities in which they operate. Over time, we will build three mutually-reinforcing assets to enable this vision:

1.  *An on-demand logistics platform that can facilitate the local delivery of any item*

2.  *Merchant services to grow sales in the modern era*

3.  *A membership program to the physical world for consumers*

### *Logistics*

If we can make possible the delivery of ice cream before it melts, or pizza before it gets cold, or groceries in an hour, we can make the on-demand delivery of anything within a city a reality. We started with restaurants because of the potential to build the most efficient logistics network with the highest

---

1    U.S. Small Business Administration, Office of Advocacy, or SBA, Frequently Asked Questions, September 2019. See the section titled "Industry, Market, and Other Data."

i

Table of Contents

node density, based on the large number of restaurants and the high frequency of use for delivery. We believe that by starting with food, we have created the most sophisticated and reliable logistics platform for local businesses. And, while food itself is a category that has a long runway for growth, we believe the network we have built ideally positions us to fulfill our vision of empowering all local businesses to compete in the convenience economy.

*Merchant Services*

Logistics alone, however, will not help physical businesses compete. How do you acquire customers in a world where they no longer walk inside your stores? What products should you make today and in the future? How should you price your products? How do you build customer relationships over time?

DoorDash is much more than an application that connects merchants, consumers, and Dashers by facilitating delivery. We provide a broad array of services that enable merchants to solve mission-critical challenges such as customer acquisition, delivery, insights and analytics, merchandising, payment processing, and customer support, and to fulfill demand generated through their own channels. This is just the beginning—we strive to become a merchant's first call when they want to grow their business.

*Membership Program*

Over time, as DoorDash partners with local businesses beyond restaurants, we want to make it easy and affordable for consumers to enjoy the best of their communities. To that end, we launched a membership program called DashPass, where customers can pay a flat monthly delivery fee (today $9.99) for unlimited deliveries from eligible merchants. To date, these deliveries come primarily from restaurants. In the future, we envision this membership program becoming a wallet for the physical world, where a consumer can access not only restaurants, but all the local businesses in their community, and receive benefits while shopping in-store, at home, or anywhere in between.

If we are successful in helping local businesses overcome the greatest business model challenge of their time, we believe that physical stores will be transformed and will morph into offering two types of products: convenience and experience. Every category of store on the street will be omni-channel—offering goods online, as well as rich, personalized experiences in-store.

Further, we believe this will lead to an increase in both local commerce and new business creation. Anyone should be able to launch a business. We hope to become the platform of choice to help businesses participate in the modern economy and enable entrepreneurs to bring their dreams to life.

The window is closing to empower this transformation, as the rise of ecommerce and other on-demand technologies are rapidly surpassing local businesses. To serve these businesses effectively, scale is paramount, and as the player with the largest market share in our category, we are uniquely positioned to help local businesses compete in the new economy.

**How We Operate**

Our greatest competitive advantage is, and always has started with, our people and our culture. Speaking for the entire DoorDash team, we are inspired by merchants and Dashers from all different backgrounds who work tirelessly to achieve their goals—and know we need to earn their trust each and every day. We take our part in their journey seriously, which is reflected in our values and the ways in which we execute, a few of which I will highlight:

- *Be customer-obsessed, not competitor-focused*: In the third month of DoorDash's operation, we experienced a terrible outage, where we decided to refund every consumer the full value

ii

424B4

Table of Contents

of their order. The refunds took out a significant, double digit percentage of our bank account. This customer obsession remains as crucial today as it was then. As COVID-19 began crippling local economies, we led the industry in reducing commissions by 50% for our local restaurant partners with five or fewer locations, benefiting approximately 180,000 local restaurants in the United States, Canada, and Australia. We will always endeavor to do right by our merchants, consumers, and Dashers, regardless of the short-term impact on our financials or stock price. At the end of the day, we believe that being laser-focused on solving problems for our customers will deliver long-term value.

•   *Get 1% better every day*: We are only as good as our next order. We operate a difficult business—we must perennially improve our products, create more customer value, and launch new services to meet the needs and expectations of our three constituencies. We know we have ample room to improve, and the opportunity to do so motivates us. While it might seem small in isolation, our daily work—be it on reducing delivery times, increasing efficiency, or improving personalization—is about compounding incremental improvements that drive significant value over time.

•   *Operate at the lowest level of detail*: Averages in our industry are meaningless, it's the distribution that matters. No consumer cares if our average delivery time is 35 minutes if they received their food in 53 minutes. At DoorDash, we go to the lowest level of detail to understand every part of our system, looking for "and" solutions that fight false "either/or" dichotomies. This is one reason why everyone at DoorDash, including me, tries to step out of our day-to-day roles once a month to do a delivery or engage in customer support, menu creation, or merchant support—staying very close to the needs of those who use our platform is key. We attribute our category-leading spend retention[2] and capital efficiency, in part, to this obsession.

•   *Dream big, start small*: We take a long-term view at DoorDash and recognize that the best way to help merchants is to iterate quickly on products to help them grow their businesses. While we won't optimize for quarterly changes to our business, we also won't pursue 1,000 things at once or begin a project without enough resources. While we plan and invest for the long term, we begin projects in one market, with a lean team, and with very little capital and ask them to earn their way toward increasing investment. These constraints, we believe, help drive creativity, in much the same way DoorDash was founded.

•   *We are owners*: At DoorDash, our operators are relentlessly focused on execution and hold themselves to the highest accountability levels while carrying no blame. Like the problems we solve, working at DoorDash is challenging. We have stretch goals and we increase them when we beat these goals, always raising the bar. To foster this ownership mentality, we believe in using equity as an important part of our employee compensation.

Our values underpin our operational playbook and make us uniquely situated to seize the opportunity before us—to enable local merchants, to level the playing field for underdogs playing from behind, and to empower local economies.

I hope you'll join us in transforming the future of local commerce.

Onward and upward,

Tony

---

2   Edison Trends. Based on the estimated dollar value of orders placed on DoorDash, Grubhub, and Uber Eats by a group of users that first placed an order on any such platform between January 1, 2019 and September 30, 2019, as determined by Edison Trends. For each platform, spend retention represents the total dollar value of orders placed by this group of users in their twelfth month on the platform as a percentage of the total dollar value of orders placed by such group in their first month. Postmates is excluded due to inconsistent data availability in April and May 2020; however, Postmates' spend retention was lower than DoorDash in all other months of the measurement period.

iii

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. This summary does not contain all of the information you should consider before investing in our Class A common stock. You should read this entire prospectus carefully, including the sections titled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Non-GAAP Financial Measures" and our consolidated financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Unless the context otherwise requires, the terms "DoorDash," "the company," "we," "us," and "our" in this prospectus refer to DoorDash, Inc. and its consolidated subsidiaries, and references to our "common stock" include our Class A common stock, Class B common stock, and Class C common stock.*

**OUR MISSION**

Our mission is to grow and empower local economies.

Our journey began on January 12, 2013, when our founders launched a website displaying menus from local restaurants in Palo Alto, California. Within a few hours, the first DoorDash consumer ordered prawn pad thai and spring rolls from a nearby Thai eatery, and shortly afterwards, dinner was delivered directly to his door.

Today, we connect over 390,000 merchants,[3] over 18 million consumers,[4] and over 1 million Dashers[5] in the United States, Canada, and Australia through our local logistics platform.

Our platform enables local brick-and-mortar businesses to thrive in today's convenience economy by addressing consumers' expectations of ease and immediacy. With over 900 million orders completed through our platform since our founding, merchants have made additional sales, consumers have connected with the best of their neighborhoods, and Dashers have found flexible economic opportunities.

**OVERVIEW**

Technology has changed consumer behavior and driven a wave of demand for convenience. Recent events have further accelerated these trends, pulling the future of e-commerce forward for businesses large and small. Consumers value frictionless online shopping experiences and on-demand delivery. As consumers demand products and services quickly, inexpensively, and at the touch of a button, business is now happening where consumers are: at work, at home, and on-the-go. Local businesses have historically provided rich personalized experiences for consumers who shop in-store, but consumers are no longer going to physical storefronts for every purchase, and local businesses have struggled to adjust. We believe many local businesses lack the capabilities to reach today's consumers or deliver to them off-premise. As a result, they miss out on this increasingly important source of growth.

---

[3]   Based on the number of individual stores that have completed an order through our platform in the past month, measured as of September 30, 2020.
[4]   Based on the number of individual consumer accounts that have completed an order on our Marketplace in the past month, measured as of September 30, 2020.
[5]   Based on the number of accounts held by independent contractors that have delivered an order through our platform, or Dashers, in the past month, measured as of September 30, 2020.

1

Table of Contents

We founded DoorDash to be a merchant-first business. We enable local brick-and-mortar businesses to thrive in an increasingly convenience-driven economy with rapidly evolving consumer expectations. We do this primarily through the DoorDash Marketplace, or our Marketplace, which offers a broad array of services that enable merchants to solve mission-critical challenges such as customer acquisition, delivery, insights and analytics, merchandising, payment processing, and customer support. DoorDash helps merchants drive significant incremental sales and leverage the fixed cost investments that they have already made. Our Marketplace enables merchants to establish an online presence and expand their reach. It generates significant demand for merchants by connecting them with millions of consumers. Merchants can fulfill this demand through delivery, facilitated by our local logistics platform, or in-person pickup by consumers. Through our Marketplace, merchants can also initiate and run promotions to drive incremental sales and attract new consumers.

There are over 30 million small businesses in the United States,[6] and they form the building blocks of local economies and communities. Small businesses, including family-owned businesses, local entrepreneurs, and operators or franchisees of large national or international chains, created approximately two-thirds of net new jobs in the United States from 2000 to 2018.[7]

When local businesses thrive, so do local economies and communities.

We are inspired by our merchants—by their entrepreneurship, their passion for their craft, their ingenuity, their resilience, and their many contributions to their communities—and are committed to helping them grow and thrive as consumer expectations evolve.

We believe that the value we deliver to merchants, consumers, and Dashers is a key reason why we have become the largest and fastest growing business in the U.S. local food delivery logistics category, with 50% U.S. category share and 58% category share in suburban markets.[8]

---

[6]  SBA; see the section titled "Industry, Market, and Other Data."

[7]  SBA; see the section titled "Industry, Market, and Other Data."

[8]  Edison Trends. Based on the dollar value of orders placed on the following platforms: Caviar, DoorDash, Grubhub, Postmates, Uber Eats, and other platforms that collectively represent less than two percent of total category share, as of October 31, 2020. Excludes Drive orders. See the section titled "Industry, Market, and Other Data."

2

Table of Contents



While we are the category leader, U.S. consumers on our platform in September 2020 represented less than six percent of the U.S. population as of September 30, 2020, and we believe we are in the early phases of broad market adoption. In 2019, we generated gross order value on our Marketplace, or Marketplace GOV, of $8.0 billion. In the same period, $302.6 billion was spent off-premise at restaurants and other consumer foodservices in the United States.[9] Our Marketplace GOV in 2019 represented less than three percent of this off-premise spend, highlighting the large addressable opportunity ahead of us in the food vertical alone. We are also beginning to expand into other verticals beyond food and our ambition is to empower all types of local businesses.

In 2019 and during the nine months ended September 30, 2020, we generated revenue of $885 million and $1.9 billion, respectively. In the same periods, we had gross profit[10] of $335 million and $944 million, respectively, and $(200) million and $433 million, respectively, in Contribution Profit (Loss).[11] In 2019 and

---

[9]   Euromonitor International Limited. Consumer foodservices include cafes and bars, full-service restaurants, limited-service restaurants, self-service cafeterias, and street stalls and kiosks. Off-premise spend is the amount spent at restaurants and other consumer foodservices through home delivery, drive-through, and take-out. There are some differences between how we calculate Marketplace GOV and how Euromonitor calculates off-premise spend. Our calculation of Marketplace GOV includes taxes and tips, as well as delivery fees, while Euromonitor excludes these amounts from the calculation of off-premise spend. However, such differences represent a relatively minor portion of the calculation of each measure, and as such, we believe Marketplace GOV and off-premise spend are generally consistent and comparable measures. See the section titled "Industry, Market, and Other Data."

[10]  Gross profit (loss) is defined as revenue less (i) cost of revenue, exclusive of depreciation and amortization and (ii) depreciation and amortization related to cost of revenue.

[11]  For more information about Contribution Profit (Loss), including the limitations of such measure, and a reconciliation of Contribution Profit (Loss) to gross profit (loss), the most directly comparable financial measure calculated in accordance with accounting principles generally accepted in the United States, or GAAP, see the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Non-GAAP Metrics" and "Non-GAAP Financial Measures."

Table of Contents

during the nine months ended September 30, 2020, we had a net loss of $667 million and $149 million, respectively, and $(475) million and $95 million, respectively, in Adjusted EBITDA.[12]

We have a massive market opportunity ahead of us to increase Total Orders and Marketplace GOV. To address this opportunity, we have made substantial investments in sales and marketing and promotions to attract and engage consumers. Our historical consumer cohorts demonstrate attractive and improving financial results because we have been able to retain and grow consumer demand while normalizing sales and marketing and promotions spend. In addition, operational and technological enhancements have improved the efficiency of our platform, lowered our cost structure, and generated further improvements to our margins. We believe that the performance of our historical consumer cohorts supports our strategy of investing in sales and marketing and promotions to add new consumers to our existing base and enhance the scale of our platform.

We use the vast majority of our sales and marketing and promotions spend to bring new consumers to DoorDash and to encourage their repeat use of our platform. For our historical consumer cohorts, sales and marketing and promotions spend is generally elevated in the initial year of a cohort's life cycle on our platform and subsequently normalizes by the second year. At the same time, the Marketplace GOV generated by each of our cohorts each year consistently increases.

We believe that the convenient access we provide to an unmatched combination of selection, experience, and value for consumers helps drive consumer engagement and category-leading spend retention.[13] Edison Trends bases its calculation of spend retention on the estimated dollar value of orders placed on DoorDash, Grubhub, and Uber Eats by a group of users that first placed an order on any such platform between January 1, 2019 and September 30, 2019, as determined by Edison Trends. For each platform, spend retention represents the total dollar value of orders placed by this group of users in their twelfth month on the platform as a percentage of the total dollar value of orders placed by such group in their first month on the platform.

The success of our investment strategy is demonstrated by the fact that our historical cohorts demonstrate attractive and improving Contribution Profit (Loss) as a percentage of Marketplace GOV. The chart below illustrates the Contribution Profit (Loss) of each cohort, expressed as a percentage of Marketplace GOV generated by the cohort on a time-indexed basis.[14] For the purposes of the chart below only, Contribution Profit (Loss) as a percentage of Marketplace GOV by cohort is calculated excluding orders fulfilled through Drive and Caviar.

---

[12] For more information about Adjusted EBITDA, including the limitations of such measure, and a reconciliation of Adjusted EBITDA to net loss, the most directly comparable financial measure calculated in accordance with GAAP, see the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Non-GAAP Metrics" and "Non-GAAP Financial Measures."

[13] Edison Trends. See the section titled "Industry, Market, and Other Data."

[14] Year 1 for the 2016 cohort has been excluded because, for periods prior to January 1, 2017, our consolidated financial statements were prepared using different accounting standards. Accordingly, information for each cohort has only been presented starting with the year ended December 31, 2017.

4

Table of Contents



Contribution Profit (Loss) as a percentage of Marketplace GOV for a cohort is generally negative in the first year that the cohort is on our platform, due to the investments we make to acquire the consumers in the cohort and encourage their repeat use of our platform. We have been successful in driving increasingly positive Contribution Profit (Loss) as a percentage of Marketplace GOV from historical consumer cohorts in subsequent years as the amounts we spend on sales and marketing and promotions for historical consumer cohorts has normalized.

In the near term, we expect to continue to make substantial investments to increase consumer adoption and extend our leadership. We believe that our business will be successful and sustainable in the long term as our business model becomes more efficient, through increasing scale and continual operational improvements, and as our sales and marketing and promotions investments normalize.

### THE DOORDASH PLATFORM

Our local logistics platform connects merchants, consumers, and Dashers. We built our local logistics platform to serve the needs of these three key constituencies and to become more intelligent and efficient with every order. As we have grown, the scale of our local logistics platform has become one of our major competitive advantages and delivers substantial benefits to everyone we serve. We connect:

- **Merchants:** Over 390,000 merchants run and grow their businesses using our technology platform.[15] When we partner with organizations, such as national restaurant chains, that have multiple individual stores on our platform, we include each such store in our merchant count. Since our founding, merchants have generated over $19 billion in sales on our Marketplace and in 2019 alone, merchants as a whole experienced 59% year-over-year same store sales growth on our Marketplace.

---

[15]  Based on the number of individual stores that have completed an order through our platform in the past month, measured as of September 30, 2020.

5

Table of Contents

- **Consumers:** Over 18 million consumers discover, engage with, and purchase goods from merchants on our local logistics platform.[16] We identify an individual consumer account by a unique email address. If a consumer had accounts under two different email addresses, and such consumer completed orders using both accounts during the measurement period, such consumer's activity would be counted as two separate consumers. Since our founding, over 900 million orders have been completed through our platform.

- **Dashers:** Over 1 million Dashers use our local logistics platform to find opportunities to earn.[17] We identify an individual Dasher account by a unique email address. If a Dasher had accounts under two different email addresses, and such Dasher delivered orders using both accounts during the measurement period, such Dasher's activity would be counted as two separate Dashers. Since our founding, Dashers have earned over $7 billion through our platform.[18]

Our local logistics platform is powered by our proprietary technology that carefully optimizes the many interactions between merchants, consumers, and Dashers to make the end-to-end experience seamless and delightful. Each order on our local logistics platform provides a broad range of information that is analyzed by our machine learning algorithms to improve the quality and performance of our platform. From presenting personalized, curated content to consumers that takes into account cuisine and dietary preferences to providing information that enables Dashers to maximize their earnings opportunities, our machine learning algorithms continuously improve the experiences of our three constituencies and make our local logistics platform more intelligent and efficient with every order.

Our local logistics platform benefits from three powerful virtuous cycles:

- **Local Network Effects:** Our ability to attract more merchants, including local favorites and national brands, creates more selection in our Marketplace, driving more consumer engagement, and in turn, more sales for merchants on our platform. Our strong national merchant footprint enables us to launch new markets and quickly establish a critical mass of merchants and Dashers, driving strong consumer adoption.

- **Economies of Scale:** As more consumers join our local logistics platform and their engagement increases, our entire platform benefits from higher order volume, which means more revenue for local businesses and more opportunities for Dashers to work and increase their earnings. This, in turn, attracts Dashers to our local logistics platform, which allows for faster and more efficient fulfillment of orders for consumers.

- **Increasing Brand Affinity:** Both our local network effects and economies of scale lead to more merchants, consumers, and Dashers that utilize our local logistics platform. As we scale, we continue to invest in improving our offerings for merchants, selection, experience, and value for consumers, and earnings opportunities for Dashers. By improving the benefits of our local logistics platform for each of our three constituencies, our network continues to grow and we benefit from increased brand awareness and positive brand affinity. With increased brand affinity, we expect that we will enjoy lower acquisition costs for all three constituencies in the long term.

---

[16]  Based on the number of individual consumer accounts that have completed an order on our Marketplace in the past month, measured as of September 30, 2020.
[17]  Based on the number of Dasher accounts that have delivered an order through our platform in the past month, measured as of September 30, 2020.
[18]  Earnings include tips, measured as of September 30, 2020.

6

Table of Contents



We have been successful in becoming the category leader in U.S. local food delivery logistics because of the value we create for merchants, consumers, and Dashers.[19] DoorDash only works if it works for merchants, consumers, and Dashers, and we continually strive to improve how we serve all constituents.

### WHY MERCHANTS WIN WITH DOORDASH

DoorDash is a merchant-first business. Our local logistics platform provides merchants with the opportunity to reach new consumers, grow their businesses, and benefit from incremental sales that leverage the fixed cost investments they have already made.

- **Demand Creation.** We provide merchants with access to highly engaged consumers in their communities, and we create demand for merchants through personalization and merchandising strategies that curate selection. A consumer survey conducted by Cowen indicates that nearly 80% of delivery orders are incremental to merchants' on-premise businesses,[20] enabling them to serve new customers and leverage fixed costs to generate incremental revenue and profit.

- **Broad Array of Merchant Services.** We offer a broad array of services that enable merchants to solve mission-critical challenges. The majority of our merchants use our Marketplace to connect with consumers and Dashers to fulfill demand. In addition to our Marketplace, we have also developed a white-label logistics service, DoorDash Drive, which allows merchants that generate demand through their own websites, apps, and other channels to fulfill orders using our platform. Our DoorDash Pickup service enables consumers to place orders on our platform and pick up the orders directly from merchants. DoorDash for Work provides our merchants with large group orders and catering orders for businesses and events.

---

19  Edison Trends; see the section titled "Industry, Market, and Other Data."
20  Cowen, Digital Delivery: Survey Says Inflection is Underway, January 11, 2019. See the section titled "Industry, Market, and Other Data."

Table of Contents

- **Operational Excellence.** Our platform is built to integrate seamlessly with merchants' existing processes and workflows. The unique challenges faced by merchants often serve as our guide as we build products and features. As we continue to scale our business, we find that many merchants face similar challenges, and so we develop solutions that may be broadly applied to merchants on our platform.

### WHY CONSUMERS WIN WITH DOORDASH

We believe DoorDash provides consumers with convenient access to an unmatched combination of selection, experience, and value.

- **Convenience.** DoorDash gives consumers living in urban and suburban communities alike the ability to have the best of their communities delivered to their doorsteps in minutes. We allow people to save one of their most precious resources: time.

- **Wide Selection.** We have partnerships with over 175 of the 200 largest national restaurant brands[21] and provide consumers access to a wide selection of merchants. Broad selection, coupled with personalization and curation that is driven by our proprietary data science and analytics, enables us to provide extensive yet customized choices to consumers.

- **Best Experience.** We are focused on delivering the best end-to-end experience for consumers, which includes ease of use, speed of delivery, and quality.

- **Value.** We provide both lifestyle and economic value to consumers. The breadth of selection, convenience, and reliability of our local logistics platform means DoorDash solves problems for many occasions. DashPass, our membership program to the physical world, is a subscription product that enables consumers to enjoy the convenience of delivery without paying per-order delivery fees. We created DashPass to reward our most engaged consumers with savings on the cost of delivery and to reward DashPass-eligible merchants by featuring them to our most engaged consumers. As of September 30, 2020, we had over five million consumers on DashPass.

### WHY DASHERS WIN WITH DOORDASH

The scale of our business provides Dashers with significant and flexible opportunities to earn.

- **Flexible Opportunities to Earn.** Dashers value the flexibility and autonomy of choosing where, when, and how often to work and the ability to earn income that fits around their other interests, which means they can log in and log out of our platform when they choose, and accept the deliveries that they prefer, all on their own terms. Dashers can use our platform after passing a background check, and eligible Dashers can receive their earnings on-demand through our Fast Pay service. We do not require Dashers to deliver by car as they also have the option to deliver by bike or scooter. In practice, this means that a broad range of people are able to deliver on our platform. In addition, our broad national coverage in the United States gives Dashers more opportunities to earn in more places.

- **Earnings Transparency.** We provide Dashers with critical information regarding deliveries upfront, including guaranteed earnings, estimated time and distance, merchant name, and consumer drop-off information, so Dashers can make informed decisions about the deliveries

---

21  Nation's Restaurant News, 2020 Top 200 Restaurant Chain Research, June 11, 2020. See the section titled "Industry, Market, and Other Data."

8

424B4

Table of Contents

they choose to accept. We also provide Dashers with key information and insights to track their earnings and meet their financial goals.

- **Dasher Community.** We aim to empower people from all walks of life to supplement their income and achieve their financial goals on their own terms. We actively listen to Dashers' perspectives and invest in constantly improving their experiences on our local logistics platform, including through the Dasher Community Council, which provides feedback directly to our executives.

## OUR OPPORTUNITY

We are the category leader in U.S. local food delivery logistics today and have an enormous market opportunity ahead of us in food alone. In 2019, Americans spent $1.5 trillion on food and beverages, of which $600.5 billion was spent on restaurants and other consumer foodservices.[22] Over time, restaurants have benefited from a shift away from cooking at home towards dine-in or delivery meals from restaurants, which has resulted in an increase in sales by restaurants.[23] This shift has been particularly pronounced with younger generations, as younger consumers spend significantly more compared to older consumers on both on-premise and off-premise restaurant dining.[24] We believe this shift towards dine-in and delivery meals will continue.

In addition to the shift towards dine-in and delivery meals, consumer spending on restaurants and other consumer foodservices has moved in recent years towards off-premise consumption, with the proportion of food consumed off-premise increasing from 44% of food and beverage spend in 2009 to 50%, or $302.6 billion, in 2019.[25] We believe that this off-premise opportunity will continue to grow. Fifty-eight percent of all adults and 70% of millennials say that they are more likely to have restaurant food delivered than they were two years ago,[26] and we believe the COVID-19 pandemic has further accelerated these trends. We believe the improving value proposition of local logistics platforms, including DoorDash, with wider selection than ever before, increasing convenience, and lower consumer fees has contributed to increasing off-premise consumption, and we expect this trend to accelerate, particularly in today's convenience economy. Across industries, including travel and retail, we have seen an increasing shift from in-store to online spend and we expect to see the same trend with food. We believe that online food delivery logistics is still in the early stages of consumer adoption and, over time, online spend will represent an increasing portion of total consumer spend on restaurants and other consumer foodservices. Through our Marketplace (which includes Pickup and DoorDash for Work) and Drive offerings, we expect to address and capture an increasing share of consumers' off-premise spend. In 2019, we generated Marketplace GOV of $8.0 billion, which represented less than three percent of the $302.6 billion off-premise opportunity.

[22] Euromonitor International Limited. Consumer foodservices include cafes and bars, full-service restaurants, limited-service restaurants, self-service cafeterias, and street stalls and kiosks. See the section titled "Industry, Market, and Other Data."
[23] U.S. Department of Agriculture, America's Eating Habits: Food Away From Home, September 2018. See the section titled "Industry, Market, and Other Data."
[24] U.S. Department of Agriculture; see the section titled "Industry, Market, and Other Data."
[25] Euromonitor International Limited; see the section titled "Industry, Market, and Other Data."
[26] National Restaurant Association, 2020 State of the Restaurant Industry, February 2020. See the section titled "Industry, Market, and Other Data."

Table of Contents

We started our business with a strategic focus on suburban markets and smaller metropolitan areas. According to Edison Trends, the U.S. local food delivery logistics category is larger in smaller metropolitan areas than in the top tier of metropolitan areas and is growing faster.[27]



We believe that suburban markets and smaller metropolitan areas have experienced significantly higher growth compared to larger metropolitan markets because these smaller markets have been historically underserved by merchants and platforms that enable on-demand delivery. Accordingly, residents in these markets are more acutely impacted by the lack of alternatives and the inconvenience posed by distance and the need to drive to merchants, and therefore consumers in these markets derive greater benefit from on-demand delivery. Additionally, suburban markets are attractive as consumers in these markets are more likely to be families who order more items per order. Lighter traffic and easier parking also mean that Dashers can serve these markets more efficiently. As a result of our early focus on and experience with suburban markets and smaller metropolitan areas, we are particularly well positioned for continued growth in these markets.

While the majority of our business today is in the United States, we have a strong and growing business in Canada and have also recently launched in Australia. We expect further international expansion to build on the massive market opportunity that is already available to us.

To date, the substantial majority of our merchants have been restaurants. We started with food because of the size and footprint of the merchant base and because we were attracted to the unique complexities of delivering food. Food is a large market with peaks and troughs of demand over the course of the day, which leads to periods of high demand during short windows of time. Focusing on restaurants enabled us to build a high-density network and improve the cost-effectiveness of our local logistics platform. We believe our expertise in food will help us scale to other verticals as more and more local businesses beyond restaurants seek to participate in the convenience economy in search of more consumers and continued growth.

With increasing consumer adoption of technology-enabled solutions in every facet of modern life, we believe that there will be increasing demand for local logistics services by merchants in industry verticals beyond food. We have already started to serve merchants in other verticals, such as grocery

---

[27] Edison Trends; see the section titled "Industry, Market, and Other Data." Edison Trends has categorized metropolitan areas into tiers based on population size, and the growth of gross monthly food sales on on-demand delivery platforms is significantly higher in tiers with smaller metropolitan areas than in the top tier. Gross monthly food sales are calculated for the months of October 2019 and October 2020 based on food sales on DoorDash, Caviar, Grubhub, Postmates, Uber Eats, and certain other platforms. The tiers are defined as follows:
- Tier 1 – New York, Los Angeles, Chicago, Philadelphia, Washington D.C., San Francisco, Boston.
- Tier 2 – The next 43 metropolitan areas by population.
- Tier 3 – The next 50 metropolitan areas by population.
- Tier 4 – All other metropolitan areas with a population greater than 100,000.
- Other – All other geographic areas.

10

424B4

Table of Contents

and flowers, but we are still in the very early stages of expanding beyond food. We have just begun our journey and have ample opportunity for continued success in local logistics across verticals and geographies. Our ambition is to empower all types of local businesses, from single proprietors to franchisees, convenience stores to grocers, and florists to pharmacies.

### OUR GROWTH STRATEGY

We intend to broaden our network of merchants by providing innovative services that help merchants grow.

- **More merchants.** We have experienced tremendous success serving merchants, primarily in the food vertical, and there are many more that we have yet to reach. We will continue to invest in our go-to-market strategy and sales efforts to continue adding new merchants. Over time, we plan to add more merchants from verticals outside of food.

- **More merchant services.** We provide a range of services to help our merchants operate and grow their businesses. We will continue to innovate and introduce new services to add value for our merchants and unlock additional revenue opportunities for DoorDash.

We seek to increase consumer adoption and have DoorDash become a daily activity.

- **More consumers.** We plan to continue to increase our consumer reach, both in the United States and internationally.

- **More consumer engagement.** In the food vertical, we strive to increase the frequency with which consumers use DoorDash by increasing the breadth of restaurant selection, expanding the availability of meals at all times of the day, addressing the needs of business consumers, and enhancing affordability by increasing DashPass adoption. In addition, as we continue to add new verticals beyond food, we expect to further increase the amount of consumer spend on our platform and broaden the benefits of DashPass.

We seek to build a reliable, high quality, and operationally efficient logistics network.

- **Better consumer experience.** Our goal is to delight consumers, thereby promoting their use of our platform and making it easier for us to acquire new consumers. We continue to make investments aimed at improving the consumer experience. We are particularly focused on building tools to help Dashers improve the quality of items delivered and the speed and timeliness of delivery, without sacrificing selection.

- **Better Dasher experience.** We also invest in improving Dasher experience and satisfaction. This includes improving onboarding and enabling Dashers to sign up and start earning faster.

- **Improve operational efficiency.** We are focused on optimizing our cost structure primarily through product improvements meant to enhance the operational efficiency and quality of our local logistics platform.

11

Table of Contents

### OUR RESPONSE TO COVID-19

The COVID-19 pandemic has challenged all of our constituents. We viewed the pandemic as a situation that required rapid and bold action to support our communities and help our constituents on the path to recovery. The pandemic has demonstrated how vital we are to the communities in which we operate. Prior to the pandemic, we played a significant role in connecting merchants to new consumers and driving incremental sales, providing selection, experience, and value to consumers, and offering economic opportunity to those looking for income. With the pandemic, our platform has become a lifeline for merchants whose only revenue options are take-out and delivery, for consumers sheltering in place, particularly vulnerable populations whose health depends on isolating, and for many of the millions of newly unemployed in need of earnings opportunities.

We have mobilized quickly to help our community.

- **Supporting Merchants.** We have provided a significant amount of financial support to merchants through reduced commissions. We also provided sales and marketing solutions for merchants and launched initiatives to support merchant growth.

- **Supporting Dashers.** We provided personal safety equipment to Dashers and implemented no-contact delivery as the default delivery option. We also provided financial assistance to certain eligible Dashers.

- **Supporting our Community.** From March through September 2020, we powered over 270,000 deliveries of meals to vulnerable community members and introduced new social impact programs.

The COVID-19 pandemic has made our mission more important than ever, and we are striving to help communities meet their challenges and become stronger.

### Our Capital Structure

Upon the closing of this offering, we will have three classes of common stock. Our Class A common stock, which is the stock we are offering by means of this prospectus, has one vote per share, our Class B common stock has 20 votes per share, and our Class C common stock has no voting rights, except as otherwise required by law. Upon the closing of this offering, our Co-Founders will together hold all of the issued and outstanding shares of our Class B common stock. Accordingly, upon the closing of this offering, Tony Xu, our co-founder, Chief Executive Officer, and a member of our board of directors, Andy Fang, our co-founder, Head of Consumer Engineering, and a member of our board of directors, and Stanley Tang, our co-founder, Head of DoorDash Labs, and a member of our board of directors, will hold approximately 69% of the voting power of our outstanding capital stock in the aggregate, which voting power may increase over time as our Co-Founders exercise or vest in equity awards outstanding at the time of the completion of this offering. If all such equity awards held by our Co-Founders had been exercised or vested and exchanged for shares of Class B common stock as of the date of the completion of this offering, our Co-Founders would collectively hold 79% of the voting power of our outstanding capital stock. Our Co-Founders have also entered into a voting agreement and irrevocable proxy, or the Voting Agreement, whereby Mr. Xu will have the authority (and irrevocable proxy) to direct the vote and vote the shares of Class B common stock held by Messrs. Fang and Tang, and their respective permitted entities and permitted transferees, at his discretion on all matters to be voted upon by stockholders. As a result, Mr. Xu will be able to determine or significantly influence any action requiring the approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction.

12

Table of Contents

Shares of our Class C common stock, which entitle the holder to zero votes per share, will not be issued and outstanding at the closing of the offering and we have no current plans to issue shares of Class C common stock. These shares will be available to be used in the future to further strategic initiatives, such as financings or acquisitions, or issue future equity awards to our service providers. Because the shares of Class C common stock have no voting rights (except as otherwise required by law), the issuance of such shares will not result in further dilution to the voting power held by our Co-Founders, in particular, Mr. Xu. Further, one of the events that will result in the final conversion of all of the outstanding shares of Class B common stock is the first date after the completion of this offering that the number of shares of capital stock, including Class A common stock, Class B common stock and Class C common stock, as well as shares of capital stock underlying equity awards or other convertible instruments, held by Mr. Xu and his permitted entities and permitted transferees is less than 35% of the Class B common stock held by Mr. Xu and his permitted entities as of immediately prior to the completion of this offering, which we sometimes refer to herein as the 35% Ownership Threshold. Because shares of Class C common stock will be counted when determining whether the 35% Ownership Threshold has been met, the issuance of shares of Class C common stock to Mr. Xu could prolong the duration of Mr. Xu's control of our voting power and his ability to elect all of our directors and to determine the outcome of most matters submitted to a vote of our stockholders by delaying the final conversion of the Class B common stock.

The multi-class structure of our common stock is intended to ensure that, for the foreseeable future, Mr. Xu continues to control or significantly influence the governance of the company which we believe will permit us to continue to prioritize our long-term goals rather than short-term results, to enhance the likelihood of stability in the composition of our board of directors and its policies, and to discourage certain types of transactions that may involve an actual or threatened acquisition of the company. This multi-class structure is intended to preserve this control until Mr. Xu departs the company or the 35% Ownership Threshold is no longer met.

**Risk Factors Summary**

Our business is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors" immediately following this prospectus summary. These risks include the following:

- We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful;

- We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to maintain or increase profitability in the future;

- We may not continue to grow on pace with historical rates;

- If Dashers are reclassified as employees under federal or state law, our business, financial condition, and results of operations would be adversely affected;

- We face intense competition and if we are unable to compete effectively, our business, financial condition, and results of operations would be adversely affected;

- If we fail to retain our existing merchants and consumers or acquire new merchants and consumers in a cost-effective manner, our revenue may decrease and our business, financial condition, and results of operations could be adversely affected;

- If we fail to cost-effectively attract and retain Dashers or to increase the use of our platform by existing Dashers, our business, financial condition, and results of operations could be adversely affected;

13

Table of Contents

- We rely on merchants on our platform for many aspects of our business, and any failure by them to maintain their service levels or any changes to their operating costs could adversely affect our business;

- We are subject to claims, lawsuits, investigations, and various proceedings, and face potential liability, expenses for legal claims, and harm to our business based on the nature of our business;

- Our business is subject to a variety of U.S. laws and regulations, including those related to worker classification, Dasher pay, and pricing and commissions, many of which are unsettled and still developing, and failure to comply with such laws and regulations could subject us to claims or otherwise adversely affect our business, financial condition, or results of operations;

- We expect a number of factors to cause our results of operations to fluctuate on a quarterly and annual basis, which may make it difficult to predict our future performance;

- Systems failures and resulting interruptions in the availability of our website, mobile application, or platform could adversely affect our business, financial condition, and results of operations;

- The COVID-19 pandemic, or a similar public health threat, could adversely affect our business, financial condition, and results of operations;

- We have identified a material weakness in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our consolidated financial statements or cause us to fail to meet our periodic reporting obligations;

- The trading price of our Class A common stock may be volatile, and you could lose all or part of your investment; and

- The multi-class structure of our common stock and the Voting Agreement between the Co-Founders will have the effect of concentrating voting power with Tony Xu, our co-founder, Chief Executive Officer, and a member of our board of directors, which will limit your ability to influence the outcome of matters submitted to our stockholders for approval, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction. Future issuances of our Class C common stock, if any, will not dilute the voting control of Mr. Xu, but will dilute his economic interest which could cause his interests to conflict with your interests. Further, the issuance of shares of Class C common stock, whether to Mr. Xu or to other stockholders, could prolong the duration of Mr. Xu's voting control.

