1  GIBSON, DUNN & CRUTCHER LLP
   JOSHUA S. LIPSHUTZ, SBN 242557
2     jlipshutz@gibsondunn.com
   555 Mission Street, Suite 3000
3  San Francisco, CA 94105-0921
   Telephone:    415.393.8200
4  Facsimile:    415.393.8306

5  MICHAEL HOLECEK, SBN 281034
      mholecek@gibsondunn.com
6  333 South Grand Avenue
   Los Angeles, CA 90071-3197
7  Telephone:    213.229.7000
   Facsimile:    213.229.7520

8
   Attorneys for Plaintiffs
9  DOORDASH, INC. and GRUBHUB INC.

10

11

12              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15  DOORDASH, INC. and GRUBHUB INC., ,          CASE NO. 3:21-CV-05502-EMC

                    Plaintiffs,                 **FIRST AMENDED COMPLAINT**
16
            v.                                  **JURY TRIAL DEMANDED**
17
   CITY AND COUNTY OF SAN FRANCISCO,            Hon. Edward M. Chen
18
                    Defendant.                  Action Filed: July 16, 2021
19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Plaintiffs DOORDASH, INC. and GRUBHUB INC. (collectively, "Plaintiffs") bring this First Amended Complaint for Declaratory Relief, Injunctive Relief, and Damages against Defendant CITY AND COUNTY OF SAN FRANCISCO.   By this First Amended Complaint, Plaintiffs allege as follows:

## I.
## INTRODUCTION

1.      The City of San Francisco has taken the unprecedented step of imposing *permanent* price controls on a private and highly competitive industry—the facilitation of food ordering and delivery through third-party platforms—by enacting an ordinance that prevents restaurants and third-party platforms from freely negotiating the price that platforms may charge restaurants for their services (the "Ordinance").[1]  This legislation is <u>unnecessary</u> because restaurants currently have an array of options for delivery, including options well below the price control established by the Board (although most restaurants have voluntarily chosen options with commissions above the Ordinance's 15% cap). It is also <u>harmful</u> because it likely will lead to reduced choice for restaurants, higher prices for consumers, and fewer delivery opportunities for couriers.  And it is <u>unconstitutional</u> because it disrupts contracts between platforms and restaurants, and permanently dictates the economic terms on which a dynamic industry operates.  Plaintiffs are committed to help bring renewed vibrancy to the City's local restaurants now that restrictions imposed during the COVID-19 pandemic have been lifted.  But the legislation adopted by the Board of Supervisors will do the opposite.  Echoing associations and delivery couriers who spoke out against this permanent price control because of its anticipated harmful effects, Mayor Breed declined to sign the Ordinance because it "oversteps what is necessary for the public good."   Left unchecked, the Ordinance's interference with voluntary, private contracts between businesses would set a dangerous precedent for government overreach.  It should be struck down.

2.      The United States and California Constitutions prohibit such government intervention by safeguarding the terms of freely negotiated contracts, protecting the right to contract and pursue legitimate business enterprises, and providing for equal protection under the law.  Among other aims,

---

[1]   Ordinance No. 234-20 added Article 53 to the San Francisco Police Code and capped fees that certain third-party platforms can charge restaurants at 15%.

Gibson, Dunn &
Crutcher LLP

these constitutional protections seek to prevent political actors from picking economic winners and losers, which is precisely the intent of the Ordinance.  Through statements made collectively and individually, members of San Francisco's Board of Supervisors have made plain the Ordinance is intended to punish the industry for its recent support of Proposition 22, a California ballot initiative that passed by an overwhelming majority during the 2020 election, and is intended to make third-party platforms less profitable.  These are not the legitimate ends of government intervention.

3.     That the Ordinance lacks a legitimate objective is underscored by the fact that it may actually harm the group it purports to help: local restaurants.  Costs to facilitate food delivery that are not covered by restaurants will likely shift to consumers—irrespective of whether those restaurants would prefer to bear those costs to increase their own sales—thereby reducing order volume, lowering restaurant revenues, and decreasing earning opportunities for couriers.  There is no evidence that the Board of Supervisors solicited or reviewed any studies or data to understand the impact of this extreme form of price-fixing, including the negative externalities it will have for San Francisco restaurants, couriers, and consumers, or the relationship between what platforms charge restaurants and restaurant profitability.  Moreover, the Board appears to have ignored these negative externalities, even though pointedly raised by couriers and trade associations at the committee hearing where this ordinance was first introduced.  Furthermore, San Francisco—which ended the most recent fiscal year with a surplus exceeding $150 million—has other, lawful means to aid restaurants, such as tax breaks or grants. Indeed, it has used such lawful means to aid the City's nightlife venues.[2] But the Board did not adopt similar legislation to aid the City's restaurants in contrast to Mayor Breed, who made $12 million in interest-free loans accessible to certain local businesses.[3]  Rather than limit itself to means consistent with the United States and California Constitutions, it chose instead to adopt an irrational law, driven

---

[2] *See* Amanda Bartlett, *SF Board of Supervisors unanimously approves recovery fund to save local entertainment venues,* SFGATE.COM (updated Feb. 23, 2021), https://bit.ly/3e09ZSV; *see also* Nat'l Restaurant Ass'n, Letter to Governor Andrew Cuomo (Feb. 18, 2021), https://bit.ly/3wubYoS (laying out strategies to aid restaurants, including tax breaks and grants, but not suggesting any form of price-fixing).

[3] *See Mayor Breed Launches $12 Million San Francisco Small Business Recovery Loan Fund,* S.F. OFF. OF THE MAYOR (July 8, 2021) https://bit.ly/3hzMYZc.

Gibson, Dunn &
Crutcher LLP

by naked animosity and ill-conceived economic protectionism, that violates the United States and California Constitutions and exceeds San Francisco's limited police power.

4.     For at least the last century, courts have held that the Constitution prohibits local governments from engaging in such economic protectionism.  Further, California courts consistently have held that cities may not fix prices to benefit only a segment of the general public—such as one industry or group of businesses.  *See State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc.*, 40 Cal. 2d 436, 447 (1953) (holding that a minimum dry cleaning price-setting ordinance was unconstitutional because it "protect[s] the industry" which is "only a small segment of the general public"); *In re Kazas*, 22 Cal. App. 2d 161, 171 (1937) (holding that a municipality could not legislate minimum barbershop prices to protect barbers).

5.     For this reason, the only price controls that typically survive constitutional scrutiny are those applicable to public utilities of civic necessities (e.g., electricity, gas, water).  But platforms such as those covered by the Ordinance here are not so essential to public health or safety, particularly as the pandemic abates, that they should be regulated like public utilities.  Moreover, unlike a public utility—which often is granted a geographic monopoly in exchange for regulated prices—Plaintiffs compete vigorously with each other and other platforms, and merchants and consumers can choose which platform(s) to use, if any.

6.     In light of the significant competition, Plaintiffs have always strived for fair contracts that properly value the services that their platforms offer to restaurants.  As part of that ongoing commitment, , in April 2021, DoorDash introduced new Partnership Plans that provide restaurants with even greater transparency and choice, including a Basic Partnership Plan where DoorDash facilitates delivery of online orders for a flat commission rate of 15%.  (Tellingly, the vast majority of San Francisco-based restaurants who opted into a new Partnership Plan selected plans with 25% and 30% commission rates so as to obtain enhanced services to boost sales.)  Grubhub's commission structure is also negotiable with restaurants selecting a rate that reflects their desired level of marketing and visibility on the Grubhub Marketplace.  Further, Plaintiffs have partnered with restaurants, spending hundreds of millions of dollars in marketing to enable restaurants to expand the reach of their menus to new consumers because when restaurants survive and succeed, so do platforms.  As a result,

Gibson, Dunn & Crutcher LLP

restaurants have had meaningful choice in whether and how they use delivery and marketing services from Plaintiffs to grow their businesses.  For example, restaurants can:

    a.   Choose whether to offer delivery at all,

    b.   Choose to facilitate delivery themselves,

    c.   Choose which, if any, third-party platform to use,

    d.   Choose a third-party delivery option that charges nothing more than credit card fees,

    e.   Choose a third-party delivery option that charges a flat fee per delivery instead of a commission, or

    f.   Subject to the cap, choose from a range of commission-based third-party delivery and marketing options at different price points, depending on the products and services that are best suited to their business's needs.

7.    But San Francisco's permanent cap puts restaurants' choice in jeopardy.  Mayor Breed agrees.  In refusing to sign the law, Mayor Breed stated it was "unnecessarily prescriptive in limiting the business models of the third-party organizations, and oversteps what is necessary for the public good."  Accordingly, through this Complaint, Plaintiffs seek declaratory relief, injunctive relief, and damages on the grounds that:

    a.   The Ordinance violates the Contract Clauses of the United States and California Constitutions;

    b.   The Ordinance violates the Takings Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution;

    c.   The Ordinance violates Article I, Section 7 of the California Constitution (Police Power);

    d.   The Ordinance violates the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution (Due Process);

    e.   The Ordinance violates the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the California Constitution (Equal Protection); and

f.  The Ordinance violates the First Amendment to the United States Constitution and Article I, Section 2 of the California Constitution.

8.  In pursuing this action, Plaintiffs seek to vindicate the deprivation of their federal constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage.  Thus, Plaintiffs seek damages and other relief under 42 U.S.C. § 1983.  Plaintiffs also are entitled to attorneys' fees and expert fees if they prevail on any of their Section 1983 claims.  *See* 42 U.S.C. § 1988(b).

## II.
## PARTIES

9.  Plaintiff DoorDash, Inc. ("DoorDash") is a Delaware corporation founded in 2013 and is headquartered in San Francisco, California.  Since day one, DoorDash's mission has been to empower local businesses by providing access to e-commerce.  Its platforms (including the DoorDash and Caviar platforms) connect consumers, a broad array of restaurants, and in some cases, delivery couriers, each of whom are affected by the Ordinance.  DoorDash offers several options to restaurants, including Marketplace (DoorDash's web- and app-based platform that facilitates pickup and delivery), Storefront (an application that enables restaurants to create a branded online store to enable pickup and delivery from their own website, in exchange for payment of credit card processing fees of 2.9%, plus $0.30 per order), and Drive (a platform that facilitates delivery of orders originating outside the Marketplace in exchange for a flat fee).  As such, DoorDash has a beneficial interest in the relief sought herein.

10.  Plaintiff Grubhub Inc. ("Grubhub") is a Delaware corporation founded in 2004 and is headquartered in Chicago, Illinois.  Grubhub's longstanding priority has been to serve restaurants.  The Company's online food ordering and delivery marketplace connects consumers, a broad array of local takeout and delivery restaurants, and in some cases, independent-contractor couriers that are affected by the Ordinance.  Grubhub elevates food ordering through innovative restaurant technology, easy-to-use platforms and an improved delivery experience, which includes the Grubhub Guarantee to facilitate diner satisfaction and protect restaurants' reputation.  Grubhub drives orders to restaurants through its Marketplace, while also offering restaurants tools to grow their own digital businesses.  These tools include Grubhub Direct to develop and manage customized restaurant ordering websites, enabling

Gibson, Dunn &
Crutcher LLP

6

restaurants to market directly to their diners.  As such, Grubhub has a beneficial interest in the relief sought herein.

11.     Defendant City and County of San Francisco (the "City" or "San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a city and county.  By naming the City as a defendant, Plaintiffs incorporate allegations against City officials in their official capacity.

### III.
### JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 over all Plaintiffs' federal constitutional claims, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 as to Grubhub's claims.

13.     Plaintiffs bring this action as both a facial challenge and an "as-applied" challenge to the Ordinance, and are excused from exhausting any administrative remedy before the City.  Plaintiffs allege that the Ordinance is invalid (1) on its face, (2) as applied to Plaintiffs, and (3) as applied to certain of Plaintiffs' contracts with San Francisco restaurants.

14.     Venue is proper in this Court because the Ordinance was enacted by the San Francisco Board of Supervisors, and the violations of Plaintiffs' rights occurred in this judicial district.

### IV.
### FACTUAL AND LEGAL STATEMENT

**A.     The Commissions Charged By Third-Party Platforms**

15.     Plaintiffs operate third-party platforms in San Francisco that connect restaurants with consumers who wish to purchase food and have it delivered to them or be ready for pickup by the consumer.  Consumers can access the platforms via Plaintiffs' websites or mobile applications on a smartphone.

16.     Other third-party platforms operating in San Francisco and elsewhere in the United States include Uber Eats, Postmates, Delivery.com, Slice, ChowNow, EatStreet, MealPal, Olo, Relay, and Ritual, among others.  The third-party platform industry is dynamic, competitive, and constantly

Gibson, Dunn &
Crutcher LLP

evolving in ways that benefit restaurants and consumers.  Until now, this dynamism has occurred largely free of government regulation, and completely free of regulation as to the fee that third-party platforms and restaurants can agree upon in exchange for the services provided.

17.     The rise of third-party platforms has resulted in the expansion of restaurants' consumer base.  Consumers, who otherwise would not have patronized a restaurant in person or would not have discovered a restaurant but for Plaintiffs' platforms, use the platforms to purchase food from that restaurant to be delivered or picked up.  One study reported that delivery sales through third-party platforms are approximately 80% incremental—meaning they otherwise would not have been placed by an eat-in diner or a takeout customer.

18.     On most third-party platforms, including Plaintiffs', independent contractor couriers perform the deliveries of food from certain restaurants to consumers, while some other restaurants choose to provide their own delivery services.  Restaurants may choose to perform other services like marketing, order processing, customer support, and technology and product development on their own. Indeed, thousands of restaurants in San Francisco do not use any third-party platform at all.  Most restaurants who do choose to use Plaintiffs' platforms are free to leave for any reason.

19.     Plaintiffs generate revenue to cover their costs by charging commissions to restaurants. These commissions represent a substantial part of Plaintiffs' revenue streams.

20.     The operational costs that Plaintiffs incur include (but are not limited to):

   a.  Platform development, maintenance, and operation;

   b.  Marketing of Plaintiffs' services to consumers, including promotions and advertising to drive demand to local restaurants;

   c.  Procurement and development of technology, including for payment processing, order management, application maintenance, and dispatching technology;

   d.  Procurement and development of restaurant-dedicated products, including products to manage promotions, order volume, and menu management;

   e.  Onboarding delivery couriers, including background checks for every courier on Plaintiffs' platforms;

Gibson, Dunn & Crutcher LLP

8

f.  Ensuring delivery couriers earn fair compensation for their work (which, as required by Proposition 22 in California, is at least 120% of the local minimum wage plus expenses and tips);

g.  Dedicated customer service specialists to provide support to restaurants, couriers, and consumers for orders placed through Plaintiffs' platforms; and

h.  Safety of Plaintiffs' platforms, including insurance costs and personal protective equipment to protect couriers.

21.    Plaintiffs compete amongst each other and with many other companies, and thus have powerful market-based incentives to offer the best overall value proposition to restaurants.

22.    Beginning before COVID-19, Plaintiffs' platforms have allowed restaurants that otherwise struggle to attract dine-in customers to boost their revenue through delivery and pickup orders—especially because consumers who order from a restaurant online are more likely to later visit the same restaurant when they dine out.  Thus, the services Plaintiffs and other platforms offer (even at commissions exceeding 15%) have helped prevent restaurant closures that may have occurred even absent the COVID-19 pandemic.  This has been a positive development for many local neighborhoods.

23.    One report stated that 78% of family dining restaurants, 77% of casual dining and fine dining restaurants, and 81% of quick service restaurants, saw their customer base change during the COVID-19 pandemic, indicating that third-party platforms help restaurants by showcasing them to new customers.

24.    In general, the restaurant industry has been growing in the years since Plaintiffs and other third-party platforms have begun offering their services and has been in a near-constant state of expansion since 2013.  Data shows that 2021 is the biggest year of expansion for key restaurant indicators at least since 2004, and that restaurant sales are trending higher.  In California alone, restaurant and food service jobs are projected to grow 9% by 2029—from 1,830,000 jobs in 2019 to 1,944,300.  The Bureau of Labor Statistics similarly estimates the restaurant "job outlook" to grow 17% by 2030, which it labels "much faster than average."  Another report highlighted the "pent-up demand" for restaurants after the COVID-19 pandemic.  According to the report, 67% of adults were not eating out at restaurants as often as they would like.

Gibson, Dunn &
Crutcher LLP

25.     This resilience in the restaurant industry comes despite difficulties unrelated to third-party platforms including large rent increases, shortage of workers, and, more recently, skyrocketing wholesale food prices (all of which persist in San Francisco).  Rather than exacerbate these cost increases, third-party platforms have helped mitigate the problem for restaurants by expanding restaurants' customer base.

26.     Restaurant commissions are not one-size-fits-all, and they are often tailored to each restaurant's needs.  These contracts are also good for restaurants—in almost all cases, a restaurant's overall revenue increases when it joins one or more of Plaintiffs' platforms.  For instance, nearly two-thirds of restaurants surveyed say they were able to increase their profits during COVID-19 because of DoorDash.  A typical contract between Plaintiffs and a restaurant includes a commission whereby the restaurant agrees to pay Plaintiff a fixed percentage of the price of the consumer's order.

27.     As one example, restaurants have significant flexibility in how they partner with DoorDash to facilitate delivery.  Restaurants can partner with DoorDash to facilitate delivery via Marketplace, Storefront, and Drive.  *See* ¶ 9.  A restaurant that selects Marketplace as the means to facilitate delivery can opt in to one of three Partnership Plans at different price points depending on the products and services that are best suited to its needs, including a Basic Partnership Plan where DoorDash facilitates the delivery of online orders for a commission rate of 15%.  However, restaurants can also choose enhanced services by opting into the Plus or Premium Packages in exchange for higher commission rates.  The vast majority of restaurants who have opted into a Partnership Plan in San Francisco have chosen a plan that includes a commission greater than 15%.

28.     DoorDash has used a percentage commission structure with many restaurants for many years such that restaurants only pay DoorDash when they receive an order through the DoorDash website or mobile application.  DoorDash's contracts with restaurants—including the percentage commission structures contained therein—often last several years, though many of those contracts are terminable on seven days' notice.  DoorDash has contracts with over 3,000 restaurants in San Francisco.  The vast majority of these contracts have been long-term and contain a fixed-percentage commission structure.  When not artificially capped by law, the vast majority of DoorDash's contracts

Gibson, Dunn & Crutcher LLP

FIRST AMENDED COMPLAINT
CASE NO. 3:21-CV-05502-EMC

1  with restaurants include a commission rate greater than 15%, and the commission rates have remained

2  the same or decreased since the COVID-19 crisis began.

3       29.    Grubhub has used a percentage commission structure with many restaurants for many

4  years.  Restaurants that use products like Grubhub's Direct Order Toolkit or Grubhub Direct do not

5  pay any marketing fees.  Restaurants that opt to use the Grubhub Marketplace to generate orders from

6  the Grubhub network of more than 30 million diners select a negotiable marketing package that

7  typically ranges from 5–20% per order, based on the restaurant's desired level of marketing support

8  and visibility.  Grubhub's contracts with restaurants are generally terminable with three days' notice.

9  But Grubhub's contracts—including the percentage commission structures contained therein—often

10  last several years because restaurants recognize the value that Grubhub provides.  Grubhub has

11  contracts with thousands of restaurants in San Francisco.  Grubhub's contracts vary restaurant by

12  restaurant, depending on the suite of services each restaurant decides is best for its business.  For

13  contracts between Grubhub and restaurants that include delivery facilitation, the total commission rate

14  is generally greater than 15% (largely as a pass-through charge to cover Grubhub's costs), and the

15  commission rates have not increased since the COVID-19 crisis began.

16       30.    The relationship between restaurant and third-party platforms historically has not been

17  subject to government regulation.  Like nearly all other types of businesses—including other

18  marketing, delivery, and point-of-sale technology businesses—restaurants and third-party platforms

19  have been permitted to agree to whatever terms they thought best for their business.  Restaurants and

20  third-party platforms have been able to negotiate their contracts freely, and many San Francisco

21  restaurants have bargained for individualized rates with third-party platforms.  Nonetheless, for several

22  years, there has been a robust debate about the amount of commissions restaurants pay to third-party

23  platforms—with some restaurants complaining that commissions were too high, and others stating that

24  third-party platforms helped their restaurants increase profitability, even accounting for the

25  commissions.  *See, e.g.*, *Filling Delivery Gaps*, RESTAURANT HOSPITALITY (June 13, 2018),

26  https://bit.ly/3eeA52Q; Lori Weisberg, *Why restaurants are jumping on the food delivery bandwagon*,

27  L.A. TIMES (Apr. 11, 2018), https://lat.ms/3e9bI6V ("Burger Lounge co-founder J. Dean Loring said

28  his chain's partnership with DoorDash has been profitable.  Burger Lounge's own research showed it

Gibson, Dunn &
Crutcher LLP

11

was gaining new customers because of delivery and was making money on those customers even after the commissions."); *Should your restaurant be on Grubhub?* BUSINESS.COM (Jan. 13, 2018), https://bit.ly/2xiWPhu.

