GIBSON, DUNN & CRUTCHER LLP
JOSHUA S. LIPSHUTZ, SBN 242557
 jlipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:     415.393.8200
Facsimile:     415.393.8306

MICHAEL HOLECEK, SBN 281034
 mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:     213.229.7000
Facsimile:     213.229.7520

Attorneys for Plaintiffs
DOORDASH, INC. and GRUBHUB INC.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOORDASH, INC. and GRUBHUB INC., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendant. | CASE NO. 21-CV-05502-EMC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Hearing Date: December 16, 2021 <br> Hearing Time: 1:30 p.m. <br> Hearing Place: Courtroom 5 – 17th Floor <br> Hon. Edward M. Chen <br><br> Action Filed: July 16, 2021 <br> FAC Filed: Oct. 1, 2021 |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL ALLEGATIONS............................................................................................................ 1

    A.    The Role Of Commissions Charged By Third-Party Platforms ................................. 1

    B.    The Mayor Caps Delivery Commissions In Response To The COVID-19 Pandemic ................................................................................................................... 3

    C.    The Board Passes The Temporary Ordinance..................................................... 3

    D.    The Board Makes The Commission Cap Permanent .......................................... 4

LEGAL STANDARD ....................................................................................................................... 5

ARGUMENT ................................................................................................................................... 6

    A.    Plaintiffs State A Claim For Violation Of The Contract Clause............................ 6

        1.    Step One: The Ordinance Substantially Impairs Plaintiffs' Contracts ................................................................................................... 6

        2.    Step Two: The Ordinance Does Not Appropriately Or Reasonably Advance A Significant And Legitimate Public Purpose..................................... 9

    B.    Plaintiffs State A Claim For Violation Of The Takings Clause................................. 13

    C.    Plaintiffs State A Claim For Violation Of San Francisco's Police Power................. 17

    D.    Plaintiffs State A Claim Under The Due Process And Equal Protection Clauses ................................................................................................................. 19

    E.    DoorDash State A Claim For Violation Of The First Amendment ........................... 22

    F.    If The Court Grants Any Part Of The City's Motion, It Should Grant Leave To Amend.................................................................................................... 25

CONCLUSION ................................................................................................................................ 25

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

3

CASES

4

*Adamson Companies v. City of Malibu*,
  854 F. Supp. 1476 (C.D. Cal. 1994)........................................................................18

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)...................................................................................6, 7, 9, 13

*Alpha Energy Savers, Inc. v. Hansen*,
  381 F.3d 917 (9th Cir. 2004)...........................................................................23, 24

*Am. Fed. of State, Cnty. & Mun. Emps. v. City of Benton*,
  513 F.3d 874 (8th Cir. 2008)..................................................................................11

*Animal Legal Def. Fund v. Otter*,
  118 F. Supp. 3d 1195 (D. Idaho 2015), *aff'd in relevant part* .........................21

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018)...............................................................................21

*Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*,
  10 F.4th 905 (9th Cir. 2021)..................................................................................13

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014)...............................................................................21

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016)......................................................................22, 23, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................5

*Association of Equipment Manufacturers v. Burgum*,
  932 F.3d 727 (8th Cir. 2019)................................................................7, 10, 11, 12

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988).................................................................................25

*Birkenfeld v. City of Berkeley*,
  17 Cal. 3d 129 (1976) ............................................................................................18

*Blair v. Bethel Sch. Dist.*,
  608 F.3d 540 (9th Cir. 2010).............................................................................22, 25

*Boardman v. Inslee*,
  978 F.3d 1092 (9th Cir. 2020)...............................................................................21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

*Brown v. Hovatter,*
    561 F.3d 357 (4th Cir. 2009)........................................................................................22

*Brown v. Legal Found. of Wash.,*
    538 U.S. 216 (2003).....................................................................................................17

*Cal. Build. Indus. Ass'n v. City of San Jose,*
    61 Cal. 4th 435 (2015).................................................................................................11

*California Grocers Association v. City of Long Beach,*
    2021 WL 3500960 (C.D. Cal. Aug. 9, 2021)..................................................................8

*Capp v. Cnty. of San Diego,*
    940 F.3d 1046 (9th Cir. 2019)......................................................................................23

*CDK Glob. LLC v. Brnovich,*
    461 F. Supp. 3d 906 (D. Ariz. 2020)............................................................................12

*Chang v. United States,*
    859 F.2d 893 (Fed. Cir. 1988)......................................................................................16

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985).....................................................................................................21

*City of Las Vegas v. Foley,*
    747 F.2d 1294 (9th Cir. 1984)......................................................................................24

*Classic Cab, Inc. v. Dist. of Columbia,*
    288 F. Supp. 3d 218 (D.D.C. 2018) .............................................................................15

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
    508 U.S. 602 (1993)...............................................................................................15, 16

*Connolly v. Pension Benefit Guaranty Corp.,*
    475 U.S. 211 (1986)...............................................................................................14, 15

*Craigmiles v. Giles,*
    312 F.3d 220 (6th Cir. 2002)........................................................................................20

*Cycle City, Ltd. v. Harley-Davidson Motor Co.,*
    81 F. Supp. 3d 993 (D. Haw. 2014) .............................................................................11

*Desoto CAB Co. v. Picker,*
    228 F. Supp. 3d 950 (N.D. Cal. 2017) ....................................................................21, 25

*Duquesne Light Co. v. Barasch,*
    488 U.S. 299 (1989).....................................................................................................22

## TABLE OF AUTHORITIES
*(continued)*

*Eldridge v. Block*,
  832 F.2d 1132 (9th Cir. 1987).................................................................................................25

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
  459 U.S. 400 (1983).................................................................................................6, 17

*Foman v. Davis*,
  371 U.S. 178 (1962).................................................................................................25

*Fortune Players Group, Inc. v. Quint*,
  2016 WL 7102735 (N.D. Cal. Dec. 6, 2016) .................................................................23

*Fraternal Order of Police Hobart Lodge Number 121, Inc. v. City of Hobart*,
  864 F.2d 551 (7th Cir. 1988).................................................................................................25

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
  997 F. Supp. 340 (E.D.N.Y. 1998) .................................................................................17

*Hawaii Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984).................................................................................................14

*Hawkeye Commodity Promotions, Inc. v. Miller*,
  432 F. Supp. 2d 822 (N.D. Iowa 2006) .........................................................................16

*Hernandez v. City of Hanford*,
  41 Cal. 4th 279 (2007) .................................................................................11, 21

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) .................................................................................22

*Home Building & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934).................................................................................................10

*Hotel & Motel Asssociation of Oakland v. City of Oakland*,
  344 F.3d 959 (9th Cir. 2003).................................................................................21

*HRPT Properties Tr. v. Lingle*,
  715 F. Supp. 2d 1115 (D. Haw. 2010) .................................................................11, 12, 13

*Huskey v. City of San Jose*,
  204 F.3d 893 (9th Cir. 2000).................................................................................24

*Image Media Advert., Inc. v. City of Chi.*,
  2017 WL 6059921 (N.D. Ill. Dec. 7, 2017) .................................................................15

*Inman v. Hatton*,
  2018 WL 1100959 (N.D. Cal. Mar. 1, 2018) .................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

*Justesen's Food Stores v. City of Tulare*,
    12 Cal. 2d 324 (1938) ......................................................................................................17, 20

*Kawaoka v. City of Arroyo Grande*,
    17 F.3d 1227 (9th Cir. 1994)......................................................................................................24

*In re Kazas*,
    22 Cal. App. 2d 161 (1937)......................................................................................12, 17, 19, 20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987) ..................................................................................................................13

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019)......................................................................................................24

*Laurel Park Cmty., LLC v. City of Tumwater*,
    698 F.3d 1180 (9th Cir. 2012)....................................................................................................15

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008)..........................................................................................19, 20, 21

*Lefrancois v. Rhode Island*,
    669 F. Supp. 1204 (D.R.I. 1987)..................................................................................................9

*In re Levenson*,
    560 F.3d 1145 (9th Cir. 2009)....................................................................................................19

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)..................................................................................................................14

*Litmon v. Harris*,
    768 F.3d 1237 (9th Cir. 2014)....................................................................................................21

*Lockary v. Kayfetz*,
    917 F.2d 1150 (9th Cir. 1990)....................................................................................................19

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)..................................................................................................................14

*Lynch v. United States*,
    292 U.S. 571 (1934)..................................................................................................7, 13, 14, 15

*McDougal v. Cty. of Imperial*,
    942 F.2d 668 (9th Cir. 1991)......................................................................................................14

*MCH Financial L.P. v. City of San Rafael*,
    714 F.3d 1118 (9th Cir. 2013)....................................................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

*Melendez v. City of N.Y.*,
__ F.4th __, 2021 WL 4997666 (2d Cir. Oct. 28, 2021)................................7, 10, 12, 13

*Merrifield v. Lockyer*,
547 F.3d 978 (9th Cir. 2008)................................................................19, 20, 21

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*,
669 F.3d 374 (3d Cir. 2012).......................................................................7

*N.Y. State Ass'n of Counties v. Axelrod*,
78 N.Y.2d 158 (1991) .............................................................................19

*N.Y. State Land Title Ass'n, Inc. v. N.Y. State Dep't of Fin. Servs.*,
169 A.D.3d 18 (1st Dep't 2019)...........................................................13, 18, 19

*Nat'l Wildlife Fed'n v. ICC*,
850 F.2d 694 (D.C. Cir. 1988) ....................................................................22

*Nekrilov v. City of Jersey City*,
2021 WL 1138360 (D.N.J. Mar. 24, 2021) .......................................................16

*New York v. Cohen*,
5 N.E.2d 835 (N.Y. 1936) .........................................................................17

