1  DONALD B. VERRILLI, JR. (*pro hac vice*)
   Donald.Verrilli@mto.com
2  ELAINE J. GOLDENBERG (*pro hac vice*)
   Elaine.Goldenberg@mto.com
3  BRENDAN B. GANTS (*pro hac vice*)
   Brendan.Gants@mto.com
4  MUNGER, TOLLES & OLSON LLP
   601 Massachusetts Avenue NW
5  Suite 500E
   Washington, DC 20001
6  Telephone:  (202) 220-1100
   Facsimile:  (202) 220-2300
7
   JUSTIN P. RAPHAEL, SBN 292380
8  Justin.Raphael@mto.com
   MUNGER, TOLLES & OLSON LLP
9  560 Mission Street
   27th Floor
10 San Francisco, CA 94105
   Telephone:    (415) 512-4000
11 Facsimile:    (415) 512-4077

12 *Counsel for* Amici Curiae *Chamber of Commerce
   of the United States of America and California*
13 *Chamber of Commerce*

14

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                     SAN FRANCISCO DIVISION

18

19
   DOORDASH, INC. and GRUBHUB, INC.,          | Case No. 3:21-cv-05502-EMC
20
              Plaintiffs,                      | **BRIEF OF *AMICI CURIAE* CHAMBER
21                                             | OF COMMERCE OF THE UNITED
          vs.                                  | STATES OF AMERICA AND
22                                             | CALIFORNIA CHAMBER OF
   CITY AND COUNTY OF SAN                      | COMMERCE IN SUPPORT OF
23 FRANCISCO,                                  | PLAINTIFFS**

24            Defendant.                        | Judge:       Hon. Edward M. Chen
                                               | Courtroom.:   5
25
                                               | Hearing Date:  December 16, 2021
26

27

28
                                                        3:21-cv-05502-EMC

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE*................................................................................................1

INTRODUCTION.......................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.     THE ARBITRARY PRICE CONTROL ORDINANCE HARMS BOTH THE
PUBLIC AND THE RESTAURANTS IT PURPORTS TO HELP ....................................2

     A.     Government Price Controls Have Harmful, Counterproductive Effects....................2

     B.     This Ordinance Has The Harmful Effects Typical Of Government Price
Controls ...................................................................................................................5

II.    THE ORDINANCE IS UNLAWFUL BECAUSE IT DOES NOT PROMOTE THE
GENERAL WELFARE ...................................................................................................11

CONCLUSION .........................................................................................................................13

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ass'n of Equip. Manufacturers v. Burgum*,
  932 F.3d 727 (8th Cir. 2019)................................................................................12

*Nat'l Soc'y of Pro. Engineers v. United States*,
  435 U.S. 679 (1978) ...............................................................................................3

*Standard Oil Co. v. FTC*,
  340 U.S. 231 (1951) ...............................................................................................5

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ...............................................................................................2

**STATE CASES**

*Birkenfeld v. City of Berkeley*,
  17 Cal. 3d 129 (1976).........................................................................................12

*Doyle v. Bd. of Barber Examiners*,
  219 Cal. App. 2d 504 (1963)..............................................................................12

*In re Herrick*,
  25 Cal. App. 2d 751 (1938).................................................................................12

*In re Kazas*,
  22 Cal. App. 2d 161 (1937)............................................................................11, 12

*Massingill v. Dep't of Food & Agric.*,
  102 Cal. App. 4th 498 (2002)............................................................................12

*McKay Jewelers v. Bowron*,
  19 Cal. 2d 595 (1942)..........................................................................................11

*State Board of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc.*,
  40 Cal. 2d 436 (1953)......................................................................................11, 12

**OTHER AUTHORITIES**

Jeffrey H. Birnbaum, *Keep Prices Out of Control*, Fortune, June 25, 2001 ......................................3

Jordan Boesch, *Can Restaurants Make Delivery Efficient?  Employing Drivers vs.
  Not*, LinkedIn (June 17, 2020), https://www.linkedin.com/pulse/can-
  restaurants-make-delivery-efficient-jordan-boesch........................................................6

**TABLE OF AUTHORITIES**

**(Continued)**

Page(s)

Ike Brannon, *Price Caps on Food Delivery Apps Only Exacerbate Restaurant Revenue Problems in the Pandemic*, Forbes (Apr. 15, 2021), https://www.forbes.com/sites/ikebrannon/2021/04/15/price-caps-on-food-delivery-apps-only-exacerbate-restaurant-revenue-problems-in-the-pandemic/?sh=5af9bfc53312 ...................................................................................................10

Robert T. Deacon & Jon Sonstelie, *The Welfare Costs of Rationing by Waiting*, 27 Econ. Inquiry 179 (1989) .........................................................................................4

Deliverect, *3 Reasons Why Food Delivery is a Must-Have For Your Restaurant*, https://www.deliverect.com/us/blog/online-food-delivery/3-reasons-why-food-delivery-is-a-must-have-for-your-restaurant ...........................................................6

Rebecca Diamond, Tim McQuade & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 Am. Econ. Rev. 3365 (Sept. 2019) .....................................................4

Terrence Doyle, *Will Permanent Fee Caps Actually Rein in Delivery Apps?*, Eater (June 28, 2021), https://www.eater.com/22554053/delivery-fee-caps-doordash-ubereats-grub-hub-san-francisco ..............................................................................8

Joanna Fantozzi, *Will Delivery Still be King in a Post-COVID World?*, Restaurant Hospitality (Feb. 10, 2021), https://www.restaurant-hospitality.com/limited-service/will-delivery-still-be-king-post-covid-world ....................................................5

Laura Forman, *Big Apple Takes Bite Out of Food Delivery*, Wall St. J., Aug. 2, 2021, https://www.wsj.com/articles/big-apple-takes-bite-out-of-food-delivery-11627910300 ..................................................................................................................8

Laura Forman, *Food-Delivery Regulation is a Drama Worth Watching*, Wall St. J., Mar. 4, 2021, https://www.wsj.com/articles/food-delivery-regulation-is-a-drama-worth-watching-11614859201 ........................................................................9

Eric Fruits, *Uber/Grubhub: Pandemic Profiteering, Merger Moratoriums, and Rising Concentration . . . Or Not*, Truth on the Market (May 15, 2020), https://truthonthemarket.com/2020/05/15/uber-grubhub-pandemic-profiteering-merger-moratoriums-and-rising-concentration-or-not ...............................................5

Jenn Harris, *In Twist, Dozens of Los Angeles Restaurants Oppose Delivery App Fee Cap*, L.A. Times, May 18, 2020, https://www.latimes.com/food/story/2020-05-18/los-angeles-restaurants-oppose-delivery-app-fee-cap ............................................10

Alicia Kelso, *Uber Eats, Postmates Deploy Tiered Pricing Structures*, Restaurant Dive (Sept. 13, 2021), https://www.restaurantdive.com/news/uber-eats-postmates-deploy-tiered-pricing-structures/606427 ...................................................7

**TABLE OF AUTHORITIES**

**(Continued)**

Page(s)

Dave Lee, *Food Delivery Apps Stung by New York City Cap on Commissions*,
Financial Times, Aug. 27, 2021, https://www.ft.com/content/d63d4453-62e0-
40e8-a303-2ee483c1d792 .................................................................................8

Zhuoxin Li & Gang Wang, *Regulating Powerful Platforms: Evidence from
Commission Fee Caps in On-Demand Services* (June 22, 2021) (manuscript at
11), https://ssrn.com/abstract=3871514 ...........................................................10

Nancy Luna, *Grubhub Says Independent Restaurants are Losing Delivery Orders
Due to Mandated Caps on Commission Fees*, Nation's Restaurant News (May
7, 2020), https://www.nrn.com/delivery-takeout-solutions/grubhub-says-
independent-restaurants-are-losing-delivery-orders-due .....................................9

Fiona M. Scott Morton, *The Problems of Price Controls*, CATO Institute (June 20,
2001), https://www.cato.org/commentary/problems-price-controls .......................4

Richard F. Muth, *Redistribution of Income Through Regulation in Housing*, 32
Emory L.J. 691 (1983) ......................................................................................4

National Restaurant Ass'n, *State of the Restaurant Industry* (2021), https://
go.restaurant.org/rs/078-ZLA-461/images/2021-State-of-the-Restaurant-
Industry.pdf .......................................................................................................5

News, *The Impacts of Price Controls*, DoorDash (Apr. 8, 2021), https://
doordash.news/2021/04/08/the-impacts-of-price-controls..................................9

Preetika Rana & Heather Haddon, *DoorDash and Uber Eats are Hot.  They're Still
Not Making Money*, Wall St. J., May 28, 2021,
https://www.wsj.com/articles/doordash-and-uber-eats-are-hot-theyre-still-not-
making-money-11622194203 ......................................................................7, 8, 10

*Rent Control Backfires Again in St. Paul*, Wall St. J., Nov. 10, 2021 ............................4

Hugh Rockoff, *Price Controls*, Library of Economics and Liberty,
https://www.econlib.org/library/Enc/PriceControls.html ....................................3

Thomas Sowell, *Basic Economics: A Citizen's Guide to the Economy* (2000) ................3

Alec Stapp, *Price Controls Won't Fix What's Ailing the Restaurant Industry*,
Progressive Policy Institute (Feb. 2021), https://www.progressivepolicy.org/
wp-content/uploads/2021/02/PPI_Price-Controls-Restaurant-Industry.pdf ............3

Survey, *New Study Shows What Consumers Crave in a Food Delivery Service*, US
Foods, https://www.usfoods.com/our-services/business-trends/2019-food-
delivery-statistics.html ......................................................................................7

**INTEREST OF *AMICI CURIAE*[1]**

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The California Chamber of Commerce ("CalChamber") is a non-profit business association with over 13,000 members, both individual and corporate, representing virtually every economic interest in the state of California.  For over 100 years, CalChamber has been the voice of California business.  Although CalChamber represents several of the largest corporations in California, seventy-five percent of its members have 100 or fewer employees.  CalChamber acts on behalf of the business community to improve the state's economic and jobs climate by representing business on a broad range of legal, legislative, and regulatory issues.  CalChamber often advocates before federal and state courts by filing *amicus curiae* briefs in cases, like this one, involving issues of paramount concern to the business community.

**INTRODUCTION**

In enacting a provision capping at 15 percent the fees that certain platforms can charge restaurants for making use of third-party delivery workers (the "Ordinance"), San Francisco has imposed an arbitrary price control that aims to serve narrow private interests but will in fact damage everyone involved:  platforms, restaurants, consumers, and workers.

There has long been a consensus among economists that price caps have harmful, counterproductive effects—and that consensus has been borne out by empirical studies examining

---

[1] Neither of the *amici* associations is a subsidiary or affiliate of any publicly owned corporation. *Amici* affirm that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

1  the actual effects of price caps in various sectors of the economy.  Such caps negatively affect the

2  quantity and quality of the good or service as to which price is capped.  They also drive uncapped

3  prices higher, as businesses harmed by the cap try to recoup lost revenue and demand is pushed

4  towards uncontrolled market sectors.

5         The Ordinance at issue here—which is directed at an extremely competitive and dynamic

6  market—has already begun to have, and will continue to have, the very harmful effects that are

7  typical of price controls.  To stay viable, platforms will have to pass along costs to consumers in the

8  form of higher fees, and users of the platforms may suffer reductions in service quality, such as

9  longer wait times and a smaller delivery radius.  Those changes will reduce consumer demand,

10  leading to less revenue for restaurants and delivery drivers.  Among restaurants, the hardest hit will

11  be small independent local restaurants that cannot hire their own delivery staff and that depend on

12  the enhanced services provided by the third-party platforms to reach customers.  In short, the

13  Ordinance will harm, rather than help, the very restaurants that the City purports to be protecting,

14  while harming other market participants in the process.

15         Under California law, cities may not use their police power to enact price-related measures

16  that do not serve the general welfare—and the Ordinance decidedly does not.  The motion to dismiss

17  should be denied.

18                                          **ARGUMENT**

19  **I.    THE ARBITRARY PRICE CONTROL ORDINANCE HARMS BOTH THE
          PUBLIC AND THE RESTAURANTS IT PURPORTS TO HELP**
20

21      **A.    Government Price Controls Have Harmful, Counterproductive Effects**

22         At the heart of the American economic model is free choice for consumers and free

23  competition among producers and service providers for consumers' business.  The meeting point

24  for those economic participants is price, "the central nervous system of the economy."  *United States*

25  *v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

26         In a competitive market, the market price conveys crucial information about the intersection

27  of supply and demand.  The market price represents the price at which consumers (*e.g.*, diners) are

28  willing to buy; producers (*e.g.*, restaurants) are willing to sell; and service providers are willing to

1    facilitate those sales (*e.g.*, by making deliveries).  When market participants can select freely among

2    alternative offers, "all elements of a bargain," including not only price but also the quality of a

3    product or service, "are favorably affected."  *Nat'l Soc'y of Pro. Engineers v. United States*, 435

4    U.S. 679, 695 (1978).

5         Government price controls distort that process, with predictably negative results for all

6    involved.  One commentator has observed:  "Two words rarely appear in the same sentence:

7    economists and consensus.  But on the issues of price controls, they belong together," because "[t]he

8    famously divided profession agrees that government-imposed price caps generally don't work and,

9    in fact, only make matters worse."  Jeffrey H. Birnbaum, *Keep Prices Out of Control*, Fortune, June

10   25, 2001 at 36; *see also, e.g.*, Thomas Sowell, *Basic Economics:  A Citizen's Guide to the Economy*

11   29 (2000) (economists are in "virtually unanimous agreement that declines in product quantity and

12   quality are the usual effects of price controls"); Walter Block, Preface in *Rent Control:  Myths &*

13   *Realities* xiv (1981) ("[e]conomists who have researched [the] effects" of price controls for rent "are

14   virtually unanimous" that such controls are bad policy).

15        As economists have long explained, when the government caps the price of a good or service

16   below the market price, several negative consequences ensue.  The market responds by providing

17   less of that good or service, thereby creating shortages.  Producers and service providers also have

18   less incentive to invest in innovation, improvements, and quality control.  At the same time, the

19   entities whose revenue is depressed by the price cap generally (and rationally) attempt to recoup

20   their lost revenue from consumers by whatever means possible—for instance, through separate

21   charges that are not regulated by the price cap.  Eventually, those combined effects tend to push

22   demand toward uncontrolled market sectors, forcing prices there to rise faster than they otherwise

23   would.  *See* Hugh Rockoff, *Price Controls*, Library of Economics and Liberty,

24   https://www.econlib.org/library/Enc/PriceControls.html.  Thus, regardless of how well intentioned

25   price controls may be, they virtually always have harmful, counterproductive effects.  *See, e.g.*, Alec

26   Stapp, *Price Controls Won't Fix What's Ailing the Restaurant Industry* at 7-8, Progressive Policy

27   Institute (Feb. 2021) ("Progressive Policy Institute Report"), https://www.progressivepolicy.org/

28   wp-content/uploads/2021/02/PPI_Price-Controls-Restaurant-Industry.pdf.

That conclusion is borne out by a number of empirical studies evaluating the consequences of price-control measures imposed on various sectors of the economy.  For example, studies show that price controls on gasoline in the 1970s created shortages that resulted in long lines at the gas pump.  *See, e.g.*, Robert T. Deacon & Jon Sonstelie, *The Welfare Costs of Rationing by Waiting*, 27 Econ. Inquiry 179, 179 (1989).  Those controls also caused gas station owners to charge fees for previously free ancillary services, like window washing, to try to compensate for lost revenue.  *See id.*  In the end, price controls cost consumers more in wait time and other costs than consumers saved as a result of lower gas prices.  *See id.*

Similarly, one recent study looked at expanded rent-control measures adopted by San Francisco in the 1990s and found that those measures harmed everyone involved.  The city's expressed goal was to rein in rising housing costs and gentrification—but instead, expanded rent control *exacerbated* the problem, meaningfully contributing to the skyrocketing housing costs the city faced in the decades after adoption of the measures.  *See* Rebecca Diamond, Tim McQuade & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 Am. Econ. Rev. 3365, 3393 (Sept. 2019); *see also, e.g.*, Fiona M. Scott Morton, *The Problems of Price Controls*, CATO Institute (June 20, 2001) ("If government prevents firms from competing over price, firms will compete on whatever dimensions are open to them."), https://www.cato.org/commentary/problems-price-controls.  Expanded rent control slowed new construction; caused some landlords to exit the rental market (for example, by converting to condominiums); and ultimately pushed long-term housing prices higher as a result of decreased housing supply.  *See, e.g.*, Richard F. Muth, *Redistribution of Income Through Regulation in Housing*, 32 Emory L.J. 691, 695 (1983).  Expanded rent control also encouraged the landlords who did continue to offer rentals to defer maintenance and repairs and to forgo improvements, thus decreasing the quality of rental housing, and incentivized those landlords to impose non-rent fees to recoup costs.  *See id.*; *Rent Control Backfires Again in St. Paul*, Wall St. J., Nov. 10, 2021.

Empirical evidence therefore confirms what economic theory teaches about government price controls:  far from serving the general welfare, such price controls ultimately harm everyone,

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS

1  including those they are intended to help.[2]  Price controls are therefore not rationally imposed in

2  competitive markets.  *See generally Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951) ("The heart

3  of our national economic policy long has been faith in the value of competition.").

**B.      This Ordinance Has The Harmful Effects Typical Of Government Price Controls**

As plaintiffs have explained, the City has now placed an indefinite price cap of 15 percent on the commission charged to restaurants by third-party platforms, which operate in a fiercely competitive, rapidly evolving early-stage market.  The Ordinance is harmful not only to the platforms the City has targeted but also to consumers, delivery drivers, and ultimately the very restaurants that the City appears to have intended to benefit.

1.  As an initial matter, it is important to recognize the role that third-party food delivery plays in the restaurant industry.  Restaurants obviously do not have to offer a delivery option to consumers, and many do not.  Even at the height of the COVID-19 pandemic, many restaurants offered pickup but not delivery.  *See* National Restaurant Ass'n, *State of the Restaurant Industry* 14-17 (2021), https://go.restaurant.org/rs/078-ZLA-461/images/2021-State-of-the-Restaurant-Industry.pdf; *see also* Joanna Fantozzi, *Will Delivery Still be King in a Post-COVID World?*, Restaurant Hospitality (Feb. 10, 2021), https://www.restaurant-hospitality.com/limited-service/will-delivery-still-be-king-post-covid-world.  Restaurants that do offer delivery are free to provide that service on their own—and, in fact, direct restaurant-to-consumer delivery accounts for about half of the food-service delivery market.  *See* Eric Fruits, *Uber/Grubhub:  Pandemic Profiteering, Merger Moratoriums, and Rising Concentration . . . Or Not*, Truth on the Market (May 15, 2020), https://truthonthemarket.com/2020/05/15/uber-grubhub-pandemic-profiteering-merger-moratoriums-and-rising-concentration-or-not.

Restaurants that want to provide customers with a delivery option but do not want to handle the entire delivery process themselves may contract with third parties to assist with deliveries in

---

[2] That conclusion may not hold true in certain very limited circumstances involving "natural monopolies," as to which market-price mechanisms are effectively unavailable.  *See* Progressive Policy Institute 9.  But those circumstances are not pertinent to this case, which involves the highly competitive market for third-party food delivery.

1    various ways.  And within the third-party market, restaurants have a variety of options.  The general

2    public is most familiar with platforms that, like plaintiffs, offer a full-service (or "full-stack") model,

3    handling everything from the customer's placement of the order to ensuring that the food is dropped

4    off at the customer's door.[3]   Those platforms spend significant sums on advertising to attract

5    consumers.  The commission they charge to restaurants reflects the value of access to that customer

6    base—which includes high-value consumers who might not have previously interacted with a

7    restaurant but could become repeat customers after a first online order.  It also reflects the value of

8    economies of scale that enable platforms to optimize routes for greater delivery speed and reliability.

9    And for restaurants, the convenience and simplicity of a partner that integrates smoothly into their

10   existing operations can allow them to achieve additional revenue and profit while maintaining focus

11   on their core business.  *See, e.g.*, Deliverect, *3 Reasons Why Food Delivery is a Must-Have For*

12   *Your Restaurant*,  https://www.deliverect.com/us/blog/online-food-delivery/3-reasons-why-food-

13   delivery-is-a-must-have-for-your-restaurant.

14        Restaurants also have the option to partner with competing services offering a different value

15   proposition at a different price point.  For example, some companies, like BentoBox, ChowNow,

16   GoParrot, Lunchbox, Olo, and Tock, handle online orders for restaurants, but are not involved with

17   the delivery.  If a restaurant wants support managing online-order data, it can partner with a customer

18   relationship management provider, such as Bikky, that focuses on providing that service.  And if a

19   restaurant is set up for online ordering and data management but does not want to make deliveries

20   itself, it can partner with a company that supplies "last-mile" delivery couriers, including restaurant-

21   focused companies like Jolt or Relay.  *See, e.g.*, Jordan Boesch, *Can Restaurants Make Delivery*

22   *Efficient?  Employing Drivers vs. Not*, LinkedIn (June 17, 2020), https://www.linkedin.com/pulse/

23   can-restaurants-make-delivery-efficient-jordan-boesch.

24        If a restaurant does decide that it wants full-service third-party delivery, the restaurant can

25   choose whether to partner with one or more providers offering a broader range of options.  Those

26

27   _____

     [3] Plaintiffs (and other platforms offering a similar model) also offer restaurants the ability to

28   choose certain individual services "a la carte" at a lower price point.

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS

providers operate in an intensely competitive market, vying for market share with a number of new and established market players.[4]  And each of those providers offers differential pricing, allowing a restaurant to partner with them at various price points depending on exactly what services the restaurant wishes to use.  For instance, a restaurant might pay a provider more to obtain marketing services (including the ability to run custom advertisements and promotions), lower customer fees, and a larger delivery radius.  *See, e.g.*, Alicia Kelso, *Uber Eats, Postmates Deploy Tiered Pricing Structures*, Restaurant Dive (Sept. 13, 2021), https://www.restaurantdive.com/news/uber-eats-postmates-deploy-tiered-pricing-structures/606427.

Consumers who wish to use such a provider also have choices.  As was true before the pandemic, many consumers use more than one provider, selecting among them on an order-by-order basis based on restaurant availability and differences in price.  *See* Survey, *New Study Shows What Consumers Crave in a Food Delivery Service*, US Foods, https://www.usfoods.com/our-services/business-trends/2019-food-delivery-statistics.html.

In short, restaurants that have chosen to contract with platforms like plaintiffs at a commission rate over 15 percent are making a voluntary and conscious trade-off.  They have decided to sacrifice some short-term margin for the greater visibility, customer exposure, and revenue that those pricing arrangements with those platforms can offer.

2. The Ordinance distorts that market by imposing a price cap on commissions.  Like other price caps, the Ordinance will have a significant negative impact on all participants in the market—here, platforms, restaurants, workers, and consumers.

Most obviously, the Ordinance will harm its intended target of platforms that match restaurants with delivery drivers—likely to the point that some will decide to exit the market entirely.  Such platforms face significant costs.  In addition to paying delivery drivers, they must pay for advertising, customer refunds (when deliveries go wrong), credit card fees, insurance, security measures such as driver background checks, and a host of other operating expenses.  *See* Preetika Rana & Heather Haddon, *DoorDash and Uber Eats are Hot.  They're Still Not Making*

---

[4] For example, some recent entrants such as HungryPanda—which focuses on Chinese food— have carved out a regional or category-specific niche within the full-service delivery market.

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS

1   *Money*, Wall St. J., May 28, 2021, https://www.wsj.com/articles/doordash-and-uber-eats-are-hot-

2   theyre-still-not-making-money-11622194203.

3      Although those platforms have had sufficient capital to weather the losses imposed by so-

4   called "emergency" commission caps during the pandemic, it is not clear that they can remain

5   economically viable in markets that impose such caps on an indefinite basis.  The amount of revenue

6   lost as a result of the caps is impressively high.  Uber Eats, for example, has reported losing more

7   than $60 million in New York City alone during the pandemic due to that city's purportedly

8   temporary commission caps.  *See* Laura Forman, *Big Apple Takes Bite Out of Food Delivery*, Wall

9   St. J., Aug. 2, 2021, https://www.wsj.com/articles/big-apple-takes-bite-out-of-food-delivery-

10  11627910300.  Commission caps cost GrubHub more than $100 million in the first half of this year

11  and cost DoorDash $26 million in just the second quarter.  *See* Dave Lee, *Food Delivery Apps Stung*

12  *by New York City Cap on Commissions*, Financial Times, Aug. 27, 2021,

13  https://www.ft.com/content/d63d4453-62e0-40e8-a303-2ee483c1d792.  Even in the high-order-

14  volume environment created by the pandemic, commission caps can make (and have made) the

15  difference between profitability and large losses that are not indefinitely sustainable.  The losses

16  imposed by such caps also are likely to overwhelm smaller competitors and deter new entrants,

17  thereby suppressing competition and innovation in the relevant market.

18      Of course, if providers do exit the market, restaurants and diners in San Francisco could face

19  a shortage or absence of full-service delivery options.  But restaurants and diners can also expect to

20  suffer a number of harms along the way as those providers react to a permanent price cap.

21      First, consumers can expect to pay higher prices.  Third-party platforms understandably have

22  already begun seeking to recoup at least some of the lost revenue directly from consumers in the

23  form of fees.  *See* Terrence Doyle, *Will Permanent Fee Caps Actually Rein in Delivery Apps?*, Eater

24  (June 28, 2021), https://www.eater.com/22554053/delivery-fee-caps-doordash-ubereats-grub-hub-

25  san-francisco.  Even before pandemic-related commission caps were instituted, delivery was a low-

26  margin, cost-intensive business—one in which the market leaders have not turned a profit.  *See* Rana

27  & Haddon, *supra*.  Revenue lost due to price controls must be made up somewhere.  And restaurants

28  that save money on a per-order basis by paying lower commissions to third-party platforms as a

result of the Ordinance are unlikely to pass those savings on to consumers.

Second, third-party platforms may well respond to the Ordinance by reducing service to both restaurants and customers, including by making delivery terms and availability more restrictive. Thus, restaurants that are not located in areas with a high density of other restaurants—and which generally pay higher commissions as a result—could be dropped from platforms entirely. Lower-cost restaurants could also be dropped (or have their use of platforms conditioned on a high minimum order), since expending effort and money to recoup a 15 percent commission on an affordable meal may not make economic sense for platforms. Meanwhile, customers located further from restaurants, who depend on expanded delivery ranges, could find their delivery options reduced or eliminated on some platforms. For example, after Jersey City imposed a restrictive commission cap during the pandemic, Uber Eats reduced its delivery radius in that city. *See* Laura Forman, *Food-Delivery Regulation is a Drama Worth Watching*, Wall St. J., Mar. 4, 2021, https://www.wsj.com/articles/food-delivery-regulation-is-a-drama-worth-watching-11614859201.

Third, higher prices for consumers, along with likely service reductions, will translate to reduced order volumes according to basic principles of supply and demand. Indeed, that has happened already in San Francisco and other cities that imposed commission caps during the pandemic. As a result of those caps and corresponding consumer price increases, GrubHub saw a ten percent decline in orders to independent local restaurants in San Francisco, and DoorDash saw four to seven percent declines in order volume in three other markets. *See, e.g.*, Nancy Luna, *Grubhub Says Independent Restaurants are Losing Delivery Orders Due to Mandated Caps on Commission Fees*, Nation's Restaurant News (May 7, 2020), https://www.nrn.com/delivery-takeout-solutions/grubhub-says-independent-restaurants-are-losing-delivery-orders-due;   News, *The Impacts of Price Controls*, DoorDash (Apr. 8, 2021), https://doordash.news/2021/04/08/the-impacts-of-price-controls.

That decline in order volume means less revenue for the restaurants the Ordinance is purportedly intended to help—especially independent local restaurants. *See* Progressive Policy Institute 13. Indeed, even at the height of early-pandemic lockdowns, a group of local restaurant owners advocated against Los Angeles's temporary commission cap based on the likelihood that

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS

the cap would result in reduced order volume—and noted that small businesses could not afford to hire or contract for their own delivery people.  *See* Jenn Harris, *In Twist, Dozens of Los Angeles Restaurants Oppose Delivery App Fee Cap*, L.A. Times, May 18, 2020, https://www.latimes.com/ food/story/2020-05-18/los-angeles-restaurants-oppose-delivery-app-fee-cap.  At the same time, the Ordinance makes it difficult for third-party platforms to offer packages that help restaurants attract more customers—through, for example, marketing services, lower customer fees, and a larger delivery radius.  If those offerings become unavailable, that will tend to favor larger, more established national restaurant brands with higher name recognition at the expense of local restaurants that rely on such offerings to get their brand in front of new customers.  Indeed, a recent analysis of commission caps found that independent local restaurants covered by those caps saw a meaningful decline in order volume.  *See* Zhuoxin Li & Gang Wang, *Regulating Powerful Platforms: Evidence from Commission Fee Caps in On-Demand Services* (June 22, 2021) (manuscript at 11), https://ssrn.com/abstract=3871514.

Finally, the Ordinance is harmful to delivery drivers—and, by harming those drivers, harms other market players as well.  Drivers rely on the payments and tips that orders generate, *see* Rana & Haddon, *The Race to Make Food Delivery Pay*, *supra*, and so a decline in order volume necessarily decreases drivers' income.  The Ordinance also threatens to decrease the amount that drivers receive in payments and tips for the orders they do deliver.  By making third-party delivery less economical for the platforms with which the drivers contract and more expensive for customers, a price cap encourages those platforms to pay drivers less and encourages customers to tip smaller amounts (or no amount at all).  That may lead to fewer drivers on the streets, which in turn means fewer opportunities for route optimization and increased wait times and service disruptions.  *See id.*; Ike Brannon, *Price Caps on Food Delivery Apps Only Exacerbate Restaurant Revenue Problems in the Pandemic*, Forbes (Apr. 15, 2021), https://www.forbes.com/sites/ikebrannon/2021/04/15/price-caps-on-food-delivery-apps-only-exacerbate-restaurant-revenue-problems-in-the-pandemic/?sh= 5af9bfc53312.  Those changes are all harmful to consumers, and are likely to have a compounding effect that decreases order volume still further and otherwise exacerbates the various negative effects described above.

## II.   THE ORDINANCE IS UNLAWFUL BECAUSE IT DOES NOT PROMOTE THE GENERAL WELFARE

For all the above reasons, it is clear that the Ordinance is harmful to the public interest.  It is designed to favor one sector of the economy over others, but in the end it will hurt the very business entities that it is intended to aid—and, along the way, will hurt many other individuals and entities.

Those extraordinary flaws in the Ordinance help demonstrate why it is contrary to law, along with the various reasons set forth in plaintiffs' complaint and defended in plaintiffs' response to the motion to dismiss.  *See, e.g.*, First Amended Complaint ("FAC") ¶¶ 83-173.  For purposes of this brief, *amici* will focus on one particular way in which the Ordinance's economic irrationality renders it legally impermissible:   the Ordinance exceeds San Francisco's authority under the California Constitution, which gives cities the right to exercise the police power of promoting the "general welfare" of the public.  *In re Kazas*, 22 Cal. App. 2d 161, 172 (1937).

California courts have interpreted the California Constitution to limit the scope of cities' authority to use price-related mandates to benefit one segment of the public at the expense of other segments.  As the Court of Appeal has explained, legislation "must promote the welfare of the general public as contrasted with that of a small percentage or insignificant numerical proportion of the citizenry."  *In re Kazas*, 22 Cal. App. 2d at 172.  Thus, where "[t]he effect of" a price-related ordinance "is to protect [an] industry" that is owned by "only a small segment of the general public," and that industry is not central to the public health in some way, the ordinance is unconstitutional.  *State Board of Dry Cleaners v. Thrift-D-Lux Cleaners, Inc.*, 40 Cal. 2d 436, 447 (1953); *see id.* at 443-46; *see generally McKay Jewelers v. Bowron*, 19 Cal. 2d 595, 601 (1942) ("A legislative body may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon . . . the pursuit of useful activities.").

California courts have frequently struck down price-control measures under those principles.  *See generally Thrift-D-Lux Cleaners*, 40 Cal. 2d at 440 ("[w]hether there has been a reasonable exercise of" the police power "is a court question").  For instance, in *Kazas*, the Court of Appeal deemed unconstitutional a provision fixing minimum prices for barber service in Bakersfield, which the court concluded was enacted not for the benefit of the public at large but only to favor special

1    interests:  owners of barbershops.  *See In re Kazas*, 22 Cal. App. at 174.  And in *Thrift-D-Lux*

2    *Cleaners*, the California Supreme Court struck down a statute fixing minimum prices to be charged

3    by dry-cleaning establishments on similar grounds, noting in the course of doing so that many other

4    jurisdictions had struck down similar provisions.  *See Thrift-D-Lux Cleaners*, 40 Cal. 2d at 440; *see*

5    *also, e.g.*, *In re Herrick*, 25 Cal. App. 2d 751, 752 (1938).

6         The Ordinance suffers from the same defects as the provisions considered in those cases.

7    The Ordinance paints with a broad brush all third-party platforms and all of their various levels of

8    service, without taking into consideration their varying "skill or efficiency of operation, excellence

9    and completeness of equipment, desirability of location or expense of conducting business"—all of

10   which may provide a reason for charging higher prices than the cap that San Francisco has imposed.

11   *Thrift-D-Lux Cleaners*, 40 Cal. 2d at 443-44 (citation omitted); *see, e.g.*, *In re Kazas*, 22 Cal. App.

12   2d at 165-66.  And no general public interest is served by that arbitrary and irrational price cap.

13   Third-party restaurant delivery is a highly competitive market, not a monopoly, and it is a market

14   for an optional bundle of services, not a necessity.  At best, the Ordinance could benefit not the

15   public but restaurant owners who choose to use certain third-party platforms.  It does not benefit

16   even those owners, however; it harms both them and their customers.  *See* pp. 5-10, *supra*.[5]  Such a

17   price control cannot possibly be said to promote the general welfare.  To the contrary, that price

18   control is "manifestly unreasonable, arbitrary or capricious."  *Massingill v. Dep't of Food & Agric.*,

19   102 Cal. App. 4th 498, 504 (2002); *see also Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 160

20   (1976); *Doyle v. Bd. of Barber Examiners*, 219 Cal. App. 2d 504, 510 (1963).

21        It is notable, although perhaps not surprising, that before enacting such a counterproductive

22   measure San Francisco apparently engaged in no economic analysis or research of any sort.  *See*

23   FAC ¶ 3.  San Francisco did not study the effect of a price cap on consumers, delivery drivers, or

24   even restaurants.  It did not analyze the characteristics of the market or consider whether the price

25   control reflected in the Ordinance would be expected to have the drawbacks common to other price

---

26

27   [5] Of course, general statements by members of the Board of Supervisors that they wished to benefit restaurants and workers do not mean that the Ordinance actually has that effect, or that benefiting

28   that subset of the public would be sufficient to establish the Ordinance's legality.  *Cf. Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019).

1    controls.  Rather, San Francisco simply selected an arbitrary 15 percent number and imposed it on

2    the market indefinitely.

3        Because the City did not act to promote the welfare of the general public, the Ordinance

4    cannot stand.  At this stage of the case, however, this Court need decide only that the allegations in

5    the complaint are sufficient for the complaint to survive a motion to dismiss.  They are, and the

6    motion to dismiss should be denied.

7                                    **CONCLUSION**

8        For the foregoing reasons, *amici* respectfully submit that the Court should deny the motion

9    to dismiss.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DATED:  November 11, 2021                    Respectfully submitted,

2    */s/ Justin P. Raphael*                      */s/ Donald B. Verrilli, Jr.*
     Justin P. Raphael, SBN 292380               Donald B. Verrilli, Jr. (pro hac vice)
3    MUNGER, TOLLES & OLSON LLP                  Elaine J. Goldenberg (pro hac vice)
     560 Mission Street                          Brendan B. Gants (pro hac vice)
4    27th Floor                                  MUNGER, TOLLES & OLSON LLP
     San Francisco, CA 94105                     601 Massachusetts Avenue NW
5    Telephone:  (415) 512-4000                  Suite 500E
                                                 Washington, DC 20001
6                                                Telephone:  (202) 220-1100

7                                                *Counsel for Amici Curiae*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS