DAVID CHIU, State Bar #189542
City Attorney
WAYNE K. SNODGRASS, State Bar #148137
JEREMY M. GOLDMAN, State Bar #218888
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:     (415) 554-6762
Facsimile:     (415) 554-4699
E-Mail:        jeremy.goldman@sfcityatty.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOORDASH, INC. and GRUBHUB INC.,<br><br>　　　Plaintiffs,<br><br>　　vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　Defendant. | Case No. 3:21-cv-05502 EMC<br><br>**DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Hearing Date:　　December 16, 2021<br>Time:　　　　　　1:30 p.m.<br>Place:　　　　　　Courtroom 5 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

I.    PLAINTIFFS' OPPOSITION TO THE CITY'S REQUEST FOR JUDICIAL
      NOTICE SHOULD BE STRICKEN AND IS MERITLESS ..................................1

II.   THE FAC FAILS TO STATE A CONTRACT CLAUSE CLAIM ........................2

      A.    There Is No Substantial Impairment ..........................................2

      B.    The Ordinance Is an Appropriate and Reasonable Way to Advance a
            Significant and Legitimate Public Purpose..................................2

III.  THE FAC FAILS TO STATE A CLAIM FOR AN UNCONSTITUTIONAL
      TAKING ..........................................................................................6

IV.   THE FAC FAILS TO STATE A CLAIM FOR EXCEEDING THE POLICE
      POWER............................................................................................7

V.    THE FAC FAILS TO STATE A DUE PROCESS CLAIM..................................9

VI.   THE FAC FAILS TO STATE AN EQUAL PROTECTION CLAIM ................11

VII.  THE FAC FAILS TO STATE A CLAIM FOR FIRST AMENDMENT
      RETALIATION................................................................................12

VIII. LEAVE TO AMEND SHOULD BE DENIED ..................................................15

# TABLE OF AUTHORITIES

## CASES

*Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*
   509 F.3d 1020 (9th Cir. 2007) ....................................................................6

*All. of Auto. Mfrs., Inc. v. Currey*
   No. 3:13-CV-398 JCH, 2014 WL 2219219 (D. Conn. May 28, 2014) ......................1

*Alpha Energy Savers, Inc. v. Hansen*
   381 F.3d 917 (9th Cir. 2004) ....................................................................14

*Andrus v. Allard*
   444 U.S. 51 (1979)...................................................................................6

*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*
   10 F.4th 905 (9th Cir. 2021) .....................................................................3

*Arizona Students' Ass'n v. Arizona Bd. of Regents*
   824 F.3d 858 (9th Cir. 2016) ..............................................................12, 15

*Association of Equipment Manufacturers v. Burgum*
   932 F.3d 727 (8th Cir. 2019) ..................................................................2, 3

*Bhd. of Locomotive Firemen & Enginemen v. Chicago, R.I. & P.R. Co.*
   393 U.S. 129 (1968).................................................................................1

*Bixby v. Pierno*
   4 Cal.3d 130 (1971) .................................................................................7

*Blair v. Bethel Sch. Dist.*
   608 F.3d 540 (9th Cir. 2010) ...................................................................15

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*
   509 U.S. 209 (1993).................................................................................8

*Brown v. Hovatter*
   561 F.3d 357 (4th Cir. 2009) ...................................................................10

*CDK Glob. LLC v. Brnovich*
   __ F.4th __, 2021 WL 4944824 (9th Cir. Oct. 25, 2021) ...............................3, 6

*City of Las Vegas v. Foley*
   747 F.2d 1294 (9th Cir. 1984) ..................................................................15

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*
   508 U.S. 602 (1993).................................................................................6

*Crossley v. California*
   479 F.Supp.3d 901 (S.D. Cal. 2020)...........................................................5

*Dairy v. Bonham*
   No. C-13-1518 EMC, 2013 WL 3829268 (N.D. Cal. July 23, 2013)................................11, 12

*Doyle v. Bd. of Barber Examiners*
   219 Cal.App.2d 504 (1963) ..........................................................................................7

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*
   459 U.S. 400 (1983)......................................................................................................3

*F.C.C. v. Beach Commc'ns, Inc.*
   508 U.S. 307 (1993).......................................................................................................1

*Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v. City of Hobart*
   864 F.2d 551 (7th Cir. 1988) .......................................................................................15

*Hettinga v. United States*
   677 F.3d 471 (D.C. Cir. 2012) ........................................................................9, 10, 11

*Home Bldg. & Loan Ass'n v. Blaisdell*
   290 U.S. 398 (1934)......................................................................................................3

*HRPT Properties Tr. v. Lingle*
   715 F. Supp. 2d 1115 (D. Haw. 2010)..........................................................................4

*In re Chocolate Confectionary Antitrust Litig.*
   801 F.3d 383 (3d Cir. 2015) ..........................................................................................8

*In re Kazas*
   22 Cal.App.2d 161 (1937) .............................................................................................7

*Jones v. Micron Tech. Inc.*
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ..........................................................................8

*Justesen's Food Stores v. City of Tulare*
   12 Cal.2d 324 (1938) ....................................................................................................7

*Kelo v. City of New London, Conn.*
   545 U.S. 469 (2005).......................................................................................................6

*Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*
   684 F.3d 462 (4th Cir. 2012) .......................................................................................15

*Keystone Bituminous Coal Ass'n v. DeBenedictis*
   480 U.S. 470 (1987)...................................................................................................3, 5

*Koala v. Khosla*
   931 F.3d 887 (9th Cir. 2019) ..........................................................................13, 14, 15

*Laurel Park Cmty., LLC v. City of Tumwater*
   698 F.3d 1180 (9th Cir. 2012) .......................................................................................6

*Lingle v. Chevron U.S.A. Inc.*
    544 U.S. 528 (2005)................................................................6, 7

*Melendez v. City of New York*
    __F.4th__, 2021 WL 4997666 (2d Cir. Oct. 28, 2021) ....................2, 3, 4, 5

*Merrifield v. Lockyer*
    547 F.3d 978 (9th Cir. 2008) ...............................................11

*Nat'l Wildlife Fed'n v. I.C.C.*
    850 F.2d 694 (D.C. Cir. 1988)..............................................10

*Nekrilov v. City of Jersey City*
    528 F. Supp. 3d 252 (D.N.J. 2021) .........................................5

*Nw. Grocery Ass'n v. City of Seattle*
    526 F. Supp. 3d 884 (W.D. Wash. 2021).....................................5

*Olson v. California*
    No. CV1910956DMGRAOX, 2020 WL 6439166 (C.D. Cal. Sept. 18, 2020) ..........1

*Pickup v. Brown*
    42 F. Supp. 3d 1347 (E.D. Cal. 2012) ......................................1

*Rosenberger v. Rector & Visitors of Univ. of Va.*
    515 U.S. 819 (1995).......................................................15

*Ross v. City of Berkeley*
    655 F. Supp. 820 (N.D. Cal. 1987).........................................4

*Ruckelshaus v. Monsanto Co.*
    467 U.S. 986 (1984).......................................................7

*San Francisco Taxi Coal. v. City & Cty. of San Francisco*
    979 F.3d 1220 (9th Cir. 2020) ............................................12

*Sanitation & Recycling Indus., Inc. v. City of New York*
    107 F.3d 985 (2d Cir. 1997) ..............................................5

*Santa Monica Beach, Ltd. v. Superior Ct.*
    19 Cal.4th 952 (1999).....................................................9

*Shanks v. Dressel*
    540 F.3d 1082 (9th Cir. 2008) ............................................10

*SmithKline Beecham Corp. v. Abbott Labs*
    740 F.3d 471 (9th Cir. 2014) .............................................8

*State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners*
    40 Cal.2d 436 (1953)......................................................7

*Synagro-WWT, Inc. v. Rush Twp., Penn.*
   204 F. Supp. 2d 827 (M.D. Pa. 2002)............................................................................5

*Texaco Puerto Rico, Inc. v. Ocasio Rodriguez*
   749 F. Supp. 348 (D.P.R. 1990)..................................................................................9

*Turner v. Boldt*
   No. C-97-1616 SI, 1997 WL 564052 (N.D. Cal. Aug. 26, 1997)................................2

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*
   633 F.3d 37 (1st Cir. 2011)..........................................................................................5

*United Healthcare Ins. Co. v. Davis*
   602 F.3d 618 (5th Cir. 2010) ...................................................................................2, 7

*United States v. Apple, Inc.*
   791 F.3d 290 (2d Cir. 2015) .........................................................................................6

*United States v. Carolene Prod. Co.*
   304 U.S. 144 (1938)......................................................................................................1

*United States v. U.S. Gypsum Co.*
   438 U.S. 422 (1978)......................................................................................................8

*Vance v. Bradley*
   440 U.S. 93 (1979)........................................................................................................1

*Watkins v. United States*
   854 F.3d 947 (7th Cir. 2017) ........................................................................................2

*WMX Techs., Inc. v. Miller*
   197 F.3d 367 (9th Cir. 1999) ........................................................................................9

*World Nutrition Inc. v. Advanced Enzymes USA*
   No. CV-19-00265-PHX-GMS, 2019 WL 5802001 (D. Ariz. Nov. 7, 2019) ...............2

*Xcaliber Int'l, Ltd. LLC v. Georgia ex rel. Carr*
   253 F. Supp. 3d 1220 (N.D. Ga. 2017) .........................................................................5

## STATUTES

Cal. Bus. & Prof. Code
§ 7465(a) ....................................................................................................................4

## SAN FRANCISCO CODES AND REGULATIONS

S.F. Police Code
§ 5300 ...............................................................................................................4, 5, 8

## PENDING LEGISLATION

S.F. BOS Legislative File No. 211131
https://sfgov.legistar.com/LegislationDetail.aspx?ID=5199186&GUID=346DF058-033B-4438-
B414-18B5D9F2BF77 .....................................................................................................4

## I.  PLAINTIFFS' OPPOSITION TO THE CITY'S REQUEST FOR JUDICIAL NOTICE SHOULD BE STRICKEN AND IS MERITLESS

In addition to their 25-page opposition to the City's motion to dismiss, Plaintiffs filed a 10-page opposition to the City's request for judicial notice.  ECF#37.  It should be stricken because it violates Local Rule 7-3(a), which provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum."

The objections are meritless in any event.  Plaintiffs contend that taking judicial notice of reports or news articles as a basis for the commission cap would require accepting their truth.  Not so: The law must be upheld "if there is any reasonably conceivable state of facts" that could provide a basis for it.  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see Pickup v. Brown*, 42 F. Supp. 3d 1347, 1376 (E.D. Cal. 2012) ("anecdotes collected from newspapers" may furnish rational basis).  Plaintiffs cite cases in which the court adjudicates facts, but that is a category mistake:

> In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true.  In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker…. "The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was 'pure speculation.'"

*Vance v. Bradley*, 440 U.S. 93, 110–11 (1979) (quoting *Bhd. of Locomotive Firemen & Enginemen v. Chicago, R.I. & P.R. Co.*, 393 U.S. 129, 138–39 (1968)).  Because a court does not engage in factual adjudication under rational basis review, judicial notice is a proper basis on which to sustain legislation.  *United States v. Carolene Prod. Co.*, 304 U.S. 144, 154 (1938) ("it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable").  The exhibits at issue are illustrative of information in the findings.

The articles and Plaintiffs' SEC filings are also judicially noticeable to show the foreseeability of regulation.  Plaintiffs argue that they may not be used "to establish a disputed fact," ECF#37 at 3, but the foreseeability of regulation is a question of law.  *See, e.g.*, *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 6439166, at *11 (C.D. Cal. Sept. 18, 2020); *All. of Auto. Mfrs., Inc. v. Currey*, No. 3:13-CV-398 JCH, 2014 WL 2219219, at *4 (D. Conn. May 28, 2014).  Judicial

notice of Plaintiffs' own statements is appropriate to establish their awareness.  *See, e.g.*, *Watkins v. United States*, 854 F.3d 947, 949-50 (7th Cir. 2017); *World Nutrition Inc. v. Advanced Enzymes USA*, No. CV-19-00265-PHX-GMS, 2019 WL 5802001, at *2 (D. Ariz. Nov. 7, 2019); *Turner v. Boldt*, No. C-97-1616 SI, 1997 WL 564052, at *2 (N.D. Cal. Aug. 26, 1997).  Unlike the cases cited by Plaintiffs, use for this purpose does not require this Court to assume that any statement is true.

## II.   THE FAC FAILS TO STATE A CONTRACT CLAUSE CLAIM

### A.   There Is No Substantial Impairment

Plaintiffs argue that regulation of their commissions was not foreseeable because governments did not previously impose price controls on third-party platforms.  ECF#36 at 7.  They cite *Association of Equipment Manufacturers v. Burgum*, 932 F.3d 727, 731 (8th Cir. 2019) ("*AEM*"), but that case did not involve a new industry with developing regulation, and the court pointed out that it had previously invalidated a similar law in another state, holding that the plaintiffs were entitled to rely on that decision in forming their expectations.  It would be patently unreasonable for an e-commerce company to assume that the early regulatory status quo would persist indefinitely.  And the kind of regulation at issue here was not only foreseeable but actually foreseen.  *See* ECF#28 at 6.

A finding of substantial impairment is also undermined by the fact that Plaintiffs' contracts are terminable at will.  ECF#28 at 6-7.  Plaintiffs cite *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010), which disagreed that "the power to terminate a contract enfolds the power to impair it for the purposes of the Contract Clause."  But that is not the point:  When Plaintiffs entered into these contracts, they knew they were not guaranteed a particular revenue stream nor protection from future regulation.  And Plaintiffs do not respond to the City's argument that the FAC does not establish a substantial impairment because Plaintiffs are free to increase consumer fees to offset a reduction in restaurant commissions.  *See* ECF#28 at 7.

### B.   The Ordinance Is an Appropriate and Reasonable Way to Advance a Significant and Legitimate Public Purpose

For the second step, Plaintiffs rely primarily on two cases from other circuits, both decided by divided panels in which the dissent criticized the majority for failing to defer to the legislature's judgment.  *See AEM*, 932 F.3d at 736 (Shepherd, J., dissenting); *Melendez v. City of New York*,

__F.4th__, 2021 WL 4997666, at *43 (2d Cir. Oct. 28, 2021) (Carney, J., dissenting).  The Ninth Circuit requires such deference.  *Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913-14 (9th Cir. 2021).  Moreover, *AEM* held that the state bore the burden to establish a significant and legitimate public purpose.  932 F.3d at 733.  That is also not the law in this circuit.  *CDK Glob. LLC v. Brnovich*, __ F.4th __, 2021 WL 4944824 at *8 (9th Cir. Oct. 25, 2021) ("*CDK*").

AEM and *Melendez* do not help Plaintiffs in any event.  *AEM* declined to find a significant and legitimate purpose, first, because the law did not include "well-supported finding or purposes," distinguishing it from cases in which the Supreme Court accepted legislative findings.  932 F.3d at 732 (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 421 n.3, 444-45 (1934) and *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 486 & n.14 (1987)).  Second, it noted that the law benefitted farm equipment dealers and "nowhere mentions benefits for farmers or rural communities," and held that a law must provide more than "incidental public benefits."  *Id.* at 733.  Plaintiffs identify no similar standard in the Ninth Circuit—and it has rejected a claim that a law must contain findings specifying its purposes, *CDK*, 2021 WL 4944824 at *9—but the Ordinance here is amply supported by findings setting forth both the factual bases for, and purposes of, the legislation showing that the benefits are not merely incidental.  *CDK* also held that a plaintiff's contention that the challenged law unfairly targeted its business did not show the absence of a significant and legitimate public purpose.  *Id.* ("Although the statute regulates the dealer data industry rather than some broader segment of the economy, that does not make it suspect.").  *Melendez* found that "the City asserts a legitimate public purpose that appears at least plausible on the pleadings record" notwithstanding the plaintiffs' allegation that its intent was only to benefit a favored group: commercial-lease guarantors.  2021 WL 4997666, at *34.  *CDK* also noted that the challenged law applied to all providers that store protected dealer data regardless of whether they currently had contracts with a provision affected by the law.  2021 WL 4844824 at *9.  The same is true here.  *See* ECF#28 at 10 n.2.

The commission cap bears an appropriate and reasonable relationship to the problem identified.  Plaintiffs complain that the cap is permanent, but in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, the Supreme Court upheld a permanent price regulation, holding that "the public purpose need not be addressed to an emergency or temporary situation."  459 U.S. 400, 412 (1983).  The issue

in *Melendez* was that the challenged law was premised on the COVID-19 emergency, yet forever barred commercial landlords' recovery. *Melendez*, 2021 WL 4997666, at *30. Here, there is no such disconnect because the removal of the sunset provision is based on the character of the market for third-party delivery services, the harms of which were evident before the pandemic, and which the Board could reasonably believe would continue in the future. *See* ECF#28 at 9-10.[1]

Plaintiffs argue that the commission cap "is not reasonably designed to revitalize the City's commercial district because it is not limited to restaurants in any specific district, and it targets *delivery*, which restaurants can do from anywhere, incentivizing them to *leave* the high-rent commercial district." ECF#36 at 12. But the findings refer to "commercial districts," with an "s." S.F. Police Code § 5300(h), (j). San Francisco has many commercial districts, and what makes them commercial districts is the presence of things like restaurants and other businesses. The findings further note that restaurants "serv[e] as commercial anchors in neighborhoods across the City," and "occupy a substantial percentage of ground floor retail space along the City's commercial corridors." *Id.* § 5300(a), (b).[2] And Plaintiffs' claim that the Ordinance will incentivize restaurants to leave commercial districts is unintelligible based their own allegation that it will reduce the volume of platform orders. ECF#25 ¶¶ 80, 81, 88. As the City pointed out, ECF#28 at 10, the Board could reasonably believe that consumers dissuaded by the increased cost of delivery could dine in or order takeout directly, just as it could reasonably believe that many restaurants would be at risk of shutting down altogether in the absence of a cap. *See* S.F. Police Code § 5300(c), (d), (h).

---

[1] The law remains subject to revision through the ordinary legislative process. On October 26, 2021, Supervisor Peskin introduced an amendment to raise the cap to 20% by permitting platforms to charge up to 15% for delivery services and an additional 5% for non-delivery services. *See* File No. 211131, https://sfgov.legistar.com/LegislationDetail.aspx?ID=5199186&GUID=346DF058-033B-4438-B414-18B5D9F2BF77. By contrast, the permanent price control imposed by Proposition 22, which DoorDash supported, is not subject to amendment except by concurrence of seven-eighths of the state legislature. *See* Cal. Bus. & Prof. Code § 7465(a).

[2] The case is therefore distinguishable from other cases on which Plaintiffs rely, like *HRPT Properties Tr. v. Lingle*, 715 F. Supp. 2d 1115 (D. Haw. 2010) and *Ross v. City of Berkeley*, 655 F. Supp. 820 (N.D. Cal. 1987). Moreover, while latter found that the ordinance was not reasonably tailored to its purpose, it concluded that preservation of the "ambience and character" of a particular shopping district was a legitimate public purpose under the Contract Clause. 655 F. Supp. at 834. Here, the Ordinance is not concerned merely with "ambience and character," nor with only one commercial district. And *HRPT* does not stand for the proposition that government may never seek to assist an industry in decline as Plaintiffs contend. ECF#36 at 11. Rather, it found that the legislation did not address any of its purposes. 715 F. Supp. 2d at 1138.

Plaintiffs also contend that the City cannot impair their contracts "simply because the City perceives a decline in restaurants that 'coincides' with the rise of platforms." ECF#36 at 11. But there is much more in the findings than that; among other things, they state that the platforms have market dominance that has allowed them to impose high commissions that threaten restaurants' already-narrow profit margins, and that restaurants must contract with these companies to access the growing share of consumers who rely on them to obtain meals. S.F. Police Code § 5300(d)-(f).[3] In *Melendez*, the court pointed out that commercial landlords were in no way responsible for the economic problem that the challenged law sought to address, distinguishing it from cases where—as here—courts upheld permanent restrictions in which the impairment was tailored to the party causing the harm. 2021 WL 4997666, at *38 (citing *Keystone*, 480 U.S. at 504-06 and *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 990, 994 (2d Cir. 1997)).

Finally, Plaintiffs contend that the commission cap is arbitrary and unreasonable, arguing that they are entitled to adequate compensation for the services they perform. ECF#36 at 13. But the cap does not prevent Plaintiffs from charging whatever they like for their services; it prevents them from charging *restaurants* more than 15%. That amount is not arbitrary and has a reasonable basis: (1) according to Plaintiffs themselves, they do offer restaurants contracts with a 15% commission; (2) those contracts at least cover delivery, which is "the most logistically demanding and resource-intensive" service the platforms offer, S.F. Police Code § 5300(d); (3) platforms' profit margins from non-delivery services are far higher, *id.* § 5300(g); and (4) the rates of 25-30% that platforms generally obtain are destructive of restaurants' narrow profit margins, making a 15% cap "a reasonable step to protect restaurants from financial collapse without unduly constraining third-party food delivery services' businesses," *id.* § 5300(j), which, again, remain free to raise fees on consumers.[4]

---

[3] As Plaintiffs' allegations indicate, platforms have attracted significant numbers of consumers by forcing restaurants to bear the brunt of the fees. *See infra* Section V.

[4] Courts can and do grant motions to dismiss when a complaint fails plausibly to allege facts to establish that a law is not a reasonable and appropriate way to advance a significant and legitimate public purpose under the applicable deferential standard of review. *See, e.g.*, *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 46 (1st Cir. 2011); *Nw. Grocery Ass'n v. City of Seattle*, 526 F. Supp. 3d 884, 897 (W.D. Wash. 2021); *Crossley v. California*, 479 F.Supp.3d 901, 920 (S.D. Cal. 2020); *Nekrilov v. City of Jersey City*, 528 F. Supp. 3d 252, 280-81 (D.N.J. 2021); *Xcaliber Int'l, Ltd. LLC v. Georgia ex rel. Carr*, 253 F. Supp. 3d 1220, 1238-39 (N.D. Ga. 2017); *Synagro-WWT, Inc. v. Rush Twp., Penn.*, 204 F. Supp. 2d 827, 848-49 (M.D. Pa. 2002).

III.     **THE FAC FAILS TO STATE A CLAIM FOR AN UNCONSTITUTIONAL TAKING**

Plaintiffs argue that no taking can be justified because the commission cap is not for a legitimate public purpose.  ECF#36 at 14.  But as discussed elsewhere in this brief, the Ordinance's findings articulate such a purpose, and takings jurisprudence requires courts to defer to the Board's judgment.  *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 480-89 (2005); *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1023 (9th Cir. 2007); *see also CDK*, 2021 WL 4944824 at *11 (claim that statute does not serve public purposes is not an independent means to challenge a regulatory taking).  Plaintiffs do not dispute that, in cases involving contract rights, courts have rejected takings claim under the third *Penn Central* factor where the government took nothing for its own use, but argue that the regulations at issue were otherwise within the government's substantive powers.  ECF#36 at 14-15.  But the same is true here.[5]

With respect to the first *Penn Central* factor, Plaintiffs acknowledge that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking," *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993), but contend that *Concrete Pipe* and the cases it cited "weighed economic harm against the public benefit, in the context of otherwise lawful government action."  ECF#36 at 16.  This statement is incorrect.  In fact, *Concrete Pipe* said that whether the plaintiff had correctly measured the economic impact "need not be resolved" because of the rule that a diminution in value is insufficient to demonstrate a taking. 508 U.S. at 645.  Moreover, in *Lingle v. Chevron U.S.A. Inc.*, which involved a taking challenge to a law that capped the amount of rent oil companies could charge service station lessee-dealers, the Supreme Court held that it is improper for a court to assess whether a challenged law substantially advances a legitimate government interest because it violates the principle of "deference to legislative

---

[5] Plaintiffs also misunderstand the City's citation to *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1190-91 (9th Cir. 2012).  The point is not that Plaintiffs can "revamp their platforms into other uses," ECF#36 at 15, but that they can earn additional revenue from them by raising consumer fees.  Without identifying it as such, Plaintiffs cite a dissent from *United States v. Apple, Inc.* 791 F.3d 290, 351 (2d Cir. 2015) for the proposition that the "law of demand" means consumers would not pay higher prices for the same product.  But the dissent wrote that consumers would not pay higher prices for e-books from Apple when they were available at lower prices from Amazon.  Here, Plaintiffs contend that the commission cap will cause consumer fees to rise across the board.  Moreover, "loss of future profits—unaccompanied by any physical property restriction— provides a slender reed upon which to rest a takings claim." *Andrus v. Allard*, 444 U.S. 51, 66 (1979).

judgments about the need for, and likely effectiveness of, regulatory actions…."  544 U.S. 528, 545 (2005).  And nothing in *Lingle* changed the rule in *Concrete Pipe*.  *Id.*

Finally, as to the second factor, Plaintiffs seek to dismiss the significance of the fact that their contracts are at-will by contending that "the Constitution protects at-will contracts."  ECF#36 at 16 (citing *United Healthcare*, 602 F.3d at 628).  But *United Healthcare* did not involve a taking claim, where Plaintiffs must show that any investment-backed expectations are more than a "unilateral expectation or an abstract need."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984).  Here, the only thing Plaintiffs actually negotiated for were contracts that restaurants could terminate at any time. And their awareness of that fact is evidenced by their own warnings to investors that they may fail to retain restaurants or may have to lower their commissions.  *See* ECF#28 at 13-14.

## IV.   THE FAC FAILS TO STATE A CLAIM FOR EXCEEDING THE POLICE POWER

Plaintiffs identify only three cases in which a court has invalidated legislation as exceeding the scope of the police power under the California constitution—two from the 1930s, and one from 1953 that involved a due process claim.  ECF#36 at 17 (citing *In re Kazas*, 22 Cal.App.2d 161 (1937), *Justesen's Food Stores v. City of Tulare*, 12 Cal.2d 324 (1938), and *State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners*, 40 Cal.2d 436 (1953)).  None of these decisions are good law, predating the California Supreme Court's articulation of the highly deferential rational basis standard that courts must apply to such claims.  *See* ECF#28 at 15.  In *Bixby v. Pierno*, 4 Cal.3d 130, 142 (1971), the California Supreme Court endorsed Justice Traynor's *dissenting* opinion in *Thrift-D-Lux* (in which he also criticized *Kazas*), writing that the courts "have realized that in the area of economic due process the will of the majority as expressed by the Legislature and its delegated administrative agencies must be permitted to meet contemporary crucial problems.  [Citations.]  Hence the court has intervened only if the questioned legislation lacks the support of any rational basis."  Plaintiffs identify no California decision applying those standards and invalidating legislation as exceeding the scope of the police power, resorting instead to a handful of out-of-state cases that did not apply California law.[6]

---

[6] The same goes for Plaintiffs' amici, who cite California cases decided after *Thrift-D-Lux* that uniformly *reject* the claims asserted.  *See* ECF#38-1 at 12.  Indeed, one of the cases contains a lengthy discussion of how significantly the applicable standard changed in favor of deference to legislative judgments.  *See Doyle v. Bd. of Barber Examiners*, 219 Cal.App.2d 504, 511-514 (1963).

Moreover, while Plaintiffs write that "[t]he City provides a number of rationales the legislature might have had in mind in passing the Ordinance," they do not discuss any of them apart from the oligopolistic nature of the market, which they dismiss along with the others as "post hoc rationalizations" that do not appear in the findings.  ECF#36 at 18.  This contention would be irrelevant even if it were true, because "deference to post-hoc explanations [is] central to rational basis review," *SmithKline Beecham Corp. v. Abbott Labs*, 740 F.3d 471, 481 (9th Cir. 2014), and accordingly, any failure to address them is fatal.  But it is not true:  The findings state that just four platforms control approximately 98% of the entire market.  S.F. Police Code § 5300(d).  The FAC does not allege otherwise, let alone establish that legislators could not rationally believe it to be true.  Allegations that platforms compete with each other or that restaurants "are free to contract (or not) with platforms," ECF#36 at 18, do not mean that the market is not oligopolistic, nor do they mean that any competition among platforms must occur along the dimension of restaurant commission rates (as opposed to, for example, the various dimensions of the consumer-side experience, number of drivers, route optimization technology to reduce delivery times, or other technological advances).  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 456 (1978) ("Price concessions by oligopolists generally yield competitive advantages only if secrecy can be maintained; when the terms of the concession are made publicly known, other competitors are likely to follow and any advantage to the initiator is lost in the process."); ECF#38-1 at 6 (identifying other potential vectors of competition).[7]

Labels aside, the FAC contains no allegations to establish that legislators could not rationally believe that independent restaurants lack negotiating power relative to platforms, that platforms have been able to use their leverage to impose commission rates that threaten restaurants' profitability, that restaurants nonetheless feel they must contract with the platforms in order to reach the growing share of customers who use them to obtain meals, and that platforms' effect on independent restaurants may adversely affect the City's economy and commercial districts.  S.F. Police Code § 5300(d)-(f).

---

[7] Plaintiffs' contention that the commission cap offers no protection beyond that afforded by competition laws, ECF#36 at 18, is incorrect, not least because oligopolistic pricing is not necessarily an antitrust violation.  *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397-98 (3d Cir. 2015); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019).  The existence of harm to independent restaurants is not dependent on whether platforms' conduct violates competition laws.

Plaintiffs' amici argue that the commission cap should be invalidated as exceeding the police power because economists supposedly agree that all price regulation is counterproductive, pointing to studies of rent control and gasoline price controls.  ECF#38-1 at 4.  They misunderstand the courts' role.  *See, e.g.*, *Santa Monica Beach, Ltd. v. Superior Ct.*, 19 Cal.4th 952, 974 (1999) ("with rent control, as with most other such social and economic legislation, we leave to legislative bodies rather than the courts to evaluate whether the legislation has fallen so far short of its goals as to warrant repeal or amendment"); *Texaco Puerto Rico, Inc. v. Ocasio Rodriguez*, 749 F. Supp. 348, 358 (D.P.R. 1990) (whether gasoline price controls are "good economics, good politics, or good public policy is, in the context of a rational basis analysis, beyond the court's mandate to determine.").

## V.     THE FAC FAILS TO STATE A DUE PROCESS CLAIM

Plaintiffs offer no persuasive response to the City's argument that the commission cap cannot be confiscatory when platforms remain free to raise consumer fees—as Plaintiffs say they will do—such that any financial loss would result only from consumer unwillingness to pay.  *See* ECF#28 at 16.  Plaintiffs argue that they will suffer harm to their reputation and goodwill, ECF#36 at 22, but they identify no case holding that price regulation may be invalidated as confiscatory on the basis of such harm, or even under more general due process principles.  *See WMX Techs., Inc. v. Miller*, 197 F.3d 367, 373-76 (9th Cir. 1999) (en banc) (business reputation and goodwill do not constitute protected liberty or property interests for the purpose of due process).  Moreover, the argument simply reveals that Plaintiffs' business model has rested on shielding consumers from the true costs of Plaintiffs' services by using their leverage to impose high commission rates on restaurants, which have little choice but to pay the amounts that Plaintiffs demand.  The possibility that some consumers may be upset if required to bear a greater share of the cost of their conveniences does not constitute cognizable constitutional harm.  And Plaintiffs cite no authority for the proposition that the Due Process Clause prevents the City from impacting their chosen business model by enacting regulation that could cause them to reallocate costs, even putting aside the FAC's failure to allege facts to establish that legislators could not rationally believe that the current allocation causes harm to the City's economy and commercial districts by threatening restaurants' profitability.  Plaintiffs' efforts to distinguish the City's authority are also unavailing.  *See* ECF#36 at 22 n.16.  They write that *Hettinga v. United*

*States*, 677 F.3d 471, 479-80 (D.C. Cir. 2012) involved a procedural due process claim, but the court held that the plaintiffs failed to plead "that the government has interfered with a cognizable liberty or property interest," which is a prerequisite of substantive due process claims as well. *See Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). With respect to *Brown v. Hovatter*, 561 F.3d 357 (4th Cir. 2009), which upheld state licensing requirements notwithstanding their inconsistency with the plaintiffs' business models, Plaintiffs write that the requirements had a rational basis in ensuring the competence of funeral homes. But the commission cap has a rational basis too, and the possibility that Plaintiffs may have to shift some fees from restaurants to consumers does not violate due process.

Because the commission cap does not limit what Plaintiffs may charge for their services, Plaintiffs' contention that a 15% commission from restaurants alone does not cover their costs or give them a fair return—putting aside that they do enter into contracts with restaurants for a 15% commission—does not establish that the cap is confiscatory, or even that it constitutes interference with a protected liberty or property interest. Plaintiffs cite *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694, 707 (D.C. Cir. 1988) for the proposition that a company "cannot be compelled to carry on even a branch of business at a loss," ECF#36 at 22, but the court was quoting a Supreme Court case from 1920 requiring a railroad to operate an unprofitable line (and the D.C. Circuit case involved a taking claim regarding the conversion of railroad rights-of-way to trail use). The commission cap does not require Plaintiffs to operate any business at all, and in any event, the fees they impose on restaurants and consumers are different revenue sources for the *same* business activity.

Finally, Plaintiffs contend that the commission cap is "arbitrary and unsupported" and, somewhat inconsistently, that the findings concerning the percentage do not "have any evidentiary support." ECF#36 at 19. First, the argument is irrelevant in the absence of interference with a protected property or liberty interest. Second, rational basis review does not require the government to furnish evidentiary support. ECF#28 at 17. Third, as described above, the need for a commission cap is amply supported by findings that the FAC does not establish legislators could not rationally believe, and the amount is not arbitrary. *See supra* Sections II.B, IV.

## VI.   THE FAC FAILS TO STATE AN EQUAL PROTECTION CLAIM

"Even in the context of a motion to dismiss, a plaintiff alleging an equal protection violation must plead a claim that establishes that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'"  *Dairy v. Bonham*, No. C-13-1518 EMC, 2013 WL 3829268, at *6 (N.D. Cal. July 23, 2013) (quoting *Hettinga*, 677 F.3d at 479).  The motion to dismiss explained why the City could rationally distinguish third-party platforms subject to the ordinance both from vendors that contract with restaurants and from platforms that serve fewer than twenty restaurants.  ECF#28 at 18-19.  As to smaller platforms, Plaintiffs' opposition offers no response whatsoever, and as to vendors, Plaintiffs ignore that platforms are unique in taking a percentage of every sale and in controlling restaurants' access to consumers by facilitating and processing the entire transaction between them.  Since Plaintiffs bear the burden to negate every conceivable basis for the classification, their failure to address these arguments is fatal.[8]

Plaintiffs also argue that the commission cap represents impermissible "economic protectionism for the sake of economic protectionism."  ECF#36 at 19 (citing *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008)).[9]  Not so:  The findings of the Ordinance refer to the special role restaurants play in San Francisco's character, community, economy, and commercial districts, and explain the commission cap as an important step to ensure that they can "continue to nurture vibrant, distinctive commercial districts."  *See* ECF#28 at 2-3.  That is not economic protectionism for its own sake.  *See id.* at 8, 15, 18.  "*Merrifield* stands for the unremarkable proposition that no rational basis

---

[8] To the extent Plaintiffs do provide a response, it is also manifestly insufficient.  They complain that "no evidence suggests" that third-party platforms charge above-market prices for non-delivery services, and that the City did not "study" whether other companies "like Google, which provides marketing services" lack market power and charge lower fees.  ECF#36 at 21.  This argument disregards the standard for rational basis review, but it is also irrelevant because the platforms are distinguishable from Google and other providers of individual services for the reasons mentioned above.  The City is not required to analyze separately each service that platforms provide, identify companies that provide only one of the services and compare their pricing, and establish that platforms effectively charge higher prices for each such service—disregarding that platforms impose overall commission rates that restaurants have little choice but to pay to gain access to a large customer base that uses the platform to search restaurants, place orders, and obtain meal delivery.  *See* ECF#38-1 at 6 (describing platforms' "full-stack" model).

[9] Plaintiffs' assertion that the Ordinance requires platforms to "subsidize" restaurants is wrong.  It neither requires platforms to provide any services to restaurants, nor prevents them from charging consumers whatever they please.  It limits the amount by which platforms can require restaurants to subsidize a service to consumers.

1    exists if the law lacks *any* legitimate reason for its adoption…. For better or for worse, governmental

2    regulations today typically benefit some groups and burden others. So long as there are other

3    legitimate reasons for the economic distinction, we must uphold the state action." *San Francisco Taxi*

4    *Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020); *see also Dairy*, 2013 WL

5    3829268, at *7. Nothing in the FAC establishes that the Board could not rationally believe that

6    protecting independent restaurants from high commissions that threaten their ability to operate

7    profitably would benefit the character and vitality of City neighborhoods.

8         Finally, not only does the FAC fail plausibly to allege that third-party platforms are politically

9    unpopular or the victims of irrational animus, *see* ECF#28 at 19-20, but—as Plaintiffs acknowledge,

10   ECF#36 at 21 n.11—such allegations are insufficient without a showing that the legislation also serves

11   no legitimate governmental purpose. As discussed above, Plaintiffs have failed to make that showing.

12   **VII.    THE FAC FAILS TO STATE A CLAIM FOR FIRST AMENDMENT RETALIATION**

13        DoorDash contends that the enactment of the "then-temporary Ordinance" one week after

14   Proposition 22 passed would "chill any ordinary company's public advocacy." ECF#36 at 23. But the

15   Board's original enactment only codified the Mayor's existing commission cap. ECF#25 ¶ 54.

16   Putting aside that the FAC does not allege that it was retaliatory, *see infra*, the codification of already-

17   existing law has no financial consequence and does not plausibly chill anything.

18        In any event, the FAC fails plausibly to allege a substantial causal relationship. DoorDash

19   relies on *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) ("*ASA*"), but

20   the facts of that case are a far cry from what is alleged here. The ASA supported an initiative,

21   Proposition 204, to increase funding for public education, and "within weeks" of the election, the

22   Arizona Board of Regents ("ABOR")—which for fifteen years had collected fees for ASA and

23   remitted them to the organization at no cost—voted to suspend collection of the fee and to withhold

24   funds already collected. While the court noted that several Regents had previously criticized the ASA

25   for supporting Proposition 204, that was hardly all there was to it: "Several Regents commented that

26   the suspension was 'political' in nature and was undertaken in response to the ASA's Proposition 204

27   advocacy." *ASA*, 824 F.3d at 863. The suspension was directed solely to the ASA and there is no

28

indication that any rationale for the action was provided apart from the express statements by multiple Regents confirming that it was a political decision in response to the ASA's advocacy.

This case, by contrast, involves legislation supported by express findings, all of which concern the harms caused to independent restaurants by third-party platforms' *business practices* and none of which refer to political advocacy in support of Proposition 22. *See* ECF#28 at 22. Moreover, the FAC quotes statements by several supervisors that affirmatively undermine DoorDash's claim because they indicate that those supervisors had the same motivations set forth in the findings. *Id.* at 23-24. The *only* supervisor who even made any reference to Proposition 22 described a "long-term project" to address that law's harmful effects. *Id.* at 24.[10] This case is the opposite of *ASA* because the statements of legislators alleged in the FAC, as well as the findings, indicate a motivation that is not retaliatory.

Moreover, while ABOR's action in *ASA* targeted the one organization against which ABOR allegedly retaliated, here the Ordinance does not affect some of the principal supporters of Proposition 22—which do not provide restaurant delivery services in San Francisco—and does affect others, like Grubhub, notwithstanding that they did not publicly support Proposition 22. ECF#28 at 22. DoorDash cites a second case involving the withholding of funds from student organizations for the proposition that an action can be retaliatory even if it impacts additional parties (although the failure to impact other supporters of Proposition 22 is unaddressed). ECF#36 at 24 (citing *Koala v. Khosla*, 931 F.3d 887, 906 (9th Cir. 2019)). In *Koala*, the student government at UCSD discontinued funding for student-run media organizations after The Koala—a school newspaper—published an article satirizing the concept of "safe spaces" on campus. Within days, a university official urged people to pressure the student government to "end the madness," and the Chancellor condemned The Koala and called on the entire community to do so as well. At a regularly scheduled meeting of the student government on the same day, the Vice Chancellor read the Chancellor's statement and a member of the student government introduced the "Media Act" to discontinue funding for student-run media organizations. It was not on the agenda but was nonetheless approved at the same meeting. The court noted that the Media Act did *not* apply to all student-run organizations but only to student-run *media* organizations,

---

[10] Plaintiffs inexplicably write that Supervisors Safai and Peskin both referred to Proposition 22. ECF#36 at 4 (citing ECF#25 ¶¶ 69-70). Supervisor Safai's statements do nothing of the sort.

discriminating "based on the identity of the speaker" and singling them out for "disfavored access to student activity fee funding."  931 F.3d at 904.  No explanation was offered for singling out media organizations.  Moreover, the complaint alleged that, notwithstanding the Media Act, at least one other student media organization in fact "continues to receive funding for its print media."  *Id.*  All of those features are missing here.  The commission cap applies to third-party platforms—regardless of whether they supported Proposition 22—because of the effects of those platforms' business practices, and it does not apply to some of Proposition 22's principal supporters, which are not third-party restaurant delivery platforms.  Moreover, even as to third-party platforms, the Ordinance is further tailored by excluding from regulation the commissions charged to formula retail restaurants, *see* ECF#28 at 3, because they are likely to have negotiating power that independent restaurants lack.

In addition, the retaliation alleged in both *ASA* and *Koala* occurred within days or weeks of the protected activity.  Here, the sunset provision was removed over seven months after the voters passed Proposition 22 and almost two years after DoorDash began its public advocacy in support of the measure.  *See* ECF#28 at 21.[11]  DoorDash argues that it also alleges that the original enactment of the commission cap was retaliatory, ECF#36 at 24, but that claim is contradicted by the very paragraph of the FAC it cites.  *See* ECF#25 ¶ 165 ("Mere days after Proposition 22 was passed, the City passed the Ordinance (at that time in its temporary version).  The Board *later removed the Ordinance's sunset provision in retaliation for the Plaintiffs' political speech in support of Proposition 22*….") (emphasis added).  But it would make no difference if the FAC had so alleged, because as noted above, the Board's original commission cap only codified the Mayor's order.  The FAC does not allege that the Mayor had a retaliatory motive in issuing it, which predated the election by seven months, and the FAC affirmatively alleges that she opposed the Board's later removal of the commission cap.  *Id.* ¶ 73.

The two student-funding cases on which DoorDash relies are also different because they concerned efforts to silence organizations whose very mission was core First Amendment activity—

---

[11] DoorDash argues that this Court should consider anything within a "three-to-eight-month time range."  ECF#36 at 24 (citing *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 928 (9th Cir. 2004)).  The almost two-year period between the beginning of DoorDash's public advocacy and the Board's removal of the sunset provision is well outside that range.  And here there are other factors— including the Ordinance's findings and operation, and statements quoted in the FAC—that affirmatively undermine the hypothesized connection between the two events.

1  press and political advocacy—by eliminating their funding.  *Koala*, 931 F.3d at 904; *ASA*, 824 F.3d at

2  868-69.[12]  Here, the City enacted regulations—including but not limited to the commission cap, *see*

3  ECF#28 at 22—on the business practices of third-party restaurant delivery platforms based on its

4  findings that those practices were causing harm to independent restaurants and thereby to the City's

5  economy, neighborhoods, and commercial districts.  DoorDash would have this Court disregard those

6  findings (and the fact that supervisors' public statements actually affirm those findings as the basis for

7  the legislation), along with the Ordinance's actual operation (which applies to platforms that did not

8  support Proposition 22 yet does *not* apply to some of its principal funders), based on nothing but the

9  fact that the Board, many months earlier, exercised its own First Amendment right, *Blair v. Bethel Sch.*

10 *Dist.*, 608 F.3d 540, 545 (9th Cir. 2010), to advocate against Proposition 22's gutting of worker

11 protections.  The retaliation claim in the FAC is nothing like *ASA* or *Koala*, and DoorDash identifies

12 no other case law that would authorize the invalidation of legislation on such a flimsy pretext.[13]

13 **VIII.  LEAVE TO AMEND SHOULD BE DENIED**

14      Plaintiffs do not indicate how, after having already amended their complaint once, they could

15 further amend it to cure its legal deficiencies.  They cannot.  Each claim is fundamentally flawed as a

16 matter of law, and accordingly, leave to amend should be denied.

17 Dated:  November 19, 2021

18                                                     DAVID CHIU, City Attorney

19                                               By:      /s/*Jeremy M. Goldman*
                                                     JEREMY M. GOLDMAN

20                                                     Attorneys for City and County of San Francisco

21      ───────────────────

22      [12] *Koala* also noted that "in the university setting, 'the State acts against a backdrop and
   tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.'"
   931 F.3d at 906 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995)).

23      [13] As the Seventh Circuit observed, "[a] pragmatic ground for rejecting the principle urged by
   the plaintiffs is that its acceptance would put at hazard a vast amount of routine legislation—federal,

24 state, and local.  Legislation passed by lame-duck legislatures, legislation passed by newly elected
   legislators—all would be subject to invalidation by a federal court upon evidence that the legislation,

25 though on its face concerned only with the most ordinary matters of governmental administration, had
   actually been intended to punish the legislators' political opponents…. The expansion of judicial

26 review of legislation would be breathtaking."  *Fraternal Ord. of Police Hobart Lodge No. 121, Inc. v.
   City of Hobart*, 864 F.2d 551, 555 (7th Cir. 1988); *see also, e.g.*, *Kensington Volunteer Fire Dep't,*

27 *Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 468 (4th Cir. 2012).  Moreover, because discovery of
   individual legislators' subjective motivations is impermissible, *City of Las Vegas v. Foley*, 747 F.2d

28 1294, 1299-99 (9th Cir. 1984), there is no additional information on which to base the claim.