United States District Court
Northern District of California

1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    DOORDASH, INC., et al.,                    Case No.  21-cv-05502-EMC
8                    Plaintiffs,
9         v.                                    ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANT'S
10   CITY AND COUNTY OF SAN                      MOTION TO DISMISS FIRST
     FRANCISCO,                                  AMENDED COMPLAINT
11
                     Defendant.                  Docket No. 28
12
13
14        Plaintiffs DoorDash, Inc. ("DoorDash") and Grubhub Inc. ("Grubhub") (collectively,

15   "Plaintiffs") filed this action against Defendant City and County of San Francisco (the "City")

16   alleging that an enacted ordinance—which caps the commissions that third-party platforms, such

17   as Plaintiffs, can charge restaurants to 15%—is unlawful.  *See* Docket No. 1 ("Complaint or

18   Compl.").  After the City filed its motion to dismiss the Complaint, Plaintiffs filed their First

19   Amended Complaint.  *See* Docket No. 25 ("FAC").  Pending before the Court is the City's motion

20   to dismiss Plaintiffs' First Amended Complaint.  *See* Docket No. 28 ("Mot.").  For the following

21   reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the City's motion to dismiss.

                              **I.        BACKGROUND**

23   A.   Factual History

24        Around February 25, 2020, Mayor London Breed declared a state of emergency in San

25   Francisco due to COVID-19.  FAC ¶ 35.  In March 2020, the City issued a shelter-in-place order.

26   *Id.* ¶ 36.  On April 10, 2020, Mayor Breed promulgated the Ninth Supplement to Mayoral

27   Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020 ("April

28   2020 Order"), which temporarily capped the commissions that third-party platforms could charge

restaurants to 15%.  *Id.* ¶ 39.  The intent of the April 2020 Order was to ensure that the City's restaurants were protected during the COVID-19 pandemic.  *Id.* ¶ 40.

Beginning in 2019 and throughout 2020, DoorDash and other industry participants publicly supported Proposition 22, a state-wide ballot measure, which would make clear that workers who use platforms such as those of Plaintiffs are independent contractors without certain benefits.  *Id.* ¶ 46.  Many members of the City's Board of Supervisors (the "Board") publicly opposed Proposition 22.  *Id.* ¶¶ 47(a), 50.  On November 3, 2020, California voters passed Proposition 22 by a margin of over 17 percentage points.  *Id.* ¶¶ 46, 48.

A week later, on November 10, 2020, the Board codified the temporary commission cap from the April 2020 Order and enacted Article 53 to the San Francisco Police Code (the "Ordinance").  *Id.* ¶ 55.  On November 20, 2020, Mayor Breed approved the Ordinance.  *Id.*  The provision at issue here in the Ordinance is the imposition of a 15% cap on the commissions that certain third-party delivery service companies may charge restaurants (the "Commission Cap").  *Id.* ¶ 57.  The Ordinance explains that the Commission Cap is an "important step[] to ensure that restaurants can thrive in San Francisco and continue to nurture vibrant, distinctive commercial districts."  FAC, Ex. D ("S.F. Police Code") § 5300(j).

Specifically, the Ordinance's findings state that restaurants "are vital to the character and community fabric of San Francisco" and are "important engines of the local economy, providing jobs and serving as commercial anchors in neighborhoods across the City."  *Id.* § 5300(a).  The findings note that "in recent years, the City's restaurant industry has been in decline" and "the number of restaurant closures has exceeded the number of new restaurants in the City for at least the past five consecutive years" according to data from the Department of Public Health.  *Id.* § 5300(b).  According to the City, this decline "coincides with the rapid rise of third-party food delivery services, businesses that process food delivery and pickup orders through mobile apps and websites."  *Id.* § 5300(d).  One consumer market outlook publication found that "revenue in the U.S. 'platform-to-consumer delivery' market was $8.7 billion in 2019, a nearly 10% increase over the same segment's valuation in 2018" and market research shows that "approximately 15.9% of all U.S. residents utilized third-party food delivery services at least once in the past year,

2

many on a regular basis." *Id.*

The Ordinance states that "This booming market is highly concentrated in just a handful of businesses" and as of "November 2019, just four third-party food delivery services controlled approximately 98% of the entire market." *Id.* "The increasing market dominance of a small number of third-party food delivery services companies has resulted in increasingly difficult economic conditions for City restaurants, which must contract with these companies if they wish to access the growing share of customers who rely on delivery platforms to obtain meals." *Id.* § 5300(e). Because of the platforms' market dominance, the Ordinance explains that they are able to "use this leverage to extract high fees from restaurants—typically totaling 30% of an order total—and thereby diminish restaurants' already-narrow profit margins." *Id.* § 5300(f). For example, "[s]ample contracts used by leading third-party food delivery services companies reflect that these companies commonly charge restaurants a 10% per-order fee for 'delivery services,' the most logistically demanding and resource-intensive service they provide to restaurants" and impose additional fees "totaling as much as 20% of the order cost for what are described as 'marketing' or 'logistics' services." *Id.* § 5300(g).

As a result, the Ordinance explains that "[c]apping the fees third-party food delivery services companies can charge restaurants" would prohibit these companies from "restricting restaurant pricing," among other things, "to ensure that restaurants can thrive in San Francisco and continue to nurture vibrant, distinctive commercial districts." *Id.* § 5300(j). It states that because "leading third-party food delivery services companies currently charge a 10% per-order fee for the most resource-intensive aspect of their business – delivery services – and that these companies report high profit margins from all aspects of their business operations" "a 15% fee cap on per-order fees" is "a reasonable step to protect restaurants from financial collapse without unduly constraining third-party food delivery services' businesses." *Id.*

The Commission Cap applies to "third-party food delivery services," defined as "any website, mobile application or other internet service that offers or arranges for the sale of food and/or beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food preparation and service

establishments."  FAC ¶ 59 (quoting S.F. Police Code § 5301).  It does not apply to "any

restaurant that meets the definition of a formula retail use under section 303.1 of the Planning

Code," *i.e.*, any restaurant that "has eleven or more other retail sales establishments in operation"

and that "maintains two or more of the following features:  a standardized array of merchandise, a

standardized façade, a standardized décor and color scheme, uniform apparel, standardized

signage, a trademark or a servicemark."  *Id.* ¶ 61.

Originally, the Commission Cap had a sunset date of sixty days after the amendment or

termination of the pandemic "Stay Safer At Home" order or any subsequent order allowing

restaurants to resume at 100% capacity.  *Id.* ¶ 62.  But in June 2021, the Board of Supervisors held

meetings to discuss removing the Ordinance's sunset provision and making it permanent.  *Id.* ¶ 64.

Plaintiffs allege that in "voting for the permanent cap," Supervisor Aaron Peskin publicly stated,

"DoorDash, Uber Eats, Postmates all contributed to the most expensive ballot measure in history,

Prop 22, to gut employee protections." *Id.* ¶ 69.  On the same day, he posted the following on

Facebook:

> "In another first among major American cities, San Francisco just
> passed my legislation setting a permanent 15% cap on delivery fees
> charged by DoorDash, UberEats, Grubhub and Postmates to
> independent restaurants.  Third-party food delivery saw exponential
> growth during the pandemic, while SF restaurants incurred $400M
> in rent debt. 70,000 Bay Area hospitality workers lost their jobs,
> while Big Tech spent $220M to pass Prop 22, the most anti-worker
> initiative in California history.  We will continue to push back
> against companies who demonstrate blatant disregard for small
> businesses, workers and neighborhoods. Correcting this imbalance is
> a long-term project."

*Id.*  The FAC also alleges that Supervisors Ahsha Safai and Catherine Stefani made statements

about third-party platforms at this time but they do not explicitly discuss DoorDash's support of

Proposition 22.  *See id.* ¶¶ 64(b), 70(a)–(c).  On June 10, 2021, the Board voted unanimously to

repeal the sunset date.  *Id.* ¶ 71.  Mayor Breed declined to sign the sunset repeal measure,

explaining that she had "concerns about making [the Commission Cap] legislation permanent" and

that the Ordinance "is unnecessarily prescriptive in limiting the business models of the third-party

organizations, and oversteps what is necessary for the public good."  *Id.* ¶ 74.  On June 29, 2021,

the Ordinance became effective without Mayor Breed's signature.  *Id.* ¶ 73.

United States District Court
Northern District of California

B.      Procedural History

On July 16, 2021, Plaintiffs filed this action against the City and on September 10, 2021, the City filed a motion to dismiss the Complaint.  *See* Compl.; Docket No. 20.  On October 1, 2021, Plaintiffs filed their First Amended Complaint alleging violations of (1) the Contract Clause of the U.S. Constitution, 42 U.S.C. § 1983, and the California Constitution; (2) the Takings Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 19 of the California Constitution; (3) Article IX, Section 7 of the California Constitution; (4) the Due Process Clause of the U.S. Constitution and Article I, Section 7 of the California Constitution; (5) the Equal Protection Clause of the U.S. Constitution and the California Constitution; and (6) the First Amendment of the U.S. Constitution and Article I, Sections 2 and 3 of the California Constitution for DoorDash.  Docket. No. 25.  Three days later, the City withdrew its original motion to dismiss and on October 15, 2021, the City filed the present motion to dismiss the FAC. The motion hearing took place on December 16, 2021.  Docket No. 54 ("Hearing Tr.").

## II.      APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] must . . . suggest that the claim has at least a plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal quotation marks omitted).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

United States District Court
Northern District of California

5

2011)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

If the court dismisses pleadings, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## III.     **DISCUSSION**

A.     Judicial Notice

As a preliminary matter, the parties dispute whether the Court should take judicial notice of 28 exhibits.  *See* Docket Nos. 29 ("JNR"), 37 ("Opp. JNR").  A court may take judicial notice of "matters of public record" without converting a motion to dismiss into a motion for summary judgment.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  But a court may not take judicial notice of a fact that is "subject to reasonable dispute."  Fed. R. Evid. 201(b); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (holding that the district court erred by taking judicial notice of disputed matters in public records, specifically facts in dispute as to an extradition hearing and waiver).  Under Federal Rule of Evidence 201, a court "may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Courts also do not take judicial notice of facts that are irrelevant.  *See Khoja*, 899 F.3d at 1000 n.5.

In addition, a defendant "may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002 (9th Cir. 2018).  "[U]nlike judicial notice, a court may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Khoja*, 899 F.3d at 1003.  But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a

well-pleaded complaint. This admonition is, of course, consistent with the prohibition against resolving factual disputes at the pleading stage." *Id.*

The City requests that the Court take judicial notice of 28 exhibits, which fall into the following categories: (1) a resolution adopted by the Board ("Ex. A"); (2) a proposed advisory of the New York State Liquor Authority ("NYSLA") ("Ex. T"); (3) the Plaintiffs' public SEC filings ("Exs. B–D"); (4) news articles ("Exs. E–S, U–Y"); and (5) campaign finance records related to the Proposition 22 campaign maintained by the California Secretary of State ("Exs. Z–BB"). Docket No. 30 ("Goldman Decl.") ¶¶ 2–29. Plaintiffs object to most of the exhibits and argue that the City's requests improperly seek judicial notice of the truth of disputed facts in public records or of facts that are not relevant to the motion to dismiss.[1] Opp. JNR at 1 (objecting to the request for judicial notice of Exs. B–Y and seeking the limited judicial notice of Exs. Z–BB).

One of Plaintiffs' main arguments is that the Court should deny the City's request for judicial notice of any documents related to the foreseeability of regulation impacting Plaintiffs' commissions under the Contract Clause analysis because the question of foreseeability of regulation is a disputed fact. Opp. JNR at 4. The City disagrees and relies on two cases to argue that the question of foreseeability of regulation is a question of law. Reply at 1; *see, e.g.*, *Olson v. California*, 2020 WL 6439166, at *11 (C.D. Cal. Sept. 18, 2020) (holding that the parties should have foreseen the regulation at issue could alter their contract obligations because "courts have opined, as early as 2015, that Uber drivers could plausibly be considered employees despite contractual language."); *All. of Auto. Mfrs., Inc. v. Currey*, 2014 WL 2219219, at *4 (D. Conn. May 28, 2014) (noting that the question of foreseeability under the Contract Clause analysis is a "legal question"). But these cases show that the legal question of foreseeability relies on the determination of certain facts, *e.g.*, existing regulation or laws at the time, court opinions, or the

---

[1] The Court rejects the City's assertion that Plaintiffs' opposition to its request for judicial notice should be stricken because they filed a separate 10-page opposition from the 25-page opposition to the City's motion to dismiss, thereby violating Local Rule 7-3(a), which provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum." Docket No. 49 ("Reply") at 1. The City's request for judicial notice was separately filed from its motion to dismiss and so the Plaintiffs may also separately file its opposition to the request for judicial notice.

1    history of regulation in an industry.  *See infra* Part III.B.1.  In this case, it is undisputed that there

2    is no history of regulating the commissions of third-party delivery apps.  Mot. at 6.  The City

3    instead argues that because the Plaintiffs were aware that the industry could be regulated, based on

4    articles and their own statements, the regulation was foreseeable.  *Id.*  Plaintiffs dispute whether

5    these articles and their own statements prove that the regulation was foreseeable.  Docket No. 36

6    ("Opp.") at 7–9.  But the question of foreseeability is separate from the question of judicial notice.

7    The Court therefore will take judicial notice of these statements or articles for the reasons

8    explained below.

9          Turning to the exhibit categories, the Board resolution opposing Proposition 22, referenced

10   in paragraph 47(a) of the FAC, is subject to judicial notice as a matter of public record and is

11   relevant to DoorDash's retaliation claim.  JNR at 1 (citing *Cath. League for Religious & C.R. v.

12   City & Cty. of San Francisco*, 464 F. Supp. 2d 938, 941 (N.D. Cal. 2006) (Patel, J.) (taking

13   judicial notice of multiple resolutions by the San Francisco Board of Supervisors)); *see Goldman*

14   Decl., Ex. A.  Plaintiffs do not object, but they contend that it cannot be offered for the truth of

15   any statements within it.  Opp. JNR at 8; *Lee*, 250 F.3d at 689–90.  Because the Board resolution

16   contains some disputed facts, *e.g.*, accusing Plaintiffs of exploiting their employees for profit, the

17   Court **GRANTS** judicial notice of Exhibit A, but not for the truth of any statements within it that

18   are subject to reasonable dispute.  *See Khoja*, 899 F.3d at 1003.

19         In contrast, the proposed Advisory in the Agenda of the NYSLA is not subject to judicial

20   notice.  JNR at 1; *see* Goldman Decl., Ex. T.  Although it is a matter of public record, it does not

21   appear in the FAC and absent a showing that Plaintiffs were aware of the matter which had

22   nothing to do with San Francisco, it is irrelevant to the resolution of the motion to dismiss.  Opp.

23   JNR at 8.  The City "fails to explain how a *proposed* action by the *New York* State Liquor

24   Authority is relevant to Plaintiffs' ability to foresee action taken by *the San Francisco* Board of

25   Supervisors," absent Plaintiffs' specific knowledge of the New York matter.  *Id.* (emphasis in

26   original).  The Court **DENIES** the request for judicial notice of Exhibit T.

27         Third, the Plaintiffs' SEC filings are subject to judicial notice because they are matters of

28   public record and "are relevant to the foreseeability of regulation that could impact the

United States District Court
Northern District of California

8

commissions charged by third-party delivery service companies and to what Plaintiffs communicated about the risks of investment, which bears on their regulatory taking claim." JNR at 2; *see* Goldman Decl., Exs. B–D. The City asserts that judicial notice of Plaintiffs' own statements in their SEC filings is appropriate to establish their awareness and "does not require this Court to assume that any statement is true." Reply at 2. Courts have judicially noticed documents with a party's own statements to establish awareness. *See, e.g.*, *Watkins v. United States*, 854 F.3d 947, 949–50 (7th Cir. 2017) (taking judicial notice of another complaint filed by the plaintiff, which established that the plaintiff was statutorily barred from bringing her medical malpractice suit because there was no plausible dispute that the plaintiff was unaware of the previous filing); *Turner v. Boldt*, No. 97-CV-1616-SI, 1997 WL 564052, at *2 (N.D. Cal. Aug. 26, 1997) (granting judicial notice of plaintiff's own documents which demonstrate that she was aware of a settlement more than one year before she filed the personal injury action).

Plaintiffs contend that courts, including the Ninth Circuit, have refused to take judicial notice of SEC filings, "even if they might otherwise fall within Federal Rule of Evidence 201, when the only purpose for which the filing is offered is to establish a disputed fact." Opp. JNR at 3. They rely on *Khoja*, where the Ninth Circuit denied a request for judicial notice of investor call transcripts submitted to the SEC because "[r]easonable people could debate what exactly this conference call disclosed" about what investors knew. *Khoja*, 899 F.3d at 1003; *see also Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (upholding district court's refusal to take notice of SEC filing in a discrimination suit because "there was considerable argument over the significance of the 10–K form" and "the fact in question [how many employees the company had for the purposes of establishing punitive damages] was not capable of accurate and ready determination by resort to the 10-K"). But in this case, the statements at issue are the Plaintiffs' own statements about the status of regulation in their industry. *See, e.g.*, Goldman Decl., Ex. B at 22 [26/183] (Grubhub noting that it was subject to "evolving" laws including those that "may cover . . . pricing" and other issues); Goldman Decl., Ex. C at 36 [40/266] (DoorDash stating that "[r]egulatory and administrative bodies may enact new laws or promulgate new regulations that are adverse to our business . . . including . . . by

9

1    attempting to regulate the commissions businesses like ours agree to with merchants."); Goldman

2    Decl., Ex. D at 59–60 [71–72/371] (DoorDash noting that its "business is subject to a variety of

3    U.S. laws and regulations, including those related to . . . pricing and commissions, many of which

4    are unsettled and still developing" and acknowledging that commission caps could be "retained

5    after the COVID-19 pandemic subsides.").  There is no dispute that Plaintiffs made these

6    statements, and they are relevant to the question of foreseeability.  The Court therefore **GRANTS**

7    the request for judicial notice of the Plaintiffs' SEC filings, not for the truth of the statements

8    therein but to establish their awareness as it relates to the question of foreseeability.

9         Fourth, newspaper publications and information on publicly accessible websites can be

10   subject to judicial notice to show what information was in the public realm and not for the truth of

11   the statements.  JNR at 2; *see Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d

12   954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to 'indicate

13   what was in the public realm at the time, not whether the contents of those articles were in fact

14   true.'"); *see* Goldman Exs. E–S, U–Y.  Plaintiffs concede that judicial notice to establish that these

15   articles were in the public realm is proper.  Opp. JNR at 6.  These documents are also relevant to

16   question of whether the regulation impacting Plaintiffs' commissions was foreseeable.  JNR at 2;

17   *see* FAC ¶ 30.  The City also asserts that the documents are relevant to the question of whether the

18   Ordinance is reasonable.  JNR at 2.  It explains that the Court does not need to assume the truth of

19   the facts in the articles because "a court is required to defer to legislative judgments, [and

20   therefore] it may not engage in judicial factfinding or evaluate the wisdom of policy choices,"

21   which is further supported by the fact that "the FAC does not contain plausible allegations to

22   establish that legislators would not believe [the articles] to be true."  JNR at 2.  The Court

23   **GRANTS** the request for judicial notice of the articles but only for the purpose of establishing that

24   they were in the public realm because they are relevant to the questions of foreseeability and the

25   Ordinance's reasonableness.

26        Finally, public campaign contributions filed with the California Secretary of State are

27   subject to judicial notice.  JNR at 2–3 (citing *Riel v. City of Santa Monica*, 2014 WL 12694159, at

28   *3 (C.D. Cal. Sept. 22, 2014)); Goldman Decl., Exs. Z–BB.  These documents are relevant to

United States District Court
Northern District of California

1    DoorDash's retaliation claim because they show substantial contributions by Instacart, a grocery

2    delivery service, and rideshare service, Lyft, which are not impacted by the Commission Cap.

3    JNR at 3.  The documents may also be relevant because they show that other delivery app services

4    such as Delivery.com, Slice, ChowNow, EatStreet, MealPal, Olo, Relay, or Ritual did not make

5    public campaign contributions to Proposition 22.  The Court therefore **GRANTS** the request for

6    judicial notice of public campaign contributions.

7    B.    Contract Clause

8            Plaintiffs allege that the Ordinance violates the Contract Clause of the federal and

9    California constitutions because the Ordinance substantially impairs their existing contracts with

10   restaurants that include commission rates above 15% and the Ordinance does not have a

11   significant or legitimate public purpose.  FAC ¶¶ 86, 89.

12           The Contract Clause of the U.S. Constitution provides that "No State shall . . . pass any . . .

13   Law impairing the Obligation of Contracts . . . ."  U.S. Const., art. I, § 10, cl. 1.  It "restricts the

14   power of States to disrupt contractual arrangements."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821

15   (2018).  The California Constitution also prohibits the Legislature from enacting a "law impairing

16   the obligation of contracts."  Cal. Const., art. I, § 9.

17           To determine when a law violates the Contract Clause, the Supreme Court has "long

18   applied a two-step test" where (1) the threshold issue is whether the state law has "operated as a

19   substantial impairment of a contractual relationship" and (2) if such factors show a substantial

20   impairment, whether the law is drawn in an "appropriate" and "reasonable" way to advance "a

21   significant and legitimate public purpose."  *Sveen*, 138 S. Ct. at 1821–22.  "The California

22   Supreme Court uses the federal Contract Clause analysis for determining whether a statute violates

23   the parallel provision of the California Constitution."  *Campanelli v. Allstate Life Ins. Co.*, 322

24   F.3d 1086, 1097 (9th Cir. 2003).

25           1.    Whether the Ordinance is a Substantial Impairment of a Contractual Relationship

26           Turning to the threshold issue, the substantial impairment inquiry "has three components:

27   whether there is a contractual relationship, whether a change in law impairs that contractual

28   relationship, and whether the impairment is substantial."  *In re Seltzer*, 104 F.3d at 236.  The City

United States District Court
Northern District of California

11

1   only challenges the third component, whether the impairment is substantial.  Mot. at 5.

2   "In answering that question," the Supreme Court "has considered the extent to which the

3   law undermines the contractual bargain, interferes with a party's reasonable expectations, and

4   prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1817.  There is

5   no substantial impairment when the contract is in a regulated industry and the challenged law was

6   "foreseeable as the type of law that would alter contract obligations."  *Energy Rsrvs. Grp., Inc. v.*

7   *Kansas Power & Light Co.*, 459 U.S. 400, 416 (1983).  Courts consider whether the law "invades

8   an area never before subject to regulation by the State" and hold that the impairment is substantial

9   when laws "work[] a severe, permanent, and immediate change" to contractual rights.  *Allied*

10  *Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247, 250 (1978).

11  The FAC alleges, and the City does not dispute, that the relationship between restaurants

12  and third-party platforms has historically not been subject to government regulation.  FAC ¶ 30.

13  But the City asserts that the Plaintiffs knew "that they were operating in a growing industry in

14  which regulation was unsettled and developing, including with respect to laws impacting their

15  commissions."  Mot. at 6.  For example, in its April 7, 2014, IPO prospectus, Grubhub noted that

16  it was subject to "evolving" laws governing the Internet and e-commerce, including those that

17  "may cover . . . pricing" as well as other issues.  Goldman Decl., Ex. B at 22 [26/183].  In a draft

18  registration statement to the SEC on February 13, 2020, DoorDash stated that "[r]egulatory and

19  administrative bodies may enact new laws or promulgate new regulations that are adverse to our

20  business . . . including . . . by attempting to regulate the commissions businesses like ours agree to

21  with merchants."  Goldman Decl., Ex. C at 36 [40/266].  Additionally, in its December 2020 IPO

22  prospectus, DoorDash similarly noted that its "business is subject to a variety of U.S. laws and

23  regulations, including those related to . . . pricing and commissions, many of which are unsettled

24  and still developing," and acknowledged that "commission caps" could be "retained after the

25  COVID-19 pandemic subsides."  Goldman Decl., Ex. D at 59-60 [71-72/371].

26  The City also points out that there was "robust debate" about the amount of Plaintiffs'

27  commissions, as acknowledged in their FAC and that complaints about the platforms' power to

28  impose excessive commissions circulated in the press long before the pandemic.  *See* FAC ¶ 30;

United States District Court
Northern District of California

1    Goldman Decl., Exs. E–H.  In fact, before the declaration of emergency on February 25, 2020,

2    "the press reported that San Francisco supervisors were considering legislation to address the

3    impact of high commission rates on local restaurants."  Mot. at 6 (citing Goldman Decl., Exs. I, J).

4         But the Court cannot say that these articles or Plaintiffs' disclosures establish as a matter of

5    law that when the Plaintiffs contracted with San Francisco restaurants "it was foreseeable that the

6    City would enact a permanent price-fixing law."  Opp. at 8.  As Plaintiffs argue, "prior to the

7    outbreak of COVID-19, no government had regulated the commissions that third-party platforms

8    could charge restaurants (or consumers)."  FAC ¶ 31.  And it appears that "no legislature in

9    California had even formally introduced commission-cap legislation prior to 2020."  *Id.*  Plaintiffs

10   point out that it "reasonably expected long-term revenue streams from their contracts that included

11   commission rates above 15%" because "[p]rior to the COVID-19 pandemic, many restaurants

12   joined one or both of Plaintiffs' platforms at commission rates greater than 15%" and until "the

13   Ordinance, the vast majority of those restaurants chose to continue their contracts with Plaintiffs at

14   commission rates greater than 15%."  FAC ¶ 86.  "These reasonably expected revenue streams are

15   [allegedly] important because Plaintiffs make significant up-front investments in their platforms in

16   reliance on long-term recoupment of those investments through commissions."  *Id.* ¶ 87.

17        In support of its position, Plaintiffs cite *Association of Equipment Manufacturers v.*

18   *Burgum*, 932 F.3d 727 (8th Cir. 2019) ("*AEM*"), where the Eighth Circuit affirmed a district court

19   decision to preliminary enjoin a North Dakota law that prohibited farm equipment manufacturers

20   from imposing certain obligations on dealers notwithstanding that these obligations were set forth

21   in existing contracts.  *AEM*, 932 F.3d at 729–30.  The Eighth Circuit had "previously held that a

22   similar retroactive law governing agreements between farm equipment dealers and manufacturers

23   in South Dakota violated the Contract Clause" and therefore the law was unforeseeable and the

24   manufacturers had no "appreciable warning of an impending intervention into their agreements."

25   *Id.*  The City asserts that *AEM* is distinguishable because there is no prior law that would make the

26   Ordinance unforeseeable and this case involves a new industry with developing regulation, where

27   "it would be patently unreasonable for an e-commerce company to assume that the early status

28   quo would persist indefinitely."  Reply at 2.

13

United States District Court
Northern District of California

1    While there is a logic to the City's argument that there is not a long history within an

2  established industry of freedom from regulation, there is little case law addressing the context of a

3  new industry.  Cases cited by the City involved industries that were traditionally regulated.  For

4  example, in *Energy Reserves Group*, the Supreme Court found that a law did not substantially

5  impair existing contracts because the natural gas industry is "heavily regulated" and that "[s]tate

6  authority to regulate natural gas prices is well established."  *Energy Rsrvs.*, 459 U.S. at 414.

7  Although the state had not "regulat[ed] natural gas prices specifically, its supervision of the

8  industry was extensive and intrusive."  *Id.*  Similarly, in *California Grocers Ass'n v. City of Long*

9  *Beach.*, 2021 WL 3500960 (C.D. Cal. Aug. 9, 2021), the court held that the temporary ordinance

10  at issue—which mandated that all grocery workers in the area be paid four dollars more than their

11  hourly wage for a period of at least 120 days—did not substantially impair the existing contracts.

12  *California Grocers Ass'n*, 2021 WL 3500960, at *5.  The court held that "[o]ther minimum labor

13  standards impact the grocery industry and the parties could have foreseen additional regulation"

14  and "the 'premium pay' the Ordinance requires is not so dissimilar from other mandated benefits

15  that it necessarily creates a substantial impairment."  *Id.* at *11.

16    To be sure, in *Olson v. California*, 2020 WL 6439166 (C.D. Cal. Sept. 18, 2020), the court

17  held that there was no substantial impairment of independent contractor contracts—contracts

18  between Postmates, a third-party food delivery app and Uber drivers—due to a California law that

19  classified the Uber drivers as employees instead of independent contractors.  *Olson*, 2020 WL

20  6439166, at *1.  The court held that "[t]he parties should have foreseen potential enforcement of

21  the [industry-wide test for determining a worker's classification] to Company Plaintiffs' drivers

22  because courts have opined, as early as 2015, that Uber drivers could plausibly be considered

23  employees despite contractual language."  *Id.* at *11.  *Olson* applies with some, but limited force

24  here because third-party platforms' relationship with merchants have hereto been entirely

25  unregulated without price caps.  *See* FAC ¶¶ 28–31.

26    The City's assertion that the impairment is not substantial "because Plaintiffs' contracts are

27  terminable at will [and therefore] they do not provide them a guaranteed revenue stream or any

28  protection from future regulation" also has logical force but itself is not sufficiently persuasive to

United States District Court
Northern District of California

establish no substantial impairment as a matter of law.  The City's reliance on *Lefrancois v. State of R.I.*, 669 F. Supp. 1204 (D.R.I. 1987) is misplaced.  There, the court noted that "there is much force to the defendants' contention" that there was no substantial impairment because the contract between the company and the Rhode Island Solid Waste Management Corporation ("RISWMC") was terminable at will by the RISWMC.  *Lefrancois*, 669 F. Supp. at 1215.  The court, however, reviewed the Contract Clause question "on the assumption that plaintiff's rights under the contract have in fact, been impaired" "in the interest of the expedient resolution" of the controversy and focused its analysis on whether there was a significant and legitimate public purpose.  *Id.*  In contrast, in *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618 (5th Cir. 2010), the Fifth Circuit held, "that the contracts were terminable at will . . . does not prevent a finding of contract impairment."  *United Healthcare*, 602 F.3d at 628.  It explained that "neither the district court nor the parties point[ed] to any authority that supports the proposition that the power to terminate a contract enfolds the power to impair it for the purposes of the Contract Clause."  *Id.*  Likewise, the existence of an at-will contract does not preclude a finding of substantial impairment, although that factor may inform the analysis.

Finally, the City asserts that the Ordinance does not substantially impair the Plaintiffs' contracts because the FAC does not allege facts establishing that the 15% cap is a significant limitation.  Mot. at 7.  For example, Plaintiffs admit that they can potentially offset lost revenues in other ways.  *See* FAC ¶ 80 ("In order to try to offset some of the revenue lost due to lower commissions with restaurants, Plaintiffs could be forced to increase the fees they charge consumers who place delivery orders").  However, the FAC alleges that increasing prices to consumers "would cause fewer orders on Plaintiffs' platform, harming Plaintiffs, restaurants, and couriers who depend on Plaintiffs' platform."  FAC ¶ 80.  They also contend that the impairment is substantial because "the commission rate is undeniably a core term of Plaintiffs' contracts with restaurants and "[a]rtificially reducing Plaintiffs' compensation fundamentally changes the parties' bargain," which "may result in Plaintiffs being unable to continue offering those services."  Opp. at 7 (citing FAC ¶¶ 26–29, 80–82); *Lynch v. United States*, 292 U.S. 571, 580 (1934) (contracts between corporations are impaired when "the right to enforce them . . . is taken away or materially

1    lessened").

2        Accepting Plaintiffs' allegations as true, it is plausible that the Ordinance substantially

3    impaired their existing contracts with restaurants.  At the very least, there are factual questions

4    about the substantiality of the impairment that preclude discussion at this stage of the proceedings.

5    Though the City has mounted significant arguments, Plaintiffs have alleged a plausible showing of

6    substantial impairment.

7        2.    Whether the Ordinance is Drawn in an Appropriate and Reasonable Way to

8             Advance a Significant and Legitimate Public Purpose

9        The next question is whether the Ordinance is drawn in an appropriate and reasonable way

10   to advance a significant and legitimate public purpose.  *Sveen*, 138 S. Ct. at 1821–22.  The parties

11   dispute whether this analysis is identical to the one for rational basis review, where the "challenger

12   bears the burden of negating every conceivable basis which might support the legislative

13   classification, whether or not the basis has a foundation in the record."  *Fields v. Legacy Health*

14   *Sys.*, 413 F.3d 943, 955 (9th Cir. 2005).

15       The Supreme Court has acknowledged that it has "never held" that the Due Process

16   analysis is "coextensive" with the more "searching" Contract Clause analysis.  *Pension Benefit*

17   *Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984); *see also AEM*, 932 F.3d at 734

18   (holding that "[a]ccepting the State's assertion of a sufficient public purpose without a stronger

19   showing would come perilously close to upholding an impairment of contractual obligations based

20   merely on a rational basis.").  But *Pension Benefit* was a case where a wholly owned government

21   corporation was a party to the contract.  *Pension Benefit*, 467 U.S. at 720.

22       When the government is not a contracting party, like this case, the Supreme Court has held

23   that "courts properly defer to legislative judgment as to the necessity and reasonableness of a

24   particular measure."  *Energy Rsrvs.*, 459 U.S. at 412–13.  The Supreme Court has explained, in a

25   decision after *Pension Benefit*, that courts must "refuse to second-guess" the government's

26   identification of "the most appropriate ways of dealing with the problem" at issue.  *Keystone*

27   *Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 506 (1987).

28       At one end of the spectrum, courts and commentators have likened this analysis to rational

United States District Court
Northern District of California

16

basis review.  *See Melendez v. City of New York*, 16 F.4th 992, 1052 (2d Cir. 2021) (Carney J.) (concurring in part) ("it is telling that the modern standard of review for Contracts Clause challenges when private contracts are at issue is so deferential as to bear a resemblance to rational basis review.") (citing Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES & POLICIES 689 (6th ed. 2019) ("As to the second and third prongs of the [Contracts Clause] test, state and local laws are upheld, even if they interfere with contractual rights, so long as they meet a rational basis test."); Geoffrey R. Stone, et al., CONSTITUTIONAL LAW 986 (7th ed. 2013) (explaining that "[m]odern review under the contract clause is substantially identical to modern rationality review under the due process and equal protection clauses" and that, under this standard, "the fit between the legitimate interest and the measure under review need not be close.")).

At the other end of the spectrum, the deference due to legislature "is not so entirely deferential as to constitute rational basis review."  *Melendez*, 16 F.4th at 1052 (Carney J.) (concurring in part).  "Unlike rational basis review, for a law to survive a Contracts Clause challenge . . . the legislature must actually articulate a significant and legitimate public purpose and the public record must support a finding that the legislature's chosen means are reasonable and appropriate."  *Id.*

The Ninth Circuit has not expressly discussed the meaning of deference to the legislature under the Contract Clause analysis.  However, the Ninth Circuit has recently affirmed a district court decision on a Contract Clause claim where the district court had applied rational basis review, *Apartment Ass'n of Greater Los Angeles v. City of Los Angeles*, 2021 WL 2460634, at *5 (C.D. Cal. June 1, 2021).  *See Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, 10 F.4th 905, 909 (9th Cir. 2021).  Although the Ninth Circuit did not specify whether it too was applying rational basis review, it relied on the Supreme Court cases, *Energy Reserves Group* and *Keystone*, to conclude that modern Contract Clause doctrine under "more contemporary Supreme Court case law has severely limited the Contracts Clause's potency."  *Apartment Ass'n of L.A.*, 10 F.4th at 909–10.  It explained that the Supreme Court in *Energy Reserves Group*, "clarified the modern approach to the Contracts Clause . . . articulating the flexible considerations courts must consider in a Contracts Clause case" and "indicat[ing] a renewed willingness to defer to the

United States District Court
Northern District of California

1    decisions of state legislatures regarding the impairment of private contracts." *Id.* at 912, 916.

2         Accordingly, the Court will analyze the Contract Clause issue under both rational basis

3    review and the highly deferential standard articulated in *Energy Reserves Group* and *Keystone*,

4    when reviewing the Ordinance's fit between its means and goals.  Where "the government is not

5    'the party asserting the benefit of the statute,'" the Plaintiffs bear the burden of showing that the

6    Ordinance does not serve a valid public purpose or that it is unreasonable.  *Apartment Ass'n of*

7    *L.A.*, 10 F.4th at 913.

8                   a.    Significant and Legitimate Public Purpose

9         The first inquiry is whether the Board has a significant and legitimate public purpose

10   behind the regulation, "such as the remedying of a broad and general social or economic

11   problem." *Energy Rsrvs.*, 459 U.S. at 412.  "The requirement of a legitimate public purpose

12   guarantees that the State is exercising its police power, rather than providing a benefit to special

13   interests." *Id.*  In addition, the "public purpose need not be addressed to an emergency or

14   temporary situation." *Id.*

15        The City asserts that the Ordinance serves a valid purpose to "ensure that restaurants can

16   thrive in San Francisco" and to "continue to nurture vibrant, distinctive commercial districts."  *See*

17   S.F. Police Code § 5300(j).  The Ordinance's findings recognize that restaurants are important

18   engines of the local economy and that the recent decline of restaurants coincides with the rapid

19   rise of a few third-party food delivery services, which can leverage their market dominance to

20   extract high fees from restaurants. *See id.* § 5300(a)–(b), (e)–(f).

21        The California Supreme Court has recognized that when a municipality "determines that a

22   particular neighborhood or the community in general is in special need of a specific type of . . .

23   business establishment," it may enact legislation "to serve such a need." *California Bldg. Indus.*

24   *Assn. v. City of San Jose*, 61 Cal.4th 435, 461–62 (2015) (upholding a city ordinance that requires

25   affordable housing).  *See also Hernandez v. City of Hanford*, 41 Cal.4th 279, 296 (2007)

26   (upholding a city ordinance that allowed large, but not small, retailers to sell furniture in one

27   commercial district because cities may regulate or control competition to preserve the economic

28   viability of business districts and neighborhood shopping areas).  Likewise, the Ninth Circuit has

United States District Court
Northern District of California

18

1    acknowledged that a city's attempt to "mitigate the fallout for those most affected by a shift in the

2    market is a permissible state purpose, even if some may question its policy wisdom." *San*

3    *Francisco Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020)

4    (affirming the constitutionality against due process and equal protection challenges of a city

5    agency's rules that favored recent owners of taxi medallions over those who had obtained their

6    medallions years ago because of the recent "ridership dry up in the face of disruptive

7    technology").[2]

8         Plaintiffs contend that the Ordinance does not further a significant and legitimate public

9    purpose because it was enacted to benefit a special-interest group, *i.e.*, local restaurant owners, as

10   opposed to the general public.  Opp. at 10; FAC ¶ 89.  Specifically, they argue that "the

11   Ordinance's intent is to tilt the competitive landscape between third-party platforms and

12   restaurants in restaurants' favor."  Opp. at 11 (citing S.F. Police Code § 5300(d)).  As explained

13   below, however, the Ordinance is distinct from the statutes that courts have struck down under the

14   Contract Clause as special interest legislation.

15         For example, in *Allied Structural Steel Company*, the Supreme Court struck down a statue

16   under the Contract Clause, which required a private employer to pay additional pension benefits if

17   it terminated their pension plans or closed Minnesota offices.  *Allied Structural Steel*, 438 U.S. at

18   247.  It noted that "[t]he law was not even purportedly enacted to deal with a broad, generalized

19   economic or social problem" and that the statute's "narrow aim was leveled, not at every

20

21   [2] Contrary to the Plaintiffs' argument, the City's reliance on these cases is proper.  *See* Opp. at 11
     n.3.  Although these cases do not involve Contract Clause claims, they helpfully show that the
22   California Supreme Court and Ninth Circuit have recognized that "the preservation of a
     municipality's downtown business district for the benefit of the municipality as a whole,"
23   *Hernandez*, 41 Cal.4th at 297, and the intent to "mitigate the fallout for those most affected by a
     shift in the market," *San Francisco Taxi Coal*, 979 F.3d at 1225, are examples of permissible
24   legislative purposes.

25   Plaintiffs also contend that although the Ninth Circuit in *San Francisco Taxi Collection* held that it
     is a legitimate government purpose to "mitigate the fallout of those most affected by a shift in the
26   market," the case is distinguishable because there the "economic aid came *from the government*,
     not forced subsidization by private business."  Opp. at 11 n.3 (emphasis in original).  This
27   argument, however, relates to the question below—whether the means of achieving the
     Ordinance's purpose are appropriate and reasonable—and not whether the Ordinance advances a
28   significant and legitimate purpose.  And as explained below, such choices are subject to
     considerable legislative deference.  *See Apartment Ass'n of L.A.*, 10 F.4th at 914.

Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees." *Allied Structural Steel*, 438 U.S. at 249.  As a result, the Supreme Court concluded that "if the Contract Clause means anything at all, it means that Minnesota could not constitutionally do what it tried to do to the company in this case." *Id.* at 250–51.  In the case at bar, the Ordinance does not narrowly single out a particular transactional relationship as in *Allied Structural Steel*.

To be sure, in *AEM*, the Eighth Circuit held that the North Dakota law—that prohibited farm equipment manufacturers from imposing certain obligations on dealers—did not advance a legitimate public purpose in part because it narrowly focused on restricting manufacturers' contract rights to "primarily benefit[] . . . farm equipment dealers." *AEM*, 932 F.3d at 733.  It explained that "[e]ven if the law indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits." *Id.*  According to the Eighth Circuit, "the State 'bears the burden of proof in showing a significant and legitimate public purpose'" and "[s]pecial-interest groups cannot establish . . . a broad societal interest" simply by pointing to "testimony . . . about a law's conceivable public benefits." *Id.*

Unlike the Eighth Circuit, however, the Ninth Circuit does not place the burden on the government to show that the legislation's purpose is legitimate, *see Apartment Ass'n of L.A.*, 10 F.4th at 913, and a law appears to target one business group over another is not *a priori* suspect.  For example, in *CDK Global*, the Arizona law under challenge "prevent[ed] database providers from limiting access to car dealer data by dealer-authorized third parties" to protect consumer privacy.  *See CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021).  The Ninth Circuit rejected the database providers' assertion that the Arizona law unfairly targeted its business because "the law applies to all [database] providers that store protected dealer data, regardless of whether they happen[] to be parties to . . . contracts that contain[] a provision affected by the law." *Id.* at 1280–81 (internal quotation marks omitted).  The court held that "[a]lthough the statute regulates the dealer data industry rather than some broader segment of the economy, that does not make it suspect" because plaintiffs' own witnesses explained that dealer

United States District Court
Northern District of California

1  management systems store highly sensitive data and "[i]t is therefore unsurprising that the Arizona

2  Legislature would be particularly interested in regulating the industry to safeguard Arizonans'

3  privacy." *Id.*

4        Moreover, "the State could reasonably determine that anticompetitive practices were of

5  particular concern in that industry and decide to focus its efforts at reform there" and "[s]everal

6  other States have enacted similar legislation, further undermining the suggestion that the Arizona

7  Legislature acted with an improper purpose." *Id.* at 1280–81.  The Ninth Circuit also held that

8  although the legislature did not make any findings, which specify that its goals were consumer

9  data privacy and competition, it was not required to do so.  *Id.* at 1280.  The court pointed out that

10 "[t]he purposes are apparent on the face of the law" because the law "contains multiple provisions

11 that further consumer data privacy" and other provisions that "address potential anticompetitive

12 business practices."  *Id.*

13       The Ninth Circuit's decision in *CDK Global* is instructive in this case.  The Ordinance

14 applies to all third-party food delivery services as defined under the Ordinance.  Plaintiffs are not

15 singled out.  *See id.* at 1280–81.  Similar to *CDK Global*, the City has articulated a concern about

16 anticompetitive practices in the restaurant industry and the economic health of the industry

17 particularly in commercial districts.  *See* S.F. Police Code § 5300(a)–(b), (e)–(f).  And Plaintiffs

18 concede that preventing restaurant closures is a "positive development for many local

19 neighborhoods."  FAC ¶ 22.  The Ordinance thus serves a valid public purpose.  The City's

20 articulated purpose addresses a broad economic problem.  *Allied Structural Support*, 438 U.S. at

21 249.

22       Similarly, in *Melendez*, the Second Circuit reviewed a denial of injunctive relief and

23 concluded that a New York law, which renders permanently unenforceable personal liability

24 guaranties of commercial lease obligations over sixteen months, likely had a legitimate purpose,

25 although the court ultimately affirmed the denial.  *Melendez*, 16 F.4th at 1038, 1047.  The Second

26 Circuit held that "the City asserts a legitimate public purpose that appears at least plausible on the

27 pleadings record" notwithstanding the plaintiffs' allegation that the City's intent was only to

28 benefit a favored group:  commercial-lease guarantors.  *Id.* at 1038.  It distinguished *Allied*

21

*Structural Support*, where the Supreme Court had "identified the challenged law to serve no public interest because it was 'not even purportedly enacted to deal with a broad, generalized economic, or social problem,' and the record suggested the target was a single employer." *Id.* at 1037.  The Second Circuit concluded that the law's alleged purpose—to mitigate the economic emergency as a result of the COVID-19 pandemic and prevent the possibility of permanently closed businesses, increased unemployment, and reduced services to City residents—found some record support and was therefore plausible for the purposes of a preliminary injunction.  *Id.* at 1036 (acknowledging statements by the legislation's sponsor and the text of extending legislation explaining that the law serves to minimize "economic and social damage caused to the city" by the pandemic, which "will be greatly exacerbated . . . if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once.").

Here, the Ordinance's stated purpose—to protect the restaurant industry—is also articulated in the Ordinance's findings.  *See* S.F. Police Code § 5300(j).  And the City has cited data to supports its purpose.  *See* S.F. Police Code § 5300(a)–(f).  The City, in articulating a public interest based on evidence and drawn to address a substantial economic problem, asserts a legitimate public purpose.  *See CDK Global*, 16 F.4th at 1280–81; *see, e.g.*, *Melendez*, 16 F.4th at 1038.  The Court thus considers whether Plaintiffs plausibly plead that the means employed by the City were "not drawn in a reasonable and appropriate way."  *CDK Global*, 16 F.4th at 1280.

b.    <u>Reasonableness and Necessity of Ordinance</u>

The second inquiry is whether limiting the commissions that platforms may charge covered establishments bears an appropriate and reasonable relationship to the problem identified by the City.  Mot. at 9.  Even if the Ordinance "is a substantial impairment of contractual relations, if its 'adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption'" the Ordinance must be upheld.  *Apartment Ass'n of L.A.*, 10 F.4th at 913 (quoting *Energy Rsrvs.*, 459 U.S. at 412); *see also Keystone*, 480 U.S. at 504 n.31 (holding that although it had "no basis" on which to conclude how substantial the alleged impairment was and although such "dearths in the record might be critical in some cases, they [were] not essential to [the]

discussion here because the [federal law] withstands scrutiny even if it is assumed that it constitutes a total impairment").  As explained above, the Court will apply both rational basis review and the highly deferential standard under *Energy Reserves Group* and *Keystone*, where courts "must 'refuse to second-guess'" the "legislature's identification of 'the most appropriate ways of dealing with the problem'" at issue.[3]  *Apartment Ass'n of L.A.*, 10 F.4th at 914 (quoting *Keystone*, 480 U.S. at 506); *see supra* Part III.B.2.

Plaintiffs contend that regardless of which standard the Court applies, the Ordinance is unreasonable because there are no extensive legislative findings that support the Commission Cap to which the Court should defer.  Hearing Tr. at 16.  They contend that because the Ordinance implements a permanent price control, the City needs to "have at least undertaken a study to determine what the profit margin can be to make sure that the companies can operate profitably."  Hearing Tr. at 27.  The City responds that the Ordinance does not in fact create a price control because Plaintiffs are free to offset any losses to consumers in the form of additional fees.  Mot. at 16; *see, e.g.*, *TCF Nat. Bank v. Bernanke*, 643 F.3d 1158, 1164 (8th Cir. 2011) (denying plaintiff's equal protection claim in part because the court was "skeptical that the [challenged law] even created a sufficient price control on TCF's debit-card business" because the law did not prohibit plaintiff from "assess[ing] fees on its customers to offset any losses").  For example, if the

---

[3] The Court rejects Plaintiffs' contention that the Court should follow the analysis in *Melendez*. *See* Hearing Tr. at 24.  There, the Second Circuit applied an exacting analysis under *Allied Structural Steel* that "is difficult to reconcile" with the approach in the subsequent *Keystone Bituminous Coal* case where the Supreme Court "[a]fter providing no more than a short paragraph of analysis, [] concluded that the challenged law was reasonable and appropriate."  *Melendez*, 16 F.4th at 1054 (Carney, J., concurring in part and dissenting in part).  The Court will follow the binding approach by the Ninth Circuit in *Apartment Association*.

Plaintiffs also attempt to distinguish *Apartment Ass'n of L.A.*, by contending that the Ninth Circuit's "absolute deference to the legislature" does not go beyond emergency situations. Hearing Tr. at 21; *see Apartment Ass'n of L.A.*, 10 F.4th at 914 (holding a court's deference to a legislature's determination of the most reasonable means to deal with a problem is "particularly so . . . in the face of a public health situation like COVID-19.").  But the Supreme Court decision in *Keystone Bituminous Coal*, on which the Ninth Circuit relies, did not involve any emergency situation.  *See Keystone*, 480 U.S. at 506 (upholding a federal law that required "coal companies either to repair the damage" to the surface or "to give the surface owner funds to repair the damage" in order to prevent the destruction of various buildings and cemeteries).  Hence, *Apartment Ass'n of L.A.*'s deference to a legislature's determinations is not limited to emergency situations.

United States District Court
Northern District of California

platforms experience any loss from the Commission Cap, they can charge a separate fee to the consumer to negate those losses. Therefore, the Ordinance is not a straight cap on price because there are ways the platforms mitigate the impact of the cap, *e.g.*, increasing consumer fees. Instead, the Ordinance functions as a form of price regulation because it effectively restricts the prices a platform can charge a restaurant for its services.

Even assuming the Ordinance effects a form of price control, the only case on which Plaintiffs rely to argue that the Board must undertake such a study, even under the deferential standard of review established by the courts, is a non-binding state court decision from New York, which is distinguishable. In *New York State Land Title Association, Inc. v. New York State Department of Financial Services*, 169 A.D.3d 18 (2019), the New York state appellate court struck down a law that capped insurance fees because the assertion that the cap "allowed insurers to be adequately compensated for the additional costs of conducting such searches while turning a reasonable profit was conclusory." *New York State Land Title Ass'n*, 169 A.D.3d at 20. The court held that without "further empirical documentation, assessment and evaluation to support the regulation," the caps were arbitrary and failed rational basis review. *Id.* The court's imposition of a requirement that the legislature judgment must be supported by a study is not consistent with either rational basis review or the directive that courts not second guess the legislature in its choice of the means of implementing a valid public purpose. *Keystone*, 480 U.S. at 506.

In any event, *New York State Land Title Ass'n* is distinguishable. Here, the Ordinance's rationale is not conclusory; the City relied on market research and sample contracts to justify its 15% commission cap. The Ordinance explains that the 15% cap is "a reasonable step to protect restaurants from financial collapse without unduly constraining third-party food delivery services' businesses" because "leading third-party food delivery services companies currently charge a 10% per-order fee for the most resource-intensive aspect of their business—delivery services—and [] these companies report high profit margins from all aspects of their business operations." S.F. Police Code § 5300(j). For example, the Ordinance finds that these platforms impose additional fees totaling as much as 20% of the order cost for non-delivery services, such as marketing or logistics services, which have higher profit margins than more resource-intensive delivery

24

1    services.  *Id.* § 5300(g).  The Ordinance also acknowledges that the typical high fees of 30% of an

2    order diminishes restaurants' already-narrow profit margins.  *Id.* § 5300(f).  As a result, the

3    Ordinance finds that 15% is a reasonable commission cap.  *Id.* § 5300(j).  In doing so, it cites data.

4    *Id.* § 5300(g), (j).

5         Plaintiffs respond that the Commission Cap is "arbitrary and utterly unsupported."  Opp. at

6    19.  They assert that "[n]either of the purported 'findings' in support of the 15% cap—that

7    'leading' third-party platforms charge 10% for 'delivery services' and 'report high profit margins

8    from all aspects of their business operations'—have any evidentiary support."  *Id.*  Instead, they

9    allege that "they have been operating at a loss in San Francisco, and have not been able to recoup

10   the revenue lost due to the commission cap" since the Ordinance went into effect.  FAC ¶ 82(a).

11   According to Plaintiffs, they will not be able to provide various services, such as marketing under

12   the Commission Cap because they "will not even be able to cover their costs."  *Id.* ¶ 82(b).  And

13   they allegedly will have to "terminate contracts with existing restaurant-partners, and/or decline to

14   enter into new contracts with prospective restaurant-partners" because "most restaurants have

15   opted for plans with commissions of 25% or 30%."  *Id.* ¶¶ 64(b), 82(d).  Consequently, they assert

16   that there cannot be a "blind deference to the legislature."[4]  Hearing Tr. at 27.

17        But under rational basis review, it is irrelevant "whether or not the basis has a foundation

18   in the record."  *Heller v. Doe by Doe*, 509 U.S. 312, 320–21 (1993).  Because Plaintiffs fail to

19   negate "every conceivable basis which might support" the Ordinance, *e.g.*, the Ordinance's

20   legitimate purpose in protecting the restaurant industry, Plaintiffs fail to satisfy their burden in

21   showing that the Ordinance is irrational.  Under the highly deferential standard established by

22   *Keystone* and *Energy Reserves Group*, Plaintiffs fail to satisfy their burden.  The cases that

23   Plaintiffs cite are distinguishable because there, the courts concluded that the means did not

---

[4] Plaintiffs also argue that the Ordinance is not reasonably designed to revitalize the City's
commercial district because it is "not limited to restaurants in any specific district, and it targets
*delivery*, which restaurants can do from anywhere, incentivizing them to *leave* the high-rent
commercial district."  Opp. at 12 (emphases in original).  But the Ordinance applies to all of San
Francisco's commercial districts and not only one.  Reply at 4; *see* S.F. Police Code § 5300(a),
(b).  Moreover, it stands to reason that restaurants in commercial districts may not enjoy the same
local dining support as neighborhood restaurants have.

United States District Court
Northern District of California

further the alleged purpose at all.  But here, Plaintiffs do not claim that there is no fit between the Ordinance's means and purpose.  They argue that the evidence on which the Board relied is wrong, not that the Board did not rely on any evidence.  *See* Opp. at 19.  But under binding precedent, the Court cannot "second-guess" the Board's identification of "the most appropriate ways of dealing with the problem" at issue.  *Keystone*, 480 U.S. at 506.  In fact, none of the courts in the cases that Plaintiffs cite question the legislative record or intent; instead the courts reiterate the deference to a legislature's choice in selecting the means of a law.

For example, Plaintiffs rely on *HRPT Properties Tr. v. Lingle*, 715 F. Supp. 2d 1115 (D. Haw. 2010), where the statute affected the leases of land owned by a single entity, HRPT.  *HRPT*, 715 F. Supp. 2d at 1118.  Specifically, the law required that any appraiser involved in a rent determination under an HRPT lease to consider factors that were not required by HRPT's leases and that "were clearly designed to favor businesses leasing land from HRPT."  *Id.*  The court held that although the stated purpose was a legitimate public purpose—to stabilize Hawaii's economy—the statute was not reasonably designed to promote this purpose.  *Id.* at 1137-38.  The statute explained that it aimed to stabilize the economy by keeping small businesses in urban environments so that consumers have easy access to those businesses.  *Id.* at 1138.  But the court found that the record did not indicate that the consumers served by HRPT's lessees are primarily in urban areas or that HRPT's lessees are small businesses more than ordinarily likely to move to rural areas.  *Id.*  Although the court noted that the "[l]egislature need not state any evidentiary findings," because the statute had several paragraphs purporting to state such findings, the court held that none of the findings indicate that it applies to the circumstances of any specific lessee affected by the statute.  *Id.*

In contrast, here, the Ordinance's means fit its purpose—the Ordinance seeks to protect the restaurant industry by capping the amount of commissions third-party platforms can charge restaurants for their services.  As the *HRPT* court noted, the Board "need not state any evidentiary findings," as Plaintiffs argue the Board must do.  *HRPT*, 715 F. Supp. 2d at 1138.

Plaintiffs also cite *Melendez*, where the ordinance at issue allowed individual guarantors of commercial leases to escape personal liability for rent that their shuttered businesses could not pay

26

1 during sixteen months of the pandemic. *Melendez*, 16 F.4th at 1040. The ordinance's purpose

2 was to help shuttered small businesses reopen after the pandemic, thereby ensuring functioning

3 neighborhoods throughout the city. *Id.* The Second Circuit held that the ordinance's means were

4 likely inappropriate because it did not condition the relief on the guarantors ever reopening their

5 businesses. *Id.* at 1041. The court explained that while it "defer[s] to legislative judgments about

6 the means reasonable and appropriate to address a public emergency, such deference is not

7 warranted in the absence of some record basis to link purpose and means that, otherwise, appears

8 missing." *Id.*

9        Here, unlike in *Melendez*, the Ordinance's findings "link" its purpose and means. The

10 Ordinance finds that the platforms' leverage on restaurants through their anticompetitive practices

11 allow them to extract high fees from restaurants. S.F. Police Code § 5300(a)–(k). It also finds

12 that the rise of these platforms have coincided with the decline of the City's restaurant industry.

13 *Id.* As a result, these findings appropriately link the Ordinance's goal in protecting the restaurant

14 industry by implementing the Commission Cap.

15        In *AEM*, the Eighth Circuit reviewed a North Dakota law that primarily benefited farm

16 equipment dealers, although it purported to benefit farmers and rural communities. *AEM*, 932

17 F.3d at 733–34 (8th Cir. 2019). The Eighth Circuit noted that the law "nowhere mentions benefits

18 for farmers or rural communities." *Id.* at 733. Instead, the law "has a narrow focus: restricting

19 the contractual rights of farm equipment manufacturers" in order to benefit farm equipment

20 dealers. *Id.* The court noted that the North Dakota "state legislature declined to follow the

21 examples of the legislatures in *Blaisdell* and *Keystone Bituminous*, which included well-supported

22 findings or purposes within their duly enacted laws, so any significant and legitimate public

23 purpose must be discerned from the design and operation of the legislation itself." *AEM*, 932 F.

24 3d at 733. Again, the Ordinance, unlike the North Dakota law, includes well-supported findings

25 that explain its benefits for the City's restaurant industry. S.F. Police Code § 5300(a)–(k).

26 Therefore, the Ordinance reasonably promotes its stated purpose.

27        The Ordinance is more akin to the legislation in the following cases. In *Apartment*

28 *Association of Los Angeles County*, the Ninth Circuit held that under "considerable deference to

27

state and local legislatures" the temporary eviction moratorium was "reasonably related to the legitimate public purpose of ensuring health and security during the pandemic" because it was "but one aspect of a broader remedial framework applicable to landlords during the pandemic." *Apartment Ass'n of L.A.*, 10 F.4th at 914, 916.  It acknowledged that Los Angeles had created an Emergency Rental Assistance Program, which provided up to $2,000 in rent payments per eligible household, and that the city expected to receive an addition $193 million for rental assistance directly from the federal government, which would be used to pay accumulated rental debt, pursuant to state legislation.  *Id.*

Similarly, in *CDK Global*, the Ninth Circuit concluded that the law, which prohibits database providers from monopolizing consumer data collected by car dealers, "advances its purposes [of protecting consumer privacy] in a reasonable way."  *CDK Global*, 16 F.14th at 1281. It held that the "record shows that contractual restrictions on third-party access to [database providers] have led many dealers to download their data . . . in an unsecured format" and therefore "by ensuring that third-party providers have direct access to dealer data through a secure API, the Dealer Law eliminates the incentive for dealers to resort to unsecured email transfers."  *Id.*  The Ninth Circuit concluded that the law reasonably furthers its purpose of protecting consumer privacy because it "requires [database] providers to give access only to those authorized integrators that comply with industry security standards" and places "reasonable restrictions on such access."  *Id.*

In *Keystone Bituminous Coal*, the Supreme Court affirmed the district court's grant of summary judgment and held that the law, which required coal companies to repair the damage to the surface or give the surface owner funds to repair the damage was valid under the Contract Clause.  *Keystone*, 480 U.S. at 506.  It acknowledged that the "record indicates that since 1966 petitioners have conducted mining operations under approximately 14,000 structures protected by the" law and that the Commonwealth "has determined that in order to deter mining practices that could have severe effects on the surface, it is not enough to set out guidelines and impose restrictions, but that imposition of liability is necessary."  *Id.* at 504–05.  The Supreme Court concluded that the law "plainly survives scrutiny."  *Id.* at 506.

Likewise, the Ordinance is reasonably drawn to further the City's stated purpose of protecting the restaurant industry.  Because the Ordinance has a legitimate public purpose and the Court cannot "second-guess" the City's determination that the Commission Cap constitutes "the most appropriate way" of advancing its purpose, Plaintiffs' Contract Clause claims are implausible and therefore the Court **GRANTS** the City's motion to dismiss these claims under the federal and state constitutions **without leave to amend**.  *Apartment Ass'n of L.A.*, 10 F.4th at 914.

C.     Takings Clause Under the Fifth Amendment and Inverse Condemnation Under the
        California Constitution

Plaintiffs allege, to the extent that their contracts with restaurants provide for a commission rate greater than 15%, the Ordinance is an unconstitutional taking of their contractual right to those commissions.  *See* FAC ¶¶ 101–14.  The "Takings Clause" of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. Amend. V; *see also* Cal. Const. art. I, § 19.  The threshold question in any takings case is whether the plaintiff has a protected property interest.  *See Turnacliff v. Westly*, 546 F.3d 1113, 1118–19 (9th Cir. 2008) (internal citations omitted).  Although the "California Supreme Court has noted that the California constitution protects a 'somewhat broader range of property values' than the corresponding federal provision," "it otherwise generally construes the clauses congruently."  *San Remo Hotel L.P. v. City And Cty. of San Francisco*, 364 F.3d 1088, 1093 (9th Cir. 2004).

The parties first dispute whether the Plaintiffs' contracts constitute property for taking under the Fifth Amendment.  Mot. at 11; Opp. at 13.  The City's reliance on *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986), to assert that Plaintiffs' contracts do not give rise to a claim, is misplaced.  Mot. at 11.  In *Connolly*, Congress passed a law that required any employer withdrawing from a multiemployer pension plan "to pay whatever share of the plan's unfunded liabilities was attributable to that employer's participation" in order to "discourage voluntary withdrawals and curtail the current incentives to flee" multiemployer plans in declining industries.  *Connolly*, 475 U.S. at 216–17.  The law affected an existing trust agreement and pension plan, under which the employer's sole obligation to the trust was to pay the contributions required by the collective bargaining agreement.  *Id.* at 218.  The Supreme Court held, "that legislation

29

United States District Court
Northern District of California

1  disregards or destroys existing contractual rights does not always transform the regulation into an

2  illegal taking" because a regulatory statute's application may not be defeated by private

3  contractual provisions if it is otherwise within the powers of Congress.  *Id.*  In *Conolly*, the

4  contract rights were not property rights subject to the Takings Clause because "the United States

5  ha[d] taken nothing for its own use, and only ha[d] nullified a contractual provision limiting

6  liability by imposing an additional obligation that [was] otherwise within the power of Congress to

7  impose."  *Id.*

8    In this case, the City argues that it has similarly taken nothing for its own use and has

9  imposed an obligation that is within its powers and therefore the Takings Clause does not protect

10  Plaintiffs' contractual rights.  Mot. at 12.  The Supreme Court, however, clarified that its decision

11  was "not to say that contractual rights are never property rights or that the Government may

12  always take them for its own benefit without compensation."  *Connolly*, 475 U.S. at 224.  When

13  the government "imposes regulations that restrict a property owner's ability to use his own

14  property," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), "a court must evaluate

15  the action under the three-factor test announced in *Penn Central Transportation Co. v. City of New

16  York*, 438 U.S. 104, (1978), to determine whether it constitutes a 'regulatory taking.'"[5]  *CDK

17  Global*, 16 F.4th at 1281; *see also Connolly*, 475 U.S. at 225 (applying the *Penn Central* factors

18  to "reinforce[] [its] belief that the imposition of withdrawal liability does not constitute a

19  compensable taking under the Fifth Amendment").[6]

20    To establish a regulatory taking, courts evaluate three factors "of particular significance":

21    • "(1) 'the economic impact of the regulation on the claimant';

22    • (2) 'the extent to which the regulation has interfered with distinct investment-

23

24  [5] A regulatory taking is different from the other Takings claim that the Supreme Court has
recognized—where the government carries out "a physical appropriation of property," which is "a

25  *per se* taking."  *Cedar Point*, 141 S. Ct. at 2072.

26  [6] The other cases on which the City relies to assert that their contracts are not "property" under the
Takings Clause concern the same statute at issue in *Connolly* and are therefore unpersuasive for

27  the same reason.  *See Bd. of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg.
Materials, Inc.*, 749 F.2d 1396, 1406 (9th Cir. 1984); *Peick v. Pension Ben. Guar. Corp.*, 724 F.2d
1247, 1275-76 (7th Cir. 1983); *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking

28  *Indus. Pension Fund*, 762 F.2d 1124, 1135 (1st Cir. 1984).

1    backed expectation; and

2    • (3) the character of the governmental action.'"

3    *Penn Central*, 438 U.S. at 124.  These are "ad hoc, factual inquiries into the circumstances of each

4    particular case." *Connolly*, 475 U.S. at 225.

5    First, there are factual questions about the economic impact of the Ordinance.  Plaintiffs

6    allege that the Ordinance "substantially diminishes the economic value" of its contracts and

7    prevents them "from obtaining reasonable returns on their investments" because most of their

8    "original contracts with restaurants included a commission rate greater than 15%."  FAC ¶ 104.

9    For example, "the vast majority of San Francisco-based restaurants who opted into" DoorDash's

10   "Partnership Plan selected plans with 25% and 30% commission rates." *Id.* ¶ 6.  According to

11   Plaintiffs, the Ordinance does not simply decrease certain commissions by as much as 50% and

12   instead it "diminishes the *value* of Plaintiffs' contracts" by "significantly more than" 50%.  *Id.*

13   ¶ 106 (emphasis in original).  But it is well-established that the "mere diminution in the value of

14   property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of*

15   *Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993).  For example,

16   the Ninth Circuit has "observed that diminution in property value because of governmental

17   regulation ranging from 75% to 92.5% does not constitute a taking." *Colony Cove Properties,*

18   *LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018).  As a result, Plaintiffs' claims—that the

19   Ordinance reduced its commissions by as much as 50%, from 30% to 15%—is not in and of itself

20   sufficient to establish a regulatory taking.

21   That said, Plaintiffs' other arguments asserting that the Ordinance causes economic harm

22   create factual issues that are sufficient to state a plausible takings claim.  They assert that the

23   Ordinance would allegedly force them to "(i) renegotiate contracts with many restaurants because

24   Plaintiffs cannot cover the cost of providing existing services at a 15% commission rate, (ii) scale

25   back certain marketing and promotional services in the City, thus harming Plaintiffs' reputation

26   and goodwill, (iii) terminate contracts . . . and/or decline to enter into new contracts, and (iv)

27   potentially raise consumer prices, further harming their goodwill." *Id.* (internal quotation marks

28   omitted).  The City responds that the fact that the Ordinance does not prevent Plaintiffs from

1  adopting a modified business model, *e.g.*, increasing fees to consumers or reducing services,

2  precludes a taking claim.  Mot. at 13.  But "[r]aising consumer fees or reducing the scope of

3  services would [allegedly] still leave Plaintiffs irreparably harmed" because it would cause fewer

4  orders and therefore Plaintiffs would not fully recoup lost revenue.  *Id.* ¶¶ 3, 82.  As a result,

5  because there remain factual questions, the Court cannot conclude  whether the Ordinance would

6  have a substantial economic impact on Plaintiffs.

7          Second, it is plausible that the Ordinance interferes with Plaintiffs' investment-backed

8  expectations.  Opp. at 16.  Plaintiffs allegedly executed their contracts with restaurants before any

9  public debate occurred about commission caps to change those expectations.  Opp. at 16.

10  Contrary to the City's contentions, the at-will nature of the contracts and the Plaintiffs' disclosures

11  to investors about the possibility of commission caps do not necessarily undermine Plaintiffs'

12  argument for the same reasons as above.  *See supra* Part III.B.1.

13          The final factor is whether the Ordinance is "more akin to an 'interference aris[ing] from

14  some public program adjusting the benefits and burdens of economic life to promote the common

15  good' than 'a physical invasion by government,'" by which a "taking" may more readily be found.

16  *CDK*, 16 F.4th at 1281 (quoting *Penn Central*, 438 U.S. at 124).  Plaintiffs contend that the

17  Ordinance "nakedly shifts revenues from one group of private businesses to another."  Opp. at 14.

18  But the Supreme Court has held, "[g]iven the propriety of the governmental power to regulate,"

19  *e.g.*, the government may "set minimum wages, control prices, or create causes of action that did

20  not previously exist," "it cannot be said that the Takings Clause is violated whenever the

21  legislation requires one person to use his or her assets for the benefit of another."  *Connolly*, 475

22  U.S. at 223.  Plaintiffs rely on Mayor Breed's statement to contend that the Ordinance fails to

23  meet the "public use" requirement—that the Ordinance was "unnecessarily prescriptive in limiting

24  the business models of the third-party organizations[] and oversteps what is necessary for the

25  public good."  FAC ¶¶ 7, 90, 105.  The statement, however, concerns the economic impact of the

26  Ordinance, not the nature of the Ordinance.  The City did not appropriate anything for its own but

27

28

United States District Court
Northern District of California

merely "adjust[ed] the benefits and burdens of economic life to promote the common good."[7] Mot. at 12 (quoting *Connolly*, 475 U.S. at 225). The third factor thus weighs in the City's favor.

Because there are factual questions about the Ordinance's economic impact and whether the Ordinance interfered with investment-backed expectations, and thus the first two factors could plausibly be resolved in Plaintiffs' favor, the Court **DENIES** the City's motion to dismiss the Takings claims.

D.    Police Power under the California Constitution

Plaintiffs assert that the Ordinance exceeds the City's authority under Article XI, Section 7 of the California Constitution because it does not promote the welfare of the general public. FAC ¶¶ 116–17. Article XI, Section 7 provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const. art. XI, § 7. When a plaintiff claims "that a statute does not constitute a proper exercise of the police power, the inquiry of court is limited to determining whether the object of the statute is one for which that power may legitimately be invoked and if so, whether the statute bears a reasonable and substantial relation to the object sought to be attained." *Allied Properties v. Dep't of Alcoholic Beverage Control*, 53 Cal. 2d 141, 146 (1959). The California Supreme Court explained that "the presumption is in favor of constitutionality and that the invalidity of an act of the Legislature must be clear before the statute can be declared unconstitutional." *Id.* "It is not the court's "province to weigh the desirability of the social or economic policy underlying the statute or to question its wisdom; they are purely legislative matters." *Id.* Instead, the "means provided in a statute must be accepted as being reasonably designed to accomplish its objective unless it is

---

[7] Plaintiffs contend that the cases on which the City relies consider whether the challenged regulation was within the government's authority and not whether the government itself obtained a benefit. *See Pro-Eco, Inc. v. Bd. of Comm'rs*, 57 F.3d 505, 511 (7th Cir. 1995) (challenged regulations—a county's moratorium on landfills—that impacted real estate option contracts were "within [the government's] substantive powers"); *Connolly*, 475 U.S. at 224 (law was "otherwise within the power of Congress"); *Classic Cab, Inc. v. Dist. of Columbia*, 288 F. Supp. 3d 218, 229 (D.D.C. 2018) (law requiring taxi operators to transition from analog metering systems to newer systems designed to run on mobile devices and calculate fares using Global Positioning System dealt with "a broad, generalized economic or social problem" in a "heavily regulated . . . industry"). But the Ordinance is within the Board's substantive powers. Reply at 6; *see supra* Part III.B; *see infra* Part III.D.

United States District Court
Northern District of California

1    unquestionable that they are improper." *Rice v. Alcoholic Bev. etc. Appeals Bd.*, 21 Cal. 3d 431,

2    452 (1978). "The courts will not nullify laws enacted under the police power unless they are

3    manifestly unreasonable, arbitrary or capricious, having no real or substantial relation to the public

4    health, safety, morals or general welfare." *Disney v. City of Concord*, 194 Cal. App. 4th 1410,

5    1415 (2011), *as modified* (May 2, 2011).

6        As established above, the Ordinance has a legitimate purpose—to protect the restaurant

7    industry—and its means are reasonable and appropriate. *See supra* Part III.B.2. Plaintiffs' amici,

8    Docket No. 38, argues that the Commission Cap does not promote the general welfare because

9    "economists supposedly agree that all price regulation is counterproductive, pointing to studies of

10   rent control and gas price controls." Reply at 9. But this argument ignores the deferential

11   standard courts must give to legislatures in these areas. *Id.*; *see, e.g.*, *Santa Monica Beach, Ltd. v.

12   Superior Ct.*, 19 Cal.4th 952, 974 (1999) ("with rent control, as with most other such social and

13   economic legislation, we leave to legislative bodies rather than the courts to evaluate whether the

14   legislation has fallen so far short of its goals as to warrant repeal or amendment").

15       The parties also dispute, for the first time, whether the alleged oligopolistic nature of the

16   restaurant delivery service market is relevant to a determination of the Ordinance's

17   reasonableness. According to the City, the "legislators may rationally conclude that public

18   welfare ultimately suffers when oligopolistic platforms can impose harmful commission structures

19   on thousands of restaurants in order to shield consumers from the true costs of convenience" and

20   that "price regulation is an appropriate response, even if the shifting of additional costs to the

21   consumers who use these services results in some reduction in demand for them." *Id.* at 15.; *see*

22   S.F. Police Code § 5300(d) (noting that only four platforms control approximately 98% of the

23   entire market). Plaintiffs respond that the third-party platform industry is not oligopolistic but

24   competitive, with restaurants that can freely enter into contracts with platforms. Opp. at 18; *see*

25   FAC ¶¶ 5, 6, 16–21, 26–30. They assert that because the alleged oligopoly does not exist, this

26   rationale cannot justify the Ordinance. Opp. at 18.

27       That platforms compete with each other, however, does not indicate that the market is not

28   oligopolistic. Reply at 8. More importantly, whether or not the market is in fact an oligopoly is

United States District Court
Northern District of California

34

irrelevant to the question of police power.  The City had grounds to believe that the platform industry was so concentrated that platforms could use their market leverage to extract high fees from restaurants.  S.F. Police Code § 5300(a)–(b), (e)–(f).  As a result, the City found that the Commission Cap would reasonably protect the restaurant industry.  *Id.* § 5300(j).  The Court cannot "weigh the desirability of the social or economic policy underlying the statute or to question its wisdom." *Allied Properties*, 53 Cal. 2d at 146.  The Ordinance's means are proper and therefore the Ordinance is a valid exercise of police power.  *Cf. Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 160 (1976) (reviewing a trial court's "findings concerning the existence of facts justifying the rent control provisions" based on the "evidence presented by the parties" to determine whether there is a "complete absence of even a debatable rational basis for the legislative determination" and therefore an invalid exercise of police power).  The Ordinance is not "manifestly unreasonable, arbitrary or capricious." *Disney,* 194 Cal. App. 4th at 1415.  Because Plaintiffs' allegations that the City exceeded its police power are implausible, the Court **GRANTS** the City's motion to dismiss this claim **without leave to amend**.

E.     Due Process

           Plaintiffs also allege that the Ordinance violates the Due Process Clause of the federal and California constitutions "because it imposes an irrational and arbitrary direct cap on third-party platforms' ability to generate the revenue needed to cover their expenses, and instead provides preferential economic treatment to certain restaurants at the direct expense of third-party platforms."  FAC ¶ 129.  Under the Due Process Clause, a law depriving Plaintiffs of property must rationally relate to a legitimate legislative purpose.  U.S. Const. amend. XIV; Cal. Const. art. I, § 7.  A price control satisfies due process as long as it is not "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt. . . .'" *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988).  The *Pennell* court determined the rationality of the rent control statute based on whether the landlords were "guaranteed a fair return on their investment." *Id.* at 13. Similarly, the California Supreme Court has held, "[i]n the context of a due process challenge to a price control . . . courts generally find that a regulation bears 'a reasonable relation to a proper legislative purpose' so long as the law does not deprive investors a 'fair return' and thereby

35

become 'confiscatory.'" *Kavanau v. Santa Monica Rent Control Bd.*, 16 Cal.4th 761, 771 (1997). "In sum, when considering whether a price regulation violates due process, a court must determine whether the regulation may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection for the relevant public interests, both existing and foreseeable." *Id.* at 772.

For the reasons explained above, the Ordinance articulates a legitimate government purpose—to protect the restaurant industry and nurture vibrant, distinctive commercial districts. *See supra* Part III.B.2.a. Plaintiffs' cases which concern laws that had no legitimate purposes are thus distinguishable. *See, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978, 992 n.15 (9th Cir. 2008) (concluding that "economic protectionism for the sake of economic protectionism is irrational" but acknowledging that "there might be instances when economic protectionism might be related to a legitimate governmental interest and survive rational basis review").

Nonetheless, accepting Plaintiffs' allegations as true, there are questions of fact about whether the Ordinance is "confiscatory." Although the City contends that the Commission Cap is not confiscatory because Plaintiffs can receive compensation from other sources, *e.g.*, by raising the price for consumers or reducing services, Plaintiffs assert that they are operating at a loss and will not be able to recoup all of their losses from the Commission Cap because some consumers will not be willing to pay higher fees. FAC ¶¶ 80, 82.

Plaintiffs also assert that increasing consumer fees will harm their reputation and goodwill and therefore the Ordinance is irrational. Opp. at 22 (citing FAC ¶ 82). But such an argument is unpersuasive. Plaintiffs do not cite any case where price regulation may be invalidated because of harm to reputation and goodwill. In fact, the Ninth Circuit has concluded that an injury to business reputation did not "rise to the level of a constitutionally protected property interest." *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 374–76 (9th Cir. 1999) (holding that plaintiff's allegation that a report's conclusion that it was connected to organized crime did not damage its "business goodwill," *i.e.*, its "expectation of continued public patronage"). In contrast, an example of an injury to "business goodwill" that is a constitutionally protected property interest can be found in *Soranno's Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989). There, the Ninth

United States District Court
Northern District of California

36

Circuit held that the owner could not be deprived of its conferred property status to business goodwill without due process where county officials had suspended the plaintiff's permits and sent letters to the plaintiff's customers informing them that the permits had been suspended and threatening to revoke their permits if they continued to engage in business with the plaintiff. *Sorranno's Gasco*, 874 F.2d at 1313–16.  In other words, although damage to reputation may not be enough, concrete financial injury, threats to customers, and damage business goodwill can be the bases for a due process claim.

In this case, Plaintiffs' allegations of injury to their business goodwill do not rise to the level of a constitutionally protected property interest.  Their claims of injury are more akin to allegations of injury to its reputation; there is no, *e.g.*, accusation that they are connected to organized crime, and there is no suspension of their business or threats to their customers.  In fact, any allegation of injury to their business goodwill from the Ordinance is unlikely given that the Ordinance does not directly raise fees to consumers and consumers may not be deterred by increased fees.

However, although most of Plaintiffs' due process arguments fail, it is plausible that the Ordinance is confiscatory, and thus the Court **DENIES** the City's motion to dismiss Plaintiffs' due process claims.[8]

F.    Equal Protection

Plaintiffs also assert that the Ordinance violates the Equal Protection Clause of the federal and California constitutions.  FAC ¶¶ 129, 146.  Plaintiffs allege that the Ordinance violates the Equal Protection Clause because (1) it "prohibits the ability of one class (third-party platforms) to freely contract with restaurants" but it "does not fix the price of any other business with whom restaurants transact, such as raw ingredient suppliers, equipment suppliers, or advertisers"; (2) it "caps the fees of third-party platforms that serve at least '20 separately owned and operated food

---

[8] The City's reliance on *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) is misplaced. There, the Supreme Court held that "the absence of legislative facts explaining the distinction [o]n the record, has no significance in rational-basis analysis" and that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *F.C.C.*, 597 U.S. at 315 (internal quotation marks omitted).  But the Supreme Court was discussing equal protection claims and not due process claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    preparation and service establishments,' but not those that serve fewer than 20 such

2    establishments"; and (3) Plaintiffs are members of a politically unpopular group of businesses and

3    therefore the Ordinance was unlawfully enacted with animus.  FAC ¶¶ 146, 148–49.

4            Under the Equal Protection Clause, laws that treat groups differently must rationally relate

5    to a legitimate end.  U.S. Const. amend. XIV; Cal. Const. art. I, § 7.[9]  When a statute neither

6    impinges upon a fundamental right nor disadvantages a suspect or quasi-suspect class, like the

7    case here, the appropriate legal standard is rational basis, particularly in the field of economic

8    regulation.  *See Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 491 (1955).  Such

9    statutes must be "wholly irrational" to violate the Equal Protection Clause.  *Fields v. Legacy*

10   *Health Sys.*, 413 F.3d 943, 955 (9th Cir. 2005).  The "challenger bears the burden of negating

11   every conceivable basis which might support the legislative classification, whether or not the basis

12   has a foundation in the record."  *Id.*  A law is "constitutionally valid if 'there is a plausible policy

13   reason for the classification, the legislative facts on which the classification is apparently based

14   rationally may have been considered to be true by the governmental decisionmaker, and the

15   relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary

16   or irrational.'"  *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012).

17           First, the application of the Ordinance to third-party platforms but not vendors, such as raw

18   ingredient or equipment suppliers, is rational.  Unlike third-party platforms, vendors do not take a

19   fixed-percentage commission out of every sale the restaurant makes.  Mot. at 18.  The Board also

20   stated its belief that the "platforms possess power over restaurants that the providers of other

21   goods and service do not," *e.g.*, the power to set prices in an oligopolistic market.[10]  *Id.*  These

22   ────────────────

23   [9] The same standards apply to equal protection claims under the federal and California
     constitutions.  *Manduley v. Superior Ct.*, 27 Cal. 4th 537, 571 (2002), *as modified* (Apr. 17, 2002).

24   [10] Plaintiffs contend that "no evidence suggests" that third-party platforms charge above-market
25   prices for non-delivery services, and that the City did not "study whether other companies that
     provide the same services—like Google, which provides marketing services—lack market power
26   and charge lower fees."  Opp. at 21.  Under traditional rational basis review, however, the City is
     not required to separately compare each service that platforms provide and establish that platforms
27   effectively charge higher prices for such services.  Reply at 11 n.8.  It is enough for the City to
     believe that "platforms impose overall commission rates that restaurants have little choice but to
28   pay to gain access to a large customer base that uses the platform to search restaurants, place
     orders, and obtain meal delivery" and therefore apply the Ordinance to the platforms only.  *Id.*; *see*

1    stated reasons are a conceivable basis for the Ordinance, and as such are rational and do not "come

2    close" to the "outer bound" of a state's action, which "borders on corruption, pure spite, or naked

3    favoritism lacking any legitimate purpose." *San Francisco Taxi Coal.*, 979 F.3d at 1225.  As the

4    Ninth Circuit has acknowledged, "For better or for worse, governmental regulations today

5    typically benefit some groups and burden others.  So long as there are other legitimate reasons for

6    the economic distinction, [the court] must uphold the state action." *Id.* at 1225; *see also Desoto*

7    *CAB Co., Inc. v. Picker*, 228 F. Supp. 3d 950, 959 (N.D. Cal. 2017) ("legislators often favor[] one

8    industry or segment of commerce over another" and "such economic regulation is historically the

9    kind of legislation that is subject to the most deferential form of traditional rational basis review

10   under the Equal Protection Clause.").  Plaintiffs cannot negate "every conceivable basis for the

11   classification." *Fields*, 413 F.3d at 955.

12           Similarly, the Ordinance's application to only platforms that serve more than 20

13   restaurants is rational because the Board stated its belief that the largest companies control most of

14   the market.  Mot. at 18–19; *see, e.g.*, *Hernandez*, 41 Cal.4th at 302 (upholding differential

15   treatment of large department stores and other retail stores because the distinction was rational—

16   the city desired to protect the economic vitality of the district but did not want to "diminish the

17   financial benefits of the [] district for the large department stores that it wanted to attract and

18   maintain").  The Board stated its belief that a platform that serves fewer than 20 restaurants will

19   not be able to exercise the power of a large platform, which can have a "network effect" that

20   increases their market power by drawing more restaurants to its platform and thereby drawing

21   more consumers to join.  Mot. at 19.

22           Plaintiffs challenge these justifications.  They allege that third-party platforms are a

23   "politically unpopular group of businesses" and assert that the Ordinance was motivated by

24   animus.  Opp. at 21.  "When a law exhibits a desire to harm an unpopular group, courts will often

25   apply a more searching application of rational basis review.  *Animal Legal Def. Fund v. Wasden*,

26

27   _____

28   *San Francisco Taxi Coal.*, 979 F.3d at 1225 ("That the City would try to mitigate the fallout for
     those most affected by a shift in the market is a permissible state purpose, even if some may
     question its policy wisdom.").

United States District Court
Northern District of California

878 F.3d 1184, 1200 (9th Cir. 2018).  "[N]either 'a bare . . . desire to harm a politically unpopular group" nor "negative attitude[s]" or "fears" about that group constitute a legitimate government interest for the purpose of [rational basis] review."  *Id.*  "When the politically unpopular group is not a traditionally suspect class, a court may strike down the challenged statute under the Equal Protection Clause if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment."  *Id.* (emphasis in original). Plaintiffs allege that the Board was motivated by animus as evidenced by its members calling Plaintiffs "modern-day robber barons" who tried to "buy democracy," "exploit[ed] their employees for profit," and supported "slave labor."  FAC ¶ 47.  But they fail to show that they are a "politically unpopular" group subject to the "more searching application of rational basis review."  *Animal Legal Def. Fund*, 878 F.3d at 1200.  The passage of Proposition 22 by a margin of over 17 percentage points and Mayor Breed's opposition to the removal of the sunset provision indicate otherwise.  FAC ¶¶ 48, 73; *see also* S.F. Police Code § 5300(d) (describing increasing usage of third-party food delivery services, especially in urban markets like San Francisco).  In contrast, examples of politically unpopular groups include the LGBTQ+ community, *see Lawrence v. Texas*, 539 U.S. 558, 580 (2003), the mentally disabled, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), and animal welfare groups, *Animal Legal Def. Fund*, 878 F.3d at 1200.

Because amendment would be futile—*i.e.*, Plaintiffs cannot allege that Ordinance's classification is irrational—the Court **GRANTS** the City's motion to dismiss Plaintiffs' Equal Protection claims **without leave to amend.**

G.   First Amendment Retaliation

Finally, DoorDash alleges that the Ordinance was enacted in retaliation for its support of Proposition 22.  FAC ¶¶ 161–63.  To state a claim for retaliation under the First Amendment, a plaintiff must plead facts showing: "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir.

2019).  "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

At the pleading stage, however, the complaint must simply allege "plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct[,]" and motive may be shown with direct or circumstantial evidence.  *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016); *see also Capp*, 940 F.3d at 1058 n.6 (noting that its conclusion that plaintiffs have plausibly alleged "but-for" causation "should not be read as disturbing [its] prior cases holding that plaintiffs need only plausibly allege that retaliatory animus was a substantial or motivating factor to state a First Amendment retaliation claim that survives a motion to dismiss.").  The Ninth Circuit has emphasized that "motive [is] a necessary element" of a retaliation claim and that "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment."  *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (citing *Arizona Students' Ass'n*, 824 F.3d at 866, 869–70).

In this case, DoorDash claims that as a result of its public support for Proposition 22, the City passed the then-temporary Ordinance a week after Proposition 22 passed in November 2020 ("November 2020 Ordinance") and removed the sunset provision in June 2021 ("June 2021 Ordinance").  FAC ¶¶ 64, 165.  There is no dispute that its public support for Proposition 22 was protected by the First Amendment.  The City only contends that DoorDash does not plausibly allege the second and third elements.  Mot. at 21.

  1. <u>Chilling Effect</u>

DoorDash contends that the enactment of the then-temporary Ordinance in November 2020 and the removal of the sunset provision in June 2021—which permanently capped its commissions, allegedly cut its revenue, and rewrote thousands of its contracts—as a result of its public support of Proposition 22 would plausibly chill an ordinary company from engaging in the same protected activity.  Opp. at 23.  The City responds that its actions did not deter DoorDash

United States District Court
Northern District of California

because it continued to work to pass Proposition 22 even though there was public information at the time about potential legislation that could cap its commissions.  Mot. at 21 (citing FAC ¶¶ 30, 46) (Plaintiffs acknowledging that "for several years, there has been a robust debate about the amount of commissions restaurants pay to third-party platforms" but continuing to publicly support Proposition 22 throughout 2019 and 2020); *see also* Goldman Decl. Exs. I, J (January and February 2020 articles about the Board's hearing to discuss the effects of delivery apps on small businesses).  The inquiry, however, is "generic and objective."  *O'Brien*, 818 F.3d at 933.  The question is not whether the City's actions actually chilled DoorDash, "but rather whether the alleged retaliation would chill a person of ordinary firmness from continuing to engage in the protected activity."  *Capp*, 940 F.3d at 1054 (internal quotation marks omitted).

　　　　Although it is implausible that the November 2020 Ordinance would chill any conduct, it is plausible that the June 2021 Ordinance would.  The November 2020 Ordinance only codified the Mayor's existing temporary commission cap from the April 2020 Order and therefore it had no financial impact and would not plausibly chill any conduct.  Reply at 12.  DoorDash does not argue that the enactment of the April 2020 Order was in retaliation for its Proposition 22 support, and it does not argue that the temporary commission cap in the November 2020 Ordinance was substantially different from the one in the April 2020 Order.  In contrast, the June 2021 Ordinance and its removal of the sunset provision allegedly "permanently shifted revenues from platforms to restaurants."  Opp. at 23.  Accepting Plaintiffs' allegations as true, it is therefore plausible that the June 2021 Ordinance and its subsequent financial consequences would chill any ordinary company's public advocacy.

　　　　2.　　Substantial or Motivating Factor

　　　　DoorDash alleges that the City's retaliatory animus was a substantial or motivating factor for enacting the two versions of the Ordinance because (1) a week after Proposition 22 was passed, the City passed the November 2020 Ordinance; and (2) numerous, contemporaneous statements of Board members show that seven months later, in June 2021, the Board removed the Ordinance's sunset provision in retaliation for its political speech in support of Proposition 22.  FAC ¶ 165.  Because the Court holds that the enactment of the November 2020 Ordinance would

United States District Court
Northern District of California

1    not chill conduct above, it focuses only on the enactment of the June 2021 Ordinance here and

2    concludes that DoorDash does not allege a plausible claim.

3         First, there is no temporal proximity between the enactment of the June 2021 Ordinance

4    and DoorDash's public support.  DoorDash and other industry participants began to support

5    Proposition 22 as early as August 2019, nearly two years before the Board removed the sunset

6    provision in June 2021.  *See* FAC ¶ 46.  DoorDash contends that the arguable triggering event was

7    the passage of Proposition 22 in November 2020 because if Proposition 22 had not passed, the

8    support for Proposition 22 would have been inconsequential.  Hearing Tr. at 35.  The Court

9    disagrees.  There is no dispute that the protected political activity is DoorDash's support of

10   Proposition 22, not the passage of Proposition 22.  As a result, the question is whether DoorDash's

11   support for Proposition 22 was a substantial or motivating factor in the Board's removal of the

12   sunset provision.  The fact that removal occurred two years after DoorDash began supporting

13   Proposition 22 weakens an inference of retaliation.  *See Huskey v. City of San Jose*, 204 F.3d 893,

14   899 (9th Cir. 2000) (holding that "[t]o conclude that [defendant] was aware of [plaintiff's]

15   statements to [defendant] and that [defendant] retaliated against [plaintiff] because of them would

16   be to engage in the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore

17   because of this.'"); *cf., Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004)

18   (holding that actions within the "three-to-eight month time range" "'easily' supports an inference

19   of retaliation.").

20        Moreover, even if the triggering event was the passage of Proposition 22 in November

21   2020, the undisputed fact that the core idea for the Commission Cap originated in the April 2020

22   Order before the passage of Proposition 22 significantly weakens DoorDash's retaliatory claim.

23   *See, e.g.*, *Inman v. Hatton*, No. 17-CV-06612-SI, 2018 WL 1100959, at *5 (N.D. Cal. Mar. 1,

24   2018) (holding that plaintiff "does not allege any facts that plausibly suggest that [defendant]

25   engaged in the allegedly retaliatory conduct *because* of [plaintiff's] protected conduct—his

26   allegations only show that the allegedly retaliatory conduct followed several months after

27   [plaintiff] filed a grievance against [defendant].").  Again, DoorDash does not allege that the April

28   2020 Order was retaliatory.  *See Huskey*, 204 F. 3d at 899; *Inman*, 2018 WL 1100959, at *5

(several months delay weakens the inference of retaliation).

Second, the fact that the Ordinance is both overbroad and underinclusive—*i.e.*, it impacts only a partial number of supporters of Proposition 22 and does not impact other major funders of Proposition 22—also weakens DoorDash's retaliation allegations. The principal funders of Proposition 22 such as Lyft, a rideshare service, and Instacart, a grocery delivery service, are not subject to the Ordinance whereas other companies who did not make public campaign donations to Proposition 22, such as Grubhub, are. Mot. at 22. And even though Proposition 22 applies to all app-based drivers and concerns the issues of app-based drivers (*e.g.*, benefits, employee status), the Ordinance only applies to restaurant delivery app-based drivers and concerns issues specific to restaurant delivery platforms (*e.g.*, commission caps, prohibitions on restaurant pricing restrictions).[11] *Id.*

The two Ninth Circuit cases on which DoorDash relies are distinguishable. In *Koala v. Khosla*, the Ninth Circuit denied a motion to dismiss a retaliation claim even though the university acted against all student organizations and not only the plaintiff, a student-run media organization called *The Koala*. *Koala*, 931 F.3d at 906. *The Koala* had published an article satirizing the concept of "safe spaces" at the university and within days, university officials had condemned *The Koala* and called for its defunding. *Id.* at 892–93. A few days later, the university introduced the "Media Act," to discontinue funding for all student-run media organizations. *Id.* The Ninth Circuit concluded that it was plausible that the publication of *The Koala*'s article "was the motivating factor that prompted the" passage of the Media Act and that *The Koala* "was indeed being singled out for special treatment" based on contemporaneous statements by university officials. *Id.* at 905.

Similarly, in *Arizona Students' Association*, an organization representing students at Arizona's three public universities ("ASA") alleged that the Arizona Board of Regents ("ABOR") had withdrawn their student activity fee funding, their only source of income, in retaliation for their support of a controversial statewide ballot measure, Proposition 204. *Ariz. Students' Ass'n*,

---

[11] The issues in the Ordinance other than the Commission Cap are not in dispute here.

United States District Court
Northern District of California

824 F.3d at 862–63.  The ABOR changed the mandatory student activity fee to an opt-in fee and

required the student associations to reimburse the administration for the costs of collection.  *Id.* at

863.  Although the Ninth Circuit acknowledged that "ABOR had no affirmative obligation to

collect or remit the ASA fee," it held that "having done so for fifteen years at no cost, ABOR

could not deprive the ASA of the benefit of its fee collection and remittance services in retaliation

for the ASA's exercise of its First Amendment rights."  *Id.* at 870.  The Ninth Circuit held that the

plaintiffs "pleaded a plausible claim for First Amendment retaliation" based on several board

members' criticism of ASA's support for Proposition 204, the temporal proximity between the

alleged retaliatory conduct and the ASA's exercise of its free-speech rights, and several Regents'

public acknowledgement that the Board's decision was "political in nature and resulted from

ASA's advocacy in support of Proposition 204," all of which "sufficiently identif[ied]

[defendant's] retaliatory intent and the nexus between the board's intent and its later [actions]."

*Id.* at 871.

   In contrast, in this case, the contemporaneous statements made by one Board member,

Supervisor Aaron Peskin, at the time of the June 2021 Ordinance, does not support an inference

that DoorDash's support of Proposition 22 was a motivating factor for the removal of the sunset

provision.  When voting for the permanent cap, Supervisor Peskin allegedly noted that

"DoorDash, Uber Eats, Postmates all contributed to the most expensive ballot measure in history,

Prop 22, to gut employee protections."[12]  FAC ¶ 69.  That same day, he allegedly posted on

Facebook, declaring that:

> "In another first among major American cities, San Francisco just
> passed my legislation setting a permanent 15% cap on delivery fees
> charged by DoorDash, UberEats, Grubhub and Postmates to
> independent restaurants.  Third-party food delivery saw exponential
> growth during the pandemic, while SF restaurants incurred $400M
> in rent debt. 70,000 Bay Area hospitality workers lost their jobs,
> while Big Tech spent $220M to pass Prop 22, the most anti-worker
> initiative in California history.  We will continue to push back
> against companies who demonstrate blatant disregard for small
> businesses, workers and neighborhoods. Correcting this imbalance is

---

[12] The FAC also references statements by Supervisors Safai and Stefani at the time, but they do not
discuss DoorDash's support of Proposition 22 let alone suggest any evidence of retaliation for support
of Proposition 22.  Mot. at 23; *see* FAC ¶¶ 64(b), 70(a)–(c).

United States District Court
Northern District of California

1                  a long-term project."

2 *Id.* Statements by individual legislators, however, do not establish the motivation of the legislative

3 body as a whole. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 384 (1968) (rejecting

4 argument that requested the Supreme Court to "void a statute that is, under well-settled criteria,

5 constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it"

6 because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what

7 motivates scores of others to enact it").

8         Furthermore, *Arizona Students' Association* is distinguishable because in that case there

9 was "no indication that any rationale for the action was provided apart from the express statements

10 by multiple Regents confirming that it was a political decision in response to the ASA's

11 advocacy." Reply at 13. *Koala* is distinguishable for the same reason—there the university

12 introduced the "Media Act" without explanation. *Id.* at 14. In contrast, the Ordinance's findings

13 and the alleged statements by other Board supervisors indicate a motivation that is not retaliatory.

14 *Id.*; *see, e.g.*, FAC ¶¶ 67–70 (Supervisor Safai explaining that "many of the businesses that rely on

15 delivery, would not have been able to survive without that option. And so many of them felt as

16 though they were in a position of negotiating with a gun to their head for lack of better term."); *see*

17 *also Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (holding that "one

18 statement without additional evidence of racial discrimination was insufficient to state a claim"

19 especially "given the many [non-discriminatory] reasons articulated by the City to support its

20 decisions"). Although the Ninth Circuit has held that "the mere existence of a legitimate motive,

21 supported though it might be by the FAC, is insufficient to mandate dismissal," *Capp*, 940 F.3d at

22 1056, DoorDash's retaliation claim is implausible for several reasons. Any amendment would be

23 futile because DoorDash cannot change the undisputed facts that make its retaliation claim

24 implausible—*i.e.*, that the idea behind the Ordinance originated before the passage of Proposition

25 22 in the April 2020 Order, that DoorDash does not allege that the April 2020 Order was

26 retaliatory, that the Ordinance is both overbroad and underinclusive regarding Proposition 22

27 supporters, and that no other Board member but Supervisor Peskin made any contemporaneous

28 statements suggesting that the removal of the sunset provision was due to DoorDash's support of

United States District Court
Northern District of California

Proposition 22.

Accordingly, the Court **GRANTS** the City's motion to dismiss the Plaintiffs' First Amendment retaliation claim related to the passage of the June 2021 Ordinance **without leave to amend**.

### IV.   <u>CONCLUSION</u>

For the reasons explained above, the Court **DENIES** the City's motion to dismiss Plaintiffs' Takings Clause claim and Due Process claim based on its alleged confiscatory effect, as well as their state claim counterparts.  The Court **GRANTS** the motion to dismiss their Contract Clause, other aspects of Due Process, Police Power, Equal Protection, and First Amendment retaliation claims as well as their state claim counterparts **without leave to amend.**

This order disposes of Docket No. 28.


**IT IS SO ORDERED**.


Dated: March 23, 2022

_____
EDWARD M. CHEN
United States District Judge