**Channels for Disclosure of Information**

Investors, the media, and others should note that, following the completion of this offering, we intend to announce material information to the public through filings with the SEC, the investor relations page on our website, press releases, public conference calls, webcasts, and our corporate blog at www.blog.doordash.com.

The information disclosed by the foregoing channels could be deemed to be material information. As such, we encourage investors, the media, and others to follow the channels listed above and to review the information disclosed through such channels.

Any updates to the list of disclosure channels through which we will announce information will be posted on the investor relations page on our website.

14

Table of Contents

**Corporate Information**

We were incorporated in 2013 as Palo Alto Delivery Inc., a Delaware corporation. In 2015, we changed our name to DoorDash, Inc. Our principal executive offices are located at 303 2nd Street, South Tower, 8th Floor, San Francisco, California 94107, and our telephone number is (650) 487-3970. Our website address is www.doordash.com. Information contained on, or that can be accessed through, our website does not constitute part of this prospectus and inclusions of our website address in this prospectus are inactive textual references only. You should not consider information contained on our website to be part of this prospectus or in deciding whether to purchase shares of our Class A common stock.

"DoorDash," our logo, and our other registered or common law trademarks, service marks, or trade names appearing in this prospectus are the property of DoorDash, Inc. Other trademarks and trade names referred to in this prospectus are the property of their respective owners.

**JOBS Act**

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of specified reduced reporting requirements that are otherwise applicable generally to public companies. These reduced reporting requirements include:

- the requirement to present only two years of audited financial statements and only two years of related management's discussion and analysis in this prospectus;

- an exemption from compliance with the auditor attestation requirement on the effectiveness of our internal control over financial reporting;

- reduced disclosure about our executive compensation arrangements; and

- an exemption from the requirements to obtain a non-binding advisory vote on executive compensation or stockholder approval of any golden parachute arrangements.

We may take advantage of these provisions until we are no longer an emerging growth company. We would cease to be an emerging growth company upon the earliest to occur of: (i) the last day of the fiscal year in which we have more than $1.07 billion in annual revenue; (ii) the date we qualify as a large accelerated filer, with at least $700 million of equity securities held by non-affiliates; (iii) the date on which we have, in any three-year period, issued more than $1.0 billion in non-convertible debt securities; and (iv) the last day of the fiscal year ending after the fifth anniversary of this offering. We may choose to take advantage of some but not all of these reduced reporting burdens. We have taken advantage of certain reduced reporting burdens in this prospectus. Accordingly, the information contained herein may be different than the information you receive from other public companies in which you hold stock.

The JOBS Act permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to use this extended transition period until we are no longer an emerging growth company or until we affirmatively and irrevocably opt out of the extended transition period. As a result, our consolidated financial statements may not be comparable to the financial statements of companies that comply with new or revised accounting pronouncements as of public company effective dates.

See the section titled "Risk Factors—Risks Related to this Offering and Ownership of Our Class A Common Stock—We are an emerging growth company and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our Class A common stock less attractive to investors."

15

424B4

Table of Contents

<div style="border">

**THE OFFERING**

| | |
|---|---|
| Class A common stock offered by us | 33,000,000 shares |
| Class A common stock to be outstanding after this offering | 286,343,071 shares |
| Class B common stock to be outstanding after this offering | 31,313,450 shares |
| Class C common stock to be outstanding after this offering | None |
| Class A, Class B, and Class C common stock to be outstanding after this offering | 317,656,521 shares |
| Use of proceeds | We estimate that the net proceeds to us from the sale of shares of our Class A common stock in this offering will be approximately $3.27 billion, based upon the initial public offering price of $102.00 per share and after deducting underwriting discounts and commissions and our estimated offering expenses. |
| | The principal purposes of this offering are to increase our capitalization and financial flexibility, create a public market for our Class A common stock, and enable access to the public equity markets for us and our stockholders. We intend to use the net proceeds we receive from this offering for general corporate purposes, including working capital, operating expenses, and capital expenditures. Additionally, we may use a portion of the net proceeds to acquire or invest in businesses, products, services, or technologies. However, we do not have agreements or commitments for any material acquisitions or investments at this time. We may use a portion of the net proceeds we receive from this offering to fund a $200 million pledge, as part of our Main Street Strong program, to support merchants, Dashers, and local communities. We may also use a portion of the net proceeds to satisfy a portion of our anticipated tax withholding and remittance obligations related to the vesting and settlement of restricted stock units, or RSUs, that we have granted. See the section titled "Use of Proceeds" for additional information. |
| Voting rights | Shares of our Class A common stock are entitled to one vote per share. |
| | Shares of our Class B common stock are entitled to 20 votes per share. |

</div>

16

Table of Contents

Shares of our Class C common stock have no voting rights, except as otherwise required by law.

Holders of our Class A common stock and Class B common stock will generally vote together as a single class, unless otherwise required by law or our amended and restated certificate of incorporation. Upon the completion of this offering, Tony Xu, our co-founder, Chief Executive Officer, and a member of our board of directors, Andy Fang, our co-founder, Head of Consumer Engineering, and a member of our board of directors, and Stanley Tang, our co-founder, Head of DoorDash Labs, and a member of our board of directors, or collectively, our Co-Founders, will hold approximately 69% of the voting power of our outstanding capital stock in the aggregate, which voting power may increase over time as our Co-Founders exercise or vest in equity awards outstanding at the time of the completion of this offering. If all such equity awards held by our Co-Founders (including the CEO Performance Award referenced below) had been exercised or vested and exchanged for shares of Class B common stock as of the date of the completion of this offering, our Co-Founders would collectively hold 79% of the voting power of our outstanding capital stock. Our Co-Founders have also entered into the Voting Agreement, which will cover an aggregate of approximately 69% of the voting power of our outstanding capital stock following this offering. Under the Voting Agreement, Mr. Xu will have the authority (and irrevocable proxy) to direct the vote and vote the shares of Class B common stock held by Messrs. Fang and Tang, and their respective permitted entities and permitted transferees, at his discretion on all matters to be voted upon by stockholders. See the sections titled "Principal Stockholders" and "Description of Capital Stock" for additional information.

New York Stock Exchange trading symbol          "DASH"

The number of shares of our Class A common stock, Class B common stock, and Class C common stock that will be outstanding after this offering is based on 253,343,071 shares of our Class A common stock, 31,313,450 shares of our Class B common stock, and no shares of our Class C common stock outstanding as of September 30, 2020, and reflects:

- 238,988,545 shares of redeemable convertible preferred stock that will automatically convert into 239,274,936 shares of Class A common stock immediately prior to the completion of this offering pursuant to the terms of our amended and restated certificate of incorporation. We refer to this conversion of redeemable convertible preferred stock into Class A common stock as the Capital Stock Conversion;

- 14,068,135 shares of Class A common stock outstanding, which number of shares excludes the shares being exchanged in the Class B Stock Exchange described below; and

- 31,313,450 shares of Class B common stock, which reflects shares of our Class A common stock outstanding beneficially owned by our Co-Founders and certain related entities as of

17

424B4

Table of Contents

September 30, 2020 that will be exchanged for an equivalent number of shares of our Class B common stock immediately prior to the completion of this offering pursuant to the terms of certain exchange agreements, or the Class B Stock Exchange.

The shares of our Class A and Class B common stock outstanding as of September 30, 2020 exclude the following:

- 34,554,510 shares of our Class A common stock issuable upon the exercise of options to purchase shares of our Class A common stock outstanding as of September 30, 2020, with a weighted-average exercise price of $2.41 per share;

- 20,021,420 shares of our Class A common stock subject to RSUs outstanding as of September 30, 2020;

- 14,003,990 shares of our Class A common stock subject to RSUs that were granted after September 30, 2020 (including 10,379,000 shares subject to RSUs that were granted to Mr. Xu, or the CEO Performance Award, that vest upon the satisfaction of a service condition and achievement of certain stock price goals);

- 105,330 shares of our Class A common stock issued upon the exercise of a warrant to purchase Class A common stock after September 30, 2020, with an exercise price of $1.492 per share;

- any shares of our Class A common stock issuable upon conversion of our convertible notes, or our Convertible Notes;[28] and

- 39,722,785 shares of our Class A common stock reserved for future issuance under our equity compensation plans, consisting of:

  - 32,493,000 shares of our Class A common stock reserved for future issuance under our 2020 Equity Incentive Plan, or our 2020 Plan, which became effective prior to the completion of this offering;

  - 731,185 shares of our Class A common stock reserved for future issuance under our 2014 Stock Plan, or our 2014 Plan, which number of shares are being added to the shares of our Class A common stock reserved for future issuance under our 2020 Plan upon its effectiveness, at which time we ceased granting awards under our 2014 Plan; and

  - 6,498,600 shares of our Class A common stock reserved for future issuance under our 2020 Employee Stock Purchase Plan, or our ESPP, which became effective prior to the completion of this offering.

Our 2020 Plan and our ESPP each provides for annual automatic increases in the number of shares of our Class A common stock reserved thereunder and our 2020 Plan also provides for increases to the number of shares that may be granted thereunder based on any shares of our Class A common stock granted pursuant to awards under our 2014 Plan that expire, are tendered to or withheld by us for payment of an exercise price or for satisfying our tax withholding and remittance obligations, or are forfeited or otherwise repurchased by us, as more fully described in the section titled "Executive Compensation—Employee Benefit and Stock Plans."

---

[28] For more information, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Convertible Notes."

Table of Contents

Following the completion of this offering, and pursuant to equity exchange right agreements to be entered into between us and our Co-Founders, or the Equity Award Exchange Agreements, each of our Co-Founders shall have a right (but not an obligation) to require us to exchange any shares of Class A common stock received upon the exercise of options to purchase shares of Class A common stock or the vesting and settlement of RSUs related to shares of Class A common stock for an equivalent number of shares of Class B common stock. We refer to this right as the Equity Award Exchange. The Equity Award Exchange applies only to equity awards granted to our Co-Founders prior to the effectiveness of the filing of our amended and restated certificate of incorporation. As of September 30, 2020, there were (i) 11,927,795 shares of our Class A common stock subject to options held by our Co-Founders that may be exchanged, upon exercise, for an equivalent number of shares of our Class B common stock following this offering and (ii) 312,030 shares of our Class A common stock subject to RSUs held by our Co-Founders that may be exchanged, upon vesting and settlement, for an equivalent number of shares of our Class B common stock following this offering. In addition, in November 2020, our board of directors granted the CEO Performance Award, an RSU award under our 2014 Plan to Tony Xu covering 10,379,000 shares of our Class A common stock, which shares may be exchanged, upon vesting and settlement of the CEO Performance Award, for an equivalent number of shares of our Class B common stock following this offering.

Except as otherwise indicated, all information in this prospectus assumes:

- a five-for-one forward split of our capital stock effected on November 9, 2020, including a proportional increase in the authorized shares of our capital stock, with all share, option, RSU, warrant, and per share information for all periods presented in this prospectus adjusted to reflect such forward split on a retroactive basis;

- the Capital Stock Conversion will occur immediately prior to the completion of this offering;

- the filing and effectiveness of our amended and restated certificate of incorporation in Delaware and the effectiveness of our amended and restated bylaws will each occur immediately prior to the completion of this offering and will effect the reclassification of our common stock into Class A common stock, or the Reclassification;

- the Class B Stock Exchange will occur immediately prior to the completion of this offering; and

- no exercise of outstanding stock options or warrants or settlement of outstanding RSUs subsequent to September 30, 2020.

19

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL AND OTHER DATA

The following tables summarize our consolidated financial and other data. We have derived the summary consolidated statements of operations data for the years ended December 31, 2018 and 2019 from our audited consolidated financial statements included elsewhere in this prospectus. We have derived the summary consolidated statements of operations data for the nine months ended September 30, 2019 and 2020 and the consolidated balance sheet data as of September 30, 2020 from our unaudited interim consolidated financial statements that are included elsewhere in this prospectus. We have prepared the unaudited interim consolidated financial statements on the same basis as the audited consolidated financial statements and have included all adjustments, consisting only of normal recurring adjustments that, in management's opinion, are necessary to state fairly the information set forth in those consolidated financial statements. Our historical results are not necessarily indicative of the results that may be expected in the future and our results for the nine months ended September 30, 2020 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2020 or any other period. The following summary consolidated financial and other data should be read in conjunction with the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Non-GAAP Financial Measures" and our consolidated financial statements and related notes included elsewhere in this prospectus. The summary consolidated financial and other data in this section are not intended to replace, and are qualified in their entirety by, our consolidated financial statements and related notes thereto included elsewhere in this prospectus.

**Consolidated Statements of Operations Data**

| | Year Ended December 31, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2019 | 2020 |
| | (in millions, except share amounts which are reflected in thousands, and per share data) | | | |
| Revenue | $ 291 | $ 885 | $ 587 | $ 1,916 |
| Costs and expenses[1]: | | | | |
| Cost of revenue, exclusive of depreciation and amortization | 228 | 523 | 353 | 899 |
| Sales and marketing | 135 | 594 | 445 | 610 |
| Research and development | 51 | 107 | 73 | 112 |
| General and administrative | 78 | 245 | 179 | 337 |
| Depreciation and amortization[2] | 9 | 32 | 16 | 89 |
| Total costs and expenses | 501 | 1,501 | 1,066 | 2,047 |
| Loss from operations | (210) | (616) | (479) | (131) |
| Interest income | 7 | 18 | 14 | 6 |
| Interest expense | (1) | — | — | (22) |
| Other expense, net | — | (68) | (67) | — |
| Loss before income taxes | (204) | (666) | (532) | (147) |
| Provision for income taxes | — | 1 | 1 | 2 |
| Net loss | (204) | (667) | (533) | (149) |
| Premium paid on repurchase of redeemable convertible preferred stock | (3) | — | — | — |
| Deemed dividend to preferred stockholders | — | (1) | (1) | — |
| Net loss attributable to common stockholders | $ (207) | $ (668) | $ (534) | $ (149) |
| Net loss per share attributable to common stockholders, basic and diluted[3] | $ (4.67) | $ (15.44) | $ (12.41) | $ (3.34) |
| Weighted-average number of shares outstanding used to compute net loss per share attributable to common stockholders, basic and diluted[3] | 44,305 | 43,252 | 43,045 | 44,568 |

20

Table of Contents

| | Year Ended December 31, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | *(in millions, except share amounts which are reflected in thousands, and per share data)* | | | |
| Pro forma net loss per share, basic and diluted(3) | | $ (2.57) | | $ (0.53) |
| Weighted-average number of shares outstanding used to compute pro forma net loss per share, basic and diluted(3) | | 259,956 | | 283,145 |

(1)    Costs and expenses include stock-based compensation expense as follows:

| | Year Ended December 31, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | *(in millions)* | | | |
| Cost of revenue, exclusive of depreciation and amortization | $ 3 | $ 2 | $ 2 | $ 1 |
| Sales and marketing | 3 | 2 | 2 | 1 |
| Research and development | 11 | 8 | 6 | 5 |
| General and administrative | 7 | 6 | 4 | 4 |
| Total stock-based compensation expense | $ 24 | $ 18 | $ 14 | $ 11 |

(2)    Depreciation and amortization related to the following:

| | Year Ended December 31, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | *(in millions)* | | | |
| Cost of revenue | $ 8 | $ 27 | $ 15 | $ 73 |
| Sales and marketing | 1 | 3 | 1 | 10 |
| Research and development | — | 1 | — | 4 |
| General and administrative | — | 1 | — | 2 |
| Total depreciation and amortization | $ 9 | $ 32 | $ 16 | $ 89 |

(3)    See Note 15 to our consolidated financial statements included elsewhere in this prospectus for an explanation of the calculations of our basic and diluted net loss per share attributable to common stockholders, pro forma net loss per share, and the weighted-average number of shares used in the computation of the per share amounts.

**Consolidated Balance Sheet Data**

| | September 30, 2020 | | |
|---|---|---|---|
| | Actual | Pro Forma(2) | Pro Forma as Adjusted(3) |
| | | *(in millions)* | |
| Cash, cash equivalents, and marketable securities | $ 1,611 | $ 1,611 | $ 4,886 |
| Working capital(1) | $ 1,156 | $ 1,156 | $ 4,434 |
| Total assets | $ 2,874 | $ 2,874 | $ 6,138 |
| Convertible notes | $ 355 | $ 355 | $ 355 |
| Total liabilities | $ 1,441 | $ 1,441 | $ 1,438 |
| Redeemable convertible preferred stock | $ 2,646 | $ — | $ — |
| Additional paid-in capital | $ 87 | $ 2,976 | $ 6,243 |
| Accumulated deficit | $(1,301) | $ (1,544) | $ (1,544) |
| Total stockholders' (deficit) equity | $(1,213) | $ 1,433 | $ 4,700 |

(1)    Working capital is defined as current assets less current liabilities.
(2)    The pro forma consolidated balance sheet data gives effect to (i) the Capital Stock Conversion, as if such conversion had occurred on September 30, 2020, (ii) the filing and effectiveness of our amended and restated certificate of incorporation, and

Table of Contents

(iii) an increase to additional paid-in capital and accumulated deficit related to stock-based compensation expense of $243 million associated with RSUs for which the service-based vesting condition was satisfied as of September 30, 2020 and for which the liquidity event-related performance vesting condition was satisfied upon the effectiveness of the registration statement of which this prospectus forms a part. Payroll tax withholding and remittance obligations have not been included in the pro forma adjustments, as further described in Note 2 to our consolidated financial statements included elsewhere in this prospectus. Subject to certain conditions which we do not expect to be satisfied until after this offering, the Convertible Notes will automatically convert into shares of our Class A common stock unless we elect to settle such conversion in cash pursuant to the terms of the Convertible Notes. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Convertible Notes" for additional information about the Convertible Notes.

(3) The pro forma as adjusted column in the consolidated balance sheet data table above gives effect to (i) the pro forma adjustments set forth above and (ii) the sale and issuance by us of 33,000,000 shares of our Class A common stock in this offering, based upon the initial public offering price of $102.00 per share and after deducting underwriting discounts and commissions and estimated offering expenses payable by us, of which $8 million had been paid as of September 30, 2020 and $3 million had been accrued as of September 30, 2020.

### Key Business and Non-GAAP Metrics

In addition to the measures presented in our consolidated financial statements, we use the following key business and non-GAAP metrics to help us evaluate our business, identify trends affecting our business, formulate business plans, and make strategic decisions:

| | Year Ended December 31, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2019 | 2020 |
| | *(in millions, except percentages)* | | | |
| Total Orders | 83 | 263 | 181 | 543 |
| Marketplace GOV | $ 2,812 | $ 8,039 | $ 5,537 | $16,485 |
| Contribution Profit (Loss)[1] | $ (59) | $ (200) | $ (190) | $ 433 |
| *Contribution Margin*[1] | *(20)%* | *(23)%* | *(32)%* | *23 %* |
| *Contribution Profit (Loss) as a % of Marketplace GOV* | *(2)%* | *(2)%* | *(3)%* | *3 %* |
| Adjusted EBITDA[1] | $ (158) | $ (475) | $ (372) | $ 95 |
| *Adjusted EBITDA Margin*[1] | *(54)%* | *(54)%* | *(63)%* | *5 %* |
| *Adjusted EBITDA as a % of Marketplace GOV* | *(6)%* | *(6)%* | *(7)%* | *1 %* |

(1) Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin are non-GAAP financial measures. For more information regarding our use of these measures and reconciliations to the most directly comparable financial measures calculated in accordance with GAAP, see the section titled "Non-GAAP Financial Measures."

See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Business and Non-GAAP Metrics" for a description of Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin.

With the COVID-19 pandemic, we have experienced a significant increase in revenue, Total Orders, and Marketplace GOV due to increased consumer demand for delivery, more merchants using our platform to facilitate both delivery and take-out, and improved efficiency of our local logistics platform. The circumstances that have accelerated the growth of our business stemming from the effects of the COVID-19 pandemic may not continue in the future, and we expect the growth rates in revenue, Total Orders, and Marketplace GOV to decline in future periods.

22

Table of Contents

## RISK FACTORS

*Investing in our Class A common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, including the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Non-GAAP Financial Measures" and our consolidated financial statements and related notes, before making a decision to invest in our Class A common stock. Our business, financial condition, results of operations, or prospects could also be harmed by risks and uncertainties not currently known to us or that we currently do not believe are material. If any of the risks actually occur, our business, financial condition, results of operations, and prospects could be adversely affected. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business and Operations

**We have a limited operating history in an evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful.**

We launched operations in 2013 and we have since frequently expanded our platform features and services and changed our pricing methodologies. This limited operating history and our evolving business make it difficult to evaluate our future prospects and the risks and challenges we may encounter. These risks and challenges include our ability to:

- accurately forecast our revenue and plan our operating expenses;

- increase the number of and retain existing merchants, consumers, and Dashers using our platform;

- successfully compete with current and future competitors;

- successfully expand our business in existing markets and enter new markets and geographies;

- anticipate and respond to macroeconomic changes and changes in the markets in which we operate;

- maintain and enhance the value of our reputation and brand;

- adapt to rapidly evolving trends in the ways merchants and consumers interact with technology;

- avoid interruptions or disruptions in our service;

- develop a scalable, high-performance technology infrastructure that can efficiently and reliably handle increased usage, as well as the deployment of new features and services;

- hire, integrate, and retain talented technology, sales, customer service, and other personnel;

- effectively manage rapid growth in our personnel and operations; and

- effectively manage our costs related to Dashers.

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this "Risk Factors" section, our business, financial condition, and results of operations could be adversely affected. Further, because we have limited historical financial data and operate in a rapidly evolving market, any predictions about our future revenue and expenses may not be as accurate as they would be if we had a longer operating history or operated in a more predictable market. We have encountered in the past, and will encounter in the future, risks and uncertainties frequently experienced by growing companies with limited operating

23

Table of Contents

histories in rapidly changing industries. If our assumptions regarding these risks and uncertainties, which we use to plan and operate our business, are incorrect or change, or if we do not address these risks successfully, our results of operations could differ materially from our expectations and our business, financial condition, and results of operations could be adversely affected.

### *We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to maintain or increase profitability in the future.*

Although we generated net income of $23 million for the three months ended June 30, 2020, we have incurred net losses in each year since our founding, we anticipate increasing expenses in the future, and we may not be able to maintain or increase profitability in the future. We incurred a net loss of $667 million and $149 million in the year ended December 31, 2019 and the nine months ended September 30, 2020, respectively, and, as of December 31, 2019 and September 30, 2020, we had an accumulated deficit of $1.2 billion and $1.3 billion, respectively. We expect our costs will increase over time and our losses to continue as we expect to invest significant additional funds towards growing our business and operating as a public company. We have expended and expect to continue to expend substantial financial and other resources on developing our platform, including expanding our platform offerings, developing or acquiring new platform features and services, expanding into new markets and geographies, and increasing our sales and marketing efforts. These efforts may be more costly than we expect and may not result in increased revenue or growth in our business. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from maintaining or increasing profitability or positive cash flow on a consistent basis. If we are unable to successfully address these risks and challenges as we encounter them, our business, financial condition, and results of operations could be adversely affected.

Following the completion of this offering, the stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods, in particular in the quarter in which the offering is completed. Additionally, we may expend substantial funds in connection with the tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs. For more information, see "—The stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods and we may also expend substantial funds to satisfy a portion of our tax withholding and remittance obligations that arise upon the initial settlement of certain of our RSUs, which may have an adverse effect on our financial condition and results of operations."

If we are unable to generate adequate revenue growth and manage our expenses, we may continue to incur significant losses in the future and may not be able to maintain or increase profitability.

### *We may not continue to grow on pace with historical rates.*

We have grown rapidly over the last several years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance. In 2018 and 2019, our revenue was $291 million and $885 million, respectively, representing a 204% growth rate. For the nine months ended September 30, 2019 and 2020, our revenue was $587 million and $1.9 billion, respectively, representing a 226% growth rate. In addition, with the COVID-19 pandemic, we have experienced a significant increase in revenue, Total Orders, and Marketplace GOV. The circumstances that have accelerated the growth of our business stemming from the effects of the COVID-19 pandemic may not continue in the future, and we expect the growth rates in revenue, Total Orders, and Marketplace GOV to decline in future periods. You should not rely on our revenue or key business metrics for any previous quarterly or annual period as any indication of our revenue, revenue growth, key business metrics, or key business metrics growth in future periods. In particular, our revenue growth rate has fluctuated in prior periods. We expect our revenue growth rate to continue to fluctuate over the

24

424B4

Table of Contents

short term and decline in the long term. Our revenue growth rate may decline in future periods as the size of our business grows and as we achieve higher market adoption rates. We may also experience declines in our revenue growth rate as a result of a number of factors, including slowing demand for our platform, insufficient growth in the number of channels, consumers, and Dashers that utilize our platform, increasing competition, a decrease in the growth of our overall market, our failure to continue to capitalize on growth opportunities, increasing regulatory costs, and the maturation of our business, among others. We also expect to continue to make investments in the development and expansion of our business, which may not result in increased revenue or growth. In addition, we have strategically focused on suburban markets and smaller metropolitan areas since our founding because of the opportunity that these markets have presented for our local logistics platform. If the demand for local logistics platforms does not continue to grow in these markets, or if we are unable to maintain our category share in these markets, our revenue growth rate could be adversely affected. If our revenue growth rate declines, investors' perceptions of our business and the trading price of our Class A common stock could be adversely affected.

*We face intense competition and if we are unable to compete effectively, our business, financial condition, and results of operations would be adversely affected.*

The markets in which we operate are intensely competitive and characterized by shifting user preferences, fragmentation, and frequent introductions of new services and offerings. In particular, local food delivery logistics, the largest category of our business today, is fragmented and intensely competitive. In the United States, we compete with other local food delivery logistics companies, such as Uber Eats, Grubhub, and Postmates, chain merchants that have their own online ordering platforms, pizza companies, such as Domino's, other merchants that own and operate their own delivery fleets, grocers and grocery delivery services, and companies that provide point of sale solutions and merchant delivery services. As we continue to expand our presence internationally, we will also face competition from local incumbents in these markets. In addition, we compete with traditional offline ordering channels, such as take-out offerings, telephone, and paper menus that merchants distribute to consumers as well as advertising that merchants place in local publications to attract consumers. Changing traditional ordering habits is difficult, and if merchants and consumers do not embrace the transition to local food delivery logistics as we expect, our business, financial condition, and results of operations could be adversely affected.

Our current and future competitors may enjoy competitive advantages, such as greater name recognition, longer operating histories, greater category share in certain markets, market-specific knowledge, established relationships with local merchants and larger existing user bases in certain markets, more successful marketing capabilities, and substantially greater financial, technical, and other resources than we have. Greater financial resources and product development capabilities may allow these competitors to respond more quickly to new or emerging technologies and changes in merchant, consumer, and Dasher preferences that may render our platform less attractive or obsolete. If certain merchants choose to partner with our competitors in a specific geographic market, or if merchants choose to engage exclusively with our competitors, we may lack a sufficient variety and supply of merchant options or lack access to the most popular merchants, such that our offering would become less appealing to consumers. Our competitors may also make acquisitions or establish cooperative or other strategic relationships among themselves or with others, including merchants. For example, Uber announced that it has entered into a definitive agreement to acquire Postmates, Just Eat Takeaway, a European local logistics platform, announced that it has entered into a definitive agreement to acquire Grubhub, and Lyft announced a partnership with Grubhub that allows Lyft's loyalty-program members free delivery from Grubhub restaurants. In addition, certain of our competitors have recently acquired kitchens to enable them to produce and deliver food directly to consumers. Our competitors could also introduce new offerings with competitive price and performance characteristics or undertake more aggressive marketing campaigns than ours. Additionally, many of our competitors are well capitalized and offer discounted services, lower merchant commission rates and consumer fees, incentives for independent contractors who provide

25

Table of Contents

delivery services and consumer discounts and promotions, innovative platforms and offerings, and alternative pay models, which may be more attractive than those that we offer. Such competitive pressures may lead us to maintain or lower our commission rates and fees or maintain or increase our incentives, discounts, and promotions in order to remain competitive, particularly in markets where we do not have a leading position. Such efforts have negatively affected, and will continue to negatively affect, our financial performance, and there is no guarantee that such efforts will be successful. Further, the markets in which we compete have attracted significant investments from a wide range of funding sources, and we anticipate that many of our competitors will continue to be highly capitalized. These investments, along with the other competitive advantages discussed above, may allow our competitors to continue to lower their prices and fees, or increase the incentives, discounts, and promotions they offer, and compete more effectively against us. Delivery logistics services for food and the other verticals in which we compete are nascent, and we cannot guarantee that they will stabilize at a competitive equilibrium that will allow us to maintain or increase profitability. As we expand to verticals beyond food, we may compete with large Internet companies with substantial resources, users, and brand power, such as Amazon and Google. Further, merchants could determine that it is more cost-effective to develop their own platforms to offer online pickup and delivery rather than use our platform.

In addition, within our industry, the cost to switch between offerings is low. Consumers have a propensity to shift to the lowest-cost provider and could use more than one local logistics platform, independent contractors who provide delivery services could use multiple platforms concurrently as they attempt to maximize earnings, and merchants could prefer to use the local logistics platform that offers the lowest commission rates and adopt more than one platform to maximize their volume of orders. As we and our competitors introduce new offerings and as existing offerings evolve, we expect to become subject to additional competition. In addition, our competitors may adopt certain of our platform features or may adopt innovations that merchants, consumers, or Dashers value more highly than ours, which would render our platform less attractive and reduce our ability to differentiate our platform. Increased competition could result in, among other things, a reduction of the revenue we generate from the use of our platform, the number of platform users, the frequency of use of our platform, and our margins.

For all of these reasons, we may not be able to compete successfully. If we lose existing merchants, consumers, or Dashers that utilize our platform, fail to attract new merchants, consumers, or Dashers, or are forced to reduce our commission rate or make pricing concessions as a result of increased competition, our business, financial condition, and results of operations would be adversely affected.

***If we fail to retain our existing merchants and consumers or acquire new merchants and consumers in a cost-effective manner, our revenue may decrease and our business, financial condition, and results of operations could be adversely affected.***

We believe that growth of our business and revenue is dependent on our ability to continue to cost-effectively grow our platform by retaining our existing merchants and consumers and adding new merchants and consumers, including in new markets. The increase in merchants attracts more consumers to our platform and the increase in consumers attracts more merchants. This network takes time to build and may grow slower than we expect or than it has grown in the past. In particular, our national brand partnerships are a key component of our strategy to provide a wide selection for consumers. If we fail to retain either our existing merchants, especially our most popular merchants and our national brand partners, or consumers, the value of our network would be diminished. In addition, we expect to continue to incur substantial expenses to acquire additional merchants and consumers. In expanding our operations into new markets to acquire additional merchants and consumers, we may be placed into unfamiliar competitive environments, and we may invest significant resources with the possibility that the return on such investments will not be achieved for several years or at all. We cannot assure you that the revenue from the merchants and consumers we acquire will ultimately exceed the cost of acquisition.

26

Table of Contents

In addition, if merchants on our platform were to cease operations, temporarily or permanently, or face financial distress or other business disruption, or if our relationships with merchants on our platform deteriorate, we may not be able to provide consumers with sufficient merchant selection. This risk is particularly pronounced with restaurants, as each year a significant percentage of restaurants go out of business, and in markets where we have fewer merchants. In addition, if we are unsuccessful in attracting and retaining popular merchants, if merchants enter into exclusive arrangements with our competitors, if we fail to negotiate satisfactory terms with merchants, or if we ineffectively manage our relationships with merchants, our business, financial condition, and results of operations could be adversely affected. Our agreements with partner merchants generally remain in effect until terminated by partner merchants or us. Based on the type of partner agreement, partner merchants may generally terminate their agreements with us by providing us at least seven or 30 days advance notice and such agreements do not generally provide for any exclusivity. In the event that our partner merchants terminate their agreements with us, the merchant selection available on our local logistics platform could be adversely affected. Changes to our business and to our relationships with some of our constituents may also impact our ability to attract and retain other constituents. For example, the increased growth of our subscription product, DashPass, and how compelling this offering is to consumers, depends on our ability to sign up eligible merchants to DashPass. Additionally, many of our consumers initially access our platform to take advantage of certain promotions, such as discounts and other reduced fees. We strive to demonstrate the value of our platform and offerings to such consumers, thereby encouraging them to access our platform regularly or subscribe as a paid user of DashPass, through prompts and notifications and time-limited trials of DashPass and other offerings. However, these consumers may never convert to a paid subscription to DashPass or access our platform after they take advantage of our promotions. If we are not able to continue to expand our consumer base or fail to convert our consumers to regular paying consumers, demand for our full-price or paid services, such as DashPass, and our revenue may grow slower than expected or decline.

Further, certain consumers are indirect users of our platform, as they place orders through third-party websites and applications, such as Google, and merchant websites. Consumers may perceive these third-party websites and applications to be more efficient or user-friendly or have a stronger brand affinity to these third parties. If consumers increasingly use such third-party websites and applications to make orders on our platform, rather than through our website and consumer mobile application directly, our ability to establish relationships and build brand loyalty with consumers, collect information about consumer trends and preferences, and provide a customized experience based on such preferences would be adversely affected. This in turn could impact our ability to attract and retain consumers and adversely affect our business, financial condition, and results of operations.

***If we fail to cost-effectively attract and retain Dashers or to increase the use of our platform by existing Dashers, our business, financial condition, and results of operations could be adversely affected.***

Our continued growth depends in part on our ability to cost-effectively attract and retain Dashers who satisfy our screening criteria and procedures and to increase use of our platform by existing Dashers. To attract and retain Dashers, we have, among other things, offered monetary incentives and perquisites, such as credits to be used for orders on our platform, free DoorDash-branded apparel, and access to Dasher Experience Centers where Dashers can receive assistance with pressing issues, meet other Dashers, and participate in special events. If we do not continue to provide Dashers with flexibility on our platform, compelling opportunities to earn income, and other incentive programs that are comparable or superior to those of our competitors, we may fail to attract new Dashers or retain existing Dashers or increase their use of our platform. For example, if merchants and consumers choose to use competing offerings, we may lack sufficient opportunities for Dashers to earn, which may reduce the perceived utility of our platform and impact our ability to attract and retain Dashers. We also frequently test Dasher incentives with subsets of existing Dashers and potential Dashers, and these incentives could fail to attract and retain Dashers or fail to increase use of our platform by existing Dashers or could have other unintended adverse consequences. In addition, changes in certain laws and regulations,

27

Table of Contents

including immigration and labor and employment laws, may result in a decrease in the pool of Dashers, which may result in increased competition for Dashers or higher costs of recruitment and engagement. Other factors outside of our control, such as increases in the price of gasoline, vehicles, or insurance, may also reduce the number of Dashers that utilize our platform or the use of our platform by Dashers. Our agreements with Dashers generally remain in effect until terminated by Dashers or us. Dashers may generally terminate their agreements with us by providing us at least seven days advance notice (or at-will in the case of Caviar couriers) and such agreements do not provide for any exclusivity. If we fail to attract Dashers or retain existing Dashers on favorable terms, if we fail to increase the use of our platform by existing Dashers, or if Dashers terminate their agreements with us, we may not be able to meet the demand of merchants and consumers and our business, financial condition, and results of operations could be adversely affected.

***We rely on merchants on our platform for many aspects of our business, and any failure by them to maintain their service levels or any changes to their operating costs could adversely affect our business.***

We rely upon merchants on our platform, including small and local independent businesses, to provide quality goods to our consumers. If these merchants experience difficulty servicing consumer demand, producing quality goods, or meeting our other requirements or standards, or experience problems with their point-of-sale or other technologies, our reputation and brand could be damaged. Further, an increase in merchant operating costs could cause merchants on our platform to raise prices, renegotiate commission rates, or cease operations, which could in turn adversely affect our operational costs and efficiency, and if merchants on our platform were to cease operations, temporarily or permanently, we may not be able to provide consumers with sufficient merchant selection, which we expect would reduce the number of consumers on our platform. Many of the factors affecting merchant operating costs, including off-premise costs and prices, are beyond the control of merchants and include inflation, costs associated with the goods provided, labor and employee benefit costs, rent costs, and energy costs. Additionally, if merchants try to pass along increased operating costs and raise prices to consumers, order volume may decline, which we expect would adversely affect our financial condition and results of operations.

***We expect a number of factors to cause our results of operations to fluctuate on a quarterly and annual basis, which may make it difficult to predict our future performance.***

Our results of operations have historically varied from period to period, and we expect that our results of operations will continue to vary significantly from quarter to quarter and year to year because of a variety of factors, many of which are outside of our control. As a result, comparing our results of operations on a period-to-period basis may not be meaningful. In addition to other risk factors described elsewhere in this "Risk Factors" section, factors that may contribute to the variability of our quarterly and annual results include:

- our ability to attract and retain merchants, consumers, and Dashers that utilize our platform in a cost-effective manner;

- our ability to accurately forecast revenue and appropriately plan expenses;

- the effects of increased competition on our business;

- our ability to successfully expand in existing markets and successfully enter new markets;

- changes in consumer behavior with respect to on-demand delivery;

- increases in marketing, sales, and other operating expenses that we may incur to grow and acquire new merchants, consumers, and Dashers;

- our business mix between Marketplace and Drive;

28

Table of Contents

- the proportion of consumers that subscribe to DashPass;

- the impact of worldwide economic conditions, including the resulting effect on consumer spending on on-demand delivery;

- the seasonality of our business, particularly with respect to local food delivery logistics, including the effect of academic calendars on college campuses and seasonal patterns in restaurant dining;

- the impact of weather on our business;

- our ability to maintain an adequate rate of growth and effectively manage that growth;

- our ability to maintain and increase traffic to our platform;

- the effects of changes in search engine placement and prominence;

- our ability to keep pace with technology changes in our industry;

- the success of our sales and marketing efforts;

- the effects of negative publicity on our business, reputation, or brand;

- our ability to protect, maintain, and enforce our intellectual property;

- costs associated with defending claims, including intellectual property infringement claims, and related judgments or settlements;

- changes in governmental or other regulations affecting our business, including regulations regarding the classification of Dashers that utilize our platform and regulations impacting the commission rates we charge to merchants;

- interruptions in service and any related impact on our business, reputation, or brand;

- the attraction and engagement of qualified employees and key personnel;

- our ability to choose and effectively manage third-party service providers;

- the effects of natural or man-made catastrophic events;

- the impact of a pandemic or an outbreak of disease or similar public health concern, such as the recent COVID-19 pandemic, or fear of such an event;

- the effectiveness of our internal control over financial reporting;

- the impact of payment processor costs and procedures;

- changes in the online payment transfer rate; and

- changes in our tax rates or exposure to additional tax liabilities.

The variability and unpredictability of our results of operations could result in our failure to meet our expectations or those of analysts that cover us or investors with respect to revenue or other results of operations for a particular period. If we fail to meet or exceed such expectations, the market price of our Class A common stock could fall substantially, and we could face costly lawsuits, including securities class action suits.

***Systems failures and resulting interruptions in the availability of our website, mobile application, or platform could adversely affect our business, financial condition, and results of operations.***

It is critical to our success that merchants, consumers, and Dashers be able to access our platform at all times. Our systems, or those of third parties upon which we rely, may experience service interruptions or

29

424B4

Table of Contents

degradation or other performance problems because of hardware and software defects or malfunctions, distributed denial-of-service and other cyberattacks, infrastructure changes, human error, earthquakes, hurricanes, floods, fires, natural disasters, power losses, disruptions in telecommunications services, fraud, military or political conflicts, terrorist attacks, computer viruses, ransomware, malware, or other events. Our systems also may be subject to break-ins, sabotage, theft, and intentional acts of vandalism, including by our own employees. Some of our systems are not fully redundant and our disaster recovery planning may not be sufficient for all eventualities. Our business interruption insurance may not be sufficient to cover all of our losses that may result from interruptions in our service as a result of systems failures and similar events.

We have experienced and will likely continue to experience system failures and other events or conditions from time to time that interrupt the availability or reduce or affect the speed or functionality of our platform. These system failures generally occur either as a result of software updates being deployed with unexpected errors or as a result of temporary infrastructure failures related to storage, network, or compute capacity being exhausted. These events have resulted in losses in revenue, though such losses have not been material to date. System failures in the future could result in significant losses of revenue. Moreover, we have in the past voluntarily provided credits in the amount of less than $1 million in 2018 and $12 million in 2019 to consumers on our platform to compensate them for the inconvenience caused by a system failure or similar event, including for orders that are delivered late or orders that are cancelled by us or the merchant, and may voluntarily provide similar such credits in the future. In addition, the affected user could seek monetary recourse from us for their losses and such claims, even if unsuccessful, would likely be time-consuming and costly for us to address. Further, in some instances, we may not be able to identify the cause or causes of these performance problems within an acceptable period of time. A prolonged interruption in the availability or reduction in the availability, speed, or other functionality of our platform could adversely affect our business and reputation and could result in the loss of users.

***The COVID-19 pandemic, or a similar public health threat, could adversely affect our business, financial condition, and results of operations.***

The current outbreak of COVID-19 has globally resulted in loss of life, business closures, restrictions on travel, and widespread cancellation of social gatherings. The extent to which the COVID-19 pandemic impacts our business will depend on future developments, which are highly uncertain and cannot be predicted at this time, including:

- new information which may emerge concerning the severity of the disease;

- the duration and spread of the outbreak;

- the severity of travel restrictions imposed by geographic areas in which we operate, mandatory or voluntary business closures;

- regulatory actions taken in response to the pandemic, which may impact merchant operations, consumer and merchant pricing, Dasher pay, and our product offerings;

- other business disruptions that affect our workforce;

- the impact on capital and financial markets; and

- actions taken throughout the world, including in markets in which we operate, to contain the COVID-19 outbreak or treat its impact.

In response to the COVID-19 pandemic, we have taken active measures to promote health and safety, including providing for no-contact delivery, distributing masks, hand sanitizer, and gloves to Dashers in affected areas, and working closely with merchants to share safety guidelines. However, our efforts may

30

Table of Contents

not be successful and we may not have sufficient protection or recovery plans to continue to deal with the COVID-19 pandemic or similar public health threats in the future. In connection with public health threats, we may also be required to temporarily close our corporate offices and have our employees work remotely, as we have done in connection with the COVID-19 pandemic, which impacts productivity and otherwise disrupts our business operations. In addition, the current outbreak of COVID-19 has resulted in a widespread global health crisis and adversely affected global economies and financial markets, and similar public health threats could do so in the future. Such events have impacted, and could in the future impact, demand for merchants and consumer purchase patterns, which in turn, could adversely affect our revenue and results of operations.

With the COVID-19 pandemic, we have experienced a significant increase in revenue, Total Orders, and Marketplace GOV due to increased consumer demand for delivery, more merchants using our platform to facilitate both delivery and take-out, and improved efficiency of our local logistics platform. The circumstances that have accelerated the growth of our business stemming from the effects of the COVID-19 pandemic may not continue in the future, and we expect the growth rates in revenue, Total Orders, and Marketplace GOV to decline in future periods.

Furthermore, if a virus or other disease is transmitted by human contact, as is the case with COVID-19, our employees and any constituent of our network may become infected, or may choose, or be advised, to avoid any contact with others, any of which may adversely affect our ability to provide our platform and for merchants, consumers, and Dashers to use our platform. In addition, shelter-in-place orders and similar regulations impact merchants' ability to operate their businesses, consumers' ability to pick up orders, and Dashers' ability to make deliveries during certain times, or at all. Further, demand from businesses that typically place large orders for their employees or in-person meetings may be significantly reduced. With the COVID-19 pandemic, our DoorDash for Work offering has been limited to providing large group orders solely to businesses that are deemed essential and we have also temporarily paused catering orders. Such events have in the past caused, and may in the future cause, a temporary closure of merchants' businesses, either due to government mandate or voluntary preventative measures, and many of our merchants may not be able to withstand prolonged interruptions to their businesses, and may be forced to go out of business. Even if merchants are able to continue to operate their businesses, many may operate with limited hours, menus, and capacity and other limitations. Any limitations on or disruptions or closures of merchants' businesses could impact the selection available on our platform, disrupt our ability to operate our local logistics platform, and adversely affect our business.

Even if a virus or other disease does not spread significantly and such measures are not implemented, the perceived risk of infection or significant health risk may adversely affect our business. Merchants may be perceived as unsafe during such public health threats, even for order delivery or pickup. If the services offered through our platform or at other businesses in our industry become a significant risk for transmitting COVID-19 or similar public health threats, or if there is a public perception that such risk exists, demand for the use of our platform would be adversely affected. Any negative impact on consumers' willingness or ability to order delivery or complete a Pickup order, or on Dashers' willingness or ability to make deliveries, could adversely affect our business, financial condition, and results of operations.

To the extent the COVID-19 pandemic or a similar public health threat has an impact on our business, it is likely to also have the effect of heightening many of the other risks described in this "Risk Factors" section.

31

Table of Contents

***Our pricing methodologies are impacted by a number of factors and ultimately may not be successful in attracting and retaining merchants, consumers, and Dashers.***

Demand for our platform is highly sensitive to a range of factors, including the price of the goods delivered, the amount of compensation and gratuities required to attract and retain Dashers, incentives paid to Dashers, and the fees and commissions we charge merchants and consumers. Many factors, including operating costs, legal and regulatory requirements, constraints or changes, and our current and future competitors' pricing and marketing strategies, could significantly affect our pricing strategies. For example, in connection with the COVID-19 pandemic, jurisdictions across the United States, including New Jersey, Washington, jurisdictions within Los Angeles County, California, San Francisco, California, Chicago, Illinois, and New York, New York, have implemented temporary commission caps on local food delivery logistics platforms. These commission caps have had in the past, and are likely to have in the future, an adverse effect on our results of operations. These commission caps have also caused, and may in the future cause, us to increase the fees we charge to consumers, though we are aware of one jurisdiction which has adopted explicit prohibitions against doing so in connection with commission caps, which could further increase our costs. With the continued duration of COVID-19, we expect these existing commission caps to persist in the near term and for additional jurisdictions where we operate to implement similar caps. If any of these events occur, or if commission caps are retained after the COVID-19 pandemic subsides, our business, financial condition, and results of operations could be further adversely affected. In addition, regulatory scrutiny or action may create different or conflicting obligations on us from one jurisdiction to another, which creates additional challenges to managing our business. Certain of our competitors offer, or may in the future offer, lower-priced or a broader range of offerings. Similarly, certain competitors may use marketing strategies that enable them to attract or retain new merchants, consumers, and Dashers at a lower cost than us. There can be no assurance that we will not be forced, through competition, regulation, or otherwise, to reduce the price of delivery for consumers, increase the incentives we pay to Dashers that utilize our platform, or further reduce the fees and commissions we charge merchants, or to increase our marketing and other expenses to attract and retain merchants, consumers, and Dashers in response to competitive pressures. We have launched, and may in the future launch, new pricing strategies and initiatives, such as subscription products like DashPass, and Dasher or consumer loyalty programs, or modify existing pricing methodologies, any of which may not ultimately be successful in attracting and retaining merchants, consumers, or Dashers. Further, our consumers' price sensitivity may vary by geographic location, and as we expand, our pricing methodologies may not enable us to compete effectively in these locations. In particular, our continued international expansion may require us to change our pricing strategies and to adjust to different cultural norms, including with respect to consumer pricing and gratuities. While we do and will attempt to set prices based on our prior operating experience and merchant, consumer, and Dasher feedback and engagement levels, our assessments may not be accurate or there may be errors in the technology used in our pricing and we could be underpricing or overpricing our services. In addition, if the services on our platform change, then we may need to revise our pricing methodologies.

***We face certain risks associated with our pay model for Dashers.***

Our pay model for Dashers, particularly with respect to tips for Dashers, has previously led, and may continue to lead, to negative publicity, lawsuits, and government inquiries. For example, under our former Dasher pay model, we would increase the amount paid to Dashers on a delivery in cases when a consumer left little or no tip. Although this "boost" pay was intended to help Dashers by making every delivery economically worthwhile, it also had the unintended effect of causing some people to be under the misimpression that not all tips were being received by Dashers. Government authorities have also brought claims against us related to our former Dasher pay model and may bring similar claims in the future. For example, on November 19, 2019, the District of Columbia filed an action in the Superior Court of the District of Columbia alleging violations of the District of Columbia's Consumer Protection Procedures Act with respect to our former Dasher pay model and on November 24, 2020, the parties filed a joint motion for entry of consent order and judgment to resolve the litigation. We could face similar claims related to our former Dasher pay model from other government authorities in the future.

Table of Contents

The incorrect understanding or perception of our former Dasher pay model by some led, and may continue to lead, to some consumers providing lower tips, or no tips at all, to Dashers, which could impact the amount that Dashers are able to earn on our platform and our ability to attract and retain Dashers. We have also launched, and may in the future launch, certain changes to the rates and fee structure for Dashers that utilize our platform, which may not ultimately be successful in attracting and retaining Dashers. For example, in September 2019, we changed our Dasher pay model to include (i) a base pay amount for each order, which depends on the estimated time, distance, and desirability of the order, (ii) promotions for orders that meet certain conditions, including bonuses for Dashers who meet specific goals, and (iii) tips from consumers, which Dashers receive 100% on top of base pay and promotions. The base pay amount, any promotions, and any tips that the consumer chooses to include at checkout are shown to Dashers when they are offered a delivery.

We increased the amount we pay to Dashers per order when we changed to our current pay model, but our current Dasher pay model may also cause less consistency in earnings across deliveries in some cases. Further, this pay model may lead to negative publicity related to perceptions of the complexity of the pay model, inconsistency in earnings for Dashers, and lack of flexibility in the ways consumers can leave tips, and as a result, we may not be successful in attracting and retaining merchants, consumers, and Dashers. In the future, based on a variety of factors, including legal and regulatory changes, we may change our pay model again. Our current pay model, and any future changes to our pay model or our ability to cost-effectively acquire and retain Dashers, could result in an increase to the fees we charge to consumers, which in turn could affect our ability to attract and retain consumers, and could adversely affect our business, financial condition, and results of operations.

Further, while we maintain that Dashers that utilize our platform are independent contractors, there is a risk that Dashers may be reclassified as employees under federal or state law. As discussed further below, we have been involved in and continue to be involved in numerous legal proceedings related to Dasher classification, and such proceedings have increased in volume since the California Supreme Court's 2018 ruling in *Dynamex Operations West, Inc. v. Superior Court*, or Dynamex, including an action brought by the San Francisco District Attorney in June 2020. In addition, an increasing number of jurisdictions are considering implementing standards similar to the test set forth in Dynamex to determine worker classification. For example, the California Legislature passed legislation, California Assembly Bill 5, or AB 5, and it was signed into law by Governor Gavin Newsom on September 18, 2019 and became effective on January 1, 2020. AB 5 codified the Dynamex standard regarding contractor classification, expanded its application, and created numerous carve-outs. We, along with certain other companies, supported a campaign for a 2020 ballot initiative in California to address AB 5 and preserve flexibility for Dashers, or the 2020 California ballot initiative. As of December 8, 2020, unofficial election results indicate that this initiative is likely to pass. In such case, certain provisions regarding compensation, along with certain other requirements, will become applicable to us and Dashers in California and our costs related to Dashers will increase in California, which could lead us to charge higher fees and commissions, which in turn could result in lower order volumes. As such, the passage of the 2020 California ballot initiative is likely to have an adverse impact on our results of operations. In addition, several other states where we operate may be considering adopting legislation similar to the 2020 California ballot initiative, which we would expect to increase our costs related to Dashers in such jurisdictions and could also adversely impact our results of operations. Even with the passage of the 2020 California ballot initiative and similar legislation, such initiatives and legislation could still be challenged and subject to litigation. In addition, we could face further challenges to the classification of Dashers that utilize our platform as independent contractors as other states where we operate are considering adopting similar legislation or regulations. A reclassification of Dashers or delivery service providers using a local logistics platform as employees could require us to revise our pricing methodologies and pay model to account for such a change to Dasher classification, and to make other substantive internal adjustments to account for any transition of a Dasher to an employment position, which would have an adverse impact on our business, financial condition, and results of operations.

33

Table of Contents

***We are committed to expanding our platform and enhancing the DoorDash experience, which may not maximize short-term financial results and may yield results that conflict with the market's expectations, which could result in our stock price being adversely affected.***

We are passionate about expanding our platform and continually enhancing the DoorDash experience, with a focus on driving long-term engagement through innovation, the expansion of our platform and services, and providing high-quality support, which may not necessarily maximize short-term financial results. We frequently make business decisions that may reduce our short-term financial results if we believe that the decisions are consistent with our goals to improve the DoorDash experience, which we believe will improve our financial results over the long term. These decisions may not be consistent with the short-term expectations of our stockholders and may not produce the long-term benefits that we expect, in which case our growth, business, financial condition, and results of operations could be adversely affected.

***If we fail to manage our growth effectively, our brand, business, financial condition, and results of operations could be adversely affected.***

Since 2013, we have experienced rapid growth in our employee headcount, the number of users on our platform, our geographic reach, and our operations, and we expect to continue to experience growth in the future. For example, the number of our full-time employees has increased from 1,032 as of December 31, 2018 to 2,600 as of December 31, 2019. Employee growth has occurred both at our San Francisco headquarters and in a number of our offices across the United States and internationally. This growth has placed, and may continue to place, substantial demands on management and our operational and financial infrastructure. For example, in connection with the audit of our consolidated financial statements as of and for the years ended December 31, 2018 and 2019, we and our independent registered public accounting firm identified a material weakness in our internal control over financial reporting. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our consolidated financial statements that could result in a restatement of our financial statements, and could cause us to fail to meet our reporting obligations, any of which could diminish investor confidence in us and could cause a decline in the price of our Class A common stock. We will need to continue to improve our operational and financial infrastructure in order to manage our business effectively and accurately report our results of operations.

As with many companies in our growth stage, a majority of our employees have been with us for fewer than 24 months. We have made, and intend to continue to make, substantial investments in our technology, customer service, and sales and marketing infrastructure. Our ability to manage our growth effectively and to integrate new employees, technologies, and acquisitions into our existing business will require us to continue to expand our operational and financial infrastructure and to continue to effectively integrate, develop, and motivate a large number of new employees, while maintaining the beneficial aspects of our culture. Continued growth could challenge our ability to develop and improve our operational, financial, and management controls, enhance our reporting systems and procedures, recruit, train, and retain highly skilled personnel, and maintain user satisfaction. Additionally, if we do not manage the growth of our business and operations effectively, the quality of our platform and the efficiency of our operations could suffer, which could adversely affect our reputation and brand, business, financial condition, and results of operations.

***Growth of our business will depend on a strong reputation and brand and any failure to maintain, protect, and enhance our brand would hurt our ability to retain or expand our base of merchants, consumers, and Dashers and our ability to increase their level of engagement.***

We believe that building a strong reputation and brand and continuing to increase the strength of the local network effects among the merchants, consumers, and Dashers that use our platform are critical to

34

Table of Contents

our ability to attract and retain all three constituencies and increase their engagement with our platform and will only become more important as competition in our industry further intensifies. Successfully maintaining, protecting, and enhancing our reputation and brand and increasing the local network effects of our platform will depend on the success of our marketing efforts, our ability to provide consistent, high-quality services and support, and our ability to successfully secure, maintain, and defend our rights to use the "DoorDash" mark, our logo, and other trademarks important to our brand, as well as a number of other factors, many of which are outside our control. We believe that our paid marketing initiatives have been critical in promoting awareness of our platform, which in turn drives new consumer growth and engagement, but future marketing efforts may not be successful or cost-effective. Our consumers have a wide variety of options for delivery of goods, including other local logistics platforms and services, and consumer preferences may also change from time to time. To expand our consumer base, we must appeal to new consumers who may have historically used other methods of delivering goods or other local logistics platforms.

Our reputation, brand, and ability to build trust with existing and new merchants, consumers, and Dashers may be adversely affected by complaints and negative publicity about us, our platform, merchants, and Dashers that utilize our platform or our competitors' platforms, even if factually incorrect or based on isolated incidents. Negative perception of our platform or company may harm our reputation, brand, and local network effects, including as a result of:

- complaints or negative publicity about us, our platform, Dashers, merchants, consumers, or our policies and guidelines, including Dasher pay;

- missing or incorrect items, inaccurate orders, or cancelled orders;

- fraud;

- illegal, negligent, reckless, or otherwise inappropriate behavior by users or third parties;

- food tampering or inappropriate or unsanitary food preparation, handling, or delivery;

- a pandemic or an outbreak of disease, such as the recent COVID-19 pandemic, in which constituents of our network become infected;

- a failure to provide Dashers with a sufficient level of orders or to pay Dashers competitively;

- a failure to offer consumers competitive pricing and delivery times;

- a failure to provide a range of delivery options sought by consumers;

- a failure to provide environmentally friendly delivery and packaging options;

- actual or perceived disruptions to or defects in our platform or similar incidents, such as privacy or data security breaches or other security incidents, site outages, payment disruptions, or other incidents that impact the reliability of our services;

- litigation over, or investigations by regulators into, our platform;

- users' lack of awareness of, or compliance with, our policies;

- changes to our policies that users or others perceive as overly restrictive, unclear, inconsistent with our values or mission, or not clearly articulated;

- a failure to comply with legal, tax, and regulatory requirements;

- a failure to enforce our policies in a manner that users perceive as effective, fair, and transparent;

- a failure to operate our business in a way that is consistent with our values and mission;

- inadequate or unsatisfactory user support experiences;

35

Table of Contents

- illegal or otherwise inappropriate behavior by our management team or other employees or contractors;

- negative responses by merchants, consumers, or Dashers to new services on our platform;

- a failure to register and prevent misappropriation of our trademarks;

- perception of our treatment of employees, merchants, consumers, and Dashers and our response to employee, merchant, consumer, and Dasher sentiment related to political or social causes or actions of management; or

- any of the foregoing with respect to our competitors, to the extent such resulting negative perception affects the public's perception of us or our industry as a whole.

If we do not successfully develop, protect, and enhance our reputation and brand and increase the local network effects of our platform, our business may not grow, and we may not be able to compete effectively. If existing and new merchants and consumers do not perceive the delivery services provided by Dashers that utilize our platform to be reliable, safe, and affordable, or if we fail to offer new and relevant services and features on our platform, we may not be able to attract or retain merchants, consumers, or Dashers or to increase their use of our platform, any of which we expect would adversely affect our business, financial condition, and results of operations. In addition, changes we may make to enhance and improve our platform and balance the needs and interests of merchants, consumers, and Dashers that utilize our platform may be viewed positively from one group's perspective but negatively from another group's perspective, or may not be viewed positively by any group. If we fail to balance the interests of merchants, consumers, and Dashers or make changes that they view negatively, merchants, consumers, and Dashers may stop or reduce usage of our platform or use alternative platforms, any of which could adversely affect our reputation, brand, business, financial condition, and results of operations.

***Unfavorable media coverage could harm our business, financial condition, and results of operations.***

We are the subject of media coverage from time to time. Unfavorable publicity regarding our business model, pay model, user support, technology, platform changes, platform quality, delivery issues, privacy or security practices, or management team could adversely affect our reputation. Such negative publicity could also harm the size of our network and the engagement and loyalty of merchants, consumers, and Dashers that utilize our platform, which could adversely affect our business, financial condition, and results of operations. For example, we have previously received negative media coverage related to the manner in which Dashers were compensated, in particular with respect to gratuities, and concerns related to food tampering and general food safety and quality, which has adversely affected our reputation and brand. As our platform continues to scale and public awareness of our brand increases, any future issues that draw media coverage could have an amplified negative effect on our reputation and brand. In addition, negative publicity related to key brands or influencers that we have partnered with may damage our reputation, even if the publicity is not directly related to us. Any negative publicity that we may receive could diminish confidence in, and the use of, our platform, which could adversely affect our business.

***We have been subject to cybersecurity incidents in the past and anticipate being the target of future attacks. Any actual or perceived security or privacy breach could interrupt our operations, harm our brand, and adversely affect our reputation, brand, business, financial condition, and results of operations.***

Our business involves the collection, storage, processing, and transmission of personal data and other sensitive and proprietary data of our merchants, consumers, and Dashers. Additionally, we maintain sensitive and proprietary information relating to our business, such as our own proprietary information and personal data relating to our employees. An increasing number of organizations, including large

36

Table of Contents

online and off-line merchants and businesses, other large Internet companies, financial institutions, and government institutions, have disclosed breaches of their information security systems and other information security incidents, some of which have involved sophisticated and highly targeted attacks. In addition, these incidents can originate on our vendors' websites, which can then be leveraged to access our website, further preventing our ability to successfully identify and mitigate the attack. We have previously experienced these types of breaches and other incidents. For example, in September 2019, we reported an incident affecting one of our vendors that resulted in the unauthorized acquisition of certain Dashers' driver licenses as well as data related to certain of our consumers. This incident has resulted in regulatory inquiries and is the subject of litigation. To date, this incident has not resulted in a material loss of revenue or the incurrence of material expenses. We have undertaken steps to enhance our data security and governance program, which include adding additional protective security layers around the data, improving security protocols that govern access to our systems, and bringing in outside expertise to increase our ability to identify and repel threats. We cannot assure you that all potential causes of the incident have been identified and remediated or will not lead to recurrence or similar incidents. While we maintain cyber insurance that may help provide coverage for these types of incidents, we cannot assure you that our insurance will be adequate to cover costs and liabilities related to this incident.

Because techniques used to obtain unauthorized access to or to sabotage information systems change frequently and may not be known until launched against us, we may be unable to anticipate or prevent these attacks, react in a timely manner, or implement adequate preventive measures, and we may face delays in our detection or remediation of, or other responses to, security breaches and other privacy- and security-related incidents. Unauthorized parties have in the past gained access, and may in the future gain access, to systems or facilities used in our business through various means, including gaining unauthorized access into our systems or facilities or those of merchants, consumers, and Dashers that utilize our platform, attempting to fraudulently induce our employees, merchants, consumers, Dashers, or others into disclosing user names, passwords, payment card information, or other sensitive information, which may in turn be used to access our information technology, or IT, systems, or attempting to fraudulently induce our employees, merchants, or others into manipulating payment information, resulting in the fraudulent transfer of funds to bad actors.

In addition, users on our platform could have vulnerabilities on their own devices that are entirely unrelated to our systems and platform but could mistakenly attribute their own vulnerabilities to us. Further, breaches experienced by other companies may also be leveraged against us. For example, credential stuffing attacks are becoming increasingly common and sophisticated actors can mask their attacks, making them increasingly difficult to identify and prevent. We have previously experienced incidents of fraud on our platform that we believe involve credential stuffing attacks, which we have been unable to detect or prevent. Certain efforts may be state-sponsored or supported by significant financial and technological resources, making them even more difficult to detect, remediate, and otherwise respond to.

Although we have developed systems and processes that are designed to protect the data of merchants, consumers, and Dashers that utilize our platform, protect our systems, prevent data loss, and prevent other security breaches and security incidents, these security measures have not fully protected our systems in the past and cannot guarantee security in the future. The IT and infrastructure used in our business may be vulnerable to cyberattacks or security breaches, and third parties may be able to access data, including personal data and other sensitive and proprietary data of merchants, consumers, and Dashers, our employees' personal data, or our other sensitive and proprietary data, accessible through those systems. Employee error, malfeasance, or other errors in the storage, use, or transmission of any of these types of data could result in an actual or perceived privacy or security breach or other security incident. Although we have policies restricting the access to the personal information we store, there is a risk that these policies may not be effective in all cases.

37

Table of Contents

Any actual or perceived breach of privacy, or any actual or perceived security breach or other incidents, could interrupt our operations, result in our platform being unavailable, result in loss or improper access to, or acquisition or disclosure of, data, result in fraudulent transfer of funds, harm our reputation, brand, and competitive position, damage our relationships with third-party partners, or result in claims, regulatory investigations, and proceedings and significant legal, regulatory, and financial exposure, including ongoing monitoring by regulators, and any such incidents or any perception that our security measures are inadequate could lead to loss of merchant, consumer, or Dasher confidence in, or decreased use of, our platform, any of which could adversely affect our business, financial condition, and results of operations. Any actual or perceived breach of privacy or security, or other security incident, impacting any entities with which we share or disclose data (including, for example, our third-party technology providers) could have similar effects. Further, any cyberattacks or actual or perceived security and privacy breaches and other incidents directed at, or suffered by, our competitors could reduce confidence in our industry as a whole and, as a result, reduce confidence in us. We also expect to incur significant costs in an effort to detect and prevent privacy and security breaches and other privacy- and security-related incidents, and we may face increased costs and requirements to expend substantial resources in the event of an actual or perceived privacy or security breach or other incident.

Additionally, defending against claims or litigation based on any security breach or incident, regardless of their merit, could be costly and divert management's attention. We cannot be certain that our insurance coverage will be adequate for data handling or data security costs or liabilities actually incurred, that insurance will continue to be available to us on commercially reasonable terms or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have an adverse effect on our reputation, brand, business, financial condition, and results of operations.

***The markets for local food delivery logistics and our other delivery logistics services are still in relatively early stages of growth, and if these markets do not continue to grow, grow slower than we expect, or fail to grow as large as we expect, our business, financial condition, and results of operations could be adversely affected.***

The local food delivery logistics market has grown rapidly since we launched our local logistics platform in 2013, but it is still relatively new, and it is uncertain to what extent market acceptance will continue to grow, if at all. In addition, the market for the other delivery logistics services we facilitate, such as grocery delivery services, is also relatively nascent, and it is uncertain whether demand for grocery delivery services or other delivery logistics services we may facilitate in the future will continue to grow and achieve wide market acceptance, if at all. Our success will depend to a substantial extent on the willingness of people to widely adopt local food delivery logistics and the other delivery logistics services we facilitate. If the public does not perceive these services as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability, or for other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, or instead adopts alternative solutions that may arise, then the market for our platform may not further develop, may develop slower than we expect, or may not achieve the growth potential we expect, any of which could adversely affect our business, financial condition, and results of operations.

***Illegal, improper, or otherwise inappropriate activity of merchants, consumers, or Dashers, whether or not occurring while using our platform, could expose us to liability and adversely affect our business, brand, financial condition, and results of operations.***

Illegal, improper, or otherwise inappropriate activities by merchants, consumers, or Dashers, including the activities of individuals who may have previously engaged with, but are not then receiving or

38

Table of Contents

providing services offered through, our platform or individuals who are intentionally impersonating consumers or Dashers or the activities of Dashers while making deliveries to our consumers, have occurred, and in the future may occur, which could adversely affect our brand, business, financial condition, and results of operations. These activities include food tampering, inappropriate or unsanitary food preparation, handling, or delivery, assault, battery, theft, unauthorized use of credit and debit cards or bank accounts, sharing of consumer accounts, and other misconduct. Such activities may result in injuries, property damage, or loss of life for consumers and third parties, or business interruptions, reputational and brand damage, or other significant liabilities for us.

We have in the past incurred, and may in the future incur, losses from various types of fraud, including use of stolen or fraudulent credit card data, referral fraud by both consumers and Dashers, fraud with respect to background checks, attempted payments by consumers with insufficient funds, fraud committed by consumers in concert with Dashers, and account takeovers of Dasher accounts by bad actors. Bad actors use increasingly sophisticated methods to engage in illegal activities involving personal information, such as unauthorized use of another person's identity, account information, or payment information and unauthorized acquisition or use of credit or debit card details, bank account information, and mobile phone numbers. Under current credit card practices, we may be liable for orders facilitated on our platform with fraudulent credit card data, even if the associated financial institution approved the credit card transaction. Despite measures we have taken to detect and reduce the occurrence of fraudulent or other malicious activity on our platform, we cannot guarantee that any of our measures will be effective or will scale efficiently with our business. Our failure to adequately detect or prevent fraudulent transactions could harm our reputation or brand, result in litigation or regulatory action, and lead to expenses that could adversely affect our business, financial condition, and results of operations.

While we have implemented various measures intended to anticipate, identify, and address the risk of these types of activities, these measures may not adequately address or prevent all illegal, improper, or otherwise inappropriate activity by these parties from occurring and such conduct could expose us to liability, including through litigation, or adversely affect our brand or reputation. For example, Dashers whose accounts we have deactivated from our platform may nevertheless find a way to create a new account on our platform and perform deliveries. At the same time, if the measures we have taken to guard against these illegal, improper, or otherwise inappropriate activities, such as our requirement that all Dashers undergo a background check, are too restrictive and inadvertently prevent Dashers and consumers otherwise in good standing from using our platform, or if we are unable to implement and communicate these measures fairly and transparently or are perceived to have failed to do so, the growth and engagement of the number of Dashers and consumers on our platform and their use of our platform could be adversely affected. In addition, our ability to adopt measures to anticipate, identify, and address illegal, improper, or otherwise inappropriate activity may be particularly limited with our Self-Delivery service, which enables merchants on our Marketplace to fulfill orders with their own delivery fleets. These delivery providers are retained directly by merchants, and as a result, we do not conduct background checks on such providers or engage in any of the other activities that are a part of the typical onboarding process for Dashers on our platform. Further, any negative publicity related to the foregoing, whether such incident occurred on our platform or on our competitors' platforms, could adversely affect our reputation and brand or public perception of our industry as a whole, which could negatively affect demand for platforms like ours, and potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***Our platform facilitates deliveries to consumers from non-partner merchants, and we face certain risks associated with these deliveries.***

We aim to have a broad selection of merchants on our platform, which includes facilitating deliveries to consumers from non-partner merchants. Facilitating deliveries from non-partner merchants is generally

39

Table of Contents

less operationally efficient than doing so with partner merchants, as our platform is not integrated with non-partner merchants' systems. For example, for orders with most partner merchants, Dashers have an expedited checkout process that does not require a separate payment in store, but for orders with non-partner merchants, Dashers may have to place and pay for the order separately in store. As a result, we generally experience higher operational expenses for each order, more time and manual processes needed to place each order, and a higher likelihood of errors. Further, we sometimes unintentionally incorrectly price non-partner goods on our platform as a result of inaccuracies that occur when capturing menu prices. The occurrence of any errors, delays with orders, or other problems associated with facilitating deliveries with non-partner merchants could create a negative perception of our platform and cause damage to our reputation and brand. While our goal is to convert non-partner merchants into partner merchants, our inability to do so at a sufficiently high rate, or at all, could adversely affect our business, financial condition, and results of operations.

Further, some non-partner merchants may not want to be included on our platform and may request to be removed. While we honor these requests, removing non-partner merchants impacts our ability to provide a broad selection of merchants. In addition, there is a risk that non-partner merchants bring legal claims against us relating to their inclusion on our platform. For example, in 2015, In-N-Out Burger filed a complaint against us claiming unfair competition, among other claims, and sought a permanent injunction to stop us from delivering their food. There is also a risk that state or local law is enacted to prevent platforms like ours from including non-partners on the platform. For example, the California Legislature passed legislation, California Assembly Bill 2149, or AB 2149, which has been signed into law by Governor Gavin Newsom and will become effective on January 1, 2021. AB 2149 would prohibit, among other things, food delivery logistics platforms from facilitating deliveries from restaurants in California without the restaurants' prior consent. Similar prohibitions have also been enacted in Louisiana, Denver, Colorado, and Tucson, Arizona and are being contemplated in other jurisdictions. Beyond regulatory restrictions, we may also adopt internal policies that limit or prohibit the facilitation of deliveries from merchants without their prior consent. For example, in November 2020, we adopted internal policies pursuant to which we generally do not add new non-partner restaurants on our platform in the United States and such policies require the use of disclaimers with existing non-partner restaurants on our platform in the United States to inform consumers that such restaurants are not partnered with DoorDash. In the future, based on a variety of factors, including legal and regulatory changes, we may continue to revise and update our internal policies related to non-partner restaurants and other merchants. To the extent we are required or we choose to remove non-partner merchants for any reason, this will adversely affect our ability to attract and retain consumers and could directly and adversely affect our business, financial condition, and results of operations.

***If we do not continue to innovate and further develop our platform, our platform developments do not perform, or we are not able to keep pace with technological developments, we may not remain competitive and our business and results of operations could suffer.***

Our success depends in part on our ability to continue to innovate and further develop our platform. To remain competitive, we must continuously enhance and improve the functionality and features of our platform, including our website and mobile applications and the suite of merchant services that we offer through our platform. If we fail to expand the suite of merchant services that we offer through our platform, or if we fail to continuously enhance and improve our existing merchant services, our ability to retain and acquire merchants could be adversely affected. If competitors introduce new offerings embodying new technologies, or if new industry standards and practices emerge, our existing technology, services, website, and mobile applications may become obsolete. Our future success could depend on our ability to respond to technological advances and emerging industry standards and practices in a cost-effective and timely manner.

We have scaled our business rapidly and significant new platform features and services have in the past resulted in, and in the future may continue to result in, operational challenges affecting our business.

40

Table of Contents

Developing and launching enhancements to our platform and new services on our platform may involve significant technical risks and upfront capital investments that may not generate return on investment. We may use new technologies ineffectively, or we may fail to adapt to emerging industry standards. If we face material delays in introducing new or enhanced platform features and services or if our recently introduced offerings do not perform in accordance with our expectations, the merchants, consumers, and Dashers that utilize our platform may forego the use of our services in favor of those of our competitors.

### Our marketing efforts to help grow our business may not be effective.

Promoting awareness of our platform is important to our ability to grow our business and to attract new merchants, consumers, and Dashers and can be costly. We believe that much of the growth in the number of merchants, consumers, and Dashers that utilize our platform is attributable to our paid marketing initiatives. Our marketing efforts currently include referrals, affiliate programs, free or discount trials, partnerships, display advertising, television, billboards, radio, video, direct mail, social media, email, podcasts, hiring and classified advertisement websites, mobile "push" communications, search engine optimization, and keyword search campaigns. Our marketing initiatives may become increasingly expensive and generating a meaningful return on these initiatives may be difficult. Even if we successfully increase revenue as a result of our paid marketing efforts, it may not offset the additional marketing expenses we incur. If our marketing efforts to help grow our business are not effective, we expect that our business, financial condition, and results of operations would be adversely affected.

### Any failure to offer high-quality support may harm our relationships with merchants, consumers, and Dashers and could adversely affect our business, financial condition, and results of operations.

Our ability to attract and retain merchants, consumers, and Dashers is dependent in part on our ability to provide high-quality support. Merchants, consumers, and Dashers depend on our support organization to resolve any issues relating to our platform. We rely on third-parties to provide some support services and our ability to provide effective support is partially dependent on our ability to attract and retain third-party service providers who are not only qualified to support users of our platform but are also well versed in our platform. As we continue to grow our business and improve our offerings, we will face challenges related to providing high-quality support services at scale. Additionally, as we continue to grow our international business and the number of international users on our platform, our support organization will face additional challenges, including those associated with delivering support in languages other than English. Any failure to maintain high-quality support, or a market perception that we do not maintain high-quality support, could harm our reputation and adversely affect our ability to scale our platform and business, our financial condition, and results of operations.

### If we fail to maintain or improve the cost-effectiveness of our local logistics platform, our business, financial condition, and results of operations could be adversely affected.

Our ability to provide a cost-effective local logistics platform depends on a number of factors, including Dasher efficiency and Dasher pay. Dasher efficiency relies on the technology that powers our local logistics platform and while we continue to make significant investments to improve the efficiency and sophistication of our technology, including enhancements to demand prediction, forecasting food preparation times at merchants, and optimizing our routing and batching algorithms, there is no guarantee that such efforts will be successful and produce the resulting gains in efficiency to our platform that we expect, or at all. Dasher pay is a major component of the cost of our business and subject to a number of risks, including changes to our Dasher pay model. The cost effectiveness of our local logistics platform would also be adversely affected if our operational and technological improvements do not reduce the number of defective orders and accordingly our cost of revenue and refunds and credits. If we are unable to maintain or improve the cost effectiveness of our local logistics

41

Table of Contents

platform, including with respect to Dasher efficiency and Dasher pay, our business, financial condition, and results of operations could be adversely affected.

### We experience significant seasonal fluctuations in our financial results, which could cause our Class A common stock price to fluctuate.

Our business is highly dependent on consumer spending and Dasher behavior patterns that have an impact on our growth and expenses. We generally experience changes in consumer activity over the course of the calendar year, although our rapid growth and the impact of the COVID-19 pandemic has made, and may continue to make, seasonal fluctuations difficult to detect. For example, consumer activity can be impacted by colder or more inclement weather, which typically increases consumer demand, and warmer or sunny weather, which typically decreases consumer demand. In addition, the number of available Dashers generally decreases during periods of inclement weather, but consumer demand during these times requires us to have more Dashers available to fulfill orders. During these times, we rely on incentive pay to attract sufficient Dashers to maintain the quality of our platform, which increases our costs. Further, severe weather in certain areas can cause businesses, including restaurants, to close, and make it impossible for Dashers to make deliveries if roads are closed or difficult to drive on. In addition, we benefit from increased order volume in our campus markets when school is in session, and we experience a decrease in order volume when school is not in session and during summer breaks and other vacation periods, causing a similar decrease in Dasher pay. Seasonality will likely cause fluctuations in our financial results on a quarterly basis. In addition, other seasonal trends may develop and the existing seasonal trends that we experience may become more pronounced and contribute to fluctuations in our results of operations as we continue to scale and our growth slows. As such, we may not accurately forecast our results of operations. However, we base our spending and investment plans on forecasts and estimates, and we may not be able to adjust our spending quickly enough if our revenue is less than expected, causing our results of operations to fail to meet our expectations or the expectations of investors.

### The impact of economic conditions, including the resulting effect on consumer spending, may adversely affect our business, financial condition, and results of operations.

Our performance is subject to economic conditions and their impact on levels of consumer spending. Some of the factors having an impact on discretionary consumer spending include general economic conditions, unemployment, consumer debt, reductions in net worth, residential real estate and mortgage markets, taxation, energy prices, interest rates, consumer confidence, and other macroeconomic factors. Consumer purchases of discretionary items generally decline during recessionary periods and other periods in which disposable income is adversely affected. Economic conditions in certain regions may also be affected by natural disasters, such as earthquakes, hurricanes, wildfires, and threats to public health, such as the recent COVID-19 pandemic. Further, small businesses that do not have substantial resources, like some of the merchants on our platform, tend to be more adversely affected by poor economic conditions than large businesses. If merchants on our platform were to cease operations, temporarily or permanently, or face financial distress or other business disruption, we may not be able to provide consumers with sufficient merchant selection, and they may be less likely to use our platform. This risk is particularly pronounced with restaurants, as each year a significant percentage of restaurants go out of business, and in markets where we have fewer merchants. In addition, because spending for purchases from many of the merchants on our platform is generally considered to be discretionary, we expect that any decline in consumer spending would have a disproportionate effect on our business relative to those businesses that sell products or services considered to be necessities. If spending at the merchants on our platform declines, consumers may be less likely to use our platform, which could adversely affect our business, financial condition, and results of operations.

42

Table of Contents

***We may face difficulties as we expand our operations into new local markets in which we have limited or no prior operating experience.***

Our capacity for continued growth depends in part on our ability to expand our operations into, and compete effectively in, new local markets. It may be difficult for us to understand and accurately predict consumer preferences and purchasing habits in these new local markets. In addition, each market has unique regulatory dynamics. These include laws and regulations that can directly or indirectly affect our ability to operate, the pool of Dashers that are available, and our costs associated with insurance, support, fraud, and onboarding new Dashers. In addition, each market is subject to distinct competitive and operational dynamics. These include our ability to offer more attractive services than alternative options and our ability to efficiently attract and retain merchants, consumers, and Dashers, all of which affect our sales, results of operations, and key business metrics. As a result, we may experience fluctuations in our results of operations due to the changing dynamics in the local markets where we operate. If we invest substantial time and resources to expand our operations and are unable to manage these risks effectively, our business, financial condition, and results of operations could be adversely affected.

***Our presence outside the United States and any future international expansion strategy will subject us to additional costs and risks and our plans may not be successful.***

We have started expanding our presence internationally. We launched our platform in Canada in 2015 and in Australia in 2019, and we expect to expand our international operations. Operating outside of the United States may require significant management attention to oversee operations over a broad geographic area with varying cultural norms and customs, in addition to placing strain on our finance, analytics, compliance, legal, engineering, and operations teams. We may incur significant operating expenses and may not be successful in our international expansion for a variety of reasons, including:

- recruiting and retaining talented and capable employees in foreign countries and maintaining our company culture across all of our offices;

- an inability to attract merchants, consumers, and Dashers;

- competition from local incumbents that better understand the local market, may market and operate more effectively, and may enjoy greater local affinity or awareness;

- differing demand dynamics, which may make our platform less successful;

- complying with varying laws and regulatory standards, including with respect to labor and employment, data privacy, tax, and local regulatory restrictions;

- obtaining any required government approvals, licenses, or other authorizations;

- varying levels of Internet and mobile technology adoption and infrastructure;

- currency exchange restrictions or costs and exchange rate fluctuations;

- operating in jurisdictions that do not protect intellectual property rights in the same manner or to the same extent as the United States;

- public health concerns or emergencies, such as the recent COVID-19 pandemic and other highly communicable diseases or viruses, outbreaks of which have from time to time occurred, and which may occur, in various parts of the world in which we operate or may operate in the future; and

- limitations on the repatriation and investment of funds as well as foreign currency exchange restrictions.

Our limited experience in operating our business internationally increases the risk that any potential future expansion efforts that we may undertake may not be successful. If we invest substantial time and

43

Table of Contents

resources to expand our operations internationally and are unable to manage these risks effectively, our business, financial condition, and results of operations could be adversely affected.

In addition, international expansion may increase our risks in complying with various laws and standards, including with respect to anti-corruption, anti-bribery, export controls, and trade and economic sanctions.

***If we or our partners fail to develop and successfully commercialize autonomous or drone delivery technologies or fail to develop such technologies before our competitors, or if such technologies fail to perform as expected, change our cost structure materially, are inferior to those of our competitors, or are perceived as less safe than those of our competitors or non-autonomous or non-drone delivery methods, our business, financial condition, and results of operations could be adversely affected.***

We believe that autonomous and drone delivery technologies may have the ability to meaningfully impact our industry. We have invested and we expect to continue to invest in research and development related to autonomous and drone delivery technologies, either directly or in partnership with companies that develop such technologies. While we believe that autonomous and drone delivery could present substantial opportunities, the development of such technologies is expensive and time-consuming and may not be successful. Autonomous and drone delivery technologies involve significant risks and liabilities. Failures of our or our partners' autonomous or drone delivery technologies could generate substantial liability, create negative publicity, or result in regulatory scrutiny, all of which could have an adverse effect on our reputation, brand, business, results of operations, and prospects. Even if our or our partners' efforts to develop autonomous and drone delivery technologies are successful, such efforts may not be cost-effective and there is no guarantee that such technologies can reduce our current costs of facilitating on-demand delivery services. Further, several other companies, including Uber and Amazon, are also developing autonomous and drone delivery technologies, either themselves or through collaborations, and we expect that they will use such technology to further compete with us in the local logistics industry. Certain competitors may commercialize autonomous and drone delivery technologies at scale before we or our partners do. In the event that our competitors bring autonomous or drone delivery to market before we do, or their technology is or is perceived to be superior to our or our partners' technology, they may be able to leverage such technology to compete more effectively with us, which would adversely affect our business, financial condition, and results of operations. For example, if competitors develop autonomous and drone delivery technologies that successfully reduce the cost of facilitating delivery logistics services, these competitors could offer their services at lower prices as compared to the price available to consumers on our platform. If a significant number of consumers choose to use our competitors' offerings over ours, our business, financial condition, and results of operations could be adversely affected.

Further, we expect that governments will develop regulations that are specifically designed to apply to autonomous and drone technologies. These regulations could include requirements that significantly delay or narrowly limit the commercialization of autonomous and drone technologies, limit the amount of autonomous and drone delivery on our platform, or impose significant liabilities on manufacturers or operators of these solutions or developers of these technologies. Moreover, these regulations may affect our or our partners' ability to design and manufacture new autonomous or drone technologies. For example, commercial drone regulations adopted by the Federal Aviation Administration limit the altitude, available airspace, and weight of a drone and also the certification of remote pilots that can operate a drone for commercial purposes in the United States. If regulations of this nature continue to be implemented, we or our partners may not be able to commercialize autonomous and drone delivery technologies in the manner we expect, or at all. Further, if we or our partners are unable to comply with existing or new regulations or laws applicable to autonomous and drone solutions, we could become subject to substantial fines or penalties.

44

Table of Contents

***If we are unable to make acquisitions and investments, or successfully integrate them into our business, our business, results of operations, and financial condition could be adversely affected.***

As part of our business strategy, we will continue to consider a wide array of potential strategic transactions, including acquisitions of businesses, new technologies, services, and other assets and strategic investments that complement our business. For example, in October 2019, we acquired certain assets and liabilities from Square, Inc. related to Caviar, a marketplace focused on facilitating deliveries from premium restaurants. We have previously acquired and continue to evaluate targets that operate in relatively nascent markets, and as a result, there is no assurance that such acquired businesses will be successfully integrated into our business or generate substantial revenue.

Acquisitions involve numerous risks, any of which could harm our business and negatively affect our financial condition and results of operations, including:

- intense competition for suitable acquisition targets, which could increase prices and adversely affect our ability to consummate deals on favorable or acceptable terms;

- failure or material delay in closing a transaction;

- transaction-related lawsuits or claims;

- difficulties in integrating the technologies, operations, existing contracts, and personnel of an acquired company;

- difficulties in retaining key employees or business partners of an acquired company;

- difficulties in retaining merchants, consumers, and delivery service providers, as applicable, of an acquired company;

- challenges with integrating the brand identity of an acquired company with our own;

- diversion of financial and management resources from existing operations or alternative acquisition opportunities;

- failure to realize the anticipated benefits or synergies of a transaction;

- failure to identify the problems, liabilities, or other shortcomings or challenges of an acquired company or technology, including issues related to intellectual property, regulatory compliance practices, litigation, revenue recognition or other accounting practices, or employee or user issues;

- risks that regulatory bodies may enact new laws or promulgate new regulations that are adverse to an acquired company or business;

- risks that regulatory bodies do not approve our acquisitions or business combinations or delay such approvals;

- theft of our trade secrets or confidential information that we share with potential acquisition candidates;

- risk that an acquired company or investment in new services cannibalizes a portion of our existing business; and

- adverse market reaction to an acquisition.

If we fail to address the foregoing risks or other problems encountered in connection with past or future acquisitions of businesses, new technologies, services, and other assets and strategic investments, or if we fail to successfully integrate such acquisitions or investments, our business, financial condition, and results of operations could be adversely affected.

45

Table of Contents

***We depend on our highly skilled employees to grow and operate our business, and if we are unable to hire, retain, manage, and motivate our employees, or if our new employees do not perform as we anticipate, we may not be able to grow effectively and our business, financial condition, and results of operations could be adversely affected.***

Our future success will depend in part on the continued service of our founders, senior management team, key technical employees, and other highly skilled employees, including Tony Xu, our co-founder and Chief Executive Officer, and on our ability to continue to identify, hire, develop, motivate, and retain talented employees. We may not be able to retain the services of any of our employees or other members of senior management in the future. Also, all of our U.S.-based employees, including our senior management team and Mr. Xu, work for us on an at-will basis, and there is no assurance that any such employee will remain with us. Our competitors may be successful in recruiting and hiring members of our management team or other key employees, and it may be difficult for us to find suitable replacements on a timely basis, on competitive terms, or at all. If we are unable to attract and retain the necessary employees, particularly in critical areas of our business, we may not achieve our strategic goals. In addition, from time to time, there may be changes in our senior management team that may be disruptive to our business. If our senior management team fails to work together effectively and to execute its plans and strategies, our business, financial condition, and results of operations could be adversely affected.

We face intense competition for highly skilled employees, especially in the San Francisco Bay Area where we have a substantial presence and need for highly skilled employees. To attract and retain top talent, we have had to offer, and we believe we will need to continue to offer, competitive compensation and benefits packages. Job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. The trading price of our Class A common stock following this offering is likely to be volatile and could be subject to fluctuations in response to various factors and may not appreciate. If the perceived value of our equity awards declines for this or other reasons, it may adversely affect our ability to attract and retain highly qualified employees. Certain of our employees have received significant proceeds from sales of our equity in private transactions and many of our employees may receive significant proceeds from sales of our equity in the public markets following this offering, which may reduce their motivation to continue to work for us. We may need to invest significant amounts of cash and equity to attract and retain new employees and expend significant time and resources to identify, recruit, train, and integrate such employees, and we may never realize returns on these investments. If we are unable to effectively manage our hiring needs or successfully integrate new hires, our efficiency, ability to meet forecasts, and employee morale, productivity, and engagement could suffer, which could adversely affect our business, financial condition, and results of operations.

***Our company culture has contributed to our success and if we cannot maintain and evolve our culture as we grow, our business could be adversely affected.***

We believe that our company culture, which promotes authenticity, empathy, support for others, and bias for action, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

- failure to identify, attract, reward, and retain people in leadership positions in our organization who share and further our culture, values, and mission;

- the increasing size and geographic diversity of our workforce;

- competitive pressures to move in directions that may divert us from our mission, vision, and values;

- the continued challenges of a rapidly evolving industry;

46

424B4

Table of Contents

- • the increasing need to develop expertise in new areas of business that affect us;

- • negative perception of our treatment of employees, merchants, consumers, and Dashers or our response to employee sentiment related to political or social causes or actions of management; and

- • the integration of new personnel and businesses from acquisitions.

If we are not able to maintain and evolve our culture, our business, financial condition, and results of operations could be adversely affected.

***Our business could be adversely impacted by changes in the Internet and mobile device accessibility of users.***

Our business depends on users' access to our platform via a mobile device or personal computer and the Internet. We may operate in jurisdictions that provide limited Internet connectivity, particularly as we expand internationally. Internet access and access to a mobile device or personal computer are frequently provided by companies with significant market power that could take actions that degrade, disrupt, or increase the cost of consumers' ability to access our platform. In addition, the Internet infrastructure that we and users of our platform rely on in any particular geographic area may be unable to support the demands placed upon it and could interfere with the speed and availability of our platform. Any such failure in Internet or mobile device or computer accessibility, even for a short period of time, could adversely affect our results of operations.

***We have identified a material weakness in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our consolidated financial statements or cause us to fail to meet our periodic reporting obligations.***

In recent periods, we have experienced rapid growth, and this growth has placed considerable strain on our IT and accounting systems, processes, and personnel. As a result, in connection with the audit of our consolidated financial statements as of and for the years ended December 31, 2018 and 2019, we and our independent registered public accounting firm identified a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The material weakness that we and our independent registered public accounting firm identified occurred because (i) we had inadequate processes and controls to ensure an appropriate level of precision related to our revenue to cash reconciliation process, and (ii) we did not have sufficient resources with the adequate technical skills to meet the emerging needs of our financial reporting requirements.

To address this material weakness, we are hiring additional accounting, engineering, and business intelligence personnel and are implementing process level and management review controls to identify and address emerging risks. While we are undertaking efforts to remediate this material weakness, we cannot predict the success of such efforts or the outcome of our assessment of the remediation efforts at this time. We can give no assurance that our efforts will remediate this deficiency in internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our consolidated financial statements that could result in a restatement of our financial statements, and could cause us to fail to meet our reporting obligations, any of which could diminish investor confidence in us and cause a decline in the price of our Class A common stock.

47

Table of Contents

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

As a public company, we are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, and the rules and regulations of the applicable listing standards of the New York Stock Exchange. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting, and financial compliance costs, make some activities more difficult, time-consuming, and costly, and place significant strain on our personnel, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting, which includes hiring additional accounting and financial personnel to implement such processes and controls. In connection with the audit of our consolidated financial statements as of and for the years ended December 31, 2018 and 2019, we and our independent registered public accounting firm identified a material weakness in our internal control over financial reporting. To address this material weakness, we are hiring additional accounting, engineering, and business intelligence personnel and implement process level and management review controls to identify and address emerging risks. While we are implementing a plan to remediate this material weakness, we cannot predict the success of such plan or the outcome of our assessment of the plan at this time. We can give no assurance that implementation of our plan will remediate this deficiency in internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future.

In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight. If any of these new or improved controls and systems do not perform as expected, we may experience further deficiencies in our controls.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. Further, additional weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our results of operations or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our Class A common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the New York Stock Exchange. We are not currently required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore not required to make a formal assessment of the effectiveness of our internal control over financial reporting

48

Table of Contents

for that purpose. As a public company, we are required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until after we are no longer an emerging growth company as defined in the JOBS Act. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed, or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have an adverse effect on our business and results of operations and could cause a decline in the price of our Class A common stock.

***We may not timely and effectively scale and adapt our existing technology and network infrastructure to ensure that our platform is accessible, which would adversely affect our business, reputation, financial condition, and results of operations.***

We expect to continue to make significant investments to maintain and improve the availability of our platform and to enable rapid releases of new features and services. However, it may become increasingly difficult to maintain and improve the availability of our platform, especially during peak usage times and as our platform becomes more complex and our user traffic increases. If our platform is unavailable when merchants, consumers, and Dashers attempt to access it or it does not load as quickly as they expect or it experiences capacity constraints due to an overwhelming number of users accessing our platform simultaneously, users may seek other offerings, and may not return to our platform as often in the future, or at all. This would adversely affect our ability to attract merchants, consumers, and Dashers and decrease the frequency with which they use our platform. To the extent that we do not effectively address capacity constraints, upgrade our systems as needed, or continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business, reputation, financial condition, and results of operations would be adversely affected.

***Defects, errors, or vulnerabilities in our applications, backend systems, or other technology systems and those of third-party technology providers could harm our reputation and brand and adversely impact our business, financial condition, and results of operations.***

The software underlying our platform is highly complex and may contain undetected errors or vulnerabilities, some of which may only be discovered after the code has been released. Our practice is to effect frequent releases of software updates, sometimes multiple times per day. The third-party software that we incorporate into our platform may also be subject to errors or vulnerabilities. Any errors or vulnerabilities discovered in our code or from third-party software after release could result in negative publicity, a loss of users or loss of revenue, and access or other performance issues. Such vulnerabilities could also be exploited by malicious actors and result in exposure of data of users on our platform, or otherwise result in a security breach or other security incident. We may need to expend significant financial and development resources to analyze, correct, eliminate, or work around errors or defects or to address and eliminate vulnerabilities. Any failure to timely and effectively resolve any such errors, defects, or vulnerabilities could adversely affect our business, reputation, brand, financial condition, and results of operations.

49

Table of Contents

***The stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods and we may also expend substantial funds to satisfy a portion of our tax withholding and remittance obligations that arise upon the initial vesting and/or settlement of certain of our RSUs, which may have an adverse effect on our financial condition and results of operations.***

We have granted RSUs to our employees and directors, which generally vest upon the satisfaction of both service-based and liquidity event-related performance vesting conditions occurring before the award's expiration date. The service-based vesting period is generally satisfied by the award holder providing services to us over a four-year period. The liquidity event-related performance vesting condition was satisfied upon the effectiveness of the registration statement of which this prospectus forms a part. As of September 30, 2020, no stock-based compensation expense had been recognized for such RSUs because a qualifying event as described above was not probable. In connection with this offering, we will record cumulative stock-based compensation expense for those RSUs for which the service-based vesting condition was satisfied prior to this offering. If this offering had been completed on September 30, 2020, we would have recorded $243 million of cumulative stock-based compensation expense related to the RSUs for which the service-based vesting condition was satisfied on that date, and would have an additional $225 million of unrecognized stock-based compensation expense related to the RSUs that would be recognized over a weighted-average period of 3.14 years. In addition to stock-based compensation expense associated with the RSUs, as of September 30, 2020, we had unrecognized stock-based compensation expense of $24 million related to outstanding stock options which we expect to recognize over a weighted-average period of 1.76 years. Following the completion of this offering, the stock-based compensation expense related to our RSUs and other outstanding equity awards will result in increases in our expenses in future periods, in particular in the quarter in which the offering is completed.

In November 2020, our board of directors granted the CEO Performance Award, an RSU award under our 2014 Plan to Tony Xu covering 10,379,000 shares of our Class A common stock. We estimated the grant date fair value of the CEO Performance Award using a model based on multiple stock price paths developed through the use of a Monte Carlo simulation that incorporates into the valuation the possibility that the achievement of certain price goals may not be satisfied. The average grant date fair value of the CEO Performance Award was estimated to be $39.83 per share, and we will recognize total stock-based compensation expense of approximately $420 million over the requisite service period of each of the nine separate tranches of the CEO Performance Award that are eligible to vest based on the achievement of certain stock price goals. If the achievement of these stock price goals are met sooner than the derived service period, we will adjust our stock-based compensation expense to reflect the cumulative expense associated with the vested award. We will recognize stock-based compensation expense if service is provided by Mr. Xu over the requisite service period, regardless of whether the stock price goals are achieved. See the section titled "Executive Compensation—CEO Performance Award " for additional information about the CEO Performance Award.

Additionally, we may expend substantial funds in connection with the tax withholding and remittance obligations that arise upon the initial vesting and/or settlement of certain of our RSUs. Our RSUs include RSUs for which the service-based vesting condition is expected to be satisfied prior to this offering and for which the liquidity event-related performance vesting condition was satisfied upon the effectiveness of the registration statement of which this prospectus forms a part, which we refer to as the IPO Vested RSUs. The IPO Vested RSUs vested upon the effectiveness of the registration statement of which this prospectus forms a part and will settle approximately 180 days following this offering, which date we refer to as the Settlement Date. Under U.S. tax laws, the employment tax withholding and remittance obligations for the IPO Vested RSUs arise in connection with the vesting of the IPO Vested RSUs, and the income tax withholding and remittance obligations arise in connection with the settlement of the IPO Vested RSUs.

Our RSUs also include RSUs for which the service-based vesting condition is expected to be satisfied after this offering but prior to the date that is approximately 90 days following this offering and for which

50

Table of Contents

the liquidity event-related performance vesting condition was satisfied upon the effectiveness of the registration statement of which this prospectus forms a part, which we refer to as the Post-IPO Vested RSUs. The Post-IPO Vested RSUs will vest on the date the service-based vesting condition is satisfied following this offering and settle on a date promptly thereafter. We expect to collect the income tax and employment tax withholding obligations on the date the Post-IPO Vested RSUs settle.

To fund the tax withholding and remittance obligations arising in connection with the vesting of the IPO Vested RSUs, we have permitted the holders of IPO Vested RSUs to elect from one of the following methods (the actual method that any individual holder of IPO Vested RSUs may have the right to elect may be different based on the holder's current status with the company): (i) instruct us to withhold shares of our Class A common stock that would otherwise be issued with respect to such RSUs and use our cash (which may include cash generated from the proceeds of this offering) to pay the relevant tax authorities to satisfy such tax obligations as well as any income tax withholding obligations arising as a result of the settlement of such withheld shares, (ii) provide a cash payment to us on the withholding date, or (iii) receive a short-term loan from us, with interest that will accrue at the applicable federal rate, with the balance of the loan generally repayable from the proceeds of sale of shares into the market on the Settlement Date. Assuming all holders of IPO Vested RSUs elect to fund the tax withholding and remittance obligations arising in connection with the vesting of the IPO Vested RSUs by withholding shares of our Class A common stock that would otherwise be issued with respect to such RSUs and use our cash to pay the relevant tax authorities to satisfy such obligations, at an assumed tax rate of 6.97% (which is an assumed blended rate of the relevant tax withholding obligations with respect to such withheld shares at the time of vesting of the IPO Vested RSUs), we expect to withhold an aggregate of approximately 344,136 shares of our Class A common stock subject to the vesting of the IPO Vested RSUs and to pay an aggregate of approximately $35 million to the relevant tax authorities in cash shortly after the completion of this offering and in our fiscal quarter ending December 31, 2020.

To fund the income tax withholding and remittance obligations arising in connection with the settlement of the IPO Vested RSUs on the Settlement Date, we will either (i) withhold shares of our Class A common stock that would otherwise be issued with respect to such IPO Vested RSUs and pay the relevant tax authorities in cash (which may include cash generated from the proceeds of this offering) to satisfy such tax obligations or (ii) have the holders of such IPO Vested RSUs use a broker or brokers to sell a portion of such shares into the market on the Settlement Date, with the proceeds of such sales to be delivered to us for us to remit to the relevant taxing authorities, in order to satisfy such income tax withholding and remittance obligations. Assuming we elect to fund the income tax withholding and remittance obligations arising in connection with the settlement of the IPO Vested RSUs on the Settlement Date by withholding shares of our Class A common stock that would otherwise be issued with respect to such IPO Vested RSUs and use our cash to pay the relevant tax authorities to satisfy such obligations, at an assumed tax rate of 46.51% (which represents an estimated income tax withholding rate and disregarding any employment tax withholding arising in connection with the vesting of the IPO Vested RSUs for U.S. based employees, and a combined maximum tax rate for non-U.S. based employees), we expect to withhold an aggregate of 2,452,657 shares of our Class A common stock subject to the settlement of the IPO Vested RSUs and to pay approximately $250 million to the relevant tax authorities in our fiscal quarter ending June 30, 2021.

To fund the tax withholding and remittance obligations arising in connection with the vesting and settlement of the Post-IPO Vested RSUs, we will either (i) withhold shares of our Class A common stock that would otherwise be issued with respect to such Post-IPO Vested RSUs and pay the relevant tax authorities in cash (which may include cash generated from the proceeds of this offering) to satisfy such tax obligations or (ii) have the holders of such RSUs use a broker or brokers to sell a portion of such shares into the market on the applicable settlement date, with the proceeds of such sales to be delivered to us for us to remit to the relevant taxing authorities, in order to satisfy such tax withholding and remittance obligations. Assuming we elect to fund the tax withholding and remittance obligations

51

Table of Contents

arising in connection with the vesting and settlement of the Post-IPO Vested RSUs by withholding shares of our Class A common stock that would otherwise be issued with respect to such Post-IPO Vested RSUs and use our cash to pay the relevant tax authorities to satisfy such obligations, at an assumed tax rate of 47.49%, we expect to withhold an aggregate of 875,510 shares of our Class A common stock subject to the settlement of the Post-IPO Vested RSUs and to pay approximately $89 million to the relevant tax authorities in our fiscal quarter ending March 31, 2021.

The amounts in the previous three paragraphs above are based upon the initial public offering price of $102.00 per share. The actual amount of this obligation could be higher or lower, depending on the market price of shares of our Class A common stock on or about the applicable settlement date. For IPO Vested RSUs, at the assumed tax rate of 46.51%, each $1.00 increase or decrease from $102.00, which was the initial public offering price for our Class A common stock, would increase or decrease, as applicable, the amount of cash required to satisfy our income tax withholding and remittance obligations related to the settlement of the IPO Vested RSUs arising in our fiscal quarter ending June 30, 2021 by approximately $2 million. For Post-IPO Vested RSUs, at the assumed tax rate of 47.49%, each $1.00 increase or decrease from $102.00, which was the initial public offering price for our Class A common stock, would increase or decrease, as applicable, the amount of cash required to satisfy our tax withholding and remittance obligations related to the vesting and/or settlement of the Post-IPO Vested RSUs arising in our fiscal quarter ending March 31, 2021 by approximately $1 million.

***We track certain operational metrics with internal systems and tools and do not independently verify such metrics. Certain of our operational metrics are subject to inherent challenges in measurement, and any real or perceived inaccuracies in such metrics may adversely affect our business and reputation.***

We track certain operational metrics, including our merchant, consumer, and Dasher counts and key business and non-GAAP metrics such as Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin, with internal systems and tools that are not independently verified by any third party and which may differ from estimates or similar metrics published by third parties due to differences in sources, methodologies, or the assumptions on which we rely. Our internal systems and tools have a number of limitations, and our methodologies for tracking these metrics may change over time, which could result in unexpected changes to our metrics, including the metrics we publicly disclose. If the internal systems and tools we use to track these metrics undercount or overcount performance or contain algorithmic or other technical errors, the data we report may not be accurate. While these numbers are based on what we believe to be reasonable estimates of our metrics for the applicable period of measurement, there are inherent challenges in measuring how our platform is used across large populations. For example, the accuracy of our operating metrics could be impacted by fraudulent users of our platform, and further, we believe that there are consumers who have multiple accounts, even though this is prohibited in our Terms of Service and we implement measures to detect and prevent this behavior. Consumer usage of multiple accounts may cause us to overstate the number of consumers on our platform. In addition, limitations or errors with respect to how we measure data or with respect to the data that we measure may affect our understanding of certain details of our business, which could affect our long-term strategies. If our operating metrics are not accurate representations of our business, if investors do not perceive our operating metrics to be accurate, or if we discover material inaccuracies with respect to these figures, we expect that our business, reputation, financial condition, and results of operations would be adversely affected.

***Operating as a public company requires us to incur substantial costs and requires substantial management attention. In addition, key members of our management team have limited experience managing a public company.***

As a public company, we will incur substantial legal, accounting, and other expenses that we did not incur as a private company. For example, we are subject to the reporting requirements of the Exchange

Table of Contents

Act, the applicable requirements of the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the rules and regulations of the SEC, and the listing standards of the New York Stock Exchange. For example, the Exchange Act requires, among other things, we file annual, quarterly, and current reports with respect to our business, financial condition, and results of operations. Compliance with these rules and regulations will increase our legal and financial compliance costs, and increase demand on our systems, particularly after we are no longer an emerging growth company. In addition, as a public company, we may be subject to stockholder activism, which can lead to additional substantial costs, distract management, and impact the manner in which we operate our business in ways we cannot currently anticipate. As a result of disclosure of information in this prospectus and in filings required of a public company, our business and financial condition will become more visible, which may result in threatened or actual litigation, including by competitors.

Many members of our management team have limited experience managing a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, financial condition, and results of operations.

<div align="center">

**Risks Related to our Legal and Regulatory Environment**

</div>

***If Dashers are reclassified as employees under federal or state law, our business, financial condition, and results of operations would be adversely affected.***

We are subject to claims, lawsuits, arbitration proceedings, administrative actions, government investigations, and other legal and regulatory proceedings at the federal, state, and municipal levels challenging the classification of Dashers that utilize our platform as independent contractors. The tests governing whether a Dasher is an independent contractor or an employee vary by governing law and are typically highly fact sensitive. Laws and regulations that govern the status and classification of independent contractors are subject to changes and divergent interpretations by various authorities, which can create uncertainty and unpredictability for us. As referenced above, we maintain that Dashers that utilize our platform are independent contractors. However, Dashers may be reclassified as employees, especially in light of the evolving rules and restrictions on service provider classification and their potential impact on the local logistics industry. A reclassification of Dashers or other delivery service providers as employees would adversely affect our business, financial condition, and results of operations, including as a result of:

- monetary exposure arising from, or relating to failure to, withhold and remit taxes, unpaid wages and wage and hour laws and requirements (such as those pertaining to failure to pay minimum wage and overtime, or to provide required breaks and wage statements), expense reimbursement, statutory and punitive damages, penalties, including related to the California Labor Code Private Attorneys General Act, or PAGA, and government fines;

- injunctions prohibiting continuance of existing business practices;

- claims for employee benefits, social security, workers' compensation, and unemployment;

- claims of discrimination, harassment, and retaliation under civil rights laws;

- claims under laws pertaining to unionizing, collective bargaining, and other concerted activity;

<div align="center">53</div>

Table of Contents

- other claims, charges, or other proceedings under laws and regulations applicable to employers and employees, including risks relating to allegations of joint employer liability or agency liability; and

- harm to our reputation and brand.

In addition to the harms listed above, a reclassification of Dashers or other delivery service providers as employees would require us to significantly alter our existing business model and operations and impact our ability to add and retain Dashers to our platform and grow our business, which we would expect to have an adverse effect on our business, financial condition, and results of operations.

We have been involved in and continue to be involved in numerous legal proceedings related to Dasher classification, and such proceedings have increased in volume since the California Supreme Court's 2018 ruling in Dynamex. We are currently involved in a number of putative class actions and representative actions brought, for example, pursuant to PAGA, and numerous individual claims, including those brought in arbitration or compelled pursuant to the terms of our independent contractor agreements to arbitration, challenging the classification of Dashers that utilize our platform as independent contractors. In addition, in June 2020, the San Francisco District Attorney filed a claim against us in the Superior Court of California, County of San Francisco, alleging that we misclassified Dashers as independent contractors as opposed to employees. This action is seeking both restitutionary damages and a permanent injunction that would bar us from continuing to classify Dashers as independent contractors. The San Francisco District Attorney also sought a preliminary injunction that would have barred us from continuing to classify Dashers in California as independent contractors during the pendency of this case. The request for the preliminary injunction was withdrawn on December 8, 2020. We believe we have meritorious defenses, despite the allegations of wrongdoing, and intend to defend ourselves vigorously in these matters. In addition, in 2017, we settled one classification matter in California on a class basis including claims raised under PAGA and are in the process of settling two similar classification matters in California. See the section titled "Business—Legal Proceedings" for additional information about these types of legal proceedings.

An increasing number of jurisdictions are considering implementing standards similar to the test set forth in Dynamex to determine worker classification. Further, the California Legislature passed AB 5 and it was signed into law by Governor Gavin Newsom on September 18, 2019 and became effective on January 1, 2020. AB 5 codified the Dynamex standard regarding contractor classification, expanded its application, and created numerous carve-outs. We, along with certain other companies, supported a campaign for the 2020 California ballot initiative to address AB 5 and preserve flexibility for Dashers. As of December 8, 2020, unofficial election results indicate that this initiative is likely to pass. In such case, certain provisions regarding compensation, along with certain other requirements, will become applicable to us and Dashers in California and our costs related to Dashers will increase in California, which could lead us to charge higher fees and commissions, which in turn could result in lower order volumes. Depending on whether and how much we choose to increase fees and commissions, these increased costs could also lead to a lower Take Rate, defined as revenue expressed as a percentage of Marketplace GOV. The provisions resulting from the 2020 California ballot initiative that would become applicable to us include, but are not limited to, (i) net earnings (which excludes tips, tolls, and certain other amounts) to Dashers no less than a net earnings floor equal to (a) 120% of the minimum wage for a Dasher's engaged time and (b) for Dashers using a motor vehicle, $0.30 per engaged mile (which amount shall be adjusted for inflation after 2021) and (ii) for Dashers averaging at least 15 hours per week of engaged time during a calendar quarter who subscribe to a qualifying health plan, payments to such Dashers of healthcare subsidies of varying dollar amounts depending on a Dasher's engaged time per week. As such, the passage of the 2020 California ballot initiative is likely to have an adverse impact on our results of operations. In addition, several other states where we operate may be considering adopting legislation similar to the 2020 California ballot initiative, which we would expect to increase

54

Table of Contents

our costs related to Dashers in such jurisdictions and could also adversely impact our results of operations. Even with the passage of the 2020 California ballot initiative and similar legislation, such initiatives and legislation could still be challenged and subject to litigation. Furthermore, if Dashers are determined to be employees in other states or under federal law, this could result in even higher increases to our costs related to Dashers, which would likely lead us to increase fees and commissions even more and may result in further lower order volumes. To the extent Dashers are determined to be employees under other state or federal law, we would be required to significantly alter our existing business model and operations, which would have an adverse impact on our business, financial condition, and results of operations.

***We are subject to claims, lawsuits, investigations, and various proceedings, and face potential liability, expenses for legal claims, and harm to our business based on the nature of our business.***

We face potential liability, expenses for legal claims, and harm to our business relating to the nature of our business generally, and with the food delivery services we facilitate in particular, including potential claims related to food offerings, delivery, and quality.

We are subject to claims, lawsuits, arbitration proceedings, government investigations, and other legal, regulatory, and other administrative proceedings, including those involving personal injury, property damage, worker classification, labor and employment, anti-discrimination, commercial disputes, competition, consumer complaints, intellectual property disputes, compliance with regulatory requirements, and other matters, and we may become subject to additional types of claims, lawsuits, government investigations, and legal or regulatory proceedings as our business grows and as we deploy new services.

We are also subject to claims, lawsuits, and other legal proceedings seeking to hold us vicariously liable for the actions of merchants, consumers, and Dashers. For example, third parties could assert legal claims against us in connection with personal injuries related to food poisoning, tampering, or other food safety issues or accidents caused by Dashers that utilize our platform. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation, and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny. In addition, we could be subject to legal claims relating to the sale of alcoholic beverages or alcohol consumption. Regardless of the outcome of any legal proceeding, any injuries to, or deaths of, any consumers, Dashers, or third parties could result in negative publicity and harm to our brand, reputation, business, financial condition, and results of operations.

Reports, whether true or not, of food-borne illnesses (such as E. Coli, avian flu, bovine spongiform encephalopathy, hepatitis A, trichinosis, or salmonella) and injuries caused by food tampering or inappropriate or unsanitary food preparation, handling, or delivery, or other food safety incidents have led to potential legal claims against, and severely injured the reputations of, participants in the food business and could do so in the future as well. Further, if any such report were to affect one or more of the merchants on our platform that generate a significant percentage of our overall Marketplace GOV, it could seriously harm our business. The potential for acts of terrorism on the U.S. or international food supply also exists and, if such an event occurs, it could harm our business and results of operations. Further, food that is ordered through our platform could be subject to a recall, but we may have limited ability, if any, to ensure compliance with a food recall. In addition, reports of food-borne illnesses, food recalls, food tampering, or inappropriate or unsanitary food preparation, handling, or delivery, even those occurring solely at merchants that are not on our platform, could, as a result of negative publicity about the restaurant or grocery industry, adversely affect our business, financial condition, and results of operations.

424B4

Table of Contents

We also face potential liability and expense for claims, including class, collective, and other representative actions, by or relating to Dashers regarding, among other things, the classification of Dashers that utilize our platform as well as our Dasher pay model, including claims regarding disclosures we make with respect to sales tax, service fees, delivery fees, and gratuities, the process of signing up to become a Dasher, including the background check process, and the nature and frequency of our communications to Dashers via email, text, or telephone. In addition, we also face potential liability and expense for claims, including class actions, by consumers relating to, among other things, our Dasher pay model, including claims regarding disclosures we make with respect to sales tax, service fees, delivery fees, and gratuities, the local food delivery logistics services we facilitate, discrepancies between the menus on our website and consumer mobile application and the menus at the restaurant from which the food is delivered, including discrepancies in menu items and the prices of such items and taxes on such items, and the nature and frequency of our marketing communications to consumers via email, text, or telephone. See the section titled "Business—Legal Proceedings" for additional information about these types of legal proceedings.

In addition, we face potential liability and expense for claims relating to the information that we publish on our website and mobile applications, including claims for trademark and copyright infringement, defamation, libel, and negligence, among others. We also face potential liability and expense for claims arising from a data security incident, including claims regarding the adequacy and timeliness of our response to such an incident and our notification to affected consumers and Dashers.

The results of any such claims, lawsuits, arbitration proceedings, government investigations, or other legal or regulatory proceedings cannot be predicted with any degree of certainty. Any claims against us, whether meritorious or not, could be time-consuming, result in costly litigation, be harmful to our reputation, require significant management attention, and divert significant resources. Determining reserves for our pending litigation is a complex and fact-intensive process that requires significant subjective judgment and speculation. It is possible that a resolution of one or more such proceedings could result in substantial damages, settlement costs, fines, and penalties that could adversely affect our business, financial condition, and results of operations. These proceedings could also result in harm to our reputation and brand, sanctions, consent decrees, injunctions, or other orders requiring a change in our business practices. Any of these consequences could adversely affect our business, financial condition, and results of operations. Further, under certain circumstances, we have contractual and other legal obligations to indemnify and to incur legal expenses on behalf of our business and commercial partners and current and former directors and officers.

In addition, we include arbitration and class action waiver provisions in our terms of service with the merchants, consumers, and Dashers that utilize our platform. These provisions are intended to streamline the litigation process for all parties involved, as they can in some cases be faster and less costly than litigating disputes in state or federal court. However, arbitration can be costly and burdensome, and the use of arbitration and class action waiver provisions subjects us to certain risks to our reputation and brand, as these provisions have been the subject of increasing public scrutiny. In order to minimize these risks to our reputation and brand, we may limit our use of arbitration and class action waiver provisions or be required to do so in a legal or regulatory proceeding, either of which could cause an increase in our litigation costs and exposure. Additionally, we permit certain users of our platform to opt out of such provisions, which could also cause an increase in our litigation costs and exposure.

Further, with the potential for conflicting rules regarding the scope and enforceability of arbitration and class action waivers on a state-by-state basis, as well as between state and federal law, there is a risk that some or all of our arbitration and class action waiver provisions could be subject to challenge or may need to be revised to exempt certain categories of protection. If these provisions were found to be unenforceable, in whole or in part, or specific claims are required to be exempted, we could experience

56

424B4

Table of Contents

an increase in our costs to litigate disputes and the time involved in resolving such disputes, and we could face increased exposure to potentially costly lawsuits, each of which could adversely affect our business, financial condition, and results of operations.

***Taxing authorities may successfully assert that we have not properly collected or remitted, or in the future should collect or remit, sales and use, gross receipts, value added, or similar taxes or withholding taxes, and may successfully impose additional obligations on us, and any such assessments, obligations, or inaccuracies could adversely affect our business, financial condition, and results of operations.***

The application of non-income, or indirect, taxes, such as sales and use tax, value-added tax, goods and services tax, business tax, and gross receipt tax, to businesses like ours is a complex and evolving issue. Many of the fundamental statutes and regulations that impose these taxes were established before the adoption and growth of the Internet and e-commerce. Significant judgment is required on an ongoing basis to evaluate applicable tax obligations, and as a result, amounts recorded are estimates and are subject to adjustments. In many cases, the ultimate tax determination is uncertain because it is not clear how new and existing statutes might apply to our business or to local logistics businesses generally.

In addition, governments are increasingly looking for ways to increase revenue, which has resulted in discussions about tax reform and other legislative action to increase tax revenue, including through indirect taxes. Such taxes could adversely affect our financial condition and results of operations.

We are subject to indirect taxes, such as payroll, sales, use, value-added, and goods and services taxes in the United States, Canada, and Australia, and we may face various indirect tax audits in various U.S. and foreign jurisdictions. In certain jurisdictions, we collect and remit indirect taxes. However, tax authorities may raise questions about, or challenge or disagree with, our calculation, reporting, or collection of taxes and may require us to collect taxes in jurisdictions in which we do not currently do so or to remit additional taxes and interest, and could impose associated penalties and fees. A successful assertion by one or more tax authorities requiring us to collect taxes in jurisdictions in which we do not currently do so or to collect additional taxes in a jurisdiction in which we currently collect taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest, could discourage merchants, consumers, and Dashers from utilizing our offerings, or could otherwise harm our business, financial condition, and results of operations. Further, even where we are collecting taxes and remitting them to the appropriate authorities, we may fail to accurately calculate, collect, report, and remit such taxes. Additionally, if merchants try to pass along increased additional taxes and raise prices to consumers, order volume may decline. Although we have reserved for potential payments of possible past tax liabilities in our financial statements, if these liabilities exceed such reserves, our financial condition would be harmed.

Under state tax law, we may be deemed responsible for collecting and remitting sales taxes directly to certain states. Our responsibility for these taxes may be applicable to past sales and could be applicable to the cost of goods or fees charged on our platform. A successful assertion that we should be collecting additional sales, use, or other taxes or remitting such taxes directly to states could result in substantial tax liabilities for past sales and additional administrative expenses. These taxes could also increase the cost for consumers using our platform. Any of the foregoing would adversely affect our business, financial condition, and results of operations.

Additionally, one or more states, localities, or other taxing jurisdictions may seek to impose additional reporting, record-keeping, or indirect tax collection obligations on businesses like ours. For example, taxing authorities in the United States and other countries have identified e-commerce platforms as a means to calculate, collect, and remit indirect taxes for transactions taking place over the Internet, and are considering related legislation. After the U.S. Supreme Court decision in *South Dakota v. Wayfair*

57

Table of Contents

*Inc.*, certain states have enacted laws that would require tax reporting, collection, or tax remittance on items sold online. Requiring tax reporting or collection could decrease merchant, consumer, or Dasher activity, which would harm our business. This new legislation could require us or Dashers to incur substantial costs in order to comply, including costs associated with tax calculation, collection, and remittance and audit requirements, which could make our offerings less attractive and could adversely affect our business, financial condition, and results of operations.

Also, federal tax rules generally require payors to report payments to unrelated parties to the IRS. Under certain circumstances, a failure to comply with such reporting obligations may cause us to become liable to withhold a percentage of the amounts paid to Dashers and merchants and remit such amounts to the taxing authorities. Due to the large number of Dashers and merchants, and the amounts paid to each, process failures with respect to these reporting obligations could result in financial liability and other consequences to us if we were unable to remedy such failures in a timely manner.

As a result of these and other factors, the ultimate amount of tax obligations owed may differ from the amounts recorded in our financial statements and any such difference may adversely affect our results of operations in future periods in which we change our estimates of our tax obligations or in which the ultimate tax outcome is determined.

***We may have exposure to greater than anticipated tax liabilities.***

We are subject to income taxes in the United States and certain foreign jurisdictions. Our effective tax rate could be adversely affected by changes in the mix of earnings and losses in countries with differing statutory tax rates, certain non-deductible expenses, and the valuation of deferred tax assets. Increases in our effective tax rate would reduce profitability or increase losses.

As we expand the scale of our international business activities, any changes in the United States or foreign taxation of such activities may increase our worldwide effective tax rate and harm our business, financial condition, and results of operations.

We have been subject to examination, and may be subject to examination in the future, by federal, state, local, and foreign tax authorities on income, employment, sales, and other tax matters. While we regularly assess the likelihood of adverse outcomes from such examinations and the adequacy of our provision for taxes, there can be no assurance that such provision is sufficient and that a determination by a tax authority would not have an adverse effect on our business, financial condition, and results of operations. Certain risks relating to employment taxes and sales taxes are described in more detail under "—If Dashers are reclassified as employees under federal or state law, our business, financial condition, and results of operations would be adversely affected." and "—Taxing authorities may successfully assert that we have not properly collected, or in the future should collect, sales and use, gross receipts, value added, or similar taxes and may successfully impose additional obligations on us, and any such assessments, obligations, or inaccuracies could adversely affect our business, financial condition, and results of operations."

On December 22, 2017, the legislation commonly referred to as the Tax Cuts and Jobs Act, or the Tax Act, was enacted, which contains significant changes to U.S. tax law, including a reduction in the corporate tax rate and a transition to a new territorial system of taxation. The primary impact of the new legislation on our provision for income taxes was a reduction of the future tax benefits of our deferred tax assets as a result of the reduction in the corporate tax rate. However, since we have recorded a full valuation allowance against our deferred tax assets, these changes did not have a material impact on our consolidated financial statements. The impact of the Tax Act will likely be subject to ongoing technical guidance and accounting interpretation, which we will continue to monitor and assess.

58

Table of Contents

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2019, we had accumulated $780 million and $576 million of federal and state net operating loss carryforwards, or NOLs, respectively, available to reduce future taxable income, which will begin to expire in 2033 for federal and 2026 for state tax purposes. It is possible that we will not generate taxable income in time to use NOLs before their expiration, or at all. Under Section 382 and Section 383 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change NOLs and other tax attributes, including R&D tax credits, to offset its post-change income may be limited. In general, an "ownership change" will occur if there is a cumulative change in our ownership by "5 percent stockholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. Our ability to use NOLs and other tax attributes to reduce future taxable income and liabilities may be subject to annual limitations as a result of prior ownership changes and ownership changes that may occur in the future, including as a result of this offering.

Under the Tax Act, as amended by the Coronavirus Aid, Relief, and Economic Security Act, or the CARES Act, net operating losses arising in taxable years beginning after December 31, 2017 and before January 1, 2021 may be carried back to each of the five taxable years preceding the tax year of such loss, but net operating losses arising in taxable years beginning after December 31, 2020 may not be carried back. Additionally, under the Tax Act, as modified by the CARES Act, net operating losses from tax years that began after December 31, 2017 may offset no more than 80% of current taxable income annually for taxable years beginning after December 31, 2020, but the 80% limitation on the use of net operating losses from tax years that began after December 31, 2017 does not apply for taxable income in tax years beginning before January 1, 2021. NOLs arising in tax years ending after December 31, 2017 can be carried forward indefinitely, but NOLs generated in tax years ending before January 1, 2018 will continue to have a two-year carryback and twenty-year carryforward period. As we maintain a full valuation allowance against our U.S. NOLs, these changes will not impact our balance sheet as of December 31, 2019. However, in future years, if and when a net deferred tax asset is recognized related to our NOLs, the changes in the carryforward and carryback periods as well as the new limitation on use of NOLs may significantly impact our valuation allowance assessments for NOLs generated after December 31, 2019.

There is also a risk that due to regulatory changes, such as suspensions on the use of NOLs and tax credits by certain jurisdictions, including in order to raise additional revenue to help counter the fiscal impact from the COVID-19 pandemic, possibly with retroactive effect, or other unforeseen reasons, our existing NOLs and tax credits could expire or otherwise be unavailable to offset future income tax liabilities. A temporary suspension of the use of certain NOLs and tax credits has been enacted in California, and other states may enact suspensions as well. For these reasons, we may not be able to realize a tax benefit from the use of our NOLs and tax credits.

***Our business is subject to a variety of U.S. laws and regulations, including those related to worker classification, Dasher pay, and pricing and commissions, many of which are unsettled and still developing, and failure to comply with such laws and regulations could subject us to claims or otherwise adversely affect our business, financial condition, or results of operations.***

The local delivery logistics industry and our business model are relatively nascent and rapidly evolving. We are subject to a variety of laws in the United States and other jurisdictions, including those related to worker classification, Dasher pay, and pricing and commissions. Laws, regulations, and standards governing issues such as worker classification, labor and employment, anti-discrimination, food safety, alcoholic beverages, online credit card payments, gratuities, pricing and commissions, text messaging, subscription services, intellectual property, data retention, privacy, data security, consumer protection, background checks, website and mobile application accessibility, and tax are often complex and subject

59

Table of Contents

to varying interpretations, in many cases due to their lack of specificity. The scope and interpretation of these laws, and whether they are applicable to us, are often uncertain and may be conflicting, including varying standards and interpretations between state and federal law, between individual states, and even at the city and municipality level. As a result, their application in practice may change or develop over time through judicial decisions or as new guidance or interpretations are provided by regulatory and governing bodies, such as federal, state, and local administrative agencies. We have been proactively working with state and local governments and regulatory bodies to ensure that our platform is available broadly in the United States and Canada.

Additionally, laws relating to the potential liability of providers of online services for activities of their users and other third parties are currently being tested by a number of claims, including actions based on invasion of privacy and other torts, unfair competition, copyright and trademark infringement, and other theories based on the nature and content of the materials searched, the ads posted, or the content provided by users. In addition, regulatory authorities in the United States at the federal and state level are considering a number of legislative and regulatory proposals concerning privacy and other matters that may be applicable to our business. It is also likely that if our business grows and evolves and our services are used in a greater number of geographies, we would become subject to laws and regulations in additional jurisdictions. It is difficult to predict how existing laws would be applied to our business and the new laws to which it may become subject.

Recent financial, political, and other events may increase the level of regulatory scrutiny on larger companies, technology companies in general, and companies engaged in dealings with independent contractors. Regulatory and administrative bodies may enact new laws or promulgate new regulations that are adverse to our business, or they may view matters or interpret laws and regulations differently than they have in the past or in a manner adverse to our business, including by changing employment-related laws or by regulating or capping the commissions businesses like ours agree to with merchants or the fees that we may charge consumers. For example, in connection with the COVID-19 pandemic, jurisdictions across the United States, including New Jersey, Washington, jurisdictions within Los Angeles County, California, San Francisco, California, Chicago, Illinois, and New York, New York, have implemented temporary commission caps on local food delivery logistics platforms. These commission caps have had in the past, and are likely to have in the future, an adverse effect on our results of operations. These commission caps have also caused, and may in the future cause, us to increase the fees we charge to consumers, though we are aware of one jurisdiction which has adopted explicit prohibitions against doing so in connection with commission caps, which could further increase our costs. With the continued duration of COVID-19, we expect these existing commission caps to persist in the near term and for additional jurisdictions where we operate to implement similar caps. If any of these events occur, or if commission caps are retained after the COVID-19 pandemic subsides, our business, financial condition, and results of operations could be further adversely affected. In addition, regulatory scrutiny or action may create different or conflicting obligations on us from one jurisdiction to another, which creates additional challenges to managing our business.

Our success, or perceived success, and increased visibility may also drive some businesses that perceive our business model negatively to raise their concerns to local policymakers and regulators. These businesses and their trade association groups or other organizations may take actions and employ significant resources to shape the legal and regulatory regimes in jurisdictions where we may have, or seek to have, a market presence in an effort to change such legal and regulatory regimes in ways intended to adversely affect or impede our business and the ability of merchants, consumers, and Dashers to use our platform.

If we are not able to comply with these laws or regulations or if we become liable under these laws or regulations, including any future laws or obligations that we may not be able to anticipate at this time, we could be adversely affected, and we may be forced to implement new measures to reduce our

60

Table of Contents

exposure to this liability. This may require us to expend substantial resources or to discontinue certain services or platform features, which would adversely affect our business. Any failure to comply with applicable laws and regulations could also subject us to claims and other legal and regulatory proceedings, fines, or other penalties, criminal and civil proceedings, forfeiture of significant assets, and other enforcement actions. In addition, the increased attention focused upon liability issues as a result of lawsuits and legislative proposals could adversely affect our reputation or otherwise impact the growth of our business. Any costs incurred to prevent or mitigate this potential liability are also expected to adversely affect our business, financial condition, and results of operations.

### We are subject to various U.S. and international anti-corruption laws and other anti-bribery and anti-kickback laws and regulations.

We are subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, or the FCPA, and other anticorruption, anti-bribery, and anti-money laundering laws in the jurisdictions in which we do business, both domestic and abroad. These laws generally prohibit us and our employees from improperly influencing government officials or commercial parties in order to obtain or retain business, direct business to any person, or gain any improper advantage. The FCPA and other applicable anti-bribery and anti-corruption laws also may hold us liable for acts of corruption and bribery committed by our third-party business partners, representatives, and agents who are acting on our behalf. We and our third-party business partners, representatives, and agents may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities and we may be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries and our employees, representatives, contractors, and agents, even if we do not explicitly authorize such activities. These laws also require that we keep accurate books and records and maintain internal controls and compliance procedures designed to prevent any such actions. While we have policies and procedures to address compliance with such laws, we cannot assure you that our employees and agents will not take actions in violation of our policies or applicable law, for which we may be ultimately held responsible, and our exposure for violating these laws increases as our international presence expands and as we increase sales and operations in foreign jurisdictions. Any violation of the FCPA or other applicable anti-bribery, anti-corruption, and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, imposition of significant legal fees, loss of export privileges, severe criminal or civil sanctions, or suspension or debarment from U.S. government contracts, substantial diversion of management's attention, a drop in our stock price, or overall adverse consequences to our business, all of which may have an adverse effect on our reputation, business, financial condition, and results of operations.

### Government regulation of the Internet, mobile devices, and e-commerce is evolving, and unfavorable changes could substantially adversely affect our business, financial condition, and results of operations.

We are subject to general business regulations and laws as well as federal and state regulations and laws specifically governing the Internet, mobile devices, and e-commerce that are constantly evolving. Existing and future laws and regulations, or changes thereto, may impede the growth of the Internet, mobile devices, e-commerce, or other online services, and increase the cost of providing online services, require us to change our business practices, or raise compliance costs or other costs of doing business. These regulations and laws, which continue to evolve, may cover taxation, tariffs, user privacy, data protection, pricing and commissions, content, copyrights, distribution, social media marketing, advertising practices, sweepstakes, mobile, electronic contracts and other communications, consumer protection, broadband residential Internet access, and the characteristics and quality of services. It is not clear how existing laws governing issues such as property ownership, sales, use, and other taxes, libel, and personal privacy apply to the Internet and e-commerce. In addition, as we continue to expand internationally, it is possible that foreign government entities may seek to censor content available on

61

424B4

Table of Contents

our mobile applications or website or may even attempt to block access to our mobile applications and website. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation and brand, a loss in business, and proceedings or actions against us by governmental entities or others, which could adversely affect our business, financial condition, and results of operations.

***Changes in laws or regulations relating to privacy or the protection or transfer of data relating to individuals, or any actual or perceived failure by us to comply with such laws and regulations or any other obligations relating to privacy or the protection or transfer of data relating to individuals, could adversely affect our business.***

We receive, transmit, and store a large volume of personally identifiable information and other data relating to the users on our platform, as well as other personally identifiable information and other data relating to individuals such as our employees. Numerous local, municipal, state, federal, and international laws and regulations address privacy and the collection, storing, sharing, use, disclosure, and protection of certain types of data, including the California Online Privacy Protection Act, the Personal Information Protection and Electronic Documents Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act, Canada's Anti-Spam Law, Australia's Privacy Act, the Telephone Consumer Protection Act of 1991, or the TCPA, Section 5 of the Federal Trade Commission Act, and effective as of January 1, 2020, the California Consumer Privacy Act, or the CCPA. These laws, rules, and regulations evolve frequently and their scope may continually change, through new legislation, amendments to existing legislation, and changes in enforcement, and may be inconsistent from one jurisdiction to another. For example, the CCPA, which went into effect on January 1, 2020, among other things, requires new disclosures to California consumers and affords such consumers new abilities to opt out of certain sales of personal information. The CCPA provides for fines of up to $7,500 per violation. Aspects of the CCPA and its interpretation and enforcement remain uncertain. The effects of this legislation potentially are far-reaching and may require us to modify our data processing practices and policies and incur substantial compliance-related costs and expenses. The CCPA has been amended on multiple occasions, and it is unclear whether it will be further amended. For example, there was a ballot initiative in California for the California Privacy Rights Act, or CPRA. If approved by California voters, this would significantly modify the CCPA, potentially resulting in further uncertainty and requiring us to incur additional costs and expenses in an effort to comply. As of December 8, 2020, unofficial election results indicate that this initiative is likely to pass. In such case, the CPRA will create obligations relating to consumer data beginning on January 1, 2022, with implementing regulations expected on or before July 1, 2022, and enforcement beginning July 1, 2023. We will continue to monitor developments related to the CPRA. The effects of this legislation potentially are far-reaching, however, and may require us to modify our data processing practices and policies and incur substantial compliance-related costs and expenses. Additionally, many laws and regulations relating to privacy and the collection, storing, sharing, use, disclosure, and protection of certain types of data are subject to varying degrees of enforcement and new and changing interpretations by courts. The CCPA and other changes in laws or regulations relating to privacy, data protection, and information security, particularly any new or modified laws or regulations, or changes to the interpretation or enforcement of such laws or regulations, that require enhanced protection of certain types of data or new obligations with regard to data retention, transfer, or disclosure, could greatly increase the cost of providing our platform, require significant changes to our operations, or even prevent us from providing our platform in jurisdictions in which we currently operate and in which we may operate in the future.

Additionally, we have incurred, and may continue to incur, significant expenses in an effort to comply with privacy, data protection, and information security standards and protocols imposed by law, regulation, industry standards, or contractual obligations. In particular, with laws and regulations such as the CCPA imposing new and relatively burdensome obligations, and with substantial uncertainty over the interpretation and application of these and other laws and regulations, we may face challenges in

62

Table of Contents

addressing their requirements and making necessary changes to our policies and practices and may incur significant costs and expenses in an effort to do so.

Despite our efforts to comply with applicable laws, regulations, and other obligations relating to privacy, data protection, and information security, it is possible that our interpretations of the law, practices, or platform could be inconsistent with, or fail or be alleged to fail to meet all requirements of, such laws, regulations, or obligations. Our failure, or the failure by our third-party providers or merchants on our platform, to comply with applicable laws or regulations or any other obligations relating to privacy, data protection, or information security, or any compromise of security that results in unauthorized access to, or use or release of personally identifiable information or other data relating to Dashers, consumers, or other individuals, or the perception that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing Dashers and consumers from using our platform, or result in fines, investigations, or proceedings by governmental agencies and private claims and litigation, any of which could adversely affect our business, financial condition, and results of operations. Even if not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our reputation and brand and adversely affect our business, financial condition, and results of operations.

***We face the risk of litigation resulting from unauthorized text messages sent in violation of the Telephone Consumer Protection Act.***

The actual or perceived improper sending of text messages may subject us to potential risks, including liabilities or claims relating to consumer protection laws. For example, the TCPA restricts telemarketing and the use of automated SMS text messages without proper consent. This has resulted, and may in the future result, in civil claims against us. The scope and interpretation of the laws that are or may be applicable to the delivery of text messages are continuously evolving and developing. If we do not comply with these laws or regulations or if we become liable under these laws or regulations, we could face direct liability and our business, financial condition, and results of operations could be adversely affected.

***Our reported results of operations may be adversely affected by changes in GAAP.***

GAAP is subject to interpretation by the Financial Accounting Standards Board, or FASB, the SEC, and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported results of operations and could affect the reporting of transactions completed before the announcement of a change. For example, in May 2014, the FASB issued Accounting Standards Update, or ASU, No. 2014-09, "Revenue from Contracts with Consumers (Topic 606)," or ASC 606, which superseded nearly all existing revenue recognition guidance, and in February 2016, the FASB issued ASU No. 2016-02, "Leases (Topic 842)," or ASC 842, which increases lease transparency and comparability among organizations. It is difficult to predict the impact of future changes to accounting principles or our accounting policies, any of which could negatively affect our reported results of operations.

### Risks Related to our Dependence on Third Parties

***We rely primarily on third-party insurance policies to insure our operations-related risks. If our insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business, which could adversely affect our business, financial condition, and results of operations.***

We procure third-party insurance policies to cover various operations-related risks including auto liability, employment practices liability, workers' compensation, business interruptions, cybersecurity and

63

Table of Contents

data breaches, crime, directors' and officers' liability, occupational accident liability for Dashers, and general business liabilities. For certain types of operations-related risks or future risks related to our new and evolving services, we may not be able to, or may choose not to, acquire insurance. In addition, we may not obtain enough insurance to adequately mitigate such operations-related risks or risks related to our new and evolving services, and we may have to pay high premiums, self-insured retentions, or deductibles for the coverage we do obtain. Additionally, if any of our insurance providers becomes insolvent, it would be unable to pay any operations-related claims that we make. Further, some of our agreements with merchants require that we procure certain types of insurance, and if we are unable to obtain and maintain such insurance, we would be in violation of the terms of these merchant agreements.

If the amount of one or more operations-related claims were to exceed our applicable aggregate coverage limits, we would bear the excess, in addition to amounts already incurred in connection with deductibles, self-insured retentions, or otherwise paid by our insurance subsidiary. Insurance providers have raised premiums and deductibles for many businesses and may do so in the future. As a result, our insurance and claims expense could increase, or we may decide to raise our deductibles or self-insured retentions when our policies are renewed or replaced. Our business, financial condition, and results of operations could be adversely affected if (i) the cost per claim, premiums, or the number of claims significantly exceeds our historical experience and coverage limits, (ii) we experience a claim in excess of our coverage limits, (iii) our insurance providers fail to pay on our insurance claims, (iv) we experience a claim for which coverage is not provided, or (v) the number of claims under our deductibles or self-insured retentions differs from historical averages.

***We rely on a third-party payment processor to process payments made by consumers and payments made to merchants and Dashers, and if we cannot manage our relationship with such third party and other payment-related risks, our business, financial condition, and results of operations could be adversely affected.***

We rely on a third-party payment processor, Stripe, to process payments made by consumers and payments made to merchants and Dashers. Under our commercial agreement with Stripe, Stripe may terminate the relationship with advanced notice. If Stripe terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we would be required to find an alternate payment processor and may not be able to secure similar terms or replace such payment processor in an acceptable timeframe. Further, the software and services provided by Stripe may not meet our expectations, may contain errors or vulnerabilities, and could be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments or other payment transactions or make timely payments to merchants and Dashers, any of which could disrupt our business for an extended period of time, make our platform less convenient and attractive to users, and adversely affect our ability to attract and retain qualified merchants, consumers, and Dashers.

Nearly all payments by our consumers are made by credit card or debit card or through third-party payment services, which subjects us to certain regulations and to the risk of fraud. We may in the future offer new payment options to consumers that may be subject to additional regulations and risks. We are also subject to a number of other laws and regulations relating to the payments we accept from our consumers, including with respect to money laundering, money transfers, privacy, and information security. If we fail to or are alleged to fail to comply with applicable regulations, we may be subject to claims and litigation, regulatory investigations and proceedings, civil or criminal penalties, fines, or higher transaction fees and may lose the ability to accept online payments or other payment card transactions, which could make our platform less convenient and attractive to consumers. We also rely on data provided by Stripe for financial statement reporting, and there could be inaccuracies and other errors in such data. If any of these events were to occur, our business, financial condition, and results of operations could be adversely affected.

<div align="center">64</div>

Table of Contents

Further, if we are deemed to be a money transmitter as defined by applicable law, we could become subject to certain laws, rules, and regulations enforced by multiple authorities and governing bodies in the United States and numerous state and local agencies that may define money transmitter differently. For example, certain states may have a more expansive view of who qualifies as a money transmitter. Additionally, outside of the United States, we could be subject to additional laws, rules, and regulations related to the provision of payments and financial services, and if we expand into new jurisdictions, the foreign regulations governing our business that we are subject to will expand as well. If we are found to be a money transmitter under any applicable regulation and we are not in compliance with such regulations, we may be subject to fines or other penalties in one or more jurisdictions levied by federal or state or local regulators. In addition to fines, penalties for failing to comply with applicable rules and regulations could include criminal and civil proceedings, forfeiture of significant assets, or other enforcement actions. We could also be required to make changes to our business practices or compliance programs as a result of regulatory scrutiny.

Additionally, our third-party payment processor requires us to comply with payment card network operating rules, which are set and interpreted by the payment card networks. The payment card networks could adopt new operating rules or interpret or re-interpret existing rules in ways that might prohibit us from providing certain services to some users, be costly to implement, or difficult to follow. If we fail to comply with these rules or regulations, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from consumers or facilitate other types of online payments, and our business, financial condition, and results of operations could be adversely affected. We have also agreed to reimburse our third-party payment processor for any reversals, chargebacks, and fines they are assessed by payment card networks if we violate these rules. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***We primarily rely on Amazon Web Services to deliver our services to users on our platform, and any disruption of or interference with our use of Amazon Web Services could adversely affect our business, financial condition, and results of operations.***

We currently host our platform and support our operations on a single datacenter provided by Amazon Web Services, or AWS, a third-party provider of cloud infrastructure services. We do not have control over the operations of the facilities of AWS that we use. AWS' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity attacks, terrorist attacks, power outages, and similar events or acts of misconduct. Our platform's continuing and uninterrupted performance is critical to our success. We have experienced, and expect that in the future we will experience, interruptions, delays, and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions, and capacity constraints. In addition, any changes in AWS' service levels may adversely affect our ability to meet the requirements of users on our platform. Since our platform's continuing and uninterrupted performance is critical to our success, sustained or repeated system failures would reduce the attractiveness of our platform. It may become increasingly difficult to maintain and improve our performance, especially during peak usage times, as we expand and the usage of our platform increases. Any negative publicity arising from these disruptions could harm our reputation and brand and may adversely affect the usage of our platform. Any of the above circumstances or events may harm our reputation and brand, reduce the availability or usage of our platform, lead to a significant short-term loss of revenue, increase our costs, and impair our ability to attract new users, any of which could adversely affect our business, financial condition, and results of operations.

Our commercial agreement with AWS will remain in effect until terminated by AWS or us. AWS may terminate the agreement for convenience by providing us at least 30 days advanced notice. AWS may also terminate the agreement for cause upon a material breach of the agreement, subject to AWS providing prior written notice and a 30-day cure period, and may in some cases terminate the

65

Table of Contents

agreement immediately for cause upon written notice. Even though our platform is entirely in the cloud, we believe that we could transition to one or more alternative cloud infrastructure providers on commercially reasonable terms. In the event that our agreement with AWS is terminated or we add additional cloud infrastructure service providers, we may experience significant costs or downtime for a short period in connection with the transfer to, or the addition of, new cloud infrastructure service providers. However, we do not believe that such transfer to, or the addition of, new cloud infrastructure service providers would cause substantial harm to our business, financial condition, or results of operations over the longer term.

***We rely on third-party background check providers to screen potential Dashers and if such providers fail to provide accurate information or we do not maintain business relationships with them, our business, financial condition, and results of operations could be adversely affected.***

We rely on third-party background check providers to provide the criminal and/or driving records of potential Dashers to help identify those that are not qualified to use our platform pursuant to applicable law or our internal standards, and our business may be adversely affected to the extent such providers do not meet their contractual obligations, our expectations, or the requirements of applicable law or regulations. If any of our third-party background check providers terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we may need to find an alternate provider, and may not be able to secure similar terms or replace such partners in an acceptable timeframe. In certain jurisdictions, including the United States, we rely on a single third-party background check provider for these jurisdictions. If we cannot find alternate third-party background check providers on terms acceptable to us, we may not be able to timely onboard potential Dashers, and as a result, our platform may be less attractive to potential Dashers and we may have difficulty finding enough Dashers to meet consumer demand. Further, if the background checks conducted by our third-party background check providers are inaccurate or do not otherwise meet our expectations, unqualified Dashers may be permitted to make deliveries on our platform, and as a result, we may be unable to adequately protect or provide a safe environment for our merchants and consumers and qualified Dashers may be inadvertently excluded from our platform. For example, we had a Dasher who had a criminal conviction that should have excluded him from using our platform who was nonetheless cleared by one of our background check providers, and as a result, we allowed him to make deliveries on our platform and he was subsequently alleged to cause personal injury to a merchant on our platform. As a result of inaccurate background checks, our reputation and brand could be adversely affected and we could be subject to increased regulatory or litigation exposure. In addition, if a Dasher engages in criminal activity after the third-party background check has been conducted, we may not be informed of such criminal activity and this Dasher may be permitted to continue making deliveries on our platform. In addition, if the background checks conducted by our third-party background check providers do not meet the requirements under applicable laws and regulations, we could face legal liability or negative publicity.

We are also subject to a number of laws and regulations applicable to background checks for potential and existing Dashers that utilize our platform. If we or our third-party background check providers fail to comply with applicable laws, rules, and legislation, our reputation, business, financial condition, and results of operations could be adversely affected, and we could face legal action, including class, collective, or other representative actions. For example, we have faced non-material issues in the past, including lawsuits and demand letters, related to notice requirements around background checks. In addition, background check qualification processes may be limited in certain jurisdictions based on national and local laws, and our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility.

In jurisdictions where our industry does not have regulations establishing standards for background checks, we decide on the scope of our background checks and the cadence with which we conduct

66

Table of Contents

such background checks. By choosing background checks that are less thorough in scope than we are permitted to conduct under applicable law or regulation, or by failing to run additional background checks after Dashers are on-boarded, we may face negative publicity or become subject to litigation in the future.

Any negative publicity related to any of our third-party background check providers, including publicity related to safety incidents or actual or perceived privacy or data security breaches or other security incidents, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

***We rely on third parties to provide some of the software for our platform. If such third parties interfere with the distribution of our platform or with our use of such software, our business would be adversely affected.***

We rely upon certain third parties to provide software for our platform. For example, we use Google Maps for the mapping function that is critical to the functionality of our platform, and accordingly, we do not control all mapping functions employed by our platform or Dashers using our platform, and it is possible that such mapping functions may not be reliable. From time to time we have had, and may in the future have, disputes with certain of our third party software providers. If, in connection with such a dispute, a software provider terminates its relationship with us or otherwise limits the provision of their software to us, the availability or usage of our platform could be disrupted. If the third parties we rely upon cease to provide access to the third-party software that we and Dashers use, whether in connection with disputes or otherwise, do not provide access to such software on terms that we believe to be attractive or reasonable, or do not provide us with the most current version of such software, we may be required to seek comparable software from other sources, which may be more expensive or inferior, or may not be available at all, any of which would adversely affect our business.

***We depend on the interoperability of our platform across third-party applications and services that we do not control.***

We have integrations with Stripe, Salesforce, Twilio, Wavefront, Snowflake, Olo, third-party offerings such as Google Maps and AWS, and a variety of other vendors. Third-party applications, products, and services are constantly evolving, and we may not be able to maintain or modify our platform to ensure its compatibility with third-party offerings following development changes. In addition, some of our competitors or merchants on our platform may take actions that disrupt the interoperability of our platform with their own products or services, or exert strong business influence on our ability to, and the terms on which we, operate and distribute our platform. As our platform evolves, we expect the types and levels of competition we face to increase. Should any of our competitors or merchants on our platform modify their technologies, standards, or terms of use in a manner that degrades the functionality or performance of our platform or is otherwise unsatisfactory to us or gives preferential treatment to our competitors' products or services, our platform, business, financial condition, and results of operations could be adversely affected.

***We rely on mobile operating systems and application marketplaces to make our applications available to merchants, consumers, and Dashers, and if we do not effectively operate with or receive favorable placements within such application marketplaces and maintain high user reviews, our usage or brand recognition could decline and our business, financial results, and results of operations could be adversely affected.***

We depend in part on mobile operating systems, such as Android and iOS, and their respective application marketplaces to make our applications available to merchants, consumers, and Dashers that

67

Table of Contents

utilize our platform. Any changes in such systems and application marketplaces that degrade the functionality of our applications or give preferential treatment to our competitors' applications could adversely affect our platform's usage on mobile devices. If such mobile operating systems or application marketplaces limit or prohibit us from making our applications available to merchants, consumers, and Dashers, make changes that degrade the functionality of our applications, increase the cost of using our applications, impose terms of use unsatisfactory to us, or modify their search or ratings algorithms in ways that are detrimental to us, or if our competitors' placement in such mobile operating systems' application marketplace is more prominent than the placement of our applications, our user growth could slow. Our applications have experienced fluctuations in the past, and we anticipate similar fluctuations in the future. Any of the foregoing risks could adversely affect our business, financial condition, and results of operations.

As new mobile devices and mobile platforms are released, there is no guarantee that certain mobile devices will continue to support our platform or effectively roll out updates to our applications. Additionally, in order to deliver high-quality applications, we need to ensure that our platform is designed to work effectively with a range of mobile technologies, systems, networks, and standards. We may not be successful in developing or maintaining relationships with key participants in the mobile industry that enhance users' experience. If merchants, consumers, or Dashers that utilize our platform encounter any difficulty accessing or using our applications on their mobile devices or if we are unable to adapt to changes in popular mobile operating systems, we expect that our user growth and user engagement would be adversely affected.

***Internet search engines drive traffic to our platform and our new consumer growth could decline and our business, financial condition, and results of operations would be adversely affected if we fail to appear prominently in search results.***

Our success depends in part on our ability to attract consumers through unpaid Internet search results on search engines like Google, Yahoo!, and Bing. The number of consumers we attract to our platform from search engines is due in large part to how and where our website ranks in unpaid search results. These rankings can be affected by a number of factors, many of which are not under our direct control and may change frequently. For example, a search engine may change its ranking algorithms, methodologies, or design layouts. As a result, links to our website may not be prominent enough to drive traffic to our website, and we may not know how or otherwise be in a position to influence the results. In some instances, search engine companies may change these rankings in a way that promotes their own competing products or services or the products or services of one or more of our competitors. Search engines may also adopt a more aggressive auction-pricing system for keywords that would cause us to incur higher advertising costs or reduce our market visibility to prospective consumers. Our website has experienced fluctuations in search result rankings in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of consumers directed to our platform could adversely affect our business, financial condition, and results of operations.

***Certain estimates and information contained in this prospectus are based on information from third-party sources and we do not independently verify the accuracy or completeness of the data contained in such sources or the methodologies for collecting such data, and any real or perceived inaccuracies in such estimates and information may harm our reputation and adversely affect our business.***

Certain estimates and information contained in this prospectus, including general expectations concerning our industry and the market in which we operate, category share, market opportunity, and market size, are based to some extent on information provided by third-party providers. This information involves a number of assumptions and limitations, and although we believe the information from such third-party sources is reliable, we have not independently verified the accuracy or completeness of the data contained in such

68

Table of Contents

third-party sources or the methodologies for collecting such data. If there are any limitations or errors with respect to such data or methodologies, or if investors do not perceive such data or methodologies to be accurate, or if we discover material inaccuracies with respect to such data or methodologies, our reputation, financial condition, and results of operations could be adversely affected.

## Risks Related to our Intellectual Property

***Failure to adequately protect our intellectual property could adversely affect our business, financial condition, and results of operations.***

Our business depends on our intellectual property, the protection of which is crucial to the success of our business. We rely on a combination of patent, trademark, trade secret, and copyright law and contractual restrictions to protect our intellectual property. In addition, we attempt to protect our intellectual property, technology, and confidential information by requiring our employees and consultants who develop intellectual property on our behalf to enter into confidentiality and invention assignment agreements, and third parties we share information with to enter into nondisclosure agreements. These agreements may not effectively prevent unauthorized use or disclosure of our confidential information, intellectual property, or technology and may not provide an adequate remedy in the event of unauthorized use or disclosure of our confidential information or technology, or infringement of our intellectual property. Despite our efforts to protect our proprietary rights, unauthorized parties may copy aspects of our platform or other software, technology, and functionality or obtain and use information that we consider proprietary. In addition, unauthorized parties may also attempt, or successfully endeavor, to obtain our intellectual property, confidential information, and trade secrets through various methods, including through cybersecurity attacks, and legal or other methods of protecting this data may be inadequate.

We have registered, among other trademarks, the term "DoorDash" in the United States, Canada, and other jurisdictions. Competitors have and may continue to adopt service names similar to ours, thereby harming our ability to build brand identity and possibly leading to user confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other trademarks that are similar to our trademarks. Litigation or proceedings before the U.S. Patent and Trademark Office or other governmental authorities and administrative bodies in the United States and abroad may be necessary in the future to enforce our intellectual property rights and to determine the validity and scope of the proprietary rights of others. Further, we may not timely or successfully apply for a patent or register our trademarks or otherwise secure our intellectual property. Our efforts to protect, maintain, or enforce our proprietary rights may be ineffective and could result in substantial costs and diversion of resources, which could adversely affect our business, financial condition, and results of operations.

***Intellectual property infringement assertions by third parties could result in significant costs and adversely affect our business, financial condition, results of operations, and reputation.***

We operate in an industry with frequent intellectual property litigation. Other parties have asserted, and in the future may assert, that we have infringed their intellectual property rights. We could be required to pay substantial damages or cease using intellectual property or technology that is deemed infringing.

For example, we recently received a letter from International Business Machines Corporation, or IBM, alleging that we infringe on at least five U.S. patents held by IBM, and inviting us to negotiate a business resolution of the allegations. To date, no litigation has been filed by IBM against us regarding the IBM patents. Based upon our preliminary review of these patents, we believe we have meritorious defenses to IBM's allegations, although there can be no assurance that we will be successful in defending against these allegations or reaching a business resolution that is satisfactory to us.

69

Table of Contents

Further, we cannot predict whether other assertions of third-party intellectual property rights or claims arising from such assertions would substantially adversely affect our business, financial condition, and results of operations. The defense of these claims and any future infringement claims, whether they are with or without merit or are determined in our favor, may result in costly litigation and diversion of technical and management personnel. Further, an adverse outcome of a dispute may require us to pay damages, potentially including treble damages and attorneys' fees if we are found to have willfully infringed a party's patent or copyright rights, cease making, licensing, or using products that are alleged to incorporate the intellectual property of others, expend additional development resources to redesign our offerings, and enter into potentially unfavorable royalty or license agreements in order to obtain the right to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all. In any event, we may need to license intellectual property which would require us to pay royalties or make one-time payments. Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, the time and resources necessary to resolve them could adversely affect our business, reputation, financial condition, and results of operations.

***We may be unable to continue to use the domain names that we use in our business or prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand, trademarks, or service marks.***

We have registered domain names that we use in, or are related to, our business, most importantly www.doordash.com. If we lose the ability to use a domain name, whether due to trademark claims, failure to renew the applicable registration, or any other cause, we may be forced to market our offerings under a new domain name, which could cause us substantial harm, or to incur significant expense in order to purchase rights to the domain name in question. We may not be able to obtain preferred domain names outside the United States due to a variety of reasons. In addition, our competitors and others could attempt to capitalize on our brand recognition by using domain names similar to ours. We may be unable to prevent third parties from acquiring and using domain names that infringe on, are similar to, or otherwise decrease the value of our brand or our trademarks or service marks. Protecting, maintaining, and enforcing our rights in our domain names may require litigation, which could result in substantial costs and diversion of resources, which could in turn adversely affect our business, financial condition, and results of operations.

***Our platform contains third-party open source software components, and failure to comply with the terms of the underlying open source software licenses could restrict our ability to provide our platform.***

Our platform contains software modules licensed to us by third-party authors under "open source" licenses. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification, or other contractual protections regarding infringement claims or the quality of the code. In addition, the public availability of such software may make it easier for others to compromise our platform.

Some open source licenses contain requirements that may, depending on how the licensed software is used or modified, require that we make available source code for modifications or derivative works we create based upon the licensed open source software, authorize further modification and redistribution of that source code, make that source code available at little or no cost, or grant other licenses to our intellectual property. If we combine our proprietary software with open source software in a certain manner, we could, under certain open source licenses, be required to release the source code of our proprietary software under the terms of an open source software license. This could enable our competitors to create similar offerings with lower development effort and time and ultimately could

70

Table of Contents

result in a loss of our competitive advantages. Alternatively, to avoid the release of the affected portions of our source code, we could be required to purchase additional licenses, expend substantial time, and resources to re-engineer some or all of our software or cease use or distribution of some or all of our software until we can adequately address the concerns.

Although we have certain policies and procedures in place to monitor our use of open source software that are designed to avoid subjecting our platform to conditions we do not intend, those policies and procedures may not be effective to detect or address all such conditions. In addition, the terms of many open source licenses have not been interpreted by U.S. or foreign courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our platform. From time to time, there have been claims challenging the ownership of open source software against companies that incorporate open source software into their solutions. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software. If we are held to have breached or failed to fully comply with all the terms and conditions of an open source software license, we could face infringement or other liability, or be required to seek costly licenses from third parties to continue providing our platform on terms that are not economically feasible, to re-engineer our platform, to discontinue or delay the provision of our platform if re-engineering could not be accomplished on a timely basis, or to make generally available, in source code form, our proprietary code, any of which could adversely affect our business, financial condition, and results of operations.

### Risks Related to Our Indebtedness and Liquidity

***We may require additional capital to support business growth, and this capital might not be available on acceptable terms, if at all.***

Historically, we have financed our operations primarily through equity issuances and cash generated from our operations. To support our growing business and to effectively compete, we must have sufficient capital to continue to make significant investments in our platform. We intend to continue to make investments to support our business growth and may require additional funds to respond to business challenges, including the need to develop new platform features and services or enhance our existing platform, improve our operating infrastructure, or acquire complementary businesses and technologies. Although we currently anticipate that our existing cash, cash equivalents, and marketable securities and cash flow from operations will be sufficient to meet our working capital and capital expenditure needs for at least the next 12 months, we may require additional financing. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through future issuances of equity, equity-linked securities, or convertible debt securities, our existing stockholders could suffer significant dilution, and any new securities we issue could have rights, preferences, and privileges superior to those of holders of our Class A common stock.

We evaluate financing opportunities from time to time, and our ability to obtain financing will depend, among other things, on our development efforts, business plans, and operating performance and the condition of the capital markets at the time we seek financing. We may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be impaired, and our business, financial condition, and results of operations may be adversely affected.

71

Table of Contents

***Our revolving credit facility and our Convertible Notes contain financial covenants and other restrictions on our actions that may limit our operational flexibility or otherwise adversely affect our results of operations.***

The terms of our revolving credit facility and our Convertible Notes include a number of covenants that limit our ability and our subsidiaries' ability to, among other things, incur additional indebtedness, grant liens, merge or consolidate with other companies or sell substantially all of our assets, pay dividends, make redemptions and repurchases of stock, make investments, loans and acquisitions, or engage in transactions with affiliates. The terms of our revolving credit facility and our Convertible Notes may restrict our current and future operations and could adversely affect our ability to finance our future operations or capital needs. In addition, complying with these covenants may make it more difficult for us to successfully execute our business strategy, including potential acquisitions, and compete against companies which are not subject to such restrictions.

A failure by us to comply with the covenants or payment requirements specified in our credit agreement could result in an event of default under the agreement, which would give the lenders the right to terminate their commitments to provide additional loans under our revolving credit facility and to declare all borrowings outstanding, together with accrued and unpaid interest and fees, to be immediately due and payable. Additionally, our failure to comply with the covenants or payment requirements specified in the Convertible Notes could result in an event of default under the Convertible Notes, which would give the holders the right to declare the outstanding principal of the Convertible Notes, together with accrued and unpaid interest thereon, to be immediately due and payable. If the debt under our revolving credit facility or the Convertible Notes were to be accelerated, we may not have sufficient cash or be able to borrow sufficient funds to refinance the debt or sell sufficient assets to repay the debt, which could immediately adversely affect our business, cash flows, results of operations, and financial condition. Even if we were able to obtain new financing, it may not be on commercially reasonable terms or on terms that are acceptable to us. As of September 30, 2020, there were no amounts outstanding under the revolving credit facility.

***We may not have the ability to raise the funds necessary to redeem the Convertible Notes upon a change of control or our incurrence of certain indebtedness, or to repay the principal amount of the Convertible Notes in cash at their maturity, and our future debt may contain limitations on our ability to pay cash upon conversion or repurchase of the Convertible Notes.***

Holders of the Convertible Notes will have the right to require us to redeem the Convertible Notes upon the occurrence of a change of control before the maturity date at a repurchase price equal to 100% of the principal amount of the Convertible Notes to be repurchased, plus accrued and unpaid interest, if any, as described in the Convertible Notes. In addition, we will be required to repay the Convertible Notes in cash at their maturity unless earlier converted, redeemed, or repurchased. Moreover, pursuant to the terms of the Convertible Notes, we may, at our option, elect to settle conversions of the Convertible Notes in cash in lieu of issuing shares of our Class A common stock. However, we may not have enough available cash on hand or be able to obtain financing at the time we are required to make repurchases of any Convertible Notes surrendered therefor or pay cash with respect to Convertible Notes being converted or at their maturity.

In addition, our ability to repurchase the Convertible Notes or to pay cash upon conversion (if we elect to settle such conversions in cash in lieu of issuing shares of our Class A common stock) or at their maturity may be limited by law, regulatory authority, or agreements governing our future indebtedness. Our failure to repurchase Convertible Notes at a time when the repurchase is required by the Convertible Notes or to pay cash upon conversions of the Convertible Notes or at their maturity as required by the Convertible Notes would constitute a default thereunder. A default under the Convertible Notes could also lead to a default under agreements governing our existing and future

72

Table of Contents

indebtedness, including our revolving credit facility. Moreover, the occurrence of a change of control under the Convertible Notes could constitute an event of default under any such agreement. If the payment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay such indebtedness and repurchase the Convertible Notes or pay cash with respect to the conversion of the Convertible Notes (if we elect, at our option, to settle such conversions in cash in lieu of issuing shares of our Class A common stock) or at maturity of the Convertible Notes.

In addition, our ability to repurchase the Convertible Notes or to pay cash upon conversion (if we elect to settle such conversions in cash in lieu of issuing shares of our Class A common stock) or at their maturity may be limited by law, regulatory authority, or agreements governing our future indebtedness. Our failure to repurchase Convertible Notes at a time when the repurchase is required by the Convertible Notes or to pay cash upon conversions of the Convertible Notes or at their maturity as required by the Convertible Notes would constitute a default thereunder. A default under the Convertible Notes could also lead to a default under agreements governing our existing and future indebtedness, including our revolving credit facility. Moreover, the occurrence of a change of control under the Convertible Notes could constitute an event of default under any such agreement. If the payment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay such indebtedness and repurchase the Convertible Notes or pay cash with respect to the conversion of the Convertible Notes (if we elect, at our option, to settle such conversions in cash in lieu of issuing shares of our Class A common stock) or at maturity of the Convertible Notes.

### Risks Related to this Offering and Ownership of Our Class A Common Stock

***The multi-class structure of our common stock and the Voting Agreement between the Co-Founders will have the effect of concentrating voting power with Tony Xu, our co-founder, Chief Executive Officer, and a member of our board of directors, which will limit your ability to influence the outcome of matters submitted to our stockholders for approval, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws, and the approval of any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction.***

Our Class A common stock, which is the stock we are offering by means of this prospectus, has one vote per share, our Class B common stock has 20 votes per share, and our Class C common stock has no voting rights, except as otherwise required by law. Upon the closing of this offering, our Co-Founders will together hold all of the issued and outstanding shares of our Class B common stock. Accordingly, upon the closing of this offering, Tony Xu, our co-founder, Chief Executive Officer, and a member of our board of directors, Andy Fang, our co-founder, Head of Consumer Engineering, and a member of our board of directors, and Stanley Tang, our co-founder, Head of DoorDash Labs, and a member of our board of directors will hold approximately 69% of the voting power of our outstanding capital stock in the aggregate, which voting power may increase over time as our Co-Founders exercise or vest in equity awards (including in connection with the Equity Award Exchange) outstanding at the time of the completion of this offering. If all such equity awards held by our Co-Founders (including the CEO Performance Award) had been exercised or vested as of the date of the completion of this offering, our Co-Founders would collectively hold 79% of the voting power of our outstanding capital stock. Our Co-Founders have also entered into the Voting Agreement, whereby Mr. Xu will have the authority (and irrevocable proxy) to direct the vote and vote the shares of Class B common stock held by Messrs. Fang and Tang, and their respective permitted entities and permitted transferees, at his discretion on all matters to be voted upon by stockholders. As a result, Mr. Xu will be able to determine or significantly influence any action requiring the approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws, and the approval of any merger,

73

Table of Contents

consolidation, sale of all or substantially all of our assets, or other major corporate transaction. Mr. Xu may have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. This concentrated control may have the effect of delaying, preventing, or deterring a change in control of our company, could deprive our stockholders of an opportunity to receive a premium for their capital stock as part of a sale of our company, and might ultimately affect the market price of our Class A common stock. Further, the separation between voting power and economic interests could cause conflicts of interest between our Co-Founders and our other stockholders, which may result in our Mr. Xu undertaking, or causing us to undertake, actions that would be desirable for himself or the Co-Founders but would not be desirable for our other stockholders.

Future transfers by the holders of Class B common stock will generally result in those shares automatically converting into shares of Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning or other transfers among our Co-Founders and their family members. In addition, each share of Class B common stock will convert automatically into one share of Class A common stock upon (i) the date fixed by our board of directors that is no less than 61 days and no more than 180 days following the first date following the completion of this offering on which the number of shares of our capital stock, including Class A common stock, Class B common stock, and Class C common stock, and any shares of capital stock underlying equity securities or other convertible instruments, held by Mr. Xu and his permitted entities and permitted transferees is less than 35% of the Class B common stock held by Mr. Xu and his permitted entities as of immediately following the completion of this offering, which we sometimes refer to herein as the 35% Ownership Threshold; (ii) 12 months after the death or permanent and total disability of Mr. Xu, during which 12-month period the shares of our Class B common stock shall be voted as directed by a person designated by Mr. Xu and approved by our board of directors (or if there is no such person, then our secretary then in office); (iii) the date fixed by our board of directors that is no less than 61 days and no more than 180 days following the date on which Mr. Xu is terminated for cause (as defined in our amended and restated certificate of incorporation): or (iv) the date fixed by our board of directors that is no less than 61 days and no more than 180 days following the date upon which (A) Mr. Xu is no longer providing services to us as an officer, employee, or consultant and (B) Mr. Xu is no longer a member of our board of directors, either as a result of Mr. Xu's voluntary resignation or as a result of a request or agreement by Mr. Xu at a meeting of our stockholders for Mr. Xu not to be renominated as a member of our board of directors. We refer to the date on which such final conversion of all outstanding shares of Class B common stock pursuant to the terms of our amended and restated certificate of incorporation occurs as the Final Conversion Date. For information about our multi-class structure, see the section titled "Description of Capital Stock."

Shares of our Class C common stock, which entitle the holder to zero votes per share (except as otherwise required by law), will not be issued and outstanding at the closing of the offering and we have no current plans to issue shares of Class C common stock. These shares will be available to be used in the future to further strategic initiatives, such as financings or acquisitions, or issue future equity awards to our service providers. Over time the issuance of shares of Class A common stock will result in voting dilution to all of our stockholders and this dilution could eventually result in our Co-Founders, in particular Mr. Xu, holding less than a majority of our total outstanding voting power. Once our Co-Founders own less than a majority of our total outstanding voting power, Mr. Xu would no longer have the unilateral ability to elect all of our directors and to determine the outcome of any matter submitted for a vote of our stockholders. Because the shares of Class C common stock have no voting rights (except as required by law), the issuance of such shares will not result in further voting dilution, which would prolong the voting control of Mr. Xu. Further, the issuance of such shares of Class C common stock to Mr. Xu would also delay the final conversion of all of our outstanding Class B common stock because shares of Class C common stock issued to Mr. Xu would be counted when determining whether the 35% Ownership Threshold has been met. As a result, the issuance of shares of Class C common stock could prolong the duration of Mr. Xu's control of our voting power and his ability to elect all of our directors and to determine the outcome of most matters submitted to a vote of our

74

Table of Contents

stockholders. In addition, we could issue shares of Class C common stock to our Co-Founders and, in that event, they would be able to sell such shares of Class C common stock and achieve liquidity in their holdings without diminishing Mr. Xu's voting control. Any future issuances of shares of Class C common stock will not be subject to approval by our stockholders except as required by the listing standards of the New York Stock Exchange. See the section titled "Description of Capital Stock—Anti-Takeover Provisions" for additional information.

***Although we do not expect to rely on the "controlled company" exemption under the listing standards of the New York Stock Exchange, we expect to have the right to use such exemption and therefore we could in the future avail ourselves of certain reduced corporate governance requirements.***

As a result of our multi-class common stock structure and the Voting Agreement between the Co-Founders, our Co-Founders will collectively hold a majority of the voting power of our outstanding capital stock following the completion of this offering and Mr. Xu will have the authority (and irrevocable proxy) to direct the vote and vote the shares of Class B common stock held by Messrs. Fang and Tang, and their respective permitted entities and permitted transferees, at his discretion on all matters to be voted upon by stockholders. Therefore, we will be considered a "controlled company" as that term is set forth in the listing standards of the New York Stock Exchange. Under these listing standards, a company in which over 50% of the voting power for the election of directors is held by an individual, a group, or another company is a "controlled company" and may elect not to comply with certain listing standards of the New York Stock Exchange regarding corporate governance, including:

- the requirement that a majority of its board of directors consist of independent directors;

- the requirement that its nominating or corporate governance committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and an annual performance evaluation of the committee; and

- the requirement that its compensation committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, an annual performance evaluation of the committee, and the rights and responsibilities of the committee relate to any compensation consultant, independent legal counsel, or any other advisor retained by the committee.

These requirements would not apply to us if, in the future, we choose to avail ourselves of the "controlled company" exemption. Although we qualify as a "controlled company," we do not currently expect to rely on these exemptions and intend to fully comply with all corporate governance requirements under the listing standards of the New York Stock Exchange. However, if we were to utilize some or all of these exemptions, we would not comply with certain of the corporate governance standards of the New York Stock Exchange, which could adversely affect the protections for other stockholders.

***We cannot predict the effect our multi-class structure may have on the market price of our Class A common stock. Future issuances of our Class C common stock, if any, will not dilute the voting control of Mr. Xu, but will dilute his economic interest which could cause his interests to conflict with your interests. Further, the issuance of shares of Class C common stock, whether to Mr. Xu or to other stockholders, could prolong the duration of Mr. Xu's voting control.***

We cannot predict whether our multi-class structure will result in a lower or more volatile market price of our Class A common stock, in adverse publicity, or other adverse consequences. For example, certain index providers have announced restrictions on including companies with multi-class share structures in certain of their indices. In July 2017, FTSE Russell announced that it plans to require new constituents of its indices to have greater than 5% of the company's voting rights in the hands of public stockholders,

75

Table of Contents

and S&P Dow Jones announced that it will no longer admit companies with multi-class share structures to certain of its indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400, and S&P SmallCap 600, which together make up the S&P Composite 1500. Also in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices and in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. Under such announced policies, the multi-class structure of our common stock would make us ineligible for inclusion in certain indices and, as a result, mutual funds, exchange-traded funds, and other investment vehicles that attempt to track those indices would not invest in our Class A common stock. These policies are relatively new and it is unclear what effect, if any, they will have on the valuations of publicly-traded companies excluded from such indices, but it is possible that they may depress valuations, as compared to similar companies that are included. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from certain stock indices would likely preclude investment by many of these funds and could make our Class A common stock less attractive to other investors. As a result, the market price of our Class A common stock could be adversely affected.

**The trading price of our Class A common stock may be volatile, and you could lose all or part of your investment.**

Prior to this offering, there has been no public market for shares of our Class A common stock. The initial public offering price of our Class A common stock was determined through negotiation among us and the underwriters. This price does not necessarily reflect the price at which investors in the market will be willing to buy and sell shares of our Class A common stock following this offering. In addition, the trading price of our Class A common stock following this offering is likely to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. These fluctuations could cause you to lose all or part of your investment in our Class A common stock since you might be unable to sell your shares at or above the price you paid in this offering. Factors that could cause fluctuations in the trading price of our Class A common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the trading prices and trading volumes of technology stocks;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our Class A common stock by us or our stockholders;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections, or our failure to meet those projections;

- announcements by us or our competitors of new services or platform features;

- the public's reaction to our press releases, other public announcements, and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

76

Table of Contents

- actual or anticipated developments in our business, our competitors' businesses, or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- actual or perceived privacy or security breaches or other incidents;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses, services, or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations, or principles;

- any significant change in our management;

- general economic conditions and slow or negative growth of our markets;

- other events or factors, including those resulting from war, incidents of terrorism, natural disasters, public health concerns or epidemics, such as the recent COVID-19 pandemic, natural disasters, or responses to these events; and

- our anticipated uses of net proceeds from this offering.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

***A substantial portion of the outstanding shares of our Class A common stock and Class B common stock after this offering will be restricted from immediate resale, but may be sold on a stock exchange in the near future. The large number of shares eligible for public sale or subject to rights requiring us to register them for public sale could depress the market price of our Class A common stock.***

The market price of our Class A common stock could decline as a result of sales of a large number of shares of our Class A common stock in the market after this offering, and the perception that these sales could occur may also depress the market price of our Class A common stock. Based on 253,343,071 shares of our Class A common stock outstanding and 31,313,450 shares of our Class B common stock outstanding (after giving effect to the Capital Stock Conversion, the Reclassification, and the Class B Stock Exchange) as of September 30, 2020, we will have 286,343,071 shares of our Class A common stock and 31,313,450 shares of our Class B common stock outstanding after this offering.

Our executive officers, directors, and the holders of substantially all of our capital stock and securities convertible into or exchangeable for our capital stock have entered into market standoff agreements with us or have entered into lock-up agreements with the underwriters under which they have agreed, subject to specific exceptions, not to sell any of our stock for a period of time up to 180 days following the date of this prospectus. We refer to such period as the lock-up period.

Our lock-up period has two potential release dates, the first following our first earnings release or periodic report (either our quarterly report on Form 10-Q or annual report on Form 10-K), subject to certain conditions described below, and the second following our second earnings release or periodic report, or 180 days, whichever is earlier.

77

Table of Contents

The terms of the lock-up agreements will expire on 40% of each stockholder's shares of common stock subject to the lock-up agreement (provided that if the stockholder is a member of our board of directors (excluding affiliated funds) or management team, then such amount is 20%) if certain conditions are met, and we refer to the date on which this occurs as the Early Lock-Up Expiration Determination Date. If such conditions are met, these shares will become available for sale prior to the opening of trading on the third full trading day following the date on which all of the below conditions are satisfied, or the Early Lock-Up Expiration Date. An Early Lock-Up Expiration Determination Date will occur if:

(1)    such date is at least 90 days after the date of this prospectus;

(2)    such date occurs after we have publicly furnished at least one earnings release on Form 8-K or filed at least one periodic report with the SEC;

(3)    on such date, and for 5 out of any 10 consecutive trading days ending on such date, the last reported closing price of our Class A common stock is at least 25% greater than the initial public offering price set forth on the cover page of this prospectus; and

(4)    such date occurs in a broadly applicable period during which trading in our securities is permitted under our insider trading policy, or an open trading window, and there are at least 5 trading days remaining in the open trading window.

All remaining shares of common stock subject to the lock-up agreement and not released on the Early Lock-Up Expiration Date will be released upon the earlier of (i) immediately prior to the opening of trading on the third full trading day after we have publicly furnished our second earnings release on Form 8-K or filed our second periodic report with the SEC or (ii) 180 days after the date of this prospectus, or the Final Lock-Up Expiration Date. We will announce both the Early Lock-Up Expiration Date and the Final Lock-Up Expiration Date through a press release or Form 8-K at least two full trading days before it is effective. We and the underwriters may release certain stockholders from the market standoff agreements or lock-up agreements prior to the end of the lock-up period.

As a result of these agreements and the provisions of our Amended and Restated Investors' Rights Agreement dated June 17, 2020, or our IRA, described further in the section titled "Description of Capital Stock—Registration Rights," and subject to the provisions of Rule 144 or Rule 701, shares of our Class A common stock (including shares of Class A common stock issuable upon conversion of Class B common stock) will be available for sale in the public market as follows (assuming no exercise of outstanding stock options or settlement of outstanding RSUs subsequent to September 30, 2020):

•    beginning on the date of this prospectus, all 33,000,000 shares of our Class A common stock sold in this offering will be immediately available for sale in the public market;

•    beginning on the Early Lock-Up Expiration Date, if the lock-up expiration has been triggered:

    •    95,709,974 shares of Class A common stock held by former holders of our redeemable convertible preferred stock will be eligible for sale in the public market from time to time thereafter subject in some cases to the volume and other restrictions of Rule 144;

    •    6,262,890 shares of Class A common stock held by members of our board of directors and members of our management team (including 6,262,690 shares of Class A common stock issuable upon conversion of Class B common stock that are held by our Co-Founders) will be eligible for sale in the public market from time to time thereafter subject in some cases to the volume and other restrictions of Rule 144;

    •    11,889,744 shares of Class A common stock held by all other holders will be eligible for sale in the public market from time to time thereafter subject in some cases to the volume and other restrictions of Rule 144; and

•    beginning on the Final Lock-Up Expiration Date, the remainder of the shares of our Class A common stock (including shares of Class A common stock issuable upon conversion of Class B

78

Table of Contents

common stock) will be eligible for sale in the public market from time to time thereafter subject in some cases to the volume and other restrictions of Rule 144.

Upon completion of this offering, stockholders owning an aggregate of up to 239,106,756 shares of our Class A common stock will be entitled, under our IRA, to require us to register shares owned by them for public sale in the United States. In addition, we intend to file a registration statement to register shares reserved for future issuance under our equity compensation plans. Upon effectiveness of that registration statement, subject to the satisfaction of applicable exercise periods and the expiration or waiver of the market standoff agreements and lock-up agreements referred to above, the shares issued upon exercise of outstanding stock options or upon settlement of outstanding RSU awards will be available for immediate resale in the United States in the open market.

Sales of our Class A common stock as restrictions end or pursuant to registration rights may make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. These sales could also cause the trading price of our Class A common stock to fall and make it more difficult for you to sell shares of our Class A common stock.

***We are an emerging growth company and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our Class A common stock less attractive to investors.***

We are an emerging growth company, as defined in the JOBS Act, and have the option to utilize certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We may take advantage of these reporting exemptions until we are no longer an emerging growth company. We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year (A) following the fifth anniversary of the completion of this offering, (B) in which we have total annual revenue of at least $1.07 billion, or (C) in which we are deemed to be a large accelerated filer, with at least $700 million of equity securities held by non-affiliates as of the prior June 30th, and (ii) the date on which we have issued more than $1 billion in non-convertible debt during the prior three-year period.

Under the JOBS Act, emerging growth companies can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We have elected to use this extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (i) are no longer an emerging growth company or (ii) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates. While we have not made such an irrevocable election, we have not delayed the adoption of any applicable accounting standards. Further, we may take advantage of some of the other reduced regulatory and reporting requirements that will be available to us so long as we qualify as an emerging growth company.

Among other things, this means that our independent registered public accounting firm will not be required to provide an attestation report on the effectiveness of our internal control over financial reporting so long as we qualify as an emerging growth company, which may increase the risk that weaknesses or deficiencies in our internal control over financial reporting go undetected. Likewise, so long as we qualify as an emerging growth company, we may elect not to provide you with certain information, including certain financial information and certain information regarding compensation of

79

Table of Contents

our executive officers, that we would otherwise have been required to provide in filings we make with the SEC, which may make it more difficult for investors and securities analysts to evaluate our company. As a result, investor confidence in our company and the market price of our Class A common stock may be adversely affected. Further, we cannot predict if investors will find our Class A common stock less attractive because we will rely on these exemptions. If some investors find our Class A common stock less attractive as a result, there may be a less active trading market for our Class A common stock and our stock price may be more volatile.

***If you purchase our Class A common stock in this offering, you will incur immediate and substantial dilution.***

The initial public offering price of $102.00 per share is substantially higher than the pro forma as adjusted net tangible book value per share of our outstanding Class A common stock and Class B common stock (after giving effect to the Capital Stock Conversion and the Class B Stock Exchange) of $13.53 per share as of September 30, 2020. Investors purchasing shares of our Class A common stock in this offering will pay a price per share that substantially exceeds the book value of our tangible assets after subtracting our liabilities. Therefore, if you purchase our Class A common stock in this offering, you will incur immediate dilution of $88.47 per share in the pro forma as adjusted net tangible book value per share from the price you paid.

This dilution is due in large part to the fact that our earlier investors paid substantially less than the initial public offering price when they purchased shares prior to this offering. In addition, as of September 30, 2020, options to purchase 34,554,510 shares of our Class A common stock, with a weighted-average exercise price of $2.41 per share, and 20,021,420 shares of our Class A common stock subject to RSUs were outstanding. Further, subject to certain conditions which we do not expect to be satisfied until after this offering, the Convertible Notes will automatically convert into shares of our Class A common stock unless we elect to settle such conversion in cash pursuant to the terms of the Convertible Notes. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Convertible Notes" for additional information about the Convertible Notes. The exercise of any of these options, settlement of any of these RSUs, any conversion of the Convertible Notes into shares of our Class A common stock (unless we elect to settle such conversion in cash pursuant to the terms of the Convertible Notes), or issuance of additional shares of our Class A common stock or Class B common stock would result in additional dilution. As a result of the dilution to investors purchasing shares in this offering, investors may receive less than the purchase price paid in this offering, if anything, in the event of our liquidation. For more information, see the section titled "Dilution."

***Prior to this offering, there has been limited trading of our Class A common stock at prices that may be higher than what our Class A common stock will trade at once it is listed.***

Prior to this offering, our shares have not been listed on any stock exchange or other public trading market, but there has been some trading of our securities in private trades. These trades were speculative, and the trading price of our securities in these trades was privately negotiated. We cannot assure you that the price of our Class A common stock will equal or exceed the price at which our securities have traded prior to this offering.

***We have not granted the underwriters an option to purchase additional shares of Class A common stock from us and the trading price of our Class A common stock may be more volatile as a result.***

We have not granted the underwriters an option to purchase additional shares of Class A common stock from us at the initial public offering price less the underwriting discount, which is a common feature in initial public offerings. Without this option, the underwriters may choose not to engage in certain transactions that stabilize, maintain, or otherwise affect the market price of our Class A common stock,

Table of Contents

such as short sales, stabilizing transactions and purchases to cover positions created by short sales, to the extent they would have engaged in any such transactions had we granted the underwriters such an option. As a result, the price of our Class A common stock may be more volatile than it might have been had we granted the underwriters such an option. These fluctuations could cause you to lose part of your investment in our Class A common stock because you might be unable to sell your shares at or above the price you paid in this offering.

***We have broad discretion over the use of net proceeds from this offering and we may not use them effectively.***

We cannot specify with any certainty the particular uses of the net proceeds that we will receive from this offering. Our management will have broad discretion in the application of the net proceeds from this offering, including for any of the purposes described in the section titled "Use of Proceeds," and you will not have the opportunity as part of your investment decision to assess whether the net proceeds are being used appropriately. Because of the number and variability of factors that will determine our use of the net proceeds from this offering, their ultimate use may vary substantially from their currently intended use. The failure by our management to apply these proceeds effectively could adversely affect our business, financial condition, and results of operations. Pending their use, we may invest our proceeds in a manner that does not produce income or that loses value. Our investments may not yield a favorable return to our investors and may negatively impact the price of our Class A common stock.

***Delaware law and provisions in our amended and restated certificate of incorporation and amended and restated bylaws could make a merger, tender offer, or proxy contest difficult, thereby depressing the market price of our Class A common stock.***

Our status as a Delaware corporation and the anti-takeover provisions of the Delaware General Corporation Law may discourage, delay, or prevent a change in control by prohibiting us from engaging in a business combination with an interested stockholder for a period of three years after the date of the transaction in which the person became an interested stockholder, even if a change of control would be beneficial to our existing stockholders. In addition, our amended and restated certificate of incorporation and amended and restated bylaws will contain provisions that may make the acquisition of our company more difficult, including the following:

- any amendments to our amended and restated certificate of incorporation will require the approval of at least a majority of the voting power of the outstanding shares of our Class A common stock and Class B common stock;

- our amended and restated bylaws will provide that approval of the holders of at least a majority of the voting power of the outstanding shares of our Class A common stock and Class B common stock voting as a single class is required for stockholders to amend or adopt any provision of our bylaws;

- our multi-class common stock structure and the Voting Agreement, which provide Tony Xu with the ability to determine or significantly influence the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A common stock, Class B common stock, and Class C common stock;

- our board of directors is classified into three classes of directors with staggered three-year terms and directors are only able to be removed from office for cause;

- until the first date on which the outstanding shares of our Class B common stock represent less than a majority of the total combined voting power of our Class A common stock and our Class B common stock, or the Voting Threshold Date, our stockholders will only be able to take action by written consent if such action is first recommended or approved by our board of

81

Table of Contents

directors, except as set forth in the section titled "Description of Capital Stock—Anti-Takeover Provisions—Amended and Restated Certificate of Incorporation and Amended and Restated Bylaw Provisions—Board of Directors Vacancies";

- after the Voting Threshold Date, our stockholders will only be able to take action at a meeting of stockholders and will not be able to take action by written consent for any matter, except as set forth in the section titled "Description of Capital Stock—Anti-Takeover Provisions—Amended and Restated Certificate of Incorporation and Amended and Restated Bylaw Provisions—Board of Directors Vacancies";

- our amended and restated certificate of incorporation will not provide for cumulative voting;

- vacancies on our board of directors will be able to be filled only by our board of directors and not by stockholders, except as set forth in the section titled "Description of Capital Stock—Anti-Takeover Provisions—Amended and Restated Certificate of Incorporation and Amended and Restated Bylaw Provisions—Board of Directors Vacancies";

- a special meeting of our stockholders may only be called by the chairperson of our board of directors, our Chief Executive Officer, our President, or a majority of our board of directors;

- certain litigation against us can only be brought in Delaware;

- our amended and restated certificate of incorporation will authorize undesignated preferred stock, the terms of which may be established and shares of which may be issued without further action by our stockholders; and

- advance notice procedures apply for stockholders to nominate candidates for election as directors or to bring matters before an annual meeting of stockholders.

These provisions, alone or together, could discourage, delay, or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and to cause us to take other corporate actions they desire, any of which, under certain circumstances, could limit the opportunity for our stockholders to receive a premium for their shares of our Class A common stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

***Our amended and restated bylaws will designate a state or federal court located within the State of Delaware as the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers, or employees.***

Our amended and restated bylaws, which will become effective immediately prior to the completion of this offering, will provide that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers, or other employees to us or our stockholders, (iii) any action arising pursuant to any provision of the Delaware General Corporation Law, our amended and restated certificate of incorporation, or our amended and restated bylaws, or (iv) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware), in all cases subject to the court having jurisdiction over indispensable parties named as defendants. Our amended and restated bylaws will also provide that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action under the Securities Act of 1933, as amended, or the Securities Act. Nothing in our amended and restated bylaws precludes stockholders that assert claims under the Exchange Act from bringing such claims in state or federal court, subject to applicable law.

82

Table of Contents

Any person or entity purchasing or otherwise acquiring any interest in any of our securities shall be deemed to have notice of and consented to these provisions. These exclusive forum provisions may limit a stockholder's ability to bring a claim in a judicial forum of its choosing for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. The enforceability of similar choice of forum provisions in other companies' charter documents has been challenged in legal proceedings, and it is possible that a court could find these types of provisions to be inapplicable or unenforceable. For example, in December 2018, the Court of Chancery of the State of Delaware determined that a provision stating that U.S. federal district courts are the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act is not enforceable. Although this decision was reversed by the Delaware Supreme Court in March 2020, courts in other states may still find these provisions to be inapplicable or unenforceable. If a court were to find the exclusive forum provisions in our amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could adversely affect our results of operations.

***In making your investment decision, you should understand that we and the underwriters have not authorized any other party to provide you with information concerning us or this offering.***

You should carefully evaluate all of the information in this prospectus. We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is not directly attributable to statements made by our officers and employees, that incorrectly reports on statements made by our officers or employees or that is misleading as a result of omitting information provided by us, our officers, or employees. We and the underwriters have not authorized any other party to provide you with information concerning us or this offering.

***If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about us, our business, or our market, or if they change their recommendation regarding our Class A common stock adversely, the market price and trading volume of our Class A common stock could decline.***

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us, our business, our market, or our competitors. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If any of the analysts who cover us change their recommendation regarding our Class A common stock adversely, provide more favorable relative recommendations about our competitors, or publish inaccurate or unfavorable research about our business, the price of our securities would likely decline. If few securities analysts commence coverage of us, or if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, we could lose visibility in the financial markets and demand for our securities could decrease, which could cause the price and trading volume of our Class A common stock to decline.

***We do not expect to pay dividends in the foreseeable future.***

We have never declared nor paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not anticipate declaring or paying any dividends to holders of our capital stock in the foreseeable future. In addition, our revolving credit facility contains restrictions on our ability to pay dividends. Consequently, stockholders must rely on sales of their Class A common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment.

83

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements within the meaning of the federal securities laws, which statements involve substantial risks and uncertainties. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expect," "plan," "anticipate," "could," "would," "intend," "target," "project," "contemplate," "believe," "estimate," "predict," "potential," or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans, or intentions. Forward-looking statements contained in this prospectus include statements about:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, operating expenses, Total Orders, Marketplace GOV, Contribution Profit (Loss), Contribution Margin, Adjusted EBITDA, and Adjusted EBITDA Margin, our ability to determine reserves, and our ability to maintain or increase profitability;

- our ability to successfully execute our business and growth strategy;

- the sufficiency of our cash, cash equivalents, and marketable securities to meet our liquidity needs;

- the demand for our platform or for local logistics platforms in general;

- our ability to attract and retain merchants, consumers, and Dashers;

- our ability to effectively manage costs related to Dashers;

- our ability to develop new offerings, services, and features and bring them to market in a timely manner and make enhancements to our platform;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- our expectations regarding outstanding litigation and legal and regulatory matters;

- our expectations regarding the effects of existing and developing laws and regulations, including with respect to independent contractor classification, taxation, and privacy and data protection;

- our ability to manage and insure auto-related and operations-related risk associated with our business;

- our expectations regarding new and evolving markets;

- our ability to develop and protect our brand;

- our ability to maintain the security and availability of our platform;

- our expectations and management of future growth;

- our expectations concerning relationships with third parties;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to integrate Caviar and any other companies and assets that we acquire;

- the increased expenses associated with being a public company;

- the impact of the recent COVID-19 pandemic, or a similar public health threat, on global capital and financial markets, general economic conditions in the United States, and our business and operations; and

- our anticipated uses of net proceeds from this offering.

84

Table of Contents

We caution you that the foregoing list may not contain all of the forward-looking statements made in this prospectus.

You should not rely upon forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this prospectus primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations, and prospects. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, and other factors, including those described in the section titled "Risk Factors" and elsewhere in this prospectus. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. We cannot assure you that the results, events, and circumstances reflected in the forward-looking statements will be achieved or occur, and actual results, events, or circumstances could differ materially from those described in the forward-looking statements.

Neither we nor any other person assumes responsibility for the accuracy and completeness of any of these forward-looking statements. Moreover, the forward-looking statements made in this prospectus relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this prospectus to reflect events or circumstances after the date of this prospectus or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, or investments we may make.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

85

# EXHIBIT E
# to
**Declaration of Jeremy M. Goldman**
**In Support Of San Francisco's Request For**
**Judicial Notice And Motion To Dismiss**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**FORM 8-K**

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): December 1, 2020**

---

**UBER TECHNOLOGIES, INC.**
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-38902 | 45-2647441 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1455 Market Street, 4th Floor**
**San Francisco, California 94103**
**(Address of principal executive offices, including zip code)**

**(415) 612-8582**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.00001 per share | UBER | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

8/27/2021                                     https://www.sec.gov/Archives/edgar/data/0001543151/000155278120000580/e20585_ex99-1.htm

EX-99.1 2 e20585_ex99-1.htm

## Uber completes acquisition of Postmates
*Combination of platforms provides more choice and convenience for consumers, new demand and tailored technology offerings for restaurants, and increased income opportunities for delivery people*

SAN FRANCISCO — Uber Technologies, Inc. (NYSE: UBER) today announced that it has completed the acquisition of Postmates Inc. in an all-stock transaction, and that the two companies have begun the process of integrating U.S. operations.

As previously announced, the transaction brings together Uber's global Mobility and Delivery platform with Postmates' beloved business in the U.S. to strengthen the delivery of food, groceries, essentials, and other goods. The consumer-facing Postmates and Uber Eats apps will continue to run separately, supported by a more efficient, combined merchant and delivery network.

In connection with the closing, Uber has signaled its commitment to the success of the restaurants and merchants who use its technology to reach customers and delivery people by announcing a national listening tour. These efforts are designed to better understand merchants' needs, and to continue to develop products, services, and policies that protect their interests.

"Uber and Postmates have long been committed to powering delivery services that support local commerce and communities, all the more important during crises like the one we face today. We're thrilled to bring these two teams together to continue to innovate, bringing ever-better products and services for merchants, delivery people, and consumers across the country," said Uber CEO Dara Khosrowshahi.

"We built Postmates to empower local commerce and bring the best of your city to your home, especially in cities like Los Angeles and across the southwest," said Bastian Lehmann, co-founder and CEO of Postmates. "I'm confident that alongside Uber Eats we will create even more opportunities for our customers, continue to drive growth for our merchants, and deliver unique earning opportunities for our Postmates."

**About Uber**

Uber's mission is to create opportunity through movement. We started in 2010 to solve a simple problem: how do you get access to a ride at the touch of a button? More than 15 billion trips later, we're building products to get people closer to where they want to be. By changing how people, food, and things move through cities, Uber is a platform that opens up the world to new possibilities.

**About Postmates**

Postmates is a leader in delivering your favorite restaurants and a whole lot more on-demand. The platform gives customers access to the most selection of merchants in the U.S. with more than 600,000 restaurants and retailers available for delivery and pickup. The market leader in Los Angeles, Postmates covers 80% of U.S. households, across all 50 states. Customers can get free delivery on all merchants by joining Postmates Unlimited, the industry's first subscription service. Learn more or start a delivery by downloading the app or visiting www.postmates.com.

**Contacts**

**Press:**
For Uber:                                         For Postmates:
press@uber.com                                    press@postmates.com

**Investors and Analysts:**
For Uber:
investor@uber.com

---

# EXHIBIT F
# to
**Declaration of Jeremy M. Goldman
In Support Of San Francisco's Request For
Judicial Notice And Motion To Dismiss**

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

LLC-12

20-E81686

## FILED

In the office of the Secretary of State
of the State of California

DEC 01, 2020

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

PORTIER, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201501010259 | DELAWARE |

**4. Business Addresses**

| a. Street Address of Principal Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1455 Market Street 4th Floor | San Francisco | CA | 94103 |

| b. Mailing Address of LLC, if different than item 4a | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1455 Market Street 4th Floor | San Francisco | CA | 94103 |

| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Brian | | Kuntz | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1455 Market Street 4th Floor | San Francisco | CA | 94103 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | CA | |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

C T CORPORATION SYSTEM (C0168406)

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company

Operates uberEATS (food delivery)

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 12/01/2020 | Kelly Lettmann | Power of Attorney | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)          Page 1 of 2          2017 California Secretary of State
www.sos.ca.gov/business/be

**Attachment to
Statement of Information**
(Limited Liability Company)

**LLC-12A
Attachment**

20-E81686

**A.   Limited Liability Company Name**

PORTIER, LLC

This Space For Office Use Only

| **B.   12-Digit Secretary of State File Number** | **C.   State or Place of Organization** (only if formed outside of California) |
|---|---|
| 201501010259 | DELAWARE |

**D.   List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address.   If the manager/member is an entity, enter the entity's name and address.  Note:  The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Francois | Pascal | Chadwick | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| 1455 Market Street 4th Floor | San Francisco | CA | 94103 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Keir | | Gumbs | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| 1455 Market Street 4th Floor | San Francisco | CA | 94103 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

# EXHIBIT G
# to

**Declaration of Jeremy M. Goldman
In Support Of San Francisco's Request For
Judicial Notice And Motion To Dismiss**

**California Secretary of State**
Electronic Filing

**FILED**
Secretary of State
State of California

# Corporation - Statement of Information

| | |
|---|---|
| Entity Name: | MAPLEBEAR INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS INSTACART |
| Entity (File) Number: | C3522047 |
| File Date: | 12/17/2020 |
| Entity Type: | Corporation |
| Jurisdiction: | DELAWARE |
| Document ID: | GM86709 |

**Detailed Filing Information**

1. Entity Name:

   MAPLEBEAR INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS INSTACART

2. Business Addresses:
   a. Street Address of Principal Office in California:

   50 Beale Street, Suite 600
   San Francisco, California 94105
   United States of America

   b. Mailing Address:

   50 Beale Street, Suite 600
   San Francisco, California 94105
   United States of America

   c. Street Address of Principal Executive Office:

   50 Beale Street, Suite 600
   San Francisco, California 94105
   United States of America

3. Officers:
   a. Chief Executive Officer:

   Apoorva  Mehta
   50 Beale Street, Suite 600
   San Francisco, California 94105
   United States of America

   b. Secretary:

   Apoorva  Mehta
   50 Beale Street, Suite 600
   San Francisco, California 94105
   United States of America

Document ID:GM86709

# California Secretary of State
## Electronic Filing

Officers (cont'd):

    c.  Chief Financial Officer:

        Sagar  Sanghvi
        50 Beale Street, Suite 600
        San Francisco, California 94105
        United States of America

4.  Director:                      Not Applicable

    Number of Vacancies on the Board of
    Directors:                Not Applicable

5.  Agent for Service of Process:    COGENCY GLOBAL INC. (C2003899)

6.  Type of Business:           Technology platform for grocery delivery
                               services.

By signing this document, I certify that the information is true and correct and that I am authorized by California law to sign.

Electronic Signature:    Apoorva Mehta

Document ID: GM86709

# EXHIBIT H
# to
### Declaration of Jeremy M. Goldman
### In Support Of San Francisco's Request For
### Judicial Notice And Motion To Dismiss

San Francisco Mulls Legislation for Ghost Kitchens and Food Delivery ...        https://sf.eater.com/2020/2/27/21156525/ghost-kitchens-board-of-supervi...

**SAN FRANCISCO**

# San Francisco Mulls Legislation for Ghost Kitchens and Food Delivery Services

### Policies will be created following a March 12 meeting at City Hall

by Eve Batey  |  Feb 27, 2020, 1:26pm PST



**An Uber Eats delivery**  |  Photo by Jakub Porzycki/NurPhoto via Getty Images

8/9/2021, 5:39 PM

A San Francisco supervisor is summoning representatives from delivery service and ghost kitchen companies to City Hall next month, for a hearing to determine the new enterprises' impact on local restaurants.

---

RELATED

**Food Delivery Services DoorDash, Uber Eats, and Postmates Might Merge**

---

At a Board of Supervisors meeting in January, District 11 Supe Ahsha Safaí said that he'd decided to convene the hearing to determine the "effects of on demand and delivery companies' platforms like Postmates, Uber Eats, Grubhub, Caviar, and the impact that they are having on small businesses here in San Francisco." And the effects, he intimated, aren't always positive, as "I have heard from countless small business owners that...the rates at which they are being charged for these delivery services once they become part of their business model are having a significant impact on their bottom line."

Speaking with Eater SF on Wednesday, Safaí took a slightly more equitable tone, at least when it came to delivery services. He says that a lot of restaurants have had the volume of orders they're fulfilling go up, and that spots like one he frequents in West Portal say that half of their business is from delivery services. But once they join the services, Safai says, "the fees can start to get exorbitant," and it becomes "harder for the businesses to pull back."

A local restaurateur behind two fast casual San Francisco spots agrees. (As their restaurants do business with a number of delivery services, they asked to remain anonymous to allow full candor.) "Our food costs are lower than some," they said, "so the 30 percent commission that Uber Eats charges me doesn't completely kill our margins — and the volume it brings make it worthwhile." They say that other services charge around 20 percent, which is more affordable — but that those services (Postmates, DoorDash, and GrubHub) don't provide as many orders, which makes relationships with them "less worthwhile."

---

RELATED

**'We Don't Even Do Take Out': Why, Then, Is This Restaurant on Seamless?**

---

According to Safaí, city agencies like the Office of Economic and Workforce Development (which is tasked with fostering small business and "making our neighborhoods more diverse, healthy, and vibrant") will attend the March 12 hearing, as will the city's Office of Economic Analysis. San

Francsico-based Uber Eats, DoorDash, and Postmates are also expected to dispatch representatives. Safai says that restaurant owners are also invited to the meeting to speak their piece. Safaí's hopeful that all the stakeholders can engage in "an honest conversation," and after that...

"A lot of things can happen," Safaí says, resisting Eater SF's efforts to glean his opinion on the food delivery business. "I'm going to reserve that for now, because I don't want a pre-determined outcome," he says. "I really want to hear what small business and the industry propose, and really listen to ideas. We're going to create policy and legislation based on that."

RELATED

**Did Your Food Delivery Come From a Rented Trailer?**

But while Safaí remained moderate on the topic of delivery services, the tone turned when ghost kitchens — which will also be discussed at the meeting — came up. Of those businesses, which the anonymous restaurateur characterized as "food from a warehouse with a cute website," Safaí asked if the delivery companies that work in partnership with ghost kitchens are "fostering an environment where we get people out of their houses," or "are we going for a model of business where people just remain in their homes?"

A cycle of in-home food delivery from these kitchens could have a "negative impact on neighborhood vitality" Safaí said (some might argue that it already has), and the anonymous restaurateur says that the rise of ghost kitchens also threatens their economic stability. "Overhead-wise, I can't compete with a ghost kitchen. They're all huge commercial kitchens that are way cheaper to run than a restaurant, and they have no impact on the community."

RELATED

**New Laws Would Ban Delivery Apps From Adding Restaurants Without Their Permission**

According to Safaí, those concerns mean that the city might be ready to crack down on the ghost kitchen game. "San Francisco's not going to allow [ghost kitchens] to put our vibrant restaurant industry out of business," he said. "We will not allow that, for sure. They'll have seek other environments to make their money."

The question, of course, is if that's actually an option. Even the restaurateur admits that the ventures "are legally run businesses, subject to the same rules and inspections that we are." (It's true: Every San

Francsico ghost kitchen address Eater SF is aware of can be found in the Department of Public Health's permit and inspection database. All are in compliance.) "I don't know how the city thinks they can regulate ghost kitchens, or even limit them, without getting into a fight that they'll end up losing," the restaurateur says.

Perhaps all will be revealed after the hearing, which is planned for 10 a.m. on March 12, during the Board of Supervisors' regular Public Safety and Neighborhood Services committee meeting. The meeting will be held in San Francisco City Hall, Committee Room 263. The public is welcome to attend.

## Sign up for the Eater San Francisco newsletter

The freshest news from the local food world

Email (required)

SUBSCRIBE

By signing up, you agree to our Privacy Notice and European users agree to the data transfer policy.

# EXHIBIT I
## to
**Declaration of Jeremy M. Goldman
In Support Of San Francisco's Request For
Judicial Notice And Motion To Dismiss**



SECTIONS

LOG IN

AUGUST 30, 2021

**BUSINESS**   **EXCLUSIVE**

# State liquor authority threatens delivery services over hefty fees

By Lisa Fickenscher and Kevin Dugan

July 10, 2019
10:13pm



AP

## COLUMNISTS



Steve Cuozzo

One World Trade Center reaches deal for entire floor



Jennifer Gould

How Hamptons restaurants became a hot spot for big-name music acts



Keith J. Kelly

CNN star's bylines mysteriously vanish from her Daily Caller stories

SEE ALL COLUMNISTS ▸

## TRENDING NOW

IN BUSINESS

**MORE ON:**
**FOOD DELIVERY**

**NYC Council votes to cap Uber Eats, DoorDash and Grubhub restaurant fees**

**Make meal prep easy this school year with HelloFresh's simple recipes**

**Blue Apron Flash Sale: Save $120 on the meal delivery service**

**DoorDash driver admits tip stunt was 'fake' after going viral**

Grubhub might have to swallow hard when it reads this new set of rules.

The New York State Liquor Authority — a powerful agency that regulates restaurants serving alcohol statewide — is developing new rules that will significantly curb the stiff fees that can be charged by food-ordering companies like Grubhub, Uber Eats, DoorDash and Postmates, The Post has learned.

The SLA's new rules could slash the fee income of Grubhub, which also owns the Seamless food-ordering site, to 10 percent of a takeout order from its current 15 percent to 30 percent, according to sources close to the situation.

Alternatively, the liquor agency could force Grubhub and others to be listed on thousands of liquor licenses, creating a potential trove of legal liabilities and bureaucratic hassles for the companies, according to sources familiar with the



2,769

**Founder Elizabeth Holmes says ex-boyfriend and Theranos partner abused her**



2,164

**Nike closes corporate offices for mental health break**



1,208

**Zuck's in luck: FTC secretly interviewed Facebook founder in 2012 making lawsuit hard: sources**

*WHAT TO SHOP NOW*

situation.

"We have guidance for third-party providers drafted that will be presented to the [SLA] board for their consideration in the coming weeks," William Crowley, a spokesman for the agency, confirmed in a statement to The Post.

At issue is the agency's existing rule stating that anyone who profits from a liquor license must be listed on the license — regardless of whether alcohol is part of a sales transaction.

The only exception to this rule is a landlord who is allowed to take up to 10 percent of a restaurant's or bar's profits.

"Historically, we've allowed landlords to include a 10 percent of revenue [clause] in their leases," Crowley said, adding that anything above that threshold is considered profiting off of the sale of alcohol.

The New York liquor board is the latest government agency to scrutinize Grubhub's business model — which could cost the company big bucks in its most important market.



**The best lululemon dance apparel, per a professional choreographer**

**Shop Sephora's makeup and beauty bestsellers for September — updated monthly**

**Shop women's work outfits and clothes for returning to the office in 2021**

**Shop the best tech deals on laptops and more from HP's Labor Day 2021 sale**

**Wayfair's Labor Day sale features up to 50% off outdoor seating, more deals**

## *SEE ALSO*



**Grubhub execs grilled over bogus fees**

Last month, the New York City Council grilled

Grubhub executives about bogus fees it has been charging restaurants for phone calls that don't generate food orders — a practice that was first exposed by The Post in May.

Meanwhile, the New York City Hospitality Alliance, which represents bars and restaurants in the Big Apple, testified at the June hearing that it has been pushing for the SLA to force the delivery companies into compliance with its licensing rules.

"Any person or entity that shares in the revenues of a business licensed by the SLA must be on the liquor license," Robert Bookman, counsel to the New York City Hospitality Alliance, told The Post. "I don't see how the agency can make an exception for these delivery companies."

The trade group is also calling on the New York State Attorney General's office and the federal government to investigate whether Grubhub is violating antitrust laws because of alleged monopolistic behavior. Grubhub controls 69 percent of the New York City food delivery market, while Uber Eats commands 14 percent and DoorDash has 10 percent, according to Second Measure, a firm that analyzes purchase data.

For Grubhub, being listed on the license would involve fees, a massive amount of paperwork and months of waiting for licenses to be approved.

That's not to mention the liability associated with serving minors alcohol, liquor license attorneys said.

Grubhub didn't respond to requests for comment.

# EXHIBIT J
# to
## Declaration of Jeremy M. Goldman
## In Support Of San Francisco's Request For
## Judicial Notice And Motion To Dismiss

NEW YORK STATE LIQUOR AUTHORITY
FULL BOARD AGENDA
MEETING OF 08/20/2019
REFERRED FROM: SECRETARY'S OFFICE

2019-01699B

REASON FOR REFERRAL
REQUEST FOR DIRECTION

PROPOSED ADVISORY REGARDING
LEASES, MANAGEMENT AGREEMENTS
AND OTHER ARRANGEMENTS BETWEEN
LICENSEES AND THIRD PARTIES
PROVIDING SERVICES TO LICENSES
REGARDING THE SALE OF ALCOHOLIC
BEVERAGES

The Members of the Authority at their regular meeting held at the Zone 2 Albany Office
on 08/20/2019 determined:



**NEW YORK** | **State Liquor**
STATE OF
OPPORTUNITY. | **Authority**

**ANDREW M. CUOMO**
Governor

**VINCENT G. BRADLEY**
Chairman

**LILY M. FAN**
Commissioner

**GREELEY FORD**
Commissioner

To:            Members of the Authority

From:          Thomas J. Donohue, Secretary to the Authority

Subject:       Proposed Advisory regarding third party agreements

Date:          August 12, 2019

Attached for your review is a proposed Advisory intended to provide guidance to the industry in situations where a third party is sharing in a licensee's profits.

It is respectfully suggested that the Members of the Authority defer any action on this proposal and hold the matter over to a future Full Board meeting to allow sufficient time for the submission of comments from the public and the industry.



**NEW YORK** STATE OF OPPORTUNITY. | **State Liquor Authority**

ANDREW M. CUOMO
Governor

VINCENT G. BRADLEY
Chairman

LILY M. FAN
Commissioner

GREELEY FORD
Commissioner

---

ADVISORY #2019-x

---

To:        All licensees

Subject:   Leases, management agreements and other arrangements between licensees
           and third parties providing services to licensees regarding the sale of alcoholic
           beverages

The purpose of this advisory is to provide guidance to applicants and licensees who are, or may become, involved in arrangements with third parties that provide services to the licensee related to the licensed business. These third parties include, but are not limited to:

- the licensee's landlord;
- managers of the licensee's business;
- delivery services;
- e-commerce/internet platforms that provide advertising or accept or forward orders for alcoholic beverages for the licensee;
- promotion companies that offer coupons, discounts, etc. for the licensee's products;
- companies that host, support or otherwise maintain a licensee's internet website, smartphone application, social media or other electronic platform; and
- fulfillment centers that store, pack, ship and/or otherwise arrange for the delivery of a licensee's products to consumers.

In general, any person who is sharing in the profits from a business holding a license to sell or manufacture alcoholic beverages must be disclosed to the Authority and included as a principal on the license. The Authority does make a distinction between "flat fee" arrangements (where the third party is paid a pre-determined amount that is not dependent in any way on the licensee's sales) and "percentage" arrangements where the third party's compensation is a percentage of the profits and is therefore dependent on the profits generated by the licensee.

In addition, the Authority has allowed certain third parties to obtain a limited percentage of the licensee's profits without the need for the third party to be included as a principal of the licensed entity. For example, a lease entitling the landlord to a percentage of the profits from the

This is a DRAFT only-
This has not been approved by
the Members of the Authority

Advisory #2019-x
Leases, management agreements and other arrangements between licensees and non-
licensees regarding the sale of alcoholic beverages
Page 2 of 3

tenant's licensed business will not require the landlord to be added as a principal of the licensed entity if the percentage does not exceed 10% of gross profits and the lease gives the landlord no other financial interest in, or control over, the licensed business. The lease may, of course, give the landlord traditional rights as the property owner over the real property where the licensed business is located.

The Authority has also allowed leases with a percentage exceeding 10% but no more than 20% when the landlord is a not-for-profit corporation, governmental agency or public authority provided the lease gives the landlord no other financial interest in, or control over, the licensed business. The Licensing Board may act on such matters without the need for review by the Members of the Authority.

Prior to 2011, applicants were required to demonstrate control over the licensed premises by way of either a lease or a deed. Since 2011 applicants can satisfy this provision with a management or other agreement that gives the applicant control over the food and beverage operations at the licensed premises. The Authority's policy set forth above regarding leases is applicable to such agreements.

In the view of the Members of the Authority, the same analysis should be applied to other arrangements between licensees and other third parties who provide services to the licensed business. Accordingly, the Authority adopts the following policy regarding all such relationships between licensees and those third parties:

- For purposes of this Advisory, a "flat fee" shall mean that the third party is compensated at a pre-determined fee that is not dependent on the monetary value of sales made by the licensee or the number of sales made by the licensee.

- For purposes of this Advisory, an "agreement that entitles the third party to a percentage" shall mean any agreement where the third party's compensation for services to the licensee is based on the monetary value of sales made by the licensee or the number of sales made by the licensee. This includes any agreement related to a percentage or number of sales, whether it is limited to sales of alcoholic beverages or excludes sales of alcoholic beverages.

- Any agreement that entitles the third party to a "flat fee" for its services is permissible and will not require the third party to be included as a principal on the license, provided that "flat fee" is commercially reasonable in the view of the Authority. In making a determination of commercial reasonableness, the Authority will look to among other things the market rate for the service being offered and whether the amount of the flat fee would tend to give significant control to the third party over the licensed business.

- Any agreement that entitles a third party to a percentage not exceeding 10% of the licensee's profits is permissible and will not require the third party to be included as a principal on the license.

This is a DRAFT only-
This has not been approved by
the Members of the Authority

Advisory #2019-x
Leases, management agreements and other arrangements between licensees and non-
        licensees regarding the sale of alcoholic beverages

Page 3 of 3

- Any agreement that entitles a not-for-profit organization, government entity or public authority to a percentage not exceeding 20% of the licensee's profits is permissible and will not require the third party to be included as a principal on the license.

Except as provided above, the Licensing Board will deny any application that includes an agreement entitling a third party a percentage of the profits from the licensed business. Provided, however, that the applicant may request that the application be forwarded to the Members of the Authority for their review. In such matters, the applicant must demonstrate good cause why the third party should not have to be included as a principal of the licensed entity. For purposes of this advisory, good cause shall not include a situation where the third party is legally prohibited from holding the license in question.

Except as provided above, a licensee with an agreement entitling a third party a percentage of the profits from the licensed business will be considered to be availing its license and subject to disciplinary action by the Authority. Provided, however, that a licensee or third party may submit a request for a declaratory ruling to the Members of the Authority for their review. In such matters, the applicant must demonstrate good cause why the third party should not have to be included as a principal of the licensed entity. For purposes of this advisory, good cause shall not include a situation where the third party is legally prohibited from holding the license in question.

Please note that this advisory only addresses the financial compensation paid by the licensee to the third-party provider. Any agreement between a licensee and third-party provider shall be subject to review to determine whether the agreement affords the third-party provider significant control over the licensee's business that would require the third-party provider to be included as a principal on the license.

To the extent that this Advisory conflicts with any prior declaratory ruling issued by the Members of the Authority, applicants and licensees are instructed that the policy set forth herein shall pre-empt such rulings as of that date of this Advisory and shall apply to ant agreements that have not been previously approved by the Authority.

---

This matter was heard and determined by the Members of the Authority at a Full Board meeting held on _____, 2019 before Chairman Vincent Bradley, Commissioner Lily Fan, and Commissioner Greeley Ford. The above written advisory was approved by Chairman Bradley on behalf of the Members of the Authority on _____, 2019.

Dated:

Thomas J. Donohue
Secretary to the Authority

This is a DRAFT only-
This has not been approved by
the Members of the Authority

# EXHIBIT K
# to
**Declaration of Jeremy M. Goldman**
**In Support Of San Francisco's Request For**
**Judicial Notice And Motion To Dismiss**

# Dr. Shirley N. Weber
California Secretary of State

Home        Campaign Finance and Lobbying Activities        CAL-ACCESS Resources
Ballot Measure Total Contributions        2020 Ballot Measure Contribution Totals

# Proposition 22 - Changes Employment Classification Rules for App-Based Transportation and Delivery Drivers. Initiative Statute.

## *In Support of this measure:*

### Total amount of reported contributions to this measure: $188,937,777*

**Individual Ballot Measure Committees Formed for this Measure**

| Committee ID** | Committee Name | Total Reported Contributions |
|---|---|---|
| 1426273 | Let Us Work, Assemblyman Kevin Kiley's Ballot Measure Committee to Repeal AB 5 and Restore the Right to Earn a Living | $275 |
| 1422181 | Yes on 22 - Save App-Based Jobs and Services: a Coalition of On-Demand Drivers and Platforms, Small Businesses, Public Safety and Community Organizations | $188,937,502 |

*Through 10/14/2020.

**The law also requires ballot measure committees that raise $1 million or more to report the **Top 10 Contributors** who have donated at least $10,000 to the committee.

## *In Opposition to this measure:*

### Total amount of reported contributions to this measure: $15,896,808*

**Individual Ballot Measure Committees Formed for this Measure**

| Committee ID** | Committee Name | Total Reported Contributions |
|---|---|---|
| 1424537 | No on Prop 22, sponsored by Labor Organizations | $15,656,610 |
| 1428618 | No on 22, a Coalition of Economic and Social Justice NonProfits Dedicated to Workers' Rights | $10,980 |
| 1427634 | Silicon Valley Rising Action, Yes on Prop 15, No on Prop 22, a Coalition of Economic and Social Justice NonProfits (NonProfit 501 c4) | $229,218 |

*Through 10/14/2020.

**The law also requires ballot measure committees that raise $1 million or more to report the **Top 10 Contributors** who have donated at least $10,000 to the committee.

# EXHIBIT L
# to
### Declaration of Jeremy M. Goldman
### In Support Of San Francisco's Request For
### Judicial Notice And Motion To Dismiss



CALIFORNIA
Secretary of State Dr. Shirley N. Weber

| SECRETARY OF STATE | ELECTIONS | CAMPAIGN & LOBBYING | BUSINESS PROGRAMS | STATE ARCHIVES | REGISTRIES |

Cal-Access Search
**GO**
Advanced Search

*Cal-Access*

**Cal-Access Home**

**Campaign Finance**

Candidates &
Elected Officials

Propositions &
Ballot Measures

Committees, Parties,
Major Donors & Slate
Mailers

Daily/Late/
Special Filings

**Lobbying Activity**

**Resources**

**For Filers Only**

**Political Reform**

**User's Manual**

Campaign Finance:
# YES ON 22 - SAVE APP-BASED JOBS AND SERVICES: A COALITION OF ON-DEMAND DRIVERS AND PLATFORMS, SMALL BUSINESSES, PUBLIC SAFETY AND COMMUNITY ORGANIZATIONS

## Election Cycle:
○ 2021 through 2022
◉ Historical
   ◉ 2019 through 2020
   ○ 2017 through 2018
   ○ 2015 through 2016
   ○ 2013 through 2014
   ○ 2011 through 2012
   ○ 2009 through 2010
   ○ 2007 through 2008
   ○ 2005 through 2006
   ○ 2003 through 2004
   ○ 2001 through 2002
   ○ 1999 through 2000

## View Information:
(Due to the amount of data, these pages may take some time to load.)
○ General Information
◉ Contributions Received
○ Contributions Made
○ Expenditures Made
○ Late and $5000+ Contributions Received
○ Late Contributions Made
○ Late Independent Expenditures
○ Electronic Filings

> **The sources and amounts of contributions to the committee are itemized here. You may click on any of the headers to sort by that category.**

## Contribution Type:
◉ All Contributions
○ Loan Contributions
○ Monetary Contributions
○ Non-Monetary Contributions

California Secretary of State - CalAccess - Campaign Finance

**DOWNLOAD THESE RESULTS: MICROSOFT EXCEL**

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| COMMITTEE ON JOBS GOVERNMENT REFORM FUND | | NON-MONETARY | SAN FRANCISCO | CA/94104 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| 982683 | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $80,000.00 | | 10/26/2020 | 3/18/2021 | 2553928-NON1410 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| COMMITTEE ON JOBS GOVERNMENT REFORM FUND | | NON-MONETARY | SAN FRANCISCO | CA/94104 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| 982683 | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $100,000.00 | | 10/13/2020 | 3/18/2021 | 2521477-NON1255 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $3,750,000.00 | | 10/28/2020 | 3/18/2021 | 2553928-INC1414 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $7,040.00 | | 10/22/2020 | 3/18/2021 | 2553928-NON1407 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,198.98 | | 10/22/2020 | 3/18/2021 | 2553928-NON1408 |

California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,446.75 | | 10/30/2020 | 3/18/2021 | 2553928-NON1457 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $4,992.00 | | 10/30/2020 | 3/18/2021 | 2553928-NON1459 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 3/18/2021 | 2553928-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $10,000,000.00 | | 9/4/2020 | 1/6/2021 | 2505778-INC933 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $7,500,000.00 | | 9/4/2020 | 1/6/2021 | 2505778-INC937 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $3,221.25 | | 8/1/2020 | 1/6/2021 | 2505778-NON834 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $17,773.02 | | 8/13/2020 | 1/6/2021 | 2505778-NON855 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $4,345.74 | | 8/19/2020 | 1/6/2021 | 2505778-NON858 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $112,554.74 | | 8/19/2020 | 1/6/2021 | 2505778-NON859 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $26,695.40 | | 9/1/2020 | 1/6/2021 | 2505778-NON908 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $16,877.16 | | 9/14/2020 | 1/6/2021 | 2505778-NON992 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $6,811.20 | | 9/15/2020 | 1/6/2021 | 2505778-NON993 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 1/6/2021 | 2505778-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $666.67 | | 6/17/2020 | 7/31/2020 | 2487622-NON707 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 7/31/2020 | 2487622-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,638.30 | | 1/14/2020 | 4/30/2020 | 2471336-NON146 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 4/30/2020 | 2471336-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | |
|---|---|---|---|---|

California Secretary of State - CalAccess - Campaign Finance

|  |  |  | STATE/ZIP |
| --- | --- | --- | --- |
| DOORDASH, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER |  | OCCUPATION |
|  |  |  |  |
| AMOUNT |  | TRANS. DATE | FILED_DATE | TRANS # |
| $27,752.48 |  | 10/1/2020 | 3/18/2021 | 2521477-NON1159 |

| NAME OF CONTRIBUTOR |  | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. |  | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER |  |  | OCCUPATION |
|  |  |  |  |  |
| AMOUNT |  | TRANS. DATE | FILED_DATE | TRANS # |
| $7,571.44 |  | 10/7/2020 | 3/18/2021 | 2521477-NON1219 |

| NAME OF CONTRIBUTOR |  | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. |  | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER |  |  | OCCUPATION |
|  |  |  |  |  |
| AMOUNT |  | TRANS. DATE | FILED_DATE | TRANS # |
| $3,815.46 |  | 10/7/2020 | 3/18/2021 | 2521477-NON1220 |

| NAME OF CONTRIBUTOR |  | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. |  | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER |  |  | OCCUPATION |
|  |  |  |  |  |
| AMOUNT |  | TRANS. DATE | FILED_DATE | TRANS # |
| $48,350.00 |  | 10/10/2020 | 3/18/2021 | 2521477-NON1251 |

| NAME OF CONTRIBUTOR |  | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. |  | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER |  |  | OCCUPATION |
|  |  |  |  |  |
| AMOUNT |  | TRANS. DATE | FILED_DATE | TRANS # |
| $101,094.83 |  | 10/12/2020 | 3/18/2021 | 2521477-NON1252 |

| NAME OF CONTRIBUTOR |  | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. |  | NON-MONETARY | SAN FRANCISCO | CA/94103 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $425,000.00 | | 10/13/2020 | 3/18/2021 | 2521477-NON1253 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,670.40 | | 10/15/2020 | 3/18/2021 | 2521477-NON1272 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 3/18/2021 | 2521477-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $30,000,000.00 | | 10/28/2019 | 2/20/2020 | 2442931-PAY3 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| GOLD RUSH ADVERTISING | | NON-MONETARY | NAPA | CA/94559 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,080.00 | | 10/23/2020 | 3/18/2021 | 2553928-NON1340 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| HOPSKIPDRIVE, INC | | NON-MONETARY | LOS ANGELES | CA/90021 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $8,937.18 | | 9/18/2020 | 1/6/2021 | 2505778- |

California Secretary of State - CalAccess - Campaign Finance

| | | | NON1221 |
|---|---|---|---|

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $30,000,000.00 | | 12/22/2020 | 3/18/2021 | 2553928-PAY1558 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 3/18/2021 | 2553928-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $17,500,000.00 | | 9/4/2020 | 1/6/2021 | 2505778-INC934 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $33,071.62 | | 7/1/2020 | 1/6/2021 | 2505778-NON695 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $126,434.38 | | 8/1/2020 | 1/6/2021 | 2505778-NON832 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|--------|--|-------------|------------|---------|
| $947.52 | | 8/11/2020 | 1/6/2021 | 2505778-NON840 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $83,686.66 | | 8/13/2020 | 1/6/2021 | 2505778-NON853 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $56,248.65 | | 8/13/2020 | 1/6/2021 | 2505778-NON854 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $355,379.86 | | 9/1/2020 | 1/6/2021 | 2505778-NON910 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 1/6/2021 | 2505778-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $46,903.66 | | 4/1/2020 | 7/31/2020 | 2487622-NON414 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---------------------|--|--------------|------|-----------|
| | | | | |

California Secretary of State - CalAccess - Campaign Finance

| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| --- | --- | --- | --- | --- |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $23,076.26 | | 5/1/2020 | 7/31/2020 | 2487622-NON529 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $24,900.20 | | 6/1/2020 | 7/31/2020 | 2487622-NON652 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 7/31/2020 | 2487622-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $300.00 | | 1/14/2020 | 4/30/2020 | 2471336-NON144 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $10,072.19 | | 1/31/2020 | 4/30/2020 | 2471336-NON170 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $45,203.72 | | 1/31/2020 | 4/30/2020 | 2471336-NON200 |

9/7/21, 5:02 PM                                California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $13,757.44 | | 2/1/2020 | 4/30/2020 | 2471336-NON201 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $11,070.00 | | 2/25/2020 | 4/30/2020 | 2471336-NON323 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $48,673.92 | | 3/1/2020 | 4/30/2020 | 2471336-NON326 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $45,122.49 | | 2/28/2020 | 4/30/2020 | 2471336-NON332 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 4/30/2020 | 2471336-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |

California Secretary of State - CalAccess - Campaign Finance

| $175,220.35 | | 10/1/2020 | 3/18/2021 | 2521477-NON1157 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $171,294.00 | | 10/8/2020 | 3/18/2021 | 2521477-NON1225 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 3/18/2021 | 2521477-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | NON-MONETARY | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $191,319.54 | | 11/19/2019 | 2/20/2020 | 2442931-NON142 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | LOAN | SAN FRANCISCO | CA/94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $30,000,000.00 | | 10/30/2019 | 2/20/2020 | 2442931-PAY21 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $3,750,000.00 | | 10/22/2020 | 3/18/2021 | 2553928-INC1371 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |

9/7/21, 5:02 PM                     California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
| --- | --- | --- | --- | --- |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $200,000.00 | | 10/21/2020 | 3/18/2021 | 2553928-NON1365 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP | |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | NON-MONETARY | SAN FRANCISCO | CA/94105 | |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $2,600.00 | | 10/30/2020 | 3/18/2021 | 2553928-NON1458 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP | |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | LOAN | SAN FRANCISCO | CA/94105 | |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 3/18/2021 | 2553928-PAY5 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP | |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | MONETARY | SAN FRANCISCO | CA/94105 | |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $17,500,000.00 | | 9/4/2020 | 1/6/2021 | 2505778-INC936 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP | |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | NON-MONETARY | SAN FRANCISCO | CA/94105 | |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $4,164.80 | | 8/1/2020 | 1/6/2021 | 2505778-NON833 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP | |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | NON-MONETARY | SAN FRANCISCO | CA/94105 | |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $2,082.34 | | 7/1/2020 | 1/6/2021 | 2505778-NON836 |

California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $7,474.77 | | 8/26/2020 | 1/6/2021 | 2505778-NON869 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $16,386.40 | | 9/1/2020 | 1/6/2021 | 2505778-NON909 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $62,456.54 | | 9/16/2020 | 1/6/2021 | 2505778-NON995 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | LOAN | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 1/6/2021 | 2505778-PAY5 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | LOAN | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 7/31/2020 | 2487622-PAY5 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | LOAN | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $0.00 | | 10/28/2019 | 4/30/2020 | 2471336-PAY5 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $12,400.00 | | 9/22/2020 | 3/18/2021 | 2521477-NON1054 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $2,380.77 | | 9/22/2020 | 3/18/2021 | 2521477-NON1055 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,833.36 | | 10/1/2020 | 3/18/2021 | 2521477-NON1158 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $31,169.26 | | 10/1/2020 | 3/18/2021 | 2521477-NON1160 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,072.04 | | 10/6/2020 | 3/18/2021 | 2521477-NON1166 |

9/7/21, 5:02 PM                     California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | NON-MONETARY | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,560.00 | | 10/16/2020 | 3/18/2021 | 2521477-NON1281 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | LOAN | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/28/2019 | 3/18/2021 | 2521477-PAY5 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | LOAN | SAN FRANCISCO | CA/94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $10,000,000.00 | | 10/28/2019 | 2/20/2020 | 2442931-PAY5 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,500,000.00 | | 10/22/2020 | 3/18/2021 | 2553928-INC1370 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/29/2019 | 3/18/2021 | 2553928-PAY23 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $2,924.91 | | 9/18/2020 | 1/6/2021 | 2505778-NON1016 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $8,776.86 | | 9/1/2020 | 1/6/2021 | 2505778-NON906 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $5,571.38 | | 8/31/2020 | 1/6/2021 | 2505778-NON938 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $621,000.00 | | 9/17/2020 | 1/6/2021 | 2505778-NON994 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/29/2019 | 1/6/2021 | 2505778-PAY23 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/29/2019 | 7/31/2020 | 2487622-PAY23 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | LOAN | SAN FRANCISCO | CA/94103 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/29/2019 | 4/30/2020 | 2471336-PAY23 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $621,000.00 | | 9/30/2020 | 3/18/2021 | 2521477-NON1106 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $108,000.00 | | 9/30/2020 | 3/18/2021 | 2521477-NON1107 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $15,461.70 | | 10/1/2020 | 3/18/2021 | 2521477-NON1163 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $248,944.00 | | 10/6/2020 | 3/18/2021 | 2521477-NON1165 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |

| | | $200,000.00 | | 10/8/2020 | 3/18/2021 | 2521477-NON1224 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |
| POSTMATES INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $90.00 | | 10/13/2020 | 3/18/2021 | 2521477-NON1257 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |
| POSTMATES INC. | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/29/2019 | 3/18/2021 | 2521477-PAY23 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |
| POSTMATES INC. | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $10,000,000.00 | | 10/29/2019 | 2/20/2020 | 2442931-PAY23 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |
| UBER TECHNOLOGIES, INC. | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $3,750,000.00 | | 10/22/2020 | 3/18/2021 | 2553928-INC1372 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,017,000.00 | | 10/28/2020 | 3/18/2021 | 2553928-NON1456 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
| --- | --- | --- | --- |

California Secretary of State - CalAccess - Campaign Finance

| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
|---|---|---|---|---|
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $1,079,100.00 | | 11/2/2020 | 3/18/2021 | 2553928-NON1461 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 3/18/2021 | 2553928-PAY19 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $17,500,000.00 | | 9/4/2020 | 1/6/2021 | 2505778-INC935 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $693,000.00 | | 9/17/2020 | 1/6/2021 | 2505778-NON1015 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $35,000.00 | | 7/1/2020 | 1/6/2021 | 2505778-NON705 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |

California Secretary of State - CalAccess - Campaign Finance

| | | | |
|---|---|---|---|
| $100,000.00 | | 8/1/2020 | 1/6/2021 | 2505778-NON835 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $9,211.14 | | 8/11/2020 | 1/6/2021 | 2505778-NON857 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $101,204.00 | | 9/1/2020 | 1/6/2021 | 2505778-NON907 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $849,750.39 | | 9/10/2020 | 1/6/2021 | 2505778-NON951 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $560,523.87 | | 9/12/2020 | 1/6/2021 | 2505778-NON991 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 1/6/2021 | 2505778-PAY19 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $5,750.00 | | 4/1/2020 | 7/31/2020 | 2487622-NON415 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $10,799.28 | | 5/1/2020 | 7/31/2020 | 2487622-NON528 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $12,533.28 | | 6/1/2020 | 7/31/2020 | 2487622-NON651 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $0.00 | | 10/30/2019 | 7/31/2020 | 2487622-PAY19 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $600.00 | | 1/14/2020 | 4/30/2020 | 2471336-NON145 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $12,400.00 | | 1/2/2020 | 4/30/2020 | 2471336-NON166 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| | | | |

California Secretary of State - CalAccess - Campaign Finance

| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
|---|---|---|---|---|
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $4,500.00 | | 2/1/2020 | 4/30/2020 | 2471336-NON184 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $25,000.00 | | 1/31/2020 | 4/30/2020 | 2471336-NON185 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $97.45 | | 1/31/2020 | 4/30/2020 | 2471336-NON186 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $25,000.00 | | 2/29/2020 | 4/30/2020 | 2471336-NON327 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $4,780.00 | | 3/1/2020 | 4/30/2020 | 2471336-NON335 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $21,960.00 | | 3/17/2020 | 4/30/2020 | 2471336-NON369 |

California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $0.00 | | 10/30/2019 | 4/30/2020 | 2471336-PAY19 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $756,000.00 | | 9/25/2020 | 3/18/2021 | 2521477-NON1102 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $207,897.20 | | 10/1/2020 | 3/18/2021 | 2521477-NON1161 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $2,229.39 | | 10/1/2020 | 3/18/2021 | 2521477-NON1162 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $729,000.00 | | 10/8/2020 | 3/18/2021 | 2521477-NON1226 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $918,000.00 | | 10/12/2020 | 3/18/2021 | 2521477-NON1254 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $56,700.00 | | 10/14/2020 | 3/18/2021 | 2521477-NON1256 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $918,000.00 | | 10/15/2020 | 3/18/2021 | 2521477-NON1273 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $0.00 | | 10/30/2019 | 3/18/2021 | 2521477-PAY19 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $42,865.32 | | 12/31/2019 | 2/20/2020 | 2442931-NON167 |

| NAME OF CONTRIBUTOR | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
|---|---|---|---|---|
| $750.00 | | 11/7/2019 | 2/20/2020 | 2442931-NON168 |

California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $450.00 | | 12/19/2019 | 2/20/2020 | 2442931-NON169 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $28,522.62 | | 10/31/2019 | 2/20/2020 | 2442931-NON171 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $28,842.30 | | 11/30/2019 | 2/20/2020 | 2442931-NON172 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | NON-MONETARY | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $25,000.00 | | 12/31/2019 | 2/20/2020 | 2442931-NON174 |

| NAME OF CONTRIBUTOR | | PAYMENT TYPE | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | LOAN | SAN FRANCISCO | CA/94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | | TRANS. DATE | FILED_DATE | TRANS # |
| $30,000,000.00 | | 10/30/2019 | 2/20/2020 | 2442931-PAY19 |

# EXHIBIT M
# to
## Declaration of Jeremy M. Goldman
## In Support Of San Francisco's Request For
## Judicial Notice And Motion To Dismiss



| SECRETARY OF STATE | ELECTIONS | CAMPAIGN & LOBBYING | BUSINESS PROGRAMS | STATE ARCHIVES | REGISTRIES |

**Cal-Access Search**

**GO**

Advanced Search

**Cal-Access Home**

**Campaign Finance**

Candidates &
Elected Officials

Propositions &
Ballot Measures

Committees, Parties,
Major Donors & Slate
Mailers

Daily/Late/
Special Filings

**Lobbying Activity**

**Resources**

**For Filers Only**

**Political Reform**

**User's Manual**

Campaign Finance:

# YES ON 22 - SAVE APP-BASED JOBS AND SERVICES: A COALITION OF ON-DEMAND DRIVERS AND PLATFORMS, SMALL BUSINESSES, PUBLIC SAFETY AND COMMUNITY ORGANIZATIONS

## Election Cycle:
○ 2021 through 2022
◉ Historical
  ◉ 2019 through 2020
  ○ 2017 through 2018
  ○ 2015 through 2016
  ○ 2013 through 2014
  ○ 2011 through 2012
  ○ 2009 through 2010
  ○ 2007 through 2008
  ○ 2005 through 2006
  ○ 2003 through 2004
  ○ 2001 through 2002
  ○ 1999 through 2000

## View Information:
(Due to the amount of data, these pages may take some time to load.)
○ General Information
○ Contributions Received
○ Contributions Made
○ Expenditures Made
◉ Late and $5000+ Contributions Received
○ Late Contributions Made
○ Late Independent Expenditures
○ Electronic Filings

In addition to filing regularly required campaign disclosure statements, candidates, officeholders, ballot measure committees, political parties, PACs, and major donors may file late contribution reports and other special filings. These usually occur in the 90 days preceding Election Day. Contributions and independent expenditures of $1,000 or more are disclosed within 24 hours of the time they are made or received. You may search in this section by filer, by date, by candidate, and by proposition. At any other time, contributions of $5,000 or more are disclosed within 10 days.

**DOWNLOAD THESE RESULTS:** MICROSOFT EXCEL

California Secretary of State - CalAccess - Campaign Finance

# Late and $5000+ Contributions Received

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $30,000,000.00 | INITIAL | 12/22/2020 | 12/23/2020 | 2538280-PAY1558 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,079,100.00 | INITIAL | 11/2/2020 | 11/2/2020 | 2531768-NON1461 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $4,992.00 | INITIAL | 10/30/2020 | 10/31/2020 | 2529258-NON1459 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $2,600.00 | INITIAL | 10/30/2020 | 10/30/2020 | 2528542-NON1458 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,017,000.00 | INITIAL | 10/28/2020 | 10/30/2020 | 2528541-NON1456 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|

California Secretary of State - CalAccess - Campaign Finance

| | | DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
|---|---|---|---|---|---|
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| | | | | | |
| AMOUNT | | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,446.75 | | INITIAL | 10/30/2020 | 10/30/2020 | 2528540-NON1457 |

| NAME OF CONTRIBUTOR | | | | CITY | STATE/ZIP |
|---|---|---|---|---|---|
| DOORDASH, INC. | | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| | | | | | |
| AMOUNT | | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $3,750,000.00 | | INITIAL | 10/28/2020 | 10/29/2020 | 2526750-INC1414 |

| NAME OF CONTRIBUTOR | | | | CITY | STATE/ZIP |
|---|---|---|---|---|---|
| COMMITTEE ON JOBS GOVERNMENT REFORM FUND | | | | SAN FRANCISCO | CA / 94104 |
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| 982683 | | | | | |
| AMOUNT | | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $80,000.00 | | INITIAL | 10/26/2020 | 10/27/2020 | 2524363-NON1410 |

| NAME OF CONTRIBUTOR | | | | CITY | STATE/ZIP |
|---|---|---|---|---|---|
| DOORDASH, INC. | | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| | | | | | |
| AMOUNT | | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,198.98 | | INITIAL | 10/22/2020 | 10/23/2020 | 2522303-NON1408 |

| NAME OF CONTRIBUTOR | | | | CITY | STATE/ZIP |
|---|---|---|---|---|---|
| DOORDASH, INC. | | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| | | | | | |
| AMOUNT | | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $7,040.00 | | INITIAL | 10/22/2020 | 10/23/2020 | 2522303-NON1407 |

| NAME OF CONTRIBUTOR | | | | CITY | STATE/ZIP |
|---|---|---|---|---|---|
| GOLD RUSH ADVERTISING | | | | NAPA | CA / 94559 |
| ID NUMBER | | EMPLOYER | | OCCUPATION | |
| | | | | | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $1,080.00 | INITIAL | 10/23/2020 | 10/23/2020 | 2522302-NON1340 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $90.00 | AMENDMENT #1 | 10/13/2020 | 10/24/2020 | 2521561-NON1257 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $3,750,000.00 | AMENDMENT #1 | 10/22/2020 | 10/24/2020 | 2521561-INC1372 |
| ~~$3,750,000.00~~ | ~~INITIAL~~ | ~~10/22/2020~~ | ~~10/22/2020~~ | ~~2521561-INC1372~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $3,750,000.00 | AMENDMENT #1 | 10/22/2020 | 10/24/2020 | 2521561-INC1371 |
| ~~$3,750,000.00~~ | ~~INITIAL~~ | ~~10/22/2020~~ | ~~10/22/2020~~ | ~~2521561-INC1371~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $1,500,000.00 | AMENDMENT #1 | 10/22/2020 | 10/24/2020 | 2521561-INC1370 |
| ~~$1,500,000.00~~ | ~~INITIAL~~ | ~~10/22/2020~~ | ~~10/22/2020~~ | ~~2521561-INC1370~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $200,000.00 | INITIAL | 10/21/2020 | 10/22/2020 | 2521555-NON1365 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,560.00 | INITIAL | 10/16/2020 | 10/19/2020 | 2517955-NON1281 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $918,000.00 | INITIAL | 10/15/2020 | 10/16/2020 | 2517180-NON1273 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,670.40 | INITIAL | 10/15/2020 | 10/16/2020 | 2517180-NON1272 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $56,700.00 | INITIAL | 10/14/2020 | 10/15/2020 | 2516492-NON1256 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| COMMITTEE ON JOBS GOVERNMENT REFORM FUND | | | SAN FRANCISCO | CA / 94104 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| 982683 | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $100,000.00 | AMENDMENT #1 | 10/13/2020 | 10/27/2020 | 2515857-NON1255 |

California Secretary of State - CalAccess - Campaign Finance

| $100,000.00 | INITIAL | 10/13/2020 | 10/14/2020 | 2515857-NON1255 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $425,000.00 | AMENDMENT #1 | 10/13/2020 | 10/31/2020 | 2514733-NON1253 |
| $250,000.00 | INITIAL | 10/13/2020 | 10/13/2020 | 2514733-NON1253 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $918,000.00 | AMENDMENT #1 | 10/12/2020 | 10/31/2020 | 2514729-NON1254 |
| $918,000.00 | INITIAL | 10/12/2020 | 10/13/2020 | 2514729-NON1254 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $150,500.00 | AMENDMENT #1 | 10/12/2020 | 10/31/2020 | 2514729-NON1252 |
| $100,500.00 | INITIAL | 10/12/2020 | 10/13/2020 | 2514729-NON1252 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $48,350.00 | INITIAL | 10/10/2020 | 10/13/2020 | 2514728-NON1251 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $729,000.00 | INITIAL | 10/8/2020 | 10/9/2020 | 2512730-NON1226 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $171,294.00 | INITIAL | 10/8/2020 | 10/9/2020 | 2512730-NON1225 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $200,000.00 | INITIAL | 10/8/2020 | 10/9/2020 | 2512730-NON1224 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $3,815.46 | AMENDMENT #1 | 10/7/2020 | 10/9/2020 | 2512199-NON1220 |
| ~~$3,815.44~~ | ~~INITIAL~~ | ~~10/7/2020~~ | ~~10/8/2020~~ | ~~2512199-NON1220~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $7,571.44 | AMENDMENT #1 | 10/7/2020 | 10/9/2020 | 2512199-NON1219 |
| ~~$7,571.44~~ | ~~INITIAL~~ | ~~10/7/2020~~ | ~~10/8/2020~~ | ~~2512199-NON1219~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| HOPSKIPDRIVE, INC | | LOS ANGELES | CA / 90021 |
| ID NUMBER | EMPLOYER | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $8,937.18 | AMENDMENT #1 | 9/18/2020 | 10/8/2020 | 2512190-NON1221 |
| ~~$8,937.18~~ | ~~INITIAL~~ | ~~9/18/2020~~ | ~~10/8/2020~~ | ~~2512190-NON1221~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $1,072.04 | INITIAL | 10/6/2020 | 10/7/2020 | 2511624-NON1166 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $248,944.00 | INITIAL | 10/6/2020 | 10/7/2020 | 2511624-NON1165 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $15,461.70 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1163 |
| ~~$3,000.00~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1163~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $2,229.39 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1162 |
| ~~$2,229.39~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1162~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $207,897.20 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1161 |
| ~~$116,000.00~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1161~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $31,169.26 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1160 |
| ~~$20,000.00~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1160~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $27,752.48 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1159 |
| ~~$40,000.00~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1159~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $1,833.36 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1158 |
| ~~$1,833.36~~ | ~~INITIAL~~ | ~~10/1/2020~~ | ~~10/2/2020~~ | ~~2509263-NON1158~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $175,220.35 | AMENDMENT #1 | 10/1/2020 | 11/2/2020 | 2509263-NON1157 |

California Secretary of State - CalAccess - Campaign Finance

| $150,000.00 | INITIAL | 10/1/2020 | 10/2/2020 | 2509263-NON1157 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $108,000.00 | INITIAL | 9/30/2020 | 10/1/2020 | 2508221-NON1107 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $621,000.00 | INITIAL | 9/30/2020 | 10/1/2020 | 2508221-NON1106 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $756,000.00 | INITIAL | 9/25/2020 | 9/25/2020 | 2506258-NON1102 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $2,380.77 | INITIAL | 9/22/2020 | 9/23/2020 | 2504746-NON1055 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $12,400.00 | INITIAL | 9/22/2020 | 9/23/2020 | 2504746-NON1054 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|

California Secretary of State - CalAccess - Campaign Finance

| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
|---|---|---|---|---|
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $2,924.91 | INITIAL | 9/18/2020 | 9/18/2020 | 2502873-NON1016 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $693,000.00 | INITIAL | 9/17/2020 | 9/18/2020 | 2502872-NON1015 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $621,000.00 | INITIAL | 9/17/2020 | 9/17/2020 | 2502394-NON994 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $62,456.54 | AMENDMENT #1 | 9/16/2020 | 9/18/2020 | 2501997-NON995 |
| ~~$78,000.00~~ | ~~INITIAL~~ | ~~9/16/2020~~ | ~~9/16/2020~~ | ~~2501997-NON995~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $6,811.20 | AMENDMENT #1 | 9/15/2020 | 10/1/2020 | 2501615-NON993 |
| ~~$6,811.20~~ | ~~INITIAL~~ | ~~9/15/2020~~ | ~~9/15/2020~~ | ~~2501615-NON993~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $16,877.16 | AMENDMENT #1 | 9/14/2020 | 10/1/2020 | 2501615-NON992 |
| ~~$2,547.14~~ | ~~INITIAL~~ | ~~9/14/2020~~ | ~~9/15/2020~~ | ~~2501615-NON992~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $560,523.87 | INITIAL | 9/12/2020 | 9/14/2020 | 2501189-NON991 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $849,750.39 | INITIAL | 9/10/2020 | 9/10/2020 | 2500603-NON951 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $7,500,000.00 | INITIAL | 9/4/2020 | 9/4/2020 | 2499011-INC937 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $17,500,000.00 | INITIAL | 9/4/2020 | 9/4/2020 | 2499011-INC936 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $17,500,000.00 | INITIAL | 9/4/2020 | 9/4/2020 | 2499011-INC935 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $17,500,000.00 | INITIAL | 9/4/2020 | 9/4/2020 | 2499011-INC934 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $10,000,000.00 | INITIAL | 9/4/2020 | 9/4/2020 | 2499011-INC933 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $5,571.38 | INITIAL | 8/31/2020 | 9/4/2020 | 2499003-NON938 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $355,379.86 | AMENDMENT #2 | 9/1/2020 | 10/30/2020 | 2498262-NON910 |
| ~~$355,379.86~~ | ~~AMENDMENT #1~~ | ~~9/1/2020~~ | ~~10/16/2020~~ | ~~2498262-NON910~~ |
| ~~$70,000.00~~ | ~~INITIAL~~ | ~~9/1/2020~~ | ~~9/2/2020~~ | ~~2498262-NON910~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $16,386.40 | AMENDMENT #2 | 9/1/2020 | 10/30/2020 | 2498262-NON909 |
| ~~$16,368.00~~ | ~~AMENDMENT #1~~ | ~~9/1/2020~~ | ~~10/16/2020~~ | ~~2498262-NON909~~ |
| ~~$10,000.00~~ | ~~INITIAL~~ | ~~9/1/2020~~ | ~~9/2/2020~~ | ~~2498262-NON909~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $26,695.40 | AMENDMENT #2 | 9/1/2020 | 10/30/2020 | 2498262-NON908 |
| ~~$25,340.80~~ | ~~AMENDMENT #1~~ | ~~9/1/2020~~ | ~~10/16/2020~~ | ~~2498262-NON908~~ |
| ~~$20,000.00~~ | ~~INITIAL~~ | ~~9/1/2020~~ | ~~9/2/2020~~ | ~~2498262-NON908~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $101,204.00 | AMENDMENT #2 | 9/1/2020 | 10/30/2020 | 2498262-NON907 |
| ~~$101,204.00~~ | ~~AMENDMENT #1~~ | ~~9/1/2020~~ | ~~10/16/2020~~ | ~~2498262-NON907~~ |
| ~~$110,000.00~~ | ~~INITIAL~~ | ~~9/1/2020~~ | ~~9/2/2020~~ | ~~2498262-NON907~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| POSTMATES INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $8,776.86 | AMENDMENT #2 | 9/1/2020 | 10/30/2020 | 2498262-NON906 |
| ~~$8,776.86~~ | ~~AMENDMENT #1~~ | ~~9/1/2020~~ | ~~10/16/2020~~ | ~~2498262-NON906~~ |
| ~~$8,754.54~~ | ~~INITIAL~~ | ~~9/1/2020~~ | ~~9/2/2020~~ | ~~2498262-NON906~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $7,474.77 | INITIAL | 8/26/2020 | 8/27/2020 | 2495616-NON869 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $112,554.74 | AMENDMENT #1 | 8/19/2020 | 9/15/2020 | 2493472-NON859 |
| ~~$104,980.72~~ | ~~INITIAL~~ | ~~8/19/2020~~ | ~~8/20/2020~~ | ~~2493472-NON859~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $4,345.74 | AMENDMENT #1 | 8/19/2020 | 9/15/2020 | 2493472-NON858 |
| ~~$4,345.74~~ | ~~INITIAL~~ | ~~8/19/2020~~ | ~~8/20/2020~~ | ~~2493472-NON858~~ |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $9,211.14 | INITIAL | 8/11/2020 | 8/17/2020 | 2492219-NON857 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $17,773.02 | INITIAL | 8/13/2020 | 8/14/2020 | 2491559-NON855 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $56,248.65 | INITIAL | 8/13/2020 | 8/14/2020 | 2491559-NON854 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $83,686.66 | INITIAL | 8/13/2020 | 8/14/2020 | 2491559-NON853 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | OCCUPATION | |
| | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $947.52 | INITIAL | 8/11/2020 | 8/13/2020 | 2491035-NON840 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| | | | |

| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| --- | --- | --- | --- | --- |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $100,000.00 | AMENDMENT #2 | 8/1/2020 | 10/2/2020 | 2489276-NON835 |
| ~~$100,000.00~~ | ~~AMENDMENT #1~~ | ~~8/1/2020~~ | ~~9/15/2020~~ | ~~2489276-NON835~~ |
| ~~$36,500.00~~ | ~~INITIAL~~ | ~~8/1/2020~~ | ~~8/8/2020~~ | ~~2489276-NON835~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| DOORDASH, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $3,221.25 | AMENDMENT #2 | 8/1/2020 | 10/2/2020 | 2489276-NON834 |
| ~~$3,221.25~~ | ~~AMENDMENT #1~~ | ~~8/1/2020~~ | ~~9/15/2020~~ | ~~2489276-NON834~~ |
| ~~$10,000.00~~ | ~~INITIAL~~ | ~~8/1/2020~~ | ~~8/8/2020~~ | ~~2489276-NON834~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $4,164.80 | AMENDMENT #2 | 8/1/2020 | 10/2/2020 | 2489276-NON833 |
| ~~$4,164.80~~ | ~~AMENDMENT #1~~ | ~~8/1/2020~~ | ~~9/15/2020~~ | ~~2489276-NON833~~ |
| ~~$5,000.00~~ | ~~INITIAL~~ | ~~8/1/2020~~ | ~~8/8/2020~~ | ~~2489276-NON833~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $126,434.38 | AMENDMENT #2 | 8/1/2020 | 10/2/2020 | 2489276-NON832 |
| ~~$120,434.30~~ | ~~AMENDMENT #1~~ | ~~8/1/2020~~ | ~~9/15/2020~~ | ~~2489276-NON832~~ |
| ~~$35,000.00~~ | ~~INITIAL~~ | ~~8/1/2020~~ | ~~8/8/2020~~ | ~~2489276-NON832~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
| --- | --- | --- | --- | --- |
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $35,000.00 | AMENDMENT #1 | 7/1/2020 | 8/12/2020 | 2478465-NON705 |

9/7/21, 5:04 PM                    California Secretary of State - CalAccess - Campaign Finance

| $14,500.00 | INITIAL | 7/1/2020 | 7/14/2020 | 2478465-NON705 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $33,071.62 | AMENDMENT #1 | 7/1/2020 | 8/12/2020 | 2478465-NON695 |
| $25,000.00 | INITIAL | 7/1/2020 | 7/14/2020 | 2478465-NON695 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $24,900.20 | AMENDMENT #1 | 6/1/2020 | 7/14/2020 | 2474374-NON652 |
| $25,000.00 | INITIAL | 6/1/2020 | 6/8/2020 | 2474374-NON652 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $12,533.28 | AMENDMENT #1 | 6/1/2020 | 7/14/2020 | 2474374-NON651 |
| $11,500.00 | INITIAL | 6/1/2020 | 6/8/2020 | 2474374-NON651 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $23,076.26 | AMENDMENT #1 | 5/1/2020 | 6/8/2020 | 2472475-NON529 |
| $50,000.00 | INITIAL | 5/1/2020 | 5/7/2020 | 2472475-NON529 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $10,799.28 | AMENDMENT #1 | 5/1/2020 | 6/8/2020 | 2472475-NON528 |
| $6,000.00 | INITIAL | 5/1/2020 | 5/7/2020 | 2472475-NON528 |

California Secretary of State - CalAccess - Campaign Finance

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $5,750.00 | AMENDMENT #1 | 4/1/2020 | 5/7/2020 | 2465109-NON415 |
| ~~$5,000.00~~ | ~~INITIAL~~ | ~~4/1/2020~~ | ~~4/7/2020~~ | ~~2465109-NON415~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $46,903.66 | AMENDMENT #1 | 4/1/2020 | 5/7/2020 | 2465109-NON414 |
| ~~$50,000.00~~ | ~~INITIAL~~ | ~~4/1/2020~~ | ~~4/7/2020~~ | ~~2465109-NON414~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $21,960.00 | INITIAL | 3/17/2020 | 3/24/2020 | 2463968-NON369 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $45,122.49 | INITIAL | 2/28/2020 | 3/11/2020 | 2462467-NON332 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $25,000.00 | AMENDMENT #1 | 2/29/2020 | 4/7/2020 | 2461010-NON327 |
| ~~$25,000.00~~ | ~~INITIAL~~ | ~~2/29/2020~~ | ~~3/3/2020~~ | ~~2461010-NON327~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $48,673.92 | AMENDMENT #1 | 3/1/2020 | 4/7/2020 | 2461010-NON326 |
| ~~$70,000.00~~ | ~~INITIAL~~ | ~~3/1/2020~~ | ~~3/3/2020~~ | ~~2461010-NON326~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $11,070.00 | AMENDMENT #1 | 2/25/2020 | 4/7/2020 | 2461010-NON323 |
| ~~$11,070.00~~ | ~~INITIAL~~ | ~~2/25/2020~~ | ~~3/3/2020~~ | ~~2461010-NON323~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $10,072.19 | INITIAL | 1/31/2020 | 3/3/2020 | 2461009-NON170 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $13,757.44 | AMENDMENT #2 | 2/1/2020 | 3/11/2020 | 2450506-NON201 |
| ~~$50,000.00~~ | ~~AMENDMENT #1~~ | ~~2/1/2020~~ | ~~3/3/2020~~ | ~~2450506-NON201~~ |
| ~~$50,000.00~~ | ~~INITIAL~~ | ~~2/1/2020~~ | ~~2/11/2020~~ | ~~2450506-NON201~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $45,203.72 | AMENDMENT #2 | 1/31/2020 | 3/11/2020 | 2450506-NON200 |
| ~~$45,203.72~~ | ~~AMENDMENT #1~~ | ~~1/31/2020~~ | ~~3/3/2020~~ | ~~2450506-NON200~~ |
| ~~$45,000.00~~ | ~~INITIAL~~ | ~~1/31/2020~~ | ~~2/11/2020~~ | ~~2450506-NON200~~ |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |

California Secretary of State - CalAccess - Campaign Finance

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $97.45 | INITIAL | 1/31/2020 | 2/6/2020 | 2447198-NON186 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $25,000.00 | INITIAL | 1/31/2020 | 2/6/2020 | 2447198-NON185 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $25,000.00 | INITIAL | 12/31/2019 | 1/28/2020 | 2437291-NON174 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $28,842.30 | INITIAL | 11/30/2019 | 1/28/2020 | 2437290-NON172 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $28,522.62 | INITIAL | 10/31/2019 | 1/28/2020 | 2437289-NON171 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | | OCCUPATION | |
|---|---|---|---|---|
| | | | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $12,400.00 | INITIAL | 1/2/2020 | 1/27/2020 | 2436612-NON166 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| | | | |

California Secretary of State - CalAccess - Campaign Finance

| UBER TECHNOLOGIES, INC. | | | SAN FRANCISCO | CA / 94103 |
|---|---|---|---|---|
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $42,865.32 | INITIAL | 12/31/2019 | 1/27/2020 | 2436611-NON167 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $0.00 | AMENDMENT #1 | 12/31/2019 | 1/27/2020 | 2431286-NON141 |
| $52,000.00 | INITIAL | 12/31/2019 | 1/16/2020 | 2431286-NON141 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $191,319.54 | AMENDMENT #2 | 11/19/2019 | 1/28/2020 | 2431285-NON142 |
| $123,319.54 | AMENDMENT #1 | 11/19/2019 | 1/27/2020 | 2431285-NON142 |
| $52,000.00 | INITIAL | 11/30/2019 | 1/16/2020 | 2431285-NON142 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| LYFT, INC | | | SAN FRANCISCO | CA / 94107 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $0.00 | AMENDMENT #1 | 10/31/2019 | 1/27/2020 | 2431284-NON143 |
| $50,000.00 | INITIAL | 10/31/2019 | 1/16/2020 | 2431284-NON143 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| MAPLEBEAR INC., DBA INSTACART | | | SAN FRANCISCO | CA / 94105 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |
| | | | | |
| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
| $10,000,000.00 | INITIAL | 10/28/2019 | 11/1/2019 | 2420348-INC4 |

| NAME OF CONTRIBUTOR | | | CITY | STATE/ZIP |
|---|---|---|---|---|
| POSTMATES INC. | | | SAN FRANCISCO | CA / 94103 |
| ID NUMBER | EMPLOYER | | OCCUPATION | |

California Secretary of State - CalAccess - Campaign Finance

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $10,000,000.00 | INITIAL | 10/29/2019 | 11/1/2019 | 2420348-INC22 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| LYFT, INC | | SAN FRANCISCO | CA / 94107 |

| ID NUMBER | EMPLOYER | OCCUPATION |
|---|---|---|
| | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $30,000,000.00 | INITIAL | 10/30/2019 | 11/1/2019 | 2420348-INC20 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| DOORDASH, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | OCCUPATION |
|---|---|---|
| | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $30,000,000.00 | INITIAL | 10/28/2019 | 11/1/2019 | 2420348-INC2 |

| NAME OF CONTRIBUTOR | | CITY | STATE/ZIP |
|---|---|---|---|
| UBER TECHNOLOGIES, INC. | | SAN FRANCISCO | CA / 94103 |

| ID NUMBER | EMPLOYER | OCCUPATION |
|---|---|---|
| | | |

| AMOUNT | TYPE | TRANS. DATE | FILED DATE | TRANS # |
|---|---|---|---|---|
| $30,000,000.00 | INITIAL | 10/30/2019 | 11/1/2019 | 2420348-INC18 |