31.     Despite this debate, prior to the outbreak of COVID-19, no government had regulated the commissions that third-party platforms could charge restaurants (or consumers).  Upon information and belief, no  legislature in California had even formally introduced commission-cap legislation prior to 2020.  Plaintiffs had entered into tens of thousands of contracts with restaurants before any legislation had been discussed, let alone introduced, regarding the amount of commissions.  Plaintiffs (and restaurants) relied on the law as it existed at the time of contracting when they entered into their contracts.  The law at that time was devoid of any government price-fixing, just as it is for almost every business-to-business relationship in other industries.

32.     In eventually passing the permanent cap, Supervisor Aaron Peskin admitted that his "office had been working on" commission cap legislation "even, actually, prior to the [COVID-19] emergency.  Because the reality is, emergency or not, we really have an imperative to protect independent restaurants from the exploitive and predatory practices of third-party food delivery apps that seek to extract wealth from our local economy."  (In fact, Plaintiffs are neither exploitive nor predatory.  As just two examples, restaurants that partnered with DoorDash were eight times more likely to survive the COVID-19 pandemic than those that did not, and three-quarters of restaurants agree that Grubhub increases the amount customers spend from their restaurant.  The fees that restaurants pay in exchange for the services they select from third-party platforms pay for the costs of operating Plaintiffs' platforms, which ultimately are for restaurants' benefit.)

33.     Nonetheless, the Board of Supervisors cited the COVID-19 pandemic as its purported justification to pass a temporary "emergency" ordinance that it now has converted into permanent legislation, even though the emergency has abated.

**B.     The Mayor Announces An Emergency Cap On Delivery Commissions In Response To The COVID-19 Pandemic**

34.     COVID-19 is a novel virus that began spreading across the United States in early 2020.

Gibson, Dunn & Crutcher LLP

35.     On or about February 25, 2020, Mayor Breed declared a state of emergency in San Francisco due to COVID-19.

36.     On or about March 16, 2020, the California Department of Public Health issued guidance for all restaurants to suspend in-restaurant seated dining and offer only drive-through or other pickup/delivery options.

37.     On or about March 16, 2020, the City and County of San Francisco Department of Public Health issued a shelter-in-place order due to COVID-19.  That order was subsequently extended several times.

38.     Beginning in March 2020, Plaintiffs made significant financial investments to support restaurants, at great cost, during the public health emergency:

    a.     Between March 2020 and May 2020, DoorDash relief programs saved restaurants more than $120 million.  DoorDash undertook took significant measures to protect and support consumers and couriers, and also made significant investments to support local restaurants.  For example, DoorDash provided a 30-day commission-free trial to over 1,400 restaurants in San Francisco that chose to join its platform during the pandemic.  DoorDash voluntarily reduced commissions for existing restaurants by half from April 9, 2020 to May 31, 2020.  DoorDash further invested millions of dollars to reduce or eliminate consumer fees and to generate more orders for restaurants, which helped restaurants keep their doors open for delivery.  And DoorDash built a new product to enable every independent restaurant or franchise to receive daily payouts to ease cash flow concerns.  DoorDash additionally granted $250,000 to help San Francisco restaurants make preparations for a winter of outdoor dining, with 50 restaurants receiving $5,000 each, in partnership with the Golden Gate Restaurant Association.  For many restaurants, these measures were key to keeping their doors open during the pandemic, paying bills, and retaining and hiring additional staff.

    b.     Grubhub has dedicated hundreds of millions of dollars to directly support restaurants since the pandemic began.  Rather than maintaining revenue it would have generated

Gibson, Dunn &
Crutcher LLP

during the pandemic, Grubhub reinvested its revenue to support restaurants, including deferred and waived commissions for independent restaurants to provide much-needed cash flow relief and Grubhub-funded diner promotions on behalf of restaurants, as well as platform improvements.  Grubhub's Community Relief Fund collected more than $30 million, which was used to directly support restaurants, workers, couriers, first responders, and others impacted by the crisis.  Grubhub also invested in procedures to help keep consumers, restaurants, and couriers safe.

39.    On April 10, 2020, Mayor Breed promulgated the Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020 (the "Order") thereby temporarily capping the commissions third-party platforms could charge restaurants.  *See* Exhibit A.  The Order stated:

    a.  "It is in the public interest to take action to maximize restaurant revenue";

    b.  "Capping the per-order fees at 15% will accomplish the legitimate public purpose of easing the financial burden on struggling restaurants"; and

    c.  "It shall be unlawful for a third-party food delivery service to charge a covered establishment a fee per online order for the use of its services that totals more than 15% of the purchase price of such online order."

40.    On the same day, Mayor Breed held a COVID-19 update[4] and issued a press release titled "Mayor London Breed Announces Delivery Fee Cap to Support San Francisco Restaurants During COVID-19 Pandemic."  *See* Exhibit B.  At the update and through the press release, Mayor Breed announced that:

    a.  "Third-party delivery providers can charge restaurants no more than 15% commission for food delivery for the duration of the Local Emergency";

    b.  The intent of the Order is to "make sure that our restaurants are protected;"[5]

---

[4]  City and County of San Francisco, *COVID-19 update*, YOUTUBE (April 10, 2020), https://bit.ly/2Rt06ln (relevant portions appear between 10:21 – and 13:26 on the video).

[5]  City and County of San Francisco, April 10, 2020 COVID-19 update, https://bit.ly/2Rt06ln.

Gibson, Dunn & Crutcher LLP

c.  The "cap on delivery fees is intended to support small businesses through the COVID-19 pandemic";

d.  "[D]elivery companies provide an important service and support local employment"; and

e.  She drafted the Order "after working with the Golden Gate Restaurant Association."

41.  During the COVID-19 pandemic and shelter-in-place orders, many San Francisco consumers relied on third-party platforms to facilitate delivery of food to their homes.  Similarly, many San Francisco restaurants relied on platforms to facilitate the sale and delivery of their food.  Accordingly, during the COVID-19 pandemic, restaurant demand for use of Plaintiffs' platforms generally increased.

42.  During the COVID-19 pandemic, San Francisco and many other jurisdictions changed their regulations to help restaurants in other ways, such as allowing restaurants more access to use streets and sidewalks for outdoor seating.  And states, including California, have allowed restaurants to sell alcoholic beverages to-go.

43.  In addition to the costly investments Plaintiffs made in supporting restaurants during the public emergency (*see* ¶ 38), the COVID-19 pandemic also caused many of Plaintiffs' costs to increase.  For example, to ensure that delivery couriers could remain active and earning, DoorDash provided free personal protective equipment and highly subsidized on-demand healthcare to couriers, and provided financial assistance to couriers who tested positive for COVID-19 and those in certain other high-risk categories.  Likewise, Grubhub paid considerably more to delivery couriers on a per-order basis, provided them with personal protective equipment at no cost, and also provided couriers with COVID-19 sick pay.  Despite increased demand for Plaintiffs' platforms and, in many cases increased costs to meet that demand, in many instances, Plaintiffs lowered their commissions.

44.  Throughout early 2021, vaccinations and other public health measures significantly reduced the number of COVID-19 infections in San Francisco and elsewhere throughout the country.

45.  On or about June 11, 2021, the City and County of San Francisco Department of Public Health issued Order of the Health Officer No. C19-07y, which lifted local capacity limits on business

Gibson, Dunn & Crutcher LLP

and other sectors, local physical distancing requirements, and many other previous health and safety restrictions as of June 15, 2021.  Order No. C19-07y also suspended the obligation of businesses to prepare and post social distancing protocols or in most instances submit health and safety plans to the Health Officer.  Order No. C19-07y has been updated over time but has not reinstituted any capacity restrictions or requirements for social distancing protocols.  *See* Exhibit C.

**C.     DoorDash Advocates For—And California Voters Overwhelmingly Pass— Proposition 22**

46.     Beginning in 2019,[6] and throughout 2020, DoorDash and other industry participants publicly supported a ballot initiative known as Proposition 22, which sought both to make clear that workers who use Plaintiffs' platforms are independent contractors and to ensure that those workers were guaranteed certain benefits often associated with traditional employment.

47.     Many City officials and Board members publicly opposed Proposition 22:

    a.  The Board unanimously adopted a resolution opposing Proposition 22 on October 20, 2020.  In the Resolution, the Board explicitly identified Plaintiffs and accused them of "exploit[ing] their employees for profit." Additionally, the Resolution accused a third-party platform of seeking to avoid adherence to the law by "put[ting] together a deceptive ballot measure creating a loophole in existing law for app-based companies to continue to exploit their workers for profit."

    b.  Supervisor Shamann Walton tweeted: "Prop 22 will make racial injustice worse in California during the worst time, and permanently lock people of color into low wages forever.  Prop 22 will eliminate our local employment equity protections and only benefit app-based companies.  Prop 22 supports slave labor.  No on 22!"

    c.  Supervisor Ahsha Safai tweeted: "VOTE NO on Prop 22! #SickofGigGreed."

    d.  Supervisor Rafael Mandelman, at a rally opposing Proposition 22, said that rally-goers were gathered "to tell Uber, Lyft and DoorDash that they do not get to buy democracy."  He further stated that "the cynicism of Prop 22 is extraordinary"

---

[6]  Josh Eidelson, *Uber, Lyft, DoorDash Put $90 Million to Possible Ballot War*, Yahoo!Finance (Aug. 29, 2019), https://yhoo.it/3zyadsb.

Gibson, Dunn & Crutcher LLP

and, calling companies who supported Proposition 22 "modern-day robber barons," accused them of "trying to use the ballot measure to deprive workers of rights and to shut down democratic processes." He concluded, "and we are going to stop them."[7]

48.     The Board's sentiments were not shared by California voters. On November 3, 2020, California voters passed Proposition 22 by a margin of over 17 percentage points.

49.     In January 2021, Supervisor Aaron Peskin tweeted about his continued opposition to Proposition 22.

50.     A recent survey by Benenson Strategy Group, an independent research firm which conducted a Proposition 22 survey of California drivers and delivery couriers reported that:

   a.   Four out of five respondents were happy that Proposition 22 passed;

   b.   Seventy-five percent believed that Proposition 22 created a better future for app-based drivers, either through flexibility, independence, or a stronger safety net of benefits; and

   c.   Nine in ten drivers said that the changes from Proposition 22 have already had a positive impact on their lives, with 76% agreeing with the statement that "Prop 22 benefits me personally."[8]

51.     This comports with recent reports evidencing that in 2021, driver earnings are up and hourly earnings are above $20 per hour in California's largest markets. As to DoorDash, delivery couriers in the Bay Area are earning $36 per hour on a delivery, including tips.

52.     Further, a report from UC Riverside School of Business Center of Economic Forecasting and Development,[9] found that Proposition 22 will lead to earnings well above minimum wage for thousands of California app-based drivers. Specifically, the study found:

---

[7] *Vote No On Prop 22! Rafael Mandelman On The San Francisco Board Of Supervisors Says No On Prop 22*, YOUTUBE (Oct. 21, 2020), https://bit.ly/3hmi7zg.

[8] JOEL BENENSON AND MITCH MARKEL, BENSON STRATEGY GROUP, *California Drivers Reaction to Prop 22* (May 13, 2021), https://bit.ly/3hHfAji.

[9] UNIV. OF CAL. RIVERSIDE CTR. FOR ECON. FORECASTING AND DEV., PROPOSITION 22: ANALYZING THE IMPACT ON APP-BASED DRIVERS' EARNINGS (Aug. 2020).

Gibson, Dunn & Crutcher LLP

a.  A driver driving an average of five hours per week would earn an average of $25.61 per hour after accounting for expenses and wait time between rides.

b.  A driver driving either 15 or 30 hours per week would earn an average of $27.58 per hour, after accounting for expenses and wait time.

53.   These hourly earnings estimates are substantially higher than the earnings guarantee of 120% of the minimum wage provided by Proposition 22 of $15.60/hour ($16.80/hour in 2021).

**D.   The Board Considers Codifying Mayor Breed's Executive Order**

54.   In July 2020, the San Francisco Small Business Commission held a meeting at which Board of Supervisors Legislative Aide Lee Hepner presented on potential legislation codifying Mayor Breed's executive order imposing a temporary commission cap.  That meeting demonstrated that the Small Business Commission and Board of Supervisors sought to economically benefit certain restaurants at Plaintiffs' expense.  For example:

a.  Commissioner William Ortiz-Cartagena stated, "We're trying to save the small restaurants here, so, you know, we -- we love what you're doing."  He also said, "We're here small business, we hear you.  We will not let these companies bleed you dry.  We promise you that."

b.  Commissioner Cynthia Huie advocated for a 10% cap rather than a 15% cap because "just knowing the margins that restaurants are working on, I feel like every little percentage point really does count.  I know, you know, when you do the books at the end of the month, it's – it's a tough – it's a tough thing to look at those numbers."

c.  Commissioner Manny Yekutiel stated that he was "100 percent" for "making it harder for these companies to get rich off the backs of small business owners."

d.  Commissioner Kathleen Dooley stated: "I was very inspired by the idea of perhaps getting our local restaurants to get together and somehow figure out a way to bypass these type of delivery services entirely.  And I know in my neighborhood, a residential group had—has been doing that, of saying, you know, this week we'll deliver, if you live in the neighborhood, from these three restaurants.  And I think, you know, clearly that's a great idea, and we need to move, you know, in our

18

community, we need to move forward with that.  That would be a way of taking control back to the restaurants themselves."

**E.     The Board Passes The Temporary Ordinance Days After California Voters Pass Proposition 22**

55.     On November 10, 2020 (one week after Californians overwhelmingly passed Proposition 22), the Board passed Ordinance No. 234-20, which added Article 53 to the San Francisco Police Code (the "Ordinance").  *See* Exhibit D.  Mayor Breed approved the Ordinance on November 20, 2020, and it became effective on December 21, 2020.

56.     The Ordinance's findings include the following:

a.   "[I]n recent years, the City's restaurant industry has been in decline."  S.F. Police Code § 5300(c).

b.   "The increasing market dominance of a small number of third-party food delivery service companies has resulted in increasingly difficult economic conditions for City restaurants, which must contract with these companies if they wish to access the growing share of customers who rely on delivery platforms to obtain meals." S.F. Police Code § 5300(e).

c.   "The COVID-19 emergency has worsened the economic picture for City restaurants. Due to a ban on dine-in restaurant service caused by a concern with the spread of COVID-19, third-party food delivery services have enjoyed unprecedented revenue, while restaurants have become dependent on delivery and takeout orders, and increasingly vulnerable to unfair contract terms demanded by delivery services companies."  S.F. Police Code § 5300(i).

57.     The Ordinance prohibits Plaintiffs from "charg[ing] a covered establishment a fee, commission, or charge per online order that totals more than 15% of the purchase price of the online order."  S.F. Police Code § 5302(a).

58.     The Ordinance does not fix the price of any other business with whom restaurants transact, such as raw ingredient suppliers or equipment suppliers, even though wholesale food prices have skyrocketed to their highest percent increase in decades.  One of the most significant commodities

that restaurants purchase—paper products—has also surged in price in recent years.  Notably, the Ordinance does not fix the price of any other advertisers that provide similar marketing services to restaurants, such as media placement agencies, classified advertisements, Google ads, etc., even though advertising on Google and other websites has grown in both popularity and price to restaurants in recent years.  And the Ordinance is silent regarding these other businesses despite the fact that, for certain other supplies and services, there is market dominance between vendors and restaurants, resulting in restaurants having limited negotiating power in those business relationships.

59.     The Ordinance regulates "third-party food delivery services," which it defines as "any website, mobile application or other internet service that offers or arranges for the sale of food and/or beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food preparation and service establishments."  S.F. Police Code § 5301.

60.     The Ordinance applies to "covered establishments," which it defines to mean "a restaurant that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale of food for same-day pickup or delivery to customers from one or more retail locations within the City."  S.F. Police Code § 5301.  The Ordinance excludes from "covered establishments" "any restaurant that meets the definition of a formula retail use under Section 303.1 of the Planning Code."  *Id.*

61.     Section 303.1 of the Planning Code defines a formula retail use as "a type of retail sales or service activity or retail sales or service establishment that has eleven or more other retail sales establishments in operation, or with local land use or permit entitlements already approved, located anywhere in the world.  In addition to the eleven establishments either in operation or with local land use or permit entitlements approved for operation, the business maintains two or more of the following features: a standardized array of merchandise, a standardized facade, a standardized decor and color scheme, uniform apparel, standardized signage, a trademark or a servicemark."

62.     The Ordinance originally provided that it "shall expire by operation of law 60 days after the County Health Officer amends or terminates the Stay Safer At Home Order or any subsequent order regulating restaurants so that restaurants may allow the number of patrons present in the indoor

space of the restaurant to resume at 100% of the restaurant's maximum occupancy, provided that no subsequent order is issued to restrict restaurant occupancy below 100% capacity during that 60-day window.  Upon expiration, the City Attorney shall cause this Article to be removed from the Police Code." *Id.* § 5312.

63.     Restaurants were permitted to resume 100% maximum capacity as of June 15, 2021. Thus, as originally enacted, the Ordinance would have expired by operation of law on August 14, 2021.

**F.     The Board Makes The Ordinance Permanent**

64.     On June 10, 2021, the San Francisco Board of Supervisors Public Safety & Neighborhood Services Committee held a meeting at which it discussed removing the Ordinance's sunset provision and thus making it permanent.  The Committee focused on the relative profits and wealth of local restaurants and third-party platforms.  For example:

a.  Mr. Hepner stated:  "Small businesses in San Francisco have amassed hundreds of millions of dollars of debt in the form of back rent owed and other financial obligations.  And in the same breath, with all due respect to the necessary delivery services that have kept a lot of restaurants afloat, food delivery platforms have really bloomed, and their market share has really expanded.  Not to single any of them out by name, but we've seen one of those companies, IPO for $87 billion dollar market cap, at the same time our restaurants are suffering still.  The legislation before you would remove that sunset and we think that it's still a critical protection for restaurants."

b.  Supervisor Catherine Stefani stated:  "Looking at the *Wall Street Journal*, on DoorDash, their revenue tripled in the first quarter showing sustained demand for food delivery services, even as coronavirus vaccinations picked up and the nation moved toward reopening.  So I really think the fact that, you know, our restaurants have suffered so much and we're trying to get them back on their feet, save them." Supervisor Stefani did not mention that DoorDash had recently introduced new Partnership Plans available to local restaurants in San Francisco, which include a Basic Partnership Plan where DoorDash facilitates the delivery of online orders for

21

1    a flat commission rate of 15% (although most restaurants have opted for plans with

2    commissions of 25% or 30%).

3    65.    In contrast, the Board heard from numerous delivery couriers that same day, each of

4    whom objected to making the temporary price control permanent and emphasized the likely detrimental

5    impact on their earning opportunities:

6        a.    Matilda Forbes: "I have been delivering food for the third party platforms since May

7            2020, when the pandemic had so much impact on my income, and I'm speaking to

8            . . . oppose the implementation of the permanent price control on the food

9            delivery services in this city . . . not only will this threaten my earnings, but this will

10           harm the very restaurants and the consumers they are meant to help."

11       b.    Michael Osofsky: "I understand that price controls were created to support

12           restaurants during these extremely trying times, but it also has an effect on my ability

13           to earn . . . .  If price controls persist, San Francisco Dashers, such as myself, could

14           lose dashing opportunities and receive lower earnings."

15       c.    David Lewis: "[W]hile the law makers might have great intentions with the

16           proposed law, it will unfortunately harm Dashers, like myself, and limit -- further

17           limit their earnings because it will cause prices for customers to go up, and the

18           numbers [sic] of delivery will likely go down . . . .  I know this job has helped others

19           like me through these difficult times and found that flexibility and motivation to

20           move forward.  I am asking you to please reconsider this proposal.  It will harm

21           Dashers, like me, the restaurants we deliver for, and most importantly, our

22           community."

23   66.    The Board also heard from the CEO of the Latino Restaurant Association, who told the

24   Board that large percentages of her member restaurants would be forced to close or lay off staff if they

25   could not partner with third-party platforms.  She cautioned that "further analysis is needed, because

26   this hinders [restaurants'] right to choose, and it's going to lead to higher fees for our customers."  In

27   that way, "arbitrary price controls hurt the very restaurants [they] might be intended to help."  In other

28

Gibson, Dunn &
Crutcher LLP

22

words, the Ordinance would not (and does not) solve neighborhood blight from restaurant closures—if anything, it exacerbates it.

67.     On June 22, 2021, the full Board held a meeting at which Supervisor Peskin acknowledged that restaurants have "begun to recover as we emerge from the pandemic," but he focused on the relative profits and revenue between restaurants and Plaintiffs:

   a.  "By some accounts, San Francisco restaurant profits plummeted by over 90% at the worst point of the pandemic."

   b.  "In that context, these delivery platforms, their sales have more than doubled during the pandemic.  By way of an example, DoorDash's initial public offering debuted with a market cap of $72 billion [] last year . . . as their CEO took home $414 million in stock awards."

   c.  "The legislation before you today seeks to extend protections that were passed during the pandemic, but which my office has been working on even actually prior to the emergency, because reality is, emergency or not, we really have an imperative to protect independent restaurants from the exploitive and predatory practices of third-party food delivery apps that seek to extract wealth from our local economy, harming our commercial corridors, and harming workers throughout the Bay Area."

   d.  "[T]he reality is, if delivery companies want to be advertising and marketing companies because that aspect of their business model is more profitable to these platforms and more easily scalable, then they should be able to do so but pursuant through separate contracts without coercion of these restaurants.  Or, for that matter, through separate companies that negotiate those services with restaurants."

68.     In a first of two votes required to amend the Ordinance from temporary to permanent, on June 22, 2021, the Board of Supervisors voted unanimously in favor of enacting a permanent cap.

69.     Members of the Board of Supervisors directly tied passage of the amendment to third-party platforms' support of Proposition 22 just months earlier.  In voting for the permanent cap, Supervisor Peskin further noted that "DoorDash, Uber Eats, Postmates all contributed to the most expensive ballot measure in history, Prop 22, to gut employee protections."  That same day, he likewise

Gibson, Dunn &
Crutcher LLP

posted on Facebook: "In another first among major American cities, San Francisco just passed my legislation setting a permanent 15% cap on delivery fees charged by DoorDash, UberEats, Grubhub and Postmates to independent restaurants.  Third-party food delivery saw exponential growth during the pandemic, while SF restaurants incurred $400M in rent debt.  70,000 Bay Area hospitality workers lost their jobs, while Big Tech spent $220M to pass Prop 22, the most anti-worker initiative in California history.  We will continue to push back against companies who demonstrate blatant disregard for small businesses, workers and neighborhoods.  Correcting this imbalance is a long-term project."

70.     Supervisor Ahsha Safai also made a statement regarding the proposed amendment to the Ordinance.  He stated:

    a.  "[M]any of the restaurants, many of the businesses that rely on delivery, would not have been able to survive without that option.  And so many of them felt as though they were in a position of negotiating with a gun to their head for lack of better term."

    b.  "I personally met with every single representative of every single delivery company and implored them to do the right thing.  So, we are in a once-in-a-generation pandemic.  These businesses have no other option.  The right thing to do would be to negotiate with us to the right number and do it voluntarily.  Don't make us legislate this.  Be the leader for the rest of the country.  Show the rest of the country what the right thing to do is in this situation.  They chose not to.  Ultimately, we went to Mayor Breed and as Supervisor Peskin said, we made the cap at 15 percent. . . .  There is room, as he said, for additional services to be negotiated.  I also do want to point out that, in its worst form, some of these companies have a vested interest in putting restaurants out of business.  They have had discussions and have been motivating a conversation around what we call ghost kitchens and want to set up their own infrastructure where they can deliver food directly to consumers by bypassing this entire industry."

Gibson, Dunn &
Crutcher LLP

c. "We are also aware of, and have our eyes out on these additional fees that we're starting to see creep up . . . I just want to put a word out to the companies that— don't pretend that you're going to come up with additional fees to try to circumvent this legislation."

71.     On June 29, 2021, the Board, again, unanimously voted in favor of the amendment removing the Ordinance's sunset provision.

72.     The Board did so without any research or analysis appropriate for such sweeping legislation.  Upon information and belief, the Board did not conduct (or ask anyone else to conduct) research or analysis regarding a permanent commission cap's potential effect on consumers, restaurants, delivery couriers, third-party platforms, the local economy, or the relationship between the commission paid by restaurants to Platforms and those restaurants' profitability.  For example, upon information and belief, the Board did not conduct (or ask anyone else to conduct) research or analysis regarding whether Plaintiffs and other third-party platforms could or would continue to offer the same level of services to restaurants under a 15% cap, and whether a 15% cap would *increase* the number of restaurants that are forced to close if Plaintiffs are forced to modify their services.  Moreover, upon information and belief, the Board did not conduct (or ask anyone else to conduct) research or analysis regarding any differences among the delivery services offered by third-party platforms, such as differences in quality, speed, or cost to the third-party platform.  The Ordinance treats every large third-party platform the same—capping fees for each at 15%—without any factual finding supporting a uniform industry-wide cap.  Similarly, upon information and belief, the Board did not conduct (or ask anyone else to conduct) research or analysis regarding differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that would justify treating the two types of platforms differently.  Nor, upon information and belief, did the Board conduct (or ask anyone else to conduct) research or analysis regarding whether the rise of third-party platforms aided the growth of restaurants in San Francisco, or identify other factors that might impede restaurants' growth.

73.     Mayor Breed disagreed with making the Ordinance permanent and refused to sign the bill, which resulted in the Ordinance's enactment ten days after the Board of Supervisors' second vote

on June 29, 2021.  Thus, the Ordinance now permanently caps the fees that Plaintiffs can charge covered establishments.

74.     In declining to sign the amendment, Mayor Breed issued a statement expressing "concerns about making [the previously temporary fee cap] legislation permanent."  Exhibit E.  She wrote that the Ordinance "is unnecessarily prescriptive in limiting the business models of the third-party organizations, and oversteps what is necessary for the public good."  *Id.*

75.     Nearly immediately after Plaintiffs filed their complaint on July 16, 2021, Supervisor Peskin tweeted, "Hardly surprising from massive corporations that just spent over $200M" in support of Proposition 22.  "I stand firmly with small businesses and by *my legislation* to stop the rampant exploitation of San Francisco's restaurant industry" (emphasis added).  Supervisor Peskin's tweet did not distinguish between those third-party platforms that donated money in support of Proposition 22 and those that did not.

76.     On July 22, 2021, Supervisor Peskin retweeted a link to a San Francisco Eater article that explained how, prior to the permanent commission cap, a restaurant was able to negotiate its own 10% commission rate with third-party platforms.

## G.     The Ordinance Targets And Irreparably Harms Plaintiffs, And Will Likely Harm Restaurants, Consumers, And Delivery Couriers

77.     Plaintiffs' contracts with restaurants, including the fixed-percentage commission structures, have benefited restaurants before, during, and after the COVID-19 pandemic by enlarging their consumer base to include (i) consumers who never would have known about or chosen the restaurant but for Plaintiffs' marketing efforts, (ii) those consumers who otherwise would have eaten at the restaurant in person but could not do so under shelter-in-place orders, and (iii) consumers who would not have eaten at the restaurant in person but purchase food for delivery or takeout.

78.     Although third-party platform costs are just one of the many costs incurred by restaurants, the Ordinance does not set prices or otherwise limit any other vendor's pricing.  For example, the Ordinance does not provide restaurants any relief from prices charged by raw ingredient supplies, equipment suppliers, advertisers, etc.  Instead, the Ordinance regulates just a subset of the third parties with whom restaurants contract.

79.     Despite the Ordinance's proffered justification based on the purported market share and profitability of certain third-party platforms, other industries relied on by San Francisco restaurants are also dominated by a number of large firms.  For example, digital advertising, which is critical for marketing and reaching new customers, especially during the pandemic, is dominated by a small number of companies.[10]

80.     The Ordinance will likely constrain the services that Plaintiffs can offer.  In order to try to offset some of the revenue lost due to lower commissions with restaurants, Plaintiffs could be forced to increase the fees they charge consumers who place delivery orders—but under the law of supply and demand, this would cause fewer orders on Plaintiffs' platform, harming Plaintiffs, restaurants, and couriers who depend on Plaintiffs' platforms.  In light of this decreased consumer demand, and the injury to goodwill and reputation due to raising consumer prices, Plaintiffs would not recoup all of the losses that result from the Ordinance.  Plaintiffs would also likely need to reduce the scope of the services provided to restaurants and consumers.  If Plaintiffs modify their operations in San Francisco, Plaintiffs, many local restaurants, and delivery couriers would be irreparably harmed.

81.     In this manner, the Ordinance will likely have the perverse result of harming the businesses and public that it purportedly intends to help.  Plaintiffs' experience during the pandemic bore this out—platforms facilitated fewer orders than they otherwise would have because of increased consumer-facing costs.  DoorDash projects that millions of dollars in Dasher earnings and tax revenue in San Francisco alone will be lost in 2021 as a result of price controls.  The Ordinance also threatens to restrict Plaintiffs' ability to offer the full suite of services they provide at a higher commission, such as advertising, taking away valuable services restaurants have overwhelmingly selected, when given a choice.

82.     Moreover, the Ordinance will irreparably harm Plaintiffs.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.  For example:

---

[10]     Megan Graham, *Digital Ad Spend Grew 12% in 2020 Despite Hit From Pandemic*, CNBC (April 7, 2021 11:01 A.M.), https://cnb.cx/39qQEaz.

Gibson, Dunn & Crutcher LLP

a. Since the Ordinance went into effect in San Francisco, Plaintiffs have been operating at a loss in San Francisco, and have not been able to recoup the revenue lost due to the commission cap.

b. The Ordinance will likely require Plaintiffs to renegotiate contracts with many restaurants, in part because many existing contracts contemplate marketing and other services that Plaintiffs will not be able to afford for only a 15% commission because Plaintiffs will not even be able to cover their costs.

c. The Ordinance will also likely require Plaintiffs to scale back certain marketing and promotional services in the City, causing irreparable harm to Plaintiffs' reputation and goodwill in the City.

d. The Ordinance will also likely require Plaintiffs to terminate contracts with existing restaurant-partners, and/or decline to enter into new contracts with prospective restaurant-partners.

e. The Ordinance will also likely require Plaintiffs to try to recoup lost revenue, possibly by increasing consumer costs, causing further harm to Plaintiffs' reputation and goodwill in the City.  Under the law of supply and demand, this would cause fewer orders on Plaintiffs' platform, harming Plaintiffs, restaurants, and couriers who depend on Plaintiffs' platforms.  In light of this decreased consumer demand and injury to reputation and goodwill, Plaintiffs would not recoup all of the losses that result from the Ordinance.  Moreover, because Plaintiffs' platforms are specially built to facilitate food pickup and delivery from restaurants, there is no viable alternative use for Plaintiffs' platforms.

## V.
## FIRST CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Contract Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of the Contract Clause of the California Constitution)**

83.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 82 above.

Gibson, Dunn &
Crutcher LLP

84.     The Ordinance violates Article I, Section 10 of the United States Constitution, which prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts."   The Contract Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."  *See Allied Structure Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).  This is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them."  *Id.* at 245.

85.     The Ordinance operates as a substantial impairment of Plaintiffs' contractual relationships with restaurants.  Plaintiffs long ago entered into contractual relationships with many San Francisco restaurants.  Those contracts included fixed-percentage commissions on which both parties relied, and both parties planned their expenditures accordingly.  Such reliance on the commission rate was vital to the contracting parties.  Plaintiffs' compliance with the City's *temporary* commission cap (at extraordinary cost to Plaintiffs) does not undermine their expectation that their original commission rates with restaurants would return after the end of the public-health emergency.

86.     Plaintiffs reasonably expected long-term revenue streams from their contracts that included commission rates above 15%.  Prior to the COVID-19 pandemic, many restaurants joined one or both of Plaintiffs' platforms at commission rates greater than 15%.  Until the Ordinance, the vast majority of those restaurants chose to continue their contracts with Plaintiffs at commission rates greater than 15%.  And, before the Ordinance, many restaurants affirmatively chose to pay additional commissions (greater than 15%) for additional services, whether permanently or temporarily.  For example, some restaurants chose to pay for short-term marketing boosts on Plaintiffs' platforms when they wanted to increase visibility to more consumers.  The Ordinance threatens to impair such choices by restaurants.

87.     These reasonably expected revenue streams are important because Plaintiffs make significant up-front investments in their platforms in reliance on long-term recoupment of those investments through commissions.  For example, Plaintiffs have spent tens of millions of dollars on marketing to enable San Francisco restaurants to expand the reach of their menus to new customers.

Gibson, Dunn &
Crutcher LLP

That investment will pay off (for both Plaintiffs and for restaurants) only if Plaintiffs generate enough long-term revenue to cover their costs.

88.     The Ordinance is intended to favor one subset of the public—local restaurant owners—rather than the public at large.  The reality is that restaurants and the public will likely be harmed if third-party platforms modify their operations in San Francisco, or if those platforms seek additional revenue from consumers to counteract the permanent decrease in commissions as a result of the Ordinance.

89.     The Ordinance does not advance a significant or legitimate public purpose.  It does not further the public health or safety.  It does not respond to an ongoing public-health threat.  And far from promoting the general welfare, it engages in ill-conceived economic protectionism.

90.     The adjustment of the rights and responsibilities of the contracting parties is not based upon reasonable conditions and of a character appropriate to the public purpose justifying the legislation's adoption.  It is not reasonable to *permanently* interfere with the ability of third-party platforms to charge the rates to which both the platforms and restaurants contractually agreed—especially when the express purpose of such interference is economic protectionism of one party at the other's expense.

91.     The unreasonableness of the interference is underscored by the City's recent budget surplus and the availability of other lawful methods to aid restaurants.

92.     For the same reasons, the Ordinance violates Article I, Section 9 of the California Constitution.  *See Teachers' Ret. Bd. v. Genest*, 154 Cal. App. 4th 1012 (2007).

93.     The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights).

94.     In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

95.     The City's unconstitutional conduct proximately caused Plaintiffs' injury.

Gibson, Dunn &
Crutcher LLP

96.     A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated the Contract Clauses of the United States and California Constitutions.

97.     Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

98.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs.

99.     In light of the violation of the Contract Clauses of the California and United States Constitutions, Plaintiffs further seek injunctive relief against enforcement of the Ordinance.

100.    In light of the violation of the Contract Clause of the United States Constitution, Plaintiffs further seek monetary damages.

## VI.
## SECOND CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 19 of the California Constitution (Inverse Condemnation))**

101.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 100 above.

102.    The federal and state Constitutions prohibit the government from taking private property "without just compensation." U.S. Const. amends. V, XIV; Cal. Const. art. I, § 19.  Contracts constitute property within the meaning of the Fifth Amendment and are susceptible to a "taking" within the meaning of the Takings Clause.  *See Lynch v. United States*, 292 U.S. 571, 579 (1934); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).  Thus, the City may not deprive Plaintiffs of the benefits of its contractual property rights without prior and just compensation.

103.    The Ordinance substantially impairs Plaintiffs' property rights in their contracts with restaurants without prior and just compensation to Plaintiffs.  A typical contract between any of the

Gibson, Dunn & Crutcher LLP

1  Plaintiffs and a restaurant includes a commission whereby the restaurant agrees to pay a Plaintiff a

2  certain percentage of the price of the consumer's order.  Plaintiffs have contracts with thousands of

3  restaurants in San Francisco.

4      104.    The Ordinance sets a permanent 15% cap on the commissions that third-party platforms

5  can charge restaurants.  Most of Plaintiffs' original contracts with restaurants included a commission

6  rate greater than 15%, even though Plaintiffs temporarily reduced those commissions to comply with

7  what was originally a *temporary* law.  The Ordinance thus substantially diminishes the economic value

8  of Plaintiffs' contracts and prevents Plaintiffs from obtaining reasonable returns on their investments.

9      105.    The taking of Plaintiffs' property is not for any valid public purpose.

10     106.    The Ordinance prevents Plaintiffs from obtaining reasonable returns on their

11  investments and could force the companies to modify their operations in San Francisco.  This is because

12  the Ordinance does not merely diminish Plaintiffs' profits under the contracts—eliminates them.

13  Although Plaintiffs are able to cover the costs of their current services at their previous commission

14  rates , they cannot cover their costs at a 15% commission rate.  Far from simply decreasing certain

15  commissions by as much as 50%, the Ordinance diminishes the *value* of Plaintiffs' contracts to

16  Plaintiffs by significantly more than that.

17     107.    The City may be held liable for this violation of the United States Constitution under 42

18  U.S.C. § 1983.

19     108.    In enacting the Ordinance, the City acted under color of state law and pursuant to an

20  official policy or custom.

21     109.    The City's unconstitutional conduct proximately caused Plaintiffs' injury.

22     110.    A bona fide and actual controversy exists between Plaintiffs and the City in that

23  Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article I, Section 19

24  of the California Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the

25  United States Constitution.

26     111.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save

27  themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the

28

1   benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in

2   substantial hardship to Plaintiffs.

3          112.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate

4   to avoid the deprivation of federal and state constitutional rights that results from applying the

5   Ordinance to Plaintiffs.

6          113.    In light of the violation of Article I, Section 19 of the California Constitution and the

7   Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, Plaintiffs

8   further seek injunctive relief against enforcement of the Ordinance.  The ongoing violation of Plaintiffs'

9   constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect

10  on Plaintiffs' reputations, goodwill, and business models.

11         114.    In light of the violation of the Takings Clause of the Fifth and Fourteenth Amendments

12  to the United States Constitution, Plaintiffs further seek monetary damages.

## VII.
## THIRD CAUSE OF ACTION

**(Declaratory and Injunctive Relief for Violation of Article I, Section 7 of the California Constitution (Police Power))**

115.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 114 above.

116.    Implicit in Article I, Section 7 of the California Constitution is the City's right to exercise police power, *i.e.*, "legislation promoting the public health, safety, morals and general welfare of a people." *In re Kazas*, 22 Cal. App. 2d 161, 165 (1937).  A City exceeds its police power where an ordinance does not "promote the welfare of the general public as contrasted with that of a small percentage . . . of the citizenry." *Id.* at 172–73.

117.    The Ordinance exceeds the City's police power because it does not promote the public health, safety, or general welfare of the public at large.  It does not seek to benefit all San Francisco workers or businesses.  Nor is the Ordinance directed at any form of price gouging.

118.    Instead, the Ordinance aims to advance the narrow interests of certain restaurants— those with contracts with Plaintiffs that have commissions higher than 15%—at the expense of

Gibson, Dunn &
Crutcher LLP

33

consumers who may be adversely affected by higher fees, restaurants who may lose the option of using Plaintiffs' services, and couriers who may lose out on delivery opportunities.

119. Prior to the Order and Ordinance, Plaintiffs' contracts with restaurants across the City routinely entailed total commission rates above 15% in order to cover the costs of their services and to satisfy the demand for such services across the City. Those costs extend well beyond facilitating delivery services, and include things like marketing, order-taking, technology and product development, payment processing, and customer service. For example, Grubhub spent more than $400 million in marketing in 2020, which allowed thousands of small, independent restaurants to gain valuable exposure. The Ordinance harms the general public by making food delivery services less economically viable, thereby reducing or eliminating the availability of food delivery services in San Francisco, or forcing an increase in the fees that Plaintiffs and other food delivery services must charge consumers. Such a price increase would cause fewer orders on Plaintiffs' platform, harming Plaintiffs (by preventing Plaintiffs from recouping the damages caused by the Ordinance), as well as restaurants and couriers who depend on Plaintiffs' platforms.

120. Third-party platforms are not so essential to the public health or safety that they should be treated akin to public utilities, and there is no adequate reason to impose an industry-wide price control. Further, the Ordinance does not provide a method by which Plaintiffs can be guaranteed a fair return on their investment going forward, such as an upward adjustment procedure.

121. The Ordinance's permanent cap also cannot be justified as a response to the COVID-19 (or any other) emergency. Nor is there any other ongoing emergency that would justify industry-wide price-fixing. Confirming such, Commissioner Manny Yekutiel stated his belief that "there was a life before DoorDash, Caviar, and Grubhub. There will be a life after them when they're done."

122. Upon information and belief, the City has not conducted (or asked anyone else to conduct) research or analysis regarding (i) a permanent commission cap's potential effect on consumers, restaurants, third-party platforms, or the local economy, (ii) any differences among the delivery services offered by third-party platforms, (iii) any differences between third-party platforms that serve 20 or more restaurants and third-party platforms that serve fewer than 20 restaurants that

would justify treating the two types of platforms differently, or (iv) the impact third-party platforms have had on the restaurant industry compared to other external factors.

123.    The Ordinance does not cap fees on any other goods or services restaurants utilize, such as supply and equipment providers, point-of-sale vendors, online reservation services, or other marketing services like Google, Facebook, or Twitter.  Rather, it caps only fees charged by certain large third-party platforms.  There is no permissible justification for singling out third-party platforms, especially when the price-fixing is not related to the public health, safety, or welfare.

124.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article I, Section 7 of the California Constitution.

125.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

126.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs.

127.    In light of the violation of Article I, Section 7 of the California Constitution, Plaintiffs further seek injunctive relief against enforcement of the Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

## VIII.
## FOURTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 7 of the California Constitution)**

128.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 127 above.

129.    The Ordinance violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 7 of the

California Constitution because it imposes an irrational and arbitrary direct cap on third-party platforms' ability to generate the revenue needed to cover their expenses, and instead provides preferential economic treatment to certain restaurants at the direct expense of third-party platforms.

130.    Businesses have a constitutionally protected interest in operating free from unreasonable governmental interference, and are also protected from excessive and unreasonable government conduct intentionally directed toward them.

131.    The Ordinance lacks a reasonable and nondiscriminatory legislative purpose.  It has no (let alone a substantial) relation to the public health, safety, morals, or general welfare.  Regardless of whether the Ordinance's *temporary* commission cap was justified by a public-health emergency, the new *permanent* cap cannot be justified as an emergency response (nor does it purport to be).

132.    In the context of price controls, a regulation bears "a reasonable relation to a proper legislative purpose so long as the law does not . . . become confiscatory." *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal. 4th 761, 771 (1997) (quotation marks omitted).

133.    Both the content and context of the Ordinance demonstrates that it is confiscatory in nature and intended to harm third-party platforms, essentially forcing them to subsidize certain restaurants' profit margins by permanently capping their ability to charge reasonable and competitive fees for their services.

134.    Moreover, the Ordinance was first issued under cover of the COVID-19 emergency, but this is pretext.  The City has extended the Ordinance's commission cap indefinitely, despite the dissipation of the COVID-19 emergency in San Francisco.  Supervisor Peskin's public statements that he had been working on a commission cap for "two years" underscores the lack of any connection between a permanent commission cap and any public-health emergency.

135.    The unreasonable interference with Plaintiffs' business that the Ordinance imposes, coupled with the pretext under which it was enacted, demonstrates that the Ordinance is "wholly arbitrary" and in violation of due process.

136.    The City may be held liable for this violation under the United States Constitution 42 U.S.C. § 1983.

Gibson, Dunn & Crutcher LLP

137.     In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

138.     The City's unconstitutional conduct proximately caused Plaintiffs' injury.

139.     A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated Article I, Section 7 of the California Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

140.     Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

141.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs.

142.     In light of the violation of Article I, Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek injunctive relief against enforcement of the Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

143.     In light of the violation of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek monetary damages.

## IX.
## FIFTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Equal Protection Clause of the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of the Equal Protection Clause of the California Constitution)**

144.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 143 above.

145.    The Ordinance violates the Equal Protection Clause of the Fourteenth Amendment, which requires that the reason for treating two groups differently be rationally related to a legitimate government interest.

146.    The Ordinance imposes an irrational and arbitrary direct cap on certain third-party platforms' ability to generate the revenue needed to cover their expenses, and instead provides preferential economic treatment to certain restaurants at the direct expense of third-party platforms, which is not a reasonable and nondiscriminatory legislative purpose.

147.    Third-party platforms and other businesses operating in the City are similarly situated, yet the Ordinance prohibits the ability of one class (third-party platforms) to freely contract with restaurants with regards to facilitating the order and delivery of food and beverages from restaurants to consumers while it does not fix the price of any other business with whom restaurants transact, such as raw ingredient suppliers, equipment suppliers, or advertisers.

148.    The Ordinance is irrational and arbitrary for a second reason: it caps the fees of third-party platforms that serve at least "20 separately owned and operated food preparation and service establishments," but not those that serve fewer than 20 such establishments.  S.F. Police Code § 5301. The City has not provided any (let alone a rational) basis for this distinction.  Small third-party platforms would be permitted to charge whatever commission they want—potentially including platforms similar to the groups that Commissioner Dooley described in her Small Business Committee statement about "figur[ing] out a way to bypass these type of delivery services entirely" through smaller neighborhood delivery groups that deliver from only "three restaurants."  The Ordinance seems specifically intended to carve out such groups and provide them with a competitive advantage.

149.    Plaintiffs are members of a politically unpopular group of businesses.  Statements by various San Francisco government officials, calling the Plaintiffs "modern day robber barons" and accusing them of "exploit[ing] their employees for profit," (additional statements described above ¶¶ 47, 67, 69–70) demonstrate animus toward Plaintiffs and an intent to retaliate against Plaintiffs for their advocacy and support of Proposition 22, as well as to economically protect one group of businesses over another group of businesses.

Gibson, Dunn & Crutcher LLP

150.    The Ordinance will undermine the City's own supposed purpose of assisting restaurants because it will drive up consumer costs, drive down deliveries, and thus negatively impact consumers, couriers, and restaurants.

151.    For substantially the same reasons, the Ordinance violates Article I, Section 3(b)(4) of the California Constitution.

152.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

153.    In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

154.    The City's unconstitutional conduct proximately caused Plaintiffs' injury.

155.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Ordinance violated the Equal Protection Clauses of the United States and California Constitutions.

156.    Plaintiffs desire a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives Plaintiffs of the benefit of their longstanding contracts with restaurants.  The enactment of the Ordinance results in substantial hardship to Plaintiffs.

157.    A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Ordinance to Plaintiffs.

158.    In light of the violation of Equal Protection Clauses of the United States and California Constitutions, Plaintiffs further seek injunctive relief against enforcement of the Ordinance.  The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on Plaintiffs' reputations, goodwill, and business models.

159.    In light of the violation of the Equal Protection Clause of the United States Constitution, Plaintiffs further seek monetary damages.

Gibson, Dunn &
Crutcher LLP

# X.
## SIXTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment of the United States Constitution (as to DoorDash) (42 U.S.C. § 1983); Declaratory Relief and Injunctive Relief for Violation of Article I, Sections 2 and 3 of the California Constitution (as to DoorDash))**

160.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 159 above.

161.     DoorDash publicly supported, advocated for, and donated money to promote Proposition 22, a state ballot measure that allowed drivers to keep the flexibility of independent contractor status while guaranteeing them certain protections similar to those of full-time employees.

162.     In supporting, advocating and promoting the ballot measure, DoorDash engaged in activities that are protected by the First Amendment of the United States Constitution and by Article I, Sections 2 and 3 of the California Constitution.

163.     The City passed the Ordinance with the intent to retaliate against Plaintiffs' exercise of their free speech rights.

164.     The Ordinance affected DoorDash's profits, which is a severe consequence that would chill a person of ordinary firmness from engaging in protected political speech.

165.     There is a substantial causal connection between DoorDash's exercise of its free speech rights and the City's passing of the Ordinance.  California voters passed Proposition 22 in November 2020.  Although popular with California voters, City officials and members of the San Francisco Board of Supervisors vehemently opposed Proposition 22.  Mere days after Proposition 22 was passed, the City passed the Ordinance (at that time in its temporary version).  The Board later removed the Ordinance's sunset provision in retaliation for the Plaintiffs' political speech in support of Proposition 22, as indicated by numerous, contemporaneous statements of Board members (described above). Because the City's actions were temporally proximate to DoorDash's exercise of its free speech rights, and Board members made statements explicitly connecting the Ordinance to Proposition 22, there is a substantial causal connection between DoorDash's exercise of its free speech rights and the City's passing of the Ordinance.

Gibson, Dunn & Crutcher LLP

166.     The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

167.     In enacting the Ordinance, the City acted under color of state law and pursuant to an official policy or custom.

168.     The City's unconstitutional conduct proximately caused DoorDash's injury.

169.     A bona fide and actual controversy exists between DoorDash and the City in that DoorDash alleges, and the City denies, that the enactment of the Ordinance violated Article I, Sections 2 and 3 of the California Constitution, and the First Amendment of the United States Constitution.

170.     DoorDash desires a judicial determination of the validity of the Ordinance to save themselves from the harm caused by the enactment of the Ordinance, which deprives DoorDash of the benefit of its longstanding contracts with restaurants and chills its protected political speech.  The enactment of the Ordinance results in substantial hardship to DoorDash.

171.     A judicial determination of the invalidity of the Ordinance is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Ordinance to DoorDash.

172.     In light of the violation of the First Amendment of the United States Constitution and Article I, Sections 2 and 3 of the California Constitution, DoorDash further seeks injunctive relief against enforcement of the Ordinance.  The ongoing violation of DoorDash's  constitutional rights constitutes irreparable harm, as does the Ordinance's long-term deleterious effect on DoorDash's reputation, goodwill, and business model.

173.     In light of the violation of the First Amendment of the United States Constitution, DoorDash further seeks monetary damages.

## XI.

**WHEREFORE, Plaintiffs pray for judgment as follows:**

1.     For a declaration that the Ordinance violates provisions of the United States Constitution and the California Constitution;

2.     For just compensation, according to proof, for permanent taking of property;

3.     For an award of damages against the City according to proof;

_

4.     For a permanent injunction enjoining the City from enforcing the Ordinance against Plaintiffs;

5.     For reasonable attorneys' fees incurred in this matter pursuant to 42 U.S.C. § 1988 and other pertinent law;

6.     For Plaintiffs' costs of suit incurred herein; and

7.     For such other and further relief as the Court deems just and proper.


DATED:  October 1, 2021                    Respectfully submitted,

                                           GIBSON, DUNN & CRUTCHER LLP


                                           By: /s/     Joshua S. Lipshutz
                                                       Joshua S. Lipshutz

                                           Attorneys for Plaintiffs
                                           DOORDASH, INC. and GRUBHUB INC.

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A



OFFICE OF THE MAYOR
SAN FRANCISCO

LONDON N. BREED
MAYOR

## NINTH SUPPLEMENT TO MAYORAL PROCLAMATION DECLARING THE EXISTENCE OF A LOCAL EMERGENCY DATED FEBRUARY 25, 2020

**WHEREAS**, California Government Code Sections 8550 et seq., San Francisco Charter Section 3.100(14) and Chapter 7 of the San Francisco Administrative Code empower the Mayor to proclaim the existence of a local emergency, subject to concurrence by the Board of Supervisors as provided in the Charter, in the case of an emergency threatening the lives, property or welfare of the City and County or its citizens; and

**WHEREAS**, On February 25, 2020, the Mayor issued a Proclamation (the "Proclamation") declaring a local emergency to exist in connection with the imminent spread within the City of a novel (new) coronavirus ("COVID-19"); and

**WHEREAS**, On March 3, 2020, the Board of Supervisors concurred in the Proclamation and in the actions taken by the Mayor to meet the emergency; and

**WHEREAS**, On March 4, 2020, Governor Gavin Newsom proclaimed a state of emergency to exist within the State due to the threat posed by COVID-19; and

**WHEREAS**, On March 6, 2020, the Local Health Officer declared a local health emergency under Section 101080 of the California Health and Safety Code, and the Board of Supervisors concurred in that declaration on March 10, 2020; and

**WHEREAS**, On March 6, 2020, the City issued public health guidance to encourage social distancing to disrupt the spread of COVID-19 and protect community health; and

**WHEREAS**, On March 7, 2020, the Local Health Officer ordered certain City facilities not to hold non-essential group events of more than 50 people for the two weeks from the date of the order and prohibited visitors from Laguna Honda Hospital; and

**WHEREAS**, On March 7, 2020, the Department of Human Resources issued guidance to minimize COVID-19 exposure risk for City employees who provide essential services to the local community, in particular during the current local emergency; and

**WHEREAS**, On March 11, 2020, March 13, 2020, March 17, 2020, March 18, 2020, and March 23, 2020, the Mayor issued supplements to the Proclamation, ordering additional measures to respond to the emergency; and

1

OFFICE OF THE MAYOR
SAN FRANCISCO

LONDON N. BREED
MAYOR



**WHEREAS,** On March 16, 2020, the City's Health Officer issued a stay safe at home order, Health Officer Order No. C19-07 (the "Stay Safe At Home Order"), requiring most people to remain in their homes subject to certain exceptions including obtaining essential goods such as food and necessary supplies, and requiring the closure of non-essential businesses, through April 7, 2020, and on March 31, 2020, the Health Officer extended the Stay Safe At Home Order through May 3, 2020; and

**WHEREAS,** On March 19, 2020, the Governor issued Executive Order N-33-20 and the California Public Health Officer issued a corresponding order requiring people to stay home except as needed subject to certain exceptions; and

**WHEREAS,** There are currently 797 confirmed cases of COVID-19 within the City and there have been 13 COVID-19-related deaths in the City; there are more than 20,000 confirmed cases in California, and there have been 542 COVID-19-related deaths in California; and

**WHEREAS,** This order and the previous orders issued during this emergency have all been issued because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time; and

**WHEREAS,** To reduce the spread of the virus and protect the public health, the Stay Safe At Home Order prohibits restaurants in the City from offering dine-in service, limiting restaurants to delivery and takeout offerings only; and

**WHEREAS,** Restricting restaurants to takeout and delivery offerings only has placed a sudden and severe financial strain on many restaurants, particularly those that are small businesses that already operate on thin margins, adding to financial pressures in the industry that predate the COVID-19 crisis; and

**WHEREAS,** It is in the public interest to take action to maximize restaurant revenue from the takeout and delivery orders that are currently the sole source of revenue for these small businesses to enable restaurants to survive this crisis and remain as sources of employment and neighborhood vitality in the City; and



OFFICE OF THE MAYOR
SAN FRANCISCO

LONDON N. BREED
MAYOR

**WHEREAS**, Many consumers use third-party applications and websites to place orders with restaurants for delivery and takeout, and these third-party platforms charge restaurants fees; service agreements between some restaurants and third-party platforms provide that the platform charges the restaurant 10% of the purchase price per order, while some agreements provide for higher per-order fees; and

**WHEREAS**, Restaurants, and particularly restaurants that are small businesses with few locations, have limited bargaining power to negotiate lower fees with third-party platforms, given the high market saturation of third-party platforms, and the dire financial straits small business restaurants are facing in this COVID-19 emergency; and

**WHEREAS**, Capping the per-order fees at 15% will accomplish the legitimate public purpose of easing the financial burden on struggling restaurants during this emergency while not unduly burdening third-party platforms, as this fee is recognized as reasonable, and third-party platforms continue to earn significant profits; and

**WHEREAS**, In the Second Supplement to the Emergency Proclamation, dated March 13, 2019, the Mayor authorized the Controller to establish a fund to receive private donations to support the City's COVID-19 response efforts; private parties have also expressed interest in donating goods to assist with emergency response efforts, and it is in the public interest to expand the prior authorization to allow the acceptance and use of such goods; and

**NOW, THEREFORE,**

I, London N. Breed, Mayor of the City and County of San Francisco, proclaim that there continues to exist an emergency within the City and County threatening the lives, property or welfare of the City and County and its citizens;

**In addition to the measures outlined in the Proclamation and in the Supplements to the Proclamation dated March 11, March 13, March 17, March 18, March 23, March 27, March 31, and April 1, 2020, it is further ordered that:**

(1)  It shall be unlawful for a third-party food delivery service to charge a covered establishment a fee per online order for the use of its services that totals more than 15% of the purchase price of such online order.

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

(a)  For purposes of this order, the following definitions apply:

"Covered establishment" means a restaurant that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale and same-day delivery of food to customers from one or more retail locations within the City.  Covered establishment shall not include any restaurant that meets the definition of a formula retail use under Section 303.1 of the Planning Code.

"Online order" means an order placed by a customer through a platform provided by a third-party food delivery service for delivery or pickup within the City.

"Purchase price" means the menu price of an online order.  Such term therefore excludes taxes, gratuities and any other fees that may make up the total cost to the customer of an online order.

"Restaurant" shall have the meaning provided in Section 451 of the Health Code.

"Third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

(b)  The Director of the Office of Economic and Workforce Development, or the Director's designee, is authorized to implement this order and issue any necessary guidance or rules consistent with this order.

(c)  This order shall take effect on April 13, 2020, and shall terminate at such time as the Health Officer amends or terminates the order prohibiting restaurants from offering dine-in service or that prohibition otherwise expires, so that dine-in service is then allowed.

(d)  A third-party food delivery service shall not be found in violation of this order if between April 13, 2020 and April 20, 2020, it imposes a fee per online order for the use of its services that totals more than 15% of the purchase price of such online order, provided it refunds the portion of the fee that exceeds 15% of the purchase price to the covered establishment prior to April 27, 2020.

4

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

(e)  If a third-party food delivery service charges a covered establishment fees that violate this order, the covered establishment shall provide written notice to the third-party food delivery service requesting a refund within seven days.  If the third-party food delivery service does not provide the refund requested after seven days or the third-party food delivery service continues to charge fees in violation of this order after the initial notice and seven-day cure period, a covered establishment may enforce this order by means of a civil action seeking damages and injunctive relief.  The prevailing party in any such action shall be entitled to an award of reasonable attorney fees.

(2)  Item 4 in the Second Supplement to the Emergency Proclamation, dated March 13, 2020, is revised and replaced as follows:

The Controller is authorized to accept and expend funds in any amount and accept, distribute and use goods valued at any amount contributed by individuals or entities for the purposes of assisting the City's efforts to respond to the COVID-19 emergency. Notwithstanding any authorization in the Administrative Code or other City laws to accept and expend funds or accept, distribute and use goods, all donations, grants, gifts and bequests of money and goods to the City for the purpose of responding to the emergency shall be accepted by the Controller, and expenditures of such funds and the distribution and use of such goods shall be subject to the Controller's direction.  Funds and goods accepted by the Controller may be expended or used by the City to provide shelter, food, financial assistance including but not limited to loans, grants, or rent, mortgage and utility payments, and other assistance to individuals and families in the City who are impacted by the emergency; to replace, repair, and rebuild public buildings, infrastructure, and other assets for use in the City's efforts to respond to the emergency; to issue and administer grants and/or interest-free loans to small businesses in the City to compensate for economic harms resulting from COVID-19; and for other City efforts to address the impacts of COVID-19.  Goods accepted by the Controller may be distributed by the City or used for any City effort to address the impacts of COVID-19.  The Controller may coordinate with or delegate responsibility to any other department or agency to develop criteria for and administer the expenditure of funds and the distribution or use of goods.  Provisions of existing agreements and of local law are suspended to the extent they would impede the disbursement of funds or the distribution or use of goods to outside entities for the purposes described above; and

OFFICE OF THE MAYOR
SAN FRANCISCO



LONDON N. BREED
MAYOR

(3)  Item 9 in the Seventh Supplement to the Emergency Proclamation, dated March 31, 2020, is revised and replaced as follows:

All fees and charges authorized by the Board of Supervisors for Fiscal Year 2019-2020 shall remain in effect until the Board's adoption of the Annual Appropriation Ordinance, or until otherwise altered by ordinance or emergency declaration.

DATED: April 10, 2020

London N. Breed
Mayor of San Francisco

n:\govern\as2020\9690082\01438868.doc

6

# EXHIBIT B

Visit the City's new website, <u>SF.gov</u>

# Office of the Mayor

# News Releases

**The latest news and announcements from Mayor London N. Breed**

## Mayor London Breed Announces Delivery Fee Cap to Support San Francisco Restaurants During COVID-19 Pandemic

**Posted Date:** Friday, April 10, 2020

**Third-party delivery providers can charge restaurants no more than 15% commission for food delivery for the duration of the Local Emergency**

**San Francisco, CA** — Mayor London N. Breed, Supervisor Ahsha Safaí, and Supervisor Aaron Peskin today announced a temporary limit on the commission that third-party food delivery companies can charge restaurants during the COVID-19 pandemic. The cap will be in effect through the remainder of the local emergency, or until businesses are permitted to reopen for dine-in service, whichever comes first. This fee cap is part of a broader effort to support small businesses in San Francisco during the COVID-19 pandemic.

Mayor Breed issued this order as part of a Supplement to the Local Emergency Declaration she made on February 25th. All Supplemental Declarations are available at https://sfmayor.org/mayoral-declarations-regarding-covid-19.

"Restaurants across San Francisco are struggling to stay open. In these tough financial circumstances, every dollar counts and can make the difference between a restaurant staying open, or shuttering. It can make the difference between staying afloat or needing to lay-off staff," said Mayor Breed. "I want to thank Supervisor Safaí and Supervisor Peskin for working with me to support our local restaurants and help them get through this difficult time."

"We've listened to our restaurants and the struggles they're facing during this unprecedented time. The high commission fees being charged to our businesses remains unchanged and that cannot continue as every dollar can mean staying open or laying- off more staff," said Supervisor Ahsha Safaí. "For San Francisco's rich network of mom and pop restaurants to survive, it's imperative that we move aggressively. I applaud Mayor Breed for working with us to take swift action."

"These corporations have refused to adjust their fees and are profiting immensely off a public health crisis while restaurants and their employees are suffering," said Supervisor Aaron Peskin. "They are trying to undercut responsible regulation in the midst of this emergency, while also denying worker demands for basic safety gear, hazard pay and adequate sick leave. I appreciate the Mayor acting quickly to provide immediate, temporary relief for San Francisco restaurants while we continue to work on more permanent relief."

Under the City's Stay Home Public Health Order, restaurants are not permitted to offer dine-in service. In order to stay open, restaurants are offering take-out and delivery, and many restaurants are relying on third-party delivery services to provide that delivery.

While some delivery services have waived fees on the customer-side, delivery services continue to charge restaurants a commission. These fees typically range from 10% to 30% and can represent a significant portion of a restaurant's revenue, especially at a time when the vast majority of sales are for delivery. This commission fee can wipe out a restaurant's entire margin.

Mayor Breed's Order temporarily limits the fee that delivery companies can charge to 15%. This cap on delivery fees is intended to support small businesses during the COVID-19 pandemic, and will be in effect for the duration of the Local Emergency, or until restaurants are allowed to resume in-person dining. While delivery companies provide an important service and support local employment, establishing a cap on commission fees is necessary to help keep restaurants in business.

Restaurants are experiencing significant financial hardship during this time and are seeing a decline in business as a result of COVID-19 and the Stay Home Order. Of the approximately 4,000 restaurants in San Francisco, the Golden Gate Restaurant Association estimates 30% to 50% are still operating and offering food delivery. The California Employment Development Department and U.S. Department of Labor indicate that a large number of the statewide 2.3 million initial unemployment claims since March are service industry workers.

"During this time of crisis, every tool that relieves economic pressure on our San Francisco restaurant community matters," said Joaquín Torres, Director of the Office of Economic and Workforce Development. "Mayor Breed's and the City's leadership provides relief for the restaurants that provide essential services to our communities, jobs for our workforce, and allows this vital part of our economy and culture to function for the ongoing benefit of our city."

"We are very appreciative of the Mayor taking action to limit the amount delivery companies can charge restaurants to 15% for the duration of the emergency order," said Laurie Thomas, Executive Director, Golden Gate Restaurant Association. "We have been advocating for this type of relief for the past month and we are appreciative of the progress. This move by the City will help ensure our restaurants who are staying open to deliver much needed food can continue to help keep staff on payroll in addition to giving them a better chance of keeping their doors open."

This Supplemental Declaration is part of Mayor Breed's ongoing efforts to support small businesses, including restaurants, during the COVID-19 pandemic. These initiatives to support small business include:

- $54 million in business taxes and licensing fees deferrals, impacting 11,000 payees;

- $10 million Workers and Families First Paid Sick Leave Program, proving up to 40 hours of paid sick leave per employee;

- $9 million Emergency Loan Fund providing up to $50,000 in zero interest loans for individual small businesses;

- $2 million Resiliency Grants providing up to $10,000 grants to over 200 small businesses;

- $2.5 million in support for working artists and arts and cultural organizations financially impacted by COVID-19;

- Supporting nonprofits funded by the City so workers don't lose their incomes;

- Issuing a Moratorium on Commercial Evictions for small and medium sized businesses that can't afford to pay rent;

- Advocating for additional resources for small business and workers through the federal CARE Act;

- Establishing City Philanthropic www.Give2SF.org Fund, where donations will support housing stabilization, food security, and financial security for workers and small businesses impacted by coronavirus;

- Launching a one stop City website for businesses and workers seeking resources, contacts, and updates during the COVID-19 emergency: www.oewd.org/covid19.

###

# EXHIBIT C

**City and County of
San Francisco**

**Department of Public Health
Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

### ORDER OF THE HEALTH OFFICER
### OF THE CITY AND COUNTY OF SAN FRANCISCO

### ENCOURAGING COVID-19 VACCINE COVERAGE
### AND REDUCING DISEASE RISKS
### (Safer Return Together)

DATE OF ORDER:  June 11, 2021, updated July 8, 2021, July 20, 2021, August 2, 2021,
August 12, 2021, August 24, 2021, and September 10, 2021

---

**Please read this Order carefully.  Violation of or failure to comply with this Order is a
misdemeanor punishable by fine, imprisonment, or both.  (California Health and Safety
Code § 120295, *et seq.*; California Penal Code §§ 69, 148(a)(1); and San Francisco
Administrative Code § 7.17(b).)**

---

Summary:  As of September 10, 2021, this Order replaces the prior update of this health
order, Health Officer Order No. C19-07y (issued August 24, 2021), in its entirety.  Even
though more people are vaccinated in San Francisco and the region against the virus that
causes COVID-19, there remains a risk that people may come into contact with others
who may have COVID-19 when outside their residence.  San Francisco is currently
experiencing a surge in new COVID-19 cases and an increase in hospitalizations, mostly
among people who are not fully vaccinated, due to the highly contagious Delta variant.
Future surges may occur due to other variants.  In some instances, individuals who are
fully vaccinated have been infected by breakthrough infections and are showing
symptoms, though nearly no vaccinated individuals have required hospitalization.  Most
COVID-19 infections are caused by people who have no symptoms of illness.  There are
also people in San Francisco who are not yet fully vaccinated, including children under
12 years old, and people who are immuno-compromised and may be particularly
vulnerable to infection and disease.  We have also seen surges in other parts of the
country and the world, increasingly impacting younger adults.  Everyone who is eligible,
including people at risk for severe illness with COVID-19—such as unvaccinated older
adults and unvaccinated individuals with health risks—and members of their households,
are urged to get vaccinated as soon as they can if they have not already done so.

The best way to address the current surge and future surges is for everyone who is
eligible to get fully vaccinated as soon as possible.  In the meantime, and consistent with
CDC recommendations regarding indoor masking, the spread of the Delta variant
necessitates imposing a face covering mandate for everyone, including people who are
vaccinated, to help prevent transmission.  Accordingly, this Order includes a "universal"
face covering requirement for individuals in indoor public settings, with some exceptions.
It also maintains face covering requirements in other settings, consistent with federal and
state rules.

This Order adds a requirement for certain businesses to check proof of full vaccination of
both patrons 12 years and older and staff for entering an indoor portion of the business's

**City and County of San Francisco**          **Department of Public Health Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

facility, subject to limited exceptions. This Order also maintains the lifting of local capacity limits on business and other sectors, local physical distancing requirements, and many other previous health and safety restrictions that were removed in the prior health order as of June 15. Businesses are no longer required to prepare and post social distancing protocols or in most instances submit health and safety plans to the Health Officer. Nor are they strongly urged to allow office employees to continue to work remotely as much as possible. Also, except for schools, childcare, and out-of-school time programs, sector specific guidance under local health directives no longer apply.

And this Order maintains some requirements on businesses and government entities, such as a general requirement to report positive cases in the workplace and in schools, a new and much more limited requirement for signage, and a proof of vaccination requirement to admit people age 12 and older to attend indoor large or mega-events largely consistent with state rules with some additional rules and limitations, as well as for staff of such events. It also requires personnel working in certain high-risk settings, such as acute care hospitals, skilled nursing facilities, residential care facilities for the elderly, homeless shelters and jails, and certain other designated health care settings, as well as certain types of listed people (home health care workers and pharmacists) to be fully vaccinated, with limited exemptions and within specified timeframes. In light of the full approval of the Pfizer-BioNTech (Comirnaty) vaccine by the FDA on August 23, 2021, this Order extends for a limited period the original September 15, 2021 deadline for personnel working in certain high-risk settings to meet the vaccination requirements, consistent with State requirements, and imposes an individual mandate for vaccination on personnel working in those settings. Also, this Order includes proof of vaccination requirements for patrons to use certain indoor facilities, such as restaurants, bars, clubs and gyms. This Order includes recommendations to reduce COVID-19 risk, but not requirements, for individuals, businesses, and government entities.

**UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE HEALTH OFFICER OF THE CITY AND COUNTY OF SAN FRANCISCO ORDERS:**

1. <u>Definitions</u>.

   For purposes of this Order, the following initially capitalized terms have the meanings given below.

   a. *Business*. A "Business" includes any for-profit, non-profit, or educational entity, whether a corporate entity, organization, partnership or sole proprietorship, and regardless of the nature of the service, the function it performs, or its corporate or entity structure.

   b. *Cal/OSHA*. "Cal/OSHA" means the California Department of Industrial Relations, Division of Occupational Safety and Health, better known as Cal/OSHA.

   c. *CDC*. "CDC" means the United States Centers for Disease Control and Prevention.

**City and County of**                      **Department of Public Health**
**San Francisco**                           **Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

d. *Close Contact*. "Close Contact" means having any of following interactions with
someone with COVID-19 while they were contagious: (i) being within six feet of
them for a total of 15 minutes or more in a 24-hour period; (ii) living or staying
overnight with them; (iii) having physical or intimate contact including hugging and
kissing; (iv) taking care of them, or having being taken care of by them; or (v) having
direct contact with their bodily fluids (*e.g.*, they coughed or sneezed on you or shared
your food utensils). The person is considered contagious *either* if they had
symptoms, from 48 hours before their symptoms began until at least 10 days after the
start of symptoms, *or* if they did not have symptoms, from 48 hours before their
COVID-19 test was collected until 10 days after they were tested.

e. *County*. The "County" means the City and County of San Francisco.

f. *COVID-19*. "COVID-19" means coronavirus disease 2019, the disease caused by the
SARS-CoV-2 virus and that resulted in a global pandemic.

g. *DPH*. "DPH" means the San Francisco Department of Public Health.

h. *DPH Core Guidance*. "DPH Core Guidance" means the webpage and related
materials titled *Core Guidance for COVID-19* that DPH regularly updates and
includes health and safety recommendations for individuals and Businesses as well as
web links to additional resources, available online at www.sfdph.org/dph/covid-
19/core-guidance.asp.

i. *Face Covering Requirements*. "Face Covering Requirements" means the requirement
to wear a Well-Fitted Mask (i) as required by federal or state law including, but not
limited to, California Department of Public Health guidance and Cal/OSHA's rules
and regulations; (ii) in indoor common areas of homeless shelters, emergency shelters,
and cooling centers, except while sleeping, showering, engaged in personal hygiene
that requires removal of face coverings, or actively eating or drinking; (iii) in indoor
common areas of jails except while sleeping, showering, engaged in personal hygiene
that requires removal of face coverings, or actively eating or drinking; and (iv) as
required by Section 3(b), below and Appendix A, attached to the Order. If a separate
state, local, or federal order or directive imposes different face covering requirements,
including requirements to wear respirators or surgical masks in certain settings, the
more health protective requirement applies.

j. *FDA*. "FDA" means the United States Food and Drug Administration.

k. *Fully Vaccinated/Full Vaccination*. "Fully Vaccinated" and "Full Vaccination" mean
two weeks after completing the entire recommended series of vaccination (usually
one or two doses) with a vaccine authorized to prevent COVID-19 by the FDA,
including by way of an emergency use authorization, or by the World Health
Organization (WHO). For example, as of the date of issuance of this Order, an
individual would be fully vaccinated at least two weeks after receiving a second dose
of the Pfizer-BioNTech (Comirnaty) or Moderna COVID-19 vaccine or two weeks

**City and County of
San Francisco**

**Department of Public Health
Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

after receiving the single dose Johnson & Johnson's Janssen COVID-19 vaccine. A list of FDA-authorized vaccines is available at www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines. A list of WHO-authorized vaccines is available at https://extranet.who.int/pqweb/vaccines/covid-19-vaccines.

Unless otherwise specified, the following are acceptable as proof of Full Vaccination: (i) the CDC vaccination card, which includes name of person vaccinated, type of vaccine provided, and date last dose administered, or similar documentation issued by another foreign governmental jurisdiction, (ii) a photo of a vaccination card as a separate document, (iii) a photo of the a vaccination card stored on a phone or electronic device, (iv) documentation of vaccination from a healthcare provider, (v) written self-attestation of vaccination signed (including an electronic signature) under penalty of perjury and containing the name of the person vaccinated, type of vaccine taken, and date of last dose administered, or (vi) a personal digital COVID-19 vaccine record issued by the State of California and available by going to https://myvaccinerecord.cdph.ca.gov or similar documentation issued by another State, local, or foreign governmental jurisdiction, or by an approved private company (a list of approved companies offering digital vaccine verification is available at www.sfdph.org/dph/alerts/files/vaccine-verification-sites.pdf). If any state or federal agency uses a more restrictive definition of what it means to be Fully Vaccinated or to prove that status for specified purposes (such as Cal/OSHA rules for employers in workplaces), then that more restrictive definition controls for those purposes. Also, to the extent Cal/OSHA approves an alternate means of documenting whether an employee is "fully vaccinated," even if less restrictive than the definition contained here, employers may use the Cal/OSHA standard to document their employees' vaccination status.

l.  *Health Officer*. "Health Officer" means the Health Officer of the City and County of San Francisco.

m.  *High-Risk Settings*. "High-Risk Settings" means certain care or living settings involving many people, including many congregate settings, where vulnerable populations reside out of necessity and where the risk of COVID-19 transmission is high, consisting of general acute care hospitals, skilled nursing facilities (including subacute facilities), intermediate care facilities, residential care facilities for the elderly, homeless shelters, and jails.

n.  *Household*. "Household" means people living in a single Residence or shared living unit. Households do not refer to individuals who live together in an institutional group living situation such as in a dormitory, fraternity, sorority, monastery, convent, or residential care facility.

o.  *Qualifying Medical Reason*. "Qualifying Medical Reason" means a medical condition or disability recognized by the FDA or CDC as a contra-indication to COVID-19 vaccination.

4

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

p. *Large Indoor Event.* "Large Indoor Event" means an event with 1,000-4,999 people attending indoors. A Large Indoor Event may be public or private, may have either assigned or unassigned seating, and may be either general admission or ticketed events. A Large Indoor Event can also include an event without seating or without tickets.

q. *Mega-Event.* "Mega-Event" means an event with either more than 5,000 people attending indoors or more than 10,000 people attending outdoors, consistent with the definition of those events in the State's Post-Blueprint Guidance. As provided in the State's Post-Blueprint Guidance, a Mega-Event may have either assigned or unassigned seating, and may be either general admission or gated, ticketed and permitted events.

r. *Personnel.* "Personnel" means the following people who provide goods or services associated with a Business in the County: employees; contractors and sub-contractors (such as those who sell goods or perform services onsite or who deliver goods for the Business); independent contractors; vendors who are permitted to sell goods onsite; volunteers; and other individuals who regularly provide services onsite at the request of the Business. "Personnel" includes "gig workers" who perform work via the Business's app or other online interface, if any.

s. *Religious Beliefs.* "Religious Beliefs" means a sincerely held religious belief, practice, or observance protected by state or federal law.

t. *Residence.* "Residence" means the location a person lives, even if temporarily, and includes single-family homes, apartment units, condominium units, hotels, motels, shared rental units, and similar facilities. Residences also include living structures and outdoor spaces associated with those living structures, such as patios, porches, backyards, and front yards that are only accessible to a single family or Household.

u. *Schools.* "Schools" mean public and private schools operating in the County, including independent, parochial, and charter schools.

v. *State's Post-Blueprint Guidance.* The "State's Post-Blueprint Guidance" means the guidance entitled "Beyond the Blueprint for Industry and Business Sectors" that the California Department of Public Health issued on May 21, 2021 and that applies from June 15, 2021 through October 1, 2021, including as the State may extend, update or supplement that guidance in the future. (See www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Beyond-Blueprint-Framework.aspx.)

w. *Tested.* "Tested" means to have a negative test for the virus that causes COVID-19 within the prior 72 hours. Both nucleic acid (including polymerase chain reaction (PCR)) and antigen tests are acceptable. The following are acceptable as proof of a negative COVID-19 test result: a printed document (from the test provider or laboratory) or an email, text message, webpage, or application (app) screen displayed

**City and County of**                    **Department of Public Health**
**San Francisco**                          **Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

on a phone or mobile device from the test provider or laboratory. The information should include person's name, type of test performed, negative test result, and date the test was administered. If any state or federal agency uses a more restrictive definition of what it means to be Tested for specified purposes (such as Cal/OSHA rules for employers in workplaces), then that more restrictive definition controls for those purposes.

x. *Ventilation Guidelines*. "Ventilation Guidelines" means ventilation guidance from recognized authorities such as the CDC, the American Society of Heating, Refrigerating and Air-Conditioning Engineers, or the State of California, including Cal/OSHA. The DPH Core Guidance also includes ventilation guidelines.

y. *Well-Fitted Mask*. A "Well-Fitted Mask" means a face covering that is well-fitted to an individual and covers the nose and mouth especially while talking, consistent with the Face Covering Requirements. DPH guidance regarding Well-Fitted Masks may be found at www.sfcdcp.org/maskingupdate. A non-vented N95 mask is strongly recommended as a Well-Fitted Mask, even if not fit-tested, to provide maximum protection. A Well-Fitted Mask does not include a scarf, ski mask, balaclava, bandana, turtleneck, collar, or single layer of fabric or any mask that has an unfiltered one-way exhaust valve.

2. <u>Purpose and Intent</u>.

a. <u>Purpose</u>. The public health threat of serious illness or death from COVID-19 is generally decreasing in the County, the Bay Area, and the State due to the vaccines. But COVID-19 continues to pose a risk especially to individuals who are not Fully Vaccinated, and certain safety measures continue to be necessary to protect against COVID-19 cases and deaths. Vaccination is the most effective method to prevent transmission and ultimately COVID-19 hospitalizations and deaths. It is important to ensure that as many eligible people as possible are vaccinated against COVID-19. Further, it is critical to ensure there is continued reporting of cases to protect individuals and the larger community. Accordingly, this Order allows Businesses, schools, and other activities to resume fully while at the same time putting in place certain requirements designed to (1) extend vaccine coverage to the greatest extent possible; (2) limit transmission risk of COVID-19; (3) contain any COVID-19 outbreaks; and (4) generally align with guidance issued by the CDC and the State relating to COVID-19 except in limited instances where local conditions require more restrictive measures. This Order is based on evidence of continued community transmission of SARS-CoV-2 within the County as well as scientific evidence and best practices to prevent transmission of COVID-19. The Health Officer will continue to monitor data regarding the evolving scientific understanding of the risks posed by COVID-19, including the impact of vaccination, and may amend or rescind this Order based on analysis of that data and knowledge.

b. <u>Intent</u>. The primary intent of this Order is to continue to protect the community from COVID-19 and to also increase vaccination rates to reduce transmission of COVID-

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

19 long-term, so that the whole community is safer and the COVID-19 health emergency can come to an end.

c.  <u>Interpretation</u>.  All provisions of this Order must be interpreted to effectuate the purposes and intent of this Order as described above.  The summary at the beginning of this Order as well as the headings and subheadings of sections contained in this Order are for convenience only and may not be used to interpret this Order.  In the event of any inconsistency between the summary, headings, or subheadings and the text of this Order, the text will control.  Certain initially capitalized terms used in this Order have the meanings given them in Section 1 above.  The interpretation of this Order in relation to the health orders or guidance of the State is described in Section 10 below.

d.  <u>Application</u>.  This Order applies to all individuals, Businesses, and other entities in the County.  For clarity, the requirements of this Order apply to all individuals who do not currently reside in the County when they are in the County.  Governmental entities must follow the requirements of this Order that apply to Businesses, unless otherwise specifically provided in this Order or directed by the Health Officer.

e.  <u>DPH Core Guidance</u>.  All individuals and Businesses are strongly urged to follow the DPH Core Guidance, containing health and safety recommendations for COVID-19.

f.  <u>Effect of Failure to Comply</u>.  Failure to comply with any of the provisions of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both, as further provided in Section 12 below.

3.  <u>General Requirements for Individuals.</u>

a.  <u>Vaccination</u>.  Individuals are strongly urged to get Fully Vaccinated as soon as they are able to.  In particular, people at risk for severe illness with COVID-19—such as unvaccinated older adults and unvaccinated individuals with health risks—and members of their Household, are urged to get Fully Vaccinated as soon as they can.  Information about who is at increased risk of severe illness and people who need to take extra precautions can be found at www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  For those who are not yet Fully Vaccinated, staying home or choosing outdoor activities as much as possible with physical distancing from other Households whose vaccination status is unknown is the best way to prevent the risk of COVID-19 transmission.  Fully Vaccinated individuals are subject to fewer restrictions as provided in this Order, and there are allowances for certain large gatherings where all the participants are Fully Vaccinated.

b.  <u>Face Coverings</u>.  Because of the recent surge in the Delta variant, everyone, including people who are Fully Vaccinated, must wear a Well-Fitted Mask in indoor public settings as described in Appendix A to this Order.  That Appendix lists exceptions

**City and County of**  
**San Francisco**

**Department of Public Health**  
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

when a Well-Fitted Mask is not required.  All persons must also follow the Face Covering Requirements.  People should be respectful of an individual's decision to wear face coverings even in settings where they are not required, such as crowded outdoor settings, and no Business or other person should take an adverse action against individuals who chose to wear a face covering to protect their health.  Under current federal law, when riding or waiting to ride on public transit people who are inside the vehicle or other mode of transportation or are indoors at a public transit stop or station, must wear Well-Fitted Masks.  This requirement extends to all modes of transportation other than private vehicles, such as airplanes, trains, subways, buses, taxis, ride-shares, maritime transportation, street cars, cable cars, and school buses.  But any passenger who is outdoors or in open-air areas of the mode of transportation, such as open-air areas of ferries, buses, and cable-cars, is not required by federal law to wear a face covering.  Personnel and passengers on public transit are urged to get Fully Vaccinated, and those who are not Fully Vaccinated are strongly urged to wear a Well-Fitted Mask or respirator when not otherwise required by the Face Covering Requirements.  Under Cal/OSHA's rules and regulations, employers may also be required to ensure employees continue to wear Well-Fitted Masks or respirators, particularly in indoor settings.

c.  <u>Monitor for Symptoms</u>.  Individuals should monitor themselves for symptoms of COVID-19.  A list of COVID-19 symptoms is available online at www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.  Anyone with any symptom that is new or not explained by another condition must comply with subsections 3(d) and 3(e) below regarding isolation and quarantine.

d.  <u>Isolation</u>.  Anyone who (i) has a positive COVID-19 test result, (ii) is diagnosed with COVID-19, or (iii) has a COVID-19 symptom that is new or not explained by another condition must refer to the latest COVID-19 isolation health directive (available online at www.sfdph.org/directives) and follow the requirements detailed there.

e.  <u>Quarantine</u>.  Anyone who had Close Contact with someone with COVID-19 must refer to the latest COVID-19 quarantine health directive (available online at www.sfdph.org/directives) and follow the requirements detailed there.

f.  <u>Moving to, Traveling to, or Returning to the County</u>.  Everyone is strongly encouraged to comply with any State travel advisories and CDC travel guidelines (available online at www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html).

g.  <u>Indoor Private Gatherings</u>.  Individuals are urged to wear Well-Fitted Masks and maintain physical distance when they are in indoor private gatherings in Residences with members of other Households, regardless of the vaccination status of those individuals.  Nothing in this section limits any requirements that apply under this Order to indoor public settings, indoor Mega-Events, Large Indoor Events, or that Cal/OSHA or other State authority may impose on any indoor setting involving gatherings.

8

**City and County of**          **Department of Public Health**
**San Francisco**               **Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

4. <u>General Requirements for Businesses and Governmental Entities</u>.

   a. <u>Vaccination</u>.  All Businesses and governmental entities are strongly urged to consider implementing measures to require Personnel and patrons to be Fully Vaccinated as soon as possible.  Also, the following Businesses must require patrons and staff (as distinguished from the broader term "Personnel") to provide proof of Full Vaccination and comply with the other requirements detailed in Appendix B to this Order:

   - Operators or hosts of establishments or events where food or drink is served indoors—including, but not limited to, dining establishments, bars, clubs, theaters, and entertainment venues.

   - Gyms, recreation facilities, yoga studios, dance studios, and other fitness establishments, where any patrons engage in cardiovascular, aerobic, strength training, or other exercise involving elevated breathing.

   b. <u>Encourage Activities that Can Occur Outdoors</u>.  All Businesses and governmental entities are urged to consider moving operations or activities outdoors, if feasible and to the extent allowed by local law and permitting requirements, because there is generally less risk of COVID-19 transmission outdoors as opposed to indoors.

   c. <u>Personnel Health Screening</u>.  Businesses and governmental entities must develop and implement a process for screening Personnel for COVID-19 symptoms, but this requirement does not mean they must perform on-site screening of Personnel. Businesses and governmental entities should ask Personnel to evaluate their own symptoms before reporting to work.  If Personnel have symptoms consistent with COVID-19, they should follow subsections 3(d) and 3(e) above.

   d. <u>Businesses Must Allow Personnel to Stay Home When Sick</u>.  Businesses are required to follow Cal/OSHA rules and regulations allowing Personnel to stay home where they have symptoms associated with COVID-19 that are new or not explained by another condition or if they have been diagnosed with COVID-19 (by a test or a clinician) even if they have no symptoms, and to not to have those Personnel return to work until they have satisfied certain conditions, all as further set forth in the Cal/OSHA rules.  Also, Businesses must comply with California Senate Bill 95 (Labor Code, sections 248.2 and 248.3), which provides that employers with more than 25 employees must give every employee 80 hours of COVID-related sick leave retroactive to January 1, 2021 and through September 30, 2021 (pro-rated for less than full time employees), including that employees may use this paid sick leave to get vaccinated or for post-vaccination illness.  Each Business is prohibited from taking any adverse action against any Personnel for staying home in any of the circumstances described in this subsection.

   e. <u>Signage</u>.  In addition to any signage otherwise required in this Order or any directives issued by the Health Officer for specific Business or other sectors, the following

9

**City and County of**                    **Department of Public Health**
**San Francisco**                          **Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

general signage requirements apply.

i.   <u>Signage for Patrons</u>.  All Businesses and governmental entities are required to conspicuously post signage reminding individuals of COVID-19 prevention best practices to reduce transmission: Get vaccinated; Stay home if sick, and talk to your doctor; Masks are required indoors; Maximize fresh air; and Clean your hands.  Sample signage is available online at https://sf.gov/outreach-toolkit-coronavirus-covid-19.

ii.  <u>Signage for Employees</u>.  All Businesses and governmental entities are required to post signs in employee break rooms or areas encouraging employees to get vaccinated and informing them how to obtain additional information.  Sample signage is available online at https://sf.gov/outreach-toolkit-coronavirus-covid-19.

f.   <u>Ventilation Guidelines</u>.  All Businesses and governmental entities with indoor operations are urged to review the Ventilation Guidelines and implement ventilation strategies for indoor operations as feasible.  Nothing in this subsection limits any ventilation requirements that apply to particular settings under federal, state, or local law.

g.   <u>Mandatory Reporting by Businesses and Governmental Entities</u>.  Consistent with Cal/OSHA rules and regulations, Businesses and governmental entities must require that all Personnel immediately alert the Business or governmental entity if they test positive for COVID-19 and were present in the workplace either (1) within the 48 hours before onset of symptoms or within 10 days after onset of symptoms if they were symptomatic; or (2) within 48 hours before the date on which they were tested or within 10 days after the date on which they were tested if they were asymptomatic.  If a Business or governmental entity learns that three or more of its Personnel are confirmed positive cases of COVID-19 and visited the workplace during their high-risk exposure period at any time during a 14-day period (*i.e.*, three cases onsite within a 14-day period), then the entity must call DPH at 628-217-6100 immediately to report the cases and in any event no later than the next business day after learning of those positive cases.  Businesses and governmental entities must also comply with all case investigation and contact tracing measures directed by DPH including providing any information requested within the timeframe provided by DPH, instructing Personnel to follow isolation and quarantine protocols specified by DPH, and excluding positive cases and unvaccinated close contacts from the workplace during these isolation and quarantine periods.

Schools and Programs for Children and Youth are subject to separate reporting requirements set forth in Health Officer Directive Nos. 2020-33 and 2020-14, respectively, including as those directives are updated in the future.

**City and County of**  
**San Francisco**

**Department of Public Health**  
**Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

5. Schools and Programs for Children and Youth

   a. Schools.  Based on the demonstrated low risk of transmission in school settings and the requirement for universal masking indoors, the Health Officer strongly believes that schools can and should reopen in full for in-person classes for all grades at the beginning of the 2021/2022 school year.  Largely because not all children are eligible to be vaccinated against COVID-19 at this time, schools must follow the health and safety requirements set forth in Health Officer Directive No. 2020-33, including as it may be amended in the future, to ensure the safety of all students and Personnel at the school site.

   b. Programs for Children and Youth.  Largely because not all children are eligible to be vaccinated against COVID-19 at this time, the following Programs for Children and Youth must operate in compliance with the health and safety requirements set forth in Health Officer Directive No. 2020-14, including as it may be amended in the future: (1) group care facilities for children who are not yet in elementary school—including, for example, licensed childcare centers, daycares, family daycares, and preschools (including cooperative preschools); and (2) with the exception of schools, which are addressed in subsection a above, educational or recreational institutions or programs that provide care or supervision for school-aged children and youth—including for example, learning hubs, other programs that support and supplement distance learning in schools, school-aged childcare programs, youth sports programs, summer camps, and afterschool programs.

6. Vaccination Requirements for Personnel in High-Risk Settings and Other Health Care Personnel.

   a. High-Risk Settings.  Except for some Personnel as provided in subsections (a)(iii), (b), and (c) below, and for Personnel exempt under subsection (d) below, no later than September 30, 2021:

      i. Businesses and governmental entities with Personnel in High-Risk Settings must (1) ascertain vaccination status of all Personnel in High-Risk Settings who routinely work onsite, and (2) ensure that before entering or working in any High-Risk Setting, all Personnel who routinely work onsite have received their first dose of a one-dose COVID-19 vaccine regimen or their second dose of a two-dose COVID-19 vaccine regimen authorized to prevent COVID-19 by the FDA, including by way of an emergency use authorization, or by the World Health Organization, and as defined in subsection (a)(vii) below.  Until such Personnel are Fully Vaccinated, they are subject to at least the minimum public health and safety requirements in subsection (a)(iv) below; and

      ii. Personnel who routinely work onsite in High-Risk Settings must have received their first dose of a one-dose COVID-19 vaccine regimen or their second dose of a two-dose COVID-19 vaccine regimen authorized to prevent COVID-19 by the FDA, including by way of an emergency use authorization,

**City and County of
San Francisco**

**Department of Public Health
Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

or by the World Health Organization, and as defined in subsection (a)(vii) below.  Until such Personnel are Fully Vaccinated, they are subject to at least the minimum public health and safety requirements in subsection (a)(iv) below; and

iii.   For purposes of this Order, Personnel who are not permanently stationed or regularly assigned to a High-Risk Setting but who in the course of their duties may enter or work in High-Risk Settings even on an intermittent or occasional basis or for short periods of time are considered to routinely work onsite in High-Risk Settings.  No later than October 13, 2021, Businesses and governmental entities with such Personnel are required to (1) ascertain vaccination status of all such Personnel and (2) ensure that before entering or working in any High-Risk Setting, all such Personnel are Fully Vaccinated with any vaccine authorized to prevent COVID-19 by the FDA, including by way of an emergency use authorization, or by the World Health Organization, unless exempt under subsection (d) below.  Additionally, no later than September 29, 2021, all such Personnel must have received their first dose of a one-dose COVID-19 vaccine regimen or their second dose of a two-dose COVID-19 vaccine regimen authorized to prevent COVID-19 by the FDA, including by way of an emergency use authorization, or by the World Health Organization, and as defined in subsection (a)(vii) below.  Until such Personnel are Fully Vaccinated, they are subject to at least the minimum public health and safety requirements in subsection (a)(iv) below; and

iv.   All Businesses and governmental entities subject to this Section 6 must require any exempt Personnel who are not Fully Vaccinated to comply with at least the following public health and safety measures:

1.   get tested for COVID-19 at least once a week (and at least twice a week for exempt Personnel who are not Fully Vaccinated in general acute care hospitals, skilled nursing facilities, and intermediate care facilities) using either a nucleic acid (including polymerase chain reaction (PCR)) or antigen test; and

2.   at all times at the worksite in the High-Risk Setting wear a face covering in compliance with the State Public Health Officer Order of July 26, 2021 ("CDPH Vaccination Status Order"), available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Unvaccinated-Workers-In-High-Risk-Settings.aspx.

    Because of the COVID-19 risks to any exempt Personnel who are not Fully Vaccinated, the High-Risk Setting must provide such Personnel, on request, with a well-fitting non-vented N95 respirator and strongly encourage such Personnel to wear that respirator at all times when working with patients, residents, clients, or incarcerated people;

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

Regular testing and masking as required under this Section 6 are not as protective of public health as Full Vaccination in helping prevent transmission of COVID-19; accordingly, they are a minimum safety requirement for exempt Personnel in High-Risk Settings. Businesses and governmental entities subject to this Section 6 may require additional safety measures for such Personnel. For example, factors a Business or governmental entity may consider in determining appropriate safety measures for exempt Personnel include, but are not limited to:

a) Whether the Personnel will place other people at risk of transmission of COVID-19 because they are required to come into contact (including on an emergency basis) with other Personnel or with persons whose vaccination status is unknown, who are not yet eligible for the vaccine, or who are members of a vulnerable population (*e.g.*, the elderly, incarcerated people, and acute care patients);

b) The type and frequency of testing available to the Personnel and whether the Business or governmental entity has the ability to provide testing to Personnel, without relying on public health resources, and track the requisite testing;

c) Whether the Business or governmental entity can ensure compliance with the mask mandate whenever the Personnel are around other people in the workplace; and

d) Whether the proposed accommodation imposes an undue burden because it is costly, infringes on other Personnel's job rights or benefits, compromises workplace safety, decreases workplace efficiency, or requires other Personnel to do more than their share of potentially hazardous or burdensome work.

Nothing under the Order limits the ability of a Business or governmental entity under applicable law to determine whether they are unable to offer a reasonable accommodation to unvaccinated Personnel with an approved exemption; and

v. All Businesses and governmental entities subject to this Section 6 must, consistent with applicable privacy laws and regulations, maintain records of employee vaccination or exemption status; and

vi. All Businesses and governmental entities subject to this Section 6 must provide these records to the Health Officer or other public health authorities promptly upon request, and in any event no later than the next business day after receiving the request.

13

**City and County of**          **Department of Public Health**
**San Francisco**               **Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

vii.     Currently, a two-dose COVID-19 vaccine regimen includes the Pfizer-BioNTech (Comirnaty) or Moderna vaccines or a COVID-19 vaccine authorized by the World Health Organization.  Currently, a one-dose vaccine regimen is the Johnson & Johnson Janssen COVID-19 vaccine.

viii.    This mandated vaccination schedule allows Businesses, governmental entities, and affected Personnel adequate time to comply with this Order.  In the interest of protecting residents of High-Risk Settings, Personnel, and their families, Businesses, governmental entities, and affected Personnel are strongly urged to meet these vaccination requirements as soon as possible.

For clarity, this requirement applies to Personnel in other buildings in a site containing a High-Risk Setting, such as a campus or other similar grouping of related buildings, where such Personnel do any of the following:  (i) access the acute care or patient, resident, client, or incarcerated person areas of the High-Risk Setting; or (ii) work in-person with patients, residents, clients, or incarcerated people who visit those areas.  All people in San Francisco who work in a clinical setting with a population that is more vulnerable to COVID-19 are strongly urged to be fully vaccinated against COVID-19.

b.    <u>Adult Care Facilities, Adult Day Programs, and Dental Offices</u>.  As soon as possible, but no later than October 13, 2021, Businesses and governmental entities with Personnel in adult care facilities, adult day programs licensed by the California Department of Social Services, and dental offices must, in relation to such settings, comply with the applicable requirements of this Section 6 and meet the timing requirements set forth in subsection (a)(iii) above.  For clarity, Personnel of such Businesses or governmental entities in those settings are subject to subsection (a)(ii) above and must be Fully Vaccinated or qualify for an exemption under subsection (d) below and follow the precautions as set forth in this Order.

c.    <u>Home Health Care Workers and Pharmacists</u>.  As soon as possible, but no later than October 13, 2021, Businesses and governmental entities with Personnel who are home health care workers or pharmacists must, in relation to such Personnel, comply with the applicable requirements of this Section 6 and meet the timing requirements set forth in subsection (a)(iii) above.  For clarity, all such Personnel are subject to subsection (a)(ii) above and must be Fully Vaccinated or qualify for an exemption under subsection (d) below and follow the precautions as set forth in this Order.

d.    <u>Limited Exemptions</u>.  Personnel covered by this Section 6 may be exempt from the vaccination requirements under this section only upon providing the requesting Business or governmental entity a declination form, signed by the individual under penalty of perjury stating either of the following:  (1) the individual is declining vaccination based on Religious Beliefs or (2) the individual is excused from receiving any COVID-19 vaccine due to Qualifying Medical Reasons.  As to declinations for Qualifying Medical Reasons, to be eligible for this exemption Personnel must also provide to their employer or the Business a written statement signed by a physician,

14

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

nurse practitioner, or other licensed medical professional practicing under the license of a physician stating that the individual qualifies for the exemption (but the statement should not describe the underlying medical condition or disability) and indicating the probable duration of the individual's inability to receive the vaccine (or if the duration is unknown or permanent, so indicate).  A sample ascertainment and declination form is available online at www.sfdph.org/dph/covid-19/files/declination.pdf.  As to declinations based on Religious Beliefs, a Business or governmental entity may seek additional information as allowed or required by applicable law to determine whether Personnel have a qualifying Religious Belief.  Personnel who qualify for and are granted by the employing Business or governmental entity an exemption due to Religious Beliefs or Qualifying Medical Reasons, as provided above, must still follow at least the minimum health and safety requirements in subsection (a)(iv), above.  Nothing in this Order is intended to limit any Business's or governmental entity's ability under applicable law to determine whether they are able to offer a reasonable accommodation to Personnel with an approved exemption.  Because testing and masking is not as effective as Full Vaccination at preventing the spread of COVID-19, a Business may determine that the minimum requirements in subsection (a)(iv) above are not sufficient to protect the health and safety of people in High-Risk Settings.

e.  Record Keeping Requirements.  Businesses or governmental entities subject to this Section 6 must maintain records with following information:

   i.  For Fully Vaccinated Personnel:  (1) full name and date of birth; (2) vaccine manufacturer; and (3) date of vaccine administration (for first dose and, if applicable, second dose).  Nothing in this subsection is intended to prevent an employer from requesting additional information or documentation to verify vaccination status, to the extent permissible under the law.

   ii.  For unvaccinated Personnel:  signed declination forms with written health care provider's statement where applicable, as described in subsection (d) above.

f.  Compliance with CDPH Orders.  In addition to the requirements set forth above:

   i.  Until the more health protective requirements in this section take effect, Businesses and governmental entities with Personnel in High-Risk Settings must comply with the requirements of the CDPH Vaccination Status Order; and

   ii.  Businesses and governmental entities with Personnel in adult care facilities and Other Health Care Settings—as that term is defined in the CDPH Vaccination Status Order—must be in full compliance with the requirements of the CDPH Vaccination Status Order.

   iii.  Businesses and governmental entities with Personnel who provide services or work in facilities covered by the State Public Health Officer Order of

15

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

August 5, 2021 ("CDPH Health Care Worker Vaccine Order"), must comply with the requirements of that order, including as that order may be amended in the future. See www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx.

g. <u>Cooperation with Public Health Authorities</u>. Businesses or governmental entities with Personnel subject to this Section 6 must cooperate with Health Officer or DPH requests for records, documents, or other information regarding the Business or governmental entity's implementation of these vaccination requirements. This cooperation includes, but is not limited to, identifying all jobs or positions within the organization and describing: (1) whether a given job or position is subject to the vaccination requirements of this Section 6, (2) how the Business or governmental entity determined a job or position is subject to vaccination requirements of this Section 6, and (3) how the Business or governmental entity is ensuring full compliance with the vaccination requirements set forth in this Section 6. Complete responses to these requests must be provided to the Health Officer or DPH promptly upon request, and in any event within three business days after receiving the request.

h. <u>Chart</u>. For convenience of reference, a chart summarizing which settings and Personnel are subject to which state and local vaccination requirements is available at https://www.sfdph.org/dph/alerts/files/C19-07-State-and-Local-Mandates-Chart.pdf.

i. <u>Operative Date</u>. This Section 6 becomes operative immediately and will continue, as updated, to be in effect until the Health Officer rescinds, supersedes, or amends it in writing.

7. <u>Mega-Events and Large Indoor Events</u>.

a. <u>Compliance with State's Post-Blueprint Guidance.</u> All Businesses, governmental entities, and other organizations hosting Mega-Events must comply with the requirements in the State's Post-Blueprint Guidance for indoor Mega-Events and are strongly urged to follow the recommendations in the State's Post-Blueprint Guidance for outdoor Mega-Events.

b. <u>Vaccine Verification Requirements</u>.

 i. For indoor Mega-Events, Personnel and patrons age 12 and up are currently required to show proof, before entering the facility, that they are Fully Vaccinated or Tested.

 ii. Except as provided below, as soon as possible, but no later than August 20, 2021, operators or hosts of indoor Mega-Events and Large Indoor Events must require all patrons age 12 and up to show proof, before entering the facility, that they are Fully Vaccinated, subject to any applicable requirements of federal, state, or local laws requiring accommodation. Indoor Mega-Events and Large Indoor Event may not accept a written self-attestation as proof of Full Vaccination.

**City and County of**      **Department of Public Health**
**San Francisco**           **Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

- Operators or hosts of indoor Mega-Events and Large Indoor Events that sold tickets or registered attendees before August 12, 2021, are not subject to the requirements in this subsection 7(b)(ii) until September 15, 2021. But beginning on August 20, 2021, and until September 15, 2021, operators or hosts of such indoor Mega-Events and Large Indoor Events must require all patrons age 12 and up to show proof, before entering the facility, that they are Fully Vaccinated or Tested.

iii.    As soon as possible, but no later than October 13, 2021, operators or hosts of indoor Mega-Events and Large Indoor Events must require all staff to show proof, before entering the facility, that they are Fully Vaccinated, subject to any applicable requirements of federal, state, or local laws requiring accommodation.

For clarity, "staff" as used in this Section 7 does not include all individuals included in the broader term "Personnel."  Performers or players who are not employed by the Business, governmental entity, or other organization hosting the event (*e.g.*, members of visiting teams and independent performers not employed by the host) are not covered by this Section, but are strongly encouraged to be Fully Vaccinated before playing or performing in San Francisco.  If they are not, they are required to:

- Remain at least six feet away from members of the public for the entire duration of the event;

- Provide the Business, governmental entity, or other organization hosting the event with proof of a negative COVID-19 test (nucleic acid or antigen) taken within the 48 hours before the event; and

- Wear a Well-Fitted Mask at all times except while actively performing or playing as required by Appendix A of this Order.

- They will not be able to enter the indoor portion of any of the businesses covered in Appendix B of this Order except areas required for them to perform or play.

c.    <u>Health and Safety Plan Requirement</u>.

The host or organizer of an indoor or outdoor Mega-Event, Large Indoor Event, or series of Mega-Events or Large Indoor Events must submit to the Health Officer a proposed plan detailing the procedures that will be implemented to minimize the risk of transmission among patrons and Personnel.  Specifically, the proposed plan should include to following:

- Description of event details (date/time; expected capacity; location; and type of event).

- Contact name for the event (*i.e.*, a person who can be reached in the event of an outbreak and/or who can be contacted to discuss the proposed plan).

- An explanation of how the host or organizer will have attendees meet requirements for providing their vaccination status (required indoors, recommended outdoors).

17

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

- An explanation of how the host or organizer will communicate/message:
  - Information to ensure that guests are aware of vaccination requirements (indoors)/recommendations (outdoors); and
  - The safety measures being taken.
- If the event is being held indoors, an explanation of how the host or organizer will adhere to the Face Covering Requirements and Appendix A of this Order.
- A description of the strategies that will be implemented to avoid stagnant crowds (this can include traffic flow, advanced ticketing, touchless payment, etc.).

A template for plans for Large Indoor Events with 1,000-4,999 attendees is available at www.sfdph.org/dph/alerts/files/C19-07-HSP-over-1000.pdf.

Plans must be submitted by email to HealthPlan@sfcityatty.org at least ten business days before the planned event or, if earlier, ten business days before the date on which tickets will begin to be sold or offered to the public. If tickets for a Large Indoor Event are already on sale as of the date of this Order, the host or organizer must submit the plan within 30 days of the date of this Order or 48 hours before the event, whichever comes first. The host or organizer does <u>not</u> need advance written approval of the Health Officer or the Health Officer's designee to proceed with the Mega-Event or Large Indoor Event consistent with the plan. But in the event the Health Officer identifies deficiencies in the plan, DPH will contact the host or organizer, and the host or organizer is required to work with DPH to address any and all deficiencies.

d.  <u>Recommendations for Outdoor Events.</u> All Businesses, governmental entities, and other organizations hosting outdoor events with between 5,000 and 9,999 attendees are strongly urged to (1) follow the recommendations in the State's Post-Blueprint Guidance for outdoor Mega-Events; and (2) require all patrons age 12 and up to show proof, before entering the event, that they are Fully Vaccinated, subject to any applicable requirements of federal, state, or local laws requiring accommodation.

e.  For convenience of reference, a chart summarizing the requirements for Mega-Events and Large Events is available at www.sfdph.org/dph/alerts/files/C19-07-Mega-and-Large-Event-Chart.pdf.

8.  <u>COVID-19 Health Indicators.</u> The City will continue to make publicly available on its website updated data on COVID-19 case rates, hospitalizations and vaccination rates. That information can be found online at https://sf.gov/resource/2021/covid-19-data-and-reports. The Health Officer will monitor this data, along with other data and scientific evidence, in determining whether to modify or rescind this Order, as further described in Section 2(a) above.

9.  <u>Incorporation of State and Local Emergency Proclamations and Federal and State Health Orders.</u> The Health Officer is issuing this Order in accordance with, and incorporates by reference, the emergency proclamations and other federal, state, and local orders and other

**City and County of San Francisco**          **Department of Public Health**
**Order of the Health Officer**

## ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

pandemic-related orders described below in this Section.  But this Order also functions independent of those emergency proclamations and other actions, and if any State, federal, or local emergency declaration, or any State or federal order or other guidance, is repealed, this Order remains in full effect in accordance with its terms (subject to Section 13 below).

    a.  <u>State and Local Emergency Proclamations</u>.  This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by the Governor, the February 25, 2020 Proclamation by the Mayor Declaring the Existence of a Local Emergency, and the March 6, 2020 Declaration of Local Health Emergency Regarding Novel Coronavirus 2019 (COVID-19) issued by the Health Officer, as each of them have been and may be supplemented.

    b.  <u>State Health Orders</u>.  This Order is also issued in light of the various Orders of the State, including, but not limited to, those of the State's Public Health Officer and Cal/OSHA.  The State has expressly acknowledged that local health officers have authority to establish and implement public health measures within their respective jurisdictions that are more restrictive than those implemented by the State Public Health Officer.

    c.  <u>Federal Orders</u>.  This Order is further issued in light of federal emergency declarations and orders, including, but not limited to, the January 20, 2021 Executive Order on Protecting the Federal Workforce and Requiring Mask-Wearing, which requires all individuals in Federal buildings and on Federal land to wear masks, maintain physical distance, and adhere to other public health measures, and the February 2, 2021 Order of the CDC, which requires use of masks on public transportation, as such orders are amended, extended or supplemented.

10.  <u>Obligation to Follow Stricter Requirements of Orders</u>.

Based on local health conditions, this Order includes a limited number of health and safety restrictions that are more stringent than those contained under State orders.  Where a conflict exists between this Order and any state or federal public health order related to the COVID-19 pandemic, the most restrictive provision (*i.e.*, the more protective of public health) controls.  Consistent with California Health and Safety Code section 131080 and the Health Officer Practice Guide for Communicable Disease Control in California, except where the State Health Officer may issue an order expressly directed at this Order and based on a finding that a provision of this Order constitutes a menace to public health, any more restrictive measures in this Order continue to apply and control in this County.

11.  <u>Obligation to Follow Health Officer Orders and Directives and Mandatory State Guidance</u>.

In addition to complying with all provisions of this Order, all individuals and entities, including all Businesses and governmental entities, must also follow any applicable

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

orders and directives issued by the Health Officer (available online at www.sfdph.org/healthorders and www.sfdph.org/directives) and any applicable mandatory guidance issued by the State Health Officer or California Department of Public Health.  To the extent that provisions in the orders or directives of the Health Officer and the mandatory guidance of the State conflict, the more restrictive provisions (*i.e.*, the more protective of public health) apply.  In the event of a conflict between provisions of any previously-issued Health Officer order or directive and this Order, this Order controls over the conflicting provisions of the other Health Officer order or directive.  And to the extent the continuing term of another order of the Health Officer is tied to the duration of the Stay-Safer-At-Home Order, this Order shall be deemed a continuation of the Stay-Safer-At-Home Order for those purposes only.

12. Enforcement.

    Under Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and the Chief of Police in the County ensure compliance with and enforce this Order.  The violation of any provision of this Order (including, without limitation, any health directives) constitutes an imminent threat and immediate menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both.  DPH is authorized to respond to such public nuisances by issuing Notice(s) of Violation and ordering premises vacated and closed until the owner, tenant, or manager submits a written plan to eliminate all violations and DPH finds that plan satisfactory.  Such Notice(s) of Violation and orders to vacate and close may be issued based on a written report made by any City employees writing the report within the scope of their duty.  DPH must give notice of such orders to vacate and close to the Chief of Police or the Chief's designee to be executed and enforced by officers in the same manner as provided by San Francisco Health Code section 597.  As a condition of allowing a Business to reopen, DPH may impose additional restrictions and requirements on the Business as DPH deems appropriate to reduce transmission risks, beyond those required by this Order and other applicable health orders and directives.

13. Effective Date.

    This Order becomes effective at 12:01 a.m. on June 15, 2021 and will continue, as updated, to be in effect until the Health Officer rescinds, supersedes, or amends it in writing.

14. Relation to Other Orders of the San Francisco Health Officer.

    Upon issuance of this order on September 10, 2021, this Order revises and entirely replaces the prior update to Health Officer Order No. C19-07y (issued August 24, 2021).  Leading up to and in connection with the effective date of this Order, the Health Officer has rescinded or is rescinding a number of other orders and directives relating to COVID-19, including those listed in the Health Officer's Omnibus Rescission of Health Officer Orders and Directives, dated June 11, 2021.  On and after the effective date of this Order, the following orders and directives of the Health Officer shall continue in full force and

**City and County of**
**San Francisco**

**Department of Public Health**
**Order of the Health Officer**

### ORDER OF THE HEALTH OFFICER No. C19-07y (updated)

effect:  Order Nos. C19-11 (Laguna Honda Hospital protective quarantine), C19-16 (hospital patient data sharing), C19-18 (vaccine data reporting), and C19-19 (minor consent to vaccination); and the directives that this Order references in Sections 3(e) and 5, as the Health Officer may separately amend or later terminate any of them.  Health Officer Order No. C19-15 was also reinstated on August 19, 2021, and remains in effect as outlined in that order (including as it is amended in the future).  Also, this Order also does not alter the end date of any other Health Officer order or directive having its own end date or that continues indefinitely.

15. Copies.

    The County must promptly provide copies of this Order as follows:  (1) by posting on the DPH website (www.sfdph.org/healthorders); (2) by posting at City Hall, located at 1 Dr. Carlton B. Goodlett Pl., San Francisco, CA 94102; and (3) by providing to any member of the public requesting a copy.

16. Severability.

    If a court holds any provision of this Order or its application to any person or circumstance to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_____

Susan Philip, MD, MPH,                          Dated:  September 10, 2021
Health Officer of the
City and County of San Francisco

Attachments:
- Appendix A – Face Covering Requirements (dated August 2, 2021)
- Appendix B – Proof of Vaccination Requirements (dated August 12, 2021)

**Order No. C19-07y – Appendix A: Face Covering Requirements**

**[August 2, 2021]**

1.  Underline **General Requirement to Wear Well-Fitted Mask**.

    Everyone, including people who are Fully Vaccinated, must wear a Well-Fitted Mask in indoor public settings at all times except as provided in Sections 4 and 5, below.

2.  **Ventilation**.

    Businesses and operators of other public and private facilities where people are allowed to remove their Well-Fitted Masks indoors (under any of the exceptions provided in Section 5, below) may only allow people to remove their Well-Fitted Masks if they use at least one of the following ventilation strategies: (1) all available windows and doors accessible to fresh outdoor air are kept open as long as air quality and weather conditions permit; (2) fully operational HVAC system; or (3) appropriately sized portable air cleaners in each room.

3.  **Proof of Full Vaccination**.

    Businesses and other entities are urged to require people to provide proof that they are Fully Vaccinated before allowing people to remove their Well-Fitted Mask to the extent allowed in Section 5, below.  For clarity, even if a Business or other entity does verify that people are Fully Vaccinated, people still must wear a Well-Fitted Mask as required by this Order.

4.  **Status-Based Exemptions**.

    a.  **Medical or Safety Exemption**.  A person does not need to wear a Well-Fitted Mask when they can show:  (1) a medical professional has provided a written exemption to the Face Covering Requirement, based on the person's medical condition, other health concern, or disability; or (2) that they are hearing impaired, or communicating with a person who is hearing impaired, where the ability to see the mouth is essential for communication; or (3) wearing a Well-Fitted Mask while working would create a risk to the person related to their work as determined by local, state, or federal regulators or workplace safety guidelines.  In accordance with California Department of Public Health ("CDPH") and United States Centers for Disease Control and Prevention ("CDC") guidelines, if a person is exempt from wearing a Well-Fitted Mask under this paragraph, they still must wear an alternative face covering, such as a face shield with a drape on the bottom edge, unless they can show either: (1) a medical professional has provided a written exemption to this alternative face covering requirement, based on the person's medical condition, other health concern, or disability; or (2) wearing an alternative face covering while working would create a risk to the person related to their work as determined by local, state, or federal regulators or workplace safety guidelines.

    A Well-Fitted Mask should also not be used by anyone who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the Well-Fitted Mask without assistance.

**Order No. C19-07y – Appendix A: Face Covering Requirements**

**[August 2, 2021]**

b. <u>Children</u>.  In accordance with CDPH and CDC guidelines, any child younger than two years old must not wear a Well-Fitted Mask because of the risk of suffocation.  Children age two to nine years must wear Well-Fitted Masks to the greatest extent feasible.  Children age two to nine years may wear an alternative face covering (as that term is described in Section 2.a, above) if their parent or caregiver determines it will improve the child's ability to comply with this Order.  Children age two to nine and their accompanying parents or caregivers should not be refused any essential service based on a child's inability to wear a Well-Fitted Mask (for example, if a four-year old child refuses to keep a Well-Fitted Mask on in a grocery store), but the parent or caregiver should when possible take reasonable steps to have the child wear a Well-Fitted Mask to protect others and minimize instances when children without Well-Fitted Masks are brought into settings with other people.  Parents and caregivers of children age two to nine years must supervise the use of Well-Fitted Masks to ensure safety and avoid misuse.

c. <u>Personal Protective Equipment</u>.  A person does not need to wear a Well-Fitted Mask when wearing personal protective equipment ("PPE") that is more protective than a Well-Fitted Mask, as required by (i) any workplace policy or (ii) any local, state, or federal law, regulation, or other mandatory guidance.  When a person is not required to wear such PPE and in an indoor public setting, they must wear a Well-Fitted Mask unless otherwise exempted from this Order.

5. <u>Activity- and Location-Based Exemptions</u>.

To the extent allowed by state or federal rules requiring face coverings for unvaccinated people, wearing a Well-Fitted Mask is not required in any of the following situations:

a. <u>Indoor Public Setting While Alone or with member of Household</u>.  A person does not need to wear a Well-Fitted Mask when they are alone or with a member of their Household in a public building or completely enclosed space such as an office, <u>and</u> people who are not part of their Household are not likely to be in the same space.  If someone who is not part of a person's Household enters the enclosed space, both people must wear a Well-Fitted Mask for the duration of the interaction.  For clarity, people must wear Well-Fitted Masks whenever they are in semi-enclosed spaces such as cubicles and common areas for shared living settings, such as hotels, shared rentals with multiple Households, dormitories, fire stations, lobbies, and elevators.  A Well-Fitted Mask must be worn if the person is in an indoor public space where others who are not part of their Household routinely are present.

b. <u>Active Eating and Drinking</u>.  People may remove their Well-Fitted Mask while actively eating or drinking.  People are urged to be seated at a table or positioned at a stationary counter or place while eating or drinking.  For clarity, Well-Fitted Masks may be removed while actively eating or drinking at events other than indoor dining, such as live performances and movies.

2

**Order No. C19-07y – Appendix A: Face Covering Requirements**

**[August 2, 2021]**

c.  <u>Personal Motor Vehicle</u>.  A person does not need to wear a Well-Fitted Mask when in a motor vehicle and either alone or exclusively with other members of the same Household.  But a Well-Fitted Mask is required when alone in the vehicle if the vehicle is used as a taxi or for any private car service or ride-sharing vehicle.  Persons sharing a personal motor vehicle with people outside of the same Household are strongly encouraged to roll down the vehicle's windows for ventilation.

d.  <u>Showering, Personal Hygiene, or Sleeping</u>.  People may remove their Well-Fitted Mask only while showering or actively engaging in personal hygiene that requires removal of the Well-Fitted Mask, including at a gym or other facility.  People may remove their Well-Fitted Mask while sleeping in indoor public settings.

e.  <u>Live or Recorded Performance and Professional Sports</u>.  Performers at indoor live or recorded settings or events such as concerts, live music, film, television, recording studios, theater, opera, symphony, and professional sports may remove their Well-Fitted Masks while actively performing or practicing.  If they remove their Well-Fitted Mask, performers must maintain at least six feet of distance from attendees and employees and are encouraged to maintain as much distance from other performers as possible.  Performers are strongly urged to be Fully Vaccinated or regularly tested, and to wear their Well-Fitted Masks to the greatest extent possible.  Attendees and employees must remain masked while attending or working at the performance except when another exception applies.

f.  <u>Religious Gatherings</u>.  Service leaders of indoor public religious gatherings, including by way of example but not limitation, choirs, may remove their Well-Fitted Mask while actively performing religious services.  If they remove their Well-Fitted Mask, service leaders must maintain at least six feet of distance from participants except when another exception applies and are encouraged to maintain as much distance from other service leaders as possible.  Service leaders are strongly urged to be Fully Vaccinated or regularly tested, and to wear their Well-Fitted Masks to the greatest extent possible.  Participants in indoor religious gatherings may remove their Well-Fitted Masks to participate in religious rituals.

g.  <u>Personal Services</u>.  Patrons of personal services such as facials, beard trims, facial piercing and tattoos, and facial massages may remove their Well-Fitted Mask only while actively receiving a service or treatment that requires temporary removal of the Well-Fitted Mask.  Where they cannot maintain at least six feet of distance, providers of personal services must wear a N-95 mask, respirator, or procedural/surgical mask while administering the service.

h.  <u>Recreational Sports</u>.  Participants in indoor recreational sports, gyms, and yoga studios may <u>not</u> remove their Well-Fitted Masks except while actively engaged in water-based sports (swimming, swim lessons, diving, water polo) and other sports where masks create imminent risk to health (e.g., wrestling, judo).  Swim instructors who are not Fully

3

**Order No. C19-07y – Appendix A: Face Covering Requirements**

**[August 2, 2021]**

Vaccinated are required to wear a face shield at all times that they are in the water with other people.

6.   Additional Recommendations.

  a.   Outdoor Crowded Gatherings.  People who are outdoors in close proximity to other people who are not part of their Household are strongly encouraged to wear a Well-Fitted Mask.

  b.   Indoor Private Gatherings.  People are strongly encouraged to wear a Well-Fitted Mask when present in an indoor private gathering at a Residence if someone who is not part of a person's Household is present in the Residence.  For clarity, people must wear a Well-Fitted Mask in common areas of a Residence that is used as a shared rental with multiple Households.

  c.   Providing a Well-Fitted Mask.  Businesses and other entities subject to this Order are strongly encouraged to provide a Well-Fitted Mask at no cost to people who do not have one upon entry inside the facility.

7.   Compliance with CDPH Vaccination Status Order's Mask Requirement.

Businesses and governmental entities with Personnel in Acute Health Care Settings, Long-Term Care Settings, High-Risk Congregate Settings, and Other Health Care Settings—as those terms are defined in the CDPH Vaccination Status Order, available online at www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Unvaccinated-Workers-In-High-Risk-Settings.aspx—must provide appropriate face coverings as required by the CDPH Vaccination Status Order.

4

**Order No. C19-07y – Appendix B: Proof of Vaccination Requirements**

**[August 12, 2021]**

1.  Covered Businesses and Events.

    For purposes of this Appendix B, Covered Businesses include:

    a.  Operators/hosts of establishments or events where food or drink is served indoors—including, but not limited to, dining establishments, bars, clubs, theaters, and entertainment venues.  For clarity, this does not include food or drink provided as part of a religious ceremony (*e.g.*, communion or kiddush).

    b.  Gyms, recreation facilities, yoga studios, dance studios, and other fitness establishments, where any patrons engage in cardiovascular, aerobic, strength training, or other exercise involving elevated breathing.  For clarity, fitness establishments and activities that are part of a K-12 school or operate as a Program for Children and Youth are covered by separate sector-specific directives (available at www.sfdph.org/directives) and are not subject to the requirements of this Appendix B.

2.  Vaccination Requirement for Patrons.

    a.  Requirement.  As soon as possible, but no later than August 20, 2021, Covered Businesses must require all patrons age 12 and older to show proof that they are Fully Vaccinated before entering any indoor portion of a facility, subject only to the exceptions below and any applicable requirements of federal, state, or local laws requiring accommodation.

        For purposes of this requirement, Covered Businesses may not accept a written self-attestation of vaccination proof of Full Vaccination.  The following are the only acceptable proof of Full Vaccination:

        (1) the CDC vaccination card, which includes name of person vaccinated, type of vaccine provided, and date last dose administered, or similar documentation issued by another foreign governmental jurisdiction;

        (2) a photo or copy of a vaccination card as a separate document;

        (3) a photo of a vaccination card stored on a phone or electronic device;

        (4) documentation of vaccination from a healthcare provider; or

        (5) a personal digital COVID-19 vaccine record issued by the State of California and available by going to myvaccinerecord.cdph.ca.gov or similar documentation issued by another state, local, or foreign governmental jurisdiction, or by an approved private company (a list of approved companies offering digital vaccine cards is available at www.sfdph.org/dph/alerts/files/vaccine-verification-sites.pdf).

1

**Order No. C19-07y – Appendix B: Proof of Vaccination Requirements**

**[August 12, 2021]**

Covered Businesses are required to cross-check proof of Full Vaccination for each patron against a photo identification, unless photo identification is integrated into the digital COVID-19 vaccine record.

b.  Exceptions and Clarifications.

  i.  For clarity, individuals who do not provide proof of Full Vaccination may use the outdoor portions of Covered Business facilities (but not the indoor portions except solely as provided in subsections (ii), (iii), and (v) below).

  ii.  Covered Businesses may allow patrons wearing a Well-Fitted Mask to come indoors to use a restroom without requiring patrons to show proof they are Fully Vaccinated.

  iii.  Dining establishments and bars may require proof of Full Vaccination to be shown at the time of patrons' first in-person interaction with staff (*e.g.*, at the time of ordering) rather than at the entrance to the establishment, but only if all such patrons wear Well-Fitted Masks at all times after entering the indoor portion of the facility and before showing such proof. Dining establishments and bars are prohibited from serving any patron indoors who fails to provide this proof.

  iv.  Theaters where concessions are sold may require proof of Full Vaccination to be shown at the time of patrons' purchase of concessions rather than at the entrance to the establishment. Theaters are prohibited from selling food or beverages to any patron indoors who fails to provide this proof.

  v.  Dining establishments and bars that serve food may allow individuals wearing a Well-Fitted Mask to enter the indoor portion of the facility to order, pick up, or pay for food or drink "to go" without showing proof of Full Vaccination.

  vi.  Businesses may obtain proof of Full Vaccination in advance of a patron's arrival at a facility, *e.g.*, by email or through a reservation system, but must confirm identification at the time of entry into the facility.

  vii.  Businesses operating food courts in indoor shopping centers that offer seated dining are required to obtain proof of Full Vaccination before patrons enter into the food court unless those operators remove seating from the area.

  viii.  Individuals hosting private events in their homes are not subject to the requirements of this Appendix B but are strongly urged to require all guests age 12 and older to show proof that they are Fully Vaccinated.

3.  Vaccination Requirement for Staff.

  a.  Requirements.  Subject to the exceptions below and any applicable requirements of

2

**Order No. C19-07y – Appendix B: Proof of Vaccination Requirements**

**[August 12, 2021]**

federal, state, or local laws requiring accommodation:

    i.    As soon as possible, but no later than August 20, 2021, Covered Businesses must use their best efforts to ascertain the vaccination status of all staff who routinely work onsite.  A sample Employee Vaccination Program Ascertainment Form is available at www.sfdph.org/dph/covid-19/files/declination.pdf.

    ii.    As soon as possible, but no later than October 13, 2021, Covered Businesses must ensure that all staff who routinely work onsite provide proof that they are Fully Vaccinated before entering or working in any indoor portion of the facility;

    iii.    Consistent with applicable privacy laws and regulations, Covered Businesses must maintain records of staff vaccination or exemption status, and provide these records to the Health Officer or other public health authorities promptly upon request, and in any event no later than the next business day after receiving the request.

  b.  Exceptions and Clarifications.

    i.    For clarity, "staff" as used in this order does not include all individuals included in the broader term "Personnel."  Individuals who enter or work in a Covered Business facility on an intermittent or occasional basis or for short periods of time (*e.g.*, individuals who deliver goods or packages) are not covered by the requirements in this Appendix B.

4.    Signage.

  a.  Signage for Patrons.  As soon as possible, but no later than August 20, 2021, all Covered Businesses are required to conspicuously post at the entrance to the facility signage informing individuals that proof of Full Vaccination is required to enter the indoor portion of the facility.  Sample signage is available at sf.gov/outreach-toolkit-coronavirus-covid-19.

  b.  Signage for Staff.  As soon as possible, but no later than August 20, 2021, all Covered Businesses are required to post signs in employee break rooms or similar areas informing staff that they are required to provide proof of Full Vaccination by October 13, 2021, and informing them how to obtain additional information about getting vaccinated.  Sample signage is available online at sf.gov/outreach-toolkit-coronavirus-covid-19.

# EXHIBIT D

# ARTICLE 53:

# REGULATION OF THIRD-PARTY FOOD DELIVERY SERVICES

| Sec. 5300. | Findings. |
| Sec. 5301. | Definitions. |
| Sec. 5302. | Cap on Per-Order Fees. |
| Sec. 5303. | Prohibition on Restricting Restaurant Pricing. |
| Sec. 5304. | Prohibition on Telephone Order Charges. |
| Sec. 5305. | Prohibition on Services Without Written Consent by a Covered Establishment. |
| Sec. 5306. | Termination of Services Within 72 Hours of Notice by Covered Establishment. |
| Sec. 5307. | Documentation of Commissions, Fees, and Terms Imposed on Restaurants. |
| Sec. 5308. | Administration and Enforcement |
| Sec. 5309. | Penalties and Enforcement. |
| Sec. 5310. | Undertaking for the General Welfare. |
| Sec. 5311. | Severability. |
| Sec. 5312. | Sunset Date. |

## SEC. 5300.  FINDINGS.

(a)   Restaurants are vital to the character and community fabric of San Francisco ("City"). They reflect and nurture the cultural diversity of the City, while offering access to food, an essential foundation of human health and basis for social connection. Restaurants are also important engines of the local economy, providing jobs and serving as commercial anchors in neighborhoods across the City.

(b)   The central place of restaurants in the City's commercial districts is evident from City real estate statistics. Restaurants occupy a substantial percentage of ground floor retail space along the City's commercial corridors, in some neighborhoods accounting for close to 25% of active ground floor businesses.

(c)   But in recent years, the City's restaurant industry has been in decline. According to data from the Department of Public Health, the number of restaurant closures has exceeded the number of new restaurants in the City for at least the past five consecutive years.

(d)   The decline of brick-and-mortar restaurants in the City over the past five years coincides with the rapid rise of third-party food delivery services, businesses that process food delivery and pickup orders through mobile apps and websites. According to one consumer market outlook publication, revenue in the U.S. "platform-to-consumer delivery" market was $8.7 billion in 2019, a nearly 10% increase over the same segment's valuation in 2018. Market research data from the first quarter of 2020 shows approximately 15.9% of all U.S. residents utilized third-party food delivery services at least once in the past year, many on a regular basis, and industry experts expect that percentage to continue to increase. Percentage use is even higher in urban markets such as San Francisco, and the COVID-19 crisis has driven the usage rates higher still. This booming market is highly concentrated in just a handful of businesses. As of November 2019, just four third-party food delivery services controlled approximately 98% of the entire market.

(e)   The increasing market dominance of a small number of third-party food delivery services companies has resulted in increasingly difficult economic conditions for City restaurants, which must contract with these companies if they wish to access the growing share of customers who rely on delivery platforms to obtain meals.

(f)   The market dominance of a few third-party food delivery services companies gives these companies disproportionate leverage in contract negotiations with restaurants. These companies use this leverage to extract high fees from restaurants – typically totaling 30% of an order total – and thereby diminish restaurants' already-narrow profit margins. Food delivery services companies also often impose contract terms that prohibit restaurants from charging a higher price for delivery orders than dine-in orders, eliminating a means by which restaurants could recoup the fees charged by delivery services. And the companies frequently include in restaurant contracts a "telephone order charge" that restaurants are required to pay even in cases where a customer telephone call does not result in an order.

(g)   Sample contracts used by leading third-party food delivery services companies reflect that these companies commonly charge restaurants a 10% per-order fee for "delivery services," the most logistically demanding and resource-intensive service they provide to restaurants. These companies often impose additional fees totaling as much as 20% of the order cost for what are described as "marketing" or "logistics" services. Market research also indicates that third-party food delivery services companies that impose such a mix of services fees earn high profits. Market research also indicates that companies' profit margins from automated non-delivery services such as marketing and online order processing are higher relative to profit margins from more resource-intensive delivery services.

(h)   While money spent by consumers at local restaurants circulates within communities and bolsters the vitality of commercial corridors, third-party food delivery services companies have amassed concentrated wealth without providing similar community benefits. And increasingly, these companies are using their market leverage to extract unfairly high payments from restaurants, hastening the closure of City restaurants and the resulting decline of City commercial districts.

(i)   The COVID-19 emergency has worsened the economic picture for City restaurants. Due to a ban on dine-in restaurant service

caused by a concern with the spread of COVID-19, third-party food delivery services have enjoyed unprecedented revenue, while restaurants have become dependent on delivery and takeout orders, and increasingly vulnerable to unfair contract terms demanded by delivery services companies.

(j)   Capping the fees third-party food delivery services companies can charge restaurants, prohibiting these companies from restricting restaurant pricing, and prohibiting these companies from imposing unfair "telephone order charges" unconnected with any customer purchase are all important steps to ensure that restaurants can thrive in San Francisco and continue to nurture vibrant, distinctive commercial districts. The fact that leading third-party food delivery services companies currently charge a 10% per-order fee for the most resource-intensive aspect of their business – delivery services – and that these companies report high profit margins from all aspects of their business operations, indicate that a 15% fee cap on per-order fees charged to restaurants is a reasonable step to protect restaurants from financial collapse without unduly constraining third-party food delivery services' businesses.

(k)   Prohibiting third-party food delivery services from providing delivery and other services to a restaurant without the restaurant's express consent, and further requiring that third-party food delivery services terminate a contract promptly upon receiving oral or written termination notice from a restaurant, are other important steps to ensure that restaurants can exercise appropriate control over their businesses.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5301.  DEFINITIONS.

For purposes of this Article 53, the following definitions apply:

"City" means the City and County of San Francisco.

"Covered establishment" means a restaurant that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale of food for same-day pickup or delivery to customers from one or more retail locations within the City. Covered establishment shall not include any restaurant that meets the definition of a formula retail use under Section 303.1 of the Planning Code.

"Food preparation and service establishment" shall have the meaning set forth in Section 451 of the Health Code, as may be amended from time to time.

"OEWD" means the Office of Economic and Workforce Development or its successor agency.

"OEWD Director" means the Director of OEWD or the Director's designee.

"Online order" means a food and/or beverage order placed by a customer through a platform provided by a third-party food delivery service for delivery or pickup within the City.

"Purchase price" means the menu price of an online order. Such term therefore excludes taxes, gratuities, and any other fees that may make up the total cost to the customer of an online order.

"Restaurant" shall have the meaning set forth in Section 451 of the Health Code, as may be amended from time to time.

"Third-party food delivery service" means any website, mobile application, or other internet service that offers or arranges for the sale of food and/or beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food preparation and service establishments.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5302.  CAP ON PER-ORDER FEES.

(a)   No third-party food delivery service may charge a covered establishment a fee, commission, or charge per online order that totals more than 15% of the purchase price of the online order.

(b)   No third-party food delivery service may charge a covered establishment a fee, commission, or charge that exceeds 15% of the purchase price of online orders to that covered establishment processed through the third-party food delivery service during the time period covered by the fee, commission, or charge.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5303.  PROHIBITION ON RESTRICTING RESTAURANT PRICING.

No third-party food delivery service may impose on a covered establishment, by contract or other means, any restrictions on the prices that a covered establishment may charge for food or beverages, whether sold through a website, app, or other service operated by the third-party food delivery service, or sold directly from the restaurant, or through any other means.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5304.  PROHIBITION ON TELEPHONE ORDER CHARGES.

No third-party food delivery service may charge a covered establishment a fee, commission, or charge for a telephone call by a customer to the third-party food delivery service that does not result in a purchase by a customer during the telephone call.

<sub>⬚</sub> (Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5305.  PROHIBITION ON SERVICES WITHOUT WRITTEN CONSENT BY A COVERED ESTABLISHMENT.

No third-party food delivery service may provide any services related to the processing or delivery of an order for delivery of food or beverages from a covered establishment unless that covered establishment expressly agrees in writing to allow the third-party food delivery service to provide such services.

<sub>⬚</sub> (Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5306.  TERMINATION OF SERVICES WITHIN 72 HOURS OF NOTICE BY COVERED ESTABLISHEMENT.

A third-party food delivery service shall terminate any service contract with a covered establishment within 72 hours after the covered establishment provides oral or written notice of its decision to terminate the contract to an individual contact person designated for communications regarding the termination or amendment of a contract in either the parties' contract or in the version of the third-party delivery service's software application used by the covered establishment, or if no such individual is so specified, to either the individual designated on the website of the California Secretary of State as agent for service of process for the third-party delivery service, or to any officer or local or regional manager of the third-party delivery service. For purposes of this Section 5306, "written notice" shall include any writing delivered by email, text message or similar message transmitted through phone or software application, facsimile, personal delivery, or mail service.

<sub>⬚</sub> (Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5307.  DOCUMENTATION OF COMMISSIONS, FEES, AND TERMS IMPOSED ON RESTAURANTS.

(a)   Third-party food delivery services shall maintain records sufficient to document their compliance with Sections 5302, 5303, 5304, 5305, and 5306, including but not limited to all relevant agreements, invoices, and transaction records, for three years from the date of any related customer transaction.

(b)   At any time, OEWD may direct any third-party food delivery service to disclose any documents and records required to be retained under subsection (a) with respect to any covered establishment. Any third-party food delivery service so directed must disclose specified documents and records to OEWD within 72 hours, not counting weekends or holidays. A third-party food delivery service's failure to provide required records to OEWD within the required 72 hours shall be a violation of this Article 53.

<sub>⬚</sub> (Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5308.  ADMINISTRATION AND ENFORCEMENT.

This Article 53 shall be administered and enforced by OEWD. The OEWD Director may adopt regulations, guidelines, and forms to carry out the provisions and purposes of this Article.

<sub>⬚</sub> (Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5309.  PENALITIES AND ENFORCEMENT.

(a)   **Enforcement Procedure.** The OEWD Director shall issue an administrative citation for the violation of any section of this Article 53. Administrative Code Chapter 100, "Procedures Governing the Imposition of Administrative Fines," is hereby incorporated in its entirety, except as it relates to the definition of a violation and the calculation of penalty amounts, addressed in subsections (b) and (c). Administrative Code Chapter 100 shall govern the procedure for imposition, enforcement, collection, and administrative review of administrative citations issued under this Section 5309.

(b)   **Violations Subject to Penalties.** Any third-party food delivery service that violates any provision of this Article 53 shall be subject to an administrative penalty imposed by order of the OEWD Director. For purposes of assessing penalties for violation of Sections 5302, 5303, 5304, 5305, and 5306, a separate violation shall accrue each time a customer transaction is processed subject to any contract, term, fee, commission, charge, or price that violates one or more of these sections. As used in the prior sentence, "customer transaction" includes a telephone call by a customer to the third-party food delivery service that does not result in a purchase by a customer during the telephone call, for purposes of identifying a violation of Section 5304. For purposes of assessing penalties for violation of Section 5307, each day a third-party food delivery service fails to disclose documents or records in violation of that section shall be a separate violation.

(c)   **Penalty Amounts.** In setting the amount of the administrative penalty, which shall not exceed $1,000 per violation, the OEWD

Director shall consider any one or more mitigating or aggravating circumstances presented, including but not limited to the following: the amount of any fee, commission, or charge collected in violation of this Article 53, the persistence of the misconduct, the willfulness of the misconduct, the length of time over which the misconduct occurred, and the assets, liabilities, and net worth of the third-party delivery service.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5310.  UNDERTAKING FOR THE GENERAL WELFARE.

In enacting and implementing this Article 53, the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5311.  SEVERABILITY.

If any section, subsection, sentence, clause, phrase, or word of this Article 53, or any application thereof to any person or circumstance, is held to be invalid or unconstitutional by a decision of a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions or applications of the Article. The Board of Supervisors hereby declares that it would have passed this Article and each and every section, subsection, sentence, clause, phrase, and word not declared invalid or unconstitutional without regard to whether any other portion of this ordinance or application thereof would be subsequently declared invalid or unconstitutional.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

## SEC. 5312.  SUNSET DATE.

This Article 53 shall expire by operation of law 60 days after the County Health Officer amends or terminates the Stay Safer At Home Order or any subsequent order regulating restaurants so that restaurants may allow the number of patrons present in the indoor space of the restaurant to resume at 100% of the restaurant's maximum occupancy, provided that no subsequent order is issued to restrict restaurant occupancy below 100% capacity during that 60-day window. Upon expiration, the City Attorney shall cause this Article to be removed from the Police Code.

(Added by Ord. 234-20, File No. 200398, App. 11/20/2020, Eff. 12/21/2020)

EXHIBIT E

OFFICE OF THE MAYOR
SAN FRANCISCO

LONDON N. BREED
MAYOR

July 9, 2021

President Shamann Walton
Members, Board of Supervisors
1 Dr. Carlton B. Goodlett Place
San Francisco CA, 94102

**Re: File 210492**

President Walton and Members of the Board of Supervisors,

I am returning file 210492 unsigned.

During the COVID pandemic, I instituted a temporary cap on third party delivery fees to protect
our restaurants and small businesses at a time when in-person dining was prohibited, and
restaurants were entirely reliant on delivery to survive. That was the right thing to do at that time.

However, I have concerns about making this legislation permanent. Though I appreciate an
intent to continue to protect our small businesses, this ordinance is unnecessarily prescriptive in
limiting the business models of the third-party organizations, and oversteps what is necessary for
the public good.

I understand that there is a commitment from the sponsors of this ordinance to bring trailing
legislation that addresses several of these concerns. I appreciate that commitment, and look
forward to reviewing that final ordinance when it comes to me for signature.

Sincerely,

Mayor London N. Breed