*Nieves v. Hess Oil Virgin Islands Corp.*,
819 F.2d 1237 (3d Cir. 1987)......................................................................9

*Northwest Grocery Association v. City of Seattle*,
2021 WL 1055994 (W.D. Wash. Mar. 18, 2021) ................................................11

*Novell, Inc. v. Microsoft Corp.*,
505 F.3d 302 (4th Cir. 2007)......................................................................13

*Olson v. California*,
2020 WL 6439166 (C.D. Cal. Sept. 18, 2020).....................................................8

*Olson v. California*,
2020 WL 905572 (C.D. Cal Feb. 10, 2020)........................................................21

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012)......................................................................6

*Penn Central Trans. Co. v. N.Y. City*,
438 U.S. 104 (1978)...............................................................................14

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984)................................................................................9

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011)..............................................................................................5

*Pro-Eco, Inc. v. Bd. of Comm'rs*,
    57 F.3d 505 (7th Cir. 1995)..............................................................................................15

*Rancho de Calistoga v. City of Calistoga*,
    800 F.3d 1083 (9th Cir. 2015)..........................................................................................16

*Reddy v. Litton Indus. Inc.*,
    912 F.2d 291 (9th Cir. 1990)............................................................................................25

*Romer v. Evans*,
    517 U.S. 620 (1996)..........................................................................................................19

*Ross v. City of Berkeley*,
    655 F. Supp. 820 (N.D. Cal. 1987)..................................................................................12

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)..........................................................................................................14

*RUI One Corp. v. City of Berkeley*,
    371 F.3d 1137 (9th Cir. 2004)..........................................................................................21

*San Francisco Taxi Coal. v. City & County of S.F.*,
    979 F.3d 1220 (9th Cir. 2020)..........................................................................................11

*Santos v. City of Houston*,
    852 F. Supp. 601 (S.D. Tex. 1994)..................................................................................20

*Smith v. Pelican Bay State Prison*,
    2016 WL 285062 (N.D. Cal. Jan. 25, 2016)....................................................................25

*Snake River Valley Elec. Ass'n v. PacifiCorp*,
    357 F.3d 1042 (9th Cir. 2004)..........................................................................................13

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013)..............................................................................................6

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013)............................................................................................18

*State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners*,
    40 Cal. 2d 436 (1953)..................................................................................12, 17, 18, 19

*Storer Cable Commc'ns v. City of Montgomery*,
    806 F. Supp. 1518 (M.D. Ala. 1992)................................................................................9

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ..................................................................................................6, 9

*Taylor v. United States*,
    959 F.3d 1031 (Fed. Cir. 2020)..........................................................................................16

*TCF National Bank v. Bernanke*,
    643 F.3d 1158 (8th Cir. 2011)........................................................................................21, 22

*Thornton v. City of St. Helens*,
    425 F.3d 1158 (9th Cir. 2005).............................................................................................21

*Tuttle v. N.H. Med. Malpractice Joint Underwriting Ass'n*,
    992 A.2d 624 (N.H. 2010) ....................................................................................................9

*Twin City Candy & Tobacco Co. v. A. Weisman Co.*,
    276 Minn. 225 (1967) .........................................................................................................19

*Ulrich v. City & County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002).........................................................................................24, 25

*United Healthcare Ins. Co. v. Davis*,
    602 F.3d 618 (5th Cir. 2010)...........................................................................................9, 16

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)................................................................................................15

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938)............................................................................................................18

*United States v. O'Brien*,
    391 U.S. 367 (1968)............................................................................................................24

*United States v. Wilde*,
    74 F. Supp. 3d 1092 (N.D. Cal. 2014) ...............................................................................21

*Vinatieri v. Mosley*,
    787 F. Supp. 2d 1022 (N.D. Cal. 2011) .............................................................................25

*Winston v. City of Syracuse*,
    887 F.3d 553 (2d Cir. 2018)................................................................................................20

*Wolff v. McDonnell*,
    418 U.S. 539 (1974)............................................................................................................20

**STATUTES**

S.F. Admin. Code § 5300(d) ....................................................................................................11

viii

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS      CASE NO. 21-CV-05502-EMC


Gibson, Dunn &
Crutcher LLP

## TABLE OF AUTHORITIES
*(continued)*

S.F. Police Code § 5312 ........................................................................................................4

**RULES**

Fed. R. Civ. P. 15(a)(2) ......................................................................................................25

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. I, § 7 ..........................................................................................................19

Cal. Const. art. I, § 19 ........................................................................................................13

U.S. Const. amend. V ..........................................................................................................13

U.S. Const. amend. XIV ......................................................................................................19

U.S. Const. art. I, § 10 ..........................................................................................................6

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS            CASE NO. 21-CV-05502-EMC

## PRELIMINARY STATEMENT

When San Francisco lawmakers imposed a permanent price cap on the commissions that third-party platforms like DoorDash and Grubhub may charge restaurants for their services (the "Ordinance"), they touted it as a first-of-its-kind law expressly intended to shift revenues from third-party platforms to restaurants.  Now that the Ordinance has been challenged in court, the City tries to recast it as run-of-the-mill regulation.  But as Mayor London Breed said when she refused to sign the Ordinance, this unprecedented price cap is "unnecessarily prescriptive in limiting the business models of the third-party organizations, and oversteps what is necessary for the public good."  Rather than advance the public health, safety, or welfare, the Ordinance forces third-party platforms to subsidize restaurants—an unconstitutional transfer of money from one group of businesses to another.

Under the U.S. Constitution and California's limitations on local governments, the Ordinance fails for many reasons.  The Ordinance substantially interferes with thousands of contracts between Plaintiffs and San Francisco restaurants, without compensating Plaintiffs, and without advancing a significant and legitimate public purpose, such as the public health, safety, or welfare.  The complaint also alleges, and the facts will prove, that the City passed the Ordinance to punish DoorDash for engaging in protected First Amendment activity—namely, its support of Proposition 22.  Thus, Plaintiffs state claims under the Contract Clause, Takings Clause, Due Process and Equal Protection Clauses, and First Amendment, as well as California's police power limitations.  The Court should deny the City's motion to dismiss.

## FACTUAL ALLEGATIONS

### A.    The Role Of Commissions Charged By Third-Party Platforms

Plaintiffs operate third-party platforms that connect restaurants with consumers who wish to purchase food and have it delivered to them or be ready for pickup.  Dkt. 25 ¶ 15.  Plaintiffs compete with numerous other third-party platforms in San Francisco and elsewhere, as well as with restaurants that deliver food themselves.  *Id.* ¶ 16.  This industry is dynamic, constantly evolving, and historically free of government regulation, including pricing controls.  *Id.* ¶¶ 16, 21, 30–31.

The rise of third-party platforms has resulted in the expansion of restaurants' consumer base.  Dkt. 25 ¶ 17.  Consumers who otherwise would not have discovered or patronized a restaurant but for

Plaintiffs' platforms use those platforms to purchase food from that restaurant to be delivered or picked up.  *Id.*  Some restaurants choose to use Plaintiffs' platforms to facilitate deliveries by couriers.  And many restaurants pay Plaintiffs to perform services like marketing, order processing, customer support, and technology and product development.  *Id.* ¶ 18.  Restaurants are free to perform any of these services on their own.  *Id.* ¶¶ 17–18.

Plaintiffs cover their costs by charging commissions to restaurants.  Dkt. 25 ¶ 19.  Plaintiffs' operational costs include (but are not limited to) platform development, maintenance, and operation; marketing; technology procurement and development; restaurant-dedicated product procurement and development; delivery courier onboarding; facilitating courier payment; customer service specialists; and platform safety.  *Id.* ¶ 20.  Plaintiffs compete with each other and many other companies, and thus have powerful market-based incentives to offer the best overall value to restaurants.  *Id.* ¶ 21.

Third-party platforms have helped restaurants during the COVID-19 pandemic by showcasing them to new customers.  Dkt. 25 ¶¶ 22–23.  This resilience in the restaurant industry comes despite difficulties *unrelated* to third-party platforms, including large rent increases, shortage of workers, and skyrocketing wholesale food prices (all of which persist in San Francisco).  *Id.* ¶ 25.  By increasing restaurants' customer base, third-party platforms help mitigate these difficulties.  *Id.*  Indeed, in almost all cases, a restaurant's revenue increases when it joins one or more of Plaintiffs' platforms.  *Id.* ¶ 26.  Nearly two-thirds of restaurants surveyed reported increases in profits during the pandemic because of DoorDash.  *Id.*  Restaurants that partnered with DoorDash were eight times more likely to survive the pandemic than those that did not, and 75% of restaurants agree that Grubhub increases the amount customers spend at their restaurant.  *Id.* ¶ 32.

Plaintiffs have contracts with thousands of restaurants in San Francisco lasting several years, which have long used a percentage commission structure.  Dkt. 25 ¶¶ 28–29.  Restaurants have significant flexibility in partnering with Plaintiffs, with commissions tailored to each restaurant's needs.  *Id.* ¶¶ 26–27.  DoorDash's Partnership Plans offer tiers of service, including a tier with a commission of 15%.  *Id.* ¶ 27.  The vast majority of San Francisco restaurants with a DoorDash Partnership Plan have chosen a plan that includes a commission greater than 15%.  *Id.*  Restaurants that choose the Grubhub Marketplace select a negotiable marketing package with commissions that

typically range from 5–20% per order for a variety of services including, but not limited to (and not always including), delivery.  *Id.* ¶ 29.  For Grubhub contracts that include delivery facilitation, the total commission generally exceeds 15% (largely to cover Grubhub's costs).  *Id.*

**B.**     **The Mayor Caps Delivery Commissions In Response To The COVID-19 Pandemic**

In February 2020, Mayor Breed declared a state of emergency due to COVID-19.  Dkt. 25 ¶ 35.  California required restaurants to suspend in-restaurant dining and offer only pickup/delivery options, *id.* ¶ 36, while San Francisco issued a shelter-in-place order, *id.* ¶ 37.  Plaintiffs invested hundreds of millions of dollars to assist restaurants during the public-health emergency.  *Id.* ¶ 38.

In April 2020, Mayor Breed promulgated an executive order that temporarily capped the commissions that third-party platforms could charge restaurants at 15% of an online order's purchase price.  Dkt. 25 ¶ 39.  The executive order stated that "[i]t is in the public interest to take action to maximize restaurant revenue," and "[c]apping the per-order fees at 15% will accomplish the legitimate public purpose of easing the financial burden on struggling restaurants."  *Id.*  Mayor Breed announced that the executive order's intent was to "make sure that our restaurants are protected," that the cap "is intended to support small businesses through the COVID-19 pandemic," and that she drafted the order "after working with the Golden Gate Restaurant Association."  *Id.* ¶ 40.

During the COVID-19 pandemic, many San Francisco consumers relied on third-party platforms to facilitate delivery of food to their homes.  Dkt. 25 ¶ 41.  Similarly, many San Francisco restaurants relied on platforms to facilitate sales and delivery.  *Id.*  The pandemic also caused many of Plaintiffs' costs to increase, but Plaintiffs often lowered their commissions voluntarily.  *Id.* ¶ 43.

**C.**     **The Board Passes The Temporary Ordinance**

In July 2020, the San Francisco Small Business Commission met to consider codifying Mayor Breed's executive order imposing a temporary commission cap.  Dkt. 25 ¶ 54.  Statements at that meeting showed that the City intentionally sought to benefit restaurants at Plaintiffs' expense.  *See id.*

In November 2020, the Board passed the Ordinance, which took effect in December 2020, Dkt. 25 ¶ 55, and prohibits Plaintiffs from "charg[ing] a covered establishment a fee, commission, or charge per online order that totals more than 15% of the purchase price of the online order," *id.* ¶ 57.  The Ordinance's findings focused on "the economic picture" of local restaurants.  *Id.* ¶ 56.

Gibson, Dunn &
Crutcher LLP

The Ordinance does not fix the price of any other business with which restaurants transact, such as raw-ingredient and equipment suppliers, even though prices for these products have risen drastically in recent years.  Dkt. 25 ¶ 58.  Nor does the Ordinance fix the price of other advertisers that provide similar marketing services to restaurants, such as media placement agencies, classified ads, and Google ads.  *Id.*  The Ordinance regulates only third-party platforms that offer services to at least "20 separately owned and operated food preparation and service establishments."  *Id.* ¶ 59.

The Ordinance originally provided that it would expire 60 days after the amendment or termination of a health order that restricts restaurant occupancy below 100% capacity.  S.F. Police Code § 5312; Dkt. 25 ¶ 62.  Restaurants were permitted to resume 100% capacity on June 15, 2021.  *Id.* ¶ 63.  Thus, as originally enacted, the Ordinance would have expired on August 14, 2021.  *Id.*

**D.     The Board Makes The Commission Cap Permanent**

In June 2021, the Public Safety & Neighborhood Services Committee discussed making the Ordinance permanent.  Dkt. 25 ¶ 64.  The Committee focused on the relative profits and wealth of local restaurants and third-party platforms, *see id.*, but it also heard from numerous delivery couriers who objected to the commission cap because it would depress their earnings opportunities, *id.* ¶ 65.  The CEO of the Latino Restaurant Association told the Committee that "further analysis is needed" because "arbitrary price controls hurt the very restaurants [they] might be intended to help."  *Id.* ¶ 66.

Soon thereafter, the full Board met and Supervisor Aaron Peskin acknowledged that restaurants have "begun to recover as we emerge from the pandemic," but he nevertheless focused on the relative revenue between restaurants and Plaintiffs.  Dkt. 25 ¶ 67.  In the first of two votes required to make the Ordinance permanent, the Board voted unanimously in favor of enacting a permanent cap.  *Id.* ¶ 68.  In doing so, Supervisors Peskin and Ahsha Safai pointed to Proposition 22, a ballot initiative that secured independent-contractor status and certain benefits for gig-economy workers.  *Id.* ¶¶ 69–70.  It was widely known that DoorDash and other third-party platforms supported Proposition 22, while many City officials publicly opposed it.  *Id*. ¶¶ 46, 47.  On November 3, 2020, California voters passed Proposition 22 by a 17% margin.  *Id.* ¶ 48.

More specifically, Supervisor Peskin referred to DoorDash's support of Proposition 22 when he voted to make the commission cap permanent.  Dkt. 25 ¶ 69.  That same day, he posted on

Facebook that San Francisco was the "first" to pass a permanent commission cap, highlighted third-party platforms' support of Proposition 22, and pledged to correct the "imbalance" between third-party platforms and small businesses. *Id.* Supervisor Safai made a similar statement. *See id.* ¶ 70.

On June 29, 2021, the Board again voted to remove the Ordinance's sunset provision, but made no additional findings to support the shift from temporary to permanent. Dkt. 25 ¶ 71. The Board did not conduct (or ask anyone else to conduct) research or analysis regarding:

- A permanent cap's potential effect on consumers, restaurants, delivery couriers, platforms, the local economy, or how commissions affect restaurants' profitability. *Id.* ¶ 72.
- Whether third-party platforms could or would continue to offer the same level of services to restaurants under a 15% cap. *Id.*
- Whether a 15% cap would increase the number of restaurants that are forced to close if Plaintiffs are forced to modify their services. *Id.*
- Any differences in the services offered by third-party platforms. *Id.*
- Any differences between third-party platforms that serve 20 or more restaurants and platforms that serve fewer than 20 restaurants. *Id.*
- The impact of third-party platforms on restaurants in San Francisco. *Id.*
- What factors might impede restaurants' growth. *Id.*

Mayor Breed refused to sign the bill, stating it "is unnecessarily prescriptive in limiting the business models of the third-party organizations, and oversteps what is necessary for the public good." Dkt. 25 ¶¶ 73–74. The Ordinance became law on June 29, 2021. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff "only needs to *allege* 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (emphasis in original). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, the court must "accept the well-pleaded factual allegations of the complaint as true and construe them in the light most favorable to

plaintiffs," *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012), and it must deny the motion unless the complaint "(1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory," *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

<u>**ARGUMENT**</u>

Plaintiffs allege facts demonstrating that the Ordinance substantially impairs a central term of their contracts—the commission rate—for the purpose of economically benefiting a favored set of private businesses. Plaintiffs allege that the Ordinance bears no rational relationship to the public health, welfare, or safety, and that it retaliates against third-party platforms for supporting Proposition 22. The Court should deny the motion to dismiss.

**A.      Plaintiffs State A Claim For Violation Of The Contract Clause**

The constitutional prohibition on impairing contractual obligations requires a two-step analysis. *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018); U.S. Const. art. I, § 10. At Step One, courts analyze whether the law substantially impairs a contract. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). If it does, courts turn to Step Two and ask whether the law is drawn in an "appropriate" and "reasonable" way to advance "a significant and legitimate public purpose," which "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id.* at 411–12. Plaintiffs allege facts sufficient to satisfy both steps.

**1.      Step One: The Ordinance Substantially Impairs Plaintiffs' Contracts**

The City concedes that the Ordinance impairs existing contracts. Dkt. 28 at 5. The only dispute is whether that impairment is "substantial," and Plaintiffs adequately plead substantial impairment here. The impairment analysis must account for the "high value" the Framers placed on private contractual rights, which "are binding under the law, and the parties are entitled to rely on them." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). When assessing the degree of impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding . . . his rights." *Sveen*, 138 S. Ct. at 1822. Relevant here is whether the law "invades an area never before subject to regulation by the State," and whether it allows "gradual applicability." *Spannaus*, 438 U.S. at 247. Impairment is substantial when laws "work[] a severe, permanent, and immediate

change" to contractual rights.  *Id.* at 250; *Melendez v. City of N.Y.*, __ F.4th __, 2021 WL 4997666, at *30 (2d Cir. Oct. 28, 2021) (reversing dismissal of Contract Clause claim where pandemic-related rent law significantly impaired landlords' contracts by "permanently and unexpectedly" upsetting reliance on existing contracts).

*Association of Equipment Manufacturers v. Burgum*, 932 F.3d 727 (8th Cir. 2019) ("*AEM*"), is instructive.  There, North Dakota prohibited farm equipment manufacturers from imposing certain reimbursement and other obligations on dealers notwithstanding that these obligations were set forth in existing contracts.  *Id.* at 729.  The government was not a contracting party, and the law's sponsor conceded the law's intent to create a "level playing field" between manufacturers and dealers.  *Id.* at 729–30.  The district court preliminarily enjoined the law.  The Eighth Circuit affirmed, holding that Step One centers on foreseeability of impairment, and that the manufacturers had no "appreciable warning of an impending intervention into their agreements." *Id.* at 730. The court further held that the new law went "a significant step beyond" previous laws "by rendering unenforceable obligations that dealers previously accepted as part of freely negotiated contracts."  *Id.* at 730–31.

In this case, under Step One, the Ordinance clearly imposes "unexpected obligations in an area where reliance was vital," in light of the total absence of permanent price controls or similar regulations in the third-party platform industry.  *See N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 387 (3d Cir. 2012); Dkt. 25 ¶¶ 1, 30, 31, 85; *see AEM*, 932 F.3d at 730 (parties lacked fair warning of contractual impairment).   And *AEM* makes clear that the Ordinance substantially impairs Plaintiffs' contracts.  The commission rate is undeniably a core term of Plaintiffs' contracts with restaurants.  Dkt. 25 ¶¶ 26–29.  Artificially reducing Plaintiffs' compensation fundamentally changes the parties' bargain and may result in Plaintiffs being unable to continue offering those services.  *Id.* ¶¶ 80–82; *Lynch v. United States*, 292 U.S. 571, 580 (1934) (contracts between corporations are impaired when "the right to enforce them . . . is taken away or materially lessened"). But the City argues that its impairment is not substantial because (i) "the contract is in a regulated industry" and (ii) the impairment was foreseeable.  Dkt. 28 at 5.  Not so. Third-party platforms' relationship with merchants is historically unregulated, without price caps, and for good reason: Platforms charge commissions based on market forces, just as in virtually every other dynamic

Gibson, Dunn & Crutcher LLP

industry, and third-party platforms are *not* public utilities.  Dkt. 25 ¶¶ 28–31, 85.  While Plaintiffs complied with the *temporary* commission cap, they reasonably expected their original commission rates would return after the public-health emergency.  *Id.* ¶ 85.  Even Supervisor Peskin confirmed that the Ordinance is unprecedented.  *Id.* ¶¶ 1, 30–31, 69.

The City claims its price-fixing law was foreseeable based on hearsay documents not subject to judicial notice.  *See* Opp. to RJN at 4–8.  Regardless, those documents do not show that the Ordinance was foreseeable.  The City cites articles stating that a New York agency "considered" a commission cap in 2019,[1] the San Francisco Small Business Commission and Planning Department decided "to discuss . . . delivery fees and their impacts" in February 2020, and some restaurants had complained about commissions.  None of those articles demonstrates that, when Plaintiffs contracted with San Francisco restaurants (*see* Dkt. 25 ¶¶ 28, 29), it was foreseeable that the City would enact a permanent price-fixing law.  Indeed, virtually *every* new law is preceded by some amount of public debate.  A regulation is not foreseeable simply due to news reports around the time it is enacted— otherwise, governments could always, with well-timed leaks and press releases, render the Contract Clause a dead letter.  The City also claims that companies in "growing industr[ies]" cannot expect their contracts to be enforceable because every "developing" industry risks government impairment of contracts.  Dkt. 28 at 6.  But not a single case supports this position, which is a startling one, particularly for San Francisco, which prides itself on fostering developing industries.[2]

The City's cases regarding substantial impairment are also inapposite.  Both cases are in the employment context—neither relates to a business-to-business contractual relationship.  In *Olson v. California*, 2020 WL 6439166, at *11 (C.D. Cal. Sept. 18, 2020), courts had warned as early as 2015 that relevant workers could be reclassified as employees, and employment law has traditionally been highly regulated.  And *California Grocers Association v. City of Long Beach*, 2021 WL 3500960, at *5 (C.D. Cal. Aug. 9, 2021), concerned a *temporary* grocery store "premium pay" law

---

[1]  The guidance considered by the state agency was not a commission cap.  *See* Opp. to RJN at 5.
[2]  The City also claims that certain statements in Plaintiffs' SEC filings show the Ordinance's foreseeability.  Dkt. 28 at 5–6.  But those statements refer to the general possibility of laws covering a myriad of Plaintiffs' business operations.  *See* Dkt. 30 at 26 (Grubhub's Prospectus statement); *id.* at 60, 131–32 (DoorDash Prospectus statement).  Plaintiffs did not forfeit their right to challenge unlawful legislation on all of those topics by disclosing the "risk" of future regulation.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS          CASE NO. 21-CV-05502-EMC

where "the parties could have foreseen additional regulation" in light of existing labor laws impacting grocery stores. Here, no prior regulation or court ruling rendered a *permanent* price control foreseeable. Moreover, governments have not traditionally regulated freely negotiated contracts between businesses in the restaurant industry. At minimum, Plaintiffs are entitled to a "more developed factual record" on the issues of reasonable expectations and degree of impairment. *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1563 (M.D. Ala. 1992).

Finally, the City argues that the at-will nature of Plaintiffs' contracts with restaurants undermines substantial impairment. Dkt. 28 at 7. But the City is unable to cite any case holding that at-will contracts are immune from Contract Clause protection, and the Fifth Circuit has expressly rejected that proposition. *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) (finding Contract Clause violation of at-will contract). The City's only case, *Lefrancois v. Rhode Island*, 669 F. Supp. 1204 (D.R.I. 1987), did not address whether an at-will contract can be substantially impaired; it assumed that a landfill law *did* substantially impair an at-will contract that had existed for less than a year where the State was "continuing regulation" of the landfill under a "comprehensive regulatory scheme." *Id.* at 1215. Here, Plaintiffs' "long-term" contracts generally last "several years," creating a reasonable expectation of long-term revenue streams. Dkt. 25 ¶¶ 28, 29. Further, no comprehensive regulatory scheme similar to *Lefrancois* exists here. *Id.* ¶¶ 30, 31.

### 2.     Step Two: The Ordinance Does Not Appropriately Or Reasonably Advance A Significant And Legitimate Public Purpose

Where, as here, a law substantially impairs contracts, courts turn to Step Two: the law's means and ends. *Sveen*, 138 S. Ct. at 1822. Laws fail Step Two when they are not "enacted to deal with a broad, generalized economic or social problem." *Spannaus*, 438 U.S. at 250; *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249–50 (3d Cir. 1987) (striking down law targeting a "narrow class" of businesses); *Tuttle v. N.H. Med. Malpractice Joint Underwriting Ass'n*, 992 A.2d 624, 647 (N.H. 2010) (same for law targeting "a discrete class of private parties").

Step Two is not equal to the rational basis test simply because the City is not a party to Plaintiffs' contracts. Dkt. 28 at 7. The Supreme Court has "never held" that the Due Process analysis is "coextensive" with the more "searching" Contract Clause analysis. *Pension Benefit Guar. Corp.*

*v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).  Citing *Pension Benefit*, the Eighth Circuit recently held that even when the government is not a contracting party, proper judicial deference does not mean "accepting the State's assertion of a sufficient public purpose without a stronger showing," which "would come perilously close" to the rational basis test.  932 F.3d at 734.  In *AEM*, the court emphasized the law's absence of "well-supported findings" and held that "[s]tatements in the legislative history" about purported public benefits "are insufficient:" "Special-interest groups cannot establish . . . a broad societal interest" simply by pointing to "testimony . . . about a law's conceivable public benefits."  *Id*. at 733.  Indeed, "the Contract Clause demands more than incidental public benefits."  *Id*.  The law in *AEM* failed Step Two because it narrowly focused on restricting manufacturers' contract rights to "primarily benefit a particular economic actor in the farm economy."  *Id*.

Similarly, the Second Circuit recently reversed the trial court's dismissal of a complaint challenging a New York City law that impaired personal-liability guaranties on commercial leases. *Melendez*, 2021 WL 4997666.  In *Melendez*, the city claimed its law was necessary to "help shuttered small businesses survive the pandemic … , ensuring functioning neighborhoods throughout the City." *Id*. at *37.  But the Second Circuit performed a searching review of the record and noted, among other things, City Council hearing statements "suggest[ing] a certain hostility to landlords and sympathy for small business owners," the lack of any requirement in the law that small businesses receiving the relief actually remain open after the pandemic, and the City Council's failure to "review … any empirical evidence" or consider the "hundreds of billions" of dollars the federal government had recently provided to small businesses.  *Id*. at *34, *40.  Those facts "weigh[ed] heavily" against the City's "professed public purpose," and the Second Circuit concluded that "the matter cannot be decided in favor of [the city] as a matter of law on a motion to dismiss."  *Id*. at *41.

As in *AEM* and *Melendez*, Plaintiffs here adequately allege that the Ordinance does not further a significant and legitimate public purpose, and it was enacted to benefit a special-interest group as opposed to the general public.  Because the Ordinance creates a ***permanent*** price control that does not address any temporary emergency, the City must overcome a "searching" and "discerning inquiry" into the Ordinance's purpose.  *AEM*, 932 F.3d at 731, 734; *Home Building & Loan Ass'n*

*v. Blaisdell*, 290 U.S. 398, 440 (1934) (although some temporary emergency laws are permitted to impair contracts under the government's police power "where vital public interests would suffer," courts should ask "whether the emergency still exists"); *Am. Fed. of State, Cnty. & Mun. Emps. v. City of Benton*, 513 F.3d 874, 882 (8th Cir. 2008) (law violated Contract Clause because while the city "offered testimony . . . to suggest that the [law] was a matter of economic necessity," they never showed that the city "faced the 'unprecedented emergency' required to justify" impairing contracts).

The City fails that discerning inquiry.  The Ordinance's intent is to tilt the competitive landscape between third-party platforms and restaurants in restaurants' favor simply because the City perceives a decline in restaurants that "coincides" with the rise of platforms.  S.F. Admin. Code § 5300(d).  But coincidence is not causation.  And Plaintiffs allege numerous unregulated factors, like soaring wholesale prices and rent, that have caused (not coincided with) challenges to the City's restaurant industry.  Dkt. 25 ¶¶ 25, 58.  And even if third-party platforms did contribute to a decline of the restaurant industry (and they did *not*), that still would not justify permanent price controls on third-party platforms.  The Constitution prohibits a city from impairing contracts simply because it finds that one industry is in decline and it wishes to reverse that trend.  *See HRPT Properties Tr. v. Lingle*, 715 F. Supp. 2d 1115, 1140 (D. Haw. 2010) (law revising rents violated Contract Clause because adjusting balance of power between a specific group of lessors and lessees "is not a legitimate aim of any statute that substantially impairs an existing contract"); *AEM*, 932 F.3d at 733.[3]

---

[3]  Cases relied on by the City to the contrary—*Cal. Build. Indus. Ass'n v. City of San Jose*, 61 Cal. 4th 435 (2015), *Hernandez v. City of Hanford*, 41 Cal. 4th 279 (2007), and *San Francisco Taxi Coal. v. City & County of S.F.*, 979 F.3d 1220 (9th Cir. 2020)—did not involve a Contract Clause claim.  Two cases analyze land-use zoning—long an area of regulation based on a city's "authority to regulate the development and use of real property within its jurisdiction."  *Cal. Build. Indus.*, 61 Cal. 4th at 456.  *Hernandez* upheld a zoning law because it preserved the character of a historic commercial district and was "aimed at regulating where, within the city, a particular type of business may be located, a very traditional zoning objective."  41 Cal. 4th at 298.  The Ordinance, in contrast, is a first-of-its-kind government intervention unconnected to real property or preserving any particular historic district.  *San Francisco Taxi Coalition* concerned a City policy favoring newer taxi medallion holders over long-time holders on the basis that more recent holders were more impacted by lower ridership.  The Ninth Circuit held that it is a legitimate government purpose to "mitigate the fallout of those most affected by a shift in the market."  979 F.3d at 1225.  But the economic aid came *from the government*, not forced subsidization by private business.  *Northwest Grocery Association v. City of Seattle*, 2021 WL 1055994, at *8 (W.D. Wash. Mar. 18, 2021), concerned a temporary hazard pay requirement for grocery stores where the plaintiff did not identify any impaired contractual provision.  *Cycle City, Ltd. v. Harley-Davidson Motor Co.*, 81 F. Supp. 3d 993, 1011 (D. Haw. 2014), concerned the "heavily regulated" motor vehicle industry in a uniquely isolated state.

Gibson, Dunn & Crutcher LLP

At minimum, Plaintiffs are entitled "to develop the record" to show that they have helped the restaurant industry. *CDK Glob. LLC v. Brnovich*, 461 F. Supp. 3d 906, 923 (D. Ariz. 2020).

Rather than justify the Ordinance as a response to any emergency, the City argues that restaurants "play an important role in the vitality of communities and commercial districts." Dkt. 28 at 8.[4]  But none of the City's cases holds that a city can fix prices between private businesses based on the possibility that it might improve neighborhood vitality.  Not every conceivable public purpose satisfies Step Two—indeed, cities may not "impose unnecessary and unreasonable restrictions" upon businesses "under the guise" of the public welfare.  *State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners*, 40 Cal. 2d 436, 441 (1953); *HRPT*, 715 F. Supp. 2d at 1139 (striking down rent revisions because adjusting balance of power between a specific group of lessors and lessees "is not a legitimate aim of any statute that substantially impairs an existing contract"); *Kazas*, 22 Cal. App. 2d at 174, 178 (striking down price floor for barbershops, which were not "affected with a public interest" despite barbers' "wide unemployment"); *AEM*, 932 F.3d at 731 (rejecting that "serving farmers and rural communities" was legitimate public purpose because "the mere assertion of a conceivable public purpose is insufficient to justify" substantial impairment).

Further, the Ordinance is not reasonably designed to revitalize the City's commercial district because it is not limited to restaurants in any specific district, and it targets *delivery*, which restaurants can do from anywhere, incentivizing them to *leave* the high-rent commercial district.  *See HRPT*, 715 F. Supp. 2d at 1139 (law was not reasonably designed to keep small businesses in "urban center" because it targeted only a specific type of long-term lease that would not affect most small businesses); *Melendez*, 2021 WL 4997666, at *37 (law meant to help tenants reopen after pandemic was unreasonable because it did not ensure those who received relief would ever reopen).  The Ordinance merely transfers money from one business to another, assuming that restaurants will become more profitable and, in turn, promote community vitality.  But such logic is too attenuated for the law to be drawn in a reasonable way.  *Ross v. City of Berkeley*, 655 F. Supp. 820, 835–36 (N.D. Cal. 1987) (law seeking to promote a neighborhood permanently impaired contracts in an

---

[4] Even if the City had cited the pandemic, that would not justify this price-fixing law.  *See In re Kazas*, 22 Cal. App. 2d 161, 171 (1937) ("The Constitution was adopted in a period of grave emergency," and its "limitations" on States' power "are not altered by emergency.")

Gibson, Dunn &
Crutcher LLP

"unreasonably overbroad and ill-tailored" way to further a "limited" public purpose); *Melendez*, 2021 WL 4997666, at *37 (law that "transferred the burden to the 'few shoulders' of commercial landlords" was unreasonable).  Under the City's reasoning, wealth transfers from large businesses to smaller ones would never violate the Contract Clause, because they could always be justified as helping local communities.  But the Contract Clause "must . . . impose *some* limits" on the City's power to abridge existing contracts.  *Spannaus*, 438 U.S. at 242.  The Ordinance exceeds those limits here, where it likely will harm the restaurants it intends to help, Dkt. 25 ¶¶ 65–66, 80–82, and it "is a wholly unreasonable way to protect [them]."  *HRPT*, 715 F. Supp. 2d at 1139.

Finally, the 15% cap is arbitrary and unreasonable.  Dkt. 25 ¶¶ 72, 82, 90–91, 119.  Restaurant commissions cover a host of services, e.g., marketing, order taking, technology and product development, payment processing, payment of delivery couriers, and customer service.    Dkt. 25 ¶¶ 20, 119.  Plaintiffs cannot perform those services without adequate compensation. *Id.* ¶¶ 19, 80–82.  And a single price cap fails to account for differences between each platform's products and services, and the custom services for which restaurants pay.  *Id.* ¶¶ 26–29, 80–82; *cf. N.Y. State Land Title Ass'n, Inc. v. N.Y. State Dep't of Fin. Servs.*, 169 A.D.3d 18, 32 (1st Dep't 2019) ("*NYSLTA I*") ("no rational basis for capping fees for" services at a particular rate without appropriate legislative study, rendering the cap an "arbitrary, across-the-board percentage figure").[5]

## B.    Plaintiffs State A Claim For Violation Of The Takings Clause

The City may not take private property for public use without just compensation.  U.S. Const. amend. V; Cal. Const. art. I, § 19.  Plaintiffs allege that the City did so here.

As an initial matter, Plaintiffs' "contracts are property" under the Fifth Amendment.  *Lynch*,

---

[5]  The City claims that legislators could believe that "network effect[s]" "could lead to oligopoly or monopoly."  Dkt. 28 at 9 n.1.  The City cites no support for the novel idea that governments can impair contracts with post hoc rationalization of fear of a possible monopoly.  The City's case, *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007), concerns antitrust standing in a suit between two companies, and does not address the Contract Clause or government action.  Further, the City cites no appellate cases holding that the Contract Clause permits courts to consider hypothetical rationales with no basis in the record.  *Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 10 F.4th 905, 913 (9th Cir. 2021) (temporary eviction moratorium related to COVID-19); *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1051 n.9 (9th Cir. 2004) (highly regulated utility contracts avoided duplication of electrical suppliers); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987) (coal mining law's links to health and safety "were genuine, substantial, and legitimate").

292 U.S. at 579; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).   The City claims

otherwise, relying on *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986).  Dkt. 28 at

11.  But *Connolly* rejected the notion that "contractual rights are never property rights."  475 U.S. at

224.  Rather, *Connolly* held that not every contract-impairing law results in a taking because private

contracts cannot defeat a law that "is otherwise within the powers of Congress."  *Id.*; *see also Lynch*,

292 U.S. at 580 (despite "great need of economy" and "the hope of relieving widespread distress,"

neither "the police nor any other power" authorized Congress to repudiate certain contracts).[6]

  *Connolly* "eschewed" a "set formula for identifying" when a contract-impairing law effects a

taking, 475 U.S. at 224, because the Takings Clause requires "essentially ad hoc, factual inquiries,"

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).  However, three factors

have "particular significance" in determining whether a contract-impairing regulation triggers the

Takings Clause: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which

the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of

the governmental action.'"  *Connolly*, 475 U.S. at 225 (quoting *Penn Central Trans. Co. v. N.Y. City*,

438 U.S. 104, 124 (1978)).  This analysis "can seldom be done on the pleadings," *McDougal v. Cty.

of Imperial*, 942 F.2d 668, 676 (9th Cir. 1991), and here Plaintiffs allege facts to support each factor.

  ***First***, starting with the Ordinance's character, the Ordinance nakedly shifts revenues from one

group of private businesses to another.   "[T]he Constitution forbids . . . taking of property when

executed for no reason other than to confer a private benefit on a particular private party."  *Hawaii

Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984).   A "purely private taking" violates the Takings

Clause's public use requirement and "serve[s] no legitimate purpose."  *Id.*  When a law "fails to meet

the 'public use' requirement or is so arbitrary as to violate due process, the inquiry ends."  *Lingle v.

Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).  Here, as Mayor Breed made clear, the Ordinance

does not advance the public good, but benefits a favored group of businesses. Dkt. 25 ¶¶ 7, 90, 105.

  The City argues that the Ordinance's character is acceptable because "[t]he City does not take

anything for its own use."  Dkt. 28 at 12.  But the government need not receive a benefit for a

---

[6]   The other cases cited by the City for this proposition are pre-*Connolly* circuit court decisions addressing the same statute *Connolly* interprets.  Dkt. 28 at 12.  None of the City's cases dispute that contracts can be property protected by the Takings Clause in appropriate circumstances.

contract to fall within the Takings Clause.  *See Lynch*, 292 U.S. at 580.  And the City's cases focus on the fact that the challenged regulations were otherwise "within [the government's] substantive powers," not whether the government itself obtained a benefit.  *See Pro-Eco, Inc. v. Bd. of Comm'rs*, 57 F.3d 505, 511 (7th Cir. 1995); *Connolly*, 475 U.S. at 224 (law was "otherwise within the power of Congress"); *Classic Cab, Inc. v. Dist. of Columbia*, 288 F. Supp. 3d 218, 229 (D.D.C. 2018) (law dealt with "a broad, generalized economic or social problem" in a "heavily regulated . . . industry").

The City next argues that Plaintiffs' ability to increase fees on consumers precludes a taking claim.  Dkt. 28 at 12–13 (citing *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1190–91 (9th Cir. 2012)).  But Plaintiffs have operated at a loss in San Francisco since the Ordinance went into effect and have been unable to recoup those losses.  Dkt. 25 ¶ 82.  And raising consumer fees or reducing the scope of services would still leave Plaintiffs *irreparably harmed*.  *Id.* ¶¶ 3, 82.  Under the law of supply and demand, raising consumer prices causes fewer orders, meaning that Plaintiffs would *not* fully recoup lost revenue.  *Id.* at ¶ 82; *United States v. Apple, Inc.*, 791 F.3d 290, 351 (2d Cir. 2015) (citing law of demand and rejecting argument that consumers would pay higher prices for same product).  Moreover, reducing services would likely harm Plaintiffs' reputation and goodwill and, unlike in *Laurel Park*, Plaintiffs cannot revamp their platforms into other uses.  Dkt. 25 ¶ 82.

***Second***, the Ordinance imposes economic harm on Plaintiffs, which have operated at a loss in San Francisco since the Ordinance went into effect and which have not recouped all the revenue lost due to the Ordinance.  Dkt. 25 ¶ 82.  The Ordinance would likely force Plaintiffs to (i) "renegotiate contracts with many restaurants" because Plaintiffs cannot cover the cost of providing existing services at a 15% commission rate, (ii) "scale back certain marketing and promotional services in the City," thus harming Plaintiffs' reputation and goodwill, (iii) "terminate contracts . . . and/or decline to enter into new contracts," and (iv) potentially raise consumer prices, further harming their goodwill.  *Id.*  In light of these "significant economic harms," "dismissal is inappropriate at this stage."  *Image Media Advert., Inc. v. City of Chi.*, 2017 WL 6059921, at *6 (N.D. Ill. Dec. 7, 2017).

The City argues this harm is not enough because the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking."  Dkt. 28 at 13 (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993)).

But *Concrete Pipe* and the cases it cited all weighed economic harm against the public benefit, in the context of otherwise lawful government action. 508 U.S. at 644–45. Here, the Ordinance harms the public welfare. *See* Dkt. 25 ¶ 81. And Plaintiffs do not allege merely that their profits would be diminished; they allege they cannot cover the costs of their current services at only a 15% commission, thus likely forcing them to "renegotiate" or "terminate" their contracts. *Id.* ¶ 82.[7]

**Third**, the Ordinance severely interferes with Plaintiffs' investment-backed expectations. Plaintiffs' expectation that their original commission rates would return after the public-health emergency was reasonable. Dkt. 25 ¶ 85. Plaintiffs' platforms were not historically regulated, *id.* ¶¶ 5, 30, 31; Plaintiffs relied on fixed commissions before the Ordinance, *id.* ¶ 85; Plaintiffs cannot cover their costs at a 15% rate, *id.* ¶ 82; and a permanent cap is unprecedented, *id.* ¶¶ 1, 69.

The City disputes Plaintiffs' investment-backed expectations on the bases that Plaintiffs' contracts are at-will and Plaintiffs knew of an ongoing public debate over commission rates. Dkt. 28 at 13–14. But the Constitution protects at-will contracts, *United Healthcare*, 602 F.3d at 628, and Plaintiffs' contracts often provide "several years" of revenue streams, Dkt. 25 ¶¶ 28, 29. The City cites no case law suggesting that public debate about changes to existing law lessen contracting parties' expectations. This is especially true when the parties executed their contracts *before* any public debate. *See* Dkt. 25 ¶ 31. Under the City's theory, a government could end-run the Contract and Takings Clauses simply by initiating public debate on a topic—such as price controls—and then introducing legislation months later. That is not, and should not be, the law, especially where, as here, there is no basis for the government to interfere in a private business relationship.[8]

---

[7] The City's first case regarding economic impact, *MCH Financial L.P. v. City of San Rafael*, 714 F.3d 1118 (9th Cir. 2013), went to trial and concerned "a slight modification" to a rent control law in the mobile home industry. *Chang v. United States*, 859 F.2d 893 (Fed. Cir. 1988), concerned foreign employment contracts subject to changes in foreign relations. In *Taylor v. United States*, 959 F.3d 1031 (Fed. Cir. 2020), the plaintiff and a third party contracted for an easement option. The third party did not exercise that option based on informal government statements. *Id.* at 1087. Here, the City affirmatively rewrote Plaintiffs' contractual commission rights.

[8] The City's cases do not help it. *Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 856 (N.D. Iowa 2006), held that investment-backed expectations favored neither party, that lottery contracts were highly regulated, and that the State was free to terminate the lottery license at any time. *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015), concerned mobile home rent control and included an upward adjustment mechanism. *Nekrilov v. City of Jersey City*, 2021 WL 1138360, at *13–14 (D.N.J. Mar. 24, 2021), upheld limits on short-term rentals in a "regulated field," where rentals were permitted only with "significant qualifications."

Because every *Penn Central* factor favors a finding of a taking, the City must provide just compensation to Plaintiffs.  *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003).  The City has not done so.  Dkt. 25 ¶¶ 55–61, 103.  Therefore, Plaintiffs stated a Takings Clause claim.

**C.      Plaintiffs State A Claim For Violation Of San Francisco's Police Power**

Under Article I, Section 7 of the California Constitution, the City may exercise police power to "promot[e] the public health, safety, morals and general welfare."  *Kazas*, 22 Cal. App. 2d at 165.  The City exceeds its police power where a law does not "promote the welfare of the general public as contrasted with that of a small percentage . . . of the citizenry." *Id.* at 172–73; *see Energy Reserves*, 459 U.S. at 412 (contrasting police power with "providing a benefit to special interests").

Here, lawmakers' statements confirm the Ordinance's intent to shift revenues to restaurants, protect those restaurants from competition, and retaliate against Plaintiffs.  Dkt. 25 ¶¶ 40, 64–70, 163–65.  California courts have long struck down similar ordinances that attempt to protect favored economic actors, even when those actors were struggling.  For example, *Kazas* struck down a price floor for barbershop services that was not intended for the "general welfare"—rather, it "concern[ed] itself with the welfare of a small group within a class."  22 Cal. App. 2d at 174.  Similarly, the California Supreme Court struck down a price floor for dry cleaning services because the public welfare was a "guise" for "unnecessary and unreasonable restrictions." *Thrift-D-Lux*, 40 Cal. 2d at 441.  The price floor did not "provid[e] for the public health, safety, morals, or general welfare," but protected "only a small segment of the general public." *Id.* at 447–48; *see Justesen's Food Stores v. City of Tulare*, 12 Cal. 2d 324, 329 (1938) (public health justification for law limiting store hours was a "guise" to shut down grocery stores while leaving other vendors exempt); *New York v. Cohen*, 5 N.E.2d 835, 835 (N.Y. 1936) (striking down law because its purpose was to favor real estate values in a particular section of the city, which "bears no relation to the welfare of the public").

More recently, a court refused to dismiss a police power claim where the plaintiff alleged that zoning laws were "wholly arbitrary, not in furtherance of any legitimate governmental purpose," and bore no "reasonable relationship either to the ends sought . . . or to the public health, safety, morals, or welfare," but rather were "designed to protect the economic interests of the owners and operators of existing retail stores by protecting them from the competition of large retailers." *Great Atl. & Pac.*

*Tea Co. v. Town of E. Hampton*, 997 F. Supp. 340, 347–48 (E.D.N.Y. 1998).  So too here.  Dkt. 25 ¶ 3 (alleging Ordinance's "economic protectionism"), ¶ 40 (Mayor Breed stating that cap's purpose was to "protect[]" restaurants), ¶ 64 (same explanation for removing Ordinance's sunset date).

The City provides a number of rationales the legislature might have had in mind in passing the Ordinance, such as the unsupported possibility that Plaintiffs are "oligopolistic."  Dkt. 28 at 15.  But none of those rationales appear in the Ordinance or legislative history.  And laws that purport to be for the public good must have a "real and substantial relation" to the "legitimate police power objective."  *Thrift-D-Lux Cleaners*, 40 Cal. 2d at 441.  The City's post hoc rationalizations cannot save the Board's silence on whether third-party platforms actually form an oligopoly that harms restaurants, or whether restaurants were harmed by factors outside of third-party platforms.  Dkt. 25 ¶ 72.  In fact, far from being oligopolistic, the third-party platform industry is competitive, and restaurants are free to contract (or not) with platforms.  *Id.* at ¶¶ 5, 6, 16–21, 26–30.  Government action disconnected from the actual facts lacks a substantial relationship to the general welfare and is not a legitimate exercise of police power.  If the alleged oligopoly "does not exist . . . this rationale cannot justify the [Ordinance]," and the "theory presented by the City is fundamentally flawed."  *Adamson Companies v. City of Malibu*, 854 F. Supp. 1476, 1486 (C.D. Cal. 1994) (rejecting claim of a "monopoly-driven power disparity" as a justification for an "onerous" regulatory scheme because the city did not investigate the relevant market); *see also NYSTLA I*, 169 A.D.3d at 32 (rate setting without "empirical documentation, assessment and evaluation" lacked rational basis).[9]

Moreover, the Ordinance does nothing to protect consumers from alleged oligopolistic practices that California's Cartwright Act, Unfair Trade Practices Act, and Unfair Competition Statute do not "already police[]."  *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013) (law lacked rational basis because it "add[ed] nothing" to existing laws "to protect consumers").  By forcing Plaintiffs to operate at a loss and likely requiring them to increase consumer fees and/or reduce services, the Ordinance in fact *undermines* the general welfare.

---

[9]   Moreover, Plaintiffs have the right to prove that the "constitutional facts" the City proffers to justify the Ordinance do not exist.  *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 160 (1976) (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938)).

1   **D.      Plaintiffs State A Claim Under The Due Process And Equal Protection Clauses**

2        Under the Due Process Clause, a law depriving Plaintiffs of property must rationally relate to

3   a legitimate legislative purpose.  U.S. Const. amend. XIV; Cal. Const. art. I, § 7;  *In re Levenson*, 560

4   F.3d 1145, 1149 (9th Cir. 2009).  Similarly, laws that treat groups differently must rationally relate to

5   a legitimate end.  U.S. Const. amend. XIV; Cal. Const. art. I, § 7; *Romer v. Evans*, 517 U.S. 620, 631

6   (1996).   Laws also "must find some footing in the realities of the subject addressed by the

7   legislation."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590 (9th Cir. 2008).  The Ordinance

8   violates due process and equal protection for at least three reasons.

9        ***First***, the Ordinance requires one set of businesses to subsidize another set of businesses—

10  which is not a legitimate government objective.  *See Merrifield v. Lockyer*, 547 F.3d 978, 992 n.15

11  (9th Cir. 2008) ("economic protectionism for the sake of economic protectionism is irrational" and

12  "cannot be said to be in furtherance of a legitimate governmental interest"); *Kazas*, 22 Cal. App. 2d at

13  167, 173; *Thrift-D-Lux*, 40 Cal. 2d at 448 (price-fixing law violated due process); *Twin City Candy &*

14  *Tobacco Co. v. A. Weisman Co.*, 276 Minn. 225, 233 (1967) (price floor violated due process because

15  "the welfare of [a particular] trade" is not a legitimate governmental interest).

16       ***Second***, the Ordinance's 15% cap is arbitrary and utterly unsupported.  Neither of the

17  purported "findings" in support of the 15% cap—that "leading" third-party platforms charge 10% for

18  "delivery services" and "report high profit margins from all aspects of their business operations"—

19  have any evidentiary support.  To the contrary, Plaintiffs are operating at a loss in San Francisco and

20  have not recouped revenue lost as a result of the Ordinance.  Dkt. 25 ¶ 82.  There is no "rational basis

21  for capping fees" where, as here, no evidence suggests that parties subject to the regulation will "be

22  adequately compensated."  *NYSLTA I*, 169 A.D.3d at 32; *N.Y. State Ass'n of Counties v. Axelrod*, 78

23  N.Y.2d 158, 167–68 (1991) (state "recalibration regulation" that reduced Medicare reimbursement

24  rates lacked "any record evidence to support [the state's] supposition" that the regulation was

25  needed).  Without "further 'empirical documentation, assessment and evaluation," the cap is "based

26  on an 'arbitrary, across-the-board percentage figure' . . . 'so lacking in reason . . . that it is essentially

27  arbitrary.'"  *NYSLTA I*, 169 A.D.3d at 32; *see Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir.

28  1990) (finding triable issues of fact undermining government's justification of water shortage);

*Kazas*, 22 Cal. App. 2d at 165 (noting city's lack of "investigation of any condition of unemployment in the barber trade in Bakersfield, its need of the ordinance or the effect of the enactment on barbers, their patrons or the general public").   Due process prohibits such arbitrary action, *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), and equal protection does not allow irrational classifications, *Merrifield*, 547 F.3d at 991; *Winston v. City of Syracuse*, 887 F.3d 553, 563 (2d Cir. 2018).

     ***Third***, the Ordinance arbitrarily caps the rate Plaintiffs can charge for their entire suite of services—including marketing, technology and product development, customer support, and payment processing (Dkt. 25 ¶¶ 58, 123)—because Plaintiffs also operate "third-party food delivery services." The Ordinance does not regulate what *other* companies can charge restaurants for those same services.   The Ninth Circuit overturned a similarly irrational classification in *Merrifield*, where the state exempted some pest controllers from licensing requirements but did not exempt others.   547 F.3d at 988.   The government justified the distinction on the fact that the regulated controllers might encounter pesticides, but the court found no reason to believe exempt controllers were less likely to encounter pesticides than non-exempt controllers.   *Id.* at 991.   The court struck down the law because "while a government need not provide a perfectly logical solution to regulatory problems, it cannot hope to survive rational basis review by resorting to irrationality."   *Id.*; *see Lazy Y Ranch*, 546 F.3d at 590 (plaintiffs stated Equal Protection claim where government's rationale in rejecting land use bids did not "offer a basis for treating [plaintiffs] differently from other bidders"); *Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002) (law requiring casket retailer licenses could not be justified by required grief training because "survivors must deal with a panoply of vendors in order to make funeral arrangements. . .  none of whom is required to have this psychological training"); *Santos v. City of Houston*, 852 F. Supp. 601, 608 (S.D. Tex. 1994) (invalidating law excluding "jitneys . . . from operating on city streets, while numerous other forms of similarly situated business entities providing ground transportation" operated "without restriction"); *Justesen's Food Stores*, 12 Cal. 2d at 329 (plaintiffs stated Equal Protection claim where law did not apply to similarly situated venders).

     The City argues that Plaintiffs differ from nonregulated companies, speculating that third-party platforms use "disproportionate leverage" to impose high fees for *delivery* services.  Dkt. 28 at 17–20.  But no evidence suggests that third-party platforms charge above-market prices for *other*

Gibson, Dunn & Crutcher LLP

services, including marketing, technology and product development, customer support, and payment processing.  Nor did the City study whether other companies that provide those same services to restaurants—like Google, which provides marketing services (Dkt. 25 ¶ 58)—lack market power and charge lower fees.  Rather, the City drew an arbitrary line between third-party platforms and other companies that offer similar services, and capped prices on one group of companies but not the other, without any investigation.  That violates equal protection.  *Merrifield*, 547 F.3d at 988.[10]

The City also argues that Plaintiffs are not an unpopular group subject to animus.  Dkt. 28 at 17–20.  But that is not required to bring an Equal Protection claim.  In any event, Board members called Plaintiffs "modern-day robber barons" who tried to "buy democracy," "exploit[ing] their employees for profit" and supporting "slave labor."  *Id.*  ¶ 47.  These statements go beyond disagreement with Plaintiffs and show the Ordinance was motivated by animus.  *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018); *Animal Legal Def. Fund v. Otter*, 118 F. Supp. 3d 1195, 1210 (D. Idaho 2015), *aff'd in relevant part* (finding animus where legislators called plaintiffs "terrorists" and "invading marauders" and accused plaintiffs of illicit motives); *Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020) ("contemporary statements" can show animus).[11]

Finally, the City argues that Plaintiffs can recoup some of their losses from consumers, and thus the Ordinance is not "confiscatory" under the Due Process Clause.  Dkt. 28 at 16 (citing *TCF*

---

[10]  The City cites *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137 (9th Cir. 2004), and *TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011), to justify its different treatment of similarly situated vendors and platforms. Dkt. 28 at 18–19.  But even under rational basis review, the City "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1066 (9th Cir. 2014).  Plaintiffs allege they are similarly situated to other third-party vendors and the City's distinction is arbitrary, Dkt. 25 ¶¶ 58, 72, 78, 79, 145–51, and should be allowed "to rebut the facts underlying defendants' asserted rationale" for the Ordinance.  *Lazy Y Ranch*, 546 F.3d at 590–91.

[11]  The City's cases on animus are inapt.  *Hernandez*, 41 Cal. 4th at 302, went to trial.  *Thornton v. City of St. Helens*, 425 F.3d 1158 (9th Cir. 2005), was decided on summary judgment.  *Hotel & Motel Asssociation of Oakland v. City of Oakland*, 344 F.3d 959 (9th Cir. 2003), relied on "direct links between the legislative findings and the scope of the ordinances" that differentiated between businesses.  *Litmon v. Harris*, 768 F.3d 1237 (9th Cir. 2014), involved a violent sexual predator seeking similar treatment to other convicts.  In *Desoto CAB Co. v. Picker*, 228 F. Supp. 3d 950 (N.D. Cal. 2017), the plaintiffs did not specifically allege any facts supporting animus.  In *United States v. Wilde*, 74 F. Supp. 3d 1092 (N.D. Cal. 2014), the plaintiffs submitted no evidence of animus at the summary judgment stage.  *Olson v. California* involved a preliminary injunction motion and found plaintiffs had not shown the statute served "no legitimate governmental purpose."  2020 WL 905572, at *9 (C.D. Cal Feb. 10, 2020).  Plaintiffs, in contrast, adequately allege the Ordinance serves no legitimate governmental purpose.

643 F.3d 1158).  But increasing consumer fees will likely reduce order volume, *id.* ¶ 3, and harm "Plaintiffs' reputation and goodwill," *id.* ¶ 82.  Thus, *TCF* favors Plaintiffs because it held that "the heart of any confiscatory-rate claim is the ability to show that the government has set a maximum price for a good or service and that the rate is below the cost of production (factoring in a reasonable rate of return)."  643 F.3d at 1164.  That is what Plaintiffs allege here: they are operating at a loss under the Ordinance.  Dkt. 25 ¶ 82.

The City also argues that a 15% cap is not confiscatory because Plaintiffs may have other revenue streams and do not need an adjustment mechanism on a percentage-based cap.  Dkt. 28 at 16–17.  But the City cannot force a company to operate one part of its business at a loss simply because it might have other revenue streams.  *See Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 707 (D.C. Cir. 1988) (even highly regulated companies that owe a public duty "cannot be compelled to carry on even a branch of business at a loss").  Moreover, Plaintiffs cannot cover the costs of their full services at a 15% rate.  Dkt. 25 ¶¶ 27, 29, 82.  And the City cannot seriously contend that Plaintiffs must depend on restaurants raising prices in the future to maintain their own profitability.[12]

## E.    DoorDash State A Claim For Violation Of The First Amendment

To state a claim for retaliation under the First Amendment, a plaintiff must plead facts showing: (1) "he engaged in activities protected by the First Amendment"; (2) "[a]s a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) "[t]here was a substantial causal relationship between the constitutionally protected activity and the adverse action."  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  DoorDash alleges facts supporting all three elements.

***First***, it is undisputed DoorDash's public support for Proposition 22 was protected by the First Amendment. Dkt. 25 ¶ 46; *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016) (protected activities include donating money and distributing elections material).

---

[12]  The City cites *Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012), but that case involved procedural due process.  *Brown v. Hovatter*, 561 F.3d 357 (4th Cir. 2009), upheld a funeral-home licensure requirement because it is rational to find a public benefit in ensuring competence through licensure.  There are no such competence concerns here.  The City's citation to the "total effect of the rate order" in *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989), is misguided, as the Court there addressed utility rates, where a reasonable rate order included a right to a fair rate of return.

*Second*, DoorDash alleges that, as a result of its protected activities, it was subjected to adverse action that would chill a person of ordinary firmness from continuing its protected activity. There is "a wide variety of conduct that impermissibly interferes with speech." *Ariz. Students' Ass'n*, 824 F.3d at 868. Just one week after Proposition 22 passed, the City enacted the then-temporary Ordinance capping Plaintiffs' commissions and cutting their revenue. Dkt. 25 ¶¶ 55–61, 82. Such financial impact would chill any ordinary company's public advocacy. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 928 (9th Cir. 2004) (plaintiff's loss of contracts on which it was the lowest bidder created genuine factual dispute on reasonable likelihood of deterrence).

The City argues that "a corporation of ordinary firmness would not be deterred" because "DoorDash worked to pass Proposition 22 notwithstanding public information that legislation that could cap its commissions was under consideration." Dkt. 28 at 21. But this inquiry is objective—the question is "whether the alleged retaliation would chill a person of ordinary firmness from continuing to engage in the protected activity." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019) (quotation marks omitted). Rewriting thousands of contracts plausibly chills an ordinary person from engaging in protected activity. The City cites the dismissal of a retaliation claim in *Fortune Players Group, Inc. v. Quint*, but the only adverse action alleged was that the defendant amended a filing in ongoing litigation and reviewed plaintiff's license application. 2016 WL 7102735, at *5 (N.D. Cal. Dec. 6, 2016). The court found that the defendant, which was tasked with reviewing license applications and "started to process that application," had not taken adverse action. *Id.* at *6. Here, rather than take routine action, the City passed a first-of-its-kind law expressly intended to ***permanently*** shift revenues from platforms to restaurants.

*Third*, DoorDash alleges a substantial causal relationship between its protected activity and the Ordinance. Multiple Supervisors publicly opposed Proposition 22 and called Plaintiffs and other third-party platforms "modern-day robber barons" who were trying to "buy democracy" by promoting Proposition 22. Dkt. 25 ¶ 47. When making the Ordinance permanent in June 2021, at least one Supervisor directly referred to DoorDash's and other platforms' advocacy for Proposition 22. *Id.* ¶ 69. This creates a plausible claim of a substantial causal relationship. *See Ariz. Students' Ass'n*, 824 F.3d at 871 (finding causation where board members stated that their action resulted from

plaintiffs' advocacy for a bill, and criticized plaintiffs' support of the bill).

The City argues that the passage of the then-temporary Ordinance a week after Proposition 22 passed does not prove causation because the removal of the sunset provision in June 2021 is the alleged retaliatory act. Dkt. 28 at 21. But DoorDash alleges that the Board's actions in November 2020 *and* June 2021 were retaliatory. Dkt. 25 ¶ 165. Both actions fall within the "three-to-eight-month time range" that "'easily' supports an inference of retaliation." *Alpha Energy Savers*, 381 F.3d at 929. The City's reliance on *Huskey v. City of San Jose*, 204 F.3d 893 (9th Cir. 2000), is misplaced as it was decided on summary judgment and, other than the timing of events, the plaintiff submitted no evidence of substantial causation. *Id.* at 900. In contrast, DoorDash alleges the City knew of and connected DoorDash's support of Proposition 22 to the Ordinance's enactment. Dkt. 25 ¶¶ 46–47, 69–70; *see Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979–80 (9th Cir. 2002) (defendant's "expressed opposition to the speech" is relevant circumstantial evidence).

The City also argues that there is no substantial causation because "there is only a partial overlap between the supporters of Proposition 22 and companies that are impacted by the Ordinance." Dkt. 28 at 22. But government action can be retaliatory even if it impacts more parties than just the object of the retaliation. *See Koala v. Khosla*, 931 F.3d 887, 906 (9th Cir. 2019) (denying motion to dismiss where university acted against all student organizations, including plaintiff, where plaintiff alleged the action was motivated by its protected activity).

Finally, the City argues that "statements by individual legislators do not establish the motivation of the legislative body as a whole." Dkt. 28 at 23. But none of the City's cases address a motion to dismiss or a First Amendment retaliation claim. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) (upholding conviction under a statute that defendant alleged restricted speech); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (mandamus review of discovery order); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (affirming summary judgment for defendant). In fact, the Ninth Circuit has held that board members' criticism of plaintiffs' support for a law "sufficiently identif[ies] [defendant's] retaliatory intent and the nexus between the board's intent and its later [actions]" and, as a result, plaintiffs "pleaded a plausible claim for First Amendment retaliation." *Ariz. Students' Ass'n*, 824 F.3d at 871. In any event,

1   questions of motive in retaliation suits "normally should be left for trial." *Ulrich*, 308 F.3d at 979.[13]

2   **F.    If The Court Grants Any Part Of The City's Motion, It Should Grant Leave To Amend**

3   The Court should deny the City's motion in full.  But if it does not, it should grant leave to

4   amend.   Courts should freely give leave to amend "when justice so requires."  Fed. R. Civ.

5   P. 15(a)(2). This policy favoring amendments should be applied with "extreme liberality." *Eldridge*

6   *v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987) (quotation marks omitted).  Thus, amendment should

7   be permitted absent undue delay, bad faith, a "dilatory motive," repeated previous failures to cure

8   deficiencies, undue prejudice, or futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

9   Nonetheless, the City seeks an order of dismissal without leave to amend.  Dkt. 28 at 24

10  (asserting futility).  But its cases do not support departing from the standard practice of permitting

11  amendment—some do not discuss amendment at all, and none concern any constitutional violations

12  alleged in this case except for Equal Protection.[14]  To the extent the Court finds that Plaintiffs failed

13  to state a claim on any cause of action, they respectfully request leave to amend. *See, e.g.*, *Vinatieri*

14  *v. Mosley*, 787 F. Supp. 2d 1022, 1031 (N.D. Cal. 2011) (granting leave to amend rational-basis

15  Equal Protection claim); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988)

16  (reversing denial of leave to amend an Equal Protection claim based partly on rational-basis review).

## <u>CONCLUSION</u>

18  The Court should deny the City's motion to dismiss.  If the Court grants any portion of the

19  City's motion, it should grant Plaintiffs leave to amend.

---

[13]   The City cites *Inman v. Hatton*, 2018 WL 1100959, at *5 (N.D. Cal. Mar. 1, 2018), to argue that a complaint must allege more than "'the allegedly retaliatory conduct followed several months after'" the protected activity.  Dkt. 25 at 21.  But DoorDash alleges that the City explicitly connected the Ordinance to its political advocacy.  Dkt. 25 ¶ 165. *Blair v. Bethel School District*—decided on summary judgment—was "not a typical First Amendment retaliation case" and involved a board member voted out of office by his peers.  608 F.3d at 543.  The court found that "more is fair in electoral politics than in other contexts." *Id.*  The City's actions here were not against a political rival; rather, the City enacted legislation singling out third-party platforms. Dkt. 25 ¶¶ 64–71. *Fraternal Order of Police Hobart Lodge Number 121, Inc. v. City of Hobart*, found no retaliation because the statute did not "single out particular individuals or groups."  864 F.2d 551, 554 (7th Cir. 1988).  Not so here.  Dkt. 25 ¶¶ 78–79, 145–47.

[14]  *See Reddy v. Litton Indus. Inc.*, 912 F.2d 291, 297 (9th Cir. 1990) (RICO standing); *Smith v. Pelican Bay State Prison*, 2016 WL 285062, at *1 (N.D. Cal. Jan. 25, 2016) (no constitutional right to watch television); *Desoto*, 228 F. Supp. 3d at 963–64 (no allegations suggesting animus, and consumer safety justified treating taxis differently from ride-hailing apps).

Gibson, Dunn &
Crutcher LLP

DATED:  November 5, 2021

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: /s/    Joshua S. Lipshutz
                    Joshua S. Lipshutz

Attorneys for Plaintiffs
DOORDASH, INC. and GRUBHUB